**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 12 -11564 (CSS) |
| ALLIED SYSTEMS HOLDINGS, INC. *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Re: Docket Nos. 538, 539** |
| | ) |
| | ) |
| | ) |
| ALLIED SYSTEMS HOLDINGS, INC. | ) Adversary Proceeding |
| | ) No.: 12-50947 (CSS) |
| Plaintiff, | ) |
| v. | ) **Re: Docket No. 4** |
| | ) |
| AMERICAN MONEY MANAGEMENT CORP., | ) |
| AVENUE CAPITAL GROUP, BDCM | ) |
| OPPORTUNITY FUND II, LP, BENNETT | ) |
| MANAGEMENT, BLACK DIAMOND CLO 2005- | ) |
| 1 LTD., DEL MAR DISTRESSED | ) **Re: <u>Omnibus Objection</u>:** |
| OPPORTUNITIES MASTER FUND, MJX ASSET | ) |
| MANAGEMENT, LLC, PAR-FOUR | ) **Hrg. Date: Nov. 7, 2012, at 9:30** |
| INVESTMENT MANAGEMENT, SPECTRUM | ) **A.M. (ET)** |
| INVESTMENT PARTNERS LP, TEAK HILL | ) **Obj. Deadline: Nov. 1, 2012, at** |
| CREDIT CAPITAL INVESTMENTS, LLC, THE | ) **4:00 P.M. (ET)** |
| CIT GROUP BUSINESS CREDIT, INC., THE | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) **Re: <u>Cross-Motion</u>:** |
| CREDITORS, YUCAIPA AMERICAN | ) |
| ALLIANCE FUND II, L.P. and YUCAIPA | ) **Hrg. Date: Nov. 7, 2012, at 9:30** |
| AMERICAN ALLIANCE (PARALLEL) FUND II, | ) **A.M. (ET) (Requested)** |
| L.P. | ) **Obj. Deadline: Nov. 7, 2012, at** |
| Defendants. | ) **9:30 A.M. (ET) (Requested)** |
| | ) |
| | ) |

---

[1]    The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta. LLC (45-5215545); Axis Canada Company (875688228); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services. Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057): QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

**OMNIBUS OBJECTION OF BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD, AND SPECTRUM INVESTMENT PARTNERS, L.P., TO THE DEBTORS'**

**(1) MOTION FOR AN ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN NON-DEBTOR THIRD PARTIES PURSUANT TO SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE,**

**(2) MOTION FOR AN ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 APPROVING STIPULATION AMONG THE DEBTORS, THE DIP AGENT, THE DIP LENDERS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING POSTPETITION SECURED DIP FINANCING, CREDIT BIDDING UNDER SECTION 363 OF THE BANKRUPTCY CODE AND CERTAIN ADMINISTRATIVE MATTERS, AND**

**(3) MOTION PURSUANT TO 11 U.S.C. § 105(A), FOR ORDER AMENDING THE FINAL ORDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503(b), AND 507(a), FED. R. BANK. P. 2002, 4001, AND 9014 AND DEL. BANK. L.R. 4001-2: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED DIP FINANCING AND (B) USE CASE COLLATERAL; (II) GRANTING SUPERPRIORITY LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS; AND (IV) MODIFYING THE AUTOMATIC STAY,**

**AND**

**CROSS-MOTION OF BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD, AND SPECTRUM INVESTMENT PARTNERS, L.P., PURSUANT TO 28 U.S.C. § 1334(c) FOR ABSTENTION**

LANDIS RATH & COBB LLP

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450


November 1, 2012

SCHULTE ROTH & ZABEL LLP

Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Counsel to BDCM Opportunity Fund II, LP,
Black Diamond CLO 2005-1 Ltd., and
Spectrum Investment Partners, L.P.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 2

STATEMENT OF FACTS ..................................................................................... 6

    A.   Allied's 2005 Bankruptcy Case and the First Lien Credit Agreement ............................ 6

    B.   Requisite Lenders under the First Lien Credit Agreement. ........................................ 7

    C.   Limited Modification of the First Lien Credit Agreement. ........................................ 9

    D.   Yucaipa Usurps Requisite Lender Status ............................................................. 11

    E.   The Georgia Action ..................................................................................... 14

    F.   The New York Action and the Involuntary Bankruptcy Cases ..................................... 16

        (i)   The Complaint and Motion to Dismiss .......................................................... 16

        (ii)   The Involuntary Bankruptcy Cases ............................................................. 17

        (iii)   The New York Action - The Answer and Summary Judgment ............................. 18

OBJECTIONS AND CROSS-MOTION ........................................................................ 19

I. THE HEARINGS ON THE MOTIONS SHOULD BE ADJOURNED UNTIL AFTER ORAL
ARGUMENT IN THE NEW YORK ACTION ON NOVEMBER 19, 2012 ON THE
PETITIONING CREDITORS' MOTION FOR SUMMARY JUDGMENT ........................... 19

II. OBJECTION TO DEBTORS' MOTION TO EXTEND THE AUTOMATIC STAY TO THE
NEW YORK ACTION .................................................................................... 22

    A.   The Automatic Stay Should Not Be Extended ....................................................... 22

        (i)   Legal Standard ...................................................................................... 23

        (ii)   The New York Action Will Not Impact the Ability of the Debtors to Administer
Their Chapter 11 Cases .......................................................................... 26

    B.   The Debtors Fail to Satisfy the Philadelphia Newspapers Standard ............................. 30

        (i)   The Bankruptcy Court Lacks Jurisdiction To Hear the Claims Alleged in the New
York Action. ...................................................................................... 30

        (ii)   "Unusual Circumstances" Do Not Exist .......................................................... 34

        (iii)   Debtors Are Not Entitled to Injunctive Relief Under Section 105(a) ..................... 34

(a)     No Threat of Irreparable Harm to the Estate or the Debtors' Ability to Reorganize ................................................................................................... 35

(b)     Reasonable Likelihood of a Successful Reorganization .............................. 36

(c)     Balance of Hardships Favors the Petitioning Creditors ............................. 36

(d)     Public Interest Favors the Petitioning Creditors ........................................ 38

III. CROSS-MOTION FOR ABSTENTION ................................................................. 39

    A.     Mandatory Abstention Under 28 U.S.C. § 1334(c)(2) Applies ..................... 39

    B.     Permissive Abstention Under 28 U.S.C. § 1334(c)(1) is Warranted ............. 42

IV. OBJECTION TO DEBTORS' MOTION TO APPROVE STIPULATION AND SETTLEMENT ........................................................................................................ 45

V. OBJECTION TO DEBTORS' MOTION TO AMEND THE FINAL DIP ORDER .............. 49

CONCLUSION ............................................................................................................... 50

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A.H. Robins Co. v. Piccinin,*
788 F.2d 994 (4th Cir. 1986) ........................................................29

*In re Adelphia Commcn's Corp.,*
298 B.R. 49 (S.D.N.Y. 2003) ........................................................29

*In re Aldan Industries, Inc.,* No. 00-10306,
2000 WL 357719 (Bankr. E.D. Pa. April 3, 2000)........................27

*Alert Holdings Inc. v. Interstate Protective Serv., Inc.,*
148 B.R. 194 (Bankr. S.D.N.Y. 1992) ........................................35

*Algemene Bank Nederland, N.V. v. Hallwood Indus. Inc.,*
133 B.R. 176 (W.D. Pa. 1991) ....................................................28

*Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.).*
175 B.R. 847 (Bankr. D. Del. 1994)........................................26, 34

*In re Am. Home Mortg. Holding,*
477 B.R. 517 (Bankr. D. Del. 2012)........................................33, 34

*In re Arrow Huss, Inc.,*
51 B.R. 853 (Bankr. D. Utah 1985)..............................................24

*Bidermann Indus. U.S.A., Inc. v. Zelnik (In re Bidermann Indus. U.S.A., Inc.),*
200 B.R. 779 (Bankr. S.D.N.Y. 1996) ........................................26

*Bowen Corp., Inc. v. Security Pac. Bank Idaho, F.S.B.,*
150 B.R. 777 (Bankr. D. Idaho 1993) ....................................41-42

*In re Combustion Eng'g, Inc.,*
391 F.3d 190 (3d Cir. 2004) ........................................5, 31, 32, 33

*Cont'l Airlines, Inc. v. Allen (In re Cont'l Airlines, Inc.),*
156 B.R. 441 (Bankr. D. Del. 1993)..............................................43

*In re Continental Airlines,*
203 F.3d 203 (3d Cir. 2000) ........................................................24

*DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.),*
435 B.R. 220 (Bankr. D. Del. 2010)..............................................44

*Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.,*
54 B.R. 353 (Bank. W.D. Wisc. 1985)..........................................35

*In re Drexel Burnham Lambert Group, Inc.*,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) ............................................................46

*In re DVI*,
    305 B.R. 414 (Bankr. D. Del. 2004) ..............................................................31

*Eastern Airlines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*,
    111 B.R. 423 (Bankr. S.D.N.Y. 1990) ...........................................................25

*In re Family Health Servs., Inc.*,
    105 B.R. 937 (Bankr. C.D. Cal 1989) ...........................................................26

*Gray v. Hirsch*,
    230 B.R. 239 (S.D.N.Y. 1999) ......................................................................35

*In re Hyloft, Inc.*,
    451 B.R. 104 (Bankr. D. Nev. 2011) .............................................................48

*In re IPDN Corp.*,
    352 B.R. 870 (Bankr. E.D. Mo. 2006) ..........................................................33

*In re Johns-Manville Corp.*,
    801 F.2d 60 (2d. Cir. 1986) ...................................................................... 29-30

*In re Kaplan*,
    104 F.3d 589 (3d Cir. 1997) ..........................................................................29

*LaRoche Indus., Inc. v. Orica Nitrogen LLC (In re LaRoche Indus., Inc.)*,
    312 B.R. 249 (Bankr. D. Del. 2004) ..............................................................44

*In re Lomas*,
    117 B.R. 64 (Bankr. S.D.N.Y. 1990) .............................................................25

*Maryland Cas. Co. v. Aselco, Inc.*,
    223 B.R. 217 (D. Kan. 1998) .........................................................................41

*McCartney v. Integra Nat'l Bank N.*,
    106 F.3d 506 (3d Cir. 1997) ...................................................................*passim*

*In re MCSi, Inc.*,
    371 B.R. 270 (S.D. Ohio 2004) .....................................................................26

*In re Monroe Well Service, Inc.*,
    67 B.R. 746 (E.D. Pa. 1986) ..........................................................................35

*In re Mugica*,
    362 B.R. 782 (Bankr. S.D. Tex. 2007) ..........................................................41

*In re Nationwide Sports Distributors, Inc.*,
   227 B.R. 455 (Bankr. E.D. Pa. 1998) ............................................................48

*Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
   365 B.R. 401 (S.D.N.Y. 2006) ....................................................................35

*North Star Contracting Corp. v. McSpedon (In re North Star Contracting Corp.)*,
   125 B.R. 368 (S.D.N.Y. 1991) ....................................................................25

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984) ......................................................................31

*In re Phila. Newspapers, LLC*,
   407 B.R. 606 (E.D. Pa 2009) ...............................................................*passim*

*In re Provincetown Boston Airline*,
   52 B.R. 620 (Bank. M.D. Fla. 1985) ............................................................35

*Sabratek Corp. v. La Salle Bank, N.A.*,
   257 B.R. 732 (Bank. D. Del. 2000) ..............................................................35

*Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*,
   440 B.R. 369 (Bankr. E.D. Pa. 2009) ...........................................................24

*In re S. Canaan Cellular Invs., Inc.*,
   427 B.R. 44 (Bankr. E.D. Pa. 2010) .............................................................29

*Stanford v. Foamex L.P.*,
   2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) ............................................. 25-26

*Stoe v. Flaherty*,
   436 F.3d 209 (3d Cir. 2006) ......................................................................40

*Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*,
   140 B.R. 461 (Bankr. N.D. Ohio 1992) .........................................................25

*Trans World Airlines, Inc. v. Icahn (In re Trans World Airlines, Inc.)*,
   278 B.R. 42 (Bankr. D. Del. 2002) ...................................... 40, 41, 43-44

*In re TSIC, Inc.*,
   428 B.R. 103 (Bankr. D. Del. 2010) ....................................... 45-46

*Union Trust Phila. LLC v. Singer Equip. Co.*,
   460 B.R. 644 (E.D. Pa. 2011) ...........................................................25, 26

*W.R. Grace & Co v. Chakarian (In re W.R. Grace & Co.)*,
   No. 01–01139, 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ..............24, 34

*In re W.R. Grace & Co.,*
    591 F.3d 164 (3d Cir. 2009) ............................................................................................31

*Wedgeworth v. Fibreboard,*
    706 F.2d 541, 546 (5th Cir. 1983) ..................................................................................24

*Wells Fargo Bank N.A. v. Johnson,*
    No. 11-1205, 2012 WL 1203427 (D. Del. Apr. 4, 2012) ........................................... 40-41

