## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ALLIED SYSTEMS HOLDINGS, INC.**, *et al.*[1], | **Case No. 12-11564 (CSS)** |
| **Debtors.** | **(Jointly Administered)** |
| | **Proposed Hearing Date: May 31, 2013 at 10:00 a.m.**<br>**Proposed Objection Date: May 29, 2013 at Noon** |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

Allied Systems Holdings, Inc. ("**Allied Holdings**"), together with the other above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), files this motion (the "**Motion**") pursuant to Sections 105(a), 363, 365, and 503(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

---

[1]    The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

Delaware (the "**Local Rules**"), for entry of two orders: (a) one, substantially in the form attached hereto as **Exhibit A** (the "**Bid Procedures Order**"), (i) approving the bid procedures (the "**Bid Procedures**") substantially in the form attached to the Bid Procedures Order at Exhibit 1, including the bid protections as set forth in the asset purchase agreement (the "**Sale Agreement**") between the Debtors, as sellers, and New Allied Acquisition Co. LLC (or its assignee or designee as contemplated by the Sale Agreement) (the "**Stalking Horse Purchaser**") an acquisition entity formed by Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, in their capacities as "Co-Administrative Agents" under the First Lien Credit Agreement (as defined below) at the direction of the BD/Spectrum Requisite Lenders (as defined below), with respect to the proposed sale (the "**Sale**") of substantially all of the assets (as discussed in greater detail below, the "**Purchased Assets**"), (ii) scheduling a hearing (the "**Sale Hearing**") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Purchased Assets (the "**Auction**"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "**Assumed and Assigned Agreements**"), and (v) granting related relief; and (b) a second order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"),[2] (i) authorizing and approving the Sale Agreement, a copy of which is attached hereto as **Exhibit C**, (ii) authorizing the Sale free and clear of liens, claims, encumbrances, and interests pursuant to the Sale Agreement, with such liens, claims, encumbrances, and interests to attach to the proceeds, if any, received by the Debtors from the Sale (the "**Sale Proceeds**") less the amount of cash necessary to fund (1) any professional fee carve-out approved in the Existing DIP Order and Replacement

---

[2]     The form of the Sale Order will be filed with the Court no later than five (5) days prior to the hearing on this Motion.

DIP Order (each as defined below), and (2) such other wind-down costs as may be approved by the Court as part of the Sale Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements (as defined herein), and (iv) granting related relief.  In support of this Motion, the Debtors respectfully state to the Court as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief sought herein are Sections 105(a), 363, 365, and 503(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1.

3.      Pursuant to Local Rule 9013-1(f), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this Motion  if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## II.  BACKGROUND

A.    **The Petitions.**

4.      On May 17, 2012, involuntary petitions were filed against Allied Holdings and Allied Systems, Ltd. (L.P.) ("**Allied Systems**") under Chapter 11 of the Bankruptcy Code in this Bankruptcy Court (the "**Court**").  The involuntary petitions were filed by BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P., (the "**Petitioning Creditors**").  On June 10, 2012, the remaining Debtors (all direct or indirect subsidiaries of Allied Holdings), filed voluntary petitions in this Court.  On June 11, 2012, Allied

Holdings and Allied Systems consented to the entry of an order for relief (the "**Consent Date**"). The "**Petition Date**" of such Debtor is the date that such involuntary petition or voluntary petition was filed by or against such Debtor.  The chapter 11 cases commenced thereby are, collectively, the "**Chapter 11 Cases**."

5.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.      An Official Committee of Unsecured Creditors (the "**Committee**") was appointed by the Office of the United States Trustee on June 19, 2012.

**B.      DIP Obligations.**

7.      Pursuant to an existing debtor-in possession delayed draw term loan facility (the "**First DIP Facility**"), substantially all of the Debtors' assets are encumbered by liens in favor of Yucaipa American Alliance Fund II, LLC, as Agent, for the benefit of certain lenders that are party from time to time to that certain Senior Secured Super-Priority Debtor in Possession Credit and Guaranty Agreement, dated as of June 12, 2012 (as amended from time to time, the "**First DIP Credit Agreement**").  The First DIP Credit Agreement currently provides post-petition financing for the Debtors in an amount of up to $22 million.

8.      Concurrently with this Motion, the Debtors have filed a motion seeking a replacement DIP lending facility (the "**Replacement DIP Facility**"), which seeks to refinance the First DIP Facility with a new credit facility in an amount up to $33.5 million provided by affiliates of the Petitioning Creditors.  The Replacement DIP Facility will provide financing to enable the Debtors to sell their assets as proposed in this Motion and ultimately wind down these Chapter 11 Cases.

C.    **Prepetition First and Second Lien Debt.**

9.    Prepetition Credit Facilities.    The plan of reorganization confirmed in the

Debtors' 2005 bankruptcy case[3] provided for two exit financing facilities: a first lien facility (the

"**First Lien Facility**") and a second lien facility (the "**Second Lien Facility**," and together with

the First Lien Facility, the "**Prepetition Credit Facilities**").    Both of these facilities were

outstanding as of the commencement of the Chapter 11 Cases.    As of the Petition Date or

Consent Date, the Debtors owed approximately $244,021,526 in principal under the First Lien

Facility and $30,000,000 under the Second Lien Facility.    The lenders under the Prepetition

Credit Facilities are referred to as the "**Prepetition Lenders**."    Each of the Debtors and the

collateral agents for the two credit facilities entered into an Intercreditor Agreement dated as of

May 15, 2007 (the "**Intercreditor Agreement**") to set forth, among other things, the relative

rights and priorities as between these two credit facilities.

10.    First Lien Facility.    The First Lien Facility is evidenced by the Amended and

Restated First Lien Senior Secured Super-Priority Debtor in Possession and Exit Credit and

Guaranty Agreement, dated as of May 15, 2007, as amended by an amendment no. 1 dated as of

May 29, 2007, an amendment no. 2, dated as of June 12, 2007, and an amendment no. 3 dated as

of April 17, 2008 (as amended, the "**First Lien Credit Agreement**"),[4] by and among Allied

Holdings and Allied Systems, as borrowers, certain of their subsidiaries, as guarantors, Goldman

Sachs Credit Partners L.P. ("**Goldman Sachs**"), as lead arranger and syndication agent, The CIT

Group/Business Credit, Inc. ("**CIT**"), in its capacity as administrative agent and collateral agent

---

[3]      In re Allied Holdings, et al., filed on July 31, 2005 in the United States Bankruptcy Court for the Northern
District of Georgia, Newnan Division (Case No. 05-12515-CRM), and closed on June 5, 2012.

[4]      An amendment no. 4 dated as of August 21, 2009 (the "**Fourth Amendment**") to the First Lien Credit
Agreement was held invalid and unenforceable in the New York Litigation (as defined herein), and thus is not
included in the definition of First Lien Credit Agreement.

(the "**First Lien Agent**"), and CIT, Yucaipa,[5] and the other lenders party thereto, as lenders (collectively, "**First Lien Lenders**").

11.    CIT resigned as First Lien Agent by notice dated April 19, 2012.  On December 3, 2012, the BD/Spectrum Requisite Lenders appointed Black Diamond Commercial Finance, L.L.C. ("**BDCF**") and Spectrum Commercial Finance LLC as successor Co-Administrative Agents (the "**First Lien Agents**") and BDCF as Collateral Agent under the First Lien Credit Agreement.

12.    The First Lien Facility provided up to $265,000,000 in principal amount of financings, and included three sub-facilities (i) a revolving loan facility of up to $35,000,000, (ii) a synthetic letter of credit facility of up to $50,000,000, and (iii) a term loan facility of up to $180,000,000.

13.    The Petitioning Creditors, together with AMMC VIII, Limited (collectively, the "**BD/Spectrum Requisite Lenders**") collectively hold $56,486,964.50 in principal amount of obligations under the First Lien Facility, which represents 23.15% of the outstanding indebtedness under such facility.    Although Yucaipa purports to hold $134,835,688.70 in principal amount of obligations under the First Lien Facility, which represents 55.25% of the outstanding indebtedness, pursuant to an opinion and order docketed on March 29, 2013, in the Supreme Court of New York, County of New York (Index No. 650150/2012 (the "**New York Litigation**")), Justice Charles E. Ramos held that Amendment No. 4 to the First Lien Credit Agreement was invalid (the "**Fourth Amendment Order**").  Pursuant to the Fourth Amendment Order and Amendment No. 3 to the First Lien Credit Agreement, Yucaipa's portion of the outstanding indebtedness under the First Lien Credit Agreement is excluded for the purpose of

---

[5]      In connection with the First Lien Credit Agreement, "**Yucaipa**" means Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P.

determining the Requisite Lenders under the First Lien Credit Agreement. Accordingly, the BD/Spectrum Requisite Lenders are the Requisite Lenders under the First Lien Credit Agreement. On April 23, 2013, Yucaipa filed in the Supreme Court of the State of New York, Appellate Division, an appeal from, and a motion to stay, the Fourth Amendment Order. However, unless the Fourth Amendment Order is either stayed or reversed on appeal, the BD/Spectrum Requisite Lenders act as the Requisite Lenders, which includes the right to direct the First Lien Agent to submit a credit bid on behalf of the First Lien Lenders. Accordingly, the Stalking Horse Purchaser, upon assignment of the rights of the First Lien Agents, will have the right to credit bid on behalf of the First Lien Lenders.

14.    Second Lien Facility. The Second Lien Facility is evidenced by the Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007, as amended by an amendment no. 1 dated as of May 29, 2007, an amendment no. 2, dated as of June 12, 2007, and an amendment no. 3, dated as of April 17, 2008 (as amended, the "**Second Lien Credit Agreement**"), by and among Allied Holdings and Allied Systems, as borrowers, certain of their subsidiaries, as guarantors, Goldman Sachs, as administrative agent and collateral agent (together with its successors as administrative agent and collateral agent, the "**Second Lien Agent**"), and as lead arranger and syndication agent, and the lenders party thereto (collectively, the "**Second Lien Lenders**"). The Bank of New York Mellon ("**BNYM**") has replaced Goldman Sachs as Second Lien Agent. The Second Lien Facility originally consisted of a $50,000,000 term loan facility.

15.    Prepetition Collateral. Both Prepetition Credit Facilities are secured by liens in all or substantially all of the assets of Allied Holdings and Allied Systems, and their U.S. and Canadian subsidiaries (the Debtors herein), pursuant to (i) in the case of the First Lien Facility,

7

the Amended and Restated Pledge and Security Agreement (First Lien) and (ii) in the case of the

Second Lien Facility, the Amended and Restated Pledge and Security Agreement (Second Lien),

both dated as of May 15, 2007 (the "**Prepetition Security Agreements**").  The credit and

security documents for the First Lien Loan Documents and the Second Lien Loan Documents (as

such terms are defined in the First Lien Credit Agreement) are referred to herein as the

"**Prepetition Loan Documents**," and the collateral described therein is referred to herein as the

"**Prepetition Collateral**."  The Prepetition Collateral principally consists of Rigs, accounts

receivable, deposits in bank accounts, certain real estate, and the stock of most of Allied

Holdings' direct and indirect subsidiaries.  The Debtors agree that their obligations under the

First Lien Credit Agreement and the Second Lien Credit Agreement are secured by perfected,

valid, binding and non-avoidable priority security interests and liens upon substantially all of the

assets of each Debtor; *provided, however*, that the Prepetition Lenders are not perfected in

certain excluded assets and deposit accounts, certain small or pledged deposits in which the First

Lien Agent does not have a control agreement, *see* Cash Management Order [D.I. 109], or in

certain real estate, which is not encumbered by a mortgage, and those assets are not included in

the Prepetition Collateral (collectively, the "**Unencumbered Assets**").  Under the Intercreditor

Agreement, the liens securing the Second Lien Facility are junior and subordinate to the liens

securing the First Lien Facility.

      16.    Prepetition Obligations.

      (a)    First Lien Debt.  Immediately prior to the Petition Date, the

principal amount of the loans under the First Lien Facility was $244,021,526, as

follows:  (a) $35,000,000 in outstanding revolving loans, (b) $33,071,526 in

outstanding letter of credit loans, and (c) $175,950,000 in outstanding term loans

(together with interest, fees and expenses, collectively, the "**Prepetition First Lien Debt**"). The Debtors have acknowledged that the Prepetition First Lien Debt is unconditionally due and owing and secured by valid, unavoidable liens pursuant to paragraph D of the First DIP Order[6] and no longer subject to any challenge except for the claims asserted against Yucaipa in the adversary proceeding captioned *The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa American Alliance Fund I, L.P. et al.*, Adv. Case No. 13-50530.

(b)    Second Lien Debt.    Immediately prior to the Petition Date, the principal amount of the term loans outstanding under the Second Lien Facility was $30,000,000 (together with interest, fees and expenses, collectively, the "**Prepetition Second Lien Debt**").

The indebtedness owing as of the Petition Date under the First Lien Credit Agreement and the Second Lien Credit Agreement is referred to collectively as the "**Prepetition Indebtedness**."

## III.    THE PROPOSED SALE AND RELATED PROCEDURES

### A.    The Proposed Sale.

17.    After substantial analysis, the Debtors believe that it is in the best interests of the Debtors and their estates to enter into the Sale Agreement to sell their assets, subject to higher and better offers. Specifically, the Debtors, after extensive prepetition and postpetition efforts to maximize value, a review of various reorganization, liquidation, and sale options and discussions

---

[6]    The "**First DIP Order**" means the "Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr. L.R. 4001-2: (i) Authorizing Debtors to (a) Obtain Postpetition Secured DIP Financing and (b) Use Cash Collateral; (ii) Granting Superpriority Liens and Providing for Superpriority Administrative Expense Status; (iii) Granting Adequate Protection to Prepetition Secured Lenders; and (iv) Modifying Automatic Stay" entered on July 13, 2012 (Dkt. No. 230).

with the Debtors' professionals, ultimately determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be to sell substantially all of their assets and to then wind-down any remaining operations. The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders and reduce potential risks, contingencies, and uncertainties in the proposed wind-down.

18.    **The following sub-paragraphs summarize key provisions of the Sale Agreement, but are qualified in their entirety by reference to the actual Sale Agreement:[7]**

a.    Purchase Price. The aggregate consideration for the sale and transfer of the Purchased Assets (the "**Purchase Price**") shall be (a) an amount of cash sufficient to pay in full all obligations owing under the Replacement DIP Facility; plus (b) an amount of cash sufficient to fund the Wind Down Budget; plus (c) Additional Cash Consideration of up to $10 million; plus (d) a credit bid equal to the Claim Contribution;[8] plus (e) the assumption of Assumed Liabilities, including payment of all Cure Costs in accordance with the terms of the Sale Order.

b.    Purchased Assets.[9] Substantially all of the Sellers' assets, including, all direct or indirect, right, title, and interests of the Sellers in and to all the tangible and intangible assets, properties, rents, claims, and contracts of the Sellers, to the extent transferable, excluding the Excluded Assets as defined in the Sale Agreement.

c.    Assumed Liabilities. The Stalking Horse Purchaser will assume and pay, perform, or discharge when due or otherwise, certain specified liabilities of the Sellers set forth in the Sale Agreement, including Cure Costs.

d.    Excluded Assets. The Purchased Assets are the only assets transferred to, or otherwise acquired by, the Stalking Horse Purchaser under the Sale Agreement. The Purchased Assets do not include the properties and assets of Sellers listed or described in Section 1.2 of the Sale Agreement.

---

[7]    Capitalized terms in the below sub-paragraphs, otherwise not defined in this Motion, have the meanings ascribed to them in the Sale Agreement and the Bid Procedures, as applicable.

[8]    The Claim Contribution is equal to $70 million less the sum of the amounts in clauses (a), (b), and (c).

[9]    The Sale does not include the transfer of "personally identifiable information," as defined in Section 101(41 A) of the Bankruptcy Code.

RLF1 8624108v.1

e.    Excluded Liabilities. The Sellers shall retain all liabilities and obligations that are not Assumed Liabilities, as described in Section 1.4 of the Sale Agreement.

f.    Business Records. Pursuant to Section 1.1 of the Sale Agreement, the Sellers' Business Records are a Purchased Asset.  Pursuant to Section 8.7 of the Sale Agreement, Purchaser must preserve the Business Records and make such records available to the Debtors.

g.    Due Diligence or Financing Condition. The Stalking Horse Purchaser will have until June 14, 2013 to complete due diligence.[10]   There are no financing conditions.

h.    Closing and Other Deadlines. The Closing shall occur on the date that is two (2) business days following the date that all conditions under Sections 9.1 and 9.2 of the Sale Agreement are satisfied or such other date as the Stalking Horse Purchaser and the Sellers may agree upon in writing.

i.    No Good Faith Deposit; Liquidated Damages.  Because the Stalking Horse Purchaser is credit bidding less than the full amount owed to it pursuant to the Prepetition First Lien Debt, no deposit has been made by or is otherwise required of the Stalking Horse Purchaser.  In the Event the Purchaser breaches its obligations under the Sale Agreement, the Sale Agreement provides that the Sellers shall be entitled, as liquidated damages, to retain the first $5 million of value otherwise distributable to the First Lien Lenders.

j.    Termination. The rights of the Stalking Horse Purchaser and the Sellers to terminate the Sale Agreement are set forth in Section 3.4 of the Sale Agreement.

k.    Successor Liability. The Sale Agreement provides that the Sale Order shall contain a determination that the Stalking Horse Purchaser is not a successor to any Seller or otherwise liable for any Seller's liabilities (other than the Assumed Liabilities).

l.    No Stay. Relief from the fourteen-day stay of Bankruptcy Rule 6004(h) is requested herein.

m.    Non-Solicitation. Section 7.1(f) of the Sale Agreement provides limitations of the Sellers' ability to solicit bids for the Purchased Assets between the date this Motion is filed and the date on which the Bid Procedures Order is entered.

---

[10]    If the Stalking Horse Purchaser's due diligence condition is not satisfied or waived by June 14, 2013, and the Stalking Horse Purchaser elects to terminate the Sale Agreement, the Stalking Horse Purchaser will not be entitled to any Expense Reimbursement (as defined below).

19.    The Debtors believe that the Sale is in the best interests of their estates and all parties-in-interest. Upon approval of the Bid Procedures, the Debtors will continue to market their assets to and negotiate with all potential purchasers, including the Stalking Horse Purchaser, in an effort to achieve maximum value for the benefit of all of their constituents.

**B.    Proposed Bid Procedures.**

20.    The Debtors believe that it is imperative that they promptly move forward with the Auction and the Sale, in order to generate and retain potential purchasers' interests in the Purchased Assets and to maintain the going-concern value of the Debtors' business. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest or best offer for the Purchased Assets while affording appropriate protection for the Stalking Horse Purchaser. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Purchased Assets by financially motivated bidders who are likely to close the transaction.

21.    The Debtors seek to conduct an open sales process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Sale Agreement attached hereto as **Exhibit C**, for the purchase of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the Sale Proceeds, if any.[11] The key provisions of the Sale Agreement are summarized above, but are qualified in their entirety by reference to the actual Sale

---

[11]    The distribution to Yucaipa of its pro rata share of the Stalking Horse Purchaser's equity by virtue of its alleged status as a First Lien Lender (or Sale Proceeds received from a Successful Bidder, as applicable) shall be held in an escrow account, pending a further Court order at the conclusion of the adversary proceeding captioned *The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa American Alliance Fund I, L.P. et al.*, Adv. Case No. 13-50530.

12

Agreement, which terms may change pursuant to negotiation with the Successful Bidder at the Auction.

22.    Attached to the Bid Procedures Order at Exhibit 1 are the proposed Bid Procedures.  Pursuant to Local Rule 6004-1: (a) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (b) the Auction will be conducted openly, but only the Debtors, the Stalking Horse Purchaser, the professionals and advisors of the Creditors Committee, any creditor of the Debtors that has provided written notice to the Debtors' counsel at least five (5) business days in advance of the Auction of his, her, or its intent to attend the Auction, and any Qualified Bidder who has timely submitted a Qualified Bid, together with professional advisors to each of the foregoing, may attend the Auction, and (c) bidding at the Auction will be transcribed.  The Bid Procedures are typical for asset sales of this size and nature, require a deposit (except with regard to the Stalking Horse Purchaser), include provisions for consultation with the Committee, and require that a bidder be a "**Qualified Bidder**" as defined in the Bid Procedures.

23.    **The following paragraphs in this section summarize key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures:**[12]

---

[12]    Capitalized terms not defined in the below sub-paragraphs shall have the meanings ascribed to them in the Bid Procedures or the Sale Agreement, as applicable.

a.     <u>Potential Bidders and Access to Information</u>.  Prior to the deadline for the submission of bids, the Debtors will afford to Potential Bidders meeting certain requirements access to reasonable due diligence or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their reasonable business judgment, determine to be reasonable and appropriate.  To obtain the foregoing due diligence and information, all Potential Bidders must comply with the following requirements:

       i.     Deliver an executed confidentiality agreement substantially on similar terms as that signed by the Stalking Horse Purchaser and in form and substance reasonably acceptable to the Debtors; and

       ii.     Disclose the identity of the Potential Bidder, including the equity holders and sponsors of the Potential Bidder and any guarantors of the obligations of the Potential Bidder in connection with the Sale; and

b.     <u>Qualified Bidders</u>.  To be a "**Qualified Bidder**" a Potential Bidder must meet the following the requirements:

       i.     Deliver an executed confidentiality agreement if not already delivered;

       ii.     Deliver no later than [_____],[13] 2013 financial information and credit-quality support or enhancement that demonstrate, in the Debtors' reasonable discretion, in consultation with the Consultation Party, the financial capability of the Potential Bidder to consummate the proposed transaction for the desired Assets;

       iii.     A determination by the Debtors, in their reasonable discretion, in consultation with the Consultation Party, that the Potential Bidder is reasonably likely to submit a bona fide offer for the Assets and will be able to consummate such transaction if selected as the Successful Bidder within the time frame set forth in the Bid Procedures; and

       iv.     Submission of a Qualified Bid.

---

[13]     At the hearing to approve the Bid Procedures, the Debtors will ask the Court to approve appropriate dates and times for all blank spaces set forth in this Motion and Exhibits.  Generally, the Debtors will be requesting that the Auction be scheduled on or about July 25, 2013 and the Sale Hearing be scheduled on or about July 31, 2013.

c.  Qualified Bid.[14]  To participate in any Auction, a Qualified Bidder must submit a written offer meeting each of the following requirements (a "**Qualified Bid**"):

i.  The consideration must include cash equal to, or in excess of, the **sum** of the following:

(a) an amount sufficient to pay the DIP Payment (as defined in section 2.1(a)(i) the Sale Agreement); plus

(b) an amount equal to the Wind Down Budget Consideration (as defined in section 2.1(a)(ii) of the Sale Agreement); plus

(c) an amount equal to the Additional Cash Consideration; plus

(d) an amount equal to the Claim Contribution (as defined in section 2.1(a)(iii) of the Sale Agreement); plus

(d) $5 million.

In addition, the bid must provide for the assumption of the Assumed Liabilities (as defined in the Sale Agreement).

ii.  Include a good faith deposit (the "**Good Faith Deposit**") in the form of a certified check, wire transfer or such other form of a cash equivalent, in an amount equal to 10% of the aggregate value of the Qualified Bidder's bid, except that the Stalking Horse Purchaser shall not be required to make a Good Faith Deposit;

iii.  Be on terms that are substantially the same or better than the terms of the Sale Agreement and be accompanied by a clean, duly executed and binding purchase agreement, including all schedules, exhibits, and ancillary documents contemplated by the Sale Agreement (collectively, a "**Modified Agreement**"), together with a blacklined copy marked to show all changes from the Sale Agreement with the Stalking Horse Purchaser;

iv.  The Modified Agreement must contain a covenant that the Qualified Bidder shall make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or other applicable competition laws or regulations, if any, and pay all

---

[14] The Stalking Horse Purchaser shall be deemed a Qualified Bidder and its credit bid is a Qualified Bid. The Debtors shall have the right, but not the obligation, to deem any lender holding undisputed claims under the First Lien Credit Agreement in excess of the principal amount of $10 million as a Qualified Bidder, and to permit such Qualified Bidder to participate in the Auction without prior compliance with the requirements of paragraph 12 of the Bid Procedures, provided however, that any offer submitted by such Qualified Bidder at or prior to the Auction shall comply with those requirements.

costs and expenses of such filings (including the Debtors' costs and expenses);

v.      Be accompanied by a list of any executory contracts or unexpired leases that are to be assumed and/or assigned and/or specify whether the final assumption and assignment of such contracts and leases is subject to any "designation rights" period;

vi.     State that the bidder will: (a) consummate and fund the proposed transaction by no later than the outside Closing Date set forth in the Sale Agreement (the "**Closing Deadline**"); and (b) in the event that the bidder is selected as a Backup Bidder, keep its offer to purchase the Assets open until 5:00 p.m. (Eastern Time) on the fifth (5th) business day following the date set for the closing of the sale to the Successful Bidder    (the "**Backup Bid Closing Deadline**").

vii.    To the extent not previously provided, state that the Qualified Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement and any related transaction documents (the "**Sale**"), and include written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that (a) provides for the Debtors as a third party beneficiary of such commitment for financing and (b) will allow the Debtors, in consultation with the Consultation Party, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale;

viii.   Include current audited financial statements and latest unaudited financial statements of the Qualified Bidder or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Qualified Bidder who will guarantee the obligations of the Qualified Bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtors, in consultation with the Consultation Party, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale;

ix.     Include an acknowledgement and representation that the Qualified Bidder:   (a) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (b) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any

16

information provided in connection therewith or the Auction other than as provided in the Modified Agreement and (c) is not entitled to any expense reimbursement, break-up fee or similar type of payment in connection with its bid;

x.  Include evidence of the Qualified Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

xi.  To the Debtors' satisfaction, fully disclose (a) the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, (b) the terms of any such participation, and (c) if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and the financial capacity of such parties to satisfy such liability;

xii.  State that the Written Offer is irrevocable until the later of (a) the closing of the transaction, if such Qualified Bidder is designated as a Successful Bidder and (b) the Backup Bidder Closing Deadline.

xiii.  Must contain provisions allowing the Debtors' reasonable access to the Debtors' books and records for the administration of their bankruptcy cases if any agreement provides for the purchase of such books and records;

xiv.  Not contain any due diligence or financing contingencies as determined by the Debtors in their reasonable discretion;

xv.  In the Debtors' discretion, provide evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement to the Debtors' satisfaction;

xvi.  All documentation submitted in support of the Written Offer must be submitted both in hard copy and electronically.

d.  Bid Deadline.  The deadline for submitting bids by a Qualified Bidder, other than the Stalking Horse Purchaser, shall be [＿＿＿＿＿＿＿], 2013, at 12:00 p.m. (Prevailing Eastern Time) (the "**Bid Deadline**").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

17

e.     Consideration of Offers.   The Debtors, in consultation with the
Consultation Party, may choose to either consider or disregard offers for
an insubstantial portion of the Assets.  Between the Bid Deadline and the
Auction, the Debtors may negotiate with or seek clarification of any
Written Offer or Qualified Bid.  Each Qualified Bidder shall provide to the
Debtors any information reasonably required by the Debtors (which the
Debtors may share with the Committee) in connection with the evaluation
of a Written Offer or Qualified Bid within two (2) business days after such
request is made.  Without the consent of the Debtors, a Qualified Bidder
may not amend, modify or withdraw its Qualified Bid, except for
proposed amendments to increase the amount or otherwise improve the
terms of the Qualified Bid, during the period that such Qualified Bid is
required to remain irrevocable and binding.

f.     Determination of Qualified Bidder and Qualified Bids.  No later than one
(1) business day prior to the Auction, the Debtors, after consultation with
the Consultation Party, shall determine in their business judgment, and
shall notify each Potential Bidder whether (i) such Potential Bidder is a
Qualified Bidder and (ii) such Potential Bidder's Written Offer is a
Qualified Bid.  Each Qualified Bidder and the Consultation Party will be
given access to all Qualified Bids at such time.   In evaluating any
Qualified Bid or subsequent bid, the Debtors shall treat comparable credit
bids and cash bids as equivalent and no credit bid shall be considered
inferior to a comparable cash bid because it is a credit bid.

g.     Auction. In the event that two or more Qualified Bids (including the Sale
Agreement) are received, the Debtors shall conduct an Auction of the
Assets.  At least one (1) day in advance of the Auction, the Debtors will
notify all Qualified Bidders of the highest or otherwise best Qualified Bid
(the "**Opening Bid**"), as determined by the Debtors in consultation with
the Consultation Party.   Only a Qualified Bidder than submitted a
Qualified Bid will be eligible to participate in the Auction.  The Auction
shall   commence   at   10:00   a.m.  (**Prevailing   Eastern   Time**)   on
[_____], 2013, at the offices of Richards, Layton and Finger, P.A.
located at 920 N. King Street, Wilmington, DE 19801 and continue
thereafter until completed.  Each Qualified Bidder participating in the
Auction will be expected to confirm at the Auction that it has not engaged
in any collusion regarding these Bid Procedures with any other Qualified
Bidder, the Auction or any proposed transaction relating to the Assets or a
portion thereof. The Auction will begin initially with the Opening Bid and
shall proceed thereafter in minimum increments of at least $500,000, with
the specific increments for each round of bidding to be announced on the
record at the Auction.  In the Debtors' discretion and upon consultation
with the Consultation Party, all Qualified Bidders shall have the right to
submit additional bids and make additional modifications to their purchase
agreement  or  Modified  Agreement,  provided,  however  that  such
modifications, on an aggregate basis and viewed in whole, shall not be less

18

favorable to the Debtors, as determined by the Debtors, and in consultation with the Consultation Party. Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable thereafter, and after consultation with the Consultation Party, identify and determine in its reasonable business judgment the highest or otherwise best Qualified Bid for the Assets (the "**Successful Bid**") and require the Successful Bidder to deliver the Successful Purchase Agreement and to deposit with the Debtors the Successful Bidder Deposit within two (2) business days after conclusion of the Auction (provided that the Stalking Horse Purchaser shall not be required to provide the Successful Bidder Deposit if the Sale Agreement is the Successful Purchase Agreement).

h.     Backup Bid.    At the conclusion of the Auction, the Debtors will determine, after consultation with the Consultation Party, which Qualified Bid, if any, is the next highest or otherwise best Qualified Bid and designate such Qualified Bid as a "**Backup Bid**" in the event the Successful Bidder fails to consummate the contemplated transaction. A Qualified Bidder that submitted a Qualified Bid that is designated a Backup Bid is a "**Backup Bidder.**" Upon a determination by the Debtors, after consultation with the Consultation Party, that the Successful Bidder is a Defaulting Buyer, the Debtors will be authorized, but not required, to consummate a sale transaction with the Backup Bidder on the terms and conditions of the Backup Bid (the "**Backup Purchase**") without further order of the Bankruptcy Court provided that the Bankruptcy Court approves such Backup Purchase at the Sale Hearing

i.     Expense Reimbursement.    Recognizing the Stalking Horse Purchaser's expenditure of time and resources, the Sale Agreement provides for certain bid protections, which are designed to compensate the Stalking Horse Purchaser for its efforts and agreement to date and to facilitate a full and fair process designed to maximize the value of the Purchased Assets. Specifically, the Debtors have determined that the Sale Agreement will further the goals of the Bidding Procedures by establishing a floor against which all other bids are evaluated. As a result, if the Sale Agreement is terminated pursuant to Sections 3.4(b) (d) (e) (g) (i) or (k), the Stalking Horse Purchaser shall be paid the Purchaser's Expense Reimbursement as defined in Section 7.1 of the Sale Agreement (the "**Expense Reimbursement**"). The Expense Reimbursement consists of the Stalking Horse Purchaser's reasonable and documented costs associated with the negotiation, execution, and delivery of the Sale Agreement and the transactions contemplated thereby and is subject to a cap of $3,000,000. The closing of any Alternative Transaction (as defined in the Sale Agreement) shall be contingent upon the payment of the Expense Reimbursement. (Sale Agreement, Section 7.1(a)).

j.     Sale Hearing. The Sale Hearing shall be conducted by the Bankruptcy Court on or before [_____], 2013.

19

k.   <u>Modifications</u>. The Debtors, with the prior written consent of the Replacement DIP Agents, may adopt and modify rules for the Auction at the Auction that, in the Debtors' reasonable judgment, in consultation with the Consultation Party, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court. The Bid Procedures may not be modified except upon order of the Bankruptcy Court or the express written consent of the Debtors, the Committee, the Replacement DIP Agents and the Stalking Horse Purchaser. The deadlines set forth in the Bid Procedures may not be extended without the prior written consent of the Replacement DIP Agents.

24.   The Debtors, with the consent of the Stalking Horse Purchaser, Replacement DIP Agents, and the Committee, expressly reserve the right to modify the relief requested herein. Moreover, the Debtors, with the consent of the Stalking Horse Purchaser, the Replacement DIP Agents, and the Committee, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Purchased Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set forth herein or the date for the Auction; (d) cancel or extend the sale of the Purchased Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

25.   The BD/Spectrum Requisite Lenders have directed the First Lien Agents to assign, and the First Lien Agents have assigned, their credit bid rights to the Stalking Horse Purchaser.

RLF1 8624108v.1

**C.**     **Notice of Auction.**

26.     The Debtors seek to have the Auction scheduled for a date no later than August 8, 2013.[15] The value of the Purchased Assets may decline substantially if the Sale process is not completed on an expedited basis. The Debtors' key customers and vendors may terminate their relationships with the Debtors, and potential bidders may lose confidence in the certainty of the Sale process and decide to stop pursuing the purchase of the Purchased Assets. As such, it is imperative to move forward with the Auction and the Sale promptly.

27.     Not later than three (3) business days after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached to the Bid Procedures Order at Exhibit 2 (the "**Sale Notice**"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Purchased Assets (by overnight mail); (b) counsel to the Stalking Horse Purchaser; (c) the Office of the United States Trustee for the District of Delaware; (d) known entities holding or asserting a security interest in or lien against any of the Purchased Assets; (e) taxing authorities whose rights may be affected by a sale of the Purchased Assets; (f) counsel to the Committee; (g) all Attorneys General for the states in which the Debtors conduct business; and (h) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

28.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of

---

[15] Section 8.1(aa) of the proposed replacement debtor-in-possession financing facility provides that an event of default will be triggered if (i) the Auction to determine the highest or otherwise best bid for all or substantially all of the Debtors' assets is not held by August 8, 2013 or (ii) the order of the Court authorizing the sale of all or substantially all of the Debtors' assets in accordance with the Successful Bid is not entered by the Court on or before August 16, 2013.

Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware, 19801; and (d) be served so as to be received by: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Stalking Horse Purchaser (or the Successful Bidder, as applicable); (iv) the Office of the United States Trustee; (v) counsel to the Committee; and (vi) all parties listed on the Main Service List, the Supplemental Service List (Pensions) and the Supplemental Service List (Government Tax / Environmental Agencies) in the Canadian recognition proceeding (collectively, the "**Notice Parties**"). The Debtors further request that the Court set an appropriate deadline to file and serve any objections to the proposed Sale (the "**Sale Objection Deadline**").

29.     Not later than ten (10) days after entry of the Bid Procedures Order, the Debtors will publish the Sale Notice in the national edition of *The Wall Street Journal or The New York Times*.

**D.     Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Assumed and Assigned Agreements.**

30.     To facilitate and effect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements, to the Stalking Horse Purchaser, or as applicable, to the Successful Bidder.

31.     The Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale (the "**Cure Amounts**"), and (b) the deadlines for objections to the assumption and/or assignment of Contracts and Leases to be assumed and/or assigned in connection with the Sale (collectively, the "**Cure Procedures**").

32.     The Debtors shall prepare and distribute to non-Debtor parties to all potential Assumed and Assigned Agreements a notice, substantially in the form annexed to the Bid Procedures Order at Exhibit 3 (a "**Cure Notice**"), listing (a) the potential Assumed and Assigned Agreement(s), and (b) the Cure Amount(s), if any, no later than five (5) business days before the

Auction. Within three (3) business days of the Sale Hearing, the Debtors shall distribute to non-

Debtor parties to all potential Assumed and Assigned Agreements evidence of the Stalking

Horse Purchaser's (or Successful Bidder's, as applicable) ability to comply with section 365 of

the Bankruptcy Code (to the extent applicable), including providing adequate assurance of the

Stalking Horse Purchaser's ability to perform in the future the Assumed and Assigned

Agreements.

      33.    To facilitate a prompt resolution of cure disputes and objections relating to the

assumption and assignment of the Assumed and Assigned Agreements, the Debtors propose the

following deadlines and procedures:

    a.    The non-Debtor parties to the Assumed and Assigned Agreements shall have until [_____], 2013 (the "**Contract Objection Deadline**"), which deadline may be extended in the sole discretion of the Debtors, to object (a "**Contract Objection**") to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assumed and Assigned Agreements in connection with the Sale; provided, however, if the Debtors amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties to the added contract or lease or to the reduced Cure Amount contract or lease shall have until five (5) days after such amendment to submit a Contract Objection (the "**Amended Contract Objection Deadline**").

    b.    Any party objecting to (i) any Cure Amount, and/or (ii) the proposed assumption and assignment of any Assumed and Assigned Agreement in connection with the Sale, shall file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assumed and Assigned Agreements(s), as applicable, any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 4:00 p.m., on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a non-Debtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "**Disputed Cure Amount**"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale

Hearing, and subject to the consent of the Successful Bidder to such consensual resolution, the Debtors shall promptly provide the Notice Parties with notice and opportunity to object to such proposed resolution, (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter, or (c) the Successful Bidder may remove the contract to which the Contract Objection relates from the schedule of contracts to be assumed and assigned.

c.   In the event that the Stalking Horse Purchaser is not the Successful Bidder for the Purchased Assets, within [＿＿] business days after the conclusion of the Auction for the Purchased Assets, the Debtors will serve a notice identifying the Successful Bidder to the non-debtor parties to the Assumed and Assigned Agreements that have been identified in the Bid of the Successful Bidder. The non-debtor parties to the Assumed and Assigned Agreements will have until [＿＿＿＿＿＿＿＿＿], 2013 (the "**Adequate Assurance Objection Deadline**") to object to the assumption, assignment, and/or transfer of such Assumed and Assigned Agreement solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code (an "**Adequate Assurance Objection**").

34.    Unless an objection to the assumption and assignment of an Assumed and Assigned Agreement is filed and served before the Contract Objection Deadline, the Amended Contract Objection Deadline, or the Adequate Assurance Objection Deadline, as applicable, all counterparties to the Assumed and Assigned Agreements shall be (a) forever enjoined and barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors, their estates, the Stalking Horse Purchaser, or the Successful Bidder shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices, (b) deemed to have consented to the Cure Amount, and (c) forever barred and estopped from asserting or claiming against the Debtors, the Stalking Horse Purchaser, or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements, or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

## IV.   RELIEF REQUESTED

35.     By this Motion, the Debtors seek the for entry of two orders: (a) the Bid Procedures Order, (i) approving the Bid Procedures, including the bid protections as set forth in the Sale Agreement, (ii) scheduling the Sale Hearing, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine cure amounts and deadlines for objections for the Assumed and Assigned Agreements, and (v) granting related relief; and (b) the Sale Order, (i) authorizing and approving the Sale Agreement, (ii) authorizing the Sale free and clear of liens, claims, encumbrances, and interests pursuant to the Sale Agreement, with such liens, claims, encumbrances, and interests to attach to the Sale Proceeds less the amount of cash necessary to fund (1) any professional fee carve-out in the First DIP Order and in the Replacement DIP Order,[16] and (2) the Wind Down Budget as contemplated in the Sale Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements (as defined herein), and (iv) granting related relief.

## II.   BASIS FOR RELIEF REQUESTED

**A.    The Sale Is Within the Sound Business Judgment of the Debtors and Should Be Approved.**

36.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this

---

[16]     The **"Replacement DIP Order"** means the "Final Order Pursuant to 11 U.S.C §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr. L.R. 4001-2: (i) Authorizing Debtors to (A) Obtain Postpetition Secured Replacement DIP Financing and (b) Use Cash Collateral; (ii) Granting Superpriority Liens and Providing for Superpriority Administrative Expense Status; (iii) Granting Adequate Protection To Prepetition Secured Lenders; (iv) Modifying Automatic Stay; and (v) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)" submitted  concurrently with this Motion..

25

Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

37.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). The Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto is based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

26

38.     Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

39.     The Debtors submit that sound business justification exists to sell the Purchased Assets to the Stalking Horse Purchaser (or the Successful Bidder, as applicable) pursuant to the Bid Procedures and the Sale Order.  Absent a sale of their assets, the Debtors lack sufficient cash resources to continue to operate the business and pay their debts as they are due, and the value of the Purchased Assets will continue to decline absent a prompt sale.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

40.     The notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets.  Indeed, the Debtors have and, upon approval of the Bid Procedures, will continue to market the Purchased Assets and will solicit the most likely interested competing bidders with the assistance of Rothschild, the Debtors' investment banker.  Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

41.     As discussed below, the Bid Procedures are designed to maximize the value received for the Purchased Assets, satisfying the third prong of the *Abbotts Dairies* standard. The "good faith" prong of the *Abbotts Dairies* standard is also satisfied as discussed further below.

**B.     The Bid Procedures and Expense Reimbursement Are Appropriate.**

42.     The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and perform diligence.  The Bid Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors have subjected, and will continue to subject, the Purchased Assets to market testing and are permitting prospective purchasers to bid on the Purchased Assets.  The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures.

43.     Further, the Expense Reimbursement is reasonable and necessary.  Section 7.1(a) of the Sale Agreement provides for the approval and payment of the Stalking Horse Purchaser's reasonable Transaction Costs (as defined in the Sale Agreement) incurred in connection with the Sale or negotiations regarding the Sale Agreement if the Sale Agreement is terminated under certain circumstances, including the closing of an Alternative Transaction (as defined in the Sale

28

Agreement). Further, the Bid Procedures Order must provide that payment of the Expense Reimbursement shall be a condition to closing of any Alternative Transaction. Notably, the Sale Agreement provides solely for reimbursement of the Stalking Horse Purchaser's Transaction Costs (capped at $3 million); there is no "break-up" or similar fee.

44. Historically, bankruptcy courts have approved bidding incentives, including expense reimbursements to an initial bidder or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); *In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a break-up fee).

45. The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In *In re O'Brien Environmental. Energy, Inc.,* 181 F.3d 527 (3d Cir. 1999), the Court of Appeals held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context. Finding no "compelling justification" for treating an application for break-up fees and expenses under section 503(b) any differently from other applications for administrative expenses, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's

29

ability to show that the fees were actually necessary to preserve the value of the estate." *Id.* at 535.

46.     In *O'Brien*, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, justifying administrative expense status.  First, there exists an actual benefit to the estate where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537.  Second, where the availability of bidding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtors is sold will reflect its true worth." *Id.*  Both of those circumstances exist in this case. The Expense Reimbursement was critical in persuading the Stalking Horse Purchaser to make an initial offer, which will serve as a "floor" for other bidders in connection with the Sale.  Further, the Expense Reimbursement was critical in persuading the Stalking Horse Purchaser to expend the time and resources associated with conducting due diligence regarding the Sale and with negotiating and entering into the Sale Agreement.  Moreover, the Stalking Horse Purchaser is not seeking a "break-up fee," but only its "reasonable and documented, out-of-pocket costs, expenses, disbursements and charges" related to the Sale or the Sale Agreement, and the Expense Reimbursement is subject to a cap of $3,000,000.  Sale Agreement § 7.1(a). Given the benefit provided to the Debtors' estates by the Stalking Horse Purchaser and the minimal protection of seeking only its reasonable costs and fees, the Debtors submit that under the "administrative expense" standard enunciated in *O'Brien*, the Expense Reimbursement

RLF1 8624108v.1

should be approved as fair and reasonable, and any Alternative Transaction should be conditioned on payment of the Expense Reimbursement.

47.     Accordingly, the Bid Procedures should be approved as set forth in the Bid Procedures Order.

## C.     The Sale is Proposed in "Good Faith."

48.     The Debtors request that the Court find that the Stalking Horse Purchaser (or the Successful Bidder, as applicable) is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the Sale.

49.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

50.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, Section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Purchased Assets.

51.     The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Sale Agreement was an arm's-length transaction, in which the Stalking Horse Purchaser (or the Successful Bidder, as applicable) acted in good faith.  The Auction is an open sale process, and the Debtors will have their own separate legal counsel to negotiate on their behalf throughout the Auction and the Sale.  Accordingly, the Debtors request

that the Court make the finding at the Sale Hearing that the Stalking Horse Purchaser (or the Successful Bidder, as applicable) has purchased the Purchased Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

**D.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

52.    Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

53.    The BD/Spectrum Requisite Lenders have consented to the Bid Procedures and the Sale Agreement in the forms attached hereto. Moreover, the Second Lien Lenders in these Cases are deemed to have consented to the Sale by virtue of the consent of the BD/Spectrum Requisite Lenders under the First Lien Facility, pursuant to section 3.1(b) of the Intercreditor Agreement. As a result, the Debtors have satisfied, at minimum, the second requirements of Section 363(f) of the Bankruptcy Code, if not others as well. Therefore, approving the sale of the Purchased Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by Section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL

1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).  As a result, the Purchased Assets may be sold free and clear of prepetition liens.

E.    **The Cure Procedures Provide Adequate Notice and Opportunity to Object and Should Be Approved.**

54.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide

adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

55.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

56.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

57.     Additionally, as set forth above, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under Title 11. Provided

that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Accordingly, pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

58.      The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Agreements with adequate notice, in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Agreements will then be given an opportunity to object to such notice. Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these Cases.

F.      **Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

59.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of

35

fourteen 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

60.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

61.     As described above, time is clearly of the essence, since the Debtors have insufficient cash to operate the business on a prolonged basis, and the continuing over-all market uncertainty and volatility are causing a decline of the value of the Debtors' estates.  Since a prompt closing of the Sale is of critical importance, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

### III.    NO PRIOR REQUEST

62.     No prior Motion for the relief requested herein has been made to this or any other court.

### IV.    NOTICE

63.     Notice of this Motion has been given to the following parties (if known), or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District

of Delaware; (b) counsel to the Committee; (c) counsel to the Stalking Horse Purchaser; (d) all taxing authorities having jurisdiction over any of the Purchased Assets subject to the sale, including the Internal Revenue Service; (e) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (g) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of the filing of this Motion; (h) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; (i) all Attorneys General for the states in which the Debtors conduct business; (j) all potential bidders previously identified or otherwise known to the Debtors; and (k) all parties listed on the Main Service List, the Supplemental Service List (Pensions) and the Supplemental Service List (Government Tax / Environmental Agencies) in the Canadian recognition proceeding.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*Page intentionally left blank*

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as **Exhibit B**; and (iii) such other and further relief as the Court deems just and proper.

Dated: May 17, 2013
Wilmington, Delaware


Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone No.:    (302) 651-7700
Facsimile No.:    (302) 651-7701
E-Mail:    Collins@rlf.com
E-Mail:    samis@rlf.com

-and-

Jeffrey W. Kelley (GA Bar No. 412296)
Ezra H. Cohen (GA Bar No. 173800)
Carolyn P. Richter (GA Bar No. 944751)
Matthew R. Brooks (GA Bar No. 378018)
Benjamin R. Carlsen (GA Bar No. 940614)
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308-2216
Telephone No.:    (404) 885-3000
Facsimile No.:    (404) 885-3900
E-Mail:    jeffrey.kelley@troutmansanders.com
E-Mail    ezra.cohen@troutmansanders.com
E-Mail:    carolyn.richter@troutmansanders.com
E-Mail:    matthew.brooks@troutmansanders.com
E-Mail:    Benjamin.carlsen@troutmansanders.com

*Counsel for Debtors*

38