# **Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                      ) Chapter 11
                            )
ALLIED SYSTEMS HOLDING,     ) Case No. 12-11564 CSS
                            )
        Debtor.             )


RICHARDS LAYTON & FINGER
One Rodney Square - 3rd Floor
Wilmington, Delaware

Wednesday, August 14, 2013
10:00 a.m.


-- TRANSCRIPT OF AUCTION PROCEEDINGS --


WILCOX & FETZER
Registered Professional Reporters
1330 King Street - Wilmington Delaware   19801
(302) 655-0477
www.wilfet.com



W&F
WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477
www.wilfet.com



ORIGINAL

2

```
 1                    MR. KELLEY:  For the record, my
 2   name is Jeff Kelley.  I practice with
 3   Troutman Sanders in Atlanta, counsel for the
 4   debtors.
 5                    This is the auction that is
 6   authorized and ordered to take place by virtue
 7   of Judge Sontchi's order, I think it's dated
 8   June 21st.
 9                    What we're going to do is my
10   co-counsel, Mark Collins, is going to lead us
11   through the rules of the auction that are set
12   forth in the bid procedures.  And then after
13   Mr. Collins is through, we're going to turn it
14   over to Steve Antinelli of Rothschild to
15   commence the actual auction process.
16                    MR. COLLINS:  Thank you.  For the
17   record, Mark Collins of Richards, Layton &
18   Finger on behalf of the debtors.
19                    What I would first like us to do
20   is have those who intend to speak on behalf of
21   any party present at the auction to announce
22   themselves, provide spelling of your name.  And
23   each and every time you speak going forward,
24   please announce your name and the party you
```



1  represent so that it can be taken down by the

2  court reporter.

3           So why don't we first start with

4  Adam Harris, if you could start?  And then work

5  down around the room for those who intend to

6  speak, again, at today's auction.

7           MR. HARRIS:  Sure.  This is

8  Adam Harris from Schulte, Roth & Zabel.  I'm

9  here on behalf of both Black Diamond and

10  Spectrum in their individual capacities and

11  their capacity to the requisite lenders.

12           MR. COLLINS:  Anybody else who

13  will be speaking on behalf of Black Diamond and

14  Spectrum or the requisite lenders?

15           MR. HARRIS:  I don't know right

16  now.

17           MR. COLLINS:  Okay.

18           MR. KLYMAN:  Robert Klyman,

19  K-L-Y-M-A-N, of Latham & Watkins LLP on behalf

20  of Yucaipa.  Also, Mike Nestor of Young Conway.

21           MR. COLLINS:  Thank you.

22           MR. AUSTIN:  Jess Austin from

23  King & Spalding on behalf of Jack Cooper

24  Holdings Corporation.  Also, potentially

4

1  speaking would be Mark Shapiro from Barclays,

2  Theo Ciupitu from Jack Cooper's in-house

3  counsel and my partner Paul Ferdinands.

4           MR. KELLEY:  Again, this is

5  Jeff Kelley.  For those who just walked in,

6  what we're doing is we're identifying people

7  who intend to speak at the auction.  We're not

8  identifying every person.

9           Please continue.

10          MR. COLLINS:  Mr. Burke.

11          MR. BURKE:  Michael Burke,

12  Sidley Austin on behalf of the official

13  committee of unsecured creditors.

14          MR. COLLINS:  Anybody else?

15          Anybody on the phone who intends

16  to speak at the auction?

17          MR. HOLDEN:  This is

18  Frederick Holden on behalf of Vascor Limited.

19  That's Holden, H-O-L-D-E-N.  I'd also like to

20  note that the person who spoke right after

21  Mr. Klyman, it was inaudible on the telephone.

22  So I couldn't hear who it was or who he

23  represents.

24          MR. COLLINS:  That was



1   Jess Austin of King & Spalding on behalf of

2   Jack Cooper.

3               MR. HOLDEN:   Thank you.

4               MR. SELTZER:   Richard Seltzer,

5   Cohen, Weiss & Simon LLP for the Teamsters

6   negotiating committee.   I doubt I'm going to

7   have anything to say at the auction.   But just

8   in case, I'll just put my name in there.

9               MR. COLLINS:   As everyone is

10  aware, the auction will be conducted --

11              MR. WAXMAN:   Well, this is

12  Jeff Waxman of Morris, James on behalf of

13  General Motors, LLC and two related entities.

14  Before we get started, General Motors has not

15  been permitted to participate.   So I don't know

16  that I'm going to have anything else to say.   I

17  just want to put something very quickly on the

18  record, if I might.

19              MR. COLLINS:   Okay.   Go ahead.

20              MR. WAXMAN:   Pursuant to this

21  Court's order dated June 21st, 2013 approving

22  the bid procedures on August 8th, General

23  Motors submitted a credit bid for its claim.

24  And on August 9th, General Motors was notified

6

1   that it was not a qualified bidder as that term

2   is defined in the bid procedures order,

3   although it was subsequently invited to attend

4   but not participate in the auction.

5            General Motors objects to its

6   exclusion from participation in the auction and

7   expressly reserves and preserves its right to

8   object to the sale of any of the debtors'

9   assets based upon, among other things, the

10  debtors exclusion of General Motors from the

11  auction process which violates this Court's bid

12  procedures order.

13           MR. KELLEY:  This is Jeff Kelley

14  speaking.  We respectfully disagree with the

15  General Motors position.  We would note that

16  General Motors does not have an allowed

17  liquidated claim and the automatic stay

18  precludes it from exercising its set-off right.

19  And the order in no way pre-judges any of those

20  issues.

21           That being said, Mr. Waxman, the

22  debtor has been in contact with both of the

23  qualified bidders.  And we are attempting to

24  resolve your issue short of having to go to



1  court with it.  We'll be in further contact

2  with you about that.

3                 MR. WAXMAN:  I appreciate it.

4  Thank you very much.  Best of luck, gentlemen.

5                 MR. COLLINS:  Thank you.

6                 MR. AUSTIN:  I guess this is the

7  point of making objections for the record.

8  Jess Austin on behalf of Jack Cooper.

9                 We object to Vascor in any way

10  participating in this auction.  The debtors

11  determined that whatever it submitted was not a

12  qualified bid.  And our reading of paragraph

13  nine of the actual bid procedures order only

14  allows designated entities as well as qualified

15  bidders to participate.  It is not a qualified

16  bidder and we object to its participation.

17                 MR. COLLINS:  For the record,

18  Mark Collins.  We understand Jack Cooper's

19  objection to that.  We do note in the bid

20  procedures which were incorporated by reference

21  into the bid procedures order that the debtors

22  are permitted discretion to invite other

23  parties to the auction, which we have done.

24                 MR. AUSTIN:  And we reserve our

1  rights, if we have a hearing on the 22nd and

2  we're not ultimately the successful bidder, to

3  continue to raise this as an issue.

4           MR. COLLINS:  Okay.  So noted.

5           MR. HOLDEN:  Excuse me.  This is

6  Fred Holden again.  Could I ask that the

7  microphone be placed close to whoever is

8  speaking?  I can catch about half of what that

9  speaker is saying.  I don't even know to whose

10  bid he objected.  I heard it was an objection.

11  But --

12           MR. AUSTIN:  I objected to your

13  bid, your proposal.

14           MR. HOLDEN:  Okay.  Thank you.

15           If you could move the microphone

16  closer to his seat, that would be very helpful.

17  Thank you.

18           MR. COLLINS:  As everyone knows,

19  the Court entered on June 20th the bid

20  procedures order.  We will be acting in

21  accordance with that order and the attached

22  procedures which were incorporated by reference

23  into that order.

24           I would first like Mr. Harris on



1  behalf of Black Diamond and Spectrum and the

2  requisite lenders and then Mr. Austin on behalf

3  of Jack Cooper to confirm that they have read

4  the bid procedures and they agreed to act in

5  conformance with them.

6              MR. HARRIS:  Adam Harris from

7  Schulte, Roth & Zabel.  We agree to act in

8  conformance with the bid procedures.

9              MR. COLLINS:  Mr. Austin.

10             MR. AUSTIN:  Jess Austin on

11 behalf of Jack Cooper.  We agree as requested.

12             MR. COLLINS:  Okay.  Pursuant to

13 paragraph nine of the order, I'd also like each

14 of the two qualified bidders to confirm that

15 they have not engaged in any collusion with any

16 other qualified bidder regarding the bid

17 procedures, the auction or any proposed

18 transaction relating to the assets or a portion

19 thereof.

20             MR. HARRIS:  Adam Harris from

21 Schulte, Roth & Zabel.  Except with respect to

22 discussions that were pre-authorized by the

23 company and the creditors' committee, we have

24 not engaged in any other conversations with any

10

1    other bidder regarding anything that would be

2    prohibited by paragraph nine.

3                   MR. AUSTIN:  Same for

4    Jack Cooper.

5                   MR. COLLINS:  All right.  Thank

6    you.

7                   Unless there are any questions

8    regarding the terms of the bid procedures, I'll

9    turn it over to Mr. Antinelli.

10                  MR. ANTINELLI:  Thank you.

11                  So based on the submissions we

12   received, we have -- and I think it's been

13   communicated to folks -- the current highest

14   and best offer that has been submitted is the

15   Jack Cooper bid.  I won't go through the whole

16   bid.  Everyone has a copy.  But it's a

17   95-million-dollar cash bid.

18                  At this time, I would ask if

19   either Black Diamond and Spectrum in their

20   capacity as a bidder or if the requisite

21   lenders would want to submit competing bid?

22                  MR. HARRIS:  Again, Adam Harris

23   from Schulte Roth.  Mr. Antinelli, I think we

24   would like an opportunity to meet with the



```
 1    company prior to responding to your request for

 2    putting in any additional bids and would

 3    request a break to do that -- the opportunity

 4    to have that meeting.

 5                    MR. ANTINELLI:  Okay.  I'm fine

 6    with that.  We'll take a break and we'll talk

 7    with Mr. Harris and his clients.

 8                    MR. COLLINS:  Thanks.

 9                    (A recess was taken.)

10                    MR. COLLINS:  We're back on the

11    record.

12                    MR. HARRIS:  This is Adam Harris

13    from Schulte, Roth & Zabel.  I'm going to try

14    and project so you guys can all hear me.  If at

15    any time you can't, just let me know and I'll

16    repeat what I'm saying.

17                    Based upon the conversation we

18    had with the company during the extended break,

19    we have agreed to make certain modifications to

20    the contract we submitted with the New Allied

21    Acquisition Co. bid on August 8th.  I'm going

22    to go through those contract changes first, and

23    then I'm going to describe the specifics of the

24    consideration under the bid.
```

12

1    So with respect to the contract

2    changes, we have agreed to modify the

3    provisions in our asset purchase agreement such

4    that we will agree to pay for all accrued and

5    unpaid/paid time off and vacation for all

6    employees as of closing, not just for

7    transferred employees.  Same thing as it

8    relates to accrued and unpaid compensation.

9    And we will also agree to provide

10   six months of COBRA through allowing employees

11   who are not transferred employees to

12   effectively go through the purchaser's benefit

13   plans for the benefit of that six months.

14   With respect to the outside date

15   in our contract, the outside date for closing,

16   which I believe was currently October 14th,

17   we'll move that date to December 31st, 2013.

18   With respect to the question of

19   whether any proceeds from the proposed

20   settlement with Yucaipa and the Allied

21   directors and the insurers, whether that would

22   be a purchased asset or excluded asset, we will

23   treat that as an excluded asset.

24   We will continue to agree to be



1    the backup bidder under our asset purchase

2    agreement, but we'll move the backup bidder

3    closing deadline to November 30th, 2013 from

4    what I believe is currently October 14th.

5              In Section 8.15 of the asset

6    purchase agreement, we will agree to reimburse

7    100 percent of the expenses incurred by the

8    company in pursuing HSR clearance.

9              And we have agreed to modify our

10   asset purchase agreement, to the extent

11   necessary, to put in what Mr. Collins refers to

12   as a hell-or-high-water specific performance

13   provision, such that in the event of a material

14   breach or a breach by the purchaser, the debtor

15   will have the right to basically seek specific

16   performance of both the cash component of the

17   bid, as well as the credit bid component.

18              Now to the specifics of the

19   modifications to consideration.  This bid is

20   being made by New Allied Acquisition Co., LLC

21   under the terms of the APA with the

22   modifications as I just outlined them for you.

23              Pursuant to Section 12.8(b) of

24   that asset purchase agreement, New Allied has

14

1  the ability to basically have the assets

2  purchased into what are referred to as

3  designated purchasers.  And we're intending to

4  do that in the manner I'm going to describe.

5                    The aggregate consideration, the

6  purchase price under this bid is 95.5 million

7  dollars.  That is compromised of two different

8  components.  There's going to be a cash

9  component equal to the sum of the amounts

10  necessary to pay off the DIP, the amounts

11  necessary to fund the wind-down budget in a

12  form to be agreed with the first lien lenders

13  and additional cash of up to 10 million

14  dollars, but in no event will the cash

15  component be less than 40.5 million.

16                    In addition, there will be a

17  credit bid component to the bid that's going to

18  be in amount sufficient to fill the

19  differential between whatever the cash

20  component is and the 95.5 million.

21                    And we will continue to assume

22  the assumed liabilities as set forth in the

23  asset purchase agreement with the modifications

24  I put on the record a little bit earlier.



1              For purposes of clarification,

2    we're going to create effectively two

3    designated purchasers.  One designated

4    purchaser will acquire the assets of the Axis

5    business, the owned and leased terminal real

6    estate and the vehicles, trucks, rigs,

7    tractors, trailers, et cetera and related

8    systems and operations.

9              The other designated purchaser

10   will acquire all the remaining assets,

11   including customer contracts and other assets.

12   And each of the businesses will assume the

13   liabilities associated with the assets it's

14   acquiring.

15              The ownership of the designated

16   purchasers will be different.  The designated

17   purchaser for the Axis assets, the real estate

18   and the vehicles, et cetera will be an

19   affiliate of Black Diamond and Spectrum, who

20   will effectively fund the cash portion of the

21   purchase price.  And that entity will afford

22   each first lien lender other than Yucaipa an

23   opportunity to participate.

24              The other entity which is going

16

1    to acquire the remaining assets will be

2    providing the credit bid portion of the

3    purchase price and will be owned by the first

4    lien lenders under the first lien credit

5    agreement pro rata.

6                    And that's the substance of the

7    bid.

8                    MR. COLLINS:  Okay.  Any

9    questions from anybody at this point?

10                   MR. ANTINELLI:  No.  I mean, I

11   think we'll take a break.

12                   MR. KLYMAN:  Actually, before we

13   do, do you have anything in writing that

14   memorializes this?

15                   MR. HARRIS:  Well, we have the

16   asset purchase agreement we submitted on the

17   8th.  The modifications I just laid out would

18   be to the provisions of that agreement.  It

19   would otherwise be exactly as we wrote it.

20                   We'll obviously be updating that

21   asset purchase agreement and the related

22   documents as we move through this process.  But

23   we didn't see any sense in starting there

24   because I assume this process is going to be



1    fairly iterative as the day goes on.

2                    It's a long way of saying no.

3    But I'm happy to answer any questions that you

4    have.

5                    MR. AUSTIN:   For the record,

6    Jess Austin.   I'm not understanding, Adam, in

7    which capacity Black Diamond and Spectrum are

8    bidding.   Are they bidding as individual

9    lenders or requisite lenders?

10                   MR. HARRIS:   The bidder is

11   New Allied Acquisition Co., LLC, the same

12   entity that put in the bid on August 8th.   And

13   it's going to exercise its right to designate

14   different entities to acquire certain of the

15   assets as per Section 12.8(b) of the asset

16   purchase agreement.

17                   Those entities that it designates

18   will have different ownership.   But from the

19   company's perspective, it's getting a bid of

20   95.5 million dollars.

21                   MR. AUSTIN:   So to make sure I

22   understand then, the party that submitted the

23   bid by the bid deadline is now offering a

24   non-cash component?

18

1          MR. HARRIS:  We are modifying

2     the agreement to basically make it a combined

3     bid -- what effectively, Jess, is a combined

4     bid for certain assets by Black Diamond and

5     Spectrum and for certain assets by the

6     requisite lenders, both of whom are qualified

7     bidders for purposes of this action.

8          MR. AUSTIN:  But you don't have

9     the documents so that everybody can see your

10    total package of agreements and financing and

11    all of that?

12         MR. HARRIS:  The documents are

13    exactly as we submitted them on the 8th.  The

14    commitment letter was submitted.  Okay.  The

15    asset purchase agreement was submitted.  The

16    adequate assurance package was submitted.  And

17    the designated purchaser provision is in there.

18    So it's exactly the same package we submitted

19    on the 8th and subject to the modifications I

20    just outlined on the record.

21         MR. AUSTIN:  But the Allied side

22    is being -- make sure I understand.  That's to

23    acquire the contracts?  That's the asset that's

24    primarily going into what you call the Allied

1  side with the requisite lenders --

2              MR. HARRIS:  It would be current

3  assets, contracts, a lot of employees.  I

4  haven't got a specific asset list for you right

5  now.  But from the company's perspective, it's

6  a 95.5-million-dollar bid.

7              MR. AUSTIN:  I understand.  But

8  just to be clear, though, the cash part of that

9  is coming through the Axis side, not through

10  the Allied side.

11              MR. HARRIS:  The cash -- I'm not

12  sure I even understand your question.  The cash

13  is being funded -- the obligor on the bid is

14  New Allied Holdings.  New Allied Holdings has a

15  commitment letter for up to 60 million dollars

16  of financing.  It is obligated to pay the

17  purchase price at closing.  How it may decide

18  to subfinance that or do in a different way is

19  kind of irrelevant.

20              MR. AUSTIN:  We reserve on that

21  point.

22              One last question for

23  clarification.  Any changes to the closing

24  conditions under the contract which you

20

1  submitted on the 8th?

2                    MR. HARRIS:   Other than the ones

3  I outlined on the record?   No.

4                    MR. KLYMAN:   For the record,

5  Robert Klyman of Latham & Watkins.   The various

6  customer contracts, those are being essentially

7  assumed and assigned to a new entity?

8                    MR. HARRIS:   Correct.

9                    MR. KLYMAN:   So it's not the

10 purchaser who's the assignee of the contract;

11 it's whoever this designated subpurchaser is?

12                    MR. HARRIS:   Correct.

13                    MR. KLYMAN:   Do you have evidence

14 or projections or anything demonstrating the

15 financial wherewithal of that entity to perform

16 under the contract?

17                    MR. HARRIS:   The financial

18 performance of that entity should substantially

19 mirror the company's projections for that

20 segment of its business as it currently exists,

21 which I believe is forecasting -- what is it --

22 24 million dollars of EBITDA for next year.

23                    MR. KLYMAN:   So one further point

24 of clarification.   What assets that are going



1    to operate to generate that revenue are being

2    acquired by the entity that is the designated

3    purchaser that will own the contracts?

4                  MR. HARRIS:  Well, there will be

5    an intercompany relationship developed between

6    the two designated purchasers where their rates

7    and other stuff will be made available to

8    effectively the operating company to run its

9    business.

10                 MR. KLYMAN:  Do you have those

11   contracts available or any description of those

12   contracts, the intercompany contracts that we

13   can look at?

14                 MR. HARRIS:  I do not have them

15   available right now, no.

16                 MR. KLYMAN:  Okay.  And we think

17   that this offer violates the bidding procedure.

18   Because you have a written offer from a party

19   in which a first lien lender or any affiliate

20   or related party is a participant directly or

21   indirectly in any capacity that is coupled with

22   a non-cash consideration bid.  And to date,

23   there's been no consent provided by a majority

24   of the first lien lenders who are not

22

```
 1   participants in that bid.

 2                   MR. HARRIS:   The non-cash

 3   consideration component is being provided by

 4   the administrative agents at direction of

 5   requisite lenders, which is specifically

 6   contemplated by the bidding procedures to be

 7   made at or prior to the auction.

 8                   MR. KLYMAN:   That's correct.   But

 9   the credit bid that can be made by the

10   requisite lender -- by the agent at the

11   direction of the requisite lender is not one

12   that -- it's being made as part and parcel of a

13   cash bid by an affiliate of a first lien

14   lender, not a credit bid in and of itself.   It

15   would be different if it was just --

16                   MR. HARRIS:   Right.   There's no

17   requisite lender bid that can be made here that

18   doesn't have a material cash component given

19   the requirements of the bid procedures.

20                   So, you know, the argument that

21   you're making, A, the requisite lender bid

22   that's permitted to be made at the auction or

23   any time prior thereto doesn't say that it has

24   to be solely a credit bid.   It just says it may
```



1    be a credit bid.  And to the extent there's a

2    cash component that has to be included in this,

3    obviously it was going to be contemplated there

4    was going to have to be money coming from

5    someplace.  The fact that we've chosen to do it

6    in the manner we have is of actually no

7    significance whatsoever to the estate.

8              MR. KLYMAN:  Our position -- and

9    we don't need to litigate it here.  Our

10   position is that it violates the bid procedures

11   that you and the debtor drafted and put forward

12   and got the Bankruptcy Court to approve.

13             MR. HARRIS:  I understand your

14   position.

15             MR. COLLINS:  Okay.

16             MR. ANTINELLI:  Take a break.

17             MR. BURKE:  One last question.  I

18   won't repeat what Mr. Austin said, but I had

19   similar questions.

20             But just on the closing

21   condition, I believe you had said -- other than

22   what you had stated, there was no change to the

23   closing condition.  So is it still a condition

24   to closing that there be an acceptable

24

1  collective bargaining agreement between, I

2  guess it would be pool one -- entity number

3  one, the Axis business?  So is it still a

4  closing condition that there be a CBA in place?

5  MR. HARRIS:  The CBA would be

6  with respect to actually pool two, which would

7  be where the operating -- the current AAG

8  operating business would effectively reside.

9  The condition is as set forth in

10 the agreement, based on discussions we had with

11 the company and in particular the October 14th

12 outside date which some people viewed as too

13 short in order to get to potentially

14 negotiations or ratified contract.  We moved

15 that date to December 31st, 2013 in order to

16 mitigate the risk of just having not enough

17 time to get it done.

18 MR. BURKE:  So there's walk-away

19 rights if there's no CBA in place, correct?

20 MR. HARRIS:  There is a condition

21 to closing that we have a CBA.

22 MR. BURKE:  Thank you.

23 MR. KLYMAN:  One other point

24 of clarification, Adam.  On this



1  hell-or-high-water provision, I think you said

2  if there's a -- I think you at one point said

3  if there's a breach and then you said material

4  breach.  I'm wondering what triggers it.

5          MR. HARRIS:  Sorry.  Let me be

6  specific on that.  If all the conditions of

7  closing have been met and we don't show up to

8  close, the company will not be required to go

9  to court and prove that they're entitled to

10 specific performance based upon the typical

11 standards of there's no alternative remedy

12 available of law, it can't be compensated by

13 damages.  They just simply get to show up and

14 say give me my money.

15         MR. KLYMAN:  And is there also a

16 potential for a damage remedy associated with

17 the bidder's failure to close?

18         MR. HARRIS:  I think it's their

19 choice.

20         MR. KLYMAN:  And if the bidder

21 fails to close, against whom would the damage

22 remedy be asserted under your hell or high

23 water?  In other words --

24         MR. HARRIS:  Well, under the

26

```
 1    hell-or-high-water provision, you're going to

 2    the purchaser and saying you must close.  Now,

 3    the credit fee component is easy because

 4    they'll just deduct the amount they owe from

 5    the credit facility.  From the cash component,

 6    they're going to have to go to the entities

 7    that are providing the cash to basically get

 8    them to pay it.

 9                 MR. KLYMAN:  So if there's a

10    breach of the agreement and you don't close,

11    then under this scenario can the debtors go to

12    the first lien lenders and say we're now

13    deducting unlimited amounts of the debt or

14    whatever the damage amount is or is it capped

15    at the amount that you're putting forward as

16    the credit bid?

17                 MR. HARRIS:  I haven't actually

18    thought about it.  But I would suspect that at

19    the end of the day, the damage number should

20    not be greater than that which they would have

21    gotten had we closed.

22                 MR. KLYMAN:  Is the full amount

23    of the damages under the hell-or-high-water

24    provision --
```



1              MR. HARRIS:  It's the purchase

2    price.  It's satisfying the purchase price.

3              MR. KLYMAN:  Is it assessable

4    against the first lien lenders in the full

5    amount of the purchase price?  Or, is it 50

6    against the purchaser and 50 against the --

7              MR. HARRIS:  The credit bid

8    portion is against the first lien lenders and

9    the cash portion against the guys who are

10   providing the cash.

11             MR. KLYMAN:  So since we're doing

12   this realtime, I have to clarify.  So if the

13   purchaser fails to close and the

14   hell-or-high-water provision is implemented and

15   they go to court, the cap on damages that would

16   be assessable to the first lien lenders would

17   be a 50-million-dollar deduction in the amount

18   of their claim or could it be something

19   greater?

20             MR. HARRIS:  I believe it's

21   50-million-dollar deduction to their claim,

22   assuming 50 million is the credit bid component

23   of the bid, yes.

24             MR. KLYMAN:  So right now it's --

28

1  I was shorthanding it.  It's --

2                  MR. HARRIS:  It's not -- the most

3  it can be is basically fifty-five.  It could be

4  less.  If the cash number goes up, the credit

5  bid number goes down.  But the credit bid

6  number can't be higher than 55 million.

7                  MR. KLYMAN:  So we're going to

8  want to have that just for clarity written out

9  so we can --

10                  MR. HARRIS:  There's a lot of

11  stuff that's going to have to get written out.

12  We're all doing this in realtime.

13                  MR. KLYMAN:  And is this

14  hell-or-high-water provision -- can the debtor

15  implement the hell-or-high-water provision if

16  there's a breach by the purchaser or is it only

17  once all the conditions to closing have been

18  satisfied?

19                  MR. HARRIS:  Honestly, Robert, I

20  don't think we've gotten to that level of

21  detail.  I mean, if the debtor has a

22  termination right based upon our material

23  breach under the terms of the agreement, then I

24  think at that point in time they could



1    implement it.  They wouldn't have to wait until

2    the very end of the time period, if you will.

3                   So right now the agreement has a

4    termination provision if we breach and fail to

5    cure within a specific period of time.  If they

6    were to exercise that termination right, at

7    that point in time, I would think they would

8    have the right to basically exercise whatever

9    rights they had either for damages or to try

10   and enforce specific performance.

11                  MR. KLYMAN:  Can you specify what

12   assets are going to the second designated

13   purchaser?  You said that that's the one that's

14   going to be the credit bidder.  What assets are

15   they getting in particular?

16                  MR. HARRIS:  Generally they're

17   getting all the current assets, which I

18   understand is about 20 million dollars in

19   accounts receivable, customer contracts, the

20   bulk of the employees -- all employees that are

21   covered by collective bargaining agreements.

22                  Other than that, I mean, I'd have

23   to go through kind of the entire list and whack

24   them all up.  So we haven't done that yet.

30

1      MR. KLYMAN:  We would need to
2  know that in order to be able to evaluate the
3  bid.  I mean, you have to identify who's
4  getting what.
5      MR. HARRIS:  Well, who's the
6  "we"?  Because the company is getting
7  95.5 million dollars.  I'm not sure why the
8  company cares how the purchaser whacks up the
9  assets as between various entities.
10      MR. KLYMAN:  Well, I think for
11  purposes of understanding the bid, we need to
12  know what's going into what pool so we can
13  determine whether or not the bid is reasonable
14  from the perspective not only from the debtors
15  but for other creditors.
16      MR. HARRIS:  Well, I'm not sure I
17  agree with that.  Because if I were to buy it
18  all into a single entity and then drop it down
19  into six different subsidiaries, it would be
20  the same thing and you wouldn't know or care
21  because the estate is getting the same value of
22  consideration.
23      We're going to have to show
24  adequate assurance as to each counter-party to

```
 1   a contract.  So we're going to have to tell
 2   them where each of these assets are going.  And
 3   they have whatever rights that they have to
 4   object to that.  So I'm not sure I even
 5   understand why your question is relevant.
 6                   MR. KLYMAN:  Is the ownership of
 7   the designated purchaser two where you're
 8   acquiring assets for a credit bid, is the
 9   equity interest in that entity spread across
10   first lien lenders?
11                   MR. HARRIS:  Yes, pro rata.
12                   MR. KLYMAN:  So the bidder, it
13   sounds like -- and tell me if I'm wrong here --
14   will own 100 percent of the designated
15   purchaser that purchases Axis, the owned and
16   leased real estate and the like.  And then will
17   the purchaser own any of designated purchaser
18   two?
19                   MR. HARRIS:  No.
20                   MR. KLYMAN:  So at the end of
21   your purchase, if you're the winning bidder,
22   the current bidder will own 100 percent of the
23   pool one assets and own none of the pool two
24   assets; is that correct?
```

32

1          MR. HARRIS:  I'm not sure that

2     the purchaser, per se, is going to own any of

3     the equity in pool one either.  They're going

4     to create a new entity and assign their rights

5     to basically acquire those assets to that

6     entity.

7          So whether we use this vehicle or

8     we don't use this vehicle, we have to figure it

9     out.  But the ultimate equity ownership in the

10    pool one assets is going to be affiliates of

11    Black Diamond and Spectrum and any other first

12    lien lender, other than your client, who wants

13    to participate.

14          And then the pool two assets are

15    going to be owned through a vehicle that will

16    be ratably owned by all the first lien lenders,

17    including your client, and subject to whatever

18    litigation may continue to exist.

19          MR. COLLINS:  Okay.  Mr. Austin.

20          MR. AUSTIN:  Jess Austin with

21    further clarification.

22          MR. HARRIS:  Jess, get closer to

23    a microphone so people can hear you on the

24    phone.



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1          MR. AUSTIN:  To follow up on that

2    last area of questions somewhat, I don't know

3    what to call them, but let's call it the

4    requisite lender bidding company.  What

5    financing commitments does it currently have in

6    place for continuing its operations post if it

7    is deemed the successful bidder and run the

8    business after a closing?

9          MR. HARRIS:  Well, it's got the

10   operating cash flow of the company, which as I

11   said before is projected to be about 24 million

12   dollars EBITDA per year.  To the extent

13   additional financing requirements are out

14   there, we'll provide it.

15          MR. AUSTIN:  But today, what

16   financing commitments today as we're at the

17   auction to submit on support of its bid does it

18   have?  The answer none?

19          MR. HARRIS:  Jess, so the

20   question is to pay the purchase price or to run

21   the business?

22          MR. AUSTIN:  I think --

23          MR. HARRIS:  I'm asking you a

24   question.  You asked me a question.  Are you

34

1  asking me to pay the purchase price?  We have a

2  60-million-dollar financing commitment in place

3  right now.

4           MR. AUSTIN:  That financing I

5  think went to New Allied Acquisition.

6           MR. HARRIS:  And that's the

7  purchaser for purposes of this bid.  They're

8  responsible for paying the purchase price.

9           MR. AUSTIN:  But -- we'll argue

10 this one with the debtor in a few minutes, I'm

11 sure.

12           Separate question I have is that

13 the condition in your contract for there to be

14 acceptable modifications to existing collective

15 bargaining agreements, is that required to

16 close both pieces of the transaction?

17           MR. HARRIS:  The whole deal only

18 closes if all -- the whole deal is all tied

19 together.  It's one purchase.

20           MR. AUSTIN:  Okay.  And if there

21 is no modifications to the collective

22 bargaining agreements satisfactory to the

23 purchaser, will the hell-or-high-water specific

24 performance provisions be applicable?



1              MR. HARRIS:  No.  Unless we --

2    no, they're not.

3              MR. AUSTIN:  Thank you.

4              MR. SELTZER:  Richard Seltzer for

5    the Teamsters negotiating committee.  One or

6    two follow-ups on that.

7              Just to clarify that the

8    employees or the majority of employees will be

9    employed by company two?

10             MR. HARRIS:  I believe that's

11   correct, Richard.

12             MR. SELTZER:  And just to follow

13   up, so that if you're chosen as the bidder and

14   you do not reach a CBA, there are no damages

15   under your contract against your purchaser; is

16   that correct?

17             MR. HARRIS:  Other than the fact

18   that the first lien lenders are now and still

19   have the assets there that they need to realize

20   value on.  No, the company has no damage claim

21   if we choose to terminate at that point.

22             MR. SELTZER:  And there's no way

23   at this point of telling what common ownership

24   there is or there would be between company one

36

1  and company two?

2            MR. HARRIS:  Well, that's not

3  entirely true.  I mean, I think we've

4  publicized pretty well what percentage of the

5  first lien debt the Black Diamond and Spectrum

6  entities own.  And we told you that they're

7  going to own 100 percent of company one subject

8  to certain other lenders wanting to

9  participate.

10           So if nobody else participates,

11  we're going to own 100 percent of company one

12  and roughly 26 percent of company two if the

13  Yucaipa debt is good and fifty-some odd percent

14  of company two if the Yucaipa debt is

15  subordinated.

16           MR. SELTZER:  That's all I have.

17           MR. AUSTIN:  Further clarifying

18  question.  Jess Austin.

19           If I understand it, you have all

20  of the vehicles -- your proposal has put all

21  the vehicles into, for a better description,

22  company one and the hard assets, the operating

23  assets into company one, which will be owned by

24  affiliates of Black Diamond and Spectrum, but



```
 1    that company two will have the customer
 2    contracts and the employees and the current
 3    assets, correct?
 4                    MR. HARRIS:   Correct.
 5                    MR. AUSTIN:   What is the
 6    arrangement between company one and company two
 7    to allow company two to use the vehicles and
 8    the operating assets to perform under the
 9    customer contracts?
10                    MR. HARRIS:   There will be a
11    lease or similar arrangements put in place
12    between those two companies that would allow
13    them access to vehicles they need in order to
14    perform.
15                    MR. AUSTIN:   So at this time you
16    don't have that ancillary agreement completed?
17                    MR. HARRIS:   I do not.
18                    MR. AUSTIN:   Do you have a term
19    sheet?
20                    MR. HARRIS:   No.
21                    MR. AUSTIN:   Thank you.
22                    MR. KLYMAN:   One other.  If we
23    had gotten this over the past two weeks, I
24    wouldn't have asked this many questions.
```

38

```
1              Where is the good faith deposit
2   that you need to put forward in the amount of
3   9.5 million dollars?
4              MR. HARRIS:  So we provided the
5   company already with 5 million dollars.  And
6   the balance would be provided through
7   effectively a give-up on distributions on the
8   first lien debt as contemplated by the terms of
9   the bid procedures order.
10             MR. KLYMAN:  Well, the bid
11  procedures say that you have to include a good
12  faith deposit in the -- oh.  So you're
13  committing to release the Black Diamond and
14  Spectrum portion of the first lien debt?
15             MR. HARRIS:  It would be ratable.
16             MR. KLYMAN:  So you're spreading
17  this across all first lien lenders?
18             MR. HARRIS:  It's a requisite
19  lender bid for that component of it.
20             MR. KLYMAN:  And where in the
21  creditor agreement does the requisite lender
22  allow it to forgive that sort of debt?
23             MR. HARRIS:  We think the
24  administrative agents under the first lien
```



1   credit agreement have broad enough authority in

2   the context of this type of arrangement to make

3   those types of commitments on behalf of the

4   lenders.

5           MR. KLYMAN:  And just to be

6   clear, you don't have independent projections

7   for company two; you're just relying on

8   Allied's projections and transferring that to

9   what we're referring to as company two?

10          MR. HARRIS:  I can't say for sure

11  that we don't have independent projections.

12  But we are for purposes of today basically

13  taking Allied's projections for purposes of

14  determining the viability for that operating

15  company and their operating forecasts.

16          MR. KLYMAN:  Under the

17  assumptions that you're laying out, when there

18  are going to be intercompany arrangements so

19  that company two can use the assets of company

20  one to perform under contracts, what sort of

21  payments is company two going to make to

22  company one under those contracts?

23          MR. HARRIS:  I don't know that

24  the amounts have been resolved yet.

40

1          MR. KLYMAN:  We may have other

2    issues.  But we just wanted to clarify that on

3    the record.

4          MR. COLLINS:  All right.  Let's

5    go off record.

6          (A recess was taken.)

7          MR. COLLINS:  We're back on the

8    record.  Over to Mr. Harris.

9          MR. HARRIS:  Thank you, Mark.

10          This is Adam Harris from Schulte,

11    Roth & Zabel.  I would like to present some

12    modifications to the bid we presented earlier

13    today resulting from some conversations we've

14    had with the company and after their

15    discussions with the consultation parties.

16          The bid that we are submitting is

17    going to be a bid by New Allied Acquisition

18    Co., but on behalf of the administrative agents

19    under the first lien credit agreement at the

20    direction of the requisite lenders.

21          We will continue to -- we intend

22    to divide the assets of the company into the

23    various subsidiary entities that we described

24    this morning.



1          In order to raise the cash for

2    the purchase price, the administrative agent is

3    essentially going to sell the equity of the

4    entity that was going to own Axis, the real

5    estate and the vehicles to the first lien

6    lenders.

7          The purchase price for that

8    equity will be equal to the cash consideration

9    under the bid.  Black Diamond and Spectrum will

10   backstop that rights offering.  And each first

11   lien lender that validly holds debt that is not

12   otherwise subordinated will be entitled to

13   participate.

14          In addition to modifying the

15   structure in the manner I just described, we

16   are going to eliminate the condition to closing

17   that required the execution and ratification of

18   new collective bargaining agreements.  And we

19   are going to replace it with a new closing

20   condition which will incorporate the following

21   concepts:

22          The condition to closing will be

23   that our new operating company be entitled to

24   participate in the new pool under the Central

42

1   States pension plan rather than the existing

2   pool and that we obtain modifications to the

3   existing collective bargaining agreements that

4   comport with the change to the contribution

5   rates that are required for new pool

6   participants as opposed to existing pool

7   participants.

8           In addition, we are going to drop

9   any requirement of having executed and ratified

10  collective bargaining agreements with the CAW

11  and Canada.  And we will insert a materiality

12  qualifier into the condition to closing that

13  there not have been any work stoppages after

14  the execution date and prior to closing.

15          And with those changes, we would

16  resubmit our bid in the aggregate purchase

17  price of 95.5 million dollars.  The terms and

18  conditions would otherwise remain as I laid

19  them out on the record this morning.

20          MR. ANTINELLI:  Thank you.  I

21  think with that the company will take a break.

22          MR. COLLINS:  Just one

23  question with respect to -- Mark Collins for

24  the record.  The increased deposit will be



```
 1    satisfied in which way?
 2                 MR. HARRIS:  The increased
 3    deposit will be satisfied by effectively an
 4    assignment to the company of the right to
 5    receive distributions by first lien lenders in
 6    amount equal to, I think it's going to be about
 7    5.5 million dollars.  There should be
 8    corresponding reduction in the amount of cash
 9    we've already submitted.  But the mechanics of
10    that we'll work out.
11                 MR. COLLINS:  Thank you.
12                 MR. BURKE:  Michael Burke for the
13    committee.  Adam, just so I understand and
14    maybe to go through it a little more slowly,
15    but I get the req lender is going to make the
16    credit bid.  The cash contribution for the bid
17    is going to be through -- is it the pool one
18    assets you're going to sell?
19                 MR. HARRIS:  So just
20    structurally, New Allied Acquisition Company is
21    going to be the purchaser.  It is responsible
22    for payment of the entirety of the purchase
23    price.  It needs to raise both the cash
24    component and provide the credit bid component.
```

44

1          As part of its bid, the intention

2    is to drop the assets down into separate

3    subsidiaries as I outlined this morning.  To

4    raise the cash component of the bid, we are

5    going to sell -- the New Allied Holdings is

6    going to sell the equity in the entity that is

7    going to own the Axis assets, the real estate

8    assets and all the trucks, vehicles, et cetera

9    to the first lien lenders.

10          Black Diamond and Spectrum will

11   backstop that rights offering.  But everybody

12   will have an opportunity to participate to the

13   extent they validly hold first lien debt that

14   is not otherwise subordinated.

15          MR. BURKE:  Okay.

16          MR. KLYMAN:  A couple

17   clarification points.  Robert Klyman for the

18   record.

19          What does that mean, validly held

20   debt?

21          MR. HARRIS:  If you're a

22   legitimate lender under the first lien credit

23   agreement entitled to own it and it's not

24   subordinated, then you get to participate to



1　the extent of that level.

2　　　　　　　MR. KLYMAN:    Robert Klyman for

3　the record again.    So this is for

4　clarification, not for argument.

5　　　　　　　So at the time your deal closes,

6　if a lender holds debt that has not been

7　subordinated, are they eligible to participate?

8　　　　　　　MR. HARRIS:    There will be a

9　mechanic that's put together that will either

10　allow you to participate on the front end

11　subject to a sale obligation if it's later

12　determined you weren't entitled to participate

13　or, conversely, give you an opportunity to

14　participate later on if there's a determination

15　that you were entitled to do so but were

16　precluded to because your debt was in dispute

17　at the time we close.    One of those two

18　mechanics will be in there.    We just haven't

19　figured out which one yet.

20　　　　　　　But the intention would be to not

21　adversely affect anybody who is disputed at the

22　time but is later determined to have been

23　entitled to participate.

24　　　　　　　MR. KLYMAN:    In the earlier



46

```
1  bid -- well, in the other bid, there was a
2  hell-or-high-water provision.
3                    MR. HARRIS:  On specific
4  performance.
5                    MR. KLYMAN:  Is that still --
6                    MR. HARRIS:  That remains.
7                    MR. KLYMAN:  And is there still a
8  provision that if there's a damage recovery by
9  the debtor for failure to close that that
10 damage recovery would be allocable to all of
11 the first lien lenders?
12                   MR. HARRIS:  Well, look, our
13 assumption is that the debtors are going to
14 want a specific performance; in which case, the
15 assets would actually move over to these
16 entities because the debtors would set off
17 against the first lien debt to the extent of
18 the credit bid and then come after Black
19 Diamond and the others for the cash.
20                   So I don't see the prospect of
21 there being an incremental damage claim beyond
22 that.  But I don't know that they're limiting
23 their rights to specific performance as opposed
24 to damages, although I'm not sure how a damage
```



1  claim could be higher.

2            MR. KLYMAN:  So if they decide

3  not to proceed with specific performance, how

4  does your bid contemplate the payment of damage

5  claim?

6            MR. HARRIS:  Well, the entity

7  only has so many assets and it only has as much

8  to credit bid as the credit bid provides.  So

9  beyond that, I'm not sure how they would go

10 after anybody else.

11            MR. KLYMAN:  So I'm not trying to

12 be coy here.  Is it your position under your

13 bid that if there's a failure to perform by the

14 bidder that the debtor would be able to get

15 specific performance or, if it chose to, some

16 form of damage claim against anyone but the

17 bidder?

18            Are the lenders at risk if

19 there's a failure to perform?

20            MR. HARRIS:  I don't believe so

21 beyond the amount that we credit bid.

22            MR. KLYMAN:  And do you have any

23 of the -- since we've been here, have you

24 drafted any of the documents that set up the

48

1   relationship between the two entities that

2   you've set up?

3               MR. HARRIS:  Since this morning,

4   no.  I will represent, though, that we would

5   expect the relationships to be on market terms.

6               MR. KLYMAN:  And you have no --

7   and this is for clarification, not for

8   argument.  You have no other documents to

9   reflect this other than the original document

10  that you submitted in connection with the bid

11  for 50 million dollars in cash; is that

12  correct?

13              MR. HARRIS:  We have an asset

14  purchase agreement, the modifications to which

15  we've now put on the record and will obviously

16  need to be documented.

17              We had a commitment letter we

18  submitted originally that will be modified to

19  reflect the backstop obligation relative to the

20  purchase of the equity.  And the principals are

21  here and they can on the record state that they

22  will go forward and do that if you'd like.

23              The only other documents I think

24  that would be necessary are simply formalities

1   relative to the cover letter to the bid making

2   certain representations, as well as a direction

3   letter from the requisite lenders to the agent

4   authorizing them to go forward with the credit

5   bid.  But that's more of a formality than it is

6   a substantive document.

7                MR. KLYMAN:  In terms of the

8   relationship between the two entities that are

9   being set up, is it still contemplated that

10  there would be some contractual relationship

11  between the two that would be documented?

12                MR. HARRIS:  Well, certainly

13  because the operating company is going to need

14  the vehicles in order to operate its business.

15                MR. KLYMAN:  When do you think

16  those documents will be drafted?

17                MR. HARRIS:  I don't know.  To be

18  honest with you, I don't know.

19                MR. KLYMAN:  I think I was a

20  little confused by the opening.  And I

21  apologize for that.  The actual bidder is which

22  entity?

23                MR. HARRIS:  New Allied Holdings.

24  New Allied Acquisition.  I'm sorry.  New Allied

50

1   Acquisition.

2                   MR. KLYMAN:  And that's the

3   affiliate of Black Diamond and Spectrum that

4   put forward --

5                   MR. HARRIS:  It's a shell company

6   we created that we used for facilitating the

7   cash bid we put in earlier.  But it can be used

8   for anybody.  And now we've chosen to use it on

9   behalf of the admin agent and the req lenders.

10                   MR. KLYMAN:  If you're determined

11  to be the successful bidder or the backup

12  bidder and you fail to close and there's a

13  breach of the agreement, is it your position

14  under your bid that the lenders' pro rata share

15  of the deposit would be forfeited?

16                   MR. HARRIS:  If the company

17  chooses to assert either specific or purported

18  damages, I think it's going to go beyond the

19  deposit.  It's going to go to the full amount

20  of the credit bid.

21                   MR. KLYMAN:  I'm just focused on

22  the deposit.

23                   MR. HARRIS:  Yes.

24                   MR. KLYMAN:  So the bid with the



1    good faith deposit would be the cash portion --

2                    MR. HARRIS:   Right.

3                    MR. KLYMAN:   -- and the portion

4    pro rata share of the first lenders claim.   And

5    if the deposit was forfeited, under your bid,

6    the deposit that would be forfeited would be

7    cash that had been put up by New Allied

8    Acquisition --

9                    MR. HARRIS:   Correct.

10                   MR. KLYMAN:   -- and 4.5 or

11   5.5 million dollars of first lien claims?

12                   MR. HARRIS:   The numbers aren't

13   exact, but yes.

14                   MR. KLYMAN:   That would be

15   allocable to all first lien lenders?

16                   MR. HARRIS:   Correct.

17                   MR. KLYMAN:   And just again for

18   clarity, do you have any independent

19   projections for the entity that would be formed

20   that would house the contracts and the

21   employees, which we've been referring to as, I

22   think, as pool two?

23                   MR. HARRIS:   No.   As I said this

24   morning, the based projections we're using for

52

1  both the adequate assurance package are

2  projections that were put together by the

3  company for the operating business; with the

4  only principal impact to the financial

5  projections being the lease obligation over to

6  the pool one company, if you will.

7              But other than that, it should be

8  a debt-free -- for the most part a debt-free

9  entity with a fairly significant cash flow.

10             MR. KLYMAN:  As part of the

11 agreement between the entity owning pool one

12 and the entity owning pool two, will there be

13 provisions in that contract that prohibit the

14 sale of assets by the entity that owns pool

15 one?

16             MR. HARRIS:  I can't answer the

17 question.

18             MR. KLYMAN:  Will there be a

19 provision in that contract that there is some

20 sort of a covenant not to compete among the two

21 entities?

22             MR. HARRIS:  Robert, the

23 agreements, as I said, aren't drafted yet.  So

24 I can't tell you exactly what's going to be in



```
 1   them.
 2               But if pool one agrees to lease
 3   assets to pool two for a specific period of
 4   time, it's got to make them available.
 5               MR. KLYMAN:  And based on the
 6   formulation of your bid, what's the time period
 7   over which the entity that owns pool two will
 8   be able to lease the assets and the entity that
 9   holds the assets in pool one?
10               MR. HARRIS:  The lease hasn't
11   been drafted yet, so I can't answer that
12   question.
13               MR. BURKE:  All right.  Are you
14   done, Rob?
15               MR. KLYMAN:  Yeah.  And then I'll
16   yield the floor to my --
17               MR. HARRIS:  Richard has a
18   question.  So...
19               MR. SELTZER:  Can you just repeat
20   what is replacing the CBA condition?
21               MR. HARRIS:  Sure.  And I'll do
22   this in my best bankruptcy lawyer trying to be
23   labor lawyer speak.
24               What the condition will be is
```



54

1  that we get an agreement from, I believe it's

2  Central States that would allow our new pool

3  two company, if you will, to participate in the

4  new pool rather than the existing pool under

5  the Central States pension plan.

6              And to the extent there are

7  comporting changes in the existing collective

8  bargaining agreements that need to be modified

9  to reduce the contribution rates to reflect

10  what a new pool participant pays versus an old

11  pool participant, we need to get those changes

12  as well.

13              MR. BURKE:   I'm sorry.   Then I'm

14  still a little confused on that answer.

15              So will there be -- will you have

16  a right of termination if there is not

17  collective bargaining agreement modifications

18  acceptable to you?

19              MR. HARRIS:   The answer to your

20  question is no.   The specific -- we're only

21  asking for specific changes.   This is not an

22  open-ended has to be acceptable to us.   The

23  changes basically tie together.

24              We want our new entity to be not



**WILCOX & FETZER LTD**

1    participating in the old pool in Central

2    States, but rather in the new pool.  The

3    contribution rates as we understand it for new

4    pool participants is lower than what's in the

5    existing collective bargaining agreements at

6    Allied.  We need those contribution rates -- we

7    need changes to the agreement to the extent

8    necessary in order to reduce the contribution

9    rates down to what a new pool participant

10   should be paying.

11                 We're not asking for any other

12   changes to the agreements.

13                 MR. BURKE:  All right.  So in my

14   bankruptcy trying to be a labor lawyer here,

15   you will assume as modified the collective

16   bargaining agreements with those specific

17   changes; is that correct?

18                 MR. HARRIS:  Subject to my

19   thinking about it more fully, yes.  That's the

20   concept.  So long as we get the modifications,

21   we intend to operate under the agreements as

22   they currently exist.

23                 MR. SELTZER:  Richard Seltzer

24   again.  Maybe you can't answer this now, but I

56

1  think it's important that you be able to

2  answer.

3              Does that mean that you are

4  assuming all of the relevant documents

5  involving the collective bargaining agreement,

6  supplements, all sorts of things except for

7  this change in terms of contributions to

8  Central States?

9              MR. HARRIS:  I haven't been

10 through all of them, Richard.  But I think the

11 intention is to answer your question in the

12 affirmative.

13             MR. HARRIS:  Obviously whatever

14 conforming changes need to be made to deal with

15 the first two things we said, they'd have to be

16 fixed throughout those agreements, the

17 supplements and the ancillary agreements, et

18 cetera.

19             MR. ANTINELLI:  We just -- in

20 Canada, you referenced CAW.  But is it CAW and

21 Teamsters both?

22             MR. HARRIS:  Yes.  Sorry.  Yes.

23             MR. SELTZER:  I'm sorry.  What?

24             MR. HARRIS:  In Canada, Steve's



1    question was we said we were going to drop the

2    requirements that we get new agreements with --

3    I think I referenced CAW.  I meant each of the

4    bargaining units in Canada, whether CAW, IBT or

5    anybody else.

6                    MR. COLLINS:  Any other

7    questions?

8                    MR. AUSTIN:  For the record,

9    Jess Austin on behalf of Jack Cooper.

10                    Mr. Harris, with respect to

11    further clarification on your new closing

12    condition, is it required that the pool two

13    company, I think you've described it, be

14    allowed to participate in the Central States in

15    its new pool contribution and also have the

16    CBA's to be then modified to accommodate that?

17                    MR. HARRIS:  Yeah.  Because if

18    you only get the first, you don't get any

19    benefit.

20                    MR. AUSTIN:  So if you don't get

21    both of them, that's a closing condition that

22    allows New Allied Acquisition --

23                    MR. HARRIS:  To not close.

24                    MR. AUSTIN:  -- to not close?

58

1              MR. HARRIS:  Correct.

2              MR. AUSTIN:  And do you have any

3    perspective at this point as to new pool two

4    company being able to actually participate as a

5    new pool company in new pool and Central

6    States?

7              MR. HARRIS:  Yes, we do have a

8    perspective, which has been developed largely

9    based upon conversations we've had with John

10   Blount and others in the industry, as well as

11   prior activities of the Central States pension

12   plan with respect to new employers.  So we

13   think there's a -- we do have a perspective on

14   it.

15             MR. AUSTIN:  Do you have a

16   current agreement on it?

17             MR. HARRIS:  No.

18             MR. AUSTIN:  And is it correct

19   that based on your presentation that it would

20   only be pool two, the pool two company that

21   would participate in the Central States, but

22   the other company, pool one or company A would

23   not?

24             MR. HARRIS:  It's not



1   contemplated that the pool one company would

2   have any employees that are subject to

3   collective bargaining agreements.

4            MR. AUSTIN:  With respect to that

5   rights offering, what is the value on the

6   rights offering you're describing?

7            MR. HARRIS:  It's whatever the

8   cash component is, I think, of the bid, which

9   we said would not be less than 40.5 million.

10  But whatever the cash requirement is to get the

11  bid closed is what we're going to raise.

12            MR. AUSTIN:  And who's going to

13  own the equity of the New Allied Acquisition

14  Co.?

15            MR. HARRIS:  That would be the

16  lenders pro rata under the terms of the first

17  lien credit agreement, to the extent they hold

18  valid debt that's not otherwise subordinated,

19  which should mirror the ownership interest in

20  pool two.

21            MR. AUSTIN:  And that ownership,

22  is it by agreement or is it through the credit

23  bid?

24            MR. HARRIS:  It's through the

60

```
1   credit bid.
2                   Well, there is an agreement, the
3   credit agreement.
4                   MR. AUSTIN:  And it's the pool
5   company two that's going to have the material
6   contracts and employees and receivables, but
7   they are not going to have the operating
8   assets, right?
9                   MR. HARRIS:  It's going to have
10  the employees who are currently housed in, I
11  believe, Allied Automotive Group, not the
12  employees who are currently housed in Axis.
13  They will be in pool one.
14                  It will have the customer
15  contracts.  It will have the current assets and
16  other assets, you know, which we will schedule
17  out probably prior to the sale hearing as part
18  of the documentation process.
19                  MR. AUSTIN:  And who's going
20  to -- what entity will own the equity in pool
21  one company?
22                  MR. HARRIS:  As I said, we're
23  going to have a rights offering out to the
24  exact same people who are going to own the pool
```



1  two company which Black Diamond and Spectrum

2  are going to backstop.

3            MR. AUSTIN:  But if no one but

4  Black Diamond and Spectrum participates in the

5  rights offering at the end of the day, Black

6  Diamond and Spectrum then own the pool one

7  company?

8            MR. HARRIS:  Yes.

9            MR. AUSTIN:  And that won't in

10  any way be owned by New Allied Acquisition

11  Corp.?

12            MR. HARRIS:  Correct.

13            MR. AUSTIN:  And other than the

14  written bid submitted on August the 8th,

15  there's no other written documentation?

16            MR. HARRIS:  Is asked and

17  answered an appropriate response?

18            MR. AUSTIN:  That's fine.  Okay.

19            And then my last question, I

20  guess, is is that it?  Is that your bid?

21            MR. HARRIS:  Until somebody tells

22  me I have to change it again, yes.

23            MR. AUSTIN:  No other

24  modifications at this time?

62

1        MR. HARRIS:  No.  I would have

2   put them on the record if there were.

3        MR. AUSTIN:  I just want to be

4   clear.  Thank you.

5        MR. COLLINS:  Okay.

6        MR. SELTZER:  Richard Seltzer.

7   Whose employees will be maintaining the

8   equipment?

9        MR. HARRIS:  One second.

10        Richard, I think the employees

11   who are currently doing all the maintenance

12   work are going to be -- I believe are IBT

13   collectively bargained for employees.  And

14   they'll all be in pool two.

15        MR. SELTZER:  Assuming that the

16   equipment all gets leased to pool two?

17        MR. HARRIS:  Yeah.  Whatever --

18   right.  They'll be doing the maintenance work

19   on whatever equipment is leased to pool two.

20        MR. COLLINS:  All right.  The

21   debtors are going to go off the record and

22   discuss the bid submitted.  Thank you.

23        (A recess was taken.)

24        MR. COLLINS:  Okay.  We're back



1    on the record.   It's Mark Collins for the

2    debtors.

3                    One question for Mr. Harris, I'd

4    like you to confirm on the record that the bid

5    put on the record by the prepetition agent at

6    the direction of the requisite lender is a

7    binding and irrevocable bid.

8                    MR. HARRIS:   It is.

9                    Sorry.   Adam Harris from Schulte,

10   Roth & Zabel.   I will confirm that the bid we

11   put on the record today is irrevocable and

12   binding in accordance with the terms of the bid

13   procedures order.

14                   MR. COLLINS:   Thank you.

15                   So subject to, you know, final

16   documentation, the debtors do deem that bid to

17   be a higher and better bid.   We pass that over

18   to Jack Cooper.

19                   MR. KLYMAN:   Robert Klyman on

20   behalf of Yucaipa, one of the consultation

21   parties.   We disagree with the debtor's

22   conclusion that it's a higher and better bid.

23   There's no documentation.   We believe it fails

24   to comport with the bid procedures that were

64

1    negotiated by Black Diamond and Spectrum and

2    the debtor and imposed on parties over the

3    objection of Yucaipa.  And we reserve all of

4    our rights with respect to whether or not it's

5    a qualified bid, whether it's a better bid and

6    whether it comports with the requirements of

7    the bid procedures.

8              We also think that the bid

9    violates the credit agreement and poses --

10   there are serious execution risks associated

11   with the bid the way that it's structured.

12             MR. BURKE:  This is Michael Burke

13   for the official committee of unsecured

14   creditors.  At this point, the committee does

15   not have sufficient information to assess

16   whether the bid submitted by Black Diamond in

17   its oral form is either a qualified bid under

18   the bid procedures order or whether it can be

19   considered a higher and better bid.  We reserve

20   all rights to object to the bid.

21             MR. AUSTIN:  This is Jess Austin

22   on behalf of Jack Cooper Holdings who had

23   submitted the bid that this morning was deemed

24   to be a qualified bid and the highest and best

1  bid, at least as of the opening.  We would like

2  to ask a number of clarifying questions based

3  on the debtor's announcement.

4           First, the question that the

5  debtor asked -- Mark, that you asked Mr. Harris

6  relative to the bid being irrevocable, can you

7  clarify that it was what I call version two of

8  the bid that they've submitted today as the

9  last bid they put on the table in a verbal

10 basis?

11          MR. COLLINS:  I'll have

12 Mr. Harris confirm that.

13          MR. HARRIS:  Adam Harris from

14 Schulte Roth.  It is the most recent version of

15 the bid as modified through the prior session

16 of the auction.

17          MR. AUSTIN:  I'd like to ask the

18 debtor, whether it be you, Mr. Collins, or

19 Mr. Antinelli as the financial advisor, can you

20 please explain to us the conclusions that the

21 debtor has reached that the bid is a higher and

22 better bid than the one submitted by Jack

23 Cooper?

24          MR. COLLINS:  We deem it to be a

66

1   higher and better bid.

2                   MR. AUSTIN:   What are the

3   components that have made that determination?

4                   MR. COLLINS:   All of the changes

5   that were placed on the record.

6                   MR. AUSTIN:   And how much do you

7   value the assumed liabilities?

8                   MR. COLLINS:   We're not going to

9   get into a component-by-component comparison.

10                  MR. AUSTIN:   Well, you have

11  determined that it's a higher and better bid.

12                  MR. COLLINS:   We have.

13                  MR. AUSTIN:   And we're trying to

14  understand how it is a higher and better bid.

15                  MR. ANTINELLI:   I think the

16  changes that were made earlier today bring the

17  identifiable liabilities that are being assumed

18  as apples to apples between the bids.

19                  MR. HARRIS:   Adam Harris from

20  Schulte on behalf of the requisite lenders.   I

21  actually think that that's not true.   I think

22  that the liabilities that have been agreed to

23  be assumed by the requisite lenders

24  particularly as it relates to WARN liabilities



1    that's incurred should we close the deal prior

2    to the expiration of the U.S. and Canadian

3    partitive provisions of WARN puts us in a

4    position where we've agreed to actually assume

5    substantially greater liabilities than Jack

6    Cooper.

7              MR. AUSTIN:   And how does the

8    debtor value the acquisition by, as we

9    understand their contract, by the Black Diamond

10   and Spectrum bid relative to the fact that it's

11   purchasing all the cash, all the deposits, the

12   insurance information in excess of the

13   wind-down expenses?  What value are you

14   allocating to any of that?

15             MR. ANTINELLI:   So under your

16   bid, the cash -- you're acquiring -- the

17   operating cash in the company is keeping excess

18   cash.  In the structure with the credit bid,

19   any excess cash would be used to paydown the

20   DIP facility.  So they're apples to apples on a

21   cash basis.

22             MR. AUSTIN:   Can the

23   debtor give us information why you're not -- if

24   this is the highest and best bid, there's not

68

1  compliance with paragraph 12 of the bid

2  procedures by Black Diamond and Spectrum?

3              MR. COLLINS:  We believe that we

4  have the flexibility within the auction

5  procedures to modify those.

6              MR. AUSTIN:  So you believe you

7  have the ability -- so let me make sure I'm

8  clarifying this.  You're modifying the bid

9  procedures to say that this bidder is not

10  required -- is not having to present an actual

11  full documented asset purchase agreement today?

12              MR. COLLINS:  That's correct.

13              MR. AUSTIN:  You're modifying the

14  bid procedures to say that this bidder does not

15  have to produce today full documentation of all

16  the ancillary agreements, such as the lease

17  agreement from pool company one to pool company

18  two, right?

19              MR. COLLINS:  That's correct.

20              MR. AUSTIN:  You're modifying it

21  so that they don't have to produce all the

22  other ancillary agreements, such as the rights

23  offering?

24              MR. COLLINS:  That's correct.



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1              MR. AUSTIN:  And we don't have

2    all the exhibits and schedules to this new

3    contract either, correct?

4              MR. COLLINS:  We do not.

5              MR. AUSTIN:  And you're modifying

6    the bid procedures that we don't know all their

7    listed executory contracts and leases that

8    they're assuming or otherwise rejecting?

9              MR. COLLINS:  Good ahead, Adam.

10             MR. HARRIS:  Adam Harris for the

11   record.  There is an asset purchase agreement

12   that was submitted on August 8th.  It was

13   accompanied by all the schedules to that asset

14   purchase agreement.  It identified the

15   executory contracts that would be assumed.  It

16   included all of the documentation necessary in

17   order to become a qualified bid.

18             It is highly usual in the context

19   of an auction to vary the terms of your opening

20   bid to make changes as requested by the

21   debtors, other parties in interest and to make

22   that bid something that the company considers

23   in its exercise of business judgment to be a

24   higher and better bid.  That is exactly what's

70

1  been going on here today.  I don't consider

2  these to be waivers of requirements under the

3  bid procedures.

4              We have an asset purchase

5  agreement which everybody has been given a copy

6  of.  We have put detailed modifications to that

7  asset purchase agreement on the record today.

8  We are highly capable of documenting that and

9  have said on the record today and can be

10  reaffirmed by the principals of both Black

11  Diamond and Spectrum acting on behalf of

12  themselves and as requisite lenders that is a

13  binding and enforceable bid.

14              And if we don't document it

15  right, somebody is going to find a way to

16  enforce it against us.  So have at it with

17  respect to your procedural issues.  But let's

18  get on to the main event here and talk about

19  some money.

20              MR. AUSTIN:  Mr. Collins, as I

21  understand the bid that Black Diamond and

22  Spectrum are currently submitting, it is a

23  credit bid, correct?  It is coming through the

24  bid -- a requisite lender directing the agent



```
 1    of the first credit facility to bid, correct?
 2                    MR. COLLINS:  Correct.
 3                    MR. AUSTIN:  Paragraph 13 of the
 4    bid procedures requires that that bid be
 5    submitted with all the documentation of
 6    paragraphs 1 through 16.  So the bid submitted
 7    on August 8 was a cash bid, correct?
 8                    MR. COLLINS:  Jess, as Adam
 9    just --
10                    MR. AUSTIN:  No.
11                    MR. COLLINS:  No.  I'm not going
12    to answer your question that way, Jess.  Adam
13    just fully explained the fact that they have a
14    fully documented asset purchase agreement on
15    file.  They have modified it per the terms of
16    today's auction.  And while we do not have a
17    completely turned black-line version of the
18    asset purchase agreement, we do have sufficient
19    information as to their bid.  And as I said
20    before --
21                    MR. AUSTIN:  I'm just trying to
22    understand what you have.
23                    MR. COLLINS:  You know exactly
24    what we have.  You have seen it.  You were
```

72

1   provided copies of it.

2                MR. AUSTIN:  But that was a cash

3   bid.  That was a cash bid submitted in their

4   individual capacity, correct?

5                MR. COLLINS:  What he has put on

6   the record today --

7                MR. AUSTIN:  I'm just asking the

8   question.

9                MR. COLLINS:  Will you let me

10  answer the question?

11               MR. AUSTIN:  No.  No, I won't

12  with this question.  Because you're not

13  answering.

14               Mr. Harris, the bid you submitted

15  on August 8th, was that not an individual bid

16  submitted on a cash bid on their individual

17  basis?

18               MR. HARRIS:  The asset purchase

19  agreement that was submitted proposed to pay

20  cash consideration and was submitted by

21  individual lenders.  We have adopted that asset

22  purchase agreement for purposes of the bid

23  we've submitted today as requisite lenders

24  together with the financing commitment that's



1    associated with it.  And that is the basis upon

2    which we have moved forward subject to the

3    modifications we have put on the record in

4    extensive detail during the course of today.

5                    MR. AUSTIN:  Mr. Collins, does

6    the debtor have audited financial statements

7    and commitment letters to support the current

8    bid that the Black Diamond and Spectrum as

9    requisite lenders are directing the agent to

10   make?

11                   MR. COLLINS:  We have a credit

12   bid from our requisite lender that is both a

13   committed cash portion and a credit bid of

14   certain of the first lien bank debt.

15                   MR. HARRIS:  And for the record,

16   we did provide audited financial statements of

17   each of Black Diamond and Spectrum funds that

18   are backstopping the commitment to Rothschild

19   for their review so they could determine the

20   creditworthiness of those entities.

21                   MR. AUSTIN:  I'm sorry.  Would

22   you repeat that or read back that comment?

23                   MR. HARRIS:  I'll just say it

24   again.  That is, we did provide to Rothschild

74

1   copies of audited financial statements for each

2   of the Black Diamond funds and Spectrum funds

3   that are providing the financing so they could

4   determine the creditworthiness of the entities

5   who are providing that money and their ability

6   to perform.

7         MR. AUSTIN:  Now, as I understand

8   it, what you're saying, Mr. Collins, is you're

9   modifying paragraph -- the deliveries that are

10  required by paragraph 12?

11        MR. COLLINS:  Jess, we have

12  flexibility within the bid procedures to allow

13  an auction to take place as we all have

14  envisioned them before, which is to allow

15  parties to put their bid on the record, to

16  modify their bid on the record and then to

17  follow it up with definitive documentation

18  later.

19        We have a fully documented asset

20  purchase agreement from Black Diamond and

21  Spectrum.  They have adopted that through the

22  requisite lender and they have modified those

23  terms on the record today.

24        MR. AUSTIN:  I would just point



1    out that at least in paragraph 13 of your bid

2    procedures, it seems to require that a credit

3    bid coming in to date shall comply -- I think

4    that is the word used -- shall comply with

5    requirements of paragraph 12, 1 through 16.

6    And that in paragraph 20, subparagraph 2,

7    paragraph 13 is one of the paragraphs which the

8    debtor can't modify for purposes of an auction.

9              MR. COLLINS:  That's not correct.

10   It's certain subparagraphs of subparagraph 12

11   cannot be modified.

12             MR. AUSTIN:  No.  Paragraph 13

13   can't be modified.

14             MR. COLLINS:  I thought you were

15   talking about paragraph 12.

16             MR. AUSTIN:  And 13 requires a

17   credit bid to be submitted with all the

18   documentation and otherwise comply with

19   paragraph 12, 1 through 16.

20             MR. COLLINS:  All right.  We view

21   it differently.

22             MR. AUSTIN:  Can you give us some

23   understanding of the debtor's -- what's the

24   debtor's understanding of the provisions stated

76

1  by Mr. Harris earlier regarding the

2  contribution level and its Central States

3  pension fund?  Specifically, does debtor have a

4  perspective whether it requires a lower

5  contribution by the purchaser to satisfy that

6  condition?  Or, do you know?

7               MR. ANTINELLI:  We expect that

8  it's a lower amount.

9               MR. AUSTIN:  You expect it's a

10  lower amount.  But you don't know?

11               MR. KELLEY:  It's a condition to

12  be negotiated.

13               MR. ANTINELLI:  I'm sure it's not

14  higher.

15               MR. AUSTIN:  Then what is the

16  component of the bid?  Is this a condition that

17  they have to get --

18               MR. ANTINELLI:  It's a condition.

19  It's a condition they can waive.  It's a

20  condition that they can enforce.

21               MR. BURKE:  Michael Burke for the

22  committee.  Is it a condition in which they can

23  terminate without penalty?

24               MR. HARRIS:  Adam Harris from



1  Schulte.  It's a condition to closing.  Which

2  if it is not satisfied means the asset purchase

3  agreement will not close unless we agree to

4  waive it.  And, no, there is no penalty

5  associated with that.

6              MR. AUSTIN:  Then is your

7  condition, Mr. Harris, that the NEWCO's

8  contribution levels actually have to be lower?

9              MR. HARRIS:  Lower than what?

10             MR. AUSTIN:  Then what the

11 company is currently contributing per employee

12 to --

13             MR. HARRIS:  Our condition, Jess,

14 just so it's all clear is that we be treated as

15 basically a new employer for purposes of

16 Central States, that we go into the new pool

17 and that we have contribution levels

18 commensurate with what a new employer would get

19 who goes into the new pool.  I believe those

20 numbers are lower than what the company's

21 current contribution levels are.

22             MR. SELTZER:  Richard Seltzer for

23 the negotiating committee.  I have to say as a

24 Teamsters negotiating... I have absolutely no

78

1  idea what you just said, Adam.  I have no idea

2  what it means.

3              I know what a new pool is.  I'm

4  very familiar with the new pool.  I am not

5  familiar -- and maybe it's my ignorance -- with

6  what contribution levels need be.

7              New pools deal with withdraw

8  liability.  They do not deal with contribution

9  levels.  So I'll say to the debtor, I'll say to

10  all the interested parties and I'll say to the

11  bidder that I as a Teamsters representative do

12  not know what this condition means and what it

13  involves.  And I would suggest the debtors find

14  out.

15              MR. AUSTIN:  In the financial

16  information you seemingly have, is that

17  financial information on both company one and

18  company two, Mr. Collins, that is under the bid

19  submitted by Mr. Harris?

20              Well, let me rephrase.  What is

21  the financial information that you received on

22  the individual two companies that are proposed

23  to be set up by the Black Diamond and Spectrum

24  bid to evidence their ability to operate post



1 closing?

2           MR. COLLINS:  We've spoken with

3 Mr. Harris about that.  He can restate what he

4 stated earlier on the record about the

5 financial makeup of pool two.

6           MR. HARRIS:  Adam Harris from

7 Schulte Roth.  As we said earlier, we've been

8 looking at and relying on the company's

9 financial forecasts with respect to the

10 operating part of the business for the AAG

11 group part of the business.

12           The projections indicate that

13 EBITDA for, I think it's 2014 should be in the

14 range of 24 or so million dollars.  That after

15 giving effect to the anticipated payments that

16 will be made from the pool two company to pool

17 one, EBITDA would, after giving effect to that,

18 still be in the 15- to 20-million-dollar range.

19 That company would be substantially unlevered

20 and should have more than sufficient cash flow

21 to pay its obligations as they come due.

22           MR. AUSTIN:  Is there information

23 available as to what the free cash flow is on

24 either pool one company or pool two company

1  after capital expenditures?  Do you have that

2  information?

3              MR. HARRIS:  Adam Harris again.

4  I don't think the free cash flow number changes

5  on pool two because all the cap ex will be

6  incorporated by pool one.  They would own the

7  rigs and be obligated to maintain them and pay

8  for that.

9              I don't have any numbers on pool

10  one for right now because we haven't worked out

11  the lease arrangements or other capital

12  requirements for the company.

13              MR. AUSTIN:  Is there a time and

14  expectation on when you expect to have that

15  financial information?

16              MR. HARRIS:  I suspect I'm going

17  to need it by the sale hearing in order to deal

18  with any kind of adequate assurance objections

19  that may be filed by contract parties whose

20  contracts are going into pool one.

21              MR. AUSTIN:  So I want to be very

22  clear.  At this point, the debtor has made a

23  determination that the Black Diamond and

24  Spectrum bid as modified this afternoon is the



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1  highest and/or best bid for Allied's assets in

2  this 363 sale auction?

3          MR. COLLINS:  Yes, subject to

4  final documentation.

5          MR. AUSTIN:  All right.  I want

6  to let you know that we want to take a break.

7  But we do reserve the right to object further,

8  including, but not limited to, a potential sale

9  hearing.  But we'd like to take a break for a

10 moment.

11         MR. COLLINS:  Sounds good.

12         MR. KLYMAN:  Before we do, I have

13 a question.  But I'll yield to Mike Burke.

14         MR. BURKE:  Michael Burke,

15 official committee for the unsecured creditors.

16 The committee would like to reiterate its

17 objection.  It does not believe that the Black

18 Diamond bid as currently contemplated can be

19 deemed the highest and best bid, nor can it be

20 deemed a qualified bid at this juncture.  And

21 we object to the debtor's determination that it

22 is both qualified and highest and best.

23         MR. AUSTIN:  May I ask one

24 further question?

82

1              In the debtor making this

2    determination, was this a board decision?

3              MR. COLLINS:  It is a management

4    decision.

5              MR. AUSTIN:  So the board did not

6    make this decision?

7              MR. COLLINS:  We have not

8    consulted with the special committee today, no.

9              MR. AUSTIN:  We reserve our right

10   to object.

11             MR. COLLINS:  Okay.

12             MR. KLYMAN:  One follow-up on

13   that.  For the record, Robert Klyman on behalf

14   of Yucaipa.

15             Did the special committee

16   delegate to management a decision as to whose

17   highest and best during the auction?

18             MR. STARK:  This is Robert Stark

19   from Brown Rudnick appearing on behalf of the

20   special committee.

21             Without getting into the

22   particulars of what either -- I think it's a

23   little bit beyond the scope of, you know,

24   asking questions about the bid.  But in terms



1   of how we're handling the auction, we're not

2   calling special committee meetings at every

3   iterative bid every issue that's being raised

4   and all the negotiating strategies.  It has

5   been delegated to management on the iterative

6   basis of advancing the auction, developing the

7   rules and moving it forward.

8              When we get to points at which we

9   perceive to be conclusion, at that point in

10  time the special committee is available to be

11  consulted.

12             Did you hear all that?

13             MR. KLYMAN:  For the record,

14  Robert Klyman.  When is this going to be

15  documented?

16             MR. COLLINS:  As quickly as

17  possible.

18             MR. KLYMAN:  Is there a deadline

19  by which the requisite lenders or the agent

20  needs to produce a new detailed term sheet, an

21  agreement, the ancillary documents?

22             MR. HARRIS:  This is Adam Harris

23  from Schulte.  I mean, we've started to make

24  those revisions.  To the extent this auction

84

1  continues, they may or may not ever be

2  relevant.  I guess that will depend on what JCT

3  decides to do next.

4            But if the auction concludes with

5  the conclusion that has been set forth by the

6  company on the record, we will work with all

7  deliberate speed to get a set of documents done

8  that comports with the modified bid we put on

9  the record today.

10            Understanding, by the way, we

11  have a very short time table to get it all done

12  given we have a sale hearing next week.

13            MR. SELTZER:  Richard Seltzer for

14  the Teamsters committee.  We just join in the

15  comments of Mr. Burke as to the status of this

16  bid, the debtor's evaluation.

17            MR. COLLINS:  Okay.

18            MR. AUSTIN:  Did the debtors have

19  expectations of when people will respond to the

20  determination that the Black Diamond and

21  Spectrum bid is higher or best?

22            MR. COLLINS:  I'm sorry.  Say

23  that again, Jess.

24            MR. AUSTIN:  Do you have a time



1    limit of when you expect people to respond?

2                    MR. COLLINS:   I'm sorry.   I'm not

3    getting the question.

4                    MR. HARRIS:   He wants to know how

5    long he has to get you an answer.

6                    MR. COLLINS:   No, we're not

7    putting you on the clock, if that was the

8    question.

9                    MR. AUSTIN:   Okay.   Thanks.

10                   (A recess was taken.)

11                   (Proceedings adjourned at

12   10:00 p.m.)

13

14                         -   -   -   -   -

15

16

17

18

19

20

21

22

23

24

86

```
 1    State of Delaware          )
                                 )
 2    County of New Castle       )

 3

 4

 5              C E R T I F I C A T E

 6        I, Patricia L. Shelton, Registered

 7    Professional Reporter and Notary Public, do

 8    hereby certify that the foregoing record,

 9    pages 2 to 85 inclusive, is a true and accurate

10    transcript of my stenographic notes taken on

11    Wednesday, August 14, 2013, in the

12    above-captioned matter.

13        IN WITNESS WHEREOF, I have hereunto set my

14    hand and seal this 14th day of August, 2013, at

15    Wilmington.

16

17

18

19              Patricia L. Shelton, RPR

20

21

22

23

24
```



Allied Systems Holdings

## A

**AAG (2)** 24:7
79:10
**ability (4)** 14:1
68:7 74:5
78:24
**able (5)** 30:2
47:14 53:8
56:1 58:4
**absolutely (1)**
77:24
**acceptable (4)**
23:24 34:14
54:18,22
**access (1)** 37:13
**accommodate (1)**
57:16
**accompanied (1)**
69:13
**accordance (2)**
8:21 63:12
**accounts (1)**
29:19
**accrued (2)** 12:4,
8
**acquire (6)** 15:4,
10 16:1 17:14
18:23 32:5
**acquired (1)** 21:2
**acquiring (3)**
15:14 31:8
67:16
**Acquisition (13)**
11:21 13:20
17:11 34:5
40:17 43:20
49:24 50:1
51:8 57:22
59:13 61:10
67:8
**across (2)** 31:9
38:17
**act (2)** 9:4,7
**acting (2)** 8:20
70:11
**action (1)** 18:7

**activities (1)**
58:11
**actual (4)** 2:15
7:13 49:21
68:10
**Actually (9)**
16:12 23:6
24:6 26:17
46:15 58:4
66:21 67:4
77:8
**Adam (22)** 3:4,8
9:6,20 10:22
11:12 17:6
24:24 40:10
43:13 63:9
65:13 66:19
69:9,10 71:8,
12 76:24 78:1
79:6 80:3
83:22
**addition (3)**
14:16 41:14
42:8
**additional (3)**
11:2 14:13
33:13
**adequate (4)**
18:16 30:24
52:1 80:18
**adjourned (1)**
85:11
**admin (1)** 50:9
**administrative (4)**
22:4 38:24
40:18 41:2
**adopted (2)**
72:21 74:21
**advancing (1)**
83:6
**adversely (1)**
45:21
**advisor (1)** 65:19
**affect (1)** 45:21
**affiliate (4)** 15:19
21:19 22:13
50:3
**affiliates (2)**

32:10 36:24
**affirmative (1)**
56:12
**afford (1)** 15:21
**afternoon (1)**
80:24
**again (11)** 3:6
4:4 8:6 10:22
45:3 51:17
55:24 61:22
73:24 80:3
84:23
**against (10)**
25:21 27:4,6,
6,8,9 35:15
46:17 47:16
70:16
**agent (8)** 22:10
41:2 49:3
50:9 63:5
70:24 73:9
83:19
**agents (3)** 22:4
38:24 40:18
**aggregate (2)**
14:5 42:16
**agree (8)** 9:7,11
12:4,9,24
13:6 30:17
77:3
**agreed (7)** 9:4
11:19 12:2
13:9 14:12
66:22 67:4
**agreement (49)**
12:3 13:2,6,
10,24 14:23
16:5,16,18,21
17:16 18:2,15
24:1,10 26:10
28:23 29:3
37:16 38:21
39:1 40:19
44:23 48:14
50:13 52:11
54:1,17 55:7
56:5 58:16
59:17,22 60:2,

3 64:9 68:11,
17 69:11,14
70:5,7 71:14,
18 72:19,22
74:20 77:3
83:21
**agreements (19)**
18:10 29:21
34:15,22
41:18 42:3,10
52:23 54:8
55:5,12,16,21
56:16,17 57:2
59:3 68:16,22
**agrees (1)** 53:2
**ahead (2)** 5:19
69:9
**Allied (23)** 11:20
12:20 13:20,
24 17:11
18:21,24
19:10,14,14
34:5 40:17
43:20 44:5
49:23,24,24
51:7 55:6
57:22 59:13
60:11 61:10
**Allied's (3)** 39:8,
13 81:1
**allocable (2)**
46:10 51:15
**allocating (1)**
67:14
**allow (7)** 37:7,
12 38:22
45:10 54:2
74:12,14
**allowed (2)** 6:16
57:14
**allowing (1)** 12:10
**allows (2)** 7:14
57:22
**alternative (1)**
25:11
**although (2)** 6:3
46:24
**among (2)** 6:9

52:20
**amount (14)**
14:18 26:4,
14,15,22 27:5,
17 38:2 43:6,
8 47:21 50:19
76:8,10
**amounts (4)** 14:9,
10 26:13 39:24
**ancillary (5)**
37:16 56:17
68:16,22 83:21
**and/or (1)** 81:1
**announce (2)**
2:21,24
**announcement (1)**
65:3
**answered (1)**
61:17
**anticipated (1)**
79:15
**Antinelli (15)**
2:14 10:9,10,
23 11:5 16:10
23:16 42:20
56:19 65:19
66:15 67:15
76:7,13,18
**APA (1)** 13:21
**apologize (1)**
49:21
**appearing (1)**
82:19
**apples (4)** 66:18,
18 67:20,20
**applicable (1)**
34:24
**appreciate (1)** 7:3
**appropriate (1)**
61:17
**approve (1)** 23:12
**approving (1)** 5:21
**area (1)** 33:2
**argue (1)** 34:9
**argument (3)**
22:20 45:4
48:8
**around (1)** 3:5

arrangement (2)
37:6 39:2
arrangements (3)
37:11 39:18
80:11
assert (1) 50:17
asserted (1)
25:22
assess (1) 64:15
assessable (2)
27:3,16
asset (27) 12:3,
22,22,23 13:1,
5,10,24 14:23
16:16,21
17:15 18:15,
23 19:4 48:13
68:11 69:11,
13 70:4,7
71:14,18
72:18,21
74:19 77:2
assets (46) 6:9
9:18 14:1
15:4,10,11,13,
17 16:1 17:15
18:4,5 19:3
20:24 29:12,
14,17 30:9
31:2,8,23,24
32:5,10,14
35:19 36:22,
23 37:3,8
39:19 40:22
43:18 44:2,7,
8 46:15 47:7
52:14 53:3,8,
9 60:8,15,16
81:1
assign (1) 32:4
assigned (1) 20:7
assignee (1)
20:10
assignment (1)
43:4
associated (5)
15:13 25:16
64:10 73:1

77:5
assume (5)
14:21 15:12
16:24 55:15
67:4
assumed (6)
14:22 20:7
66:7,17,23
69:15
assuming (4)
27:22 56:4
62:15 69:8
assumption (1)
46:13
assumptions (1)
39:17
assurance (4)
18:16 30:24
52:1 80:18
Atlanta (1) 2:3
attached (1) 8:21
attempting (1)
6:23
attend (1) 6:3
auction (30) 2:5,
11,15,21 3:6
4:7,16 5:7,10
6:4,6,11 7:10,
23 9:17 22:7,
22 33:17
65:16 68:4
69:19 71:16
74:13 75:8
81:2 82:17
83:1,6,24 84:4
audited (3) 73:6,
16 74:1
August (8) 5:22,
24 11:21
17:12 61:14
69:12 71:7
72:15
AUSTIN (98)
3:22,22 4:12
5:1 7:6,8,24
8:12 9:2,9,10,
10 10:3 17:5,
6,21 18:8,21

19:7,20 23:18
32:19,20,20
33:1,15,22
34:4,9,20
35:3 36:17,18
37:5,15,18,21
57:8,9,20,24
58:2,15,18
59:4,12,21
60:4,19 61:3,
9,13,18,23
62:3 64:21,21
65:17 66:2,6,
10,13 67:7,22
68:6,13,20
69:1,5 70:20
71:3,10,21
72:2,7,11
73:5,21 74:7,
24 75:12,16,
22 76:9,15
77:6,10 78:15
79:22 80:13,
21 81:5,23
82:5,9 84:18,
24 85:9
authority (1) 39:1
authorized (1) 2:6
authorizing (1)
49:4
automatic (1) 6:17
Automotive (1)
60:11
available (7) 21:7,
11,15 25:12
53:4 79:23
83:10
aware (1) 5:10
Axis (8) 15:4,17
19:9 24:3
31:15 41:4
44:7 60:12

**B**

back (4) 11:10
40:7 62:24
73:22

backstop (4)
41:10 44:11
48:19 61:2
backstopping (1)
73:18
backup (3) 13:1,
2 50:11
balance (1) 38:6
bank (1) 73:14
Bankruptcy (3)
23:12 53:22
55:14
Barclays (1) 4:1
bargained (1)
62:13
bargaining (14)
24:1 29:21
34:15,22
41:18 42:3,10
54:8,17 55:5,
16 56:5 57:4
59:3
based (11) 6:9
10:11 11:17
24:10 25:10
28:22 51:24
53:5 58:9,19
65:2
basically (10)
13:15 14:1
18:2 26:7
28:3 29:8
32:5 39:12
54:23 77:15
basis (5) 65:10
67:21 72:17
73:1 83:6
become (1) 69:17
behalf (24) 2:18,
20 3:9,13,19,
23 4:12,18
5:1,12 7:8 9:1,
2,11 39:3
40:18 50:9
57:9 63:20
64:22 66:20
70:11 82:13,19
benefit (3) 12:12,

13 57:19
Best (10) 7:4
10:14 53:22
64:24 67:24
81:1,19,22
82:17 84:21
better (10) 36:21
63:17,22 64:5,
19 65:22 66:1,
11,14 69:24
beyond (5) 46:21
47:9,21 50:18
82:23
bid (179) 2:12
5:22,23 6:2,
11 7:12,13,19,
21 8:10,13,19
9:4,8,16 10:8,
15,16,17,21
11:21,24
13:17,17,19
14:6,17,17
16:2,7 17:12,
19,23,23 18:3,
4 19:6,13
21:22 22:1,9,
13,14,17,19,
21,24 23:1,10
26:16 27:7,22,
23 28:5,5
30:3,11,13
31:8 33:17
34:7 38:9,10,
19 40:12,16,
17 41:9 42:16
43:16,16,24
44:1,4 46:1,1,
18 47:4,8,8,
13,21 48:10
49:1,5 50:7,
14,20,24 51:5
53:6 59:8,11,
23 60:1 61:14,
20 62:22 63:4,
7,10,12,16,17,
22,24 64:5,5,
7,8,11,16,17,
18,19,20,23,

24 65:1,6,8,9,
15,21,22 66:1,
11,14 67:10,
16,18,24 68:1,
8,14 69:6,17,
20,22,24 70:3,
13,21,23,24
71:1,4,4,6,7,
19 72:3,3,14,
15,16,22 73:8,
12,13 74:12,
15,16 75:1,3,
17 76:16
78:15,24
80:24 81:1,18,
19,20 82:24
83:3 84:8,16,
21

**bidder (24)** 6:1
7:16 8:2 9:16
10:1,20 13:1,
2 17:10 25:20
29:14 31:12,
21,22 33:7
35:13 47:14,
17 49:21
50:11,12 68:9,
14 78:11

**bidders (4)** 6:23
7:15 9:14 18:7

**bidder's (1)** 25:17

**bidding (5)** 17:8,
8 21:17 22:6
33:4

**bids (2)** 11:2
66:18

**binding (3)** 63:7,
12 70:13

**bit (2)** 14:24
82:23

**Black (32)** 3:9,
13 9:1 10:19
15:19 17:7
18:4 32:11
36:5,24 38:13
41:9 44:10
46:18 50:3
61:1,4,5 64:1,

16 67:9 68:2
70:10,21 73:8,
17 74:2,20
78:23 80:23
81:17 84:20

**black-line (1)**
71:17

**Blount (1)** 58:10

**board (2)** 82:2,5

**both (13)** 3:9
6:22 13:16
18:6 34:16
43:23 52:1
56:21 57:21
70:10 73:12
78:17 81:22

**breach (9)** 13:14,
14 25:3,4
26:10 28:16,
23 29:4 50:13

**break (8)** 11:3,6,
18 16:11
23:16 42:21
81:6,9

**bring (1)** 66:16

**broad (1)** 39:1

**Brown (1)** 82:19

**budget (1)** 14:11

**bulk (1)** 29:20

**Burke (20)** 4:10,
11,11 23:17
24:18,22
43:12,12
44:15 53:13
54:13 55:13
64:12,12
76:21,21
81:13,14,14
84:15

**business (12)**
15:5 20:20
21:9 24:3,8
33:8,21 49:14
52:3 69:23
79:10,11

**businesses (1)**
15:12

**buy (1)** 30:17

## C

**call (4)** 18:24
33:3,3 65:7

**calling (1)** 83:2

**can (30)** 3:1 8:8
11:14 18:9
21:13 22:9,17
26:11 28:3,9,
14 29:11
30:12 32:23
39:19 48:21
50:7 53:19
64:18 65:6,19
67:22 70:9
75:22 76:19,
20,22 79:3
81:18,19

**Canada (4)**
42:11 56:20,
24 57:4

**Canadian (1)** 67:2

**cap (2)** 27:15
80:5

**capable (1)** 70:8

**capacities (1)** 3:10

**capacity (5)** 3:11
10:20 17:7
21:21 72:4

**capital (2)** 80:1,
11

**capped (1)** 26:14

**care (1)** 30:20

**cares (1)** 30:8

**case (2)** 5:8
46:14

**cash (48)** 10:17
13:16 14:8,13,
14,19 15:20
19:8,11,12
22:13,18 23:2
26:5,7 27:9,
10 28:4 33:10
41:1,8 43:8,
16,23 44:4
46:19 48:11
50:7 51:1,7

52:9 59:8,10
67:11,16,17,
18,19,21 71:7
72:2,3,16,20
73:13 79:20,
23 80:4

**catch (1)** 8:8

**CAW (5)** 42:10
56:20,20 57:3,
4

**CBA (6)** 24:4,5,
19,21 35:14
53:20

**CBA's (1)** 57:16

**Central (11)**
41:24 54:2,5
55:1 56:8
57:14 58:5,11,
21 76:2 77:16

**certain (8)** 11:19
17:14 18:4,5
36:8 49:2
73:14 75:10

**certainly (1)** 49:12

**cetera (4)** 15:7,
18 44:8 56:18

**change (4)** 23:22
42:4 56:7
61:22

**changes (16)**
11:22 12:2
19:23 42:15
54:7,11,21,23
55:7,12,17
56:14 66:4,16
69:20 80:4

**choice (1)** 25:19

**choose (1)** 35:21

**chooses (1)** 50:17

**chose (1)** 47:15

**chosen (3)** 23:5
35:13 50:8

**Ciupitu (1)** 4:2

**claim (10)** 5:23
6:17 27:18,21
35:20 46:21
47:1,5,16 51:4

**claims (1)** 51:11

**clarification (9)**
15:1 19:23
20:24 24:24
32:21 44:17
45:4 48:7
57:11

**clarify (4)** 27:12
35:7 40:2 65:7

**clarifying (3)**
36:17 65:2
68:8

**clarity (2)** 28:8
51:18

**clear (5)** 19:8
39:6 62:4
77:14 80:22

**clearance (1)** 13:8

**client (2)** 32:12,
17

**clients (1)** 11:7

**clock (1)** 85:7

**close (15)** 8:7
25:8,17,21
26:2,10 27:13
34:16 45:17
46:9 50:12
57:23,24 67:1
77:3

**closed (2)** 26:21
59:11

**closer (2)** 8:16
32:22

**closes (2)** 34:18
45:5

**closing (22)** 12:6,
15·13:3 19:17,
23 23:20,23,
24 24:4,21
25:7 28:17
33:8 41:16,19,
22 42:12,14
57:11,21 77:1
79:1

**Co (5)** 11:21
13:20 17:11
40:18 59:14

**COBRA (1)** 12:10

**co-counsel (1)**

2:10

Cohen (1) 5:5

collective (13)
24:1 29:21
34:14,21
41:18 42:3,10
54:7,17 55:5,
15 56:5 59:3

collectively (1)
62:13

Collins (75) 2:10,
13,16,17 3:12,
17,21 4:10,14,
24 5:9,19 7:5,
17,18 8:4,18
9:9,12 10:5
11:8,10 13:11
16:8 23:15
32:19 40:4,7
42:22,23
43:11 57:6
62:5,20,24
63:1,14 65:11,
18,24 66:4,8,
12 68:3,12,19,
24 69:4,9
70:20 71:2,8,
11,23 72:5,9
73:5,11 74:8,
11 75:9,14,20
78:18 79:2
81:3,11 82:3,
7,11 83:16
84:17,22 85:2,
6

collusion (1) 9:15

combined (2)
18:2,3

coming (4) 19:9
23:4 70:23
75:3

commence (1)
2:15

commensurate (1)
77:18

comment (1)
73:22

comments (1)

84:15

commitment (7)
18:14 19:15
34:2 48:17
72:24 73:7,18

commitments (3)
33:5,16 39:3

committed (1)
73:13

committee (17)
4:13 5:6 9:23
35:5 43:13
64:13,14
76:22 77:23
81:15,16 82:8,
15,20 83:2,10
84:14

committing (1)
38:13

common (1)
35:23

communicated (1)
10:13

companies (2)
37:12 78:22

company (69)
9:23 11:1,18
13:8 21:8
24:11 25:8
30:6,8 33:4,
10 35:9,20,24
36:1,7,11,12,
14,22,23 37:1,
6,6,7 38:5
39:7,9,15,19,
19,21,22
40:14,22
41:23 42:21
43:4,20 49:13
50:5,16 52:3,
6 54:3 57:13
58:4,5,20,22,
22 59:1 60:5,
21 61:1,7
67:17 68:17,
17 69:22
77:11 78:17,
18 79:16,19,

24,24 80:12
84:6

company's (5)
17:19 19:5
20:19 77:20
79:8

comparison (1)
66:9

compensated (1)
25:12

compensation (1)
12:8

compete (1)
52:20

competing (1)
10:21

completed (1)
37:16

completely (1)
71:17

compliance (1)
68:1

comply (3) 75:3,
4,18

component (19)
13:16,17
14:9,15,17,20
17:24 22:3,18
23:2 26:3,5
27:22 38:19
43:24,24 44:4
59:8 76:16

component-by-component (1)
66:9

components (2)
14:8 66:3

comport (2) 42:4
63:24

comporting (1)
54:7

comports (2) 64:6
84:8

compromised (1)
14:7

concept (1) 55:20

concepts (1)
41:21

concludes (1)

84:4

conclusion (3)
63:22 83:9
84:5

conclusions (1)
65:20

condition (26)
23:21,23,23
24:4,9,20
34:13 41:16,
20,22 42:12
53:20,24
57:12,21 76:6,
11,16,18,19,
20,22 77:1,7,
13 78:12

conditions (4)
19:24 25:6
28:17 42:18

conducted (1)
5:10

confirm (5) 9:3,
14 63:4,10
65:12

conformance (2)
9:5,8

conforming (1)
56:14

confused (2)
49:20 54:14

connection (1)
48:10

consent (1) 21:23

consider (1) 70:1

consideration (8)
11:24 13:19
14:5 21:22
22:3 30:22
41:8 72:20

considered (1)
64:19

considers (1)
69:22

consultation (2)
40:15 63:20

consulted (2)
82:8 83:11

contact (2) 6:22

7:1

contemplate (1)
47:4

contemplated (6)
22:6 23:3
38:8 49:9
59:1 81:18

context (2) 39:2
69:18

continue (6) 4:9
8:3 12:24
14:21 32:18
40:21

continues (1) 84:1

continuing (1)
33:6

contract (16)
11:20,22
12:1,15 19:24
20:10,16
24:14 31:1
34:13 35:15
52:13,19 67:9
69:3 80:19

contracts (19)
15:11 18:23
19:3 20:6
21:3,11,12,12
29:19 37:2,9
39:20,22
51:20 60:6,15
69:7,15 80:20

contractual (1)
49:10

contributing (1)
77:11

contribution (14)
42:4 43:16
54:9 55:3,6,8
57:15 76:2,5
77:8,17,21
78:6,8

contributions (1)
56:7

conversation (1)
11:17

conversations (3)
9:24 40:13

Allied Systems Holdings

58:9

conversely (1)
45:13

Conway (1) 3:20

Cooper (12) 3:23
5:2 7:8 9:3,11
10:4,15 57:9
63:18 64:22
65:23 67:6

Cooper's (2) 4:2
7:18

copies (2) 72:1
74:1

copy (2) 10:16
70:5

Corp (1) 61:11

Corporation (1)
3:24

corresponding (1)
43:8

counsel (2) 2:3
4:3

counter-party (1)
30:24

couple (1) 44:16

coupled (1) 21:21

course (1) 73:4

court (6) 3:2 7:1
8:19 23:12
25:9 27:15

Court's (2) 5:21
6:11

covenant (1)
52:20

cover (1) 49:1

covered (1) 29:21

coy (1) 47:12

create (2) 15:2
32:4

created (1) 50:6

credit (41) 5:23
13:17 14:17
16:2,4 22:9,
14,24 23:1
26:3,5,16
27:7,22 28:4,
5 29:14 31:8
39:1 40:19

43:16,24
44:22 46:18
47:8,8,21
49:4 50:20
59:17,22 60:1,
3 64:9 67:18
70:23 71:1
73:11,13 75:2,
17

creditor (1) 38:21

creditors (4) 4:13
30:15 64:14
81:15

creditors' (1) 9:23

creditworthiness (1)
73:20 74:4

cure (1) 29:5

current (10)
10:13 19:2
24:7 29:17
31:22 37:2
58:16 60:15
73:7 77:21

currently (11)
12:16 13:4
20:20 33:5
55:22 60:10,
12 62:11
70:22 77:11
81:18

customer (6)
15:11 20:6
29:19 37:1,9
60:14

**D**

damage (11)
25:16,21
26:14,19
35:20 46:8,10,
21,24 47:4,16

damages (7)
25:13 26:23
27:15 29:9
35:14 46:24
50:18

date (8) 12:14,

15,17 21:22
24:12,15
42:14 75:3

dated (2) 2:7
5:21

day (3) 17:1
26:19 61:5

deadline (3) 13:3
17:23 83:18

deal (8) 34:17,
18 45:5 56:14
67:1 78:7,8
80:17

debt (15) 26:13
36:5,13,14
38:8,14,22
41:11 44:13,
20 45:6,16
46:17 59:18
73:14

debt-free (2) 52:8,
8

debtor (20) 6:22
13:14 23:11
28:14,21
34:10 46:9
47:14 64:2
65:5,18,21
67:8,23 73:6
75:8 76:3
78:9 80:22
82:1

debtors (15) 2:4,
18 6:10 7:10,
21 26:11
30:14 46:13,
16 62:21 63:2,
16 69:21
78:13 84:18

debtors' (1) 6:8

debtor's (6)
63:21 65:3
75:23,24
81:21 84:16

December (2)
12:17 24:15

decide (2) 19:17
47:2

decides (1) 84:3

decision (4) 82:2,
4,6,16

deduct (1) 26:4

deducting (1)
26:13

deduction (2)
27:17,21

deem (2) 63:16
65:24

deemed (4) 33:7
64:23 81:19,20

defined (1) 6:2

definitive (1)
74:17

delegate (1)
82:16

delegated (1) 83:5

deliberate (1) 84:7

deliveries (1) 74:9

demonstrating (1)
20:14

depend (1) 84:2

deposit (10) 38:1,
12 42:24 43:3
50:15,19,22
51:1,5,6

deposits (1) 67:11

describe (2)
11:23 14:4

described (3)
40:23 41:15
57:13

describing (1)
59:6

description (2)
21:11 36:21

designate (1)
17:13

designated (15)
7:14 14:3
15:3,3,9,15,
16 18:17
20:11 21:2,6
29:12 31:7,14,
17

designates (1)
17:17

detail (2) 28:21
73:4

detailed (2) 70:6
83:20

determination (6)
45:14 66:3
80:23 81:21
82:2 84:20

determine (3)
30:13 73:19
74:4

determined (5)
7:11 45:12,
22 50:10 66:11

determining (1)
39:14

developed (2)
21:5 58:8

developing (1)
83:6

Diamond (32) 3:9,
13 9:1 10:19
15:19 17:7
18:4 32:11
36:5,24 38:13
41:9 44:10
46:19 50:3
61:1,4,6 64:1,
16 67:9 68:2
70:11,21 73:8,
17 74:2,20
78:23 80:23
81:18 84:20

different (7) 14:7
15:16 17:14,
18 19:18
22:15 30:19

differential (1)
14:19

differently (1)
75:21

DIP (2) 14:10
67:20

directing (2)
70:24 73:9

direction (5) 22:4,
11 40:20 49:2
63:6

directly (1) 21:20
directors (1)
    12:21
disagree (2) 6:14
    63:21
discretion (1) 7:22
discuss (1) 62:22
discussions (3)
    9:22 24:10
    40:15
dispute (1) 45:16
disputed (1)
    45:21
distributions (2)
    38:7 43:5
divide (1) 40:22
document (3)
    48:9 49:6
    70:14
documentation (10)
    60:18 61:15
    63:16,23
    68:15 69:16
    71:5 74:17
    75:18 81:4
documented (6)
    48:16 49:11
    68:11 71:14
    74:19 83:15
documenting (1)
    70:8
documents (10)
    16:22 18:9,
    12 47:24 48:8,
    23 49:16 56:4
    83:21 84:7
dollars (15) 14:7,
    14 17:20
    19:15 20:22
    29:18 30:7
    33:12 38:3,5
    42:17 43:7
    48:11 51:11
    79:14
done (6) 7:23
    24:17 29:24
    53:14 84:7,11
doubt (1) 5:6

down (6) 3:1,5
    28:5 30:18
    44:2 55:9
drafted (5) 23:11
    47:24 49:16
    52:23 53:11
drop (4) 30:18
    42:8 44:2 57:1
due (1) 79:21
during (3) 11:18
    73:4 82:17

**E**

earlier (8) 14:24
    40:12 45:24
    50:7 66:16
    76:1 79:4,7
easy (1) 26:3
EBITDA (4)
    20:22 33:12
    79:13,17
effect (2) 79:15,
    17
effectively (8)
    12:12 15:2,
    20 18:3 21:8
    24:8 38:7 43:3
either (9) 10:19
    29:9 32:3
    45:9 50:17
    64:17 69:3
    79:24 82:22
eligible (1) 45:7
eliminate (1)
    41:16
else (6) 3:12
    4:14 5:16
    36:10 47:10
    57:5
employed (1) 35:9
employee (1)
    77:11
employees (18)
    12:6,7,10,11
    19:3 29:20,20
    35:8,8 37:2
    51:21 59:2

60:6,10,12
    62:7,10,13
employer (2)
    77:15,18
employers (1)
    58:12
end (5) 26:19
    29:2 31:20
    45:10 61:5
enforce (3) 29:10
    70:16 76:20
enforceable (1)
    70:13
engaged (2) 9:15,
    24
enough (2)
    24:16 39:1
entered (1) 8:19
entire (1) 29:23
entirely (1) 36:3
entirety (1) 43:22
entities (14) 5:13
    7:14 17:14,17
    26:6 30:9
    36:6 40:23
    46:16 48:1
    49:8 52:21
    73:20 74:4
entitled (7) 25:9
    41:12,23
    44:23 45:12,
    15,23
entity (25) 15:21,
    24 17:12 20:7,
    15,18 21:2
    24:2 30:18
    31:9 32:4,6
    41:4 44:6
    47:6 49:22
    51:19 52:9,11,
    12,14 53:7,8
    54:24 60:20
envisioned (1)
    74:14
equal (3) 14:9
    41:8 43:6
equipment (3)
    62:8,16,19

equity (9) 31:9
    32:3,9 41:3,8
    44:6 48:20
    59:13 60:20
essentially (2)
    20:6 41:3
estate (7) 15:6,
    17 23:7 30:21
    31:16 41:5
    44:7
et (4) 15:7,18
    44:8 56:17
evaluate (1) 30:2
evaluation (1)
    84:16
even (3) 8:9
    19:12 31:4
event (3) 13:13
    14:14 70:18
everybody (3)
    18:9 44:11
    70:5
everyone (3) 5:9
    8:18 10:16
evidence (2)
    20:13 78:24
ex (1) 80:5
exact (2) 51:13
    60:24
exactly (6) 16:19
    18:13,18
    52:24 69:24
    71:23
Except (2) 9:21
    56:6
excess (3) 67:12,
    17,19
excluded (2)
    12:22,23
exclusion (2) 6:6,
    10
Excuse (1) 8:5
executed (1) 42:9
execution (3)
    41:17 42:14
    64:10
executory (2)
    69:7,15

exercise (4)
    17:13 29:6,8
    69:23
exercising (1)
    6:18
exhibits (1) 69:2
exist (2) 32:18
    55:22
existing (7)
    34:14 42:1,3,
    6 54:4,7 55:5
exists (1) 20:20
expect (5) 48:5
    76:7,9 80:14
    85:1
expectation (1)
    80:14
expectations (1)
    84:19
expenditures (1)
    80:1
expenses (2)
    13:7 67:13
expiration (1) 67:2
explain (1) 65:20
explained (1)
    71:13
expressly (1) 6:7
extended (1)
    11:18
extensive (1) 73:4
extent (10) 13:10
    23:1 33:12
    44:13 45:1
    46:17 54:6
    55:7 59:17
    83:24

**F**

facilitating (1) 50:6
facility (3) 26:5
    67:20 71:1
fact (4) 23:5
    35:17 67:10
    71:13
fail (2) 29:4
    50:12

fails (3) 25:21
27:13 63:23
failure (4) 25:17
46:9 47:13,19
fairly (2) 17:1
52:9
faith (3) 38:1,12
51:1
familiar (2) 78:4,5
fee (1) 26:3
Ferdinands (1) 4:3
few (1) 34:10
fifty-five (1) 28:3
fifty-some (1)
36:13
figure (1) 32:8
figured (1) 45:19
file (1) 71:15
filed (1) 80:19
fill (1) 14:18
final (2) 63:15
81:4
financial (13)
20:15,17
52:4 65:19
73:6,16 74:1
78:15,17,21
79:5,9 80:15
financing (9)
18:10 19:16
33:5,13,16
34:2,4 72:24
74:3
find (2) 70:15
78:13
fine (2) 11:5
61:18
Finger (1) 2:18
first (42) 2:19
3:3 8:24
11:22 14:12
15:22 16:3,4
21:19,24
22:13 26:12
27:4,8,16
31:10 32:11,
16 35:18 36:5
38:8,14,17,24

40:19 41:5,10
43:5 44:9,13,
22 46:11,17
51:4,11,15
56:15 57:18
59:16 65:4
71:1 73:14
fixed (1) 56:16
flexibility (2) 68:4
74:12
floor (1) 53:16
flow (5) 33:10
52:9 79:20,23
80:4
focused (1) 50:21
folks (1) 10:13
follow (3) 33:1
35:12 74:17
following (1)
41:20
follow-up (1)
82:12
follow-ups (1)
35:6
forecasting (1)
20:21
forecasts (2)
39:15 79:9
forfeited (3)
50:15 51:5,6
forgive (1) 38:22
form (3) 14:12
47:16 64:17
formalities (1)
48:24
formality (1) 49:5
formed (1) 51:19
formulation (1)
53:6
forth (4) 2:12
14:22 24:9
84:5
forward (9) 2:23
23:11 26:15
38:2 48:22
49:4 50:4
73:2 83:7
Fred (1) 8:6

Frederick (1) 4:18
free (2) 79:23
80:4
front (1) 45:10
full (5) 26:22
27:4 50:19
68:11,15
fully (4) 55:19
71:13,14 74:19
fund (3) 14:11
15:20 76:3
funded (1) 19:13
funds (3) 73:17
74:2,2
further (7) 7:1
20:23 32:21
36:17 57:11
81:7,24

## G

General (8) 5:13,
14,22,24 6:5,
10,15,16
Generally (1)
29:16
generate (1) 21:1
gentlemen (1) 7:4
gets (1) 62:16
given (3) 22:18
70:5 84:12
give-up (1) 38:7
giving (2) 79:15,
17
goes (4) 17:1
28:4,5 77:19
good (6) 36:13
38:1,11 51:1
69:9 81:11
greater (3) 26:20
27:19 67:5
Group (2) 60:11
79:11
guess (4) 7:6
24:2 61:20
84:2
guys (2) 11:14
27:9

## H

half (1) 8:8
handling (1) 83:1
happy (1) 17:3
hard (1) 36:22
Harris (153) 3:4,
7,8,15 8:24
9:6,6,20,20
10:22,22 11:7,
12,12 16:15
17:10 18:1,12
19:2,11 20:2,
8,12,17 21:4,
14 22:2,16
23:13 24:5,20
25:5,18,24
26:17 27:1,7,
20 28:2,10,19
29:16 30:5,16
31:11,19 32:1,
22 33:9,19,23
34:6,17 35:1,
10,17 36:2
37:4,10,17,20
38:4,15,18,23
39:10,23 40:8,
9,10 43:2,19
44:21 45:8
46:3,6,12
47:6,20 48:3,
13 49:12,17,
23 50:5,16,23
51:2,9,12,16,
23 52:16,22
53:10,17,21
54:19 55:18
56:9,13,22,24
57:10,17,23
58:1,7,17,24
59:7,15,24
60:9,22 61:8,
12,16,21 62:1,
9,17 63:3,8,9
65:5,12,13,13
66:19,19
69:10,10

72:14,18
73:15,23 76:1,
24,24 77:7,9,
13 78:19 79:3,
6,6 80:3,3,16
83:22,22 85:4
hear (4) 4:22
11:14 32:23
83:12
heard (1) 8:10
hearing (5) 8:1
60:17 80:17
81:9 84:12
held (1) 44:19
hell (1) 25:22
hell-or-high-water (9)
13:12 25:1
26:1,23 27:14
28:14,15
34:23 46:2
helpful (1) 8:16
high (1) 25:22
higher (12) 28:6
47:1 63:17,22
64:19 65:21
66:1,11,14
69:24 76:14
84:21
highest (7) 10:13
64:24 67:24
81:1,19,22
82:17
highly (2) 69:18
70:8
hold (2) 44:13
59:17
HOLDEN (7)
4:17,18,19
5:3 8:5,6,14
H-O-L-D-E-N (1)
4:19
Holdings (6) 3:24
19:14,14 44:5
49:23 64:22
holds (3) 41:11
45:6 53:9
honest (1) 49:18
Honestly (1)

28:19
house (1) 51:20
housed (2) 60:10,
12
HSR (1) 13:8

**I**

IBT (2) 57:4
62:12
idea (2) 78:1,1
identifiable (1)
66:17
identified (1)
69:14
identify (1) 30:3
identifying (2) 4:6,
8
ignorance (1) 78:5
impact (1) 52:4
implement (2)
28:15 29:1
implemented (1)
27:14
important (1) 56:1
imposed (1) 64:2
inaudible (1) 4:21
include (1) 38:11
included (2) 23:2
69:16
including (3)
15:11 32:17
81:8
incorporate (1)
41:20
incorporated (3)
7:20 8:22
80:6
increased (2)
42:24 43:2
incremental (1)
46:21
incurred (2) 13:7
67:1
independent (3)
39:6,11 51:18
indicate (1) 79:12
indirectly (1)

21:21
individual (7)
3:10 17:8
72:4,15,16,21
78:22
industry (1) 58:10
information (10)
64:15 67:12,
23 71:19
78:16,17,21
79:22 80:2,15
in-house (1) 4:2
insert (1) 42:11
insurance (1)
67:12
insurers (1) 12:21
intend (5) 2:20
3:5 4:7 40:21
55:21
intending (1) 14:3
intends (1) 4:15
intention (3) 44:1
45:20 56:11
intercompany (3)
21:5,12 39:18
interest (3) 31:9
59:19 69:21
interested (1)
78:10
into (17) 7:21
8:23 14:2
18:24 30:12,
18,19 36:21,
23 40:22
42:12 44:2
66:9 77:16,19
80:20 82:21
invite (1) 7:22
invited (1) 6:3
involves (1) 78:13
involving (1) 56:5
irrelevant (1)
19:19
irrevocable (3)
63:7,11 65:6
issue (3) 6:24
8:3 83:3
issues (3) 6:20

40:2 70:17
iterative (3) 17:1
83:3,5

**J**

Jack (14) 3:23
4:2 5:2 7:8,18
9:3,11 10:4,
15 57:9 63:18
64:22 65:22
67:5
James (1) 5:12
JCT (1) 84:2
Jeff (4) 2:2 4:5
5:12 6:13
Jess (17) 3:22
5:1 7:8 9:10
17:6 18:3
32:20,22
33:19 36:18
57:9 64:21
71:8,12 74:11
77:13 84:23
John (1) 58:9
join (1) 84:14
Judge (1) 2:7
judgment (1)
69:23
juncture (1) 81:20
June (3) 2:8
5:21 8:19

**K**

keeping (1) 67:17
KELLEY (7) 2:1,
2 4:4,5 6:13,
13 76:11
kind (3) 19:19
29:23 80:18
King (2) 3:23 5:1
KLYMAN (70)
3:18,18 4:21
16:12 20:4,5,
9,13,23 21:10,
16 22:8 23:8
24:23 25:15,

20 26:9,22
27:3,11,24
28:7,13 29:11
30:1,10 31:6,
12,20 37:22
38:10,16,20
39:5,16 40:1
44:16,17 45:2,
2,24 46:5,7
47:2,11,22
48:6 49:7,15,
19 50:2,10,21,
24 51:3,10,14,
17 52:10,18
53:5,15 63:19,
19 81:12
82:12,13
83:13,14,18
K-L-Y-M-A-N (1)
3:19
knows (1) 8:18

**L**

labor (2) 53:23
55:14
laid (2) 16:17
42:18
largely (1) 58:8
last (5) 19:22
23:17 33:2
61:19 65:9
later (4) 45:11,
14,22 74:18
Latham (2) 3:19
20:5
law (1) 25:12
lawyer (3) 53:22,
23 55:14
laying (1) 39:17
Layton (1) 2:17
lead (1) 2:10
lease (7) 37:11
52:5 53:2,8,
10 68:16 80:11
leased (4) 15:5
31:16 62:16,19
leases (1) 69:7

least (2) 65:1
75:1
legitimate (1)
44:22
lender (19)
15:22 21:19
22:10,11,14,
17,21 32:12
33:4 38:19,21
41:11 43:15
44:22 45:6
63:6 70:24
73:12 74:22
lenders (40) 3:11,
14 9:2 10:21
14:12 16:4
17:9,9 18:6
19:1 21:24
22:5 26:12
27:4,8,16
31:10 32:16
35:18 36:8
38:17 39:4
40:20 41:6
43:5 44:9
46:11 47:18
49:3 50:9
51:4,15 59:16
66:20,23
70:12 72:21,
23 73:9 83:19
lenders' (1) 50:14
less (3) 14:15
28:4 59:9
letter (5) 18:14
19:15 48:17
49:1,3
letters (1) 73:7
level (3) 28:20
45:1 76:2
levels (5) 77:8,
17,21 78:6,9
liabilities (7)
14:22 15:13
66:7,17,22,24
67:5
liability (1) 78:8
lien (33) 14:12

Wilcox & Fetzer Ltd.
www.wilfet.com        (302) 655-0477

15:22 16:4,4
21:19,24
22:13 26:12
27:4,8,16
31:10 32:12,
16 35:18 36:5
38:8,14,17,24
40:19 41:5,11
43:5 44:9,13,
22 46:11,17
51:11,15
59:17 73:14
limit (1) 85:1
Limited (2) 4:18
81:8
limiting (1) 46:22
liquidated (1) 6:17
list (2) 19:4
29:23
listed (1) 69:7
litigate (1) 23:9
litigation (1) 32:18
little (5) 14:24
43:14 49:20
54:14 82:23
LLC (3) 5:13
13:20 17:11
LLP (2) 3:19 5:5
long (3) 17:2
55:20 85:5
look (2) 21:13
46:12
looking (1) 79:8
lot (2) 19:3
28:10
lower (7) 55:4
76:4,8,10
77:8,9,20
luck (1) 7:4

**M**

main (1) 70:18
maintain (1) 80:7
maintaining (1)
62:7
maintenance (2)
62:11,18

majority (2)
21:23 35:8
makeup (1) 79:5
making (4) 7:7
22:21 49:1
82:1
management (3)
82:3,16 83:5
manner (3) 14:4
23:6 41:15
many (2) 37:24
47:7
Mark (8) 2:10,17
4:1 7:18 40:9
42:23 63:1
65:5
market (1) 48:5
material (5)
13:13 22:18
25:3 28:22
60:5
materiality (1)
42:11
may (8) 19:17
22:24 32:18
40:1 80:19
81:23 84:1,1
maybe (3) 43:14
55:24 78:5
mean (8) 16:10
28:21 29:22
30:3 36:3
44:19 56:3
83:23
means (3) 77:2
78:2,12
meant (1) 57:3
mechanic (1) 45:9
mechanics (2)
43:9 45:18
meet (1) 10:24
meeting (1) 11:4
meetings (1) 83:2
memorializes (1)
16:14
met (1) 25:7
Michael (5) 4:11
43:12 64:12

76:21 81:14
microphone (3)
8:7,15 32:23
might (1) 5:18
Mike (2) 3:20
81:13
million (20) 14:6,
13,15,20
17:20 19:15
20:22 27:22
28:6 29:18
30:7 33:11
38:3,5 42:17
43:7 48:11
51:11 59:9
79:14
minutes (1) 34:10
mirror (2) 20:19
59:19
mitigate (1) 24:16
modifications (16)
11:19 13:19,
22 14:23
16:17 18:19
34:14,21
40:12 42:2
48:14 54:17
55:20 61:24
70:6 73:3
modified (11)
48:18 54:8
55:15 57:16
65:15 71:15
74:22 75:11,
13 80:24 84:8
modify (5) 12:2
13:9 68:5
74:16 75:8
modifying (7)
18:1 41:14
68:8,13,20
69:5 74:9
moment (1) 81:10
money (4) 23:4
25:14 70:19
74:5
months (2) 12:10,
13

more (4) 43:14
49:5 55:19
79:20
morning (6)
40:24 42:19
44:3 48:3
51:24 64:23
Morris (1) 5:12
most (3) 28:2
52:8 65:14
Motors (8) 5:13,
14,23,24 6:5,
10,15,16
move (5) 8:15
12:17 13:2
16:22 46:15
moved (2) 24:14
73:2
moving (1) 83:7
much (3) 7:4
47:7 66:6
must (1) 26:2

**N**

name (4) 2:2,22,
24 5:8
necessary (6)
13:11 14:10,
11 48:24 55:8
69:16
need (15) 23:9
30:1,11 35:19
37:13 38:2
48:16 49:13
54:8,11 55:6,
7 56:14 78:6
80:17
needs (2) 43:23
83:20
negotiated (2)
64:1 76:12
negotiating (5)
5:6 35:5
77:23,24 83:4
negotiations (1)
24:14
Nestor (1) 3:20

New (47) 11:20
13:20,24
17:11 19:14,
14 20:7 32:4
34:5 40:17
41:18,19,23,
24 42:5 43:20
44:5 49:23,24,
24 51:7 54:2,
4,10,24 55:2,
3,9 57:2,11,
15,22 58:3,5,
5,12 59:13
61:10 69:2
77:15,16,18,
19 78:3,4,7
83:20
NEWCO's (1)
77:7
next (3) 20:22
84:3,12
nine (3) 7:13
9:13 10:2
nobody (1) 36:10
non-cash (3)
17:24 21:22
22:2
none (2) 31:23
33:18
nor (1) 81:19
note (3) 4:20
6:15 7:19
noted (1) 8:4
notified (1) 5:24
November (1)
13:3
number (7) 24:2
26:19 28:4,5,
6 65:2 80:4
numbers (3)
51:12 77:20
80:9

**O**

object (8) 6:8
7:9,16 31:4
64:20 81:7,21

Auction
August 14, 2013

Allied Systems Holdings

82:10

objected (2) 8:10, 12

objection (4) 7:19 8:10 64:3 81:17

objections (2) 7:7 80:18

objects (1) 6:5

obligated (2) 19:16 80:7

obligation (3) 45:11 48:19 52:5

obligations (1) 79:21

obligor (1) 19:13

obtain (1) 42:2

obviously (4) 16:20 23:3 48:15 56:13

October (3) 12:16 13:4 24:11

odd (1) 36:13

off (5) 12:5 14:10 40:5 46:16 62:21

offer (3) 10:14 21:17,18

offering (8) 17:23 41:10 44:11 59:5,6 60:23 61:5 68:23

official (3) 4:12 64:13 81:15

old (2) 54:10 55:1

once (1) 28:17

One (54) 15:3 19:22 20:23 22:11 23:17 24:2,3,23 25:2 29:13 31:23 32:3,10 34:10,19 35:5, 24 36:7,11,22, 23 37:6,22

39:20,22 42:22 43:17 45:17,19 52:6, 11,15 53:2,9 58:22 59:1 60:13,21 61:3, 6 62:9 63:3, 20 65:22 68:17 75:7 78:17 79:17, 24 80:6,10,20 81:23 82:12

ones (1) 20:2

only (11) 7:13 28:16 30:14 34:17 47:7,7 48:23 52:4 54:20 57:18 58:20

open-ended (1) 54:22

opening (3) 49:20 65:1 69:19

operate (4) 21:1 49:14 55:21 78:24

operating (14) 21:8 24:7,8 33:10 36:22 37:8 39:14,15 41:23 49:13 52:3 60:7 67:17 79:10

operations (2) 15:8 33:6

opportunity (5) 10:24 11:3 15:23 44:12 45:13

opposed (2) 42:6 46:23

oral (1) 64:17

order (23) 2:7 5:21 6:2,12, 19 7:13,21 8:20,21,23 9:13 24:13,15

30:2 37:13 38:9 41:1 49:14 55:8 63:13 64:18 69:17 80:17

ordered (1) 2:6

original (1) 48:9

originally (1) 48:18

others (2) 46:19 58:10

otherwise (7) 16:19 41:12 42:18 44:14 59:18 69:8 75:18

out (14) 16:17 28:8,11 32:9 33:13 39:17 42:19 43:10 45:19 60:17, 23 75:1 78:14 80:10

outlined (4) 13:22 18:20 20:3 44:3

outside (3) 12:14, 15 24:12

over (9) 2:14 10:9 37:23 40:8 46:15 52:5 53:7 63:17 64:2

owe (1) 26:4

own (17) 21:3 31:14,17,22, 23 32:2 36:6, 7,11 41:4 44:7,23 59:13 60:20,24 61:6 80:6

owned (7) 15:5 16:3 31:15 32:15,16 36:23 61:10

ownership (7) 15:15 17:18 31:6 32:9

35:23 59:19,21

owning (2) 52:11, 12

owns (2) 52:14 53:7

**P**

package (4) 18:10,16,18 52:1

paragraph (14) 7:12 9:13 10:2 68:1 71:3 74:9,10 75:1,5,6,7,12, 15,19

paragraphs (2) 71:6 75:7

parcel (1) 22:12

part (8) 19:8 22:12 44:1 52:8,10 60:17 79:10,11

participant (4) 21:20 54:10, 11 55:9

participants (4) 22:1 42:6,7 55:4

participate (19) 5:15 6:4 7:15 15:23 32:13 36:9 41:13,24 44:12,24 45:7, 10,12,14,23 54:3 57:14 58:4,21

participates (2) 36:10 61:4

participating (2) 7:10 55:1

participation (2) 6:6 7:16

particular (2) 24:11 29:15

particularly (1) 66:24

particulars (1) 82:22

parties (8) 7:23 40:15 63:21 64:2 69:21 74:15 78:10 80:19

partitive (1) 67:3

partner (1) 4:3

party (5) 2:21,24 17:22 21:18,20

pass (1) 63:17

past (1) 37:23

Paul (1) 4:3

pay (9) 12:4 14:10 19:16 26:8 33:20 34:1 72:19 79:21 80:7

paydown (1) 67:19

paying (2) 34:8 55:10

payment (2) 43:22 47:4

payments (2) 39:21 79:15

pays (1) 54:10

penalty (2) 76:23 77:4

pension (4) 42:1 54:5 58:11 76:3

people (6) 4:6 24:12 32:23 60:24 84:19 85:1

per (5) 17:15 32:2 33:12 71:15 77:11

perceive (1) 83:9

percent (7) 13:7 31:14,22 36:7, 11,12,13

percentage (1) 36:4

perform (7) 20:15 37:8,

Wilcox & Fetzer Ltd.
www.wilfet.com        (302) 655-0477

14 39:20
47:13,19 74:6
**performance (11)**
13:12,16
20:18 25:10
29:10 34:24
46:4,14,23
47:3,15
**period (4)** 29:2,5
53:3,6
**permitted (3)**
5:15 7:22
22:22
**person (2)** 4:8,20
**perspective (7)**
17:19 19:5
30:14 58:3,8,
13 76:4
**phone (2)** 4:15
32:24
**pieces (1)** 34:16
**place (7)** 2:6
24:4,19 33:6
34:2 37:11
74:13
**placed (2)** 8:7
66:5
**plan (3)** 42:1
54:5 58:12
**plans (1)** 12:13
**please (3)** 2:24
4:9 65:20
**pm (1)** 85:12
**point (15)** 7:7
16:9 19:21
20:23 24:23
25:2 28:24
29:7 35:21,23
58:3 64:14
74:24 80:22
83:9
**points (2)** 44:17
83:8
**pool (64)** 24:2,6
30:12 31:23,
23 32:3,10,14
41:24 42:2,5,
6 43:17 51:22

52:6,11,12,14
53:2,3,7,9
54:2,4,4,10,
11 55:1,2,4,9
57:12,15 58:3,
5,5,20,20,22
59:1,20 60:4,
13,20,24 61:6
62:14,16,19
68:17,17
77:16,19 78:3,
4 79:5,16,16,
24,24 80:5,6,
9,20
**pools (1)** 78:7
**portion (9)** 9:18
15:20 16:2
27:8,9 38:14
51:1,3 73:13
**poses (1)** 64:9
**position (7)** 6:15
23:8,10,14
47:12 50:13
67:4
**possible (1)** 83:17
**post (2)** 33:6
78:24
**potential (2)**
25:16 81:8
**potentially (2)**
3:24 24:13
**practice (1)** 2:2
**pre-authorized (1)**
9:22
**precluded (1)**
45:16
**precludes (1)** 6:18
**pre-judges (1)**
6:19
**prepetition (1)**
63:5
**present (3)** 2:21
40:11 68:10
**presentation (1)**
58:19
**presented (1)**
40:12
**preserves (1)** 6:7

**pretty (1)** 36:4
**price (14)** 14:6
15:21 16:3
19:17 27:2,2,
5 33:20 34:1,
8 41:2,7
42:17 43:23
**primarily (1)**
18:24
**principal (1)** 52:4
**principals (2)**
48:20 70:10
**prior (8)** 11:1
22:7,23 42:14
58:11 60:17
65:15 67:1
**pro (5)** 16:5
31:11 50:14
51:4 59:16
**probably (1)**
60:17
**procedural (1)**
70:17
**procedure (1)**
21:17
**procedures (31)**
2:12 5:22 6:2,
12 7:13,20,21
8:20,22 9:4,8,
17 10:8 22:6,
19 23:10 38:9,
11 63:13,24
64:7,18 68:2,
5,9,14 69:6
70:3 71:4
74:12 75:2
**proceed (1)** 47:3
**Proceedings (1)**
85:11
**proceeds (1)**
12:19
**process (5)** 2:15
6:11 16:22,24
60:18
**produce (3)**
68:15,21
83:20
**prohibit (1)** 52:13

**prohibited (1)** 10:2
**project (1)** 11:14
**projected (1)**
33:11
**projections (11)**
20:14,19
39:6,8,11,13
51:19,24 52:2,
5 79:12
**proposal (2)** 8:13
36:20
**proposed (4)**
9:17 12:19
72:19 78:22
**prospect (1)**
46:20
**prove (1)** 25:9
**provide (6)** 2:22
12:9 33:14
43:24 73:16,24
**provided (5)**
21:23 22:3
38:4,6 72:1
**provides (1)** 47:8
**providing (5)**
16:2 26:7
27:10 74:3,5
**provision (12)**
13:13 18:17
25:1 26:1,24
27:14 28:14,
15 29:4 46:2,
8 52:19
**provisions (6)**
12:3 16:18
34:24 52:13
67:3 75:24
**publicized (1)**
36:4
**purchase (39)**
12:3 13:1,6,
10,24 14:6,23
15:21 16:3,16,
21 17:16
18:15 19:17
27:1,2,5
31:21 33:20
34:1,8,19

41:2,7 42:16
43:22 48:14,
20 68:11
69:11,14 70:4,
7 71:14,18
72:18,22
74:20 77:2
**purchased (2)**
12:22 14:2
**purchaser (23)**
13:14 15:4,9,
17 18:17
20:10 21:3
26:2 27:6,13
28:16 29:13
30:8 31:7,15,
17,17 32:2
34:7,23 35:15
43:21 76:5
**purchasers (4)**
14:3 15:3,16
21:6
**purchaser's (1)**
12:12
**purchases (1)**
31:15
**purchasing (1)**
67:11
**purported (1)**
50:17
**purposes (9)**
15:1 18:7
30:11 34:7
39:12,13
72:22 75:8
77:15
**Pursuant (3)** 5:20
9:12 13:23
**pursuing (1)** 13:8
**put (24)** 5:8,17
13:11 14:24
17:12 23:11
36:20 37:11
38:2 45:9
48:15 50:4,7
51:7 52:2
62:2 63:5,11
65:9 70:6

72:5 73:3
74:15 84:8
puts (1) 67:3
putting (3) 11:2
26:15 85:7

**Q**

qualified (14) 6:1,
23 7:12,14,15
9:14,16 18:6
64:5,17,24
69:17 81:20,22
qualifier (1) 42:12
quickly (2) 5:17
83:16

**R**

raise (5) 8:3
41:1 43:23
44:4 59:11
raised (1) 83:3
range (2) 79:14,
18
rata (5) 16:5
31:11 50:14
51:4 59:16
ratable (1) 38:15
ratably (1) 32:16
rates (6) 21:6
42:5 54:9
55:3,6,9
rather (3) 42:1
54:4 55:2
ratification (1)
41:17
ratified (2) 24:14
42:9
reach (1) 35:14
reached (1) 65:21
read (2) 9:3
73:22
reading (1) 7:12
reaffirmed (1)
70:10
real (5) 15:5,17
31:16 41:4

44:7
realize (1) 35:19
realtime (2)
27:12 28:12
reasonable (1)
30:13
receivable (1)
29:19
receivables (1)
60:6
receive (1) 43:5
received (2)
10:12 78:21
recent (1) 65:14
recess (4) 11:9
40:6 62:23
85:10
record (42) 2:1,
17 5:18 7:7,
17 11:11
14:24 17:5
18:20 20:3,4
40:3,5,8
42:19,24
44:18 45:3
48:15,21 57:8
62:2,21 63:1,
4,5,11 66:5
69:11 70:7,9
72:6 73:3,15
74:15,16,23
79:4 82:13
83:13 84:6,9
recovery (2) 46:8,
10
reduce (2) 54:9
55:8
reduction (1) 43:8
reference (1)
7:20 8:22
referenced (2)
56:20 57:3
referred (1) 14:2
referring (2) 39:9
51:21
refers (1) 13:11
reflect (3) 48:9,
19 54:9

regarding (4)
9:16 10:1,8
76:1
reimburse (1) 13:6
reiterate (1) 81:16
rejecting (1) 69:8
related (4) 5:13
15:7 16:21
21:20
relates (2) 12:8
66:24
relating (1) 9:18
relationship (4)
21:5 48:1
49:8,10
relationships (1)
48:5
relative (4) 48:19
49:1 65:6
67:10
release (1) 38:13
relevant (3) 31:5
56:4 84:2
relying (2) 39:7
79:8
remain (1) 42:18
remaining (2)
15:10 16:1
remains (1) 46:6
remedy (3) 25:11,
16,22
repeat (4) 11:16
23:18 53:19
73:22
rephrase (1)
78:20
replace (1) 41:19
replacing (1)
53:20
reporter (1) 3:2
represent (2) 3:1
48:4
representations (1)
49:2
representative (1)
78:11
represents (1)
4:23

req (2) 43:15
50:9
request (2) 11:1,3
requested (2)
9:11 69:20
require (1) 75:2
required (7) 25:8
34:15 41:17
42:5 57:12
68:10 74:10
requirement (2)
42:9 59:10
requirements (7)
22:19 33:13
57:2 64:6
70:2 75:5
80:12
requires (3) 71:4
75:16 76:4
requisite (27)
3:11,14 9:2
10:20 17:9
18:6 19:1
22:5,10,11,17,
21 33:4 38:18,
21 40:20 49:3
63:6 66:20,23
70:12,24
72:23 73:9,12
74:22 83:19
reserve (6) 7:24
19:20 64:3,19
81:7 82:9
reserves (1) 6:7
reside (1) 24:8
resolve (1) 6:24
resolved (1)
39:24
respect (12) 9:21
12:1,14,18
24:6 42:23
57:10 58:12
59:4 64:4
70:17 79:9
respectfully (1)
6:14
respond (2)
84:19 85:1

responding (1)
11:1
response (1)
61:17
responsible (2)
34:8 43:21
restate (1) 79:3
resubmit (1)
42:16
resulting (1)
40:13
revenue (1) 21:1
review (1) 73:19
revisions (1)
83:24
Richard (10) 5:4
35:4,11 53:17
55:23 56:19
62:6,10 77:22
84:13
Richards (1) 2:17
right (32) 3:15
4:20 6:7,18
10:5 13:15
17:13 19:4
21:15 22:16
27:24 28:22
29:3,6,8 34:3
40:4 43:4
51:2 53:13
54:16 55:13
60:8 62:18,20
68:18 70:15
75:20 80:10
81:5,7 82:9
rights (15) 8:1
24:19 29:9
31:3 32:4
41:10 44:11
46:23 59:5,6
60:23 61:5
64:4,20 68:22
rigs (2) 15:6
80:7
risk (2) 24:16
47:18
risks (1) 64:10
Rob (1) 53:14

Robert (10) 3:18 20:5 28:19 44:17 45:2 52:22 63:19 82:13,18 83:14
room (1) 3:5
Roth (9) 3:8 9:7, 21 10:23 11:13 40:1 63:10 65:14 79:7
Rothschild (3) 2:14 73:18,24
roughly (1) 36:12
Rudnick (1) 82:19
rules (2) 2:11 83:7
run (3) 21:8 33:7,20

**S**

sale (8) 6:8 45:11 52:14 60:17 80:17 81:2,8 84:12
Same (7) 10:3 12:7 17:11 18:18 30:20, 21 60:24
Sanders (1) 2:3
satisfactory (1) 34:22
satisfied (4) 28:18 43:1,3 77:2
satisfy (1) 76:5
satisfying (1) 27:2
saying (5) 8:9 11:16 17:2 26:2 74:8
scenario (1) 26:11
schedule (1) 60:16
schedules (2) 69:2,13
Schulte (12) 3:8

9:7,21 10:23 11:13 40:10 63:9 65:14 66:20 77:1 79:7 83:23
scope (1) 82:23
se (1) 32:2
seat (1) 8:16
second (2) 29:12 62:9
Section (3) 13:5, 23 17:15
seek (1) 13:15
seemingly (1) 78:16
seems (1) 75:2
segment (1) 20:20
sell (4) 41:3 43:18 44:5,6
SELTZER (18) 5:4,4 35:4,4, 12,22 36:16 53:19 55:23, 23 56:23 62:6, 6,15 77:22,22 84:13,13
sense (1) 16:23
Separate (2) 34:12 44:2
serious (1) 64:10
session (1) 65:15
set (10) 2:11 14:22 24:9 46:16 47:24 48:2 49:9 78:23 84:5,7
set-off (1) 6:18
settlement (1) 12:20
shall (2) 75:3,4
Shapiro (1) 4:1
share (2) 50:14 51:4
sheet (2) 37:19 83:20
shell (1) 50:5
short (3) 6:24

24:13 84:11
shorthanding (1) 28:1
show (3) 25:7, 13 30:23
side (4) 18:21 19:1,9,10
Sidley (1) 4:12
significance (1) 23:7
significant (1) 52:9
similar (2) 23:19 37:11
Simon (1) 5:5
simply (2) 25:13 48:24
single (1) 30:18
six (3) 12:10,13 30:19
slowly (1) 43:14
solely (1) 22:24
somebody (2) 61:21 70:15
someplace (1) 23:5
somewhat (1) 33:2
Sontchi's (1) 2:7
Sorry (9) 25:5 49:24 54:13 56:22,23 63:9 73:21 84:22 85:2
sort (3) 38:22 39:20 52:20
sorts (1) 56:6
sounds (2) 31:13 81:11
Spalding (3) 3:23 5:1
speak (6) 2:20, 23 3:6 4:7,16 53:23
speaker (1) 8:9
speaking (4) 3:13 4:1 6:14 8:8
special (5) 82:8, 15,20 83:2,10

specific (18) 13:12,15 19:4 25:6,10 29:5,10 34:23 46:3,14,23 47:3,15 50:17 53:3 54:20,21 55:16
specifically (2) 22:5 76:3
specifics (2) 11:23 13:18
specify (1) 29:11
Spectrum (29) 3:10,14 9:1 10:19 15:19 17:7 18:5 32:11 36:5,24 38:14 41:9 44:10 50:3 61:1,4,6 64:1 67:10 68:2 70:11,22 73:8, 17 74:2,21 78:23 80:24 84:21
speed (1) 84:7
spelling (1) 2:22
spoke (1) 4:20
spoken (1) 79:2
spread (1) 31:9
spreading (1) 38:16
standards (1) 25:11
STARK (2) 82:18, 18
start (2) 3:3,4
started (2) 5:14 83:23
starting (1) 16:23
state (1) 48:21
stated (3) 23:22 75:24 79:4
statements (3) 73:6,16 74:1
States (11) 42:1 54:2,5 55:2

56:8 57:14 58:6,11,21 76:2 77:16
status (1) 84:15
stay (1) 6:17
Steve (1) 2:14
Steve's (1) 56:24
still (8) 23:23 24:3 35:18 46:5,7 49:9 54:14 79:18
stoppages (1) 42:13
strategies (1) 83:4
structurally (1) 43:20
structure (2) 41:15 67:18
structured (1) 64:11
stuff (2) 21:7 28:11
subfinance (1) 19:18
subject (9) 18:19 32:17 36:7 45:11 55:18 59:2 63:15 73:2 81:3
submissions (1) 10:11
submit (2) 10:21 33:17
submitted (32) 5:23 7:11 10:14 11:20 16:16 17:22 18:13,14,15, 16,18 20:1 43:9 48:10,18 61:14 62:22 64:16,23 65:8, 22 69:12 71:5, 6 72:3,14,16, 19,20,23 75:17 78:19
submitting (2) 40:16 70:22

subordinated (6)
36:15 41:12
44:14,24 45:7
59:18
subparagraph (2)
75:6,10
subparagraphs (1)
75:10
subpurchaser (1)
20:11
subsequently (1)
6:3
subsidiaries (2)
30:19 44:3
subsidiary (1)
40:23
substance (1)
16:6
substantially (3)
20:18 67:5
79:19
substantive (1)
49:6
successful (3) 8:2
33:7 50:11
sufficient (4)
14:18 64:15
71:18 79:20
suggest (1) 78:13
sum (1) 14:9
supplements (2)
56:6,17
support (2) 33:17
73:7
Sure (15) 3:7
17:21 18:22
19:12 30:7,16
31:4 32:1
34:11 39:10
46:24 47:9
53:21 68:7
76:13
suspect (2)
26:18 80:16
systems (1) 15:8

T

table (2) 65:9
84:11
talk (2) 11:6
70:18
talking (1) 75:15
Teamsters (6) 5:5
35:5 56:21
77:24 78:11
84:14
telephone (1) 4:21
telling (1) 35:23
tells (1) 61:21
term (3) 6:1
37:18 83:20
terminal (1) 15:5
terminate (2)
35:21 76:23
termination (4)
28:22 29:4,6
54:16
terms (14) 10:8
13:21 28:23
38:8 42:17
48:5 49:7
56:7 59:16
63:12 69:19
71:15 74:23
82:24
Thanks (2) 11:8
85:9
Theo (1) 4:2
thereof (1) 9:19
thereto (1) 22:23
thinking (1) 55:19
though (2) 19:8
48:4
thought (2) 26:18
75:14
throughout (1)
56:16
tie (1) 54:23
tied (1) 34:18
today (18) 33:15,
16 39:12
40:13 63:11
65:8 66:16
68:11,15 70:1,
7,9 72:6,23

73:4 74:23
82:8 84:9
today's (2) 3:6
71:16
together (5)
34:19 45:9
52:2 54:23
72:24
told (1) 36:6
total (1) 18:10
tractors (1) 15:7
trailers (1) 15:7
transaction (2)
9:18 34:16
transferred (2)
12:7,11
transferring (1)
39:8
treat (1) 12:23
treated (1) 77:14
triggers (1) 25:4
Troutman (1) 2:3
trucks (2) 15:6
44:8
true (2) 36:3
66:21
try (2) 11:13
29:9
trying (5) 47:11
53:22 55:14
66:13 71:21
turn (2) 2:13
10:9
turned (1) 71:17
two (53) 5:13
9:14 14:7
15:2 21:6
24:6 31:7,18,
23 32:14 35:6,
9 36:1,12,14
37:1,6,7,12,
23 39:7,9,19,
21 45:17 48:1
49:8,11 51:22
52:12,20 53:3,
7 54:3 56:15
57:12 58:3,20,
20 59:20 60:5

61:1 62:14,16,
19 65:7 68:18
78:18,22 79:5,
16,24 80:5
type (1) 39:2
types (1) 39:3
typical (1) 25:10

U

ultimate (1) 32:9
ultimately (1) 8:2
under (32) 11:24
13:1,21 14:6
16:4 19:24
20:16 25:22,
24 26:11,23
28:23 35:15
37:8 38:24
39:16,20,22
40:19 41:9,24
44:22 47:12
50:14 51:5
54:4 55:21
59:16 64:17
67:15 70:2
78:18
units (1) 57:4
Unless (3) 10:7
35:1 77:3
unlevered (1)
79:19
unlimited (1)
26:13
unpaid (1) 12:8
unpaid/paid (1)
12:5
unsecured (3)
4:13 64:13
81:15
up (15) 14:13
19:15 25:7,13
28:4 29:24
30:8 33:1
35:13 47:24
48:2 49:9
51:7 74:17
78:23

updating (1)
16:20
upon (6) 6:9
11:17 25:10
28:22 58:9
73:1
use (5) 32:7,8
37:7 39:19
50:8
used (4) 50:6,7
67:19 75:4
using (1) 51:24
usual (1) 69:18

V

vacation (1) 12:5
valid (1) 59:18
validly (3) 41:11
44:13,19
value (6) 30:21
35:20 59:5
66:7 67:8,13
various (3) 20:5
30:9 40:23
vary (1) 69:19
Vascor (2) 4:18
7:9
vehicle (3) 32:7,
8,15
vehicles (9) 15:6,
18 36:20,21
37:7,13 41:5
44:8 49:14
verbal (1) 65:9
version (3) 65:7,
14 71:17
versus (1) 54:10
viability (1) 39:14
view (1) 75:20
viewed (1) 24:12
violates (4) 6:11
21:17 23:10
64:9
virtue (1) 2:6

W

Allied Systems Holdings

wait (1) 29:1
waive (2) 76:19
   77:4
waivers (1) 70:2
walk-away (1)
   24:18
walked (1) 4:5
wants (2) 32:12
   85:4
WARN (2) 66:24
   67:3
water (1) 25:23
Watkins (2) 3:19
   20:5
WAXMAN (5)
   5:11,12,20
   6:21 7:3
way (11) 6:19
   7:9 17:2
   19:18 35:22
   43:1 61:10
   64:11 70:15
   71:12 84:10
week (1) 84:12
weeks (1) 37:23
Weiss (1) 5:5
weren't (1) 45:12
whack (1) 29:23
whacks (1) 30:8
what's (6) 30:12
   52:24 53:6
   55:4 69:24
   75:23
whatsoever (1)
   23:7
wherewithal (1)
   20:15
whole (3) 10:15
   34:17,18
who's (5) 20:10
   30:3,5 59:12
   60:19
whose (4) 8:9
   62:7 80:19
   82:16
wind-down (2)
   14:11 67:13
winning (1) 31:21

withdraw (1) 78:7
within (3) 29:5
   68:4 74:12
without (2) 76:23
   82:21
wondering (1)
   25:4
word (1) 75:4
words (1) 25:23
work (6) 3:4
   42:13 43:10
   62:12,18 84:6
worked (1) 80:10
writing (1) 16:13
written (5) 21:18
   28:8,11 61:14,
   15
wrong (1) 31:13
wrote (1) 16:19

**Y**

year (2) 20:22
   33:12
yield (2) 53:16
   81:13
Young (1) 3:20
Yucaipa (8) 3:20
   12:20 15:22
   36:13,14
   63:20 64:3
   82:14

**Z**

Zabel (6) 3:8
   9:7,21 11:13
   40:11 63:10

**1**

1 (3) 71:6 75:5,
   19
10 (1) 14:13
10:00 (1) 85:12
100 (5) 13:7
   31:14,22 36:7,
   11

12 (6) 68:1
   74:10 75:5,10,
   15,19
12.8b (2) 13:23
   17:15
13 (5) 71:3
   75:1,7,12,16
14th (3) 12:16
   13:4 24:11
15- (1) 79:18
16 (3) 71:6
   75:5,19

**2**

2 (1) 75:6
20 (2) 29:18
   75:6
2013 (4) 5:21
   12:17 13:3
   24:15
2014 (1) 79:13
20-million-dollar (1)
   79:18
20th (1) 8:19
21st (2) 2:8 5:21
22nd (1) 8:1
24 (3) 20:22
   33:11 79:14
26 (1) 36:12

**3**

30th (1) 13:3
31st (2) 12:17
   24:15
363 (1) 81:2

**4**

4.5 (1) 51:10
40.5 (2) 14:15
   59:9

**5**

5 (1) 38:5
5.5 (2) 43:7

51:11
50 (4) 27:5,6,
   22 48:11
50-million-dollar (2)
   27:17,21
55 (1) 28:6

**6**

60 (1) 19:15
60-million-dollar (1)
   34:2

**8**

8 (1) 71:7
8.15 (1) 13:5
8th (10) 5:22
   11:21 16:17
   17:12 18:13,
   19 20:1 61:14
   69:12 72:15

**9**

9.5 (1) 38:3
95.5 (5) 14:6,20
   17:20 30:7
   42:17
95.5-million-dollar (1)
   19:6
95-million-dollar (1)
   10:17
9th (1) 5:24