# **Exhibit B**

# In The Matter Of:

*Allied Systems Holding*

---

*Auction*

*August 15, 2013*

---

*Wilcox & Fetzer, Ltd.*

*1330 King Street*

*Wilmington, DE   19801*

*email: depos@wilfet.com, web: www.wilfet.com*

*phone:  302-655-0477, fax:  302-655-0497*



Original File 081513alliedps.txt

Min-U-Script® with Word Index

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                    ) Chapter 11
                          )
ALLIED SYSTEMS HOLDING,   ) Case No. 12-11564 CSS
                          )
        Debtor.           )


RICHARDS LAYTON & FINGER
One Rodney Square
Wilmington, Delaware


Thursday, August 15, 2013
9:30 a.m.


-- TRANSCRIPT OF AUCTION PROCEEDINGS --


WILCOX & FETZER
Registered Professional Reporters
1330 King Street - Wilmington Delaware  19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1              MR. COLLINS:  Okay.  It's

2    Mark Collins for the record.  We are

3    reconvening the auction of Allied.

4              I understand that Mr. Harris

5    would like to make some additional comments and

6    potential modifications to his most recent bid.

7    So I'll turn it over to Mr. Harris.

8              MR. HARRIS:  Good afternoon,

9    everybody.  Adam Harris from Schulte, Roth &

10   Zabel.  The use of the word "like" may be a

11   little bit of an overstatement.  But I do have

12   a few other clarifications to our bid that have

13   resulted from further conversations with the

14   company which I'd like to put on the record.

15             The first is that to the extent

16   that there is excess cash and cash equivalence,

17   unearned insurance premiums, tax refunds in

18   excess of 2-1/2 million on the balance sheet as

19   of the closing date, the purchaser will either

20   exclude such excess from the definition of

21   purchased assets or increase the amount of the

22   credit bid component of its bid on a

23   dollar-for-dollar basis equal to the amount of

24   that excess.

1                    The second clarification is

2    that we will include in the asset purchase

3    agreement a covenant that provides that to the

4    extent the purchaser exercises its rights under

5    Section 12.8(b) to designate different

6    purchasers with respect to various assets or to

7    assume liabilities or take assignment of

8    certain contracts, that the purchaser and the

9    designated purchaser will provide information

10   to the sellers sufficient to meet the adequate

11   assurance of future performance and obligations

12   under those contracts for the benefit of

13   counterparties and lessors.

14                   The third clarification is that

15   we have agreed to provide independent

16   guarantees by the Black Diamond and Spectrum

17   entities to support the specific performance

18   obligation with respect to the cash portion of

19   the purchase price.

20                   The next clarification is we have

21   agreed to drop in its entirety the condition to

22   closing set forth in Section 9.2(n) of the

23   asset purchase agreement, which was the one we

24   were talking about last night relative to

1  modifications to the pension plan and the

2  collective bargaining agreements.

3                And just one clarification, and

4  that is we had last night said that we would

5  agree to what we referred to as a

6  hell-or-high-water provision on specific

7  performance.  That language has not yet been

8  included in the asset purchase agreement.  We

9  have asked the company to provide us with

10  language they would find satisfactory.

11                I was provided about a half hour

12  ago with some proposed language from the

13  Troutman firm which we are reviewing.  But to

14  the extent you're looking at the asset purchase

15  agreement that was circulated last night in

16  black-line form or this morning, that language

17  is not yet in there.  But we have agreed to the

18  concept and we're working on the language.

19                Those are the modifications we

20  wanted to put on the record with respect to our

21  bid.

22                MR. COLLINS:  Thank you.

23                Mark Collins.  As we stated last

24  night on the record, we do believe that that

1  bid is a qualifying bid and is a higher and

2  better bid than the opening bid of Jack Cooper.

3  And we would turn it over to Mr. Austin on

4  behalf of Jack Cooper to determine if they

5  would like to bid.

6              MR. AUSTIN:  I have some

7  questions.  I'm not sure of some of the

8  clarifications.  And for the record, this is

9  Jess Austin on behalf of Jack Cooper Holdings.

10             The point on the collective

11  bargaining agreements and pension plans, do I

12  understand that the closing conditions that

13  they have to be modified -- acceptable to the

14  purchasers have been totally removed?

15             MR. HARRIS:  Yes.  Adam Harris

16  for Schulte Roth.

17             MR. AUSTIN:  Do the closing

18  conditions still include a requirement that the

19  purchasers must have agreement on the wind-down

20  budget?

21             MR. HARRIS:  There is a closing

22  condition that there be an agreed wind-down

23  budget between the first lien lenders and the

24  company, yes.

 1              MR. AUSTIN:  Has this deal been

 2    fully documented?  I mean, all the complete

 3    documents to support it?

 4              MR. HARRIS:  The asset purchase

 5    agreement in draft form has been circulated.

 6    It's being negotiated.  As far as I'm

 7    concerned, it's being worked on as we speak, as

 8    are the ancillary documents.  So, no, Jess,

 9    it's not fully documented and signed.

10              MR. AUSTIN:  Relative to these

11    further changes and from the discussions last

12    night, has the company's board approved this?

13              MR. COLLINS:  No, it has not.

14              MR. AUSTIN:  At this point,

15    Jack Cooper would like to take about a

16    ten-minute break.  I would ask that everybody

17    stay here.  We would like to meet with limited

18    representatives of the company to, I think,

19    respond to a couple of things that you had

20    discussed with us.  And then that will

21    determine whether or not we want to submit a

22    counterproposal.

23              MR. KLYMAN:  Before we go off the

24    record -- Robert Klyman, Latham & Watkins on

1  behalf of Yucaipa.

2              You mentioned that the purchaser

3  and designee would provide adequate assurance

4  with respect to the various contracts that were

5  assumed and assigned.  By what date will those

6  be provided?

7              MR. HARRIS:  The asset purchase

8  agreement allows that designation to occur up

9  to a certain period of time prior to closing.

10  And if and when those designations are done and

11  it is determined that contracts will be going

12  into entities other than the purchaser, we will

13  provide the adequate assurance at that point in

14  time, provide it to counterparties together

15  with the notice that's contemplated by the

16  asset purchase agreement and give those

17  counterparties an opportunity to file any

18  objections they deem appropriate at that time.

19              MR. KLYMAN:  Will that

20  information be provided by either the purchaser

21  or the designees prior to the hearing to

22  approve the sale?

23              MR. HARRIS:  It may be available

24  in summary format, but probably not in detail.

1           MR. KLYMAN:  When will you

2    deliver final copies of all of the documents

3    that memorialize the purchase agreement and the

4    ancillary documents, including, without

5    limitation, bid documents reflecting the

6    relationship between what we were referring

7    yesterday as the designee that would hold pool

8    one assets and designee that would hold pool

9    two assets?

10          MR. HARRIS:  Well, I think it is

11   our anticipation that we would have the

12   documents reflecting the purchase of the assets

13   from the debtors and the authority to do so and

14   the financing to do so certainly prior to the

15   sale hearing.

16              With respect to the underlying

17   documents that talk about the relationships

18   between the companies that may exist

19   post-closing, we'll probably have term sheets,

20   but not full documentation outlining what those

21   relationships are expected to be, also prior to

22   the sale hearing.

23          MR. KLYMAN:  How far in advance

24   of the sale hearing?

1            MR. HARRIS:  As soon as I can get

2   them to you, Robert.  I mean, we're working on

3   them as we speak.

4            I do, however, want to note for

5   the record that from the company's perspective,

6   other than the ability to get the deal closed,

7   I don't believe those underlying documents have

8   any real relevance to the sale process.

9            MR. KLYMAN:  Yesterday you

10   described your bid as having two -- the end

11   result would be the assets would be broken into

12   two entities:  One holding real estate, the

13   rigs and the like, and the other holding

14   contracts and employees and other ancillary

15   assets to be identified.

16            Is it still the contemplation

17   under the bid that those would be the two

18   entities that would be set up or are you

19   contemplating more entities or more designees?

20            MR. HARRIS:  It is still

21   contemplated there would be designated

22   purchasers as is contemplated by the agreement.

23   I can't tell you whether it's going to be two

24   entities or three entities.  We're still

```
 1   working through that depending on how the
 2   capital structure looks like it best resolves
 3   that in terms of the asset allocations.
 4              MR. KLYMAN:  By what date will
 5   you identify whether it's two, three or more
 6   designees and what assets and liabilities are
 7   going to each of those designees?
 8              MR. HARRIS:  Again, as it relates
 9   to the purchase of the assets from the debtor,
10   we have one purchaser who's on the hook for the
11   whole purchase price, both the cash component
12   and the credit bid component.  That entity and
13   the funds that I identified earlier are --
14   subject themselves to specific performance.
15              So we're putting together those
16   allocations as quickly as we can.  We hopefully
17   will have preliminary views on that by early
18   next week.  I don't think it's relevant for the
19   overall sale process, frankly, how the assets
20   get allocated once the debtor sells them.
21              MR. KLYMAN:  Based on the bid
22   that's on the table with these modifications,
23   is it still contemplated that one entity will
24   be exercising an acquisition through a credit
```

1  bid and another separate entity will be

2  exercising a purchase through a cash and a

3  rights offering backstopped by Black Diamond

4  and Spectrum?

5            MR. HARRIS:  No.  To be clear,

6  the bid is being made by one entity who has

7  designation rights with respect to entities

8  into which assets, liabilities and contracts

9  may be placed at closing.

10            So we've got one entity that's

11 making a bid, one entity that's responsible for

12 a purchase price, guarantors on the cash

13 portion of that.  So you should think about

14 this as New Allied Acquisition Co.'s bid.  And

15 it has the ability to basically suballocate the

16 assets, liabilities and contracts in its

17 discretion prior to closing.

18            MR. KLYMAN:  And who are the

19 equity holders of New Allied Acquisition Co.,

20 LLC?

21            MR. HARRIS:  Right now?

22            MR. KLYMAN:  Yes.

23            MR. HARRIS:  It is an affiliate

24 of Black Diamond and Spectrum as the founding

```
1   members of that entity.  The entity has been

2   designated by the admin agents and the

3   requisite lenders as having authority to make

4   the credit bid, which will ultimately be on

5   behalf of all of the lenders.

6                    MR. KLYMAN:  Do you have a

7   written authorization that you can share with

8   us or some representation from the agent that

9   they've actually made that assignment?

10                   MR. HARRIS:  I have a form of

11  one, yes.

12                   MR. KLYMAN:  But you don't have

13  one that's been executed?

14                   MR. HARRIS:  Well, I have one

15  that was executed back in May when we did the

16  first credit bid through the exact same entity.

17  And I just haven't changed the date on it and

18  gotten it signed.  But it's the same

19  authorization.  A different asset purchase

20  agreement obviously.

21                   MR. KLYMAN:  Yucaipa reserves all

22  of its rights with respect to this bid.  We

23  continue to believe it is not a qualified bid,

24  does not comport with the bid procedures and --
```

1   it is not a qualified bid.

2                   MR. AUSTIN:  For the record,

3   Jack Cooper reserves all its rights and has the

4   same position relative to this bid.

5                   MR. COLLINS:  Understood.

6                   MR. BURKE:  Michael Burke for the

7   committee.  Just a few questions, Mr. Harris.

8                   If I understand correctly, you

9   are withdrawing the closing condition, which is

10  9.2(n), that the purchaser shall have agreed on

11  new collective bargaining agreements with the

12  various collective bargaining units; is that

13  correct?

14                  MR. HARRIS:  I'm deleting 9.2(n)

15  in whatever form it was circulated last night

16  or any predecessor form of it.  It's now out.

17                  MR. BURKE:  Is it the intention

18  of the potential purchasers to include the

19  collective bargaining agreements in the assumed

20  contracts list?

21                  MR. HARRIS:  No.

22                  MR. BURKE:  One last --

23                  MR. HARRIS:  It's the exact same

24  provision that was in the Jack Cooper bid.



1              MR. BURKE:  One last question.

2   9.2(i), as I understand it, is that condition

3   to closing still operative and that has not

4   been waived?

5              And for clarification, it is that

6   between the execution date and the closing

7   date, sellers shall not have experienced any

8   material labor strike or other work stoppage.

9   Is that still a condition to closing?

10             MR. HARRIS:  It is.

11             MR. BURKE:  Again, Michael Burke

12   for the committee.  We reserve on the right

13   whether this is a qualified bid.

14             MR. SELTZER:  Richard Seltzer for

15   the Teamsters negotiating committee.  We also

16   reserve all our rights.  And as we have made

17   clear to the debtor, we believe that the

18   acceptance of this offer, entering into an

19   asset purchase agreement based on this offer

20   will be a violation of Article 1, Section 3 of

21   our current collective bargaining agreement.

22             I would point out in response to

23   Mr. Harris's comments that Jack Cooper is a

24   signatory of the same collective bargaining

1   agreement that Allied is.  So Jack Cooper is

2   bound under its collective bargaining agreement

3   with Teamsters negotiating committee to employ

4   and -- employ the employees of Allied who would

5   be taken by Jack Cooper under this collective

6   bargaining agreement.  So that essentially they

7   have met the obligations of the collective

8   bargaining agreement.  This offer does not.

9                MR. COLLINS:  Okay.  We're off

10  the record.

11               (A recess was taken.)

12               MR. COLLINS:  Let's go back on

13  the record and turn it over to Mr. Austin.

14               MR. AUSTIN:  For the record, this

15  is Jess Austin on behalf of Jack Cooper

16  Holdings Corporation.  Before I give a

17  response, I just want to make sure, any more

18  changes?

19               MR. COLLINS:  No more changes.

20               MR. AUSTIN:  No more changes by

21  Black, Diamond and Spectrum on what's been

22  stated already?

23               MR. HARRIS:  Not based on the

24  proposal that's currently on the table, no.

1              MR. AUSTIN:  And we'll have three

2    points relative to the Jack Cooper asset

3    purchase agreement which was submitted, which

4    the debtors announced at the beginning of this

5    auction was at least at that time the highest

6    and best bid received for the proposed assets

7    to be sold.

8              Change number one, Section 8.15

9    of the Jack Cooper asset purchase agreement, we

10   will modify that -- and we're in the process,

11   probably will have an actual hard copy with

12   these modifications -- to pay all of the costs,

13   the company's HSR costs and expenses up to a

14   3-million-dollar cap.

15             Second modification to the

16   contract is in the definition of the material

17   adverse event.  There was a provision dealing

18   with the -- having net orderly liquidation

19   value of the company's rigs, equipment, if you

20   will.  We will change that to 90 percent of net

21   orderly liquidation value.  And subject to

22   review and approval, we will base that off of

23   the company's appraised numbers versus the

24   Taylor & Martin appraisal, which is noted in

1   the MAE.

2                   Before we came in here, we did

3   ask the company to share with us its summary.

4   But we didn't get a chance to get a response to

5   that.

6                   And the last change -- and we've

7   gone through this, I think, in the sense of

8   what we think of this auction and how it's been

9   conducted.  But Jack Cooper will increase the

10  purchase price to 100 million dollars from the

11  current bid of 95 million.  Accordingly, we

12  will cop up a deposit.

13                  I want to be very clear.  That

14  proposal and the increase in the purchase price

15  has a condition that Jack Cooper must be

16  designated and this auction closed -- be

17  designated the successful bidder with the

18  approval of the special committee of the

19  company's board and the auction close by

20  5:00 p.m. eastern time today.

21                  Unless there's any question, that

22  is Jack Cooper's highest and best bid.

23                  MR. COLLINS:  Thank you.

24                  Any questions for...



```
1                    MR. HARRIS:  Yes.  I have several
2    questions actually.  It finally gets to be my
3    turn.
4                    Some clarifications, Mr. Austin,
5    on the modifications to the bid.  The change to
6    the HSR, your existing agreement basically says
7    you'll reimburse one-half of the company's
8    costs up to a cap of a million dollars and then
9    100 percent in the deal closes.
10                   Is the 3 million intended to
11   replace the 1 million cap on the 50 percent or
12   is it 3 million dollars --
13                   MR. CIUPITU:  3 million dollars.
14                   MR. HARRIS:  -- whether or not
15   the deal closes?
16                   MR. CIUPITU:  Whether or not it
17   closes.
18                   MR. AUSTIN:  It's 3 million
19   dollars whether or not the deal closes.
20                   MR. HARRIS:  Thank you.
21                   Second question, has the
22   Taylor & Martin appraisal been completed?
23                   MR. AUSTIN:  No.
24                   MR. HARRIS:  So as we sit here
```



```
 1    today, we don't know what the orderly
 2    liquidation value is?
 3                    MR. CIUPITU:  Because we don't
 4    have the Taylor & Martin proposal, Allied came
 5    back to us and said, well, we need something
 6    that we can measure against.  We understand
 7    Allied has one.  So we just need to review it
 8    quickly, make sure it looks okay and this will
 9    be based on your appraisal.
10                    MR. HARRIS:  Mr. Austin, does
11    Jack Cooper Holdings currently have a valid and
12    binding financing commitment?  Because the one
13    you delivered with your bid, at least as I read
14    it, expired at noon today.
15                    MR. AUSTIN:  You read it wrong.
16    It expires at midnight tonight.
17                    MR. HARRIS:  A.m./p.m. things
18    sometimes throw me off.
19                    But it does expire at midnight
20    tonight.
21                    MR. AUSTIN:  The commitment paper
22    speaks for itself.
23                    MR. HARRIS:  Is your bid
24    irrevocable through the sale hearing date as
```



1   required by the bid procedures?

2                   MR. AUSTIN:  No, because the bid

3   procedures have been modified.  And our bid was

4   accepted as a qualified bid when we started.

5   And we had that limited condition in our bid to

6   start with.

7                   MR. CIUPITU:  Let me clarify.

8   What it says is if we become the successful

9   bidder today, then it's extended through the

10  end of the year.  If we do not become the

11  successful bidder today, then it has expired.

12                  MR. HARRIS:  So if a different

13  person is denominated as the successful bidder

14  and then it goes to the sale hearing and that's

15  not approved by the Court, you're not standing

16  there as the backup at that point, correct?

17                  MR. CIUPITU:  Correct.

18                  MR. AUSTIN:  That's correct.

19                  MR. HARRIS:  Does Jack Cooper

20  Holdings intend to request any amendments to

21  the existing Ford contracts with respect to

22  pricing increases if it is deemed the

23  successful bidder?

24                  MR. AUSTIN:  What we're going to



1    do with our potential customers is irrelevant

2    to your considerations at this time.

3                    MR. HARRIS:  Yet, you maintain a

4    liquidated damages provision in your contract

5    of 10 million dollars?

6                    MR. AUSTIN:  That's correct.

7                    MR. HARRIS:  And to date, you

8    have not agreed to conform the provisions in

9    Article 6 of your asset purchase agreement to

10   those in the asset purchase agreement of

11   New Allied Acquisition relating to picking up

12   any WARN liability in the U.S. or similar

13   liability in Canada to the extent you close

14   prior to the expiration of the notice periods;

15   is that right?

16                   MR. AUSTIN:  We're making no

17   additional changes other than which I've

18   announced on the record.

19                   MR. HARRIS:  Does Jack Cooper

20   Holdings have any intention to close any of the

21   existing terminals or facilities that are being

22   operated by Allied post-closing?

23                   MR. AUSTIN:  What Jack Cooper

24   decides to do with those terminals is



1    irrelevant to this auction today.

2                    MR. HARRIS:  Does Jack Cooper

3    Holdings have any oral or written agreements

4    with the IBT with respect to commitments to

5    hire specific numbers of employees?

6                    MR. AUSTIN:  Whatever we have is

7    irrelevant to this auction today.

8                    MR. HARRIS:  Do you have any oral

9    or written agreements with IBT with respect to

10   the potential transition of employees currently

11   under the Canadian autoworkers to move into the

12   IBT in Canada?

13                   MR. AUSTIN:  Same comment.

14                   MR. HARRIS:  Does the IBT have

15   any agreement with the company or any of its

16   officers and directors to acquire any economic

17   interests in Jack Cooper Holdings other than

18   through the employee relationships governed by

19   the collective bargaining agreement?

20                   MR. AUSTIN:  We have no idea what

21   agreements exist between the IBT and the

22   company other than collective bargaining

23   agreements.

24                   MR. HARRIS:  You have no idea or

1    there are none?

2                    MR. AUSTIN:  We don't know

3    whether there are or not.  I can't answer that

4    question.

5                    MR. HARRIS:  Is there anybody

6    here from the company who can answer that

7    question?

8                    MR. AUSTIN:  Well, I don't know.

9    They're sitting across the table.

10                   MR. KELLEY:  What company are you

11   talking about?

12                   MR. HARRIS:  I said does Jack

13   Cooper Holdings.

14                   MR. AUSTIN:  I thought you said

15   the debtor.

16                   MR. HARRIS:  I meant to say Jack

17   Cooper Holdings.  Does IBT have any interest in

18   or have any right to acquire an interest in

19   Jack Cooper Holdings --

20                   MR. CIUPITU:  No.

21                   MR. AUSTIN:  No.

22                   MR. HARRIS:  Is there any oral or

23   written agreements pursuant to which Yucaipa or

24   any of its affiliates either has or has a right



```
 1   to acquire any interest in Jack Cooper

 2   Holdings?

 3                 MR. AUSTIN:  No.

 4                 MR. HARRIS:  I don't have any

 5   further questions.  Similar to all of my

 6   colleagues in the room, I also reserve all of

 7   our rights with respect to what may transpire

 8   hereafter.

 9                 MR. COLLINS:  Okay.  Go off the

10   record for one minute.

11                 (A recess was taken.)

12                 MR. COLLINS:  Mr. Austin.

13                 MR. AUSTIN:  I just want to

14   follow up on a point of clarification and just

15   kind of a line questioning Mr. Harris was

16   asking me about.

17                 To be clear, the Jack Cooper bid

18   is an all cash bid.  There's no equity being

19   offered to anyone.  There's no agreements with

20   International Brotherhood of Teamsters,

21   autoworkers, no deal with Yucaipa, no

22   discussions of any equities, nothing like that

23   with either Black Diamond or Spectrum or any

24   other holder of either first lien or second
```



1    lien debt or any other claims against the

2    debtors' estate.  So I just wanted the record

3    to be very clear about that.

4                    MR. COLLINS:  Thank you.

5                    With that, the debtors after

6    consultation with Yucaipa and the creditors'

7    committee do deem the revised Jack Cooper bid

8    to be a higher and better bid.  And we put it

9    back to the requisite lenders for their bid.

10                   MR. HARRIS:  Thank you, Mark.

11                   Adam Harris from Schulte,

12   Roth & Zabel.  On behalf of New Allied

13   Acquisition Co., we are going to increase the

14   amount of our bid to an aggregate purchase

15   price of $100,500,000 by increasing the credit

16   bid component of the bid as previously set

17   forth.  All other terms and conditions of the

18   bid will be as previously set forth on the

19   record and as provided to the company.

20                   MR. COLLINS:  All right.  Thank

21   you.  We'd like to take a break.

22                   (A recess was taken.)

23                   MR. COLLINS:  Okay.  So we're

24   back on the record.  Before we respond to the

1   most recent offer by the requisite lenders, I

2   understand that Jack Cooper has two

3   modifications to their prior bid, which we

4   would like to have put on the record at the

5   outset.

6                MR. AUSTIN:  This is Jess Austin

7   for Jack Cooper.  And Theo Ciupitu, general

8   counsel, will describe the two changes that we

9   are prepared to make to the asset purchase

10  agreement.

11               MR. CIUPITU:  So looking at the

12  APA that Black Diamond and Spectrum presented,

13  they had a Section 6.3(c) that we did not have.

14  So we're suggesting putting that into our APA.

15  But we would be deleting the "or any applicable

16  employment legislation."  That's the first

17  modification.

18               The second modification relates

19  to the material adverse effect.  So basically

20  on the material adverse effect, the out

21  language.  But instead of referring to the

22  Taylor & Martin appraisal, it's referred to the

23  Accuval March 2012 appraisal.

24               Then there will also be a

1    clarification that in determining what that

2    original -- and, by the way, the other change

3    would be instead of 95 percent, it's

4    90 percent.

5                    Now, in determining what the base

6    is, the 100 percent, you would be subtracting

7    all rigs that have been scrapped since

8    appraisal to the execution date.  You'd be

9    basically subtracting the value of the rigs

10   that have been scrapped from the appraisal date

11   to the execution date.

12                   MR. COLLINS:  All right.  Thank

13   you.  Okay.

14                   MR. HARRIS:  This is Adam Harris.

15   I just have one question, Theo, about what you

16   just said.  So the 90 percent calculation is

17   off of the net amount of the Accuval appraisal

18   after deducting the value of the rigs that have

19   already been scrapped?

20                   MR. CIUPITU:  Yes.

21                   MR. HARRIS:  So the 90 percent

22   doesn't get affected by things that have

23   already happened before today?

24                   MR. CIUPITU:  Correct.  Yes.



1                    MR. HARRIS:  All right.

2                    MR. CIUPITU:  I mean, I'll go

3    through it again.  In March, Accuval,

4    100 percent.  You subtract everything that's

5    been scrapped.  So that's the new 100 percent.

6    90 percent of that.

7                    MR. COLLINS:  All right.  Thank

8    you.

9                    First of all, I want to thank

10   everybody for their participation.  I know it's

11   been a long couple of days.  And we've done a

12   lot of consultation with the creditors'

13   committee and with Yucaipa, as well as

14   different qualifying bidders.  And after a lot

15   of discussion and analysis, conversation and

16   the like, the debtors have determined that the

17   most recent bid by the requisite lenders is not

18   deemed to be a higher or otherwise better bid.

19                    As a result of that, we are going

20   to deem the most recent bid by Jack Cooper to

21   be the successful bid.  And we are going to

22   conclude the auction.  But we're certainly

23   happy to answer any questions you may have.

24                    MR. HARRIS:  Well, the first

1   question is, so you're not giving us any

2   further rights to bid?

3                   MR. COLLINS:   Well, I understood

4   that you were not intending to further bid.

5   But...

6                   MR. HARRIS:   Would you, please,

7   put on the record for the benefit of the record

8   the rationale behind the company's conclusion

9   that the most recent bid put on the table by

10  the requisite lenders, which was clearly

11  $500,000 higher in dollar amount, was not a

12  higher or better bid in light of the previous

13  determinations that the company made based upon

14  essentially the same contract terms, which have

15  only been improved since earlier bids that you

16  did deem both qualified and in some instances

17  higher or better than other bids submitted by

18  JCT?

19                  MR. COLLINS:   A number of

20  reasons.   The primary reason has been further

21  consultation with the creditors' committee, as

22  well as the union representative who is here.

23                  And there is, in our view,

24  concerns about your ability to close given

1    certain 1113 issues.  In other words, you do

2    not have at this point any agreement with the

3    unions on either a modified agreement, you're

4    not assuming the current collective bargaining

5    agreements.  And their stated opposition to

6    your bid has caused concerns about your ability

7    to close the transaction.

8                      MR. HARRIS:  So to be clear, the

9    company's view at least now is that in the

10   absence of an agreement to either assume the

11   union contracts or some other agreement between

12   the potential buyer and the union, that there

13   is no price that we could pay which would make

14   you comfortable to allow our bid to be

15   successful?

16                      MR. COLLINS:  No.  I'm not going

17   to say that.  The bid that you have currently

18   proposed is not deemed to be a higher and

19   better bid.

20                      MR. HARRIS:  Yet, in our

21   discussions, you have not provided us with any

22   value associated with that risk in order to

23   permit us to reformulate a new bid, have you?

24                      MR. COLLINS:  Nor have you come

```
 1   back with a modified bid.
 2                   MR. HARRIS:  Without
 3   understanding how big of a discount you're
 4   putting on, I'm not sure how that would be
 5   possible, to be honest with you.
 6                   Can you instruct me how I'm
 7   supposed to react without having direction from
 8   the company?
 9                   MR. COLLINS:  Not at this time.
10   I cannot.  We've obviously had a number of
11   discussions with you off the record regarding
12   these concerns, told you that the issues are
13   hard to quantify.
14                   But currently your bid is not at
15   an amount sufficient for us to say it's a
16   higher and better bid when you factor in the
17   risk of your ability to consummate that
18   transaction, and primarily to obtain Bankruptcy
19   Court approval of that transaction given the
20   union issues.
21                   MR. HARRIS:  But to be clear, the
22   company is not prepared to quantify in any
23   respect what it would take in order to deal
24   with those concerns to give us guidance?
```



1               MR. COLLINS:  I do not have that

2    information, no.

3               MR. HARRIS:  As we're sitting

4    here right now, rather than doing that, you're

5    prepared to close the auction and declare a

6    successful bidder?

7               MR. COLLINS:  We are prepared to

8    declare Jack Cooper the successful bidder and

9    your most recent bid as the backup bid.

10              MR. HARRIS:  And just for the

11   record, I want to make it clear that after

12   hearing from you of your recently developed

13   concerns relating to these particular issues,

14   Black Diamond and Spectrum did request an

15   extension of time and adjournment of the

16   auction until Monday in order to try and deal

17   with these issues and reformulate a bid that

18   would address your concerns, correct?

19              MR. COLLINS:  That is correct.

20              MR. HARRIS:  And you turned us

21   down in that respect; isn't that right?

22              MR. COLLINS:  We did speak with

23   Jack Cooper, the other qualified bidder, about

24   having agreement to extend the auction until

1    next Monday.  That request was not agreed to.

2    And I understand Yucaipa and the committee were

3    involved in those discussions.  So as a result,

4    we are going to conclude the auction today.

5                    MR. HARRIS:  Does the company

6    have authority under the bidding procedures to

7    extend the auction and adjourn from time to

8    time to the extent it deems it necessary in

9    order to maximize value to the estate?

10                   MR. COLLINS:  Within our

11   discretion, yes.

12                   MR. HARRIS:  And you choose not

13   to exercise that discretion?

14                   MR. COLLINS:  That's correct.

15                   MR. HARRIS:  And that's

16   principally because JCT told you their

17   financing commitment expires today, prior to

18   the conclusion of the auction theoretically,

19   and basically they're not willing to go extend

20   it?

21                   MR. COLLINS:  That is my

22   understanding.  And Mr. Austin can confirm

23   that.

24                   MR. AUSTIN:  That is correct.



1  We're not willing to agree to any further
2  extension.
3           MR. HARRIS:  And, in fact, the
4  financing -- effectively the deadline that is
5  being set by JCT is hampering your exercise of
6  discretion to potentially maximize value for
7  the estate by allowing us time to formulate an
8  alternative bid?
9           MR. COLLINS:  No.  I mean, we've
10  been here obviously for two days.  We've tried
11  to be as open and transparent as we can be with
12  everybody.  It's obviously a dynamic process
13  and we've had a lot of consultation with the
14  creditors' committee on this issue, the union
15  representatives, yourselves.  And given where
16  we are at 7:00 o'clock this evening, we believe
17  this is the best course of action for the
18  estate.
19           MR. HARRIS:  But is it, in fact,
20  true that this issue as what is effectively a
21  disqualifying factor given the actions you're
22  now taking were only brought to our attention
23  late this afternoon after we submitted our last
24  bid?

```
1                    MR. COLLINS:  I don't know if
2     it's a disqualifying event.  Given the bid of
3     Jack Cooper, the comments of union
4     representatives, comments of the creditors'
5     committee, we have determined that to be the
6     higher and better bid than your bid.
7                    I have told you, and I'll restate
8     it, we are not prepared to tell you today what
9     bid you must make in order to be a higher and
10    better bid than that.  Obviously you're free to
11    rebid if you'd like.  And we can go through
12    that process.  But, you know, we've had these
13    discussions off the record as to where we are.
14                    MR. HARRIS:  I think it's
15    somewhat futile for us to spin our wheels with
16    the company trying to reformulate a bid that
17    meets the requirements in value or terms until
18    you're prepared to tell us what it would take.
19                    And I think that in failing to do
20    that, you are effectively telling us there's no
21    bid that we could submit on the existing
22    contract terms in terms of dollar amount that
23    would ever satisfy the company's concerns
24    relative to the union issues.
```

1                    So I think that the actions the
2       company has taken are prematurely ending this
3       auction, which I think is unfair and
4       inappropriate.
5                    Frankly, you know, given the
6       history of this auction, this issue which has
7       now been brought to our attention as, I believe
8       it's fair to characterize as a disqualifying
9       event was not included in the bid procedures,
10      was not, frankly, raised by the IBT at the time
11      of the bid procedures as something all bidders
12      should be cognizant of.  It was not in your
13      formed asset purchase agreement.  There was no
14      requirement in there, as there were many other
15      requirements, to assume these agreements or
16      otherwise have as a condition that you must
17      assume the agreements in order to be a
18      qualified bid.
19                   We submitted a bid on August 8th.
20      Nobody said anything about it.  We submitted a
21      bid on August 14th.  Nobody said anything about
22      it.  You qualified both of those bids and
23      deemed us the highest and best bids two times
24      thereafter without even a whisper of this; from

```
 1    the company's perspective.
 2                   MR. COLLINS:  With all due
 3    respect, the union issues have been present in
 4    this case from the outset.  You could have
 5    filed your asset purchase agreement by either
 6    assuming the collective bargaining agreement or
 7    to have spent the time period prior to today's
 8    auction reaching agreement with them.  You have
 9    chosen not --
10                   MR. HARRIS:  The company --
11                   MR. COLLINS:  Let me finish.
12                   You have chosen not to do so.  We
13    have another bidder here that has no union
14    issues, no 1113 issues.  We do believe that to
15    be significant in our calculation as to the
16    higher and better bid.
17                   MR. HARRIS:  The company signed
18    an asset purchase agreement with my clients in
19    their capacity as requisite lenders back in
20    May.  That had identical terms, effectively, to
21    what is presented here today.  The company
22    signed it.  They submitted it to the Court for
23    approval.  So they obviously believed at that
24    point in time it could have gotten done.  Okay.
```

1                     So to tell me, Mark, that I

2    should have been out trying to negotiate a deal

3    with a party who clearly, as this record

4    indicates, has a preferred buyer here and

5    absolutely no interest in engaging whatsoever

6    with anybody other than JCT is effectively

7    handing the decision-making with respect to the

8    outcome of this auction to a party in interest

9    for its own parochial interest and not for the

10   benefit of this estate.

11                    MR. SELTZER:  This is Richard

12   Seltzer --

13                    MR. HARRIS:  And, Richard, let me

14   finish my statement and then you can say

15   whatever you'd like.

16                    MR. SELTZER:  It's hard to tell

17   when you're finished, Adam.

18                    MR. HARRIS:  Okay.  Well, I'm

19   not.  So I'll let you know when I am.

20                    So I believe you are prematurely

21   ending this basically on an artificial deadline

22   which was improperly set by JCT in coming in

23   with a commitment letter which did not give

24   sufficient flexibility to the company to be

1   able to carry out the auction the way it should

2   have and the way it could have.  And with this

3   issue coming up the way it's coming up I think

4   is completely inappropriate.

5                   And, look, we reserve all of our

6   rights.  We are not going to consent to this

7   deal as requisite lender.  It's not going to

8   get approved under 363 because it can't.

9   Because we're prepared to pay you more for this

10  asset.  And the only thing standing in our way,

11  frankly, is in our view -- and Mr. Seltzer I'm

12  sure will disagree with me -- the IBT's

13  determination that they would rather have their

14  guys work for JCT than us.

15                  Now I'm done.

16                  MR. SELTZER:  Richard Seltzer,

17  Cohen, Weiss & Simon for the Teamsters

18  negotiating committee.

19                  In May in reference to the

20  bidding procedures and the asset purchase

21  agreement that Mr. Harris just referred to --

22  and I'm sure from time to time he reads the

23  filings in this case -- the Teamsters

24  negotiating committee filed an extensive

1  reservation of rights in relation to that

2  bidding procedure and that asset purchase

3  agreement.  And we put Black Diamond and every

4  entity and the Court in this case on notice of

5  our reservation of rights on the successorship

6  issue.

7          We quoted the contract, we cited

8  cases, the same cases we've reconfirmed with

9  the debtor today, and made extremely clear what

10 our position was.  That was 90 days -- about

11 90 days ago.  This is not a surprise issue.

12         The bidding procedures refer to

13 one of the variables that could be considered

14 is a position on the collective bargaining

15 agreement.  So that is clear.

16         And I will also say for the

17 record that Mr. Harris and I have known each

18 other for 30 years, or however long it's been.

19 I have not received a phone call, an e-mail or

20 any communication in this case since it was

21 filed over a year ago requesting any

22 communication or meeting with the Teamsters.

23         The Teamsters got a first

24 communication from Black Diamond last week.  We

1   responded the next day, had six people on a

2   conference call with Mr. Sawyer.  When he asked

3   for a further follow-up call, we agreed and we

4   were told that he wasn't able to arrange it.

5   That is the record of communication in this

6   case between my client and yours, Mr. Harris,

7   and it's quite clear.

8                    Thank you.

9                    MR. COLLINS:  Adam, anything

10  further?

11                   MR. HARRIS:  No.  I have nothing

12  further.

13                   MR. COLLINS:  Again, thank you,

14  everyone, for your time, patience.  We do

15  appreciate --

16                   MR. HARRIS:  Mark, I do have one

17  other comment.  I'm sorry.

18                   MR. COLLINS:  Go ahead.

19                   MR. HARRIS:  If the company is

20  basically giving us an ultimatum to make a

21  decision tonight as to what we want to do

22  relative to the union contracts, then we're

23  going to take the opportunity to do that.  And

24  we're going to try to get ahold of our



```
 1   principals and possibly come back with a
 2   revised bid that addresses your concerns.  But
 3   we're not going to let this go based upon the
 4   way this has been conducted this afternoon.  So
 5   if I were you, I wouldn't close the auction.
 6                  MR. COLLINS:  No.  If you're
 7   telling us you're going to address the concerns
 8   we've told you about off the record, we will
 9   stay here and wait to hear back from you.
10                  MR. HARRIS:  That's what we're
11   going to try and do.  I have a bunch of people
12   I have to reach.  We'll be back to you as soon
13   as we hear --
14                  MR. AUSTIN:  Hold on.  This is
15   Jess Austin on behalf of Jack Cooper.  Our
16   pending bid then, if you haven't closed the
17   auction, is good until 8:30.
18                  MR. HARRIS:  The commitment is
19   good until midnight.
20                  MR. AUSTIN:  8:30 p.m. eastern
21   time, Wilmington, Delaware.
22                  MR. SELTZER:  Richard Seltzer for
23   the Teamsters negotiating committee.  Let me
24   also make clear that our view under the
```

1  successorship clause of our contract, what I

2  refer to as the successorship clause, all of

3  the entities, the parent and both subsidiaries

4  that have been announced as the structure for

5  your offer would all be successors.

6                    MR. HARRIS:  I understand.

7                    (A recess was taken.)

8                    MR. COLLINS:  Let's go back on

9  the record.

10                   Mr. Harris.

11                   MR. HARRIS:  Thanks, Mark.

12  Adam Harris from Schulte, Roth & Zabel.  During

13  the break, we have determined to present a

14  further modified bid.  Except to the extent of

15  what I say here and conforming changes that

16  might be necessary, the bid as we've submitted

17  it will remain in full force and effect.

18                   The first change is that we will

19  include in our asset purchase agreement a

20  covenant that we will sign the National Master

21  Freight agreement and each supplement and

22  ancillary document in exactly the same form as

23  Allied currently has in effect with the same

24  terms, same conditions, same maturity dates as

1    Allied's current contract with the IBT.

2                    The second change is that we are

3    going to be including in our bid a

4    10-million-dollar liquidated damages provision

5    that substantively will mirror that which is

6    included in the JCT bid.  The corollary to that

7    is we're going to eliminate the specific

8    performance provision.

9                    The third change is that we're

10   going to eliminate -- we are going to withdraw

11   our obligation to be a backup bidder if you

12   choose to go with JCT as first lien lenders.

13   We'll have to do what we do if they choose not

14   to close.  But we don't want to have our bid

15   hanging out there.  And we don't want to have

16   financing commitments hanging out there while

17   we wait around in the event that's the way this

18   goes.

19                    The last change we're making is

20   we're increasing our purchase price to

21   105 million from our previous bid of

22   100.5, which was not accepted by the company,

23   by increasing the credit bid component of the

24   bid.

```
 1                    Those are all the changes to our
 2    agreement.  I would just make one other note.
 3    And that is the modification that was put on
 4    the record with respect to the JCT bid relative
 5    to adopting our language under Section 6.3(c)
 6    is limited to WARN liability, which is U.S.,
 7    and the dilution of the applicable -- reference
 8    to applicable employment legislation still
 9    leaves the company exposed to potential
10    liability in Canada, which we understand could
11    be as much as 12 million dollars.
12                    With that, we've submitted our
13    revised bid.
14                    MR. COLLINS:  Adam, a
15    clarification.  I'm not sure the National
16    Master Freight agreement is the correct name of
17    the agreement that we are parties to.  And I'll
18    ask Mr. Blount to confirm.  I believe it's
19    NAMATA.
20                    MR. HARRIS:  If I got the name
21    wrong, I got the name wrong.  We will sign
22    those agreements.  The identical agreements
23    that the company is currently party to, we will
24    sign them in our new entity.
```

```
 1                    MR. BLOUNT:  In the U.S. only?
 2                    MR. HARRIS:  In Canada as well.
 3     To be clear, they're new agreements.  They're
 4     not an assumption of the existing agreements.
 5     In identical form.
 6                    MR. AUSTIN:  Would you restate
 7     that?
 8                    MR. HARRIS:  I said they will be
 9     new agreements with identical terms that we
10     will sign in our capacity in our new company.
11                    MR. COLLINS:  Another question
12     for you, Adam.  There's a work stoppage
13     termination right.  Is that being eliminated as
14     part of this revised bid?
15                    MR. HARRIS:  It is not.  My
16     understanding was that the request to eliminate
17     the condition to closing that there have been
18     no material work stoppage was based on a
19     concern the company had relating to potential
20     right to strike the company would have -- the
21     Teamsters would have, or union employees would
22     have in the event you signed an agreement that
23     did not comport with their successorship
24     provision.  We believe our agreement to sign
```

1   the identical agreements comports with their

2   successorship obligations.  And, therefore, you

3   shouldn't have a concern in that regard.

4                    MR. COLLINS:  Any other questions

5   from qualified bidders?

6                    MR. AUSTIN:  Jess Austin on

7   behalf of Jack Cooper.  Mr. Harris, you used

8   the term "we will execute these agreements."

9   And you used the term "we" in a number of

10  scenarios.  "We" as far as executing the new

11  agreements, is that all three companies that

12  have been described as being ultimately set up

13  under the Black Diamond and Spectrum bid?

14                   MR. HARRIS:  That's an internal

15  matter to be discussed between us and the IBT

16  and is really not of any concern to your

17  company.

18                   MR. SELTZER:  Richard Seltzer on

19  behalf of the Teamsters negotiating committee.

20  Same question.

21                   MR. HARRIS:  We'll have that

22  discussion separately, Richard.

23                   MR. SELTZER:  Then in my mind,

24  you have not fulfilled the successorship

```
 1   obligations of the agreement.
 2                   MR. HARRIS:  We would intend to
 3   sign a new agreement --
 4                   MR. SELTZER:  You keep using
 5   "we."  You have not identified who the "we" is.
 6                   MR. HARRIS:  If I can finish the
 7   sentence, I'm getting to the punch line.
 8                   We would intend to have our
 9   operating company sign a new agreement in
10   identical form to what the company is currently
11   obligated under with all supplements and
12   ancillary agreements.
13                   MR. SELTZER:  You understand that
14   Allied currently owns its equipment and real
15   estate.  And so you're saying a company -- a
16   strip-down company, a skeletal company that
17   essentially has a customer contract and the
18   employees and nothing else is going to be -- in
19   your view, is the only signatory?
20                   MR. HARRIS:  We have not
21   conclusively determined what's going to be
22   inside that company.  We have generically
23   described it.  But that entity will be the one
24   that will be signing the agreement.
```



1                    MR. SELTZER:   Under the Master

2    Freight agreement, the parent companies are

3    required to sign the work preservation

4    agreement.   Are you agreeing to do that?

5                    MR. HARRIS:   There are no parent

6    companies.

7                    MR. SELTZER:   You described

8    earlier today there was going to be a parent

9    company that was the purchaser that had two

10   subsidiaries, A and B.

11                   MR. HARRIS:   No, I did not.   That

12   is not what I said.

13                   MR. SELTZER:   Could you clarify?

14                   MR. HARRIS:   I said there is one

15   company that's a purchaser.   It intends to

16   designate certain other purchasers to take the

17   assets, liabilities and contracts.   Under the

18   terms of our contract, those designees are

19   not -- do not need to be wholly-owned

20   subsidiaries or even partially-owned

21   subsidiaries.

22                   In fact, Richard, just to be

23   clear, we expect the ownership of the various

24   entities to be different, not the same.

```
1                    MR. SELTZER:  So I'm going to
2    ask, is the purchasing entity going to sign the
3    collective bargaining agreements or only a
4    designated company that you're describing as
5    the operating company?
6                    MR. HARRIS:  The designated
7    purchaser will sign.
8                    MR. SELTZER:  Is the designated
9    purchaser going to have a parent?
10                    MR. HARRIS:  No.
11                    MR. SELTZER:  When you describe
12   that there would be -- excuse me.  And this may
13   be my ignorance of corporate terms.  When you
14   describe that there's going to be a covenant
15   that you'll do this, is that a precondition of
16   the effectiveness of the agreement?
17                    MR. HARRIS:  It will be a
18   precondition to the effectiveness of the
19   agreement.
20                    MR. CIUPITU:  This is
21   Theo Ciupitu for the record.  Just to, again,
22   make sure we understand this, just the
23   operating company -- I understand there's no
24   parent company; brother and sister.  The
```

1  operating --

2              MR. HARRIS:  Not brother and

3  sister.  Two completely independent and

4  unaffiliated entities.

5              MR. CIUPITU:  But the operating

6  company only, not the asset company?

7              MR. HARRIS:  Correct.

8              MR. BURKE:  Michael Burke for the

9  committee.  Adam, just one quick question.  So

10  if it is a covenant -- and I believe that you

11  are withdrawing the, quote, unquote, hell or

12  high water -- any damages would be limited to

13  the security deposit; is that correct?

14              MR. HARRIS:  It would be limited

15  to the liquidated damages provision, which I

16  think I said was 10 million dollars, which

17  would be identical to what JCT has in their

18  contract.

19              MR. BURKE:  Right.  There would

20  be no specific performance provision, correct?

21              MR. HARRIS:  There would be no

22  specific performance provision.

23              MR. AUSTIN:  Jess Austin.  I

24  never really finished all the questions I had.

1                    The company, Mr. Harris, that

2    you're proposing to sign the agreements with

3    the Teamsters, you, I think, said that was

4    going to be the operating company?

5                    MR. HARRIS:  Correct.

6                    MR. AUSTIN:  And is that the

7    company which you had previously described

8    today would include -- it would take the

9    contracts, the employees and the current

10   assets?

11                   MR. HARRIS:  At least those

12   assets -- those things, yes.

13                   MR. AUSTIN:  Are you now saying

14   they may take different assets?

15                   MR. HARRIS:  They may take more.

16   It won't take less.

17                   MR. AUSTIN:  But it hasn't been

18   determined yet?

19                   MR. HARRIS:  We're still working

20   through the asset schedules.

21                   MR. AUSTIN:  All right.  So to

22   that end, we have no more documents than what

23   we had earlier today relative to Black Diamond

24   and Spectrum's proposed transaction?



```
 1                    MR. HARRIS:  Like I described to
 2   you the last three times you asked me that
 3   question, we have an asset purchase agreement.
 4   It is obviously very iterative at this point.
 5   That is what defines the deal as between us and
 6   the company.  It has certain designation rights
 7   associated with it which have not been
 8   questioned at any point during the course of
 9   these proceedings.  And that outlines the terms
10   of our deal, together with everything we've
11   been putting on the record over the course of
12   the last 48 hours to the extent it's not
13   already documented.
14                    MR. AUSTIN:  With respect to the
15   agreements to be signed, I understand you
16   propose them to be entirely new agreements;
17   they're not the assumption of the existing
18   agreements?
19                    MR. HARRIS:  Correct.
20                    MR. AUSTIN:  The
21   10-million-dollar liquidated damages, is that a
22   cash deposit or is that a reduction claim?
23                    MR. HARRIS:  A combination.
24                    MR. AUSTIN:  Can you illuminate
```



1    what's the percentage of cash and what's the

2    percentage of claim?

3                    MR. HARRIS:  Well, right now

4    we've made a 5-million-dollar cash deposit and

5    we've offered up 4-1/2 million dollars on our

6    95-million-dollar bid of claim -- of

7    distribution forgiveness, not claim reduction.

8    So it's cash equivalent.  And we would expect

9    to modify that by another half a million

10   dollars.  So it's out there and available in

11   the event it's needed.

12                   MR. AUSTIN:  One moment.

13                   At this time, can you advise

14   whether the assets of the Axis companies of the

15   debtors will be in the operating company?

16                   MR. HARRIS:  Axis will not be in

17   the operating company.

18                   MR. AUSTIN:  Okay.

19                   MR. KLYMAN:  For the record,

20   Robert Klyman on behalf of Yucaipa.  I think I

21   missed between the NAMATA and the National

22   Freight which contracts you were describing

23   that you have a covenant that you would sign

24   entirely new agreements with respect to.  Can I

1    impose on you to just repeat what those are?

2                MR. HARRIS:  We will sign new

3    collective bargaining agreements with all the

4    supplements and ancillary documents in exactly

5    the same form as Allied currently has in effect

6    with the IBT.

7                MR. KLYMAN:  Why are you

8    assigning new contracts as opposed to just

9    assuming the existing contracts?

10               MR. HARRIS:  Similar to JCT's

11   bid, we are leaving the withdraw liability

12   associated with the existing contracts behind

13   and we want to be treated as a new

14   company/party to those agreements rather than

15   any kind of legacy to the existing contracts.

16   The economics for the counterparties to those

17   contracts are identical, similar to what

18   they're getting under the JCT deal.

19               MR. KLYMAN:  Do you have any oral

20   or written agreements with any unions where

21   they have agreed to sign entirely new

22   agreements with you?

23               MR. HARRIS:  Well, I think their

24   successorship provision contemplates that if

```
 1    they want to enforce it, they have to sign

 2    agreements with the buyers of the assets.

 3                    I have not had a conversation

 4    with Mr. Seltzer.  And I will call him because

 5    he sounds like he desperately needs a call from

 6    me.

 7                    MR. KLYMAN:  You haven't had

 8    communications with any of the other unions

 9    either?

10                    MR. HARRIS:  We have reached out

11    to the IBT.  We've reached out to Central

12    States.  We have not had communications with

13    the other unions.

14                    MR. KLYMAN:  None of them have

15    agreed to sign these independent new contracts?

16                    MR. HARRIS:  I'm stating my

17    willingness to do it as part of our bid.  If

18    they choose not to do it, I can't force anybody

19    to sign anything.

20                    MR. KLYMAN:  One other

21    clarification.  The 10-million-dollar

22    liquidated damage provision that you've

23    described, is that the same as the requirement

24    that you might lose your deposit or is this a
```

1   new 10 million dollars?

2                   MR. HARRIS:  Well, the liquidated

3   damages provision in the JCT deal is

4   effectively forfeiture of their good faith

5   deposit.  We would structure ours the same way.

6                   MR. KLYMAN:  And you describe it

7   as we are going to be paying -- we're going to

8   be obligated for a 10-million-dollar liquidated

9   damages provision.  Which entities exactly

10  would be responsible for those damages?

11                  MR. HARRIS:  Well, it's the

12  purchaser, which is New Allied Acquisition

13  who's signing the agreement is responsible for

14  the entirety of the purchase price.  The actual

15  person bearing the burden of that forfeiture

16  would be Black Diamond and Spectrum to the

17  extent they put up the 5 million dollars in

18  cash.  And all the first lien lenders would

19  bear the burden ratably of the other 5 million

20  dollars.

21                  MR. AUSTIN:  Jess Austin for

22  Jack Cooper Holdings.  One further clarifying

23  question, Mr. Harris.

24                  Do you have an estimate of the



1    EBITDA of the operating company where, as I

2    understand it, it does not include the Axis

3    assets?  You're not proposing to include the

4    Axis assets.

5              MR. HARRIS:  My understanding is

6    projected EBITDA for 2014 pre-lease is roughly

7    24 million dollars.  And we project after lease

8    payments to be somewhere between 15 and 20.

9    It's based upon the company's numbers.

10             MR. SHAPIRO:  Without Axis?

11             MR. HARRIS:  Yes, that's without

12   Axis.

13             MR. AUSTIN:  Okay.

14             MR. KLYMAN:  One other question.

15   With respect to these two entities that you've

16   described, the operating company and I guess

17   it's the property holding company for lack of a

18   better term, do you have independent financial

19   statements for either of them?

20             MR. HARRIS:  No.  Because they

21   haven't been created yet.  And I haven't

22   decided exactly what assets are going to be in

23   each of them as we sit here right now.

24             As we told you before, that is



1  something that we are continuing to work on.

2  And for purposes of adequate assurance, as I

3  said earlier, we have agreed with the company

4  that to the extent we exercise our designation

5  rights under 12.8(b) of the contract, which we

6  obviously intend to do, we will provide the

7  information, including financial information to

8  the extent it's available, to counterparties

9  for the purpose of showing adequate assurance.

10              MR. COLLINS:  I believe

11  Mr. Blount had a question for you.

12              MR. BLOUNT:  John Blount for the

13  debtors.  Just one clarifying question.  When

14  you were listing the CVA's that you were going

15  to enter new identical CVA's, I didn't hear the

16  Canadian autoworkers, I don't think.

17              MR. HARRIS:  To the extent

18  those -- in Canada, as you and I have

19  discussed, there is likely a legal implication

20  that we are legal successors and obligated to

21  basically negotiate with expired contracts.

22              If there are contracts that are

23  not expired, we would certainly sign identical

24  ones for the duration of those contracts that

1   are currently in effect and/or negotiate new

2   ones.

3                   MR. BLOUNT:   Thank you.

4                   MR. AUSTIN:   Two further

5   clarifying questions on the operating company.

6   If I understood, Mr. Harris, you said the

7   projected EBITDA for the operating co. without

8   the Axis assets is 24 million dollars.   Do you

9   know what the trailing 12 months of EBITDA has

10   been for the operating company without the --

11   what would be your operating company?

12                   MR. HARRIS:   Well, it would be

13   the same as the existing company's EBITDA for

14   the trailing 12 months less imputed lease

15   costs.   So I don't have that number.

16                   MR. AUSTIN:   And is it the

17   operating company that will also be paying the

18   capital expenditures or CAPEX required on any

19   of the rigs?

20                   MR. HARRIS:   No.   I think it's

21   our intention that the CAPEX on the rigs,

22   because they're going to be owned by the asset

23   property company, will be paid by that company,

24   not by the operating company.

```
 1                    MR. AUSTIN:  Okay.
 2                    MR. COLLINS:  All right.
 3                    MR. SELTZER:  Richard Seltzer.  I
 4   would request -- I don't think it's very
 5   long -- in light of the importance of the
 6   covenant you've described that you provide a
 7   copy in writing.
 8                    MR. HARRIS:  Of the covenant?
 9                    MR. SELTZER:  Yes.
10                    MR. HARRIS:  Sure.  I'm happy to
11   draft it up.
12                    MR. SELTZER:  I would appreciate
13   you providing it in writing and e-mailing it.
14                    MR. HARRIS:  Okay.  I mean, I'm
15   happy to sit down with you and actually work up
16   something that you find acceptable.
17                    MR. SELTZER:  I actually need to
18   talk to my clients.
19                    MR. HARRIS:  Okay.
20                    MR. COLLINS:  Okay.  We'd like to
21   take a break obviously to discuss the bid.  And
22   we'll go back on the record when --
23                    MR. AUSTIN:  We understand you
24   have to take a break.  And we have a real
```



1  deadline issue.

2                    MR. COLLINS:  We understand.

3                    MR. AUSTIN:  Whether anybody

4  cares about that or not, that deadline issue is

5  a practical matter, has been presented to

6  everyone not only in addition to this bid but

7  even earlier when we were trying to present an

8  opportunity to be a stalkinghorse.  So we have

9  to be done by 10:00.

10                    MR. COLLINS:  All right.  Thank

11  you.

12                    (A recess was taken.)

13                    MR. COLLINS:  Okay.  We're back

14  on the record.  Adam, turn it over to you

15  because I believe you have one modification to

16  your prior bid.

17                    MR. HARRIS:  Yes.  It's

18  Adam Harris from Schulte Roth.  In connection

19  with our prior bid, we had modified our

20  previous terms to include a 10-million-dollar

21  liquidated damages provision and to eliminate

22  the ability of the company to seek specific

23  performance.

24                    As a result of subsequent



1    conversations with the company, we have agreed

2    to increase the liquidated damages provision to

3    20 million dollars, which would be comprised of

4    5 million dollars of cash and 15 million

5    dollars is forgiveness of distributions on

6    account of our secured/unsecured claims of the

7    first lien lenders.

8                    Other than that, our bid stands

9    as previously submitted.

10                    MR. COLLINS:  With that, the

11   debtors, following consultation with Yucaipa

12   and the creditors' committee, do deem that to

13   be a higher and better bid.  And we turn it

14   over to Jack Cooper.

15                    MR. AUSTIN:  I have a few

16   questions.  Jess Austin on behalf of Jack

17   Cooper.

18                    I guess the first one will be

19   directed to Mr. Antinelli, is whether the

20   debtors' financial advisor can state on the

21   record what is the anticipated EBITDA to be by

22   what Black Diamond and Spectrum call the

23   operating company?

24                    MR. ANTINELLI:  We're taking



1    under advisement the breakup that the

2    purchasers have indicated of approximately

3    24 million dollars or the existing projections

4    of the company, which they're breaking up.  But

5    I don't have access to any new set of

6    projections yet from the purchaser.

7                    MR. AUSTIN:  And what is the

8    anticipated EBITDA for the, what I would call

9    the asset company?

10                    MR. ANTINELLI:  I don't know.

11   The remainder of the company's EBITDA.

12                    MR. AUSTIN:  Can you guys explain

13   to me then what financial information or

14   analysis you guys have done to determine that

15   these are viable companies?  Mark?

16                    MR. COLLINS:  Jess, we'll put our

17   case on at the sale hearing about adequate

18   assurance of future performance.

19                    MR. AUSTIN:  Your bid procedures

20   have been very clear that you're supposed to

21   have today financial information to make that

22   determination before you decide someone is a

23   higher and better bid.

24                    MR. COLLINS:  We understand what

```
1   our sale procedures are.  We are comfortable
2   with where we are at.  And you can object at
3   the sale hearing if you so choose.
4               MR. AUSTIN:  What agreements, if
5   any, are there between Black Diamond and
6   Spectrum regarding the employment of existing
7   senior management of Allied post-closing?
8               MR. KELLEY:  None.  I'm not aware
9   of any.
10              MR. HARRIS:  Adam Harris from
11  Schulte Roth.  None.
12              MR. AUSTIN:  What agreements, if
13  any, are there between Black Diamond and
14  Spectrum regarding dropping any current
15  litigation that is existing by Black Diamond
16  and Spectrum against the current managers of --
17  management of Allied?
18              MR. HARRIS:  As you know, Jess,
19  there's a pending settlement that's been
20  provided by the committee and Yucaipa.  That
21  settlement is up for hearing next week, which
22  includes a settlement of the claims against the
23  only member of senior management, who is
24  currently sitting in the room.  And we have
```

1   other litigation claims.  I do not believe they

2   would involve Mr. Gendregske or any other

3   member of senior management, excluding certain

4   other officers and directors who are affiliates

5   of Yucaipa.

6                   MR. AUSTIN:  I'm sorry.  With

7   coughing and speaking, I really couldn't

8   understand.

9                   MR. HARRIS:  There's no agreement

10  to drop any litigation against anybody.

11                  MR. AUSTIN:  What agreement, if

12  any, exists to pick up current payments due

13  under the senior management's employment

14  contract due on change of control?

15                  MR. HARRIS:  None.

16                  MR. AUSTIN:  Has there been any

17  additional threatened litigation by senior

18  management and/or board of directors by Black

19  Diamond and Spectrum?  Yes or no?

20                  MR. KELLEY:  Not that I'm aware

21  of.

22                  MR. HARRIS:  Other than against

23  Yucaipa affiliated directors, no.

24                  MR. AUSTIN:  In connection with



1   the company's determination that the current,

2   yet again, modified Black Diamond and Spectrum

3   bid is the highest and best, I need to

4   understand what is the committee's position?

5   Does it agree or disagree with that assessment?

6             MR. BURKE:  Jess, the committee

7   will make a statement in a moment.  Michael

8   Burke for the committee.

9             MR. AUSTIN:  And I'd ask the same

10  of Yucaipa.

11            MR. KLYMAN:  We oppose it as a

12  qualified bid.  We don't think it's higher or

13  better.  And we have a few comments to put on

14  the record once you and Mr. Burke are done.

15            MR. AUSTIN:  Last question, and

16  then I need one moment to confer with my client

17  and then maybe we'll have additional comments.

18  Has the board's special committee signed off on

19  this bid?

20            MR. STARK:  Yes.

21            MR. AUSTIN:  At this point,

22  Jack Cooper stands by its prior bid.  It will

23  submit no other bid in this auction.  I have

24  some comments I'd like to make.  I don't know

1  whether you care to hear them now or whether

2  you want to wait to hear from the committee and

3  then Yucaipa.

4           MR. COLLINS:  It's up to you,

5  Jess.

6           MR. AUSTIN:  I think we came -- I

7  know my client came to this auction and

8  submitted a bid and has been submitting bids

9  since I think the end of June with respect that

10  the debtors intended to sell their assets as

11  viable functioning going concerns.  And,

12  indeed, that's what the bid procedures I think

13  at Paragraph C or Section C specifically

14  provided.

15           We have stated previously today

16  that we object to how this auction has been

17  run.  We object that the Black Diamond and

18  Spectrum bid has been presented and has been

19  further modified -- as I think I've likened

20  this almost to like a Ronco knife commercial

21  that you didn't like this, but wait there's

22  more.  But that this bid has been nothing but a

23  ghost bid.  There is no substance and it is in

24  violation of your bid procedures.

1              Now what I may say here may make

2    not a damn bit of difference to you because

3    you've made your decision and you will proceed.

4    But what we think you have now done is accepted

5    a bid that is actually worse than the prior

6    bid.  It is nothing more than a

7    5-million-dollar cash option to figure out

8    whether or not they'll ultimately going to

9    close on this transaction because they still

10   have the walk-away if there's a strike between

11   now and the closing date.  It has no hard

12   specific performance provision, which at least

13   previously you could sue for and take the

14   45 million in cash.

15              Now you're only looking at a

16   5-million-dollar cash provision and I guess a

17   15-million-dollar claim forgiveness of claims

18   that, best we can tell, is still out of the

19   money.

20              So any claim on any part of this

21   on a claim forgiveness we think is a very

22   femoral type benefit to this debtor's estate.

23   And you couple all of that with the fact

24   there's no backup bidder now that they have now

1  modified their bid where your own bid

2  procedures specifically say whatever

3  modifications they make on a subsequent bid

4  shouldn't be overall worse than what had

5  previously been presented.

6           From our perspective -- obviously

7  you disagree -- is that any proposed asset

8  purchase agreement here has significant

9  execution risks without any remedy.

10          You also have a situation where

11 you're going to enter into a transaction where

12 this company or this NEWCO is going to spin off

13 assets away from what is going to be the

14 operating company without apparently any

15 analysis; certainly no analysis which has been

16 disclosed to us of how you can make a

17 determination that these companies are

18 financially viable and otherwise satisfy

19 Section 365 of the Bankruptcy Code on adequate

20 assurance of future performance.  Not past

21 performance, not today's performance, but

22 future performance.

23          And that's not just related, I

24 think, to the assumption of contracts.  But I

1  think you have at least a fiduciary duty not

2  only to creditors and other parties, but also

3  to employees.

4              This company has now already been

5  through two Chapter 11's.  Black Diamond and

6  Spectrum have certainly indicated at least

7  their experience in the trucking industry is

8  less than stellar up to this date.

9              We renew our objections that

10  Black Diamond and Spectrum coming in today were

11  supposed to come in today with full and

12  complete documentation.  There's no exception

13  to that under your own bid procedures.  And

14  they were bid procedures that were developed

15  specifically with and probably heavily drafted

16  by Black Diamond and Spectrum.

17              You could not modify -- as your

18  bid procedures say, whatever discretion you

19  had, you could not modify their presenting a

20  credit bid and their compliance with

21  paragraph 12, which you now have indeed done.

22              On a personal basis and on the

23  basis -- I think I can speak for my client.  We

24  don't mind losing.  We've come to many

1    auctions, participated -- I know I have -- and

2    my clients have not won the auction.  That

3    happens.

4              We do mind losing, however, when

5    you're doing so presenting with companies,

6    companies that you've said using your

7    projections -- and I point to you,

8    Mr. Antinelli, because it's your company that

9    developed the confidential information

10   memorandum that said this company has these

11   type of EBITDA based on that they had to get

12   labor concessions.

13             You now agree to a contract where

14   they're saying we don't have to get labor

15   concessions.  So you now have a company that

16   has higher costs and you're splitting off the

17   operating assets from the place where you're

18   going to have the operations where they are

19   currently losing money.  How any of this can be

20   financially viable we can't see.

21             But they don't have agreements,

22   they don't have a commitment, they don't have a

23   guarantee, from what we can see -- because we

24   see obviously no documents -- to do whatever is

1  necessary to support this company on a

2  go-forward basis.

3                You functionally allowed, from

4  our perspective, Black Diamond and Spectrum to

5  bid, to modify its bid and to further modify

6  its bid to its sole benefit without further

7  appropriate diligence and in violation of the

8  estate's fiduciary duties -- the debtor's

9  fiduciary duties to their estates.

10                We reserve all our rights.  We

11  reserve the right to file objections if you go

12  forward with this contract and seek approval

13  for it at the August 22nd sale hearing date.

14                MR. KLYMAN:  One question for you

15  guys.  Did you ask Schulte for an opinion in

16  connection with this transaction on any matter,

17  including, without limitation, the ability of

18  the purchaser to pledge as damages debt of

19  other lenders?

20                MR. COLLINS:  Did we ask for a

21  legal opinion from them on that?

22                MR. KLYMAN:  Yes.

23                MR. COLLINS:  No.

24                MR. KLYMAN:  Did the special



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1   committee conclude that under the credit

2   agreement Black Diamond -- the purchaser has

3   the ability to pledge debt of other lenders in

4   favor of a damages provision?

5           MR. STARK:  I'm not going to get

6   into what the special committee deliberated on.

7   We deliberated upon the bid.  We conducted

8   diligence appropriate and made the decision we

9   did.  That's the answer I'm going to give you

10  to that question.

11          MR. KLYMAN:  Yucaipa does not

12  believe that this is a higher and better bid or

13  even a qualified bid.

14          Just going through your bid

15  procedures, they can't satisfy Section 12(II)

16  because the good faith deposit is not going to

17  be collectable from other lenders.  You had no

18  analysis to support that.  They've given no

19  analysis to support that.  It's not something

20  that the agent has the ability to do under the

21  credit agreement.

22          Under 12(III), their bid was not

23  accompanied by a duly executed and enforceable

24  purchase agreement.  In fact, no one has even

1   seen a final version of the agreement.  And it

2   wasn't executed and it wasn't delivered.

3                    It also does not include, as

4   required by 12(III), all exhibits and schedules

5   to the agreement or term sheets that describe

6   the material terms and provisions of such

7   agreements.

8                    The whole setting up of op. co.

9   and prop. co. and the interrelationship between

10  the two and what assets are going into what

11  entity is to be determined by the purchaser in

12  its sole discretion.  No one sitting here

13  today, except maybe Black Diamond and Spectrum,

14  knows what's going into those pools.

15                   There's no list of executory

16  contracts that are to be assumed and assigned

17  and who will be the assignee under those

18  agreements.

19                   Under 12(VI), the qualified bid

20  is supposed to state that the bidder can be

21  selected as the backup bidder.  They were under

22  their prior bid.  And now you've allowed them

23  to escape that requirement.

24                   Under 12(VII), there's no

1    evidence that the purchaser is financially

2    capable of consummating the transaction

3    contemplated by the agreement.  There's no

4    evidence -- there's no analysis that the agents

5    can bid the debt of other lenders by assigning

6    it to a third-party entity.  And there's no

7    evidence, no written evidence of a firm,

8    irrevocable commitment for the financing as

9    required under the bid procedures.

10                   Under 12(VIII) in the hole, it's

11   a requirement that the bid include current

12   audited financials and latest unaudited

13   financial statements of the qualified bidder,

14   and there are none.

15                   It doesn't comply with the rest

16   of 12(VIII) either.  I won't read it for the

17   record.

18                   Under 12(X), the bidder has to

19   demonstrate evidence of its ability to comply

20   with Section 365 of the Bankruptcy Code,

21   including providing adequate assurance of

22   future performance.

23                   There is no evidence in the

24   record that the op. co. entity which is

```
1    purportedly going to have employees divorced
2    from the operating assets of the company has
3    any ability to perform under any contract
4    whatsoever.
5              We are told that we're relying on
6    the existing projections of the company which
7    include assumptions that are not present in the
8    current bid.  And there's no evidence and no
9    documentation of the economic relationship
10   between the prop. co. and the op. co., no
11   covenant that the property company will
12   continue to do business with the operating
13   company, that they won't compete, that they
14   won't sell assets, they won't sell material
15   operating assets.  So all of that is a fiction.
16             And while Mr. Harris has said
17   that doesn't matter from anyone's perspective
18   as long as the estate is getting value, these
19   were bid procedures that you drafted and they
20   drafted and imposed over the vigorous objection
21   of Yucaipa.
22             Under 20(XII), there's been no
23   statement that the offer is irrevocable until
24   the closing -- of the backup bidder at closing
```

1    deadline.

2                    There's no evidence of

3    authorization and approval from the bidder's

4    board of directors.  In fact, we don't even

5    know who the board of directors are or who the

6    equity holders are.

7                    The provisions that were

8    particularly highly litigated in the context of

9    the bid procedures had to do with a bidder that

10   asserts an offer that includes non-cash

11   consideration.  This bidder falls within the

12   confines of 12(XVII) in the hole.  And they're

13   including non-cash consideration as part of its

14   offer.  They didn't comply with the timeline.

15   They didn't come with valuations.

16                    And under 18 in the hole, no

17   written offer that includes non-cash

18   consideration that is made by an entity in

19   which a first lien lender or any affiliate or

20   related parties are participants, whether

21   directly or indirectly, that written offer

22   shall not constitute a qualified bid unless the

23   debtors obtain the written consent of the

24   holders of a majority of the prepetition first

1   lien debt held by the other first lien lenders

2   that are not participating in that bid.  You

3   have not obtained that consent.  And Yucaipa

4   does not grant that consent.

5                Section 22 of your bid procedures

6   require that the provisions of 12(XVII) and

7   12(XVIII) and paragraph 13 shall not be

8   modified.  You have modified them.

9                In addition, under 22 in the

10  hole, the auction was not fairly and evenly

11  administered.  This auction disadvantaged

12  Jack Cooper from the outset.

13                Jack Cooper complied with the

14  written bid procedures.  You accepted their bid

15  in writing.  They've committed financing.  They

16  had the legal ability to close.

17                You've allowed Black Diamond and

18  Spectrum to morph a structure of a bid from

19  op. co./prop. co. with no evidence of any

20  agreements or financial wherewithal, to then in

21  subsequent bid saying maybe we won't have

22  op. co. and prop. co., to now we have op. co.

23  and prop. co. again and maybe a third or fourth

24  designee who is yet to be identified without

1  identifying which asset would be in which

2  entity.

3              That provision also requires

4  material terms of each bid to be fully

5  disclosed to the other bidders.  You don't have

6  material terms of their bid that were

7  disclosed, particularly the relationship

8  between op. co. and prop. co.

9              28 in the hole requires that

10  modification shall not be less favorable to the

11  debtor.  And this debtor is permitting a

12  nebulous Black Diamond and Spectrum bid to be

13  transformed from a bid that is mandatorily a

14  backup bid that has to close with specific

15  performance remedy against Black Diamond and

16  Spectrum to a highest and best option for

17  5 million dollars in cash and arguably no

18  abilities to specifically perform against the

19  other lenders.

20              And 29 in the hole provides that

21  a determination of a successful bidder has to

22  take into account all material factors,

23  including, without limitation, the aggregate

24  amount of cash consideration, which leans

1   heavily in favor of Jack Cooper, and executory

2   contracts to be assumed and assigned.

3                   We have no idea which contracts

4   are going to be assumed and assigned to which

5   entity that may be designated or even which

6   contracts are going to be put in which entity.

7                   And so for those and other

8   reasons that we've stated on the record

9   previously, we believe that the current bid

10  from Black Diamond and Spectrum is not a

11  qualified bid and should be rejected.  And we

12  reserve all of our rights to make those

13  arguments in connection with any hearing.

14                  MR. SELTZER:  It's

15  Richard Seltzer for Teamsters negotiating

16  committee.  Just a couple questions.

17                  I had asked before we broke

18  whether the covenant language could be provided

19  in writing.  Is that available?

20                  MR. HARRIS:  We've drafted a form

21  of a covenant, Richard.  We will provide it to

22  you as soon as we're done.

23                  We've drafted a form of it.

24  We'll provide it to you as soon as we're done



1    here.

2                    MR. SELTZER:  Just so I can

3    understand it -- I guess either the debtor or

4    Black Diamond can answer this -- the parties to

5    an APA which isn't finished, which you haven't

6    seen or seen the covenant language, but does

7    the union have any enforcement rights in

8    relation to that covenant?

9                    MR. HARRIS:  The execution is

10   going to be a condition to the effectiveness of

11   the agreement.  And obviously delivery of those

12   agreements is going to be a condition to

13   closing.  So we can't close the deal unless we

14   have signed agreements and deliver them.

15   Presumably you'll execute them as well if you

16   choose to.

17                   MR. SELTZER:  So is that in the

18   covenant language or is that a condition of

19   closing language that's also been added?

20                   MR. HARRIS:  Well, I mean, we can

21   put it in as a covenant.  We can also put it in

22   as a condition, a deliverable that has to be

23   delivered at closing.  I'm happy to do both.

24                   MR. SELTZER:  I don't know what

1   the APA is.  So I guess I'm trying to figure

2   out what it is.

3                MR. HARRIS:  We'll work in the

4   language.  But it's going to have to be

5   delivered obviously in order to go effective

6   and close.

7                MR. SELTZER:  I would just say

8   very briefly that the Teamsters negotiating

9   committee reserves all of its rights in

10  relation to we do not think this was the

11  highest and best bid.

12               We believe that it's in violation

13  of the debtor's obligations under its

14  collective bargaining agreement with the

15  Teamsters negotiating committee, which is

16  enforceable through arbitration, including, but

17  not limited to, the fact that, as I have raised

18  previously, that the purchaser is not

19  obligated -- whatever the purchaser is, whoever

20  the successors are -- and there appear to be a

21  number of them -- are not obligated, as we

22  understand the covenant, which we haven't seen

23  yet, to comply with the obligations of the

24  successorship clause.  It appears to include

1    both the actual purchaser who's doing the

2    assignment and the assignee that has the Axis

3    assets, the truck assets and the real estate

4    assets.

5              So for those reasons and other

6    reasons and joining in many of the objections

7    that have been noted by Yucaipa, we do not

8    think that, one, this is the best and highest

9    bid.  And, two, we don't think this is an

10   approvable or executable bid, as will be

11   reflected in the objections we'll be filing

12   with the Bankruptcy Court.

13             MR. BURKE:  Michael Burke for the

14   official committee of unsecured creditors.  You

15   know, it is unfortunate since the beginning of

16   this case, every single item in this case has

17   to be hotly contested.  Unfortunately, as we

18   all can probably tell, the sale hearing will be

19   contested and likely discovery notices will be

20   sent out tomorrow by various parties.

21             With that said, the committee

22   does have to say that the debtor in good faith

23   consulted with the committee at every step of

24   the auction process.  And for that, we are

1  appreciative.

2              At the same time, we do have to

3  say -- the committee does say that in light of

4  the substantial execution risks in connection

5  with the closing of the requisite lender

6  transaction, coupled with the fact that now

7  there is not a backup bid, it leads the

8  committee to believe that for these reasons and

9  others that the requisite lender bid is not the

10  highest and best bid.

11              Unfortunately, by taking the

12  requisite lender bid, we have left 100 million

13  dollars cash and the future of this company in

14  substantial doubt.

15              Moreover, the terms of the

16  particular requisite lender contract do, in

17  fact, as Mr. Austin state, essentially equate

18  to a 5-million-dollar option in that the

19  requisite lenders are only required to pay

20  5 million dollars cash if there is a breach and

21  the rest would be forgiveness of debt, which it

22  is unclear whether the requisite lenders

23  actually have the ability to do under the first

24  lien credit agreement.



1                    Furthermore, there is no evidence

2    in the record at all that the requisite lenders

3    have even talked to the CBA units, no less can

4    complete agreements with them that will lead to

5    continued survival of this company.

6                    The committee is also

7    disappointed that the requisite lenders would

8    not agree to the specific performance

9    provisions and that they have provided very

10   little in the way of documentation to support

11   their bid.

12                   For these reasons and among

13   others, literally there is a question of

14   whether this can be a qualified bid.  But at a

15   bear minimum, the committee has to respectfully

16   disagree with the debtors because the committee

17   does not believe the oral bid submitted by the

18   requisite lenders at 11:00 o'clock on Thursday

19   night equals a qualified bid, nor is it the

20   best and highest bid.

21                   MR. COLLINS:  Go ahead, Jess.

22                   MR. AUSTIN:  I just had -- is he

23   finished?

24                   I do have a question.



1  Paragraph 20 of your bid procedures order

2  provides that objections to the sale deadline

3  was to be today at 4:00 p.m.  Obviously that

4  point has come and gone.

5            Will the debtor modify that --

6  I'm asking the debtor will they modify that to

7  extend the objection deadline to August 21 at

8  noon?

9            MR. COLLINS:  We will give

10 that some consideration, Jess.  I don't think

11 August 21 is going to be workable given the

12 hearing is on the 22nd.  But we will certainly

13 talk with you about that.

14            MR. AUSTIN:  You have August 21

15 at 4:00 p.m. as the deadline for any

16 counterparties that have objections to adequate

17 assurance, which is why I chose that date, for

18 filing objections.

19            MR. COLLINS:  Okay.  We'll let

20 you know.

21            MR. KLYMAN:  Please keep us in

22 the loop, too, because we're going to want to

23 know that we have an extension so that we can

24 prepare for the hearing and take whatever

1   discovery is necessary.

2                   MR. COLLINS:  Okay.

3                   MR. KELLEY:  A lot has been said

4   during the course of this auction about alleged

5   lack of compliance with bid procedures and so

6   on and so forth.  And a lot has been said

7   during this auction about people reserving

8   their rights.

9                   The debtors are reserving their

10  rights with respect to the fact that Cooper

11  participated in this auction over two days

12  knowing that there's a backup bid requirement.

13  And so we're reserving our rights with respect

14  to the backup bid requirement in the bid

15  procedures.

16                  MR. COLLINS:  All right.  Thank

17  you, everyone.

18                  I'm sorry.  Before we do that, as

19  part of the bid procedures order, we are

20  required at the end, the conclusion of the

21  auction to declare the successful bidder.

22                  The debtors do declare Black

23  Diamond and Spectrum acting at the direction --

24  or, as the agent acting at the direction of the

1   requisite lender --

2                    MR. KLYMAN:  But that's not the

3   bidder.  The bidder is Allied --

4                    MR. HARRIS:  New Allied

5   Acquisition.

6                    MR. COLLINS:  New Allied

7   Acquisition Co., which is a vehicle established

8   by Black Diamond and Spectrum as requisite

9   lenders, have submitted the highest and best

10  bid and are deemed to be the successful bidder.

11                   MR. SELTZER:  And I assume that

12  that selection is public?

13                   MR. BURKE:  It's all a public

14  auction, yes.

15                   MR. COLLINS:  Yes.  We'll be

16  filing a notice tomorrow.

17                   The auction is closed.

18                   (Proceedings concluded at

19  11:47 p.m.)

20

21                         -   -   -   -   -

22

23

24

```
 1   State of Delaware        )
                              )
 2   County of New Castle     )

 3

 4

 5              C E R T I F I C A T E

 6        I, Patricia L. Shelton, Registered

 7   Professional Reporter and Notary Public, do

 8   hereby certify that the foregoing record,

 9   pages 2 to 89 inclusive, is a true and accurate

10   transcript of my stenographic notes taken on

11   Thursday, August 15, 2013, in the

12   above-captioned matter.

13        IN WITNESS WHEREOF, I have hereunto set my

14   hand and seal this 16th day of August, 2013, at

15   Wilmington.

16

17

18

19             Patricia L. Shelton, RPR

20

21

22

23

24
```

**$**

**$100,500,000 (1)** 25:15
**$500,000 (1)** 29:11

**A**

**abilities (1)** 80:18
**ability (13)** 9:6 11:15 29:24 30:6 31:17 62:22 73:17 74:3,20 76:19 77:3 79:16 85:23
**able (2)** 39:1 41:4
**absence (1)** 30:10
**absolutely (1)** 38:5
**acceptable (2)** 5:13 61:16
**acceptance (1)** 14:18
**accepted (4)** 20:4 44:22 69:4 79:14
**access (1)** 64:5
**accompanied (1)** 74:23
**Accordingly (1)** 17:11
**account (2)** 63:6 80:22
**Accuval (3)** 26:23 27:17 28:3
**acquire (3)** 22:16 23:18 24:1
**acquisition (8)** 10:24 11:14, 19 21:11 25:13 57:12 89:5,7

**across (1)** 23:9
**acting (2)** 88:23, 24
**action (1)** 34:17
**actions (2)** 34:21 36:1
**actual (3)** 16:11 57:14 84:1
**actually (6)** 12:9 18:2 61:15,17 69:5 85:23
**Adam (13)** 2:9 5:15 25:11 27:14 38:17 41:9 43:12 45:14 46:12 51:9 62:14,18 65:10
**added (1)** 82:19
**addition (2)** 62:6 79:9
**additional (4)** 2:5 21:17 66:17 67:17
**address (2)** 32:18 42:7
**addresses (1)** 42:2
**adequate (9)** 3:10 7:3,13 59:2,9 64:17 70:19 76:21 87:16
**adjourn (1)** 33:7
**adjournment (1)** 32:15
**admin (1)** 12:2
**administered (1)** 79:11
**adopting (1)** 45:5
**advance (1)** 8:23
**adverse (3)** 16:17 26:19, 20
**advise (1)** 54:13
**advisement (1)** 64:1
**advisor (1)** 63:20

**affected (1)** 27:22
**affiliate (2)** 11:23 78:19
**affiliated (1)** 66:23
**affiliates (2)** 23:24 66:4
**afternoon (3)** 2:8 34:23 42:4
**Again (7)** 10:8 14:11 28:3 41:13 50:21 67:2 79:23
**against (8)** 19:6 25:1 65:16,22 66:10,22 80:15,18
**agent (3)** 12:8 74:20 88:24
**agents (2)** 12:2 76:4
**aggregate (2)** 25:14 80:23
**ago (3)** 4:12 40:11,21
**agree (5)** 4:5 34:1 67:5 72:13 86:8
**agreed (12)** 3:15, 21 4:17 5:22 13:10 21:8 33:1 41:3 55:21 56:15 59:3 63:1
**agreeing (1)** 49:4
**agreement (67)** 3:3,23 4:8,15 5:19 6:5 7:8, 16 8:3 9:22 12:20 14:19, 21 15:1,2,6,8 16:3,9 18:6 21:9,10 22:15, 19 26:10 30:2, 3,10,11 32:24 36:13 37:5,6, 8,18 39:21 40:3,15 43:19, 21 45:2,16,17

**46:22,24 48:1,** 3,9,24 49:2,4 50:16,19 53:3 57:13 66:9,11 70:8 74:2,21, 24 75:1,5 76:3 82:11 83:14 85:24
**agreements (42)** 4:2 5:11 13:11,19 22:3, 9,21,23 23:23 24:19 30:5 36:15,17 45:22,22 46:3, 4,9 47:1,8,11 48:12 50:3 52:2 53:15,16, 18 54:24 55:3, 14,20,22 56:2 65:4,12 72:21 75:7,18 79:20 82:12,14 86:4
**ahead (2)** 41:18 86:21
**ahold (1)** 41:24
**alleged (1)** 88:4
**Allied (19)** 2:3 11:14,19 15:1, 4 19:4,7 21:11,22 25:12 43:23 48:14 55:5 57:12 65:7,17 89:3,4,6
**Allied's (1)** 44:1
**allocated (1)** 10:20
**allocations (2)** 10:3,16
**allow (1)** 30:14
**allowed (3)** 73:3 75:22 79:17
**allowing (1)** 34:7
**allows (1)** 7:8
**almost (1)** 68:20
**alternative (1)** 34:8

**46:22,24 48:1,**

**Am/pm (1)** 19:17
**amendments (1)** 20:20
**among (1)** 86:12
**amount (8)** 2:21, 23 25:14 27:17 29:11 31:15 35:22 80:24
**analysis (7)** 28:15 64:14 70:15,15 74:18,19 76:4
**ancillary (6)** 6:8 8:4 9:14 43:22 48:12 55:4
**and/or (2)** 60:1 66:18
**announced (3)** 16:4 21:18 43:4
**anticipated (2)** 63:21 64:8
**anticipation (1)** 8:11
**Antinelli (4)** 63:19,24 64:10 72:8
**APA (4)** 26:12, 14 82:5 83:1
**apparently (1)** 70:14
**appear (1)** 83:20
**appears (1)** 83:24
**applicable (3)** 26:15 45:7,8
**appraisal (8)** 16:24 18:22 19:9 26:22,23 27:8,10,17
**appraised (1)** 16:23
**appreciate (2)** 41:15 61:12
**appreciative (1)** 85:1
**appropriate (3)**

7:18 73:7 74:8

**approvable (1)**
84:10

**approval (6)**
16:22 17:18
31:19 37:23
73:12 78:3

**approve (1)** 7:22

**approved (3)**
6:12 20:15
39:8

**approximately (1)**
64:2

**arbitration (1)**
83:16

**arguably (1)**
80:17

**arguments (1)**
81:13

**around (1)** 44:17

**arrange (1)** 41:4

**Article (2)** 14:20
21:9

**artificial (1)** 38:21

**asserts (1)** 78:10

**assessment (1)**
67:5

**asset (29)** 3:2,23
4:8,14 6:4 7:7,
16 10:3 12:19
14:19 16:2,9
21:9,10 26:9
36:13 37:5,18
39:10,20 40:2
43:19 51:6
52:20 53:3
60:22 64:9
70:7 80:1

**assets (33)** 2:21
3:6 8:8,9,12
9:11,15 10:6,
9,19 11:8,16
16:6 49:17
52:10,12,14
54:14 56:2
58:3,4,22
60:8 68:10

70:13 72:17
75:10 77:2,14,
15 84:3,3,4

**assigned (4)** 7:5
75:16 81:2,4

**assignee (2)**
75:17 84:2

**assigning (2)**
55:8 76:5

**assignment (2)**
3:7 12:9 84:2

**associated (3)**
30:22 53:7
55:12

**assume (5)** 3:7
30:10 36:15,
17 89:11

**assumed (5)** 7:5
13:19 75:16
81:2,4

**assuming (3)**
30:4 37:6
55:9

**assumption (3)**
46:4 53:17
70:24

**assumptions (1)**
77:7

**assurance (9)**
3:11 7:3,13
59:2,9 64:18
70:20 76:21
87:17

**attention (2)**
34:22 36:7

**auction (34)** 2:3
16:5 17:8,16,
19 22:1,7
28:22 32:5,16,
24 33:4,7,18
36:3,6 37:8
38:8 39:1
42:5,17 67:23
68:7,16 72:2
79:10,11
84:24 88:4,7,
11,21 89:14,17

**auctions (1)** 72:1

**audited (1)** 76:12

**August (6)** 36:19,
21 73:13 87:7,
11,14

**Austin (82)** 5:3,6,
9,17 6:1,10,
14 13:2 15:13,
14,15,20 16:1
18:4,18,23
19:10,15,21
20:2,18,24
21:6,16,23
22:6,13,20
23:2,8,14,21
24:3,12,13
26:6,6 33:22,
24 42:14,15,
20 46:6 47:6,
6 51:23,23
52:6,13,17,21
53:14,20,24
54:12,18
57:21,21
58:13 60:4,16
61:1,23 62:3
63:15,16 64:7,
12,19 65:4,12
66:6,11,16,24
67:9,15,21
68:6 85:17
86:22 87:14

**authority (3)** 8:13
12:3 33:6

**authorization (3)**
12:7,19 78:3

**autoworkers (3)**
22:11 24:21
59:16

**available (4)** 7:23
54:10 59:8
81:19

**aware (2)** 65:8
66:20

**away (1)** 70:13

**Axis (8)** 54:14,
16 58:2,4,10,
12 60:8 84:2

**B**

**back (13)** 12:15
15:12 19:5
25:9,24 31:1
37:19 42:1,9,
12 43:8 61:22
62:13

**backstopped (1)**
11:3

**backup (10)**
20:16 32:9
44:11 69:24
75:21 77:24
80:14 85:7
88:12,14

**balance (1)** 2:18

**Bankruptcy (4)**
31:18 70:19
76:20 84:12

**bargaining (18)**
4:2 5:11
13:11,12,19
14:21,24 15:2,
6,8 22:19,22
30:4 37:6
40:14 50:3
55:3 83:14

**base (2)** 16:22
27:5

**Based (9)** 10:21
14:19 15:23
19:9 29:13
42:3 46:18
58:9 72:11

**basically (8)**
11:15 18:6
26:19 27:9
33:19 38:21
41:20 59:21

**basis (4)** 2:23
71:22,23 73:2

**bear (2)** 57:19
86:15

**bearing (1)** 57:15

**become (2)** 20:8,
10

**beginning (2)**
16:4 84:15

**behalf (11)** 5:4,9
7:1 12:5
15:15 25:12
42:15 47:7,19
54:20 63:16

**behind (2)** 29:8
55:12

**benefit (5)** 3:12
29:7 38:10
69:22 73:6

**best (13)** 10:2
16:6 17:22
34:17 36:23
67:3 69:18
80:16 83:11
84:8 85:10
86:20 89:9

**better (15)** 5:2
25:8 28:18
29:12,17
30:19 31:16
35:6,10 37:16
58:18 63:13
64:23 67:13
74:12

**bid (177)** 2:6,12,
22,22 4:21
5:1,1,2,2,5
8:5 9:10,17
10:12,21 11:1,
6,11,14 12:4,
16,22,23,24
13:1,4,24
14:13 16:6
17:11,22 18:5
19:13,23 20:1,
2,3,4,5 24:17,
18 25:7,8,9,
14,16,16,18
26:3 28:17,18,
20,21 29:2,4,
9,12 30:6,14,
17,19,23 31:1,
14,16 32:9,9,
17 34:8,24
35:2,6,6,9,10,

16,21 36:9,11,
18,19,21
37:16 42:2,16
43:14,16 44:3,
6,14,21,23,24
45:4,13 46:14
47:13 54:6
55:11 56:17
61:21 62:6,16,
19 63:8,13
64:19,23 67:3,
12,19,22,23
68:8,12,18,22,
23,24 69:5,6
70:1,1,3
71:13,14,18,
20 73:5,5,6
74:7,12,13,14,
22 75:19,22
76:5,9,11
77:8,19 78:9,
22 79:2,5,14,
14,18,21 80:4,
6,12,13,14
81:9,11 83:11
84:9,10 85:7,
9,10,12 86:11,
14,17,19,20
87:1 88:5,12,
14,14,19 89:10
**bidder (23)**
17:17 20:9,
11,13,23 32:6,
8,23 37:13
44:11 69:24
75:20,21
76:13,18
77:24 78:9,11
80:21 88:21
89:3,3,10
**bidders (4)** 28:14
36:11 47:5
80:5
**bidder's (1)** 78:3
**bidding (4)** 33:6
39:20 40:2,12
**bids (5)** 29:15,
17 36:22,23

68:8
**big (1)** 31:3
**binding (1)** 19:12
**bit (2)** 2:11 69:2
**Black (32)** 3:16
11:3,24 15:21
24:23 26:12
32:14 40:3,24
47:13 52:23
57:16 63:22
65:5,13,15
66:18 67:2
68:17 71:5,10,
16 73:4 74:2
75:13 79:17
80:12,15
81:10 82:4
88:22 89:8
**black-line (1)** 4:16
**Blount (5)** 45:18
46:1 59:11,12,
12 60:3
**board (5)** 6:12
17:19 66:18
78:4,5
**board's (1)** 67:18
**both (6)** 10:11
29:16 36:22
43:3 82:23
84:1
**bound (1)** 15:2
**breach (1)** 85:20
**break (5)** 6:16
25:21 43:13
61:21,24
**breaking (1)** 64:4
**breakup (1)** 64:1
**briefly (1)** 83:8
**broke (1)** 81:17
**broken (1)** 9:11
**brother (2)** 50:24
51:2
**Brotherhood (1)**
24:20
**brought (2)**
34:22 36:7
**budget (2)** 5:20,
23

**bunch (1)** 42:11
**burden (2)** 57:15,
19
**BURKE (16)** 13:6,
6,17,22 14:1,
11,11 51:8,8,
19 67:6,8,14
84:13,13 89:13
**business (1)**
77:12
**buyer (2)** 30:12
38:4
**buyers (1)** 56:2

---

## C

**calculation (2)**
27:16 37:15
**call (7)** 40:19
41:2,3 56:4,5
63:22 64:8
**came (4)** 17:2
19:4 68:6,7
**can (32)** 9:1
10:16 12:7
19:6 23:6
31:6 33:22
34:11 35:11
38:14 48:6
53:24 54:13,
24 63:20
64:12 65:2
69:18 70:16
71:23 72:19,
23 75:20 76:5
82:2,4,20,21
84:18 86:3,14
87:23
**Canada (5)**
21:13 22:12
45:10 46:2
59:18
**Canadian (2)**
22:11 59:16
**cap (3)** 16:14
18:8,11
**capable (1)** 76:2
**capacity (2)**

37:19 46:10
**CAPEX (2)** 60:18,
21
**capital (2)** 10:2
60:18
**care (1)** 68:1
**cares (1)** 62:4
**carry (1)** 39:1
**case (8)** 37:4
39:23 40:4,20
41:6 64:17
84:16,16
**cases (2)** 40:8,8
**cash (20)** 2:16,
16 3:18 10:11
11:2,12 24:18
53:22 54:1,4,
8 57:18 63:4
69:7,14,16
80:17,24
85:13,20
**caused (1)** 30:6
**CBA (1)** 86:3
**Central (1)** 56:11
**certain (6)** 3:8
7:9 30:1
49:16 53:6
66:3
**certainly (6)** 8:14
28:22 59:23
70:15 71:6
87:12
**chance (1)** 17:4
**Change (10)**
16:8,20 17:6
18:5 27:2
43:18 44:2,9,
19 66:14
**changed (1)**
12:17
**changes (8)** 6:11
15:18,19,20
21:17 26:8
43:15 45:1
**Chapter (1)** 71:5
**characterize (1)**
36:8
**choose (6)** 33:12

44:12,13
56:18 65:3
82:16
**chose (1)** 87:17
**chosen (2)** 37:9,
12
**circulated (3)**
4:15 6:5
13:15
**cited (1)** 40:7
**CIUPITU (14)**
18:13,16
19:3 20:7,17
23:20 26:7,11
27:20,24 28:2
50:20,21 51:5
**claim (7)** 53:22
54:2,6,7
69:17,20,21
**claims (5)** 25:1
63:6 65:22
66:1 69:17
**clarification (9)**
3:1,14,20 4:3
14:5 24:14
27:1 45:15
56:21
**clarifications (3)**
2:12 5:8 18:4
**clarify (2)** 20:7
49:13
**clarifying (3)**
57:22 59:13
60:5
**clause (3)** 43:1,2
83:24
**clear (15)** 11:5
14:17 17:13
24:17 25:3
30:8 31:21
32:11 40:9,15
41:7 42:24
46:3 49:23
64:20
**clearly (2)** 29:10
38:3
**client (4)** 41:6
67:16 68:7

71:23

**clients (3)** 37:18
61:18 72:2

**close (13)** 17:19
21:13,20
29:24 30:7
32:5 42:5
44:14 69:9
79:16 80:14
82:13 83:6

**closed (4)** 9:6
17:16 42:16
89:17

**closes (4)** 18:9,
15,17,19

**closing (20)** 2:19
3:22 5:12,17,
21 7:9 11:9,
17 13:9 14:3,
6,9 46:17
69:11 77:24,
24 82:13,19,
23 85:5

**Co (16)** 11:19
25:13 60:7
75:8,9 76:24
77:10,10
79:19,22,22,
22,23 80:8,8
89:7

**co/prop (1)** 79:19

**Code (2)** 70:19
76:20

**cognizant (1)**
36:12

**Cohen (1)** 39:17

**colleagues (1)**
24:6

**collectable (1)**
74:17

**collective (18)** 4:2
5:10 13:11,12,
19 14:21,24
15:2,5,7
22:19,22 30:4
37:6 40:14
50:3 55:3
83:14

**COLLINS (60)**
2:1,2 4:22,23
6:13 13:5
15:9,12,19
17:23 24:9,12
25:4,20,23
27:12 28:7
29:3,19 30:16,
24 31:9 32:1,
7,19,22 33:10,
14,21 34:9
35:1 37:2,11
41:9,13,18
42:6 43:8
45:14 46:11
47:4 59:10
61:2,20 62:2,
10,13 63:10
64:16,24 68:4
73:20,23
86:21 87:9,19
88:2,16 89:6,
15

**combination (1)**
53:23

**comfortable (2)**
30:14 65:1

**coming (4)** 38:22
39:3,3 71:10

**comment (2)**
22:13 41:17

**comments (7)** 2:5
14:23 35:3,4
67:13,17,24

**commercial (1)**
68:20

**commitment (7)**
19:12,21
33:17 38:23
42:18 72:22
76:8

**commitments (2)**
22:4 44:16

**committed (1)**
79:15

**committee (35)**
13:7 14:12,
15 15:3 17:18

25:7 28:13
29:21 33:2
34:14 35:5
39:18,24
42:23 47:19
51:9 63:12
65:20 67:6,8,
18 68:2 74:1,
6 81:16 83:9,
15 84:14,21,
23 85:3,8
86:6,15,16

**committee's (1)**
67:4

**communication (4)**
40:20,22,24
41:5

**communications (2)**
56:8,12

**companies (9)**
8:18 47:11
49:2,6 54:14
64:15 70:17
72:5,6

**company (77)**
2:14 4:9 5:24
6:18 17:3
22:15,22 23:6,
10 25:19
29:13 31:8,22
33:5 35:16
36:2 37:10,17,
21 38:24
41:19 44:22
45:9,23 46:10,
19,20 47:17
48:9,10,15,16,
16,22 49:9,15
50:4,5,23,24
51:6,6 52:1,4,
7 53:6 54:15,
17 58:1,16,17
59:3 60:5,10,
11,17,23,23,
24 62:22 63:1,
23 64:4,9
70:12,14 71:4
72:8,10,15

73:1 77:2,6,
11,13 85:13
86:5

**company/party (1)**
55:14

**company's (15)**
6:12 9:5
16:13,19,23
17:19 18:7
29:8 30:9
35:23 37:1
58:9 60:13
64:11 67:1

**compete (1)**
77:13

**complete (3)** 6:2
71:12 86:4

**completed (1)**
18:22

**completely (2)**
39:4 51:3

**compliance (2)**
71:20 88:5

**complied (1)**
79:13

**comply (4)** 76:15,
19 78:14 83:23

**component (5)**
2:22 10:11,
12 25:16 44:23

**comport (2)**
12:24 46:23

**comports (1)** 47:1

**comprised (1)**
63:3

**concept (1)** 4:18

**concern (3)**
46:19 47:3,16

**concerned (1)** 6:7

**concerns (10)**
29:24 30:6
31:12,24
32:13,18
35:23 42:2,7
68:11

**concessions (2)**
72:12,15

**conclude (3)**

28:22 33:4
74:1

**concluded (1)**
89:18

**conclusion (3)**
29:8 33:18
88:20

**conclusively (1)**
48:21

**condition (13)**
3:21 5:22
13:9 14:2,9
17:15 20:5
36:16 46:17
82:10,12,18,22

**conditions (4)**
5:12,18
25:17 43:24

**conducted (3)**
17:9 42:4
74:7

**confer (1)** 67:16

**conference (1)**
41:2

**confidential (1)**
72:9

**confines (1)** 78:12

**confirm (2)** 33:22
45:18

**conform (1)** 21:8

**conforming (1)**
43:15

**connection (5)**
62:18 66:24
73:16 81:13
85:4

**consent (4)** 39:6
78:23 79:3,4

**consideration (5)**
78:11,13,18
80:24 87:10

**considerations (1)**
21:2

**considered (1)**
40:13

**constitute (1)**
78:22

**consultation (5)**

25:6 28:12
29:21 34:13
63:11
**consulted (1)**
84:23
**consummate (1)**
31:17
**consummating (1)**
76:2
**contemplated (5)**
7:15 9:21,22
10:23 76:3
**contemplates (1)**
55:24
**contemplating (1)**
9:19
**contemplation (1)**
9:16
**contested (2)**
84:17,19
**context (1)** 78:8
**continue (2)**
12:23 77:12
**continued (1)** 86:5
**continuing (1)**
59:1
**contract (16)**
16:16 21:4
29:14 35:22
40:7 43:1
44:1 48:17
49:18 51:18
59:5 66:14
72:13 73:12
77:3 85:16
**contracts (28)** 3:8,
12 7:4,11
9:14 11:8,16
13:20 20:21
30:11 41:22
49:17 52:9
54:22 55:8,9,
12,15,17
56:15 59:21,
22,24 70:24
75:16 81:2,3,6
**control (1)** 66:14
**conversation (2)**

28:15 56:3
**conversations (2)**
2:13 63:1
**Cooper (42)** 5:2,
4,9 6:15 13:3,
24 14:23 15:1,
5,15 16:2,9
17:9,15 19:11
20:19 21:19,
23 22:2,17
23:13,17,19
24:1,17 25:7
26:2,7 28:20
32:8,23 35:3
42:15 47:7
57:22 63:14,
17 67:22
79:12,13 81:1
88:10
**Cooper's (1)**
17:22
**cop (1)** 17:12
**copies (1)** 8:2
**copy (2)** 16:11
61:7
**corollary (1)** 44:6
**corporate (1)**
50:13
**Corporation (1)**
15:16
**correctly (1)** 13:8
**Co's (1)** 11:14
**costs (5)** 16:12,
13 18:8 60:15
72:16
**coughing (1)** 66:7
**counsel (1)** 26:8
**counterparties (6)**
3:13 7:14,17
55:16 59:8
87:16
**counterproposal (1)**
6:22
**couple (4)** 6:19
28:11 69:23
81:16
**coupled (1)** 85:6
**course (4)** 34:17

53:8,11 88:4
**Court (5)** 20:15
31:19 37:22
40:4 84:12
**covenant (15)** 3:3
43:20 50:14
51:10 54:23
61:6,8 77:11
81:18,21 82:6,
8,18,21 83:22
**created (1)** 58:21
**credit (11)** 2:22
10:12,24 12:4,
16 25:15
44:23 71:20
74:1,21 85:24
**creditors (2)** 71:2
84:14
**creditors' (6)** 25:6
28:12 29:21
34:14 35:4
63:12
**current (12)**
14:21 17:11
30:4 44:1
52:9 65:14,16
66:12 67:1
76:11 77:8
81:9
**currently (13)**
15:24 19:11
22:10 30:17
31:14 43:23
45:23 48:10,
14 55:5 60:1
65:24 72:19
**customer (1)**
48:17
**customers (1)**
21:1
**CVA's (2)** 59:14,
15

**D**

**damage (1)** 56:22
**damages (12)**
21:4 44:4

51:12,15
53:21 57:3,9,
10 62:21 63:2
73:18 74:4
**damn (1)** 69:2
**date (15)** 2:19
7:5 10:4
12:17 14:6,7
19:24 21:7
27:8,10,11
69:11 71:8
73:13 87:17
**dates (1)** 43:24
**day (1)** 41:1
**days (5)** 28:11
34:10 40:10,
11 88:11
**deadline (8)** 34:4
38:21 62:1,4
78:1 87:2,7,15
**deal (15)** 6:1 9:6
18:9,15,19
24:21 31:23
32:16 38:2
39:7 53:5,10
55:18 57:3
82:13
**dealing (1)** 16:17
**debt (6)** 25:1
73:18 74:3
76:5 79:1
85:21
**debtor (11)** 10:9,
20 14:17
23:15 40:9
80:11,11 82:3
84:22 87:5,6
**debtors (12)** 8:13
16:4 25:5
28:16 54:15
59:13 63:11
68:10 78:23
86:16 88:9,22
**debtors' (2)** 25:2
63:20
**debtor's (3)**
69:22 73:8
83:13

**decide (1)** 64:22
**decided (1)** 58:22
**decides (1)** 21:24
**decision (3)**
41:21 69:3
74:8
**decision-making (1)**
38:7
**declare (4)** 32:5,
8 88:21,22
**deducting (1)**
27:18
**deem (5)** 7:18
25:7 28:20
29:16 63:12
**deemed (5)**
20:22 28:18
30:18 36:23
89:10
**deems (1)** 33:8
**defines (1)** 53:5
**definition (2)** 2:20
16:16
**Delaware (1)**
42:21
**deleting (2)**
13:14 26:15
**deliberated (2)**
74:6,7
**deliver (2)** 8:2
82:14
**deliverable (1)**
82:22
**delivered (4)**
19:13 75:2
82:23 83:5
**delivery (1)** 82:11
**demonstrate (1)**
76:19
**denominated (1)**
20:13
**depending (1)**
10:1
**deposit (7)** 17:12
51:13 53:22
54:4 56:24
57:5 74:16
**describe (5)** 26:8

50:11,14 57:6
75:5

**described (9)**
9:10 47:12
48:23 49:7
52:7 53:1
56:23 58:16
61:6

**describing (2)**
50:4 54:22

**designate (2)** 3:5
49:16

**designated (9)**
3:9 9:21 12:2
17:16,17 50:4,
6,8 81:5

**designation (4)**
7:8 11:7 53:6
59:4

**designations (1)**
7:10

**designee (4)** 7:3
8:7,8 79:24

**designees (5)**
7:21 9:19
10:6,7 49:18

**desperately (1)**
56:5

**detail (1)** 7:24

**determination (5)**
39:13 64:22
67:1 70:17
80:21

**determinations (1)**
29:13

**determine (3)** 5:4
6:21 64:14

**determined (7)**
7:11 28:16
35:5 43:13
48:21 52:18
75:11

**determining (2)**
27:1,5

**developed (3)**
32:12 71:14
72:9

**Diamond (32)**

3:16 11:3,24
15:21 24:23
26:12 32:14
40:3,24 47:13
52:23 57:16
63:22 65:5,13,
15 66:19 67:2
68:17 71:5,10,
16 73:4 74:2
75:13 79:17
80:12,15
81:10 82:4
88:23 89:8

**difference (1)** 69:2

**different (6)** 3:5
12:19 20:12
28:14 49:24
52:14

**diligence (2)** 73:7
74:8

**dilution (1)** 45:7

**directed (1)** 63:19

**direction (3)** 31:7
88:23,24

**directly (1)** 78:21

**directors (6)**
22:16 66:4,
18,23 78:4,5

**disadvantaged (1)**
79:11

**disagree (4)**
39:12 67:5
70:7 86:16

**disappointed (1)**
86:7

**disclosed (3)**
70:16 80:5,7

**discount (1)** 31:3

**discovery (2)**
84:19 88:1

**discretion (6)**
11:17 33:11,
13 34:6 71:18
75:12

**discuss (1)** 61:21

**discussed (3)**
6:20 47:15
59:19

**discussion (2)**
28:15 47:22

**discussions (6)**
6:11 24:22
30:21 31:11
33:3 35:13

**disqualifying (3)**
34:21 35:2
36:8

**distribution (1)**
54:7

**distributions (1)**
63:5

**divorced (1)** 77:1

**document (1)**
43:22

**documentation (4)**
8:20 71:12
77:9 86:10

**documented (3)**
6:2,9 53:13

**documents (11)**
6:3,8 8:2,4,5,
12,17 9:7
52:22 55:4
72:24

**dollar (2)** 29:11
35:22

**dollar-for-dollar (1)**
2:23

**dollars (22)**
17:10 18:8,
12,13,19 21:5
45:11 51:16
54:5,10 57:1,
17,20 58:7
60:8 63:3,4,5
64:3 80:17
85:13,20

**done (11)** 7:10
28:11 37:24
39:15 62:9
64:14 67:14
69:4 71:21
81:22,24

**doubt (1)** 85:14

**down (2)** 32:21
61:15

**draft (2)** 6:5
61:11

**drafted (5)** 71:15
77:19,20
81:20,23

**drop (2)** 3:21
66:10

**dropping (1)**
65:14

**due (3)** 37:2
66:12,14

**duly (1)** 74:23

**duration (1)** 59:24

**During (4)** 43:12
53:8 88:4,7

**duties (2)** 73:8,9

**duty (1)** 71:1

**dynamic (1)** 34:12

**E**

**earlier (6)** 10:13
29:15 49:8
52:23 59:3
62:7

**early (1)** 10:17

**eastern (2)** 17:20
42:20

**EBITDA (9)** 58:1,
6 60:7,9,13
63:21 64:8,11
72:11

**economic (2)**
22:16 77:9

**economics (1)**
55:16

**effect (6)** 26:19,
20 43:17,23
55:5 60:1

**effective (1)** 83:5

**effectively (6)**
34:4,20
35:20 37:20
38:6 57:4

**effectiveness (3)**
50:16,18
82:10

**either (12)** 2:19

7:20 23:24
24:23,24 30:3,
10 37:5 56:9
58:19 76:16
82:3

**eliminate (4)** 44:7,
10 46:16 62:21

**eliminated (1)**
46:13

**else (1)** 48:18

**e-mail (1)** 40:19

**e-mailing (1)**
61:13

**employ (2)** 15:3,4

**employee (1)**
22:18

**employees (9)**
9:14 15:4
22:5,10 46:21
48:18 52:9
71:3 77:1

**employment (4)**
26:16 45:8
65:6 66:13

**end (5)** 9:10
20:10 52:22
68:9 88:20

**ending (2)** 36:2
38:21

**enforce (1)** 56:1

**enforceable (2)**
74:23 83:16

**enforcement (1)**
82:7

**engaging (1)** 38:5

**enter (2)** 59:15
70:11

**entering (1)** 14:18

**entirely (1)** 53:16
54:24 55:21

**entirety (2)** 3:21
57:14

**entities (13)** 3:17
7:12 9:12,18,
19,24,24 11:7
43:3 49:24
51:4 57:9
58:15

entity (20) 10:12, 23 11:1,6,10, 11 12:1,1,16 40:4 45:24 48:23 50:2 75:11 76:6,24 78:18 80:2 81:5,6

equal (1) 2:23

equals (1) 86:19

equate (1) 85:17

equipment (2) 16:19 48:14

equities (1) 24:22

equity (3) 11:19 24:18 78:6

equivalence (1) 2:16

equivalent (1) 54:8

escape (1) 75:23

essentially (4) 15:6 29:14 48:17 85:17

established (1) 89:7

estate (10) 9:12 25:2 33:9 34:7,18 38:10 48:15 69:22 77:18 84:3

estates (1) 73:9

estate's (1) 73:8

estimate (1) 57:24

even (8) 36:24 49:20 62:7 74:13,24 78:4 81:5 86:3

evening (1) 34:16

evenly (1) 79:10

event (6) 16:17 35:2 36:9 44:17 46:22 54:11

everybody (4) 2:9 6:16 28:10 34:12

everyone (3)

41:14 62:6 88:17

evidence (10) 76:1,4,7,7,19, 23 77:8 78:2 79:19 86:1

exact (2) 12:16 13:23

exactly (4) 43:22 55:4 57:9 58:22

Except (2) 43:14 75:13

exception (1) 71:12

excess (4) 2:16, 18,20,24

exclude (1) 2:20

excluding (1) 66:3

excuse (1) 50:12

executable (1) 84:10

execute (2) 47:8 82:15

executed (4) 12:13,15 74:23 75:2

executing (1) 47:10

execution (6) 14:6 27:8,11 70:9 82:9 85:4

executory (2) 75:15 81:1

exercise (3) 33:13 34:5 59:4

exercises (1) 3:4

exercising (2) 10:24 11:2

exhibits (1) 75:4

exist (2) 8:18 22:21

existing (14) 18:6 20:21 21:21 35:21 46:4 53:17 55:9,12, 15 60:13 64:3

65:6,15 77:6

exists (1) 66:12

expect (2) 49:23 54:8

expected (1) 8:21

expenditures (1) 60:18

expenses (1) 16:13

experience (1) 71:7

experienced (1) 14:7

expiration (1) 21:14

expire (1) 19:19

expired (4) 19:14 20:11 59:21,23

expires (2) 19:16 33:17

explain (1) 64:12

exposed (1) 45:9

extend (4) 32:24 33:7,19 87:7

extended (1) 20:9

extension (3) 32:15 34:2 87:23

extensive (1) 39:24

extent (11) 2:15 3:4 4:14 21:13 33:8 43:14 53:12 57:17 59:4,8, 17

extremely (1) 40:9

F

facilities (1) 21:21

fact (10) 34:3,19 49:22 69:23 74:24 78:4 83:17 85:6,17 88:10

factor (2) 31:16 34:21

factors (1) 80:22

failing (1) 35:19

fair (1) 36:8

fairly (1) 79:10

faith (3) 57:4 74:16 84:22

falls (1) 78:11

far (3) 6:6 8:23 47:10

favor (2) 74:4 81:1

favorable (1) 80:10

femoral (1) 69:22

few (4) 2:12 13:7 63:15 67:13

fiction (1) 77:15

fiduciary (3) 71:1 73:8,9

figure (2) 69:7 83:1

file (2) 7:17 73:11

filed (3) 37:5 39:24 40:21

filing (3) 84:11 87:18 89:16

filings (1) 39:23

final (2) 8:2 75:1

finally (1) 18:2

financial (7) 58:18 59:7 63:20 64:13, 21 76:13 79:20

financially (3) 70:18 72:20 76:1

financials (1) 76:12

financing (7) 8:14 19:12 33:17 34:4 44:16 76:8 79:15

find (2) 4:10 61:16

finish (3) 37:11 38:14 48:6

finished (4) 38:17 51:24 82:5 86:23

firm (2) 4:13 76:7

first (17) 2:15 5:23 12:16 24:24 26:16 28:9,24 40:23 43:18 44:12 57:18 63:7,18 78:19,24 79:1 85:23

flexibility (1) 38:24

follow (2) 24:14

following (1) 63:11

follow-up (1) 41:3

force (2) 43:17 56:18

Ford (1) 20:21

forfeiture (2) 57:4, 15

forgiveness (5) 54:7 63:5 69:17,21 85:21

form (11) 4:16 6:5 12:10 13:15,16 43:22 46:5 48:10 55:5 81:20,23

format (1) 7:24

formed (1) 36:13

formulate (1) 34:7

forth (4) 3:22 25:17,18 88:6

forward (1) 73:12

founding (1) 11:24

fourth (1) 79:23

frankly (4) 10:19 36:5,10 39:11

free (1) 35:10

Freight (4) 43:21 45:16 49:2 54:22

fulfilled (1) 47:24
full (3) 8:20
    43:17 71:11
fully (3) 6:2,9
    80:4
functionally (1)
    73:3
functioning (1)
    68:11
funds (1) 10:13
further (16) 2:13
    6:11 24:5
    29:2,4,20
    34:1 41:3,10,
    12 43:14
    57:22 60:4
    68:19 73:5,6
Furthermore (1)
    86:1
futile (1) 35:15
future (6) 3:11
    64:18 70:20,
    22 76:22 85:13

**G**

Gendregske (1)
    66:2
general (1) 26:7
generically (1)
    48:22
gets (1) 18:2
ghost (1) 68:23
given (8) 29:24
    31:19 34:15,
    21 35:2 36:5
    74:18 87:11
giving (2) 29:1
    41:20
goes (2) 20:14
    44:18
go-forward (1)
    73:2
Good (6) 2:8
    42:17,19 57:4
    74:16 84:22
governed (1)
    22:18

grant (1) 79:4
guarantee (1)
    72:23
guarantees (1)
    3:16
guarantors (1)
    11:12
guess (5) 58:16
    63:18 69:16
    82:3 83:1
guidance (1)
    31:24
guys (4) 39:14
    64:12,14 73:15

**H**

half (2) 4:11
    54:9
hampering (1)
    34:5
handing (1) 38:7
hanging (2)
    44:15,16
happened (1)
    27:23
happens (1) 72:3
happy (4) 28:23
    61:10,15 82:23
hard (4) 16:11
    31:13 38:16
    69:11
Harris (147) 2:4,
    7,8,9 5:15,15,
    21 6:4 7:7,23
    8:10 9:1,20
    10:8 11:5,21,
    23 12:10,14
    13:7,14,21,23
    14:10 15:23
    18:1,14,20,24
    19:10,17,23
    20:12,19 21:3,
    7,19 22:2,8,
    14,24 23:5,12,
    16,22 24:4,15
    25:10,11
    27:14,14,21

28:1,24 29:6
30:8,20 31:2,
21 32:3,10,20
33:5,12,15
34:3,19 35:14
37:10,17
38:13,18
39:21 40:17
41:6,11,16,19
42:10,18 43:6,
10,11,12
45:20 46:2,8,
15 47:7,14,21
48:2,6,20
49:5,11,14
50:6,10,17
51:2,7,14,21
52:1,5,11,15,
19 53:1,19,23
54:3,16 55:2,
10,23 56:10,
16 57:2,11,23
58:5,11,20
59:17 60:6,12,
20 61:8,10,14,
19 62:17,18
65:10,10,18
66:9,15,22
77:16 81:20
82:9,20 83:3
89:4
Harris's (1) 14:23
hear (5) 42:9,13
    59:15 68:1,2
hearing (15) 7:21
    8:15,22,24
    19:24 20:14
    32:12 64:17
    65:3,21 73:13
    81:13 84:18
    87:12,24
heavily (2) 71:15
    81:1
held (1) 79:1
hell (1) 51:11
hell-or-high-water (1)
    4:6
hereafter (1) 24:8

high (1) 51:12
higher (16) 5:1
    25:8 28:18
    29:11,12,17
    30:18 31:16
    35:6,9 37:16
    63:13 64:23
    67:12 72:16
    74:12
highest (10) 16:5
    17:22 36:23
    67:3 80:16
    83:11 84:8
    85:10 86:20
    89:9
highly (1) 78:8
hire (1) 22:5
history (1) 36:6
hold (3) 8:7,8
    42:14
holder (1) 24:24
holders (3) 11:19
    78:6,24
holding (3) 9:12,
    13 58:17
Holdings (12) 5:9
    15:16 19:11
    20:20 21:20
    22:3,17 23:13,
    17,19 24:2
    57:22
hole (6) 76:10
    78:12,16
    79:10 80:9,20
honest (1) 31:5
hook (1) 10:10
hopefully (1)
    10:16
hotly (1) 84:17
hour (1) 4:11
hours (1) 53:12
HSR (2) 16:13
    18:6

**I**

IBT (11) 22:4,9,
    12,14,21

23:17 36:10
44:1 47:15
55:6 56:11
IBT's (1) 39:12
idea (3) 22:20,
24 81:3
identical (10)
37:20 45:22
46:5,9 47:1
48:10 51:17
55:17 59:15,23
identified (4) 9:15
10:13 48:5
79:24
identify (1) 10:5
identifying (1)
80:1
ignorance (1)
50:13
illuminate (1)
53:24
implication (1)
59:19
importance (1)
61:5
impose (1) 55:1
imposed (1)
77:20
improperly (1)
38:22
improved (1)
29:15
imputed (1) 60:14
inappropriate (2)
36:4 39:4
include (12) 3:2
5:18 13:18
43:19 52:8
58:2,3 62:20
75:3 76:11
77:7 83:24
included (3) 4:8
36:9 44:6
includes (3)
65:22 78:10,
17
including (8) 8:4
44:3 59:7

73:17 76:21
78:13 80:23
83:16

**increase (5)** 2:21
17:9,14 25:13
63:2

**increases (1)**
20:22

**increasing (3)**
25:15 44:20,
23

**indeed (2)** 68:12
71:21

**independent (4)**
3:15 51:3
56:15 58:18

**indicated (2)** 64:2
71:6

**indicates (1)** 38:4

**indirectly (1)**
78:21

**industry (1)** 71:7

**information (8)**
3:9 7:20 32:2
59:7,7 64:13,
21 72:9

**inside (1)** 48:22

**instances (1)**
29:16

**instead (2)** 26:21
27:3

**instruct (1)** 31:6

**insurance (1)** 2:17

**intend (4)** 20:20
48:2,8 59:6

**intended (2)**
18:10 68:10

**intending (1)** 29:4

**intends (1)** 49:15

**intention (3)**
13:17 21:20
60:21

**interest (6)** 23:17,
18 24:1 38:5,
8,9

**interests (1)** 22:17

**internal (1)** 47:14

**International (1)**

24:20

**interrelationship (1)**
75:9

**into (11)** 7:12
9:11 11:8
14:18 22:11
26:14 70:11
74:6 75:10,14
80:22

**involve (1)** 66:2

**involved (1)** 33:3

**irrelevant (3)**
21:1 22:1,7

**irrevocable (3)**
19:24 76:8
77:23

**issue (8)** 34:14,
20 36:6 39:3
40:6,11 62:1,4

**issues (9)** 30:1
31:12,20
32:13,17
35:24 37:3,14,
14

**item (1)** 84:16

**iterative (1)** 53:4

**J**

**Jack (42)** 5:2,4,
9 6:15 13:3,
24 14:23 15:1,
5,15 16:2,9
17:9,15,22
19:11 20:19
21:19,23 22:2,
17 23:12,16,
19 24:1,17
25:7 26:2,7
28:20 32:8,23
35:3 42:15
47:7 57:22
63:14,16
67:22 79:12,
13 81:1

**JCT (12)** 29:18
33:16 34:5
38:6,22 39:14

44:6,12 45:4
51:17 55:18
57:3

**JCT's (1)** 55:10

**Jess (15)** 5:9
6:8 15:15
26:6 42:15
47:6 51:23
57:21 63:16
64:16 65:18
67:6 68:5
86:21 87:10

**John (1)** 59:12

**joining (1)** 84:6

**June (1)** 68:9

**K**

**keep (2)** 48:4
87:21

**KELLEY (4)**
23:10 65:8
66:20 88:3

**kind (2)** 24:15
55:15

**KLYMAN (29)**
6:23,24 7:19
8:1,23 9:9
10:4,21 11:18,
22 12:6,12,21
54:19,20 55:7,
19 56:7,14,20
57:6 58:14
67:11 73:14,
22,24 74:11
87:21 89:2

**knife (1)** 68:20

**knowing (1)** 88:12

**known (1)** 40:17

**knows (1)** 75:14

**L**

**labor (3)** 14:8
72:12,14

**lack (2)** 58:17
88:5

**language (12)** 4:7,

10,12,16,18
26:21 45:5
81:18 82:6,18,
19 83:4

**last (15)** 3:24
4:4,15,23
6:11 13:15,22
14:1 17:6
34:23 40:24
44:19 53:2,12
67:15

**late (1)** 34:23

**latest (1)** 76:12

**Latham (1)** 6:24

**lead (1)** 86:4

**leads (1)** 85:7

**leans (1)** 80:24

**lease (2)** 58:7
60:14

**least (7)** 16:5
19:13 30:9
52:11 69:12
71:1,6

**leaves (1)** 45:9

**leaving (1)** 55:11

**left (1)** 85:12

**legacy (1)** 55:15

**legal (4)** 59:19,
20 73:21 79:16

**legislation (2)**
26:16 45:8

**lender (7)** 39:7
78:19 85:5,9,
12,16 89:1

**lenders (23)** 5:23
12:3,5 25:9
26:1 28:17
29:10 37:19
44:12 57:18
63:7 73:19
74:3,17 76:5
79:1 80:19
85:19,22 86:2,
7,18 89:9

**less (5)** 52:16
60:14 71:8
80:10 86:3

**lessors (1)** 3:13

**letter (1)** 38:23

**liabilities (5)** 3:7
10:6 11:8,16
49:17

**liability (5)** 21:12,
13 45:6,10
55:11

**lien (10)** 5:23
24:24 25:1
44:12 57:18
63:7 78:19
79:1,1 85:24

**light (3)** 29:12
61:5 85:3

**likely (2)** 59:19
84:19

**likened (1)** 68:19

**limitation (3)** 8:5
73:17 80:23

**limited (6)** 6:17
20:5 45:6
51:12,14 83:17

**line (2)** 24:15
48:7

**liquidated (9)**
21:4 44:4
51:15 53:21
56:22 57:2,8
62:21 63:2

**liquidation (3)**
16:18,21 19:2

**list (2)** 13:20
75:15

**listing (1)** 59:14

**literally (1)** 86:13

**litigated (1)** 78:8

**litigation (4)**
65:15 66:1,
10,17

**little (2)** 2:11
86:10

**LLC (1)** 11:20

**long (4)** 28:11
40:18 61:5
77:18

**look (1)** 39:5

**looking (3)** 4:14
26:11 69:15

**looks (2)** 10:2
19:8
**loop (1)** 87:22
**lose (1)** 56:24
**losing (3)** 71:24
72:4,19
**lot (5)** 28:12,14
34:13 88:3,6

**M**

**MAE (1)** 17:1
**maintain (1)** 21:3
**majority (1)** 78:24
**making (3)** 11:11
21:16 44:19
**management (5)**
65:7,17,23
66:3,18
**management's (1)**
66:13
**managers (1)**
65:16
**mandatorily (1)**
80:13
**many (3)** 36:14
71:24 84:6
**March (2)** 26:23
28:3
**Mark (7)** 2:2
4:23 25:10
38:1 41:16
43:11 64:15
**Martin (4)** 16:24
18:22 19:4
26:22
**Master (3)** 43:20
45:16 49:1
**material (10)**
14:8 16:16
26:19,20
46:18 75:6
77:14 80:4,6,
22
**matter (4)** 47:15
62:5 73:16
77:17
**maturity (1)** 43:24

**maximize (2)**
33:9 34:6
**may (15)** 2:10
7:23 8:18
11:9 12:15
24:7 28:23
37:20 39:19
50:12 52:14,
15 69:1,1 81:5
**maybe (4)** 67:17
75:13 79:21,23
**mean (6)** 6:2 9:2
28:2 34:9
61:14 82:20
**meant (1)** 23:16
**measure (1)** 19:6
**meet (2)** 3:10
6:17
**meeting (1)** 40:22
**meets (1)** 35:17
**member (2)**
65:23 66:3
**members (1)** 12:1
**memorandum (1)**
72:10
**memorialize (1)**
8:3
**mentioned (1)** 7:2
**met (1)** 15:7
**Michael (5)** 13:6
14:11 51:8
67:7 84:13
**midnight (3)**
19:16,19
42:19
**might (2)** 43:16
56:24
**million (28)** 2:18
17:10,11 18:8,
10,11,12,13,
18 21:5 44:21
45:11 51:16
54:5,9 57:1,
17,19 58:7
60:8 63:3,4,4
64:3 69:14
80:17 85:12,20
**mind (3)** 47:23

71:24 72:4
**minimum (1)**
86:15
**minute (1)** 24:10
**mirror (1)** 44:5
**missed (1)** 54:21
**modification (6)**
16:15 26:17,
18 45:3 62:15
80:10
**modifications (8)**
2:6 4:1,19
10:22 16:12
18:5 26:3 70:3
**modified (11)**
5:13 20:3
30:3 31:1
43:14 62:19
67:2 68:19
70:1 79:8,8
**modify (8)** 16:10
54:9 71:17,19
73:5,5 87:5,6
**moment (3)**
54:12 67:7,16
**Monday (2)**
32:16 33:1
**money (2)** 69:19
72:19
**months (2)** 60:9,
14
**more (11)** 9:19,
19 10:5 15:17,
19,20 39:9
52:15,22
68:22 69:6
**Moreover (1)**
85:15
**morning (1)** 4:16
**morph (1)** 79:18
**most (6)** 2:6
26:1 28:17,20
29:9 32:9
**move (1)** 22:11
**much (1)** 45:11
**must (4)** 5:19
17:15 35:9
36:16

**N**

**NAMATA (2)**
45:19 54:21
**name (3)** 45:16,
20,21
**National (3)**
43:20 45:15
54:21
**nebulous (1)**
80:12
**necessary (4)**
33:8 43:16
73:1 88:1
**need (6)** 19:5,7
49:19 61:17
67:3,16
**needed (1)** 54:11
**needs (1)** 56:5
**negotiate (3)**
38:2 59:21
60:1
**negotiated (1)** 6:6
**negotiating (9)**
14:15 15:3
39:18,24
42:23 47:19
81:15 83:8,15
**net (3)** 16:18,20
27:17
**New (28)** 11:14,
19 13:11
21:11 25:12
28:5 30:23
45:24 46:3,9,
10 47:10 48:3,
9 53:16 54:24
55:2,8,13,21
56:15 57:1,12
59:15 60:1
64:5 89:4,6
**NEWCO (1)**
70:12
**next (5)** 3:20
10:18 33:1
41:1 65:21
**night (7)** 3:24

4:4,15,24
6:12 13:15
86:19
**Nobody (2)**
36:20,21
**non-cash (3)**
78:10,13,17
**none (6)** 23:1
56:14 65:8,11
66:15 76:14
**noon (2)** 19:14
87:8
**Nor (2)** 30:24
86:19
**note (2)** 9:4 45:2
**noted (2)** 16:24
84:7
**notice (4)** 7:15
21:14 40:4
89:16
**notices (1)** 84:19
**number (6)** 16:8
29:19 31:10
47:9 60:15
83:21
**numbers (3)**
16:23 22:5
58:9

**O**

**object (3)** 65:2
68:16,17
**objection (2)**
77:20 87:7
**objections (8)**
7:18 71:9
73:11 84:6,11
87:2,16,18
**obligated (5)**
48:11 57:8
59:20 83:19,21
**obligation (2)**
3:18 44:11
**obligations (6)**
3:11 15:7
47:2 48:1
83:13,23

**obtain (2)** 31:18
78:23
**obtained (1)** 79:3
**obviously (14)**
12:20 31:10
34:10,12
35:10 37:23
53:4 59:6
61:21 70:6
72:24 82:11
83:5 87:3
**occur (1)** 7:8
**o'clock (2)** 34:16
86:18
**off (12)** 6:23
15:9 16:22
19:18 24:9
27:17 31:11
35:13 42:8
67:18 70:12
72:16
**offer (10)** 14:18,
19 15:8 26:1
43:5 77:23
78:10,14,17,21
**offered (2)** 24:19
54:5
**offering (1)** 11:3
**officers (2)** 22:16
66:4
**official (1)** 84:14
**once (2)** 10:20
67:14
**one (37)** 3:23
4:3 8:8 9:12
10:10,23 11:6,
10,11 12:11,
13,14 13:22
14:1 16:8
19:7,12 24:10
27:15 40:13
41:16 45:2
48:23 49:14
51:9 54:12
56:20 57:22
58:14 59:13
62:15 63:18
67:16 73:14

74:24 75:12
84:8
**one-half (1)** 18:7
**ones (2)** 59:24
60:2
**only (12)** 29:15
34:22 39:10
46:1 48:19
50:3 51:6
62:6 65:23
69:15 71:2
85:19
**op (7)** 75:8
76:24 77:10
79:19,22,22
80:8
**open (1)** 34:11
**opening (1)** 5:2
**operated (1)**
21:22
**operating (22)**
48:9 50:5,23
51:1,5 52:4
54:15,17 58:1,
16 60:5,7,10,
11,17,24
63:23 70:14
72:17 77:2,12,
15
**operations (1)**
72:18
**operative (1)** 14:3
**opinion (2)** 73:15,
21
**opportunity (3)**
7:17 41:23
62:8
**oppose (1)** 67:11
**opposed (1)** 55:8
**opposition (1)**
30:5
**option (3)** 69:7
80:16 85:18
**oral (5)** 22:3,8
23:22 55:19
86:17
**order (9)** 30:22
31:23 32:16

33:9 35:9
36:17 83:5
87:1 88:19
**orderly (3)** 16:18,
21 19:1
**original (1)** 27:2
**others (2)** 85:9
86:13
**otherwise (3)**
28:18 36:16
70:18
**ours (1)** 57:5
**out (14)** 13:16
14:22 26:20
38:2 39:1
44:15,16
54:10 56:10,
11 69:7,18
83:2 84:20
**outcome (1)** 38:8
**outlines (1)** 53:9
**outlining (1)** 8:20
**outset (3)** 26:5
37:4 79:12
**over (9)** 2:7 5:3
15:13 40:21
53:11 62:14
63:14 77:20
88:11
**overall (2)** 10:19
70:4
**overstatement (1)**
2:11
**own (3)** 38:9
70:1 71:13
**owned (1)** 60:22
**ownership (1)**
49:23
**owns (1)** 48:14

**P**

**paid (1)** 60:23
**paper (1)** 19:21
**Paragraph (4)**
68:13 71:21
79:7 87:1
**parent (6)** 43:3

49:2,5,8 50:9,
24
**parochial (1)** 38:9
**part (5)** 46:14
56:17 69:20
78:13 88:19
**partially-owned (1)**
49:20
**participants (1)**
78:20
**participated (2)**
72:1 88:11
**participating (1)**
79:2
**participation (1)**
28:10
**particular (2)**
32:13 85:16
**particularly (2)**
78:8 80:7
**parties (5)** 45:17
71:2 78:20
82:4 84:20
**party (3)** 38:3,8
45:23
**past (1)** 70:20
**patience (1)**
41:14
**pay (4)** 16:12
30:13 39:9
85:19
**paying (2)** 57:7
60:17
**payments (2)**
58:8 66:12
**pending (2)**
42:16 65:19
**pension (2)** 4:1
5:11
**people (3)** 41:1
42:11 88:7
**percent (11)**
16:20 18:9,
11 27:3,4,6,
16,21 28:4,5,6
**percentage (2)**
54:1,2
**perform (2)** 77:3

80:18
**performance (17)**
3:11,17 4:7
10:14 44:8
51:20,22
62:23 64:18
69:12 70:20,
21,21,22
76:22 80:15
86:8
**period (2)** 7:9
37:7
**periods (1)** 21:14
**permit (1)** 30:23
**permitting (1)**
80:11
**person (2)** 20:13
57:15
**personal (1)**
71:22
**perspective (5)**
9:5 37:1 70:6
73:4 77:17
**phone (1)** 40:19
**pick (1)** 66:12
**picking (1)** 21:11
**place (1)** 72:17
**placed (1)** 11:9
**plan (1)** 4:1
**plans (1)** 5:11
**please (2)** 29:6
87:21
**pledge (2)** 73:18
74:3
**pm (5)** 17:20
42:20 87:3,15
89:19
**point (13)** 5:10
6:14 7:13
14:22 20:16
24:14 30:2
37:24 53:4,8
67:21 72:7
87:4
**points (1)** 16:2
**pool (2)** 8:7,8
**pools (1)** 75:14
**portion (2)** 3:18

11:13
**position (4)** 13:4
    40:10,14 67:4
**possible (1)** 31:5
**possibly (1)** 42:1
**post-closing (3)**
    8:19 21:22
    65:7
**potential (7)** 2:6
    13:18 21:1
    22:10 30:12
    45:9 46:19
**potentially (1)**
    34:6
**practical (1)** 62:5
**precondition (2)**
    50:15,18
**predecessor (1)**
    13:16
**preferred (1)** 38:4
**pre-lease (1)** 58:6
**preliminary (1)**
    10:17
**prematurely (2)**
    36:2 38:20
**premiums (1)** 2:17
**prepare (1)** 87:24
**prepared (7)** 26:9
    31:22 32:5,7
    35:8,18 39:9
**prepetition (1)**
    78:24
**present (4)** 37:3
    43:13 62:7
    77:7
**presented (5)**
    26:12 37:21
    62:5 68:18
    70:5
**presenting (2)**
    71:19 72:5
**preservation (1)**
    49:3
**Presumably (1)**
    82:15
**previous (3)**
    29:12 44:21
    62:20

**previously (9)**
    25:16,18
    52:7 63:9
    68:15 69:13
    70:5 81:9
    83:18
**price (9)** 3:19
    10:11 11:12
    17:10,14
    25:15 30:13
    44:20 57:14
**pricing (1)** 20:22
**primarily (1)**
    31:18
**primary (1)** 29:20
**principally (1)**
    33:16
**principals (1)** 42:1
**prior (14)** 7:9,21
    8:14,21 11:17
    21:14 26:3
    33:17 37:7
    62:16,19
    67:22 69:5
    75:22
**probably (5)** 7:24
    8:19 16:11
    71:15 84:18
**procedure (1)**
    40:2
**procedures (26)**
    12:24 20:1,3
    33:6 36:9,11
    39:20 40:12
    64:19 65:1
    68:12,24 70:2
    71:13,14,18
    74:15 76:9
    77:19 78:9
    79:5,14 87:1
    88:5,15,19
**proceed (1)** 69:3
**proceedings (2)**
    53:9 89:18
**process (6)** 9:8
    10:19 16:10
    34:12 35:12
    84:24

**project (1)** 58:7
**projected (2)**
    58:6 60:7
**projections (4)**
    64:3,6 72:7
    77:6
**prop (5)** 75:9
    77:10 79:22,
    23 80:8
**property (3)**
    58:17 60:23
    77:11
**proposal (3)**
    15:24 17:14
    19:4
**propose (1)** 53:16
**proposed (5)**
    4:12 16:6
    30:18 52:24
    70:7
**proposing (2)**
    52:2 58:3
**provide (10)** 3:9,
    15 4:9 7:3,13,
    14 59:6 61:6
    81:21,24
**provided (9)** 4:11
    7:6,20 25:19
    30:21 65:20
    68:14 81:18
    86:9
**provides (3)** 3:3
    80:20 87:2
**providing (2)**
    61:13 76:21
**provision (20)** 4:6
    13:24 16:17
    21:4 44:4,8
    46:24 51:15,
    20,22 55:24
    56:22 57:3,9
    62:21 63:2
    69:12,16 74:4
    80:3
**provisions (5)**
    21:8 75:6
    78:7 79:6 86:9
**public (2)** 89:12,

13
**punch (1)** 48:7
**purchase (35)** 3:2,
    19,23 4:8,14
    6:4 7:7,16 8:3,
    12 10:9,11
    11:2,12 12:19
    14:19 16:3,9
    17:10,14 21:9,
    10 25:14 26:9
    36:13 37:5,18
    39:20 40:2
    43:19 44:20
    53:3 57:14
    70:8 74:24
**purchased (1)**
    2:21
**purchaser (22)**
    2:19 3:4,8,9
    7:2,12,20
    10:10 13:10
    49:9,15 50:7,
    9 57:12 64:6
    73:18 74:2
    75:11 76:1
    83:18,19 84:1
**purchasers (7)**
    3:6 5:14,19
    9:22 13:18
    49:16 64:2
**purchasing (1)**
    50:2
**purportedly (1)**
    77:1
**purpose (1)** 59:9
**purposes (1)** 59:2
**pursuant (1)**
    23:23
**put (14)** 2:14
    4:20 25:8
    26:4 29:7,9
    40:3 45:3
    57:17 64:16
    67:13 81:6
    82:21,21
**putting (4)** 10:15
    26:14 31:4
    53:11

**Q**

**qualified (17)**
    12:23 13:1
    14:13 20:4
    29:16 32:23
    36:18,22 47:5
    67:12 74:13
    75:19 76:13
    78:22 81:11
    86:14,19
**qualifying (2)** 5:1
    28:14
**quantify (2)**
    31:13,22
**quick (1)** 51:9
**quickly (2)** 10:16
    19:8
**quite (1)** 41:7
**quote (1)** 51:11
**quoted (1)** 40:7

**R**

**raised (2)** 36:10
    83:17
**ratably (1)** 57:19
**rather (3)** 32:4
    39:13 55:14
**rationale (1)** 29:8
**reach (1)** 42:12
**reached (2)**
    56:10,11
**reaching (1)** 37:8
**react (1)** 31:7
**read (3)** 19:13,
    15 76:16
**reads (1)** 39:22
**real (5)** 9:8,12
    48:14 61:24
    84:3
**really (3)** 47:16
    51:24 66:7
**reason (1)** 29:20
**reasons (6)**
    29:20 81:8
    84:5,6 85:8

86:12

**rebid (1)** 35:11

**received (2)** 16:6
40:19

**recent (6)** 2:6
26:1 28:17,20
29:9 32:9

**recently (1)** 32:12

**recess (5)** 15:11
24:11 25:22
43:7 62:12

**reconfirmed (1)**
40:8

**reconvening (1)**
2:3

**record (39)** 2:2,
14 4:20,24
5:8 6:24 9:5
13:2 15:10,13,
14 21:18
24:10 25:2,19,
24 26:4 29:7,
7 31:11 32:11
35:13 38:3
40:17 41:5
42:8 43:9
45:4 50:21
53:11 54:19
61:22 62:14
63:21 67:14
76:17,24 81:8
86:2

**reduction (2)**
53:22 54:7

**refer (2)** 40:12
43:2

**reference (2)**
39:19 45:7

**referred (3)** 4:5
26:22 39:21

**referring (2)** 8:6
26:21

**reflected (1)**
84:11

**reflecting (2)** 8:5,
12

**reformulate (3)**
30:23 32:17

35:16

**refunds (1)** 2:17

**regard (1)** 47:3

**regarding (3)**
31:11 65:6,14

**reimburse (1)** 18:7

**rejected (1)** 81:11

**related (2)** 70:23
78:20

**relates (2)** 10:8
26:18

**relating (3)** 21:11
32:13 46:19

**relation (3)** 40:1
82:8 83:10

**relationship (3)**
8:6 77:9 80:7

**relationships (3)**
8:17,21 22:18

**relative (8)** 3:24
6:10 13:4
16:2 35:24
41:22 45:4
52:23

**relevance (1)** 9:8

**relevant (1)** 10:18

**relying (1)** 77:5

**remain (1)** 43:17

**remainder (1)**
64:11

**remedy (2)** 70:9
80:15

**removed (1)** 5:14

**renew (1)** 71:9

**repeat (1)** 55:1

**replace (1)** 18:11

**representation (1)**
12:8

**representative (1)**
29:22

**representatives (3)**
6:18 34:15
35:4

**request (5)** 20:20
32:14 33:1
46:16 61:4

**requesting (1)**
40:21

**require (1)** 79:6

**required (7)** 20:1
49:3 60:18
75:4 76:9
85:19 88:20

**requirement (7)**
5:18 36:14
56:23 75:23
76:11 88:12,14

**requirements (2)**
35:17 36:15

**requires (2)** 80:3,
9

**requisite (18)**
12:3 25:9
26:1 28:17
29:10 37:19
39:7 85:5,9,
12,16,19,22
86:2,7,18
89:1,8

**reservation (2)**
40:1,5

**reserve (7)** 14:12,
16 24:6 39:5
73:10,11 81:12

**reserves (3)**
12:21 13:3
83:9

**reserving (3)**
88:7,9,13

**resolves (1)** 10:2

**respect (22)** 3:6,
18 4:20 7:4
8:16 11:7
12:22 20:21
22:4,9 24:7
31:23 32:21
37:3 38:7
45:4 53:14
54:24 58:15
68:9 88:10,13

**respectfully (1)**
86:15

**respond (2)** 6:19
25:24

**responded (1)**
41:1

**response (3)**
14:22 15:17
17:4

**responsible (3)**
11:11 57:10,
13

**rest (2)** 76:15
85:21

**restate (2)** 35:7
46:6

**result (4)** 9:11
28:19 33:3
62:24

**resulted (1)** 2:13

**review (2)** 16:22
19:7

**reviewing (1)** 4:13

**revised (4)** 25:7
42:2 45:13
46:14

**Richard (11)**
14:14 38:11,
13 39:16
42:22 47:18,
22 49:22 61:3
81:15,21

**Right (21)** 11:21
14:12 21:15
23:18,24
25:20 27:12
28:1,7 32:4,
21 46:13,20
51:19 52:21
54:3 58:23
61:2 62:10
73:11 88:16

**rights (20)** 3:4
11:3,7 12:22
13:3 14:16
24:7 29:2
39:6 40:1,5
53:6 59:5
73:10 81:12
82:7 83:9
88:8,10,13

**rigs (7)** 9:13
16:19 27:7,9,
18 60:19,21

**risk (2)** 30:22
31:17

**risks (2)** 70:9
85:4

**Robert (3)** 6:24
9:2 54:20

**Ronco (1)** 68:20

**room (2)** 24:6
65:24

**Roth (6)** 2:9
5:16 25:12
43:12 62:18
65:11

**roughly (1)** 58:6

**run (1)** 68:17

**S**

**sale (14)** 7:22
8:15,22,24
9:8 10:19
19:24 20:14
64:17 65:1,3
73:13 84:18
87:2

**same (20)** 12:16,
18 13:4,23
14:24 22:13
29:14 40:8
43:22,23,24,
24 47:20
49:24 55:5
56:23 57:5
60:13 67:9
85:2

**satisfactory (1)**
4:10

**satisfy (3)** 35:23
70:18 74:15

**Sawyer (1)** 41:2

**saying (4)** 48:15
52:13 72:14
79:21

**scenarios (1)**
47:10

**schedules (2)**
52:20 75:4

**Schulte (7)** 2:9

5:16 25:11
43:12 62:18
65:11 73:15

**scrapped (4)**
27:7,10,19
28:5

**second (6)** 3:1
16:15 18:21
24:24 26:18
44:2

**Section (11)** 3:5,
22 14:20 16:8
26:13 45:5
68:13 70:19
74:15 76:20
79:5

**secured/unsecured (1)**
63:6

**security (1)** 51:13

**seek (2)** 62:22
73:12

**selected (1)** 75:21

**selection (1)**
89:12

**sell (3)** 68:10
77:14,14

**sellers (2)** 3:10
14:7

**sells (1)** 10:20

**SELTZER (34)**
14:14,14
38:11,12,16
39:11,16,16
42:22,22
47:18,18,23
48:4,13 49:1,
7,13 50:1,8,
11 56:4 61:3,
3,9,12,17
81:14,15 82:2,
17,24 83:7
89:11

**senior (5)** 65:7,
23 66:3,13,17

**sense (1)** 17:7

**sent (1)** 84:20

**sentence (1)** 48:7

**separate (1)** 11:1

**separately (1)**
47:22

**set (8)** 3:22
9:18 25:16,18
34:5 38:22
47:12 64:5

**setting (1)** 75:8

**settlement (3)**
65:19,21,22

**several (1)** 18:1

**shall (5)** 13:10
14:7 78:22
79:7 80:10

**SHAPIRO (1)**
58:10

**share (2)** 12:7
17:3

**sheet (1)** 2:18

**sheets (2)** 8:19
75:5

**showing (1)** 59:9

**sign (18)** 43:20
45:21,24
46:10,24 48:3,
9 49:3 50:2,7
52:2 54:23
55:2,21 56:1,
15,19 59:23

**signatory (2)**
14:24 48:19

**signed (8)** 6:9
12:18 37:17,
22 46:22
53:15 67:18
82:14

**significant (2)**
37:15 70:8

**signing (2)** 48:24
57:13

**similar (4)** 21:12
24:5 55:10,17

**Simon (1)** 39:17

**single (1)** 84:16

**sister (2)** 50:24
51:3

**sit (3)** 18:24
58:23 61:15

**sitting (4)** 23:9

32:3 65:24
75:12

**situation (1)** 70:10

**six (1)** 41:1

**skeletal (1)** 48:16

**sold (1)** 16:7

**sole (2)** 73:6
75:12

**someone (1)**
64:22

**sometimes (1)**
19:18

**somewhat (1)**
35:15

**somewhere (1)**
58:8

**soon (4)** 9:1
42:12 81:22,24

**sorry (3)** 41:17
66:6 88:18

**sounds (1)** 56:5

**speak (4)** 6:7
9:3 32:22
71:23

**speaking (1)** 66:7

**speaks (1)** 19:22

**special (4)** 17:18
67:18 73:24
74:6

**specific (11)** 3:17
4:6 10:14
22:5 44:7
51:20,22
62:22 69:12
80:14 86:8

**specifically (4)**
68:13 70:2
71:15 80:18

**Spectrum (27)**
3:16 11:4,24
15:21 24:23
26:12 32:14
47:13 57:16
63:22 65:6,14,
16 66:19 67:2
68:18 71:6,10,
16 73:4 75:13
79:18 80:12,

16 81:10
88:23 89:8

**Spectrum's (1)**
52:24

**spent (1)** 37:7

**spin (2)** 35:15
70:12

**splitting (1)** 72:16

**stalkinghorse (1)**
62:8

**standing (2)**
20:15 39:10

**stands (2)** 63:8
67:22

**STARK (2)** 67:20
74:5

**start (1)** 20:6

**started (1)** 20:4

**state (3)** 63:20
75:20 85:17

**stated (5)** 4:23
15:22 30:5
68:15 81:8

**statement (3)**
38:14 67:7
77:23

**statements (2)**
58:19 76:13

**States (1)** 56:12

**stating (1)** 56:16

**stay (2)** 6:17
42:9

**stellar (1)** 71:8

**step (1)** 84:23

**still (11)** 5:18
9:16,20,24
10:23 14:3,9
45:8 52:19
69:9,18

**stoppage (3)**
14:8 46:12,18

**strike (3)** 14:8
46:20 69:10

**strip-down (1)**
48:16

**structure (4)** 10:2
43:4 57:5
79:18

**suballocate (1)**
11:15

**subject (2)** 10:14
16:21

**submit (3)** 6:21
35:21 67:23

**submitted (12)**
16:3 29:17
34:23 36:19,
20 37:22
43:16 45:12
63:9 68:8
86:17 89:9

**submitting (1)**
68:8

**subsequent (3)**
62:24 70:3
79:21

**subsidiaries (4)**
43:3 49:10,
20,21

**substance (1)**
68:23

**substantial (2)**
85:4,14

**substantively (1)**
44:5

**subtract (1)** 28:4

**subtracting (2)**
27:6,9

**successful (12)**
17:17 20:8,
11,13,23
28:21 30:15
32:6,8 80:21
88:21 89:10

**successors (3)**
43:5 59:20
83:20

**successorship (8)**
40:5 43:1,2
46:23 47:2,24
55:24 83:24

**sue (1)** 69:13

**sufficient (3)** 3:10
31:15 38:24

**suggesting (1)**
26:14

summary (2) 7:24
    17:3
supplement (1)
    43:21
supplements (2)
    48:11 55:4
support (6) 3:17
    6:3 73:1
    74:18,19 86:10
supposed (4)
    31:7 64:20
    71:11 75:20
sure (9) 5:7
    15:17 19:8
    31:4 39:12,22
    45:15 50:22
    61:10
surprise (1) 40:11
survival (1) 86:5

T

table (4) 10:22
    15:24 23:9
    29:9
talk (3) 8:17
    61:18 87:13
talked (1) 86:3
talking (2) 3:24
    23:11
tax (1) 2:17
Taylor (4) 16:24
    18:22 19:4
    26:22
Teamsters (14)
    14:15 15:3
    24:20 39:17,
    23 40:22,23
    42:23 46:21
    47:19 52:3
    81:15 83:8,15
telling (2) 35:20
    42:7
ten-minute (1)
    6:16
term (5) 8:19
    47:8,9 58:18
    75:5

terminals (2)
    21:21,24
termination (1)
    46:13
terms (17) 10:3
    25:17 29:14
    35:17,22,22
    37:20 43:24
    46:9 49:18
    50:13 53:9
    62:20 75:6
    80:4,6 85:15
Thanks (1) 43:11
Theo (3) 26:7
    27:15 50:21
theoretically (1)
    33:18
thereafter (1)
    36:24
therefore (1) 47:2
third (3) 3:14
    44:9 79:23
third-party (1) 76:6
thought (1) 23:14
threatened (1)
    66:17
three (5) 9:24
    10:5 16:1
    47:11 53:2
throw (1) 19:18
Thursday (1)
    86:18
timeline (1) 78:14
times (2) 36:23
    53:2
today (22) 17:20
    19:1,14 20:9,
    11 22:1,7
    27:23 33:4,17
    35:8 37:21
    40:9 49:8
    52:8,23 64:21
    68:15 71:10,
    11 75:13 87:3
today's (2) 37:7
    70:21
together (3) 7:14
    10:15 53:10

told (7) 31:12
    33:16 35:7
    41:4 42:8
    58:24 77:5
tomorrow (2)
    84:20 89:16
tonight (3) 19:16,
    20 41:21
totally (1) 5:14
trailing (2) 60:9,
    14
transaction (9)
    30:7 31:18,
    19 52:24 69:9
    70:11 73:16
    76:2 85:6
transformed (1)
    80:13
transition (1)
    22:10
transparent (1)
    34:11
transpire (1) 24:7
treated (1) 55:13
tried (1) 34:10
Troutman (1) 4:13
truck (1) 84:3
trucking (1) 71:7
true (1) 34:20
try (3) 32:16
    41:24 42:11
trying (4) 35:16
    38:2 62:7 83:1
turn (6) 2:7 5:3
    15:13 18:3
    62:14 63:13
turned (1) 32:20
two (18) 8:9
    9:10,12,17,23
    10:5 26:2,8
    34:10 36:23
    49:9 51:3
    58:15 60:4
    71:5 75:10
    84:9 88:11
type (2) 69:22
    72:11

U

ultimately (3)
    12:4 47:12
    69:8
ultimatum (1)
    41:20
unaffiliated (1)
    51:4
unaudited (1)
    76:12
unclear (1) 85:22
under (35) 3:4,
    12 9:17 15:2,
    5 22:11 33:6
    39:8 42:24
    45:5 47:13
    48:11 49:1,17
    55:18 59:5
    64:1 66:13
    71:13 74:1,20,
    22 75:17,19,
    21,24 76:9,10,
    18 77:3,22
    78:16 79:9
    83:13 85:23
underlying (2)
    8:16 9:7
Understood (3)
    13:5 29:3
    60:6
unearned (1) 2:17
unfair (1) 36:3
unfortunate (1)
    84:15
Unfortunately (2)
    84:17 85:11
union (12) 29:22
    30:11,12
    31:20 34:14
    35:3,24 37:3,
    13 41:22
    46:21 82:7
unions (4) 30:3
    55:20 56:8,13
units (2) 13:12
    86:3

Unless (3) 17:21
    78:22 82:13
unquote (1) 51:11
unsecured (1)
    84:14
up (20) 7:8 9:18
    16:13 17:12
    18:8 21:11
    24:14 39:3,3
    47:12 54:5
    57:17 61:11,
    15 64:4 65:21
    66:12 68:4
    71:8 75:8
upon (4) 29:13
    42:3 58:9 74:7
use (1) 2:10
used (2) 47:7,9
using (2) 48:4
    72:6

V

valid (1) 19:11
valuations (1)
    78:15
value (10) 16:19,
    21 19:2 27:9,
    18 30:22 33:9
    34:6 35:17
    77:18
variables (1)
    40:13
various (5) 3:6
    7:4 13:12
    49:23 84:20
vehicle (1) 89:7
version (1) 75:1
versus (1) 16:23
viable (4) 64:15
    68:11 70:18
    72:20
view (5) 29:23
    30:9 39:11
    42:24 48:19
views (1) 10:17
vigorous (1)
    77:20

violation (4)
14:20 68:24
73:7 83:12

**W**

wait (4) 42:9
44:17 68:2,21
waived (1) 14:4
walk-away (1)
69:10
WARN (2) 21:12
45:6
water (1) 51:12
Watkins (1) 6:24
way (9) 27:2
39:1,2,3,10
42:4 44:17
57:5 86:10
week (3) 10:18
40:24 65:21
Weiss (1) 39:17
what's (5) 15:21
48:21 54:1,1
75:14
whatsoever (2)
38:5 77:4
wheels (1) 35:15
wherewithal (1)
79:20
whisper (1) 36:24
whole (2) 10:11
75:8
wholly-owned (1)
49:19
who's (3) 10:10
57:13 84:1
willing (2) 33:19
34:1
willingness (1)
56:17
Wilmington (1)
42:21
wind-down (2)
5:19,22
withdraw (2)
44:10 55:11
withdrawing (2)

13:9 51:11
Within (2) 33:10
78:11
without (14) 8:4
31:2,7 36:24
58:10,11 60:7,
10 70:9,14
73:6,17 79:24
80:23
won (1) 72:2
word (1) 2:10
words (1) 30:1
work (8) 14:8
39:14 46:12,
18 49:3 59:1
61:15 83:3
workable (1)
87:11
worked (1) 6:7
working (4) 4:18
9:2 10:1 52:19
worse (2) 69:5
70:4
writing (4) 61:7,
13 79:15 81:19
written (10) 12:7
22:3,9 23:23
55:20 76:7
78:17,21,23
79:14
wrong (3) 19:15
45:21,21

**Y**

year (2) 20:10
40:21
years (1) 40:18
yesterday (2) 8:7
9:9
Yucaipa (18) 7:1
12:21 23:23
24:21 25:6
28:13 33:2
54:20 63:11
65:20 66:5,23
67:10 68:3
74:11 77:21

79:3 84:7

**Z**

Zabel (3) 2:10
25:12 43:12

**1**

1 (2) 14:20
18:11
10 (3) 21:5
51:16 57:1
10:00 (1) 62:9
100 (6) 17:10
18:9 27:6
28:4,5 85:12
100.5 (1) 44:22
105 (1) 44:21
10-million-dollar (5)
44:4 53:21
56:21 57:8
62:20
11:00 (1) 86:18
11:47 (1) 89:19
1113 (2) 30:1
37:14
11's (1) 71:5
12 (4) 45:11
60:9,14 71:21
12.8b (2) 3:5
59:5
12II (1) 74:15
12III (2) 74:22
75:4
12VI (1) 75:19
12VII (1) 75:24
12VIII (2) 76:10,
16
12X (1) 76:18
12XVII (2) 78:12
79:6
12XVIII (1) 79:7
13 (1) 79:7
14th (1) 36:21
15 (2) 58:8 63:4
15-million-dollar (1)
69:17

18 (1) 78:16

**2**

20 (3) 58:8
63:3 87:1
2012 (1) 26:23
2014 (1) 58:6
20XII (1) 77:22
21 (3) 87:7,11,
14
2-1/2 (1) 2:18
22 (2) 79:5,9
22nd (2) 73:13
87:12
24 (3) 58:7
60:8 64:3
28 (1) 80:9
29 (1) 80:20

**3**

3 (5) 14:20
18:10,12,13,18
30 (1) 40:18
363 (1) 39:8
365 (2) 70:19
76:20
3-million-dollar (1)
16:14

**4**

4:00 (2) 87:3,15
4-1/2 (1) 54:5
45 (1) 69:14
48 (1) 53:12

**5**

5 (5) 57:17,19
63:4 80:17
85:20
5:00 (1) 17:20
50 (1) 18:11
5-million-dollar (4)
54:4 69:7,16
85:18

**6**

6 (1) 21:9
6.3c (2) 26:13
45:5

**7**

7:00 (1) 34:16

**8**

8.15 (1) 16:8
8:30 (2) 42:17,
20
8th (1) 36:19

**9**

9.2i (1) 14:2
9.2n (3) 3:22
13:10,14
90 (7) 16:20
27:4,16,21
28:6 40:10,11
95 (2) 17:11
27:3
95-million-dollar (1)
54:6