## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
|  | Hearing Date: September 10, 2013 at 12:00 p.m. (ET)<br>Objection Deadline: September 3, 2013 at 5:00 p.m. (ET) |
|  | Ref. Nos. 1175, 1320 |

### OBJECTIONS OF JACK COOPER HOLDINGS CORP. TO SALE OF THE DEBTORS' ASSETS TO NEW ALLIED ACQUISITION CO. LLC

Jack Cooper Holdings Corp. ("Jack Cooper"), by and through its undersigned counsel, hereby objects (the "Objections") to the entry of an order approving the sale of the assets of Allied Systems Holdings, Inc. and its affiliated debtors (collectively, the "Debtors") to New Allied Acquisition Co. LLC ("New Allied"), and in support of these Objections respectfully represents to the Court as follows:

### Introduction and Preliminary Statement

1.     As described in detail below, the "auction" conducted by the Debtors on August 14 and 15, 2013 was a sham. The structure of the "successful bid", as described at the Auction and made more manifest with the documents and organizational chart filed with the Court on August 27, is designed to facilitate the future liquidation of the acquired "hard" assets of the

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-220 I 081 ); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0 169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (875688228); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cardin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-03651 00); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.).

Debtors to the detriment of its customers and employees and makes a mockery of an ostensible "going concern" sale process. Jack Cooper's all cash bid was the only "Qualified Bid" and was the only bid evidencing a full commitment to operate the Debtors' assets on a going concern basis, maintain uninterrupted service to the Debtors' customers and preserve almost 2,000 jobs.

2.    At the Auction, instead of having Jack Cooper bid to buy the Debtors' assets on the level and fair playing field approved by this Court, the Debtors repeatedly and impermissibly ignored, waived or modified the bidding procedures for the sole benefit of BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD (collectively "Black Diamond"), and Spectrum Investment Partners LP ("Spectrum", and collectively with Black Diamond, "Black Diamond/Spectrum") as the Requisite Lenders under the Debtors' Prepetition First Lien Credit Agreement.[2]   As a result, Jack Cooper was forced to bid against an unqualified "phantom" transaction that: (i) was not documented and was not supported by any financial information as required by the Bid Procedures; (ii) had a continuously changing deal structure; and (iii) appeared to be a liquidation bid designed to benefit Black Diamond/Spectrum while unfairly disadvantaging the Debtors' customers and employees.    In contrast to Black Diamond/Spectrum's bids at the Auction through New Allied, Jack Cooper's bids were going concern transaction bids which would preserve jobs and maintain operations for the Debtors' customers.  During the two-day Auction, Jack Cooper was the only bidder that submitted a bid the Debtors and the Consultation Parties all agreed was a Qualified Bid and was the highest or best bid; none of the Consultation Parties, or the Teamsters National Automobile Transportation Industry Negotiating Committee as representative for the International Brotherhood of Teamsters (the "Teamsters"), believed that any of the bids presented by Black Diamond/Spectrum through

---

[2] Capitalized terms that are used but not defined in these Objections shall have the meanings ascribed to such terms in the Bid Procedures Order (as defined below) and/or the Bid Procedures.

New Allied conformed to the Bid Procedures, was a Qualified Bid, or was the highest bid or best bid.    This Court should not put its seal of approval on a sale transaction tainted by a clearly defective and unfair process.

3.    In contrast to Jack Cooper's $95 million initial all cash bid, Black Diamond/Spectrum, through separate affiliates of their respective parent organizations, presented an all cash bid with the maximum cash value of only $45 million by the bid deadline of August 8, 2013.    At the Auction itself, Black Diamond/Spectrum abandoned their all cash bid and verbally submitted a credit bid in their capacity as the Requisite Lenders with direction to the Prepetition First Lien Agents.    The Black Diamond/Spectrum Credit Bid (as defined below) was premised on financing derived through a yet to be determined "rights offering" and splitting the Debtors' assets into two companies – one owning the "Axis" assets and all of the "hard" assets (e.g., equipment, vehicles and real property) and effectively controlled by Black Diamond/Spectrum, and the other having limited assets (e.g., the Debtors' current accounts receivable) but being saddled with the Debtors' liabilities under the customer contracts and claims under collective bargaining agreements and the Central States pension plan and owned pro rata by lenders holding claims under the Prepetition First Lien Credit Agreement.[3] Irrespective of the complex financial and corporate structure described at the Auction, the Black Diamond/Spectrum Credit Bid was not accompanied by full and complete documentation and financial information as required by the Bid Procedures at any time during the Auction.[4] However, at the conclusion of the Auction and after the Debtors had waived  the explicit requirements under the Bid Procedures for full and complete documentation, the Debtors

---

[3] The structure of the Black Diamond/Spectrum transaction will almost certainly lead to continued litigation with Yucaipa and the Teamsters.

[4] As noted and addressed in detail below, the Black Diamond/Spectrum Credit Bid described at the Auction has morphed yet again as evidenced by the "final" documents filed in the cases on August 27.  See Notice of Filing Sale-Related Documents filed August 27, 2013 [Dkt. No. 1654].

announced that the credit bid from Black Diamond/Spectrum as Requisite Lenders was the highest and best.  As noted, neither the Committee nor Yucaipa as the Consultation Parties, nor the Teamsters, agreed with the Debtors.  Rather, they believed that Jack Cooper's all cash bid was and is the highest and best.

4.    At the Sale Hearing, this Court may be faced with the unusual circumstance where the Debtors present the credit bid from Black Diamond/Spectrum as the highest and best bid, with the Committee, Yucaipa and the Teamsters arguing that the Debtors are wrong and that Jack Cooper's bid is the highest and best bid and that a sale of the Debtors' assets to Jack Cooper should be approved by this Court.  Jack Cooper agrees with the position which it believes will be advanced by the Committee, Yucaipa and the Teamsters.  Jack Cooper respectfully requests that this Court not approve the sale of the Debtors' assets to Black Diamond/Spectrum pursuant to a credit bid, but otherwise approve as higher and better the sale of the Debtors' assets to Jack Cooper pursuant to an all cash transaction where it will continue to operate the Debtors' business as a going concern and to employ the vast majority of the Debtors' employees, both union and non-union.  Jack Cooper, at no small cost, was able to obtain an extension of committed financing to support its final bid submitted at the Auction on August 15 and, if allowed, is willing and able to engage in a further bid for the Debtors' assets should this Court reopen the Auction based on the Objections presented herein and the evidence which will be presented at the Sale Hearing.[5]

---

[5] As in the past, Jack Cooper's available financing is not open ended as to time, but expires at 11:59 p.m. (New York time) on September 13, 2013 if this Court has not ruled by such date that Jack Cooper is the Successful Bidder for the Debtors' assets.

## Objections

5.    On June 21, 2013, this Court entered an Order (the "Bid Procedures Order")
approving certain Bid Procedures to be used in connection with the proposed sale of the Debtors'
assets.  Black Diamond/Spectrum, as the Petitioning Creditors, participated in the drafting of,
and approved, the Bid Procedures.[6]

6.    The Bid Procedures provide that Qualified Bids to purchase the Debtors' assets
were to be submitted on or prior to 12:00 p.m. (noon) on August 8, 2013. [Bid Procedures, para.
15].  Upon information and belief, two Qualified Bids for the Debtors' assets were submitted
prior to the August 8 deadline: (i) a $95 million cash bid submitted by Jack Cooper (the "Jack
Cooper Bid"); and (ii) a cash bid submitted by Black Diamond/Spectrum (the "Black
Diamond/Spectrum Cash Bid") through a newly formed entity in an amount equal to the sum of
(a) the amount necessary to satisfy the Debtors' obligations under their DIP credit facility, and
(b) the amount needed to fully fund the Debtors' post-closing "wind-down budget."  Upon
information and belief, Black Diamond/Spectrum's bid vehicle, "New Allied", was to be owned
by BDCM Opportunity Fund III, L.P. and Khroma Special Situations Master SPC Ltd. (the
"Initial BD/S Bidders"), affiliates of Black Diamond/Spectrum.  The value of the Black
Diamond/Spectrum Cash Bid as of the August 8 bid deadline was approximately $38.2 million
(i.e., the sum of the wind-down budget and amount outstanding under the DIP facility as of
August 8, 2013).  The Black Diamond/Spectrum Cash Bid was submitted by the Initial BD/S
Bidders in their individual capacities and not in their capacity as the Requisite Lenders directing
the Prepetition First Lien Agents.

---

[6] The Bid Procedures as approved came after this Court summarily denied Black Diamond/Spectrum's efforts to be
the "stalking horse" bidder for the Debtors' assets and following mediation to develop the Bid Procedures.

7.    The Bid Procedures provide, in the event two or more Qualified Bids are received, that the Debtors shall conduct an Auction on August 14, 2003 at 10:00 a.m.  [Bid Procedures, para. 18].  Prior to the Auction, the Debtors: (i) confirmed that the Jack Cooper Bid and Black Diamond/Spectrum Cash Bid were both Qualified Bids; (ii) provided copies of both Qualified Bids to Jack Cooper and the Initial BD/S Bidders; and (iii) notified Jack Cooper and the Initial BD/S Bidders that the Jack Cooper Bid would be the Opening Bid at the Auction.

8.    As soon as the Auction started, Black Diamond/Spectrum requested a "break" to permit them to meet with the Debtors.  [8/14/13 Auction Transcript at p. 11].  Except for two short periods when the Debtors went "back on the record" to permit Black Diamond/Spectrum to attempt to articulate a higher or better competing bid than the Jack Cooper Bid, the requested break essentially lasted 12 hours (until 10 p.m.).

9.    When the Debtors initially reconvened the Auction to permit Black Diamond/Spectrum to present a competing bid (the "Initial BD/S Competing Bid"), the Black Diamond/Spectrum Cash Bid was verbally modified to match certain features of the Jack Cooper Bid.  The purchase price under the Initial BD/S Competing Bid was increased to $95.5 million, comprised of cash in an amount equal to not less than $40.5 million and a credit bid representing the balance of the purchase price.[7]  [8/14/13 Auction Transcript at pp. 12-14].

10.    In addition, counsel to Black Diamond/Spectrum (Adam Harris) described what appeared to be a hastily concocted scheme pursuant to which the acquisition entity formed by Black Diamond/Spectrum, New Allied, would divide the Debtors' assets between two newly to-be-formed entities.  In exchange for the cash portion of the purchase price, one entity

---

[7] By submitting a bid that included non-cash consideration, the Initial BD/S Bidders did not comply with paragraphs 12(xvii) and (xviii) of the Bid Procedures and the bid could not constitute a Qualified Bid. [See Bid Procedures, para. 12 (xvii), (xviii)].  Under the Bid Procedures, any cash bid including non-cash consideration – including the right to subsequently include non-cash consideration in any Qualified Bid – was required to have presented the non-cash consideration for evaluation on July 30, 2013.

("PropertyCo") would acquire the assets of what is generally referred to as the "Axis business", and all the Debtors' owned and leased real property, vehicles, tractors, trucks, trailers and rigs, and the Debtors' related systems and operations.  In exchange for the credit bid portion of the purchase price, the second entity would acquire the Debtors' customer contracts, accounts receivable and other current assets, and would be responsible for hiring the Debtors' unionized employees.  Counsel for Black Diamond/Spectrum referred to the second company as "OpCo." This, however, is a misnomer because this company ("OpCo/LiabilityCo") would house all of the Debtors' obligations to perform under existing customer contracts and would have all employee related liabilities (such as claims and obligations under collective bargaining agreements and related pension claims).  Moreover, OpCo/LiabilityCo would take on the liability of having to lease equipment, rigs and terminals from PropertyCo in order for OpCo/LiabilityCo to be able to perform under any assumed customer contracts.  PropertyCo would be owned by affiliates of Black Diamond/Spectrum, and the First Lien Lenders (other than Yucaipa) would have an opportunity to "participate" in the ownership.  OpCo/LiabilityCo would be owned by the First Lien Lenders pro rata.  [8/14/13 Auction Transcript at pp. 15-16, 29].

11.    The structure of the Initial BD/S Competing Bid to split the Debtors' assets into two separate companies appeared to be designed to accomplish three goals:  (i) allowing the Petitioning Creditors to continue their blood feud with Yucaipa by not allowing Yucapia to participate in the ownership of the Debtors' hard assets; (ii) putting all of the risk of a post-closing business failure on the Debtors' customers and unionized employees; and (iii) in the event of a post-closing business failure or a decision by New Allied not to try to rehabilitate and

operate the Debtors' business, facilitating a liquidation of the Debtors' hard assets for the benefit of Black Diamond/Spectrum.[8]

12.     Not surprisingly, when Mr. Harris finished describing the Initial BD/S Competing Bid, the participants at the Auction (other than the Debtors) had a number of questions regarding the proposal.

13.     When responding to questions, Mr. Harris acknowledged that he had nothing in writing that memorialized the material terms of the Initial BD/S Competing Bid.  [8/14/13 Auction Transcript at pp. 16-17].  He also admitted that Black Diamond/Spectrum had made a bid that now included a non-cash component.  He further stated that there would be an "intercompany relationship developed" between PropertyCo and OpCo/LiabilityCo, but he had no documentation evidencing the relationship and was unable or unwilling to describe the terms of the "intercompany relationship."[9]  [8/14/13 Auction Transcript at p. 21, 37, 39].  Finally, Mr. Harris acknowledged that his clients did not have independent financial projections for purposes of establishing the viability of OpCo/LiabilityCo but said that Black Diamond/Spectrum were relying on the Debtors' projections to establish viability (even though the Debtors have not operated, and cannot operate, their business in this manner).[10]  [8/14/13 Auction Transcript at pp.

---

[8] The idea of Black Diamond structuring an acquisition of the Debtors' assets to facilitate a future liquidation is not foreign to Black Diamond and parties involved in the car hauling business.  Black Diamond's last foray into this business, through its affiliate Black Diamond Commercial Finance, L.L.C., turned out abysmally for Black Diamond and all other parties in interest.  See Performance Transportation Services, Inc., United States Bankruptcy Court, Western District of New York, Ch. 11 Case No. 07-04746 (MJK) (the "PTS Case").  The PTS case resulted in a complete liquidation under chapter 7 with substantial losses to all creditors and the loss of almost 2,000 jobs.  Upon information and belief, the majority of Performance Transportation Services, Inc.'s equity was owned and controlled by affiliates of Yucaipa.

[9] Because the Initial BD/S Competing Bid did not have appropriate documentation evidencing the terms and conditions of the bid, including ancillary documents, the bid did not comply with paragraph 12(iii) of the Bid Procedures. [See Bid Procedures, para. 12 (iii)].

[10] Because the Initial BD/S Competing Bid was not accompanied by financial statements or financial projections relating to PropertyCo and OpCo/LiabilityCo, the bid did not comply with paragraph 12(viii) of the Bid Procedures. [See Bid Procedures, para. 12 (viii)].

39, 51-52].  After Mr. Harris finished attempting to respond to questions, the Debtors again went "off the record."

14.    The second time the Debtors reconvened the Auction, Mr. Harris announced that the Initial BD/S Bidders had, in effect, abandoned their prior bids (whether the initial all cash bid or the hybrid bid announced at the start of the Auction).  Under the new structure described by Mr. Harris, the bid was still being made by "New Allied", but was now a credit bid presented by the Prepetition First Lien Agents acting at the direction of the Requisite Lenders (the "Black Diamond/Spectrum Credit Bid").  [8/14/13 Auction Transcript at p. 40].  Under this scenario, the Prepetition First Lien Agents would sell the equity of PropertyCo pursuant to the terms of an unspecified "rights offering" to raise the cash portion of the purchase price.[11]  [8/14/13 Auction Transcript at pp. 41, 44, 60-61].  The Black Diamond/Spectrum Credit Bid resembled the Initial BD/S Competing Bid in that it preserved the PropertyCo – OpCo/LiabilityCo structure and maintained the distribution of equity interests as previously described.  However, the Black Diamond/Spectrum Credit Bid did change one of the closing conditions relating to the Debtors' collective bargaining agreements and post-closing participation in the Central States pension plan.  In follow on questions, Mr. Harris once again confirmed that he had no documentation evidencing the Black Diamond/Spectrum Credit Bid. [8/14/13 Auction Transcript at pp. 61-62].

15.    When the Debtors reconvened the Auction, they declared that the Black Diamond/Spectrum Credit Bid was a "higher and better bid" than the Jack Cooper Bid. [8/14/13 Auction Transcript at p. 63].

---

[11] Because the Black Diamond/Spectrum Credit Bid did not disclose the identities of the entities that would be participating in connection with the bid or the terms of such participation, the bid did not comply with paragraph 12(x)(i) of the Bid Procedures. [See Bid Procedures, para. 12 (x)(i)].

16.     Yucaipa, as a Consultation Party, disagreed with the Debtors' decision, noting that the Black Diamond/Spectrum Credit Bid violated the Bid Procedures, was not a Qualified Bid, was not a better bid, violated the Prepetition First Lien Credit Agreement, and created serious execution risks due to the structure of the bid. [8/14/13 Auction Transcript at pp. 63-64]. Similarly, the Committee, as a Consultation Party, objected to the Debtors' conclusion, stating that the Black Diamond/Spectrum Credit Bid was not a Qualified Bid and could not be deemed the highest and best bid. [8/14/13 Auction Transcript at p. 81].

17.     Jack Cooper then asked the Debtors a number of questions regarding the Black Diamond/Spectrum Credit Bid.  In response, the Debtors' counsel admitted the Debtors had repeatedly modified (or waived the provisions of) paragraph 12 of the Bid Procedures for Black Diamond/Spectrum, including (without limitation) by not requiring a binding asset purchase agreement or any of the ancillary agreements evidencing the bid (including the agreements evidencing the intercompany relationship between PropertyCo and OpCo/LiabilityCo and the agreement governing the proposed rights offering being presented in conjunction with the Black Diamond/Spectrum Credit Bid).  [8/14/13 Auction Transcript at pp. 67-69].  Jack Cooper's counsel also noted that: (i) the Black Diamond/Spectrum Credit Bid was a credit bid; (ii) paragraph 13 of the Bid Procedures required credit bids to comply with the requirements of paragraphs 12(i) – (xvi) of the Bid Procedures;  and (iii) paragraph 20(ii) of the Bid Procedures provided that the Debtors shall not modify the provisions of paragraph 13 of the Bid Procedures. [8/14/13 Auction Transcript at pp. 74-75].  In response, the Debtors' counsel simply stated (despite the plain language of the Bid Procedures) "[W]e view it differently."  [8/14/13 Auction Transcript at p. 75].

18.    During continued discussion regarding the Black Diamond/Spectrum Credit Bid, it became obvious the Debtors did not understand or have any agreement regarding the closing condition relating to the Debtors' collective bargaining agreements and post-closing participation in the Central States pension plan. [8/14/13 Auction Transcript at pp. 75-77.]  After hearing the Debtors' confusion regarding this issue, counsel for the Teamsters stated:

> "I have absolutely no idea what you just said. . . I have no idea what it means. . . I as a Teamsters representative do not know what this condition means and what it involves.  And I would suggest the debtors find out." [8/14/13 Auction Transcript at pp. 77-78].

19.    After the Debtors reaffirmed their decision that the Black Diamond/Spectrum Credit Bid was a "higher and better" bid (notwithstanding their obvious confusion and Black Diamond/Spectrum's failure to comply with Paragraphs 12(i) – (xvi) of the Bid Procedures), the Auction was adjourned for the evening.

20.    After the Auction was adjourned on August 14, Jack Cooper met with its legal and financial advisors to determine if Jack Cooper was willing to continue to participate in the Auction.  At that time, from Jack Cooper's perspective it appeared the Debtors had spent all of August 14 manipulating the Auction rules and modifying the Bid Procedures for the sole benefit of Black Diamond/Spectrum.   And, Jack Cooper was now being asked to bid against a transaction proposal that was not documented, violated the Bid Procedures, and was not a Qualified Bid.

21.    When the Auction reconvened on August 15, 2013, despite its serious reservations regarding the conduct of the Auction on August 14, Jack Cooper announced several favorable changes to its proposed asset purchase agreement (which had been delivered to the Debtors as part of Jack Cooper's initial bid submission on August 8).  Jack Cooper also increased its bid to $100 million in cash (the "Enhanced Jack Cooper Bid").  However, because

of the irregularities in the conduct of the Auction to that point, Jack Cooper made clear that the Enhanced Jack Cooper Bid was conditioned upon the Auction being closed and Jack Cooper being declared the Successful Bidder by 5 p.m. on August 15, 2013. [8/15/13 Auction Transcript at pp. 16-17].

22.    The Debtors then announced that the Enhanced Jack Cooper Bid was a higher and better bid. No participant at the Auction disputed that the Enhanced Jack Cooper Bid was a Qualified Bid or that it was the highest and best bid. [8/15/13 Auction Transcript at p. 25].

23.    Black Diamond/Spectrum through New Allied then increased the Black Diamond/Spectrum Credit Bid to $100.5 million, by increasing the credit bid component of the bid. [8/15/13 Auction Transcript at p. 25].

24.    Jack Cooper thereafter announced several favorable changes to the language of its proposed asset purchase agreement but the cash purchase price remained at $100 million.  After this announcement, the Debtors stated that the increased Black Diamond/Spectrum Credit Bid was no longer a higher or otherwise better bid and that the Enhanced Jack Cooper Bid (as modified) would be deemed the Successful Bid.[12] [8/15/13 Auction Transcript at pp. 26-28].

25.    Black Diamond/Spectrum then objected to the Debtors' decision, and the ensuing dialogue made clear that the Debtors now had serious concerns regarding the Black Diamond/Spectrum Credit Bid, including with respect to the ability to obtain this Court's approval of the transaction and New Allied's ability to close.  These concerns generally related to employee/union issues and the proposed structure of the Black Diamond/Spectrum Credit

---

[12] In the event the Enhanced Jack Cooper Bid (as modified) had been selected as the Successful Bid, all of the documentation evidencing the bid had been completed and could have been expeditiously filed with the Court within several hours of the closing of the Auction.

Bid.  Black Diamond/Spectrum requested a final opportunity to further modify their bid, and the Debtors agreed to give them more time. [8/15/13 Auction Transcript at pp. 29-42].

26.    When the Auction reconvened, Black Diamond/Spectrum submitted their final credit bid (the "Final Black Diamond/Spectrum Credit Bid").    The Final Black Diamond/Spectrum Credit Bid increased the purchase price to $105 million, by further increasing the credit bid component of the bid, and added a covenant committing to enter into new collective bargaining agreements with the Debtors' various unions.    However, Black Diamond/Spectrum further modified the bid by making two material unfavorable changes and clarified a point with significant negative implications to the Debtors' unionized workforce. First, they eliminated the provisions in their proposed (phantom) asset purchase agreement that required New Allied to serve as a Backup Bidder.[13]    Second, Black Diamond/Spectrum eliminated a provision they had previously agreed to as part of the Auction, which had been described as a "hell or high water" specific performance provision, and reduced the liquidated damages arising from a breach in closing by New Allied from more than $40 million cash to only $5 million cash. [8/15/13 Auction Transcript at pp. 43-45].  The combination of these two unfavorable modifications violated paragraph 20(viii) of the Bid Procedures.    [See Bid Procedures, para. 20 (viii)].  With respect to the new covenant, Black Diamond/Spectrum subsequently clarified that only OpCo/LiabilityCo would be obligated as to any new collective bargaining agreements and pension contribution claims, not PropertyCo or PropertyCo's ultimate parent entity or equity holders.

27.    The dialogue following the submission of the Final Black Diamond/Spectrum Credit Bid evidenced continuing confusion regarding the structure of the bid, the ownership of New Allied, PropertyCo and OpCo/LiabilityCo, and the scope of the newly announced covenant

---

[13] This change violated paragraphs 12(vi) and (xii) of the Bid Procedures. [See Bid Procedures, para. 12 (vi), (xii)].

to enter into new collective bargaining agreements. [8/15/13 Auction Transcript at pp. 45-61]. Among other things, Mr. Harris stated <u>for the first time</u> that PropertyCo and OpCo/LiabilityCo <u>would</u> <u>not</u> have a parent company and would be "<u>completely independent and unaffiliated</u> <u>entities</u>." [8/15/13 Auction Transcript at pp. 50-51] (emphasis supplied).

28.    Irrespective that the Final Black Diamond/Spectrum Credit Bid violated numerous provisions of the Bid Procedures and should not have been considered a Qualified Bid, the Debtors announced that it was a higher and better bid and eventually determined that it was the Successful Bid. [8/15/13 Auction Transcript at pp. 63, 89].    Given that there was no documentation evidencing the bid and no financial statements or projections supporting the bid's convoluted structure, it is unclear how the Debtors were able to make this determination.  This is especially true where heretofore the Debtors, as a whole, have not been profitable, have significant deferred capital expenditures piling up, and where new OpCo/LiabilityCo will be burdened with higher labor and pension costs than included in the Debtors' recent financial projections <u>and</u> will be saddled with new obligations to lease equipment, rigs and terminals from PropertyCo to fulfill OpCo/LiabilityCo's obligations under assumed customer contracts.

29.    In contrast to the Debtors, Yucaipa, as Consultation Party, concluded that the Final Black Diamond/Spectrum Credit Bid was not a Qualified Bid or the highest or best bid, and Yucaipa highlighted the numerous provisions of the Bid Procedures that were ignored, waived or modified by the Debtors for the benefit of Black Diamond/Spectrum.  [8/15/13 Auction Transcript at pp. 74-81].  The Teamsters also agreed that Black Diamond/Spectrum's credit bid was not the highest and best bid and observed that, by signing the Final Black Diamond/Spectrum Credit Bid, the Debtors would be violating their obligations under their existing collective bargaining agreements. [8/15/13 Auction Transcript at pp. 83-84].  Finally,

14

the Committee weighed in stating that by designating the Final Black Diamond/Spectrum Credit Bid as the Successful Bid, the Debtors had "left $100 million dollars in cash" on the table and had put "the future of this company in substantial doubt." [8/15/13 Auction Transcript at p. 85]. The Committee concluded by stating that it does not believe "the oral bid submitted by the Requisite Lenders at 11:00 o'clock on Thursday night equals a qualified bid, nor is it the highest and best bid." [8/15/13 Auction Transcript at p. 86] (emphasis supplied).

30.     The Bid Procedures contemplate that the Successful Purchase Agreement would be signed by the Debtors and the Successful Bidder within two business days after the conclusion of the Auction.  In other words, the Debtors and Black Diamond/Spectrum through New Allied were required to finalize and sign their asset purchase agreement (together with all ancillary agreements, schedules and exhibits) by no later than Monday, August 19, 2013. Because the Debtors allowed Black Diamond/Spectrum to bid at the Auction without any documentation evidencing or supporting their bid, it is not surprising this deadline was not met.

31.     It was only on August 27, 2013 – twelve days following the Auction's conclusion – that the Debtors and Black Diamond/Spectrum finally completed the documents evidencing the Successful Bid (as determined by the Debtors at the Auction over the objection of the Consultation Parties) and filed them in these cases (the "Black Diamond/Spectrum Final Bid Documents").[14]

32.     Even a casual review of the Black Diamond/Spectrum Final Bid Documents reveals that Black Diamond/Spectrum's purported Successful Bid has continued to "evolve" since the Auction.  For example, at the Auction, Black Diamond/Spectrum proposed splitting the Debtors' assets between two companies; however, the Black Diamond/Spectrum Final Bid

---

[14] Limited information regarding New Allied's "adequate assurance package" was not filed until two days later on August 29, 2013.  See Notice of Filing Adequate Assurance Package, August 29, 2013 [Dkt. No. 1712].

Documents provide that the assets will apparently now be divided among five newly formed entities (in addition to New Allied). See Notice of Filing Adequate Assurance Package, p. 4 and Exhibit 1.[15]  Similarly, at the Auction Black Diamond/Spectrum represented that the equity in PropertyCo would be sold pursuant to a "rights offering" made available to the lenders under the Prepetition First Lien Credit Agreement; now, the equity in PropertyCo's parent company (i.e., Axis/Allied LeaseCo Holdings LLC) will be distributed to the first lien lenders who participate in a new $60 million second lien term loan that will be secured by PropertyCo's assets.  Given that PropertyCo's assets will also apparently be used to secure a $20 million first lien revolving credit facility, this means that between August 15 and August 27 PropertyCo morphed from being a newly formed entity with no secured debt to an entity burdened by $80 million of first and second lien secured debt.

33.     The Black Diamond/Spectrum Final Bid Documents reinforce the conclusion that the Debtors' decision, to waive or disregard the Bid Procedures for the benefit of Black Diamond/Spectrum and allow Black Diamond/Spectrum to bid at the Auction without any documentation evidencing their bids, was a colossal blunder.  By not requiring Black Diamond/Spectrum to memorialize the terms of the Final  Black Diamond/Spectrum Credit Bid in writing at the Auction, the Debtors' opened the door for Black Diamond/Spectrum to continue modifying their bid after the Auction by loading up the various to-be-formed designated purchaser entities with secured debt controlled by Black Diamond/Spectrum.  Indeed, the Black Diamond/Spectrum Final Bid Documents reveal that the bid being presented for approval at the Sale Hearing is materially worse than the oral bid announced by the Debtors as the Successful

---

[15] In the documents filed by Black Diamond/Spectrum, there do not appear to be any restrictions on Black Diamond/Spectrum's non-union companies entering into direct competition with unionized OpCo/LiabilityCo.

Bid on August 15 (over the objections of the Consultation Parties, the Teamsters and Jack Cooper).

**Arguments and Citation of Authority**

## I.   JACK COOPER HAS STANDING TO PRESENT ITS OBJECTIONS AND THIS COURT SHOULD ALLOW IT TO BE HEARD

34.     Jack Cooper presents its Objections challenging the intrinsic structure and fairness of the Auction and the proposed sale of the Debtors' assets to Black Diamond/Spectrum.  Here, the Debtors conducted the Auction unfairly and with total disregard for the Bid Procedures to which the Debtors had agreed and which Black Diamond/Spectrum had a hand in crafting. Paragraph 13 of the Bid Procedures specifically provides that any credit bid at the Auction "shall comply with the requirements of paragraph 12(i) – (xvi)" of the Bid Procedures.   [Bid Procedures, para. 13]  (emphasis supplied).  Paragraph 20(ii) of the Bid Procedures provides that "the Debtors shall not modify the rules for the Auction set forth in Paragraph . . . 13 . . . of these Bid Procedures."  [Bid Procedures, para. 20(ii)] (emphasis supplied).   Paragraph 20(ii) further provides that the "Auction procedures must be fairly and evenly administered . . . . "  [Id.]

35.     The Final Black Diamond/Spectrum Credit Bid did not comply with the Bid Procedures and should not have been considered a Qualified Bid because the Final Black Diamond/Spectrum Credit Bid did not comply with Paragraph 12 of the Bid Procedures as follows:

> (a) Failure to comply with Paragraph 12(iii) in that Black Diamond/Spectrum did not present at the Auction a duly executed and binding purchase agreement blacklined to show changes against the form agreement filed by the Debtors;
>
> (b) Failure to comply with Paragraph 12(iii) in that the Final Black Diamond/Spectrum Credit Bid was not accompanied by all exhibits, schedules

17

and ancillary agreements contemplated by the asset purchase agreement, including (but not limited to) any equipment lease agreements or other intercompany agreements between PropertyCo and OpCo/LiabilityCo;

(c) Failure to comply with Paragraph 12(v) in that Black Diamond/Spectrum did not identify executory contracts or leases to be assumed and/or assigned only to OpCo/LiabilityCo;

(d) Failure to comply with Paragraphs 12(vii) and (viii) in that Black Diamond/Spectrum presented no financial information showing the ability of New Allied to consummate the sale, including (but not limited to) any written agreements concerning the proposed "rights offering" to support PropertyCo's purchase of the Debtors' hard assets for purposes of funding the cash required under the credit bid;

(e) Failure to comply with Paragraph 12(x) in that Black Diamond/Spectrum presented no information concerning New Allied, and specifically OpCo/LiabilityCo's ability to provide adequate assurance of the ability to perform under any contracts assigned to it in connection with the proposed sale; and

(f) Failure to comply with Paragraph 12(xi) in that Black Diamond/Spectrum failed to disclose the identity of all entities owning or otherwise controlling either PropertyCo or OpCo/LiabilityCo, the terms of their interests in each entity, and the formation documents with respect to each entity.

36.    Where there has been a wholesale failure to comply with the Bid Procedures by the Debtors and where Jack Cooper's Objections go to the intrinsic fairness of the proposed sale,

then Jack Cooper has standing to present Objections to the transfer of the Debtors' assets to Black Diamond/Spectrum pursuant to the Final Black Diamond/Spectrum Credit Bid. See, e.g., In Colony Hill Associates, 111 F.3d 267, 274 (2d Cir. 1997) quoting, In re Harwald Co., 487 F.2d 443, 444-45 (7th Cir. 1974); In re Beck Industries, Inc., 605 F.2d 624, 634 N. 13 (2d Cir. 1979).    Courts have recognized that unsuccessful bidders can challenge the equity of a bankruptcy sale transaction where the sale is tinged by unfairness and where the challenge is to the "intrinsic structure of the sale". In re Colony Hill Assoc., 111 3F.3d at 277; accord In re Hat, 310 B.R. 752, 758 (Bankr. C.D. Cal. 2004).    Jack Cooper's Objections go to the heart of the Auction process and how it was conducted.    During the two days of the Auction, Jack Cooper's bid was the only bid designated by the Debtors and acknowledged by the Committee and Yucaipa in their capacity as Consultation Parties, along with the Teamsters, as being both a Qualified Bid and being the highest and best bid.    Even following the Debtors' determination at the conclusion of the Auction that the Final Black Diamond/Spectrum Credit Bid was highest and best and was to be deemed the Successful Bid, the Committee, the Teamsters and Yucaipa still stood behind Jack Cooper's all cash bid as the highest and best.

37.    In connection with presenting its Objections, Jack Cooper has been successful in reinstating its committed financing to allow it to continue to present itself as a viable purchaser for the Debtors' assets.    Jack Cooper is the only buyer committed to operating those assets on a going concern basis, maintaining relationships with the Debtors' customers and employing the maximum number of the Debtors' employees, including both its union and non-union employees.    This Court should allow Jack Cooper to present it Objections, which it believes will be joined in by the Committee, the Teamsters and Yucaipa, and deny approval of the Final Black Diamond/Spectrum Credit Bid as the Successful Bid for the Debtors' assets.

38.    With all due respect to counsel and the other professionals representing the Debtors, the conduct of the Auction on August 14 and 15 was a sham requiring Jack Cooper to bid against a phantom transaction, being developed on the fly and for which there were no substantive documents available to analyze or evaluate either the structure of the proposed credit bid or the financial viability of the surviving companies.   Numerous times throughout the Auction, when questioned, Mr. Harris acknowledged that full and complete documentation did not exist:

(a)    "The asset purchase agreement in draft form has been circulated.  It's being negotiated.  As far as I'm concerned, it's being worked on as we speak, as are the ancillary documents.  So, no, Jess, it's not fully documented and signed." [8/15/13 Auction Transcript at p. 6];

(b)    "Well, I think it is our anticipation that we would have the documents reflecting the purchase of the assets from the debtors and the authority to do so and the financing to do so certainly prior to the sale hearing.  With respect to the underlying documents that talk about the relationships between the companies that may exist post-closing, we'll probably have term sheets, but not fully documentation outlining what those relationships are expected to be, also prior to the sale hearing.  [8/15/13 Auction Transcript at p. 8];

(c)    "I can't tell you whether it's going to be two entities or three entities.  We're still working through that depending on how the capital structure looks . . . ." [8/15/13 Auction Transcript at pp. 9-10];

(d)    "So we're putting together those allocations as quickly as we can.  We hopefully will have preliminary views on that by early next week.  I don't

20

think it's relevant for the overall sale process, frankly, how the assets get allocated once the debtor sells them." [8/15/13 Auction Transcript at p. 10];

(e) "We're still working through the asset schedules." [8/15/13 Auction Transcript at p. 52];

(f) "[W]e have an asset purchase agreement. It is obviously very iterative at this point." [8/15/13 Auction Transcript at p. 53]; and

(g) In response to a question regarding independent financial statements for either PropertyCo or OpCo/LiabilityCo, "No. Because they haven't been created yet. And I haven't decided exactly what assets are going to be in each of them as we sit here right now. As we told you before, that is something that we are continuing to work on." [8/15/13 Auction Transcript at pp. 58-59].

The fact that documents evidencing the Final Black Diamond/Spectrum Credit Bid have now been finalized and filed with the Court does not correct the deficiencies existing as of and during the Auction.

39.    As further evidence the Debtors did not comply with their own Bid Procedures, the Debtors' financial advisors acknowledged they did not have access to any new financial projections from Black Diamond/Spectrum and they did not know the projected EBITDA for either or both of PropertyCo or OpCo/LiabilityCo. [8/15/13 Auction Transcript at pp. 63-64]. Irrespective of having no documentation from Black Diamond/Spectrum with respect to their final credit bid and no financial information to gauge the viability and the ability of "New Allied" to perform under assigned contracts, Jack Cooper was asked by the Debtors to bid against this ghost of a transaction. Jack Cooper's objections to bidding against a non-existent bid were joined in and supported by the Committee, the Teamsters and Yucaipa which now, on

21

information and belief, join in Jack Cooper's Objections to designating the Final Black Diamond/Spectrum Credit Bid as the Successful Bid for Allied's assets.

40.    If there was any question that the Auction was a wholesale violation of the Bid Procedures, this Court need only cursorily examine the Black Diamond/Spectrum Final Bid Documents filed on August 27, <u>twelve</u> days after the Auction's purported conclusion.    The structure of the Black Diamond/Spectrum directed credit bid has shape shifted once again.    As evidenced by the documents filed, there are now effectively <u>five</u> designated purchasers (in addition to various other newly formed subsidiary entities) – New Axis Acquisition LLC ("<u>New Axis</u>"), New Allied LeaseCo Acquisition LLC (i.e., PropertyCo), New Allied OpCo LLC (i.e., OpCo/LiabilityCo) New Allied LeaseCo (Canada) Acquisition Inc., and New Allied Management Services LLC—and the ultimate ownership of the "Designated Purchasers" <u>is</u> <u>not</u> pro rata among the lenders holding claims under the Prepetition First Lien Credit Agreement. Moreover, the "new" deal now is proposed to be financed through three different secured loans totaling $86.5 million in commitment amounts, not a "rights" offering, and which loans will be primarily funded and controlled by affiliates of Black Diamond/Spectrum.

41.    Furthermore, the Black Diamond/Spectrum Final Bid Documents still do not comply with the Bid Procedures in that all schedules and exhibits and all ancillary documents – equipment lease documents between PropertyCo and OpCo/LiabilityCo, loan documents, etc. – have not been filed; rather, only skeletal "term sheets" are provided, with no "back up" documentation or financial information to test and evaluate the financial viability and ability to perform under assumed contracts of these "Designated Purchasers."    Irrespective of the continued opaqueness of the so-called "Successful Bid," what is clear from what has been filed is the ease in the future with which Black Diamond/Spectrum can cut OpCo/LiabilityCo loose, with

all of its attendant claims and liabilities, and retain value through Axis and the Debtors' hard assets either by maintaining a non-union shop or through a full liquidation of the business.

## II.    THIS COURT SHOULD APPROVE THE SALE OF ALLIED'S ASSETS TO JACK COOPER BY REOPENING THE BIDDING FOR ALLIED'S ASSETS AND CONDUCTING THE AUCTION ITSELF ON A FAIR AND EVEN PLAYING FIELD

42.    Where the Auction of the Debtors' assets was conducted in total violation of the Bid Procedures, this Court should not approve the sale of the Debtors' assets to Black Diamond/Spectrum through the Final Black Diamond/Spectrum Credit Bid.  Only the Debtors apparently believe that such bid is a Qualified Bid and should be deemed the Successful Bid following the Auction.  None of the Debtors other constituents – the Committee and Yucaipa as Consultation Parties and the Teamsters – join in such designation.  Rather, each of them believes that Jack Cooper's bid was the only Qualified Bid for the Debtors' assets and that it should be designated the Successful Bidder.

43.    Since the close of the Auction, Jack Cooper has been able to reinstate its financing commitment to support its original Qualified Bid as well as any other bid by Jack Cooper which this Court may now allow.  At the very least, this Court should give Jack Cooper one more opportunity to present a bid for the Debtors' assets.  Unlike where the parties were on August 15, now that Black Diamond/Spectrum and the Debtors have agreed on documentation for their prior phantom transaction and filed those documents with this Court on August 27, Jack Cooper now knows at least what it has to "bid against", and all other parties can evaluate any additional bid which Jack Cooper may be prepared to present against something other than a ghost transaction.

44.    The governing principle for this Court to consider at the Sale Hearing is securing the highest value for the Debtor' estates and maximizing creditor recovery.  In re Corporate

Assets, Inc., 368 F.3d 761, 767 (7th Cir. 2004) citing In re Chun King, Inc., 753 F.2d 547, 549 (7th Cir. 1985).  While maximizing value may be paramount, in determining the highest or best bid for the Debtors' assets, this Court may also consider factors other than just price.  For example, this Court may and should consider the impact of any sale to Black Diamond/Spectrum's "Designated Purchasers" on the Debtors' employees and litigation which may arise in connection with the sale or post-closing.  See, e.g., In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (approving sale to second highest bidder after considering potential employee and litigation issues likely to arise in a sale to highest bidder); In re Schutt Sports Inc., No. 10-12795 (KJC) (Bankr. D. Del., Dec. 15, 2010) (Dkt. No. 463 at pp. 103, 105) (approving sale to second highest bidder which guaranteed employment to 400 of debtor's employees, noting that "saving jobs is a tangible thing"); see also In re Motors Liquidation Co., 430 B.R. 65, 84 (Bankr. S.D.N.Y. 2010) (in connection with a 363 sale, courts may consider the broader public interest inclusive of job preservation and maintaining customers' confidence).[16]  In the bids before the Court, only Jack Cooper's all cash bid represents a realistic option for continued long term employment for the Debtors' employees and uninterrupted service to the Debtors' customers, and at the same time provides significant real, cash value to the Debtors' senior creditors.

45.    Jack Cooper recognizes the Court has an interest in protecting the integrity of an auction process, but where a bankruptcy sale has not yet progressed to the entry of an order approving a designated purchaser, this Court enjoys "broad discretion to decide whether to entertain" additional bids for a debtor's assets.  In re Corporate Assets, Inc., 368 F.3d at 768,

---

[16] Whatever else may flow from the Sale Hearing, Jack Cooper is certain that there will be ongoing litigation if this Court approves any sale to Black Diamond/Spectrum as currently proposed. Presumably, Yucaipa will not quietly accept non-voting equity interests in "New Allied" and the Teamsters will not acquiesce in the Debtors' operating tangible assets being stripped away to non-union companies.

citing In re Food Barn Store, Inc., 107 F.3d 558, 565 (8th Cir. 1997); see also In re Financial News Network, Inc., 980 F.2d 165 (2d Cir. 1992).    Where, as here, the bidding for the Debtors' assets proved to be complex in that the deemed Successful Bid was being developed over time (indeed, further developed over twelve days following the Auction), and where no order has been entered approving the sale to Black Diamond/Spectrum, this Court should conclude that consideration of additional bids for the Debtors' assets would not unduly frustrate or impair expectations of any of the participants in the Auction or compromise the integrity of the judicial process.   In re Corporate Assets, Inc., 368 F.3d at 768; In re Financial News Network, Inc., 980 F.2d at 170.   In fact, consideration of the Enhanced Jack Cooper Bid and any further enhancement thereto will serve to protect the integrity of the 363 sale process.

46.   Since the close of the Auction on August 15, Jack Cooper successfully reinstated its financing commitment for acquiring the Debtors' assets and it stands ready, willing and able to complete such acquisition in accordance with the terms of its prior asset purchase agreement or by submitting to the Court a true final and best all cash bid which then can be evaluated against any additional credit bid Black Diamond/Spectrum as the Requisite Lenders may choose to submit.[17]   Jack Cooper is the only entity standing before the Court that has fully committed financing and will be acquiring the Debtors' assets for cash in a going concern structure which enhances the continued operations of the business, employing the maximum number of

---

[17] Any additional credit bid as may be directed by Black Diamond/Spectrum as Requisite Lenders should not include any claims under the Prepetition First Lien Credit Agreement held by Yucaipa.  Section 363(k) of the Bankruptcy Code allows credit bids only as to allowed claims.  11 U.S.C. § 363(k) (emphasis supplied).  See In re SubMicron Sys. Corp., 432 F.3d 448 (3d Cir. 2006) (upholding District Court of Delaware's ruling that lenders were permitted to credit bid the full amount of their allowed claims) and In re Midway Invs., Ltd., 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof") (emphasis added); cf. In re Daufuskie Island Prop., LLC, 441 B.R. 60, 63 (Bankr. D.S.C. 2010) (holding creditor could not credit bid when its debt was subject to significant dispute regarding its validity).  Because Black Diamond/Spectrum are litigating with Yucaipa as to the validity of Yucaipa's claims under the Prepetition First Lien Credit Agreement, Yucaipa's claims are not allowed claims and may not be included in any credit bid.

employees, both union and non-union, and assuring customers of continued service. This Court should not allow such an opportunity to be lost, especially where the prior conduct of the Auction was unfair and completely violated the terms of the Bid Procedures approved by this Court. The subsequent filings of the Black Diamond/Spectrum Final Bid Documents do nothing to change this conclusion. As is readily apparent from the August 27 filings, Black Diamond/Spectrum have established a structure which will assure continued litigation with Yucaipa and other parties-in-interest (such as the Teamsters) and will prepare the Debtors' assets for future liquidation with no attendant responsibility for the Debtors' employees and customers.

47. The Auction of August 14 and 15 was not conducted in a manner which was beyond reproach; rather, the Bid Procedures approved by this Court were wholly disregarded, documentation for the Successful Bid was non-existent at the time of the Auction and not filed with the Court until August 27, and the "final" sale documents as filed evidence a further evolving structure not disclosed at the Auction and still do not conform to the Bid Procedures. Further, the Consultation Parties and the Teamsters disagree with the Debtors as to which bids were qualified and/or are the highest and best. Simply put, the Auction did not preserve the integrity of the judicial process and, as such, it should be reopened.

## Conclusion

48. At the Auction, Jack Cooper's bids conformed to all the stated and Court approved Bid Procedures. In contrast to the undocumented proposals presented by Black Diamond/Spectrum, Jack Cooper's bids were in writing, fully documented and accompanied by full and complete financial information so all impacted parties could evaluate the merits of Jack Cooper's bids.

49.    Where, as here, the Debtors wholly ignored their own Bid Procedures in favor of Black Diamond/Spectrum, second guessing the Debtors' determination as to the successful bidder at the Auction of their assets conducted pursuant to section 363 of the Bankruptcy Code is not difficult.  Either overturning the results of the Auction or allowing continued bidding is not unprecedented where the rules of the Auction were disregarded and waived in a manner not allowed by the approved Bid Procedures, where all of the other creditors and parties in interest, other than Black Diamond/Spectrum, disagree with the Debtors' conclusions and support selling the Debtors' assets to Jack Cooper, and where this Court has not yet entered an order approving any sale.  The Debtors may be on the "horns of a dilemma" in that they have two bids for their assets, either one of which they, as the Debtors, may be willing to accept provided that this Court provides "direction" on the Debtors' choice.

50.    In considering the issues to be presented at the Sale Hearing, this Court has three alternatives before it:

   (a) Approve the sale of the Debtors' assets pursuant to the Final Black Diamond/Spectrum Credit Bid and overrule all of the objections;

   (b) Deny approval of the Final Black Diamond/Spectrum Credit Bid and enter an order approving the sale of the Debtors' assets to Jack Cooper pursuant to the terms of the Enhanced Jack Cooper Bid (as modified); or

   (c) Reopen the Auction to allow Jack Cooper to present one final and best bid for the Debtors' assets.

51.    Jack Cooper asks that this Court deny approval of the Final Black Diamond/Spectrum Credit Bid as the Successful Bid and choose either options (b) or (c) noted above as to how to proceed to complete the sale of the Debtors' assets.

Dated:  September 3, 2013
        Wilmington, Delaware

**COUSINS CHIPMAN & BROWN, LLP**

William E. Chipman Jr. (No. 3818)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199

and

**KING & SPALDING LLP**
Jesse H. Austin, III
Georgia Bar No. 028813
Paul K. Ferdinands
Georgia Bar No. 258623
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:    (404) 572-4600
Facsimile:    (404) 572-5100

*Counsel for Jack Cooper Holdings Corp.*