*Wolser v. Joshua Slocum, Ltd. (In re Joshua Slocum, Ltd.),*
    109 B.R. 101 (E.D. Pa. 1989) ..........................................................................................43

## FEDERAL STATUTES

11 U.S.C. § 105(a) ...........................................................................................................*passim*

11.U.S.C. § 362(a) ........................................................................................................23, 38

28 U.S.C. § 1334(a) ...........................................................................................................31

28 U.S.C. § 1334(c) .........................................................................................................*passim*

BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. and Spectrum Investment Partners, L.P. (collectively, the "Petitioning Creditors"), by their undersigned counsel, hereby submit this Omnibus Objection to the following motions each filed by the Debtors on October 18, 2012:  (a) the Motion For Order Extending The Automatic Stay To Certain Non-Debtor Third Parties Pursuant To Sections 105 and 362 Of The Bankruptcy Code, dated October 18, 2012 [Adv. Proc. D.I. 4], (the "Stay Extension Motion"), (b) the Motion For An Order Pursuant To Section 105(a) Of The Bankruptcy Code and Bankruptcy Rule 9019 Approving Stipulation Among The Debtors, The DIP Agent, The  DIP Lenders And The Official Committee Of Unsecured Creditors Regarding Postpetition Secured DIP Financing, Credit Bidding Under Section 363 Of The Bankruptcy Code And Certain Administrative Matters, dated October 18, 2012 [D.I. 539] (the "Credit Bid Motion"), and (c) the Motion Pursuant To 11 U.S.C. § 105(a) For Order Amending The Final DIP Order Pursuant To 11 U.S.C. §§ 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr.L.R. 4001-2: (I) Authorizing Debtors To (A) Obtain Postpetition Secured DIP Financing And (B) Use Cash Collateral; (II) Granting Superpriority Liens And Providing For Superpriority Administrative Expense Status; (III) Granting Adequate Protection To Prepetition Secured Lenders; And (IV) Modifying Automatic Stay [D.I. 538] (the "DIP Amendment Motion", and together with the Stay Extension Motion and Credit Bid Motion, the "Debtors' Motions")); and further submit the Petitioning Creditors' Cross-Motion for Abstention Pursuant to 28 U.S.C. § 1334(c) (the "Cross-Motion"); and in support of such Omnibus Objection and Cross-Motion respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

1.        The trio of motions filed by the Debtors on October 18, 2012 are the culmination of a highly choreographed series of events that began more than three years ago with Yucaipa's attempt -- with the support of the Debtors that they control -- to hijack control of the First Lien Credit Agreement and declare itself "Requisite Lender." Initially, this strategy was designed to stop the exercise by the First Lien Lenders of their contractual rights and remedies after numerous Events of Default had occurred (including, but not limited to, the failure to pay principal and interest when due), and to provide Yucaipa with a "runway" to see if the Debtors' operations could be improved and Yucaipa's substantial equity investment preserved. At the same time, however, Yucaipa's strategy -- if successful -- would allow them to do exactly what is being now proposed: to "credit bid" not only the debt they purport to hold, but also to drag along all of the other First Lien Lenders and force them to become minority holders of illiquid equity in a company controlled by Yucaipa. The terms of the First Lien Credit Agreement were specifically designed to make sure that this very result could not happen, and as the Debtors well know, the validity of the amendment to the First Lien Credit Agreement upon which Yucaipa relies to carry out this strategy is the subject of pending litigation before the New York State Supreme Court. Yet the Debtors and Yucaipa, marching hand in hand, have now come before this Court asking:

(i)        *to stop* the New York Action (despite repeatedly admitting that a judicial resolution of the issues presented there is necessary);

(ii)       *to start an identical action* in this Court but with the Debtors (and their estates) incurring all of the costs and expenses to champion Yucaipa's,

---

[2]    Unless otherwise set forth herein, capitalized terms shall have the meanings set forth in the Statement of Facts or Objection/Cross-Motion section of this brief.

position, and effectively relieving Yucaipa of the burden of paying its own costs;[3] and at the same time

(iii)   *to recognize* Yucaipa as the Requisite Lender for purposes of moving forward with an as-yet undisclosed sale process and establishing deadlines that cannot possibly be met if these issues are to be properly litigated -- thereby conceding the very issues that are at the heart of the disputes.

This Court should not countenance this conduct and the Debtors' Motions should be denied.

2.      In the Stay Extension Motion, the Debtors argue that resolution of the issues of who is the Requisite Lender and whether the Fourth Amendment is valid and enforceable (in whole or in part) is critical to the administration of the Debtors' estates and necessary as a condition precedent to the development and implementation of a bankruptcy strategy.   Petitioning Creditors disagree with this assertion.   Debtors here, if they were truly independent, and in light of the bona fide dispute regarding Yucaipa's status as the Requisite Lender, would avail themselves of the numerous options provided by the Bankruptcy Code to move forward with administration of the estates and implementation of an exit strategy, including (without limitation) moving under section 363(k) to deny any First Lien Lender the right to credit bid as "Requisite Lender" (*i.e.*, on behalf of all First Lien Lenders), and conducting an open auction.   The Debtors could also look to sell their assets free and clear of liens based upon the existence of a bona fide dispute under section 363(f)(4).   The Debtors could also propose a plan of reorganization.   The Debtors -- who are under Yucaipa's domination and control -- have done none of these things.   Instead, the Debtors have sought to derail the New York Action while at the same time filing the Credit Bid Motion, which clearly and unambiguously defines a bankruptcy strategy the Debtors intend to implement: namely a sale process where Yucaipa will inevitably be declared the successful bidder based upon its "credit

---

[3]    Pursuant to the DIP Amendment Motion the Debtors would borrow the funds from Yucaipa to pay the fees and expenses associated with prosecution of the newly filed Adversary Proceeding, the beneficiary of which is Yucaipa.

bid" of not only the Obligations it purports to hold, but also the Obligations held by all First Lien Lenders -- even though the Debtors do not have and are not likely to get on the timetable outlined in the Stipulation the very judicial resolution they say is required. These positions are wholly inconsistent, and evidence the Debtors' intent (at the direction of their controlling shareholder Yucaipa) to hand the Requisite Lender status to Yucaipa so they can "credit bid" the Obligations of all First Lien Lenders while at the same time forcing all other parties, including Petitioning Creditors, to try and stop that result from occurring.

3.    As this Court is aware, oral argument on the Petitioning Creditors' fully-briefed motion for summary judgment in the New York Action is currently scheduled for November 19th before Justice Ramos. The outcome of that hearing could potentially provide the Debtors with the judicial resolution they say they so desperately need, and render moot some or all of the relief requested in the Stay Extension Motion and the Credit Bid Motion, as well as the newly filed Adversary Proceeding. Despite this fact, Debtors have refused to adjourn the hearing on the Stay Extension Motion, the Credit Bid Motion and the DIP Amendment Motion, and instead have determined to embroil the estates in expensive, time-consuming and distractive litigation based upon speculative concerns about the potential for serial litigation and "inconsistent rulings." Those concerns, however, are baseless. To reach this conclusion the Court need only focus on who the parties are to the First Lien Credit Agreement.

4.    It is clear that Petitioning Creditors and Yucaipa will be bound by any judgment rendered in the New York Action, regardless of which way it comes out, so there is no risk of serial litigation from those parties. CIT, which holds all of the Revolver Obligations, has already settled with Yucaipa and the Debtors in its individual capacity, and has agreed not to contest either the validity of the Purported Fourth Amendment or Yucaipa's status as Requisite

4

Lender -- so no risk there.  That leaves approximately seven other First Lien Lenders of record (other than CIT) who are not parties to the New York Action,[4] and the Debtors.  Based upon the Joinder Agreement attached to the Appendix[5] as Exhibit Y, all of the other First Lien Lenders (except for one Lender that upon information and belief holds a $1.8 million position; the "Joining First Lien Lenders") have agreed to be bound by any determination made by the court in the New York Action (so no risk there).[6]  That leaves only the Debtors.  The Debtors -- assuming there is even a modicum of independence from Yucaipa -- should be prepared to abide by the ruling of the New York court, since their only concern really should be making sure *there is* a Requisite Lender with whom they can negotiate (to the extent that is necessary, which may not be the case), and *not who* the Requisite Lender might be.  Thus, there is no risk of serial litigation or of "inconsistent rulings."

5.    It also follows that this Court lacks "related to" jurisdiction over the New York Action because the litigation of the claims in the New York Action will not have an effect on or impair the Debtors' reorganization process.  Without "related to" jurisdiction, this Court has no authority to extend the automatic stay.  The law in the Third Circuit is clear that there is no "related to" jurisdiction over an action between non-debtor parties if such action simply affects one possible plan or strategy for reorganization.  *See In re Combustion Eng'g, Inc.,*  391 F.3d 190, 228-29 (3d Cir. 2004) ("the boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization, even if we perceive the plan to be in the

---

[4]    The aggregate holdings of the seven First Lien Lenders who are not parties to the New York Action is approximately $18 million.

[5]    The Petitioning Creditors simultaneously submit with these Objections and Cross-Motion the Appendix to the Petitioning Creditors' Objection to Debtors' Stay Extension Motion, Credit Bid Motion, and DIP Amendment Motion; and Cross-Motion for Abstention Pursuant to 28 U.S.C. § 1334(c) ("Appendix" or "App.").

[6]    The Lender that holds the $1.8 million dollar position has not yet responded on whether they will become a party to the Joinder Agreement.

public interest."). Thus, the Debtors have failed to meet their burden of proving that such extreme and unusual relief as extension of the automatic stay to the non-debtor third parties in the New York Action is appropriate here.

6.      Finally, even if the Court determines that it has "related to" jurisdiction over the state law claims presented in the New York Action, the Court should abstain from hearing the claims set forth in the Adversary Proceeding because all of the elements of mandatory abstention are met under 28 U.S.C. § 1334(c)(2): (i) the New York Action seeks a declaration that the Purported Fourth Amendment to the First Lien Credit Agreement is not valid under New York law; (ii) the claims in the New York action do not "arise under" or "arise in" a case under Title 11; (iii) the Debtors' concede that this Court would not have jurisdiction over the claims but for their alleged relation to the bankruptcy case; and (iv) the New York claims can be "timely adjudicated" in the state court action.

7.      For all the foregoing reasons, more specifically discussed below, the Petitioning Creditors request that the relief requested in the Debtors' Motions be denied, and the Cross-Motion for Abstention be granted.

## STATEMENT OF FACTS

### A.      Allied's 2005 Bankruptcy Case and the First Lien Credit Agreement

8.      Allied, based in Georgia, was a leading provider of distribution and transportation services to the automotive industry, specializing in the delivery of new vehicles from manufacturing plants to dealerships. In May 2007, Allied and several related entities emerged from bankruptcy under a plan of reorganization that, among other things, resulted in Yucaipa becoming the majority shareholder of Allied with control over both Allied's Board of Directors and its senior management.

9.     To finance its May 2007 emergence from bankruptcy, Allied obtained financing through two credit facilities consisting of (a) a $265 million senior secured first priority credit facility evidenced by the First Lien Credit Agreement (the "First Lien Credit Agreement") (App. Ex. A; amended by the First Amendment, App. Ex. B; the Second Amendment, App. Ex. C; and the Third Amendment, App. Ex. D), and (b) a $50 million second lien credit facility ("Second Lien Credit Agreement").   The First Lien Credit Agreement provided for (i) term loans in the aggregate principal amount of $180 million (the "Term Loans"); (ii) a $35 million revolving credit facility from CIT (the "Revolving Loan"); and (iii) a $50 million synthetic letter of credit facility ("LC Facility").   The Petitioning Creditors are Lenders under the First Lien Credit Agreement who own or control, with power to vote, between $40 million and $60 million of the Term Loan and LC Facility.

**B.     Requisite Lenders under the First Lien Credit Agreement.**

10.     Central to the First Lien Credit Agreement is the concept of the Requisite Lender(s).   As defined in the First Lien Credit Agreement, which definition specifically incorporates the definition of Term Loan Exposure, the Requisite Lenders are

> one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.

(App. Ex. A, First Lien Credit Agreement § 1.1).

11.     As majority debt holders, the Requisite Lenders are vested with broad authority to make key decisions affecting the rights of all First Lien Lenders, including the Petitioning Creditors.   Thus, for example, subject to certain important exceptions (one of which is applicable here), Requisite Lender consent is all that is required for any "amendment, modification, termination or waiver of any provision of the [First Lien Credit Agreement], or

consent to any departure by any [Borrower or Guarantor] therefrom." [7]  (App. Ex. A, First Lien Credit Agreement § 10.5(a)).

12.    In addition, the Requisite Lenders are vested with authority to direct the Administrative Agent to exercise certain rights and remedies on behalf of all Lenders, such as declaring Events of Default, demanding immediate payment by Allied of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations.  (App. Ex. A, First Lien Credit Agreement §§ 8.1, 9.8).

13.    Significantly, in addition to the right to direct the Administrative Agent to exercise remedies on behalf of all Lenders, the Requisite Lender also has the power *to direct the Administrative Agent to refrain from exercising such remedies.*[8] (App. Ex. A, First Lien Credit Agreement §§ 8.1, 9.8).  In light of the critical role the Requisite Lender plays in directing the exercise (or non-exercise) of the rights of the First Lien Lenders, the First Lien Credit Agreement expressly prohibited, absent the consent of all affected First Lien Lenders, any amendment or modification of the First Lien Credit Agreement "if the effect thereof would … amend the definition of **Requisite Lenders**."  (App. Ex. A, First Lien Credit Agreement § 10.5(b)(ix)).

14.    Given the manifest conflict of interest that would arise if Yucaipa–as controlling and majority shareholder of Allied–were able to control the exercise of the First Lien Lenders' rights and remedies under the First Lien Credit Agreement, and thereby protect and benefit itself as equity owner, the First Lien Credit Agreement was initially drafted and was executed to foreclose any possibility that Yucaipa could become a Requisite Lender.  Under the

---

[7]    "Credit Document" is defined as the First Lien Credit Agreement, "the Notes if any, the Collateral Documents, the Intercreditor Agreement . . . and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, Issuing Bank or any Lender in connection herewith." (§ 1.1). Credit Party means each Borrower and each Guarantor." (*Id.*).

[8]    Pursuant to Section 9.8(b) of the First Lien Credit Agreement, no individual Lender is permitted to take any action to enforce any rights as against the collateral.

First Lien Credit Agreement, the only parties eligible to be a Requisite Lender are "Lenders," which consist solely of the original First Lien Lender signatories to the First Lien Credit Agreement, and Eligible Assignees who subsequently become First Lien Lenders.  (App. Ex. A, First Lien Credit Agreement § 1.1).

15.    Yucaipa was not a First Lien Lender signatory under the First Lien Credit Agreement. (App. Ex. A, First Lien Credit Agreement).  Nor could Yucaipa become a First Lien Lender through an Assignment Agreement because, pursuant to Section 10.6(c) of the First Lien Credit Agreement, First Lien Lenders were only permitted to sell, transfer or assign their rights under the First Lien Credit Agreement (*i.e.*, enter into an Assignment Agreement) to Eligible Assignees.  (App. Ex. A, First Lien Credit Agreement § 10.6(c))  The definition of Eligible Assignee expressly provides that "no ... Sponsor shall be an Eligible Assignee." (App. Ex. A, First Lien Credit Agreement § 1.1).  Yucaipa is the Sponsor.  (App. Ex. A, First Lien Credit Agreement).

### C.    Limited Modification of the First Lien Credit Agreement.

16.    In or around April 2008, Yucaipa sought to acquire a portion of the Obligations under the First Lien Credit Agreement (and thus become a First Lien Lender under the First Lien Credit Agreement).  (App. Ex. D, Third Amendment, Recitals).  However, due to the restrictions prohibiting Yucaipa from being an Eligible Assignee, Yucaipa could only purchase the Obligations if an amendment to the First Lien Credit Agreement were executed permitting such acquisition.  (App. Ex. A, First Lien Credit Agreement §§ 1.1, 10.6(c)).  As a result, Yucaipa and Allied requested and received consent from a majority of the First Lien Lenders to amend the First Lien Credit Agreement – the Third Amendment – to permit Yucaipa to become a "Lender" under extremely limited circumstances and conditions and with severe restrictions.  (App. Ex. D, Third Amendment § 2.1).

DOC ID-19180735.8                                   9

17.     Specifically, under the Third Amendment, Yucaipa was expressly designated a Restricted Sponsor Affiliate and was:

- *Prohibited from* accumulating over (i) 25% of the aggregate principal amount of the Term Loan Exposure held by all First Lien Lenders or (ii) $50 million of the principal amount of Term Loans, (App. Ex. D, Third Amendment §§ 2.7(c), 2.7(e)) – **thus preventing the acquisition of the majority ownership stake required to become a Requisite Lender;** [9]

- *Prohibited from* exercising any and all voting rights it would otherwise have as a First Lien Lender, including the right to consent to an amendment of the First Lien Credit Agreement or the right to vote its debt in any Allied bankruptcy – **thereby precluding Yucaipa from exercising any voting rights needed to act as a Requisite Lender** (App. Ex. D, Third Amendment §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e));

- *Prohibited from* including its Term Loans in any calculation of Term Loan Exposure when such calculation was required under the First Lien Credit Agreement – **thus again precluding Yucaipa from amassing a sufficient stake to become a Requisite Lender** (App. Ex. D, Third Amendment § 2.1(e)); **and**

- *Required to* contribute to Allied as capital no less than 50% of the aggregate principal amount of any Term Loans that Yucaipa obtained within ten days after the date of such acquisition – **thus further minimizing the impact Yucaipa could assert through its ownership of the Term Loans.** (App. Ex. D, Third Amendment § 2.7(e))

To ensure Yucaipa's compliance with these fundamental restrictions, the Third Amendment further required Allied to deliver to the Administrative Agent monthly reports of the amount of

---

[9]   Yucaipa was also prohibited from acquiring *any* Revolving Loans or LC Deposit Loans.  (App. Ex. D, Third Amendment § 2.1(c)).

Term Loans acquired and held by Yucaipa, and the price paid for such loans.[10]  (App. Ex. D, Third Amendment § 2.3(a)).

18.    These conditions and restrictions make clear the First Lien Lenders' continuing intent under the First Lien Credit Agreement to preclude Yucaipa from ever becoming, or even being eligible to become, the Requisite Lender.  Because of these conditions and restrictions, the Third Amendment did not "affect" the First Lien Lenders in the manner that would require the consent of each First Lien Lender under section 10.5(b) of the First Lien Credit Agreement.[11]

**D.    Yucaipa Usurps Requisite Lender Status.**

19.    By early 2009, Allied had been in continuous default under the First Lien Credit Agreement for more than a year, including (without limitation) as a result of the failure to pay principal and interest when due.  (App. Ex. A).  Allied and Yucaipa have acknowledged these defaults and recognized that the defaults entitled the First Lien Lenders to exercise rights and remedies under the First Lien Credit Agreement, including the right to accelerate the Obligations and enforce remedies. (App. Ex. F, Forbearance Agreement[12]).

---

[10]   Despite this requirement, and in contravention of the Third Amendment, Yucaipa utilized its control over Allied to cause Allied to fail to deliver these monthly reports of Yucaipa's holdings, which constituted another Event of Default under the First Lien Credit Agreement.  In fact, since August 2008, Allied, at Yucaipa's direction and control, has been in continuous default under the First Lien Credit Agreement.  Allied and Yucaipa acknowledged the defaults and recognized that the defaults entitled the First Lien Lenders to accelerate the debt. (App. Ex. F, Forbearance Agreement.)

[11]   Section 10.5(a) of the First Lien Credit Agreement generally provides that amendments or modifications to the First Lien Credit Agreement will be effective if consented to by Requisite Lenders (*i.e.*, holders of a majority of the outstanding Obligations).  If, however, the proposed amendment or modification is of the type identified in subclauses (i)-(xi) of section 10.5(b), the amendment or modification must be consented to by each Lender "that would be affected thereby."  The reason for the distinction is that amendments or modifications of the types set forth in subclauses (i)-(xi) are clearly ones that could fundamentally change a Lenders' decision to extend (or withhold the extension of) credit, and thus the First Lien Credit Agreement requires that any affected Lender be consulted and its consent obtained.  These changes have the most significant impact on Lender economics and can fundamentally change the initial contract between each Lender and the Borrower.

[12]   "Forbearance Agreement" refers to the Forbearance Agreement, dated September 24, 2009, between Allied Systems Holdings, Inc., Allied Systems, Ltd. (L.P.), as Borrowers, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent, and Lenders, attached hereto as App. Ex. F.

20.    In a transparent effort to frustrate the First Lien Lenders' rights under the First Lien Credit Agreement – in particular to prevent the First Lien Lenders from declaring the Obligations to be immediately due and payable and exercising remedies – Yucaipa engineered a two-step hijacking of Allied's First Lien Credit Agreement.

21.    First, Yucaipa and ComVest Investment Partners III, L.P. ("ComVest") – who then held a majority of the Obligations under the First Lien Credit Agreement – entered into an Assignment and Assumption Agreement whereby Yucaipa agreed to acquire the Obligations owned by ComVest for a combination of cash and future consideration (calculated as a percentage of Yucaipa's ultimate recovery on the Obligations purchased). That transaction, however, could not be consummated so long as the restrictions on Yucaipa's acquisition, ownership and voting of Obligations, as set forth in the Third Amendment, remained effective. So as a condition to consummation of the transaction Yucaipa required that an amendment to the First Lien Credit Agreement be entered into by Allied and ComVest eliminating the restrictions.

22.    Thus, on August 21, 2009, Yucaipa caused Allied to enter into the Purported Fourth Amendment with ComVest. (App. Ex. E, Purported Fourth Amendment). No Lenders other than ComVest consented to the Purported Fourth Amendment prior to its execution (App. Ex. E, Purported Fourth Amendment at 11-13) even though stripping out the conditions and restrictions that prevented Yucaipa from becoming Requisite Lender clearly affected all the First Lien Lenders.

23.    The sole purpose and effect of the Purported Fourth Amendment was to remove all of the restrictions imposed on Yucaipa's acquisition, ownership and voting of Obligations under the First Lien Credit Agreement (as amended through the Third Amendment), thereby for the first time making Yucaipa eligible to be a Requisite Lender. (*See, e.g.*, App. Ex.

E, Purported Fourth Amendment §§ 2.1(b), 2.4).    Thus, the Purported Fourth Amendment purports to:

- Modify the definition of Term Loan Exposure (a term expressly used in the definition of Requisite Lenders in the First Lien Credit Agreement) to delete the language from "Term Loan Exposure" added by the Third Amendment that excludes the amount of Term Loans held by Yucaipa from any calculation of the aggregate amount of Term Loans outstanding (App. Ex. E, Purported Fourth Amendment § 2.1(b); App. Ex. D, Third Amendment § 2.1(c); App. Ex. A, First Lien Credit Agreement § 1.1);

- Eliminate the provision of the First Lien Credit Agreement added by the Third Amendment that prohibited Yucaipa from acquiring more than the lesser amount of 25% of the aggregate Term Loan Exposure, or $50 million of the principal amount of Term Loans (App. Ex. E, Purported Fourth Amendment § 2.4(c); App. Ex. D, Third Amendment § 2.7(c); App. Ex. A, First Lien Credit Agreement § 10.6(c));

- Eliminate the restrictions placed on Yucaipa's right to vote as if it was a First Lien Lender, including the right to consent to any modification of the First Lien Credit Agreement and to vote its debt in bankruptcy, that were added by the Third Amendment (App. Ex. E, Purported Fourth Amendment § 2.4(a); App. Ex. D, Third Amendment § 2.7(a); App. Ex. A, First Lien Credit Agreement § 10.5);

- Eliminate the requirement added by the Third Amendment that Yucaipa was required to make a capital contribution to Allied of 50% of the aggregate principal amount of Term Loans it acquired. (App. Ex. E, Purported Fourth Amendment § 2.4(e); App. Ex. D, Third Amendment § 2.7(e)); and

- Eliminate the restriction in the definition of Eligible Assignee in the First Lien Credit Agreement as initially drafted that prohibited the Sponsor from becoming an Eligible Assignee.    (App. Ex. E, Purported Fourth

Amendment § 2.1(b); App. Ex. D, Third Amendment
§ 2.1(c); App. Ex. A, First Lien Credit Agreement § 1.1).[13]

The Purported Fourth Amendment therefore sought to accomplish what no rational First Lien

Lender would have permitted at the time the First Lien Credit Agreement was executed – it

afforded the opportunity for Yucaipa to control simultaneously the Borrower, through its

majority equity position, and the First Lien Lenders, through its alleged Requisite Lender

position.

24.     Upon the execution and purported effectiveness of the Purported Fourth

Amendment, Yucaipa and ComVest consummated the transactions contemplated by the

Assignment and Assumption Agreement.  Through that acquisition, and in conjunction with the

purported removal of the restrictions on Yucaipa in the Purported Fourth Amendment, Yucaipa

contended that *it* was the Requisite Lender, with all of the attendant powers to enforce or refuse

to enforce the First Lien Lenders' rights and remedies.

25.     Not surprisingly, once it purported to become Requisite Lender, Yucaipa

refused to allow the Administrative Agent to enforce any of those rights.  It prevented the

Administrative Agent from taking any actions on behalf of the First Lien Lenders to accelerate

the Obligations or exercise remedies, notwithstanding Allied admitted its continuing Events of

Default for more than three years, including the failure to pay millions of dollars of principal and

interest on the Obligations to the detriment of all of Allied's legitimate First Lien Lenders.

E.     **The Georgia Action**

26.     The Administrative Agent initially refused to acknowledge the validity of

the Purported Fourth Amendment or Yucaipa's alleged status as Requisite Lender.  In response,

---

[13]   It is important to note that the Purported Fourth Amendment did not just eliminate the restrictions added by the
Third Amendment; rather, it also purported to eliminate restrictions that existed in the original Credit
Agreement, and on which the First Lien Lenders relied in agreeing to extend credit in the first instance.

Yucaipa and Allied commenced an action against The CIT Group/Business Credit, Inc. ("CIT"), in its individual capacity and not as the Administrative Agent, in the Superior Court of Fulton County, Georgia, *inter alia*, (a) alleging breach of the First Lien Credit Agreement, (b) seeking a declaration that the Purported Fourth Amendment was effective and binding on the parties to the First Lien Credit Agreement, and (c) seeking a declaration that Yucaipa was the Requisite Lender under the First Lien Credit Agreement (the "Georgia Action"). Thereafter, on December 21, 2009, CIT filed a verified answer and counterclaims against Yucaipa and Allied seeking a declaration that the Purported Fourth Amendment was ineffective and not binding, that Yucaipa was not the Requisite Lender, and other relief.

27.    Notwithstanding the positions set forth in the CIT answer and counterclaim, on December 5, 2011, without notice to or consultation with the Petitioning Creditors, the parties to the Georgia Action entered into a settlement agreement pursuant to which CIT, in its individual capacity, agreed not to "object to, challenge or contest, either directly or indirectly, the validity of the Fourth Amendment," and acknowledged "that Yucaipa is the Requisite Lender for all purposes including the exercise of remedies." (*See* App. Ex. G, Georgia Action Settlement Agreement; *see also* App. Ex. H, Notice of Dismissal Georgia Action).

28.    In addition to controlling Allied as Sponsor and Purported Requisite Lender, Yucaipa also now purports to act as Administrative Agent. Effective May 18, 2012, CIT resigned as the Administrative Agent. Under Section 9.7 of the First Lien Credit Agreement, upon the resignation of the Administrative Agent, the Requisite Lenders have the right to appoint a successor Administrative Agent. (*See* App. Ex. A). Moreover, if the Requisite Lenders do not appoint a successor Administrative Agent, the Requisite Lenders are deemed to have succeeded

the Administrative Agent and become vested with all the right, powers, privileges and duties of the retiring Administrative Agent.  (*See* App. Ex. A).  Yucaipa has claimed status as the Administrative Agent based on its purported role as Requisite Lender.

29.     Among its most significant responsibilities under the First Lien Credit Agreement, under Section 9.8, the Administrative Agent (now allegedly Yucaipa) is empowered with the right (at the direction of the Requisite Lenders, allegedly Yucaipa) to credit bid the Obligations of all of the First Lien Lenders (which includes Petitioning Creditors' debt) in an asset sale pursuant to Section 363 of the Bankruptcy Code.  (*See* App. Ex. A).

**F.     The New York Action and the Involuntary Bankruptcy Cases**

    **(i)     The Complaint and Motion to Dismiss**

30.     In order to protect their interests as Lenders, promptly after learning of the Settlement the Petitioning Creditors commenced an action against Yucaipa on January 17, 2012 in the Supreme Court of the State of New York, County of New York, seeking a declaration that the Purported Fourth Amendment is invalid, ineffective and not binding, and that Yucaipa is not the Requisite Lender under the First Lien Credit Agreement.  *BDCM Opportunity Fund II, LP et al. v. Yucaipa American Alliance Fund I L.P. et al, Index No.* 650150/2012 (the "New York Action").  (App. Ex. I, New York Action Complaint).  The Debtors are not parties to the New York Action.

31.     In the New York Action, the Petitioning Creditors seek a declaration that the Purported Fourth Amendment to the First Lien Credit Agreement -- which ostensibly strips out all of the fundamental restrictions incorporated into the First Lien Credit Agreement by the Third Amendment on the ability of Yucaipa as "Sponsor" and majority shareholders to acquire more than a majority of the Term Loans and become the Requisite Lender -- is ineffective,

because the Debtors failed to obtain (and did not even seek) the unanimous First Lien Lender consent required by the First Lien Credit Agreement. (*See* App. Ex. I).

32.    Yucaipa filed a motion to dismiss the complaint on March 23, 2012 on the grounds that a two-page stipulation dismissing the Georgia Action with prejudice barred the New York Action under the doctrine of *res judicata.* Yucaipa did not move to dismiss on the grounds that the Debtors and/or other First Lien Lenders were "necessary parties" to the lawsuit. The motion was fully briefed and oral argument was held before the Hon. Charles E. Ramos on May 30, 2012. (App. Ex. K, So Ordered Transcript). Justice Ramos denied the Motion to Dismiss from the bench at the conclusion of oral argument. An order denying the Motion to Dismiss was entered on June 7, 2012. (App. Ex. J, Decision and Order).

### (ii)    The Involuntary Bankruptcy Cases

33.    On May 17, 2012, the Petitioning Creditors filed involuntary petitions against Debtors. On June 10, 2012, Allied consented to orders for relief. No trustee or examiner has yet to be appointed in these cases.

34.    On June 19, 2012 the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

35.    Since the commencement of these chapter 11 cases and despite the pendency of the New York Action, Yucaipa has continued to hold itself out as the Requisite Lender, and the Debtors have continued to acknowledge their support for that position. For instance, in a June 11, 2012 motion to authorize Debtors to obtain Debtor In Possession ("DIP") financing [D.I. 79] (the "DIP Motion"), the Debtors referred to Yucaipa as the "Requisite Lender" on no less than eight occasions. (*See, e.g.*, DIP Motion ¶¶ 9, 24, 39, 40). And while the Debtors did acknowledge that "[c]ertain other First Lien Lenders have challenged Yucaipa's ability to act in such a role," the Debtors have nevertheless doggedly continued to act as if Yucaipa is the

Requisite Lender, for example arguing "Yucaipa is the Requisite Lender whose consent is required to make the decision whether to allow a priming lien on the collateral." (DIP Motion at n.4, ¶ 39).[14]

> (iii)    **The New York Action - The Answer and Summary Judgment**

36.    On August 6, 2012, Yucaipa filed its Answer and Affirmatives Defenses in the New York Action. (App. Ex. L). Thereafter, the Petitioning Creditors promptly moved for summary judgment, and on August 27, 2012 the Petitioning Creditors filed their motion for summary judgment, related memorandum of law and statement of undisputed facts (the "Summary Judgment Motion"; App. Ex. M, Notice of Motion for Summary Judgment; App. Ex. N, Plaintiffs' Memorandum of Law,; App. Ex. O, Ehrlich Affidavit). Among other things, the Summary Judgment Motion seeks entry of an order declaring that the Purported Fourth Amendment is invalid and that Yucaipa is not the Requisite Lender. Yucaipa filed its opposition papers on September 26, 2012. (App. Ex. P, Defendants' Memorandum of Law in Opposition of Summary Judgment; App. Ex. Q, Grant Affirmation; App. Ex. R, Walker Affidavit). Petitioning Creditors filed their reply on October 9, 2012. (App. Ex. S, Reply Memorandum of Law). At that point, the Summary Judgment Motion was fully briefed and the parties were awaiting notification from the New York court of the date for oral argument.

37.    On October 18, 2012, the Debtors filed the above captioned adversary proceeding, *Allied Systems Holdings, Inc. v. American Money Management, Corp. et al,* Adv. Proc. No. 12-50947 (the "Adversary Proceeding") and the present Debtors' Motions, and

---

[14]    Yucaipa's counsel has made remarks of similar import on several occasions, including in connection with the hearings on approval of the DIP financing. The Petitioning Creditors did not oppose the DIP financing because it was necessary to permit the Debtors to continue to operate. Given Yucaipa's refusal to allow a priming financing (and the Debtors' refusal to pursue one over Yucaipa's objection), the Debtors had no other choice. The Petitioning Creditors did, however, record their objection to the Yucaipa assertion that it was Requisite Lender.

obtained from this Court a hearing date of November 7, 2012 (approximately two and a half weeks before the regular November omnibus hearing date). On the same day, Yucaipa sent a letter to Justice Ramos advising him that the Debtors had filed a request with this Court to enjoin further proceedings in the New York court. (*See* App. Ex. T).

38.     Despite Yucaipa's letter, on October 22, 2012 Justice Ramos notified the parties that oral argument on the Summary Judgment Motion would be held on November 19, 2012. Thus it appears that Justice Ramos is prepared to promptly address the Summary Judgment Motion.

## OBJECTIONS AND CROSS-MOTION

### I.

**THE HEARINGS ON THE MOTIONS SHOULD BE ADJOURNED UNTIL AFTER ORAL ARGUMENT IN THE NEW YORK ACTION ON NOVEMBER 19, 2012 ON THE PETITIONING CREDITORS' MOTION FOR SUMMARY JUDGMENT**

39.     As noted above, the Petitioning Creditors commenced the New York Action in January, 2012. Since the case was commenced, Justice Ramos has devoted a substantial amount of time to the case, including conducting a hearing, after extensive briefing, on Yucaipa's motion to dismiss (which was denied from the bench), two informal case conferences, and now in conjunction with his preparation for the oral argument on the Summary Judgment Motion.

40.     As discussed above, the Petitioning Creditors' Summary Judgment Motion is fully briefed and oral argument will be held on November 19th absent this Court granting the Stay Extension Motion. Despite Yucaipa's letter of October 18th, on October 22, 2012 Justice Ramos notified the parties that oral argument on the Summary Judgment Motion would be held

on November 19, 2012. Thus, it appears that Justice Ramos is prepared to promptly address the Summary Judgment Motion, and a resolution may be forthcoming in the near future.

41.    The Petitioning Creditors believe that this Court should adjourn the hearings on the Motions so as to permit the oral argument before Justice Ramos to proceed on November 19th. The reasons for such adjournment are compelling.

42.    First, the outcome of that hearing could render moot all or a substantial portion of the issues raised by the Debtors in the Adversary Proceeding, which would in turn bear upon any decision this Court might make in connection with the Stay Extension Motion, the Credit Bid Motion and the DIP Amendment Motion.[15]

43.    Second, even if the New York Court does not rule on the Summary Judgment Motion from the bench, what does (or does not) transpire at that hearing may well provide important data points to this Court that may guide this Court's thinking on whether to grant all or any portion of the relief requested by the Debtors in the Motions, or in respect of the Petitioning Creditors' cross motion for mandatory or permissive abstention.    Among other things, that hearing could provide this Court with a sense of whether the New York Court is in a position to timely adjudicate the action -- a critical factor in the abstention analysis.

44.    Third, the Debtors cannot articulate any harm to their estates that would result from an adjournment of these hearings.    There is nothing stopping the Debtors from continuing to market their assets, from filing a motion to approve sale procedures (should that be the course they choose to pursue), or taking any other action to move forward with the

---

[15]    The Debtors argue that the grant of summary judgment in the New York Action would still leave numerous open issues that would require further adjudication, such as what provisions of the Third Amendment and Fourth Amendment are valid and enforceable.    That argument is simply incorrect, particularly since the issue of severability has been briefed by the parties as part of the summary judgment proceedings.    Thus, if summary judgment is granted we would expect Justice Ramos to address all material outstanding issues.    (*See* App. Ex. P Yucaipa Opp. to Summary Judgment at 23-25).

administration of their estates.  Conversely, depending on what transpires (or does not transpire) at the November 19th argument, the Debtors' estates may save the millions of dollars in Debtor and Committee professional fees and expenses that would otherwise be expended in commencing and prosecuting the Adversary Proceeding from scratch in this Court.[16]

45.     Fourth, the Debtors' concerns about who would be bound by any decision in the New York Action and the potential for serial litigation are unavailing.  Based on the Joinder Agreement, all of the First Lien Lenders (except for CIT and one First Lien Lender that, upon information and belief, holds a $1.8 million position) have agreed to be bound by any determination made by the New York Court.  The Petitioning Creditors and Yucaipa, as parties to the New York Action, are obviously bound.  And CIT is restricted from bringing any such litigation by virtue of the settlement in the Georgia Action.  (*See* App. Ex. G  Thus, there is no risk of "serial" litigation of these issues.  That leaves only the Debtors, who should frankly embrace any decision that brings them the resolution of the issues they claim to so desperately need.[17]

46.     Finally, the Petitioning Creditors want to address the Court's observation during the telephonic conference that, since the Summary Judgment Motion is being made prior to discovery, the New York Court may not rule quickly.  In fact, because the Summary Judgment

---

[16]  It is noteworthy that the one party that truly benefits from the Debtors' prosecution of the Adversary Proceeding is Yucaipa, who will effectively shift from themselves to the Debtors the burden and cost of proving the validity and enforceability of the Purported Fourth Amendment and that they are the Requisite Lender.  This is a repeat of what happened in the Georgia Action, where Yucaipa caused the Debtors to pay in excess of $2 million of their legal fees and expenses while the First Lien Lenders went unpaid on their principal and interest.  *See* discussion at ¶¶ 101-02 *infra*; *see also* App. Ex. W (Email Correspondence from Debtors' Counsel on July 31, 2012 regarding Statement of Financial Affairs and payments to insiders; and spreadsheet detailing insider payments).

[17]  Debtors' implication that somehow they would seek to re-litigate a determination by the New York Court finding the Purported Fourth Amendment to be invalid, or that Yucaipa is not the Requisite Lender, is at best curious, and at worst highly concerning.  While Debtors certainly have an interest in attaining resolution of a dispute over who is the Requisite Lender, they should not be taking sides in that dispute.  Rather, they should be prepared to deal with whoever is determined to hold that title by a court of competent jurisdiction overseeing the contractual dispute between the First Lien Lenders.

Motion is based on the argument that the language of the First Lien Credit Agreement is unambiguous, and that the New York Court is limited to reviewing the four corners of the applicable agreements (without regard to parol evidence) to determine if the language is ambiguous, the Petitioning Creditors believe the New York Court will rule quickly. (*See* App. Ex. N). The process of determining if the relevant language is ambiguous on its face is not time consuming. If the New York Court determines that the language is not ambiguous, then we believe the New York Court will rule quickly as to the meaning of the language because the process of construing the relevant provisions is also not time consuming. Thus, the issues presented to the New York Court may be over very soon.

47.    Based upon the foregoing, the Petitioning Creditors respectfully request that the November 7, 2012 hearings be adjourned to a date determined by the Court.

## II.

## OBJECTION TO DEBTORS' MOTION TO EXTEND THE AUTOMATIC STAY TO THE NEW YORK ACTION

### A.    The Automatic Stay Should Not Be Extended

48.    The Debtors ask this Court to invoke its authority under Section 105(a) of the Bankruptcy Code to extend the automatic stay under Section 362(a) of the Bankruptcy Code to enjoin the Petitioning Creditors' prosecution of the New York Action. The Debtors argue that until the dispute between the Petitioning Creditors and Yucaipa is resolved and the identity of the Requisite Lender is determined, the resulting "uncertainty" of the dispute will interfere with the Debtors' ability "to develop and implement a plan for a successful resolution of their bankruptcy." (*See* Stay Extension Motion at 1). The Debtors insist that this Court "is the only forum where uncertainty surrounding First Lien Credit Agreement and its amendments can be

resolved effectively, efficiently and fairly." (*Id.*) (emphasis supplied). Neither is true, and the Debtors cannot meet their heavy burden of proof with respect to their requested relief.

49. Before turning to the applicable legal standards, however, it is important that this Court keep the following facts in mind. First, this is not a request to enjoin a suit between two non-debtor parties for a limited period of time to allow a reorganization to proceed. It is a request to permanently enjoin the New York Action; if the stay is extended as requested by the Debtors, the New York Action is effectively over. The Debtors do not cite to a single case that supports such extraordinary relief. Second, the Debtors here are asking for -- and, in fact, admit that through the Adversary Proceeding they are asking for -- resolution of the exact same issues that are before the New York Court. Which bring us to the final point, which is that the Debtors do not want to stop litigation over the resolution of these issues: they just want to stop it in New York. In essence what is really being sought here is a form of removal or venue transfer by the Debtors to their preferred forum in respect of a case to which they are not a party (although they had the chance for several months to intervene and chose not to do so). Again, there are no cases under Section 105(a) that support extension of the Section 362(a) stay in order to effectuate the result the Debtors seek here.

(i)     **Legal Standard**

50. The commencement of a bankruptcy case triggers an automatic stay of the acts described in Sections 362(a)(1)-(8) of the Bankruptcy Code. Although the scope of the automatic stay is broad, the plain language of Section 362(a) stays actions only against a debtor. Section 362(a)(1) bars "the commencement or continuation ... of a judicial ... or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case..." 11 U.S.C. § 362(a)(1) (italics added). Courts in the Third Circuit have created a narrow exception to this rule through the use of Section 105(a) of the Bankruptcy

Code to permit a limited extension of the automatic stay to third party actions between non-debtors in "unusual circumstances." *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509 (3d Cir. 1997). Such "unusual circumstances" have been found to exist where (i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization. *Id.* Section 105 has a limited scope and does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code. *See In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000).

51.    The use of Section 105(a) to expand the otherwise limited scope of the automatic stay is reserved for the "most extreme and unusual circumstances." *W.R. Grace & Co v. Chakarian (In re W.R. Grace & Co.)*, No. 01–01139, ADV. A–01–771, 2004 WL 954772, *2 (Bankr. D. Del. April 29, 2004); *Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 379 (Bankr. E.D. Pa. 2009) ("The entry of an injunction restraining one set of nondebtors from proceeding against another set of nondebtors is appropriate only in 'unusual circumstances' and should 'not be granted lightly'") (internal citations omitted). The Debtors bear the burden of proof that such an extraordinary remedy is warranted. *See Wedgeworth v. Fibreboard*, 706 F.2d 541, 546 (5th Cir. 1983); *see also In re Arrow Huss, Inc.*, 51 B.R. 853, 859 (Bankr. D. Utah 1985) ("The movant's burden of proof is a heavy one and must be supported by substantial evidence, the quantum of which will necessarily vary depending on the scope and duration of the stay sought").

52.    The Debtors' motion is principally premised upon the second prong of the *McCartney* exception[18] -- that the New York Action, a third-party action, will have an adverse

---

[18]    While the Debtors reference the "identity of interest" test in passing, they do not argue that issuance of an injunction here is warranted under that test.

impact on the debtor's ability to accomplish reorganization. However, courts have applied this exception sparingly, and principally to enjoin third parties from continuing suits that name the debtor's key officers and directors who are directly involved in the debtor's reorganization, and where failure to issue the injunction staying the suit for a period of time would result in the director's or officer's attention being substantially diverted from the reorganization efforts. *See, e.g., Union Trust Phila. LLC v. Singer Equip. Co.*, 460 B.R. 644, 658 (E.D. Pa. 2011) (debtor's sole members "actively involved" in reorganization); *Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461, 467 (Bankr. N.D. Ohio 1992) (debtor's officer who had "an important full-time role in debtor's business and reorganization effort"); *North Star Contracting Corp. v. McSpedon (In re North Star Contracting Corp.)*, 125 B.R. 368, 371 (S.D.N.Y. 1991) (debtor's president was "principal player" in reorganization); *Eastern Airlines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (debtors' chairman was "central actor" in reorganization); *In re Lomas*, 117 B.R. 64, 66-67 (Bankr. S.D.N.Y. 1990) (members of task force dedicated to reorganization; "efforts would suffer irreparable harm if lawsuit permitted to continue").

53.    As those decisions make clear, the primary concern supporting the issuance of the injunction was that the debtor's ability to reorganize would be harmed by the diversion of the defendants' time spent defending those actions. *See Stanford v. Foamex L.P.*, 2009 WL 1033607, *3 (E.D. Pa. Apr. 15, 2009) ("Courts that have stayed actions against non-debtors to facilitate a debtor's reorganization have done so where the non-debtor is essential to the reorganization because of the non-debtor's expertise, intimate relationship to the company

and/or anticipated use of personal capital to effectuate the restructuring.") (citing *McCartney*, 106 F.3d at 510).[19]

54.     Conversely, courts have declined to extend the stay where, as here, the nexus between the alleged impact on the debtor's ability to reorganize and the non-debtor lawsuit was too speculative or attenuated to warrant such an extraordinary remedy.  *See, e.g., Stanford*, No. 07-4225, 2009 WL 1033607 at *3 (denying extension of stay where there was "nothing to suggest that defendants are intimately linked to [the debtor] or that defendants' time ... is necessary to restructure [the debtor]"); *In re MCSi, Inc.*, 371 B.R. 270, 273 (S.D. Ohio 2004) (declining to extend the stay to prevent a securities litigation against debtors' former officers from proceeding where there would be no "detrimental impact on the debtor's reorganization efforts"); *Bidermann Indus. U.S.A., Inc. v. Zelnik (In re Bidermann Indus. U.S.A., Inc.)*, 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996) (declining to enjoin state court action against debtor's chairman where lawsuit did not interfere with reorganization and chairman did not participate in the day to day management of the debtor).

**(ii)     The New York Action Will Not Impact the Ability of the Debtors to Administer Their Chapter 11 Cases.**

55.     The situation in the present case bears no resemblance to the cases relied upon by the Debtors in arguing that the stay should be extended.  Most notably, none of the Debtors nor any or their directors are parties to the New York Action.  (*See* App. Ex. I).

---

[19]     The cases cited by the Debtors themselves support this proposition. (*See* Stay Extension Motion at 11) (citing *Union Trust Phila., LLC v. Singer Equip. Co.*, 460 B.R. 644 (E.D. Pa. 2011) (staying state court proceeding against sole members of the debtor *because reorganization would suffer if members' attention was diverted by litigation*).  The other cases cited by the Debtors apply only to situations under the first *McCartney* exception, *i.e.*, where  the debtors share an identity of interest with the non-debtor third party in litigation. *See, e.g., In re Am. Film Techs., Inc.*, 175 B.R. 847 (Bankr. D. Del. 1994) (staying prosecution of wrongful discharge claims against former and present directors of debtor corporation *because of debtor's indemnification obligations and its possible exposure to collateral estoppel prejudice*); *In re Family Health Servs., Inc.*, 105 B.R. 937 (Bankr. C.D. Cal 1989) (staying collection actions against non-debtor members of debtor HMO *because judgments against non-debtors would trigger claims for indemnification from the debtor HMO*).

Therefore, the Debtors cannot claim that their level of "involvement" (which is none) in the New York Action is a distraction from the day-to-day needs of the reorganization effort.

56.    Without that fact pattern, the Debtors are left to contrive other arguments to support a claim that "unusual circumstances" exist warranting the requested relief. Specifically, the Debtors' argue that a permanent stay of the New York Action is warranted -- and the litigation of the exact same issues in this Court is appropriate -- because any determination in the New York Action would "not bind all of the affected parties nor reach all of the disputed issues." (Stay Extension Motion at 13).[20] Stripped to its essence, this specter of additional lawsuits or the risk of serial litigation resulting in inconsistent determinations is an insufficient basis to extend the stay and does not constitute the "most extreme and unusual circumstances" warranted for the drastic remedy of extension of the stay. *See, e.g., In re Aldan Industries, Inc.*, No. 00-10306, 2000 WL 357719, *8 (Bankr. E.D. Pa. April 3, 2000).[21]

57.    As discussed above, the Petitioning Creditors and Yucaipa will be bound by the outcome of the New York Action. CIT is prohibited from raising any further issues by

---

[20]    The Debtors assertion that the New York Action will not resolve all of the necessary issues is simply incorrect. The very issues raised by the Debtors -- the potential severability of provisions in the Purported Fourth Amendment and the validity of changes to the definition of Term Loan Exposure and Eligible Assignee in the Third Amendment -- are at issue in the New York Action and were specifically briefed in connection with the Summary Judgment Motion. (*See* App. Exs. I, L, M, N, P, S).

[21]    In *Aldan Industries*, certain parties to an arbitration against the debtor and non-debtor guarantors moved the bankruptcy court for a declaration that the automatic stay did not apply to the arbitration proceeding. The court, after deciding that the arbitration was stayed as to the debtor, considered whether the arbitration should be stayed as to the non-debtor guarantors. The non-debtor guarantors, relying on *McCartney*, argued that "unusual circumstances" existed to extend the stay and that the arbitration should be resolved in one "centralized litigation" before the bankruptcy court so that all matters, issues and defenses could be considered in a single forum. *In re Aldan Industries, Inc.*, 2000 WL 357719, at *7-8. Otherwise (the guarantors argued), the dispute between the parties would have to be "raised in three different actions" -- first, the arbitration, then another action by the guarantors against the debtor's estate for subrogation, and then a third action by the debtor against the guarantors for counterclaims. *Id.* at *6. According to the non-debtor guarantors, proceeding in the bankruptcy court would "lessen the impact upon the Debtor's estate as well as centralize all claims in the Bankruptcy Court," and prevent the need for "duplicative litigation" that would prejudice the debtor's estate and increase litigation costs. *Id.* at *7. The bankruptcy court found this argument, among others, to be unpersuasive and held that no "unusual circumstances" existed "warranting an exception to the general prohibition against extending the automatic stay to preclude the continuation of a suit against a nondebtor." *Id.* at *8. Likewise, here, the Debtors have not shown that any unusual circumstances exist.

virtue of its settlement. (*See* App. Ex. G). And the Joining First Lien Lenders (who constitute all of the remaining First Lien Lenders with the exception of one holder of a $1.8 million in Obligations), have agreed in writing to be bound by the outcome of the New York Action. (*See* App. Ex. Y). These facts effectively eviscerate the Debtors' only argument in support of the stay. Thus, the only party to the First Lien Credit Agreement who would not be bound by the outcome of the New York Action is the Debtors.[22]

58.    Ironically, extending the automatic stay to the New York Action will cause more harm to the Debtors' estate than allowing the New York Action to proceed. *See Algemene Bank Nederland, N.V. v. Hallwood Indus. Inc.,* 133 B.R. 176, 179 (W.D. Pa. 1991) ("the purpose of the stay provisions are to help conserve the assets of a debtor"). In particular, extending the stay will result in the following:

(a)  Delay - Substantial delay in the adjudication of the issues relating to the validity and enforceability of the Purported Fourth Amendment and whether Yucaipa constitutes "Requisite Lenders." The New York Action has been pending for 10 months and is ready for oral argument on a fully briefed summary judgment motion. That oral argument will occur on November 19th absent this Court granting the relief requested in the Stay Extension Motion. The Adversary Proceeding is an entirely new action with a substantial number of additional parties, that will at best take months to even catch up to the current status of the New York Action;

(b)  Cost - Since the Debtors are not parties to the New York Action they are not incurring any costs or expenses in connection with its prosecution. If the stay is granted, the Debtors' estates will be burdened with the costs and expenses of both the Debtors' professionals and the Committee's professionals; and

(c)  Diversion of Estate Resources - Since the Debtors are not parties to the New York Action, the prosecution of such Action will not divert the attention of the Debtors' principals away from the reorganization effort. If the stay is granted and the Adversary Proceeding is prosecuted, the Debtors will have injected themselves and their management team into the heart of the litigation.

---

[22]   The Committee is not a party to the First Lien Credit Agreement and thus it has no standing to be heard with respect to the interpretation of that Agreement. (*See* App. Ex. A). The Debtors' inclusion of the Committee as a defendant in the Adversary Proceeding is completely nonsensical.

59.     When viewed in their totality, the Debtors' Motions (the Stay Extension Motion, the DIP Motion and the Credit Bid Motion) ask the Court to do nothing less than to allow the Debtors to spend estate funds (borrowed under a DIP financing from Yucaipa) to thrust themselves into the middle of an intercreditor dispute where their sole interest (if they have an interest at all) should be *obtaining an outcome,* rather than *advocating a particular outcome.*  As presently constructed, the prosecution of the Adversary Proceeding and the Motions is designed solely to promote a sale process that "hand the keys" to Yucaipa through a credit bid for the Debtors' assets as the Requisite Lender.  The Court should not permit the Debtors to use the automatic stay as a sword against the Petitioning Creditors for the benefit of Yucaipa and to the detriment to the estate and its creditors.

60.     The Debtors cite to several cases for the general proposition that this Court has the authority, in appropriate circumstances, to extend the stay to litigation between non-debtors.  However, the facts of those cases, and the alleged impact on the Debtors' ability to reorganize, are vastly different and wholly distinguishable from the present case.[23]  *See, e.g., In re Kaplan,* 104 F.3d 589, 598 (3d Cir. 1997) (court declines to use Section 105(a) powers to authorize retroactive allocation of pre-petition tax payments); *Adelphia,* 298 B.R. at 53 (automatic stay does not apply to actions to obtain proceeds of debtors D&O insurance policies); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1008 (4th Cir.), *cert. denied,* 479 U.S. 876 (1986) (injunction necessary to prevent burdens and impediments to the debtor's reorganization because the co-defendants were entitled to absolute indemnity by the debtor); *In re Johns-Manville*

---

[23]    In many of the cases cited by the Debtors, while the court acknowledged its general authority to do so, the court denied the debtor's request to extend the stay. *See, e.g., In re Adelphia Commc'n's Corp.,* 298 B.R. 49, 55 (S.D.N.Y. 2003) (finding that bankruptcy court's speculation as to adverse effects on chapter 11 estates provided insufficient foundation for extension of stay); *In re S. Canaan Cellular Invs., Inc.,* 427 B.R. 44 (Bankr. E.D. Pa. 2010) (approving limited injunction contained in a plan of reorganization but refusing to enjoin prosecution of state court litigation where, among other reasons, legal issues therein did not involve federal bankruptcy law).

*Corp.,* 801 F.2d 60, 64 (2d Cir. 1986) (reversing bankruptcy court's issuance of an injunction prohibiting an equity committee from pursuing a state court action to compel a shareholders meeting to replace the debtors' directors because there was insufficient evidence of any "harm to the reorganization"); *In re Phila. Newspapers, LLC,* 407 B.R. 606, 614 (E.D. Pa. 2009) ("relatively short" 60-day extension of automatic stay appropriate where actions against key employees would distract them from assisting with the reorganization).

61.    For the foregoing reasons the Petitioning Creditors submit that "unusual circumstances" do not exist to warrant an extension of the stay.

**B.    The Debtors Fail to Satisfy the Philadelphia Newspapers Standard**

62.    Although the Third Circuit applies the "unusual circumstances" analysis set forth in *McCartney v. Integra National Bank North* to evaluate whether an extension of the stay is warranted, the Debtors present their case based upon a three-step test set forth by the district court in *Philadelphia Newspapers* to determine whether the automatic stay should extend to non-debtor third parties: (1) does the Bankruptcy Court have jurisdiction over the claims of the Petitioning Creditors against Yucaipa; (2) can the Bankruptcy Court properly extend Section 362(a) to the action between the Petitioning Creditors and Yucaipa; and (3) can the Bankruptcy Court properly exercise its discretion in issuing an injunction, pursuant to Section 105(a), enjoining suit against non-debtors. *See Phila. Newspapers,* 407 B.R. at 611. Under either the *McCartney* or *Philadelphia Newspapers* analysis, the Debtors fail to demonstrate a sufficient basis warranting an extension of the stay.

**(i)    The Bankruptcy Court Lacks Jurisdiction To Hear the Claims Alleged in the New York Action.**

63.    The Bankruptcy Court lacks jurisdiction to hear the claims in the New York Action because those claims have no effect on the Debtors' estates or their administration.

The claims set forth in the New York Action derive entirely from the First Lien Credit Agreement, and not from any substantive right created by bankruptcy law. Accordingly, the Bankruptcy Court should only exercise jurisdiction over the claims in the New York Action if the claims are "related to" the Debtors' bankruptcy case. 28 U.S.C. § 1334(a); *see also Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *In re DVI*, 305 B.R. 414, 416 (Bankr. D. Del. 2004). A proceeding can only be "related to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *See In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009) (*held*, bankruptcy court had no jurisdiction over state court action against non-debtor; under the *Pacor* standard "an inchoate claim of common law indemnity is not, in and of itself, enough to establish the bankruptcy court's subject matter jurisdiction"); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226-27 (3d Cir. 2004) (finding no "related to" jurisdiction over independent personal injury actions against debtors' non-debtor affiliates, because (i) the actions against the non-debtors would not deplete the debtors' estates, and (ii) the fact that the plan or reorganization depended on financial contributions from non-debtors, would not affect debtors' ability to formulate plan).

64. Disregarding the limited scope of "related to" jurisdiction, the Debtors argue that this court has "related to" jurisdiction over the New York Action because the litigation to determine "Requisite Lender" status "will have a substantial effect on the Debtors' reorganization process" and until determined, will "substantially impair" the Debtors' efforts to reorganize. (*See* Stay Extension Motion at 12). This statement is patently false. The litigation to determine the Requisite Lender issue relates solely to the question of whether Yucaipa can submit a credit bid for the Debtors' assets *on behalf of, and without the consent of, all First Lien Lenders*. There is nothing about that litigation that impairs the Debtors' ability to solicit bids for

its assets (including from Yucaipa in its individual capacity), conduct an auction, or even potentially sell the assets free and clear of liens. There is also nothing about the New York Action that would impair the Debtors' ability to propose a plan of reorganization. Rather, the Debtors have chosen to ignore these other possible alternatives and to point at the New York Action as the reason for its alleged incapacity because that litigation does do one thing -- it impacts the Debtors' ability to engage in a transaction with Yucaipa as Requisite Lender, which is clearly the Debtors' preferred outcome. However, the law in the Third Circuit is clear that there is no "related to" jurisdiction over a dispute that simply affects one possible plan or strategy for reorganization. *See Combustion Eng'g, Inc.*, 391 F.3d at 229 ("the boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization, even if we perceive the plan to be in the public interest").

65.     In *Combustion Engineering*, the debtor sought to extend the proposed plan's channeling injunction to include two non-debtor affiliates of the debtor. *Id.;* 391 F.3d at 228. The debtor argued that bankruptcy court had "related to" jurisdiction over the non-debtors and the asbestos claims against the non-debtors because financial contributions to the debtor's plan were contingent on obtaining an injunction against personal injury claims asserted against the non-debtors. *Id.* ("if the channeling injunction does not extend to claims against the non-debtors], there is no plan; it is that simple"). Rejecting this argument, the Third Circuit reasoned that the proposed plan's dependence on extending the injunction to the non-debtors did, by itself, "not provide a sufficient basis for exercising subject matter jurisdiction." *Id.*; *see also id.* at 224 ("whether the injunction is essential to the reorganization ... may have little or no bearing on the threshold jurisdictional inquiry"). Accordingly, the Third Circuit held that the bankruptcy court lacked "related to" jurisdiction over the claims against the non-debtor. *Id.* Importantly, the

Third Circuit court rejected the notion that a debtor could create subject matter jurisdiction over claims against a non-debtor third party by advancing a particular reorganization strategy that depended on a contribution by that non-debtor. *Id.* at 230.

66.    Thus, the Debtors' cannot create "related to" jurisdiction based upon the allegation that the New York Action could affect a reorganization strategy predicated upon Yucaipa's ability, as the Requisite Lender, to credit bid on behalf of all First Lien Lenders in the context of the sale process.

67.    Moreover, the Court also lacks jurisdiction because the outcome of the New York Action will not directly affect the Debtors' bankruptcy cases. The claims in the New York Action will solely determine the First Lien Lenders' respective rights and obligations under the First Lien Credit Agreement and will not alter any of the Debtors' rights, liabilities or options or freedom of action. *See In re Am. Home Mortg. Holding*, 477 B.R. 517, 529 (Bankr. D. Del. 2012) ("the *Pacor* test requires the conceivability of a *direct* impact upon the estate") (emphasis in original); *see also In re IPDN Corp.*, 352 B.R. 870, 878 (Bankr. E.D. Mo. 2006) (finding court had no "related to" jurisdiction in action for declaratory relief between two non-debtors, because the requested relief would have no effect on the bankruptcy estate, would not increase the estate's assets, and would not affect the administration of the estate). Whether or not the Purported Fourth Amendment is found be valid, the Debtors' rights and obligation under the First Lien Credit Agreement will remain unaffected.

68.    The sole case cited by the Debtors in support of their position, *Philadelphia Newspapers,* is inapposite. In *Philadelphia Newspapers*, the court found that it had "related to" jurisdiction to enjoin a state court lawsuit based upon findings that (1) allowing the lawsuit to continue would "distract" the debtors' in-house counsel's from the reorganization; (2)

debtors could become obligated to indemnify non-debtor parties to that suit under common law theories; (3) debtors had provided indemnification to its employees in the past; and (4) the debtors could later be collaterally estopped from defending certain claims. *Phila. Newspapers*, 407 B.R. at 614-15. Not one of the reasons cited by the *Philadelphia Newspapers* court is present here or supports "related to" jurisdiction over the New York Action.

69.    For the foregoing reasons, the Bankruptcy Court lacks jurisdiction over the New York Action. *See Am. Home Mortg.*, 477 B.R. at 529 ("if it is impossible for a collateral dispute between third-parties to directly impact the estate, the bankruptcy court will lack 'related to' jurisdiction").

### (ii)    "Unusual Circumstances" Do Not Exist

70.    As discussed at length above in paragraphs 50 to 61, "unusual circumstances" do not exist to justify extension of the automatic stay here to non-debtor parties to the New York Action.

### (iii)    Debtors Are Not Entitled to Injunctive Relief Under Section 105(a)

71.    Extending the automatic stay to a non-debtor party is analogous to granting injunctive relief. *See, e.g., Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)*. 175 B.R. 847, 849 (Bankr. D. Del. 1994). Therefore, bankruptcy courts have applied a four part test for establishing a preliminary injunction to extend the stay to third parties. *Id.; see also W.R. Grace & Co.*, 2004 WL 954772, at *32-33.

72.    To obtain a preliminary injunction the party seeking the injunction must demonstrate that (i) that is a danger of imminent irreparable harm to the estate or the debtor's ability to reorganize, (ii) there is a reasonable likelihood of a successful reorganization, (iii) the court must balance the relative harm as between the debtor and the creditor who would be restrained, and (iv) the court must consider the public interest; this requires the balancing of the

public interest in successful bankruptcy reorganizations with other competing societal interests. *See Phila. Newspapers,* 407 B.R. at 616-17; *see also In re Monroe Well Service, Inc.,* 67 B.R. 746 (E.D. Pa. 1986). All of these requirements must be established in order to obtain the relief sought. *In re Provincetown Boston Airline,* 52 B.R. 620, 625 (Bank. M.D. Fla. 1985); *see also Sabratek Corp. v. La Salle Bank, N.A.,* 257 B.R. 732 (Bank. D. Del. 2000) (declining to enjoin a state court action that did not involve property of the estate because there was no showing of irreparable harm); *Gray v. Hirsch,* 230 B.R. 239, 243-44 (S.D.N.Y. 1999) (refusing to stay proceeding based on "limited or theoretical risk" to debtor's reorganization). The Debtors bear the burden of proof "in obtaining the extraordinary and drastic remedy of an injunction." *See Phila. Newspapers,* 407 B.R. at 616 (internal citations omitted).

<blockquote>

(a)     **No Threat of Irreparable Harm to the Estate or the Debtors' Ability to Reorganize**

</blockquote>

73.    Irreparable harm in the context of a reorganization is shown only when the failure to enjoin the actions would "burden, delay or otherwise impede the reorganization." *Alert Holdings Inc. v. Interstate Protective Serv., Inc.,* 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992). The Debtors must present strict proof -- not conclusory allegations -- to sustain this burden. *Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.,* 54 B.R. 353, 358 (Bank. W.D. Wisc. 1985) (denying injunction against debtors' auditor because purported risk of delay to reorganization was "mere speculation [that did] not constitute the type of proof required to entitle the Debtors to an injunction"). Further, the threat to the reorganization process must be imminent, substantial and irreparable. *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),* 365 B.R. 401, 410 (S.D.N.Y. 2006).

74.    Here, the Debtors have provided this Court with no evidence of imminent, substantial and irreparable harm. There is no threat to the reorganization process posed by

continuation of the New York Action.  The Debtors only allege anticipated or speculative harm that may occur in the future, and those allegations themselves have no factual bases.  The Debtors' arguments regarding the potential for serial litigation -- particularly in light of the Joinder Agreement -- are speculative and conjecture and do not demonstrate the harm required for injunctive relief.

75.     Further, the absence of clarity on who is the Requisite Lender under the First Lien Credit Agreement is not a threat to the reorganization process.  The Debtors have multiple alternatives available to move forward with a reorganization, either through a sale or pursuant to a plan of reorganization.  The only instance in which the absence of clarity has any effect on this matter is in the context of the Debtors' preferred alternative -- which is handing the assets over to Yucaipa through a credit bid on behalf of all First Lien Lenders as Requisite Lender.

**(b)     Reasonable Likelihood of a Successful Reorganization**

76.     The Debtors fail to address this factor in their analysis except to argue in a conclusory fashion that "they have a reasonable likelihood of success as to their claim for declaratory judgment" in the Adversary Proceeding.  (*See* Stay Extension Motion at 14). However, "reasonable likelihood of success" in the bankruptcy context means the ability to successfully reorganize the debtors.  *See Phila. Newspapers*, 407 B.R. at 617, n15 (internal citations omitted).  The Debtors have failed to meet their burden on this issue.

**(c)     Balance of Hardships Favors the Petitioning Creditors**

77.     As set forth above, the Debtors will not suffer any harm if the Petitioning Creditors are permitted to continue prosecuting the New York Action against Yucaipa.  The outcome of the New York Action will not prevent the Debtors from developing and implementing a strategy for a reorganization.

78.     On the other hand, the Petitioning Creditors will be substantially harmed if the stay is granted and the Petitioning Creditors are forced to re-start their intercreditor litigation against Yucaipa from scratch in the context of the Adversary Proceeding.    The Petitioning Creditors have invested in excess of $1 million in fees and expenses in connection with the prosecution of the New York Action during its 10 month pendency.    If forced to start over, Petitioning Creditors would be required to pay these fees and expenses a second time.    At the same time, Yucaipa will effectively be relieved of its obligation to pay its own costs as the Debtors champion Yucaipa's cause at the cost and expense of the estates and their creditors.    The balance of harm clearly weighs in favor of the Petitioning Creditors.

79.     The Debtors further argue that granting the injunction will not cause the Petitioning Creditors any harm because "Yucaipa's Requisite Lender status still will be heard, only in a more appropriate forum." (*See* Stay Extension Motion at 15).    That is simply not the case.    As evidenced by the Credit Bid Motion, the Debtors have already agreed with Yucaipa to proceed on an expedited timetable for both a sale and a hearing on any "Secured Debt Matter" (which as defined includes all of the issues from both the New York Action and the Adversary Proceeding). (*See* Credit Bid Motion at 5-6).    In the absence of a disposition of the issues on summary judgment (such as is pending presently in the New York Action and scheduled for argument on November 19th, where Yucaipa has adamantly argued that summary judgment is inappropriate), a full trial on the merits could not possibly happen by the February 18th date contemplated in the Credit Bid Motion.    Thus, it appears that the Debtors are proceeding with the Adversary Proceeding as plaintiffs and with Yucaipa and others as defendants not so they can obtain prompt resolution, but rather so they can propose a settlement giving Yucaipa everything they want for some nominal consideration while leaving Petitioning Creditors and other parties

in interest to object based on the standards for approval of a settlement under Bankruptcy Rule 9019. This Court should not tolerate such behavior.

80.    In the New York Action, the Petitioning Creditors are not seeking monetary damages; rather they are seeking a declaration that the Purported Fourth Amendment is not valid and a declaration that Yucaipa is not the Requisite Lender. (*See* App. Ex. I).  The restrictions on Yucaipa's ability to become the Requisite Lender in the First Lien Credit Agreement and Third Amendment were essential to safeguard the rights of the First Lien Lenders; without these safeguards, Yucaipa would have the ability to do exactly what it is now trying to do (with the Debtors' assistance) -- become the Requisite Lender and use that position to frustrate and destroy the rights of the other Lenders.  If the stay is extended and Yucaipa's planned credit bid of not only the Obligations they purport to hold but of all First Lien Lenders is permitted to move forward,  the Petitioning Creditors will lose any possibility of challenging the purported Fourth Amendment and Yucaipa's subsequent claimed-status as the Requisite Lender on the merits.

### (d)    Public Interest Favors the Petitioning Creditors

81.    Finally, the public interest would be served by denying the Debtors' request for an extension of the stay.  Congress enacted Section 362 of the Bankruptcy Code to protect debtors and to give them a "breathing spell" from their creditors so they could have an opportunity to reorganize.  Courts have recognized a narrow exception under which a court, using its equitable powers under Section 105(a), can extend that stay to litigation between non-debtors. *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997).  The Petitioning Creditors contend that it would be contrary to the public interest for a court to issue injunctive relief where the circumstances justifying application of the narrow exception

discussed at length above simply do not exist.  They do not exist here.  Public interest weighs in favor of upholding Congress' intent in limiting the application of the automatic stay.

82.    For all of the foregoing reasons, the Debtors have failed to meet their heavy burden and the request for extension of the automatic stay should be denied.

## III.

## CROSS-MOTION FOR ABSTENTION

83.    Even if the Court finds that it has "related to" jurisdiction to hear the Debtors' claims, mandatory abstention pursuant to 11 U.S.C. § 1334(c)(2) requires the denial of the Stay Extension Motion and dismissal of the Adversary Proceeding to allow the New York Action to continue.  The Petitioning Creditors hereby cross-move this Court for mandatory abstention or, alternatively, permissive abstention.

A.    <u>Mandatory Abstention Under 28 U.S.C. § 1334(c)(2) Applies</u>

84.    Section 1334(c)(2) of Title 28 of the United States Code governs mandatory abstention and provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

Upon a timely motion under § 1334(c)(2), a district court must abstain if the following five requirements are met: (1) the proceeding is based upon a state law claim or cause of action; (2) the claim or cause of action is "related to" a case under title 11; but does not "arise under" title 11 and does not "arise in" a case under title 11, (3) federal courts would not have jurisdiction over the claim but for its relation to the bankruptcy case; (4) an action "is

commenced" in a state forum of appropriate jurisdiction; and (5) the action can be "timely adjudicated" in a state forum of appropriate jurisdiction. *See Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006); *Wells Fargo Bank N.A. v. Johnson*, CIV. 11-1205-SLR, 2012 WL 1203427 (D. Del. Apr. 4, 2012) (finding mandatory abstention appropriate when all five requirement were met in state law *in rem* foreclosure action); *Trans World Airlines, Inc. v. Icahn (In re Trans World Airlines, Inc.)*, 278 B.R. 42 (Bankr. D. Del. 2002).

85.    It is undisputed that the first four requirements for mandatory abstention have been met. The First Lien Credit Agreement is governed by New York law, and the New York Action seeks declaratory relief regarding various terms and provisions of the First Lien Credit Agreement. (*See* Adversary Complaint ¶ 48). The Debtors admit that the New York Action neither "arises under" nor "arises in", but do allege that it is "related to" the Debtors' bankruptcy cases. (*See* Stay Extension Motion at 11-12). But for the Debtors' bankruptcy case, there is no independent basis for federal jurisdiction. No federal causes of action have been plead in the New York State Action, and there is no diversity of citizenship between plaintiffs and defendants in that action.

86.    Lastly, the New York Action can be "timely adjudicated" in the Supreme Court of the State of New York. In fact, a hearing on the Petitioning Creditors' fully briefed motion for summary judgment has already been scheduled for November 19th. Importantly, "timely adjudication" is not determined by "whether the action would be *more quickly* adjudicated in this [c]ourt than in the state court, but rather, whether the action can be *timely adjudicated* in the state court." *Trans World Airlines, Inc.*, 278 B.R. at 51 (Bankr. D. Del. 2002) (emphasis in original). The facts in *Trans World Airlines* are instructive. There, the bankruptcy court held that both mandatory and permissive abstention were appropriate, *id.* at 53, finding that

the contract dispute between the non-debtors could be "timely adjudicated" in New York state court because (i) it depended solely on determination of state law, (ii) it did not implicate any Bankruptcy Code provisions or principles, (iii) the state court proceeding was at least as far along as the adversary proceeding, and (iv) the current burden on bankruptcy court's docket increased the likelihood that the action could be more quickly adjudicated in state court. *Id.* at 51.

   87. Here, the New York Action can be timely adjudicated thus meeting the requirement for mandatory abstention under 11 U.S.C. § 1334(c)(2). Specifically, the New York Action is a straightforward state law contract dispute between non-debtors, and does not involve any Bankruptcy Code provisions or principles. The New York Action is at least 10 months ahead of the Adversary Proceeding, the Petitioning Creditors' motion for summary has been fully briefed and Justice Ramos has scheduled oral arguments on the motion for November 19, 2012. In addition, Justice Ramos has already ruled on Yucaipa's Motion to Dismiss and is thus familiar with the facts of the case. The progress in the New York Action, including the pending motions for summary judgment, weighs strongly in favor of a "timely adjudication" in the New York Supreme Court. *See Trans World Airlines, Inc.*, 278 B.R. at 51; *In re Mugica*, 362 B.R. 782, 793 (Bankr. S.D. Tex. 2007) (granting mandatory abstention, when the movant introduced evidence that the action had been prosecuted in state court and the state court was familiar with the case); *Maryland Cas. Co. v. Aselco, Inc.*, 223 B.R. 217, 221 (D. Kan. 1998) (granting mandatory abstention, because all that remained was for parties to file cross-motions for summary judgment, and state court had already shown willingness to expedite matter); *Bowen Corp., Inc. v. Security Pac. Bank Idaho, F.S.B.*, 150 B.R. 777, 784 (Bankr. D. Idaho 1993)

(action could be "timely adjudicated" in state court when (i) summary judgment motion had been submitted prior to removal, and (ii) state court was familiar with issues).

88.    Despite the Debtors' stated need for a quick resolution, the Debtors' and Yucaipa's requested relief will actually prolong the litigation over the enforceability of the Purported Fourth Amendment. On the one hand, the Debtors urge this Court to resolve this issue because it "is the only forum where all of the issues surrounding the First Lien Credit Agreement can be resolved efficiently and consistently," and "without a conclusive determination ... the Debtors are constrained from moving forward with an exit strategy that will maximize value." (Stay Extension Motion at 2-3). But at the same time, the Debtors are effectively seeking to restart the litigation in a new forum with more parties, all of which will not result in a speedy resolution of this issue.[24]

**B.**    **Permissive Abstention Under 28 U.S.C. § 1334(c)(1) is Warranted**

89.    If the Court determines that all of the elements necessary for mandatory abstention are not present, this Court should nevertheless exercise its discretion to abstain pursuant to 28 U.S.C. § 1334(c)(1). The statute governing discretionary abstention provides that "nothing in this section [1334] prevents a district court in the interests of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." Courts have noted that when most, but not all, of the requirements for mandatory abstention are met, careful consideration should be given to whether it would be appropriate to exercise discretionary

---

[24]    Tellingly, Yucaipa opposed the Petition Creditors' Summary Judgment Motion in the New York Action on grounds that summary judgment is premature and discovery is necessary on Yucaipa's affirmative defenses, including on the issue of *res judicata* and estoppel, and to determine the intent of the First Lien Credit Agreement. (App. Ex. P, Defendants' Memorandum of Law in Opposition of Summary Judgment at 8-9, 16, 22-23). Thus, in Yucaipa's view, regardless of where the dispute will be litigated, it will involve lengthy and time-consuming discovery.

abstention under § 1334(c)(1).  *See Wolser v. Joshua Slocum, Ltd. (In re Joshua Slocum, Ltd.),* 109 B.R. 101, 107 (E.D. Pa. 1989).  Thus, if the Court finds that mandatory abstention is not applicable solely based on the absence of one factor, then it should carefully consider abstaining under § 1334(c)(1).

90.    In determining whether permissive abstention is appropriate under 28 U.S.C. § 1334(c)(1), courts in this District have considered one or more of the factors articulated in *Cont'l Airlines, Inc. v. Allen (In re Cont'l Airlines, Inc.),* 156 B.R. 441, 443 (Bankr. D. Del. 1993).  The factors include: "(1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (4) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the burden of the court's docket; (7) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; and (8) the presence in the proceeding of non-debtor parties." *See, e.g., In re Cont'l Airlines, Inc.,* 156 B.R. at 443 (quoting *TTS, Inc., v. Stackfleth (Matter of Total Tech. Servs., Inc.),* 142 B.R. 96, 101-02 (Bankr. D. Del. 1992)); *Trans World Airlines, Inc.,* 278 B.R. at 52 (granting permissive abstention of contract action between nondebtors, when (1) litigating matter in New York would not disrupt efficient administration of bankruptcy, (2) state law issues predominated over any bankruptcy issues, (3) New York was better forum to adjudicate straightforward state law issues, (4) action had already been commenced in New York state court, (5) there was no basis other than "related to" jurisdiction, (6) action was not a core proceeding, (7) action was only tangentially related to main bankruptcy case, (8) all claims were based on state law and there was no need to sever any bankruptcy matters, (9) action could be

adjudicated in New York at least as quickly, and (10) action did not implicate any of debtors' substantive rights or affect the administration of their estates); *LaRoche Indus., Inc. v. Orica Nitrogen LLC (In re LaRoche Indus., Inc.)*, 312 B.R. 249, 253-55 (Bankr. D. Del. 2004) (granting permissive abstention of contract action because, among other things, (1) the action would have no effect on the recovery of creditors, (2) the action was a contract dispute dominated by state law and did not implicate any provision of the Bankruptcy Code, (3) there was a pending state court action, (4) there was no independent basis for federal jurisdiction, (4) relationship of dispute was tenuous and successful prosecution would not result in any enhances distributions to creditors); *DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.),* 435 B.R. 220, 223-24 (Bankr. D. Del. 2010).

91.     Here, these factors strongly militate in favor of abstention, because, as stated above, (1) the New York Action will not directly affect the Debtors' bankruptcy cases, as it will solely determine the lenders' respective rights and obligations under the First Lien Credit Agreement and will not alter any of the Debtors' rights, liabilities or options or freedom of action, (2) the New York Action is a straightforward state law contract dispute between non-debtors, and does not involve any Bankruptcy Code provisions or principles, (3) the New York Action has been pending in New York State Court since January 2012, (4) but for the Debtors' bankruptcy cases, there is no independent basis for federal jurisdiction over the New York Action, (5) the New York Action is unrelated and remote to the Debtors, as it has been ongoing for at 10 months, during which time the Debtors never sought to intervene, nor did Yucaipa seek to dismiss the New York Action for lack of necessary parties, and (6) here it appears that the Debtors are improperly "forum shopping" on behalf of Yucaipa, hoping to find a court that will provide Yucaipa the relief it seeks.

92.     Therefore, the Court should abstain from hearing the Adversary Proceeding.

## IV.

## OBJECTION TO DEBTORS' MOTION TO APPROVE STIPULATION AND SETTLEMENT

93.     Through the Credit Bid Motion, the Debtors seek the approval of a "Stipulation" that purports to resolve "certain matters" among the Debtors, the Committee and Yucaipa "relating to the DIP Financing Agreement, the Final DIP Order, the administration of the New York State Action and the Yucaipa Credit Bid…" Credit Bid Motion ¶ 6. The "certain matters" being resolved, however, are nowhere articulated. In reality, the Credit Bid Motion is nothing more than a thinly-veiled attempt to bless Yucaipa's participation in as yet to be disclosed sale process as the Requisite Lender with the ability to credit bid all or any portion of the First Lien Obligations. The Debtors have determined to proceed in this fashion despite the existence of material disputes regarding Yucaipa's status, and despite the Debtors' own protestations that they are hamstrung in moving forward with administration of these cases unless and until the issues regarding Yucaipa's status as Requisite Lender are resolved. (Stay Extension Motion at 12). The Petitioning Creditors submit that the "settlement" falls far below the lowest point in the range of reasonableness, and therefore, respectfully ask that the Court deny the relief requested in the Credit Bid Motion.[25]

94.     First, this is a settlement with an insider so its review is subject to close scrutiny; Debtors are not entitled to the benefits of the business judgment rule. *See In re TSIC, Inc.*, 428 B.R. 103, 111 (Bankr. D. Del. 2010) ("An insider is any person or entity whose

---

[25]     Petitioning Creditors have no objection to Yucaipa and the Committee entering into an agreement to either extend the Challenge Period or increase the Committee's investigation budget. Those items, however, can be handled without granting Yucaipa all of the additional benefits contemplated by the Credit Bid Motion.

relationship with a debtor is sufficiently close that any transactions between them ought to be subjected to closer scrutiny than those occurring at arm's length."); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (subjecting proposed settlement to "closer scrutiny because it was negotiated with an insider" and that "closer scrutiny of insider agreements should be added to the cook book list of factors that courts use to determine whether a settlement is fair and reasonable").

95.    Second, is not clear to the Petitioning Creditors what matters are being settled by the Credit Bid Motion.  At its core, the Stipulation appears to be nothing but an attempt by the Debtors and Yucaipa to thwart the prosecution of the New York Action, allow Yucaipa to proceed in the sale process as if it is the Requisite Lender, and then force parties to object to the Yucaipa Credit Bid on an unreasonable timetable in the context of a sale hearing rather than in either the New York Action or even the Adversary Proceeding.  What the Debtors have in mind, however, is not apparent.  (*See* Credit Bid Motion at 9) (The Stipulation is "a crucial step in addressing the Secured Debt Matters, moving forward with a competitive sale process and bringing these Chapter 11 Cases to an ultimate resolution.  Without the agreement embodied in the Stipulation, litigating the Secured Debt Matters could become markedly more complex and costly for the Debtors... ").  This language sounds like the Debtors and Yucaipa are seeking to avoid litigation of the Secured Debt Matters altogether, and to instead have them summarily adjudicated in the context of a sale hearing.  The Debtors cannot so cavalierly trample on the contractual rights of the Petitioning Creditors as against Yucaipa.

96.    Third, allowing Yucaipa to participate in a sale process as if it is the Requisite Lender -- when that status is in material dispute -- can only create havoc and confusion

amongst potential third party bidders. Questions will inevitably arise that have no answer, such as:

- "Does Yucaipa have authority to bind the rest of the lenders?", and
- "What discount are the Debtors applying to the Yucaipa Credit Bid given the risk associated with their challenged authority?"

More importantly, handing Yucaipa a license to submit a credit bid for in excess of $265 million in light of the likely enterprise value of the Debtors and these material disputes over authority sends one clear message to the market -- Yucaipa wants to own these assets and the Debtors are going to do whatever they can to facilitate that result. That is no way to maximize value.

97.     Fourth, to the extent the Credit Bid Motion seeks to establish a timetable for filing objections to a Yucaipa Credit Bid that might be submitted in connection with an as yet undefined sale process, the Petitioning Creditors submit that the request is premature. If the Debtors intend to file a Sale Motion, the procedures, timetables and objection deadlines for not only a Yucaipa Credit Bid, but all matters customarily addressed therein, can be reviewed at the same time by the Court and parties in interest in the context of that Sale Motion. Should the Court consider the request in the context of the Credit Bid Motion, the Petitioning Creditors submit that paragraph 8 of the Stipulation is unreasonable and inconsistent with both the New York Action and the Adversary Proceeding. Issue has already been joined on the question of whether the Purported Fourth Amendment is valid and whether Yucaipa is the Requisite Lender. What more basis of an objection could there be? Further, to the extent any such objection would have to address the merits of a Yucaipa Credit Bid, such Yucaipa Credit Bid would have to be submitted and available to all parties in interest in final form well before any objection deadline - - here, 14 days prior to the Hearing. In most sale scenarios, that is not the case as bids generally continue to evolve virtually up to the date of the sale hearing.

98.     Fifth, to the extent the Credit Bid Motion seeks to establish February 18, 2013 as the date by which hearings will be held on "any Secured Debt Matter," that timetable is unrealistic.   In fact, if the issues are not resolved on summary judgment (which Yucaipa strenuously argued in the New York Action was not appropriate), there is no way that discovery can be completed and a trial on the merits conducted on or prior to that date.   This again raises the specter that the Debtors and Yucaipa have no intention of ever having the issues in the New York Action or the Adversary Proceeding decided on their merits.

99.     Finally, the Stipulation provides for an extension of the Challenge Period solely for the benefit of the Committee, but not for any other party in interest.   (*See* Stipulation ¶ 8).  As a result, absent relief from this Court, the Petitioning Creditors will be obligated to file Challenges on or before November 15, 2012.   The filing of such Challenges will constitute Events of Default under the DIP Financing Agreement.   It is not appropriate for this Court to approve a "settlement" where the effect will be the certain occurrence of Events of Default under the DIP Financing Agreement.

100.    Based upon the foregoing, the so-called "settlement" embodied in the Stipulation is not fair, reasonable or in the best interests of the estate, and should not be approved. *See, e.g., In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455 (Bankr. E.D. Pa. 1998) (finding proposed settlement, which involved releases by debtor and payments from insiders to members of official committee, not to be in the paramount interest of all creditors); *In re Hyloft, Inc.*, 451 B.R. 104, 117 (Bankr. D. Nev. 2011) (denying approval of proposed settlement with insiders where it appeared that agreement was essentially negotiated and determined between insiders of the Debtor).

## V.

## OBJECTION TO DEBTORS' MOTION TO AMEND THE FINAL DIP ORDER

101.    As part of the overall strategy of the Debtors and Yucaipa to enjoin the prosecution of the New York Action, the Debtors also ask the Court to approve an amendment to the Final DIP Order to permit them use proceeds of DIP Loans to pay professional fees and expenses associated with the prosecution of the Adversary Proceeding.  It is wholly inappropriate -- and the Debtors can ill-afford to borrow money, and pay interest on those borrowings -- to finance litigation that will provide no benefit to the estate and only benefit Yucaipa.

102.    The DIP Amendment Motion unfortunately comes as no surprise to the Petitioning Creditors, as this will not be the first time the Debtors use their cash to underwrite Yucaipa's litigation fees and expenses.  In July of this year, the Petitioning Creditors learned that the Debtors had made payments in the amount of approximately $2 million in the aggregate to Latham & Watkins LLP and Kasowitz, Benson, Torres & Friedman LLP on behalf of Yucaipa for services rendered in connection with the Georgia Action against CIT (in addition to paying their own counsel).  (*See* App. Ex. V, Letter to Debtors' Counsel;  App. Ex. W Debtors' Counsel's email responding to Letter).  Of this amount, approximately $800,000 was paid in the twelve-month period preceding the Petition Date and is likely recoverable as preferential transfers.[26]  The present DIP Amendment Motion is nothing more than an effort to have the Debtors again underwrite Yucaipa's litigation costs, but this time by paying interest as well!  By

---

[26]    The entirety of the payments are also likely recoverable as fraudulent transfers since the estate received no consideration or benefit for making these payments.  Further, these payments were not reflected in Allied Systems Holdings, Inc.'s ("Allied Holdings") Statement of Financial Affairs.  *See* App. Ex. U, SOFA of Allied Holdings, Exh. C - Payments to Insiders [D.I. 297].  And although upon the Petitioning Creditors' demand the Debtors subsequently amended their SOFA to reflect these transfers, the amendments still did not make clear that these transfer were made to or for the benefit of Yucaipa.  *See* App. Ex. X, Amended SOFA of Allied Holdings, Exh. C - Payments to Insiders at 5-6 [D.I. 311] (showing payments made to Latham & Watkins LLP and Kasowitz, Benson, Torres & Friedman LLP).

commencing the Adversary Proceeding and injecting themselves into the disputes between the Petitioning Creditors and Yucaipa, the Debtors have taken up Yucaipa's cause and now propose to advance it while burdening the creditors with the costs. This Court should not permit the Debtors to incur these costs for the benefit of Yucaipa. Accordingly, the Petitioning Creditors ask that the Court deny the DIP Amendment Motion and not condone the Debtors' waste of further estate resources to effectuate Yucaipa's agenda.

## CONCLUSION

WHEREFORE, the Petitioning Creditors respectfully request that the Court enter and order, (i) adjourning the Stay Extension Motion, the Credit Bid Motion, and the DIP Amendment Motion until November 26, 2012 or such other date after oral argument in the New York Action on November 19, 2012 as the Court may determine; (ii) denying the relief requested in the Stay Extension Motion, the Credit Bid Motion, and the DIP Amendment Motion; (iii) granting the Petitioning Creditors' Cross-Motion for Abstention, and (iv) granting such other and further relief as is just and proper.

Dated: November 1, 2012
   Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955