# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 12-11564 (CSS) |
| ALLIED SYSTEMS HOLDINGS, *et al.*, | ) | (Jointly Administered) |
| | ) | **Hearing Date: September 10, 2013 at 12:00 p.m. (ET)** |
| Debtor(s). | ) | **Objection Deadline September 4, 2013 at 4:00 p.m.** |
| | ) | **(ET) (By Agreement)** |
| | ) | |
| | ) | **Ref. D.I. Nos. 1175, 1431, 1654** |

## OBJECTION OF THE TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS INDUSTRY NEGOTIATING COMMITTEE ("TNATINC") TO DEBTORS' MOTION FOR ENTRY OF AN ORDER:  (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

The Teamsters National Automobile Transporters Industry Negotiating

Committee ("**TNATINC**"), a creditor, party in interest, and the national negotiating committee

of approximately 31 local unions affiliated with the International Brotherhood of Teamsters

("**IBT**") which are the exclusive collective bargaining representatives of over 1,000 bargaining

unit employees of the Debtors[1] pursuant to collective bargaining agreements ("CBAs") with the

Debtors,[2] hereby objects to the Motion ("**Motion**") of the Debtors (the "**Debtors**," the

"**Company**," or "**Allied**") for Entry of an Order: (B)(I) Approving Asset Purchase Agreement

and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business;

(II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and

Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain Executory

---

[1] These employees work in various classifications of drivers, yard employees, and mechanics.

[2] The current National Master Automobile Transporters Agreement ("NMATA") runs from June 1, 2011 until August 31, 2015 and is currently being finalized in a printed edition . The contractual provisions concerning the transfer of operations, grievance and arbitration procedures, and seniority remain identical to the provisions in the prior agreement and are attached hereto as Exhibit 3A; terms sheets and documents reflecting other provisions that were changed in the current CBA are attached hereto as Exhibit 3B.

Contracts and Unexpired Leases; and (IV) Granting Related Relief (D. I.  No. 1175), all in connection with a proposed sale, following an auction, to entities related to Black Diamond and Spectrum ("BD/S").

## INTRODUCTION

1.       The employees represented by the TNATINC have been conscientiously working and maintaining the key operations of the Debtors during this extremely difficult bankruptcy.  In turn, TNATINC, in its individual capacity, and as a member of the Official Committee of Unsecured Creditors, has closely monitored every aspect of this bankruptcy and has directly participated in court hearings, mediations, and the auction that is the subject of the instant Motion.

2.       The TNATINC has been open and clear about its rights under its collective bargaining agreement ("CBA") with Allied in relation to a sale of assets.  These rights have been violated as a result of Allied choosing the BD/S bid and proceeding with this Motion, an action that also may well lead to liquidation.  The CBA consists of the National Master Automobile Transporters Agreement ("NMATA"), various supplements and local agreements, and a Work Preservation Agreement ("WPA") binding on parent companies.  In a May 29, 2103 Reservation of Rights ("ROR") (D.I. No. 1207) filed in response to a bidding procedures motion later withdrawn by the Debtors, the TNATINC noted that under its CBA with Allied, Allied could not sell its assets (absent relief pursuant to Section 1113 which could end in a strike) unless the successors/purchasers agreed to enter into the same CBAs.  The ROR noted that BD/S had not met with the TNATINC, presented a business plan, identified a management team, or presented a plan for Allied's future.  Sadly, as reviewed *infra*, that situation has not changed in the intervening three months.  The ROR also noted that BD/S had been involved in another bankruptcy case with the Teamsters that  led to a Section 1113(e) order, a strike, and ultimately

liquidation.  *See* http://www.teamster.org/content/teamsters-set-record-straight-about-pts-shutdown2.  A copy of the May 29, 2013 ROR is attached hereto as Exhibit 1.

       3.     The BD/S bid chosen as a winning bid by Allied is a phantom bid.  The "purchasers" have not engaged in any serious discussion with TNATINC, the representative of the overwhelming majority of Allied's employees, either before or after the auction.  They have provided no business plan and have not disclosed the identity of management (and, as reviewed *infra*, it is unclear what company will be providing management – New Allied OpCo LLC, New Allied Management Services, LLC, or some other entity).  In light of this apparent lack of any preparation for actual operation of the assets, and the fact that the BD/S asset purchase agreements changed the penalty for a material breach of the APA by BD/S from providing a remedy of specific performance to only liquidated damages with a cash component of only $5 million, which on information and belief Yucaipa may argue is not authorized under various relevant agreements, this may be nothing more than a $5 million option – or a pure option.

       4.     On information and belief, the "purchasers" have not engaged in any serious discussions with Allied's major and key customer, Ford.

       5.     The bid as now documented in a substantially revised asset purchase agreement weeks after the auction and hours after the deadline for doing so, and various other sale related documents, still fails to provide a clear, unequivocal, and definitive structure in relation to Allied's successorship obligations to TNATINC under the CBA, and to the extent the structure is disclosed it violates the CBA.  (D.I. No. 1654).  Further, the Debtors, in clear violation of Local Rule 6004-1(b)(ii), failed to file a proposed sale order at the time of the original sale motion, and even failed to do so at the time  of the filing of the sale documents and adequate assurance documents.

6.      Apart from CBA issues discussed *infra*, which constitutes a legal objection to the Motion regardless of the conduct of the auction, the TNATINC objects to the Motion because the BD/S bid was not the highest and best bid, and the Debtors' selection of the BD/S bid as the winning bid was inconsistent with appropriate business judgment, for reasons including the following:  (a) how the auction was conducted, (b) contrary to the bidding procedures, the "bid" consisted of a series of major oral modifications concerning the identity of the bidders, structure, conditions to closing, contractual relations with the TNATINC, and other major, indeed, core elements of the bid, (c) the failure of that bid, as structured, as well as later filed documents (*see* D.I. No. 1712) to provide adequate assurance of future performance for assumed and assigned contracts under Section 365 (b)(1)(c), which could include the CBA with the TNATINC, (d) the lack of specificity and clarity in the oral bid when selected, which in and of itself demonstrates that the Debtors could not have exercised appropriate business judgment,[3] (e) the failure to provide the key contractual documents at the auction  - or for weeks thereafter, and (f) the degree of execution risk.[4]  It is also questionable whether BD/S would  be a purchaser in good faith under Section 363(m).  Because of all these material  irregularities, at minimum, the auction should be re-opened or a new auction held.

7.      It is the essence of auctions - at least successful auctions - that the price offered for assets increases as the auction proceeds.  It is highly unusual for the very structure of

---

[3] This lack of clarity was clear at the auction. August 15, 2103 Auction Transcript, pp. 6, 8, 9-10, 52, 53, 58-59, 63-64 (D.I. No. 1616-2).

[4] *See, generally, e.g.*, Qualified Bid Requirements 12(iii) (bid must include APA and "all exhibits and schedules contemplated by the purchase agreement, and to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the purchase agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements . . .," 12 (vii),12(viii) (bid must be accompanied by financial statements or financial projections of purchasers),  12(x) (bid must provide information on adequate assurance of ability to perform under assumed and assigned contracts), 12(x)(i) (bid must identify those participating in bid and terms of participation), 13 and 20(ii) (credit bids must comply with the requirements of sections 12(i)-(xvi) and paragraph 13 may not be modified).

a bid at an auction to change substantially multiple times pursuant to oral modifications and to culminate in an alleged "winning" bid that has not been reduced to writing - - either at the time the bid is chosen as highest and best or for weeks thereafter - - and then have a written APA modify the oral final bid.

8.      It is telling that every major constituency in this case - excluding BD/S – is objecting to this sale.  The TNATINC joins in and adopts as stated herein the arguments raised by the objection of the Official Committee of Unsecured Creditors, and states that key aspects of the objections filed by Jack Cooper Holdings Corp. ("Jack Cooper") (D.I. No.1724) (and expected to be filed by Yucaipa) also preclude approval of this Motion.

9.      Most important, the TNATINC objects to the Debtors entering into this asset purchase agreement with BD/S because to do so is a clear and undisputed violation of the current CBA between the TNATINC and the Debtors.

10.      As reviewed herein, under that CBA, the Debtors cannot enter into, execute, or implement such a sale without the successor(s) agreeing to enter into the current CBA with the TNATINC, which includes seniority provisions that require the hiring of employees consistent with that provision.  Under well settled law: (a) the Debtors cannot thereby *de facto* reject the CBA absent compliance with the exclusive and mandatory provisions of Section 1113 of the Bankruptcy Code, and (b) if there is any dispute over the clear meaning of the contractual protection that should be resolved pursuant to the mandatory arbitration provisions of the CBA, and the TNATINC has already filed a grievance and requested an expedited arbitration, an expedited arbitration procedure to which the Debtors failed to agree.

11.      First, Allied is in violation of its obligations under the CBA because it has not insured that purchasers, whatever their identity today or in the future, will meet the

obligations of the CBA.  The APA provides that there is no third party beneficiary to the APA.

It is unclear what, if any obligation, any Purchasing Entity has to hire employees and enter into a

CBA.  Therefore, to the extent the APA is ambiguous or subject to change, the TNATINC – and

other parties – have no assurance that their rights will be protected.  Under its CBA with Allied,

the TNATINC is entitled to clear, unequivocal, and definitive assurance that the CBA is being

complied with, rather than the risk that it will be left holding the bag when BD/S further

manipulates the process.

            12.      Further, BD/S, in their final, oral and "winning" bid, and now in the new

asset purchase agreement, divide and assign the assets of Allied to various entities and removed

from the operating company, which allegedly will hire employees, the hard assets of real estate,

trucks, and the Axis entity, as well as management, and apparently leave the now skeletal

operating company alone to enter into a CBA with the TNATINC.  The "operating" company

will essentially be a leasing company with materially different assets and operations from the

Allied employer with whom the TNATINC is currently a party to a CBA - the same Allied

"operations" whose transfer is subject to the limitations in the CBA.[5]  Further, in an additional

change between its final bid and recently filed asset purchase agreement, there is a now a new

management company that will provide management services to other entities, including OpCo.

In any event, it is unclear which if any entity is obligated to hire employees and enter into a

CBA.  What is clear is that the TNATINC would have no ability pursuant to the APA to enforce

whatever obligations may or may not exist in the APA.

---

[5] Thus, OpCo will have only $6.5 million in financing, and no other entity will guarantee its obligations, but will be liable for $6.3 million in annual payment to lease vehicles (*See* Terms of  Unitary Master Vehicle Lease Agreement, Section 5, Ex. G to Sale Related Documents [D.I. No.  1654] and $1.725 million *plus* taxes, utilities, and operating expenses in annual rent *See* Term Sheet for Unitary Lease, Basic Rent  Section 5, Ex. F to Sale Related Documents [D.I. No. 1654]).

13.     This ever changing and evolving  structure is a clear violation of the provisions and intent of the successorship clause of the CBA.  It is also a blueprint for the liquidation of the Allied operating assets that would leave current Allied creditors -  employees, trade, pension funds, and OEMs - to become future creditors of the skeletal BD/S operating company without access to the Allied hard assets.

14.     If BD/S continue on this reckless course, and Allied continues to act in violation of its obligations under the CBA, the TNATINC reserves all its rights as to TNATINC's future action.

### **BACKGROUND**

The Failure of BD/S to Meet or Confer with the TNATINC

15.     Pursuant to this Objection, the TNATINC is asking the Court to uphold TNATINC's legal objections to the sale of Debtors' assets to BD/S and the relevant cure amounts.  The circumstances of this case demonstrate the importance of the TNATINC vigorously enforcing its rights under the CBA.

16.     As noted *supra*, ¶2, BD/S had been involved in another bankruptcy case with the IBT that led to a Section 1113(e) order, a strike, and ultimately liquidation.

17.     As counsel for the TNATINC reviewed at the auction [August 15, 2103 Auction Transcript, pp. 39-41 (D.I. No. 1616-2)], neither counsel for BD/S nor business representatives of those entities reached out to the TNATINC during the course of this bankruptcy - despite, for example, the participation of all of these parties at numerous court hearings and mediation sessions.  Indeed, despite its efforts to win the auction and buy Allied's assets, BD/S did not meet with or talk to the TNATINC's representatives or counsel during the auction.

18.     The week before the auction, on the evening of August 6, 2103, Hugh E. Sawyer ("Sawyer"), a Managing Director at Huron Consulting Services, on behalf of BD/S, notified Roy Gross, a co-chair of the TNATINC, that he wished to have a conversation with TNATINC representatives that week.  On August 9, 2013, that conversation took place with numerous TNATINC representatives participating.  During that conversation, Sawyer confirmed that he was hired by the law firm of Schulte Roth & Zabel LLP, not directly by BD/S, and that representatives of BD/S wished to have a conference call with representatives of IBT.  In response to questions, Sawyer, three business days before the auction, was unable to clarify whether BD/S wanted to have this conversation in their capacity as DIP Lenders, bidders/potential bidders in the case, or simply interested parties, and was unable to describe a particular topic for this conversation.

19.     Nonetheless, later that same day, Friday, August 9, 2013, after reviewing the prior conversation, Mr. Gross, on behalf of the TNATINC, agreed, as a courtesy, to a call:

> Despite all these factors, as a courtesy, Teamster representatives are willing to participate in a conference call to listen to whatever it is BD/S wants to say.  We fully expect that you will not misrepresent this call as anything other than being requested by BD/S and responded to, in light of all the above factors, as a courtesy by the Teamsters.  Please let us know when you would like to try to arrange such a call and who would participate on behalf of BD/S.

20.     Four days later, on Tuesday, August 13, 2013, the day before the auction, Sawyer replied that "Unfortunately, I have been unable to confirm schedules for this call. Perhaps we can get this back on the calendar in the near future if helpful to all parties."  *See* email communications attached hereto as Exhibit 2.[6]

---

[6] In light of this history, it is incredible that at the auction counsel for BD/S complained that the Union had "no interest in engaging whatsoever with anybody" but Jack Cooper. [August 15, 2103 Auction Transcript, pp. 38-39 (D.I. No. 1616-2)].

21.     There has been no substantive conversation between BD/S and the

TNATINC since the auction.

<u>The National Master Automobile Transporters Agreement ("NMATA") and Work Preservation
Agreement ("WPA")</u>

22.     The current unrejected CBA, including the National Master Automobile

Transporters Agreement ("NMATA"), which is a master agreement entered into by multiple

employers, including Jack Cooper,[7] provides successorship protections against the Debtors.[8]

Relevant sections of the NMATA and WPA are attached hereto as Exhibit 3A.[9]

23.     Article I, Section 3 of the CBA provides that the Company must give

written notice of the CBA to a "purchaser, transferee, lessee, assignee or other entity involved in

the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which

the operations covered by this Agreement or any part thereof including rights only may be

transferred," with the notice copied to the Union.  Allied must include the obligations of the

CBA in "the agreement of sale, transfer, or assignment of the business."  The CBA provides that

corporate reorganization does not relieve an employer of these responsibilities, and that the sold

or transferred operations must continue to be governed by the CBA following the transaction.

The protections are broadly defined to cover "stock sales or exchanges, mergers, consolidation or

spin-offs *or any other method by which business is transferred*" (emphasis added), and to insure

compliance, the union must be provided with "the *exact nature* of the transaction, not including

financial details."  (Emphasis added)

---

[7] Because Jack Cooper is already a party to the Master Agreement, it is already directly obligated to TNATINC
under that agreement to cover hired Allied bargaining unit employees and operations under that Agreement.

[8] The full agreement will be placed into evidence at the hearing.

[9] *See* p. 1 n. 2 *supra*.

3.      **Transfer of Company Title or Interest**

The Employer's obligations under this Agreement, including Supplements, Local Riders and dispatch procedures in effect at the time of the transaction shall be binding upon its *successors, administrators, executors and assigns*. The Employer agrees that the obligations of this Agreement shall be included in the agreement of sale, transfer or assignment of the business. In the event an entire operation or a portion thereof or rights only are sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation or use of such rights shall continue to be subject to the terms and conditions of this Agreement for the life thereof. *Transactions covered by this provision include stock sales or exchanges, mergers, consolidation or spin-offs or any other method by which business is transferred.*

On the sale, transfer or lease of an individual run or runs or rights only, or such rights are taken over by assignment, receivership or bankruptcy proceedings, the specific provisions of this Agreement, including Supplements or other conditions, shall prevail. It is understood by this Section that the signator Employer shall not sell, lease or transfer such run or runs or rights to a third party to evade this Agreement.

Corporate re-organizations by a signatory Employer, occurring during the term of this Agreement, shall not relieve the signatory Employer or the re-organized Employer of the obligations of this Agreement during its term.

In the event the Employer fails to require the purchaser, the transferee or lessee to agree to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement. The obligations set forth above shall not apply in the event of the sale, lease or transfer of a portion of the rights comprising less than all of the signator Employer's rights to a nonsignator company unless the purpose is to evade this Agreement.

The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee or other entity involved in the sale, merger, consolidation, acquisition, transfer, spin-off, lease or other transaction by which the operations covered by this Agreement or any part thereof including rights only may be transferred.

*Such notice shall be in writing, with a copy to the Union*, at the time the seller, transferor or lessor makes the purchase and sale negotiation known to the public or executes a contract or transaction as herein described whichever first occurs. The Union shall also be advised of the exact nature of the transaction, not including financial details.

- 10 -

The term rights includes routes and runs.

Exhibit 3A (Emphasis added).  Identical provisions are included in section 9 of a collectively

bargained Work Preservation Agreement binding on Allied's parent companies.  *See* Exhibit 3A

attached hereto.

24.      Under Article 7 of the NMATA, all grievances and "questions of

interpretation" are subject to mandatory and binding grievance and arbitration provisions in the

event of any dispute.  There is a multi-layered grievance process which, in the event of ultimate

deadlock by a National Joint Arbitration Committee, ultimately leads to a decision by a Board of

Arbitration consisting of one union co-chairman, one company Cc-chairman, and a neutral

arbitrator.  The Board of Arbitration generally meets quarterly to hear and decide cases. *See*

Exhibit 3A, Article 6, Section 9(c), attached hereto.

25.      Article 5 of the NMATA makes clear that seniority, as reflected in various

seniority lists, governs rights relating to employment, layoff, transfer, and other major

employment decisions.  *See* Exhibit 3A attached hereto.

The Auction

26.      During the auction, without any consultation or communication with the

TNATINC at any time, BD/S took three different positions as to the TNATINC CBA: initially,

they included as a condition to closing reaching a new CBA with TNATINC; then BD/S orally

modified their offer to make reaching agreement on changes to particular portions of the CBA

dealing with the Central States Teamsters Pension Fund a condition of closing; and finally they

orally modified their offer to state that the purchasing company would assign employees and

customer contracts to an operating company and only that operating company ("OpCo"), as

opposed to the purchaser itself or the company that would be assigned and own real estate assets,

trucking assets ("rigs"), and Axis assets would enter into a CBA with the TNATINC.  [August

14, 2013 Auction Transcript, pp. 23-24, 41-42, 58-59  (D.I. No. 1616-1); August 15, 2103

Auction Transcript, pp. 3-4, 13, 43-44, 48 (D.I. No. 1616-2)].  Counsel for the TNATINC made

clear in meetings with the Company and in public at the auction that each of these proposals,

including the final proposal, violated Allied's contractual obligations under the CBA with the

TNATINC.  *See, e.g.,* August 15, 2103 Auction Transcript, pp. 14-15, 47-48, 83-84 (D.I. No.

1616-2).  At least in earlier rounds of the auction, the Debtors acknowledged that any BD/S bid

could not be highest and best because of execution risks in relation to the TNATINC and Section

1113 issues.  [August 15, 2103 Auction Transcript, pp. 29-30 (D.I. No. 1616-2)].

      27.    The most recent BD/S Asset Purchase Agreement in existence as of the

end of the end of the auction was dated August 14, 2013.  *See* Exhibit 4 attached hereto.   No

updated APA was produced for weeks thereafter until August 27, 2013 at 7:00 p.m., rather than

the required deadline of 5:00 p.m.

      28.    The August 14, 2013 APA provided that Allied Acquisition Company,

formed by BD/S, would purchase the Allied assets and then have the right to assign them to

various fully-owned related entities.  Counsel for BD/S specifically stated on the record of the

auction, in response to a question from counsel to TNATINC, that the purchaser under the APA

would not be a parent of the companies assigned assets, and indeed that "[t]here are no parent

companies." [August 15, 2103 Auction Transcript, p. 49 (D.I. No. 1616-2)].  That statement is

inconsistent with the structure of the August 27, 2013 APA filed with the Court.

      29.    There has been no proposed sale order filed, either at the time of the filing

of the Motion or at the time various sale documents were filed on August 27.

      30.    Obviously, with so much at stake, the TNATINC, other interested parties,

and the Court should not be guessing about basic provisions of the proposed transaction.

31.    Following the completion of the auction, on August 19, 2103 the

TNATINC filed grievances under the CBA against various Allied entities objecting to the

proposed sale of assets absent compliance with successorship provisions of the CBA.  The

Grievance stated as follows in relation to the contractual violation:

> (a)    Fails to include in the APA that all the obligations of the NMATA, including Area Supplements, Local Riders and dispatch procedures in effect at the time of the transaction, to be binding on New Allied Acquisition Co., LLC and its affiliates and subsidiaries;
>
> (b)    Fails to require that the "entire operation" of Allied Systems Holding, Inc., Allied Automotive Group, Inc., Allied Systems, Ltd. (L.P.) and Transport Support, Inc. continue to be subject to the terms and conditions of NMATA, Area Supplements and Local Riders and dispatch procedures;
>
> (c)    Entered into the APA with New Allied Acquisition Co., LLC in order to evade the terms and conditions of NMATA, Area Supplements and Local Riders and dispatch procedures.

TNATINC requested an order of specific performance and a cease and desist order.  TNATINC

stated that "in order to expedite resolution of this dispute" it requested that Allied advance the

hearing of the dispute directly to the Board of Arbitration at an arbitration panel session already

scheduled for Friday, August 30.  A copy of the grievance is attached hereto as Exhibit 5.[10]

32.    Each of the named Allied entities responded to the grievances.  One

"parent" company, Allied Systems Holdings. Inc., alleged that it was not a party to the NMATA

or the "Work Preservation Agreement" that contained the same successorship language as the

NMATA.  Another parent company, Allied Auto Group, Inc., stated that it was not a party to the

NMATA but did not deny it was a party to the WPA.  The two operating companies, Allied

Automobile Group, Inc. ("AAG") and Transport Support, Inc. ("TSI"), stated that they would not

---

[10] The alternative, all-cash bidder, Jack Cooper, is in its own right a signatory to the National Master Automobile Transporters Agreement (and its parent is concededly a party to the WPA), and other provisions of that Agreement apply to any purchased Allied operations and transferred Allied employees, and Jack Cooper has confirmed to TNATINC that such provisions will apply.

"proceed to arbitration before the Board of Arbitration" because to do so would be "contrary" to various contractual provisions establishing various stages of the grievance procedure, and because "[a]dditionally, the issues raised in your letter *are premature, since no asset purchase agreement has been finalized, approved, signed, or executed and no bargaining unit work has been subcontracted*." (Emphasis added). These responses are attached hereto as Exhibit 6.

33.     On August 26, 2013, TNATINC replied, reaffirming that it was willing to waive earlier steps in the grievance procedure, and that if "Allied fails to agree to proceed to arbitration this week, any argument by Allied in the bankruptcy court that an arbitration cannot proceed in a timely fashion will be without merit." The reply also noted, in relation to the suggestion that the grievance was premature, that it was "incredible" that Allied had chosen a winner of the auction and scheduled a sale hearing "but takes the position that it cannot proceed with a grievance because there is no certainty concerning the asset purchase agreement," but in any event, unless the proposed buyer would commit to all purchasing entities and their assigns entering into CBAs with the Teamsters, "the issues as stated in the grievance are ripe and ready for decision rather than premature . . ." *See* Exhibit 7 attached hereto.

The Filed Asset Purchase Agreement and Sale Documents

34.     On August 27, 2013, the Debtors filed various Sale-Related Documents – the Asset Purchase Agreement with New Allied Acquisition Company (Exhibit A), a "Chart Detailing Summary of Post-Closing Corporate Structure" (Exhibit B), various documents detailing with designation of purchasers (Exhibits C and D), documents dealing with shared services and leases (Exhibits E, F, and G), and various commitment letters (Exhibits H-J) (D.I. No. 1654).

35.     As relevant here, these documents provide as follows:

- **There are no third party beneficiaries of the agreement.** This is provided generally in the second sentence of Section 12.8(a), and more specifically, in Section 6.4 relating to the provisions of Article VI on Employees, which states that all provisions contained therein are included "for the sole benefit of the Sellers and the Employment Offering Purchaser Entities and no third party, and in particular no employee, has any "third party beneficiary or other rights . . .".

- **The APA is unclear and noncommittal as to the hiring of bargaining unit employees**

  - Section 6.1 of the APA states that effective at the closing "the Purchaser or a Designated Purchaser (the "Employment Offering Purchaser Entity") *shall offer employment to such of the Employees* and on such terms and conditions of employment *as Purchaser shall determine in its sole discretion*, *except to the extent otherwise required by* applicable employment laws, *the New Collective Bargaining Agreements*, or the Canadian Collective Bargaining Agreements." (emphasis added). Despite the seniority lists that are an integral part of the current CBA, this would permit BD/S to pick and choose employees, and cut off recall rights for, *i.e.*, employees currently on worker's compensation or leave.

  - Section 12.8 of the APA provides that the APA Purchaser can designate one or more Designated Purchasers to*, inter alia*, "employ specified Transferred Employee on or after the Closing Date."

  - While the Notice of Designated Purchasers, second paragraph, confirms that pursuant to Section 12.8 (b) of the APA, Purchaser can designate one or more Designated Purchasers to, *inter alia*, employ specified Transferred Employees on or after the Closing Date*, no Schedule to that Notice of Designated Purchasers, including Schedule D relating to the New Allied OpCo LLC, actually designates a Designated Purchaser to employ Transferred Employees.* Indeed, footnote 1 on page 1 of the Notice of Designated Purchasers states that "Purchaser will deliver supplemental notices of Designated Purchasers with respect to Transferred Employees and the other Assigned Contracts not addressed herein within the timeframe contemplated by Section 12.8(b) of the APA," which apparently is a reference to the phrase "[i]n connection with the Closing" in Section 12.8. **Thus, the TNATINC and bargaining unit employees will not know until the Closing which, if any, Designated Purchaser will hire Transferred Employees.**

  - The APA provides that the Purchasers, whatever their identity today or in the future, have total discretion as to the hiring of employees except to the extent required – not by Allied's current CBA – but by the New CBAs, and total discretion to designate a Designated Purchaser to execute any such hiring, although in the Notice of Designated Purchasers it fails to do

so.  Of course, even if somehow the hiring obligations were clear and appropriate, the APA otherwise provides, as reviewed *supra*, that there are no third party beneficiaries to the APA, so it is unclear how, when, and against whom under the APA the TNATINC could ever meaningfully enforce any the hiring obligations related to the successorship clause of the current CBA, let alone under the APA or some future CBA.

- *The APA provides various and contradictory options for the treatment of the CBA*.

  o CBAs are defined as excluded assets and excluded liabilities in Sections 1.2(j) and 1.4 (k) of the APA.

  o However, it is a condition precedent to the obligations of the Purchaser, that *if* requested in writing by the Purchaser, this Court will enter an order reasonably acceptable to the Purchaser authorizing the Sellers to assume and assign to the Purchaser (whatever its identity now or in the future) "one or more" of the existing U.S. CBAs. Section 9.2(m) of the APA.

  o Section 8.12 of the APA states that each "Employment Offering Purchaser Entity" (defined in Section 6.1 as reviewed *supra* as a purchaser or designated purchaser who offers employment to Allied employees) who offers employment to Transferred Employees who are covered by a CBA to which an Allied entity is a party will execute the New US Collective Bargaining Agreements with respect to the Transferred Employees, with a "New US Collective Bargaining Agreement" appearing to be identical to the current CBAs) (APA, Section 10.1, p. 65).  *Of course, as noted supra, it is unclear which if any entity will be obligated to hire employees*.

  o The "Purchaser" who is a party to the APA and is so defined is New Allied Acquisition Co. LLC, which, despite the CBA, is not obligated to become a party to the CBA.[11]

- *In any event, it appears that under any scenario the only entity that might in some fashion offer to enter into a collective bargaining relationship with the TNATINC is the subsidiary company New Allied OpCo LLC, but the filed documents do not designate it, and the TNATINC and employees are to be left hanging until the closing.*  *See* APA, §12.8; Chart, Exhibit B to the Filed Sale Documents; Notice of Designated Purchasers, Section 2.a and Schedule D.

---

[11] While Exhibit G, item 1 of the Sale Documents states that OpCo will maintain the trucking equipment, the Shared Services Agreement attached and filed as Exhibit E under Section 10  authorizes LeaseCo or ManageCo, who would not be parties to the CBA, to subcontract various services out, an ambiguity that is of concern to the TNATINC, as the current CBA covers mechanics who work on vehicles and drivers.

- ***Key components of the current Allied operations and business – real estate, trucks, Axis, and management – will not be part of any potential contracting party with the TNATINC.***

## OBJECTION

**THE MOTION CANNOT BE APPROVED BECAUSE THE
DEBTORS MUST COMPLY WITH SECTION 1113 OF THE CODE
AND CANNOT REJECT OBLIGATIONS UNDER COLLECTIVE BARGAINING
AGREEMENTS THROUGH THIS PROPOSED SALE; AND CERTAIN OTHER
PROVISIONS SHOULD BE INCLUDED IN ANY SALE ORDER; THE ALLEGED
"TEAMSTERS" CURE IS WITHOUT BASIS [12]**

A.     A Collective Bargaining Agreement May Be Rejected
       Only Pursuant to the Exclusive Provisions of Section 1113

36.     A debtor may reject a collective bargaining agreement with a union representing its employees and the obligations contained therein only if the debtor meets the stringent and exclusive requirements set forth in Section 1113 of the Bankruptcy Code.  *See* 11 U.S.C. § 1113.  Section 1113(a) provides that a debtor may reject a collective bargaining agreement "only in accordance with the provisions of this section", 11 U.S.C. § 1113(a), and section 1113(f) provides that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. § 1113(f).

37.     The Third Circuit has emphasized that the statute forbids the application of other Code provisions to permit a debtor to escape the requirements of section 1113.  "The intent behind section 1113 is to preclude debtors or trustees in bankruptcy from unilaterally terminating, altering, or modifying the terms of a collective bargaining agreement without following its strict mandate.  ***Moreover, the provision operates to preclude the application of other bankruptcy code provisions to the advantage of debtors and trustees to permit them to***

---

[12] As reviewed *supra*, the TNATINC also joins in the objections filed by other parties.

*escape the terms of a collective bargaining agreement without complying with the*

*requirements of section 1113*." *See In re Cont'l Airlines*, 125 F.3d 120, 137 (3d Cir. 1997)

(citation omitted) (Emphasis added).

      38.    The Second Circuit agrees, "[w]e construe subsection 1113(f) quite

literally.  We hold that it was meant to prohibit the application of *any* other provision of the

Bankruptcy Code when such application would permit a debtor to achieve a unilateral

termination or modification of a collective bargaining agreement without meeting the

requirements of § 1113." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 990-91 (2d Cir. 1990)

(emphasis added).

      39.    Thus, a debtor cannot reject, or *de facto* reject, collectively bargained

obligations, including relevant successorship clauses, without invoking and meeting the stringent

requirements of Section 1113.  The instant Motion therefore must be denied absent the Debtors'

compliance with section 1113.  The Motion cannot be approved if the Debtors' entry into the

proposed APA with BD/S and/or whatever entity is the purchase structure *de jour*, is inconsistent

with the CBAs and Section 1113.

    B.     <u>The Stringent Requirements of Section 1113</u>

      40.    Congress added section 1113 to the Code in response to the Supreme

Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513 (1984).  There, the Court held

that a collective bargaining agreement is an executory contract like any other, and could be

unilaterally repudiated on a mere showing that it "burden[ed] the estate" and that the balance of

equities favored rejection.  *Id.* at 526.  *Bildisco* heightened fears that debtors would increasingly

use "bankruptcy law as an offensive weapon in labor relations."  *In re Roth Am. Inc.,* 975 F.2d

949, 956 (3d Cir. 1992).  This led to the enactment of section 1113.  *See Truck Drivers Local*

*807, IBT v. Carey Transp. Inc.*, 816 F.2d 82, 87 (2d Cir. 1987).

41.     In order to reject its collective bargaining agreement, a debtor must satisfy

each of the requirements of section 1113(c) by demonstrating that:

- its proposal provides for "those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor";

- it has provided the union "with such relevant information as is necessary to evaluate the proposal";

- its proposal "assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably";

- it has met with the union "to confer in good faith in attempting to reach mutually satisfactory modifications";

- the union has "refused to accept such proposal without good cause;" and

- "the balance of the equities clearly favors rejection of such agreement."

*See* 11 U.S.C. §1113(b) and (c); *Carey*, 816 F.2d at 93.

42.     Thus, rejection would be possible here only if the Debtors had made a

proposal to the TNATINC and provided the information necessary to evaluate the proposals, met

and negotiated in good faith, and the Court ultimately found that all of the statute's requirements

had been met, including, *inter alia,* that the proposal was necessary to reorganize and that the

union had rejected the proposal without good cause.

C.      The Debtors' Failure to Comply with Section 1113

43.     It is undisputed that the Debtor has failed to comply with the exclusive

and stringent requirements of section 1113.  At the threshold, the Debtors have made no

proposals to modify the CBAs.  Having made no such proposals, which is the initial step of the

section 1113 process, the Debtors have obviously not complied with any of the other statutory

requirements.

44.     In their Motion, the Debtors seek to sell the Debtors' assets free and clear of the CBAs and without strict compliance with the successorship provisions of the CBAs – and without any successor liability claims.

45.     As reviewed *supra*, ¶35, (a) there are no third party beneficiaries of the APA, (b) the APA is unclear and noncommittal as to the hiring of bargaining unit employees, (c) the APA provides various and contradictory options for the treatment of the CBA, (d) the Purchaser who has signed the APA will not be a party to the CBA, (d) under any scenario, various key components of the Allied "operations" and "business" covered by the current CBA are being assigned to different Designated Purchasers, and (e) the only entity that may enter into a CBA is the subsidiary shell company New Allied OpCo LLC which will have no real estate or trucking or Axis assets (or apparently management), and the APA and associated documents do not even designate OpCo as entering into the CBA and hiring employees.

46.     This is hardly clear and unequivocal compliance with strict contractual obligations of Allied to include the obligations of the CBA (rather than some contingent, amorphous, ambiguous, potential obligation of a shell subsidiary potentially without employees, all with no third party enforcement) in "the agreement of sale, transfer, or assignment of the business" or "any other method by which the business is transferred. "  This is also hardly unequivocal compliance with strict contractual obligations of Allied to insure that the sold or transferred operations must continue to be governed by the CBA following the transaction (rather than some  contingent, amorphous, ambiguous, potential obligation of a shell subsidiary potentially without employees, all with no third party enforcement).

47.     As noted *supra*, section 1113(f) plainly states that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section".

48.     In addition, the Third Circuit has held that section 1113 applies with full force to asset sales.  In *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,[13] the Third Circuit held that a debtor could not alter its obligations under a CBA by a partial assumption and assignment to a purchaser because that would be "an attempt to effect an alteration of the CBA," and therefore the debtor "was required to comply with the procedures set out in Code § 1113." To do otherwise, the court held, would permit the debtor and a purchaser "to misuse the Code in an effort to avoid the collective bargaining process that Congress deemed essential to the balance between labor and reorganizing debtors that it struck in Section 1113."  *Id.* at 82.[14]

49.     Similarly, in *In re Maxwell Newspapers*, *Inc.*, 981 F.2d 85, 89 (2d Cir. 1992), the Second Circuit concluded that "[a] debtor may sell the assets of the business unencumbered by a collective bargaining agreement *if* that agreement has been rejected pursuant to § 1113.") (emphasis added).

D.     Section 1113's Requirements Apply to Successorship Clauses

50.     Consistent with the decisions of the Third Circuit in *Anchor Resolution* and Second Circuit in *Maxwell Newspapers*, bankruptcy courts have also upheld the application of contractual successorship clauses to asset sales.  *See In re Stein Henry Co., Inc.*, No. 91-15491S, 1992 WL 122902, at *2 (Bankr. E.D. Pa. June 1, 1992) (refusing to confirm plan which

---

[13] 197 F.3d 76, 81-82 (3d Cir. 1999).

[14] Attempts to utilize other provisions of the Code to override Section 1113's exclusive provisions have similarly been rejected.  *See, e.g., Chicago Dist. Council of Carpenters Pension Fund v. Cotter*, 914 F.Supp. 237, 242 (N.D. Ill. 1996) (CBA cannot be rejected as part of plan of reorganization pursuant to provision providing automatic rejection of unassumed executory contracts pursuant to section 365).

would result in asset sale without satisfaction of CBA's successorship clause, which stated that

the contract applied to "successors" and "assigns," because "[o]nly through the medium of 11

U.S.C. § 1113(f) can a collective bargaining agreement be terminated or modified in any way"

and "[r]ights provided in the agreement as to successor-entities must be preserved unless there is,

unlike here, compliance with the procedures of 11 U.S.C. § 1113.");  *In re Agripac, Inc*., No.

699*-60001-frall, slip op. at 10-13 (Bankr. D. Ore. Apr. 2, 1999) (concluding that "[f]ailure to

include in Sale Agreement a successor clause as required by the CBA is a breach of the

Collective Bargaining Agreement which may result in a substantial claim against the estate" and

holding that the sale could not proceed absent compliance with section 1113*)* [15]*;  See also In re*

*Nat'l Forge Co.,* 289 B.R. 803, 808 (Bankr. W.D. Pa. 2003) (Debtor "compelled" prior to

gaining approval of sale of assets to seek rejection of CBA "[b]ecause of the successor

language."); *In re Bruno's Supermarket, LLC*, 2009 WL 1148369 (Bankr. N.D.Al.) (Debtor

seeks rejection of collective bargaining agreement with successorship clause prior to seeking

approval of sale of assets). [16]

---

[15] A true and correct copy of the *Agripac* decision is attached hereto as Exhibit 8.

[16] The Eighth Circuit BAP case *In re Family Snacks, Inc.,* 257 B.R. 884, 890-98 (8th Cir. B.A.. 2001), and the bankruptcy court decision in *In re The Lady H Coal Co., Inc.* 193 B.R. 233 (Bankr. S.D.W.Va. 1996), *aff'd* 199 B.R. 595 (S.D.W.Va. 1996), *aff'd on other grounds, sub nom. In re Leckie Smokeless Coal Co.,* 99 F.3d 573 (4th Cir. 1996), are not to the contrary.

In *Family Snacks*, the purchaser of assets ultimately signed a new CBA with the union and assumed post-petition employee claims.  257 B.R. at 888.  The Union had objected to the sale on the basis of the failure to pay certain prepetition claims, asserting that the agreement had been impliedly assumed or assumed as a matter of law, while the debtor, now a non-operating entity, moved to reject that agreement.  The only remaining questions on appeal were whether a rejection application could be made after the sale of the debtor's assets and whether the bankruptcy court's denial of a section 1113 rejection motion resulted in the assumption of a CBA. *Id.* at 887, 890.  In that situation, the question at issue was not whether the sale of the assets was an alteration of the CBA, and so the issue of a potential conflict between Section 363 and Section 1113 was not before the panel.  Indeed, the panel noted that "[a] debtor may not, however, fail to take steps to reject the CBA under § 1113 and, at the same time, fail to comply with the terms of the CBA.  A debtor remains bound by the terms of the CBA until it takes affirmative steps to reject that agreement." *Id.* at 896 n.8.  In short, to the extent that *Family Snacks* bears on the question before this Court, it supports the position of the TNATINC, not the Debtors.

51.    As Judge Bernstein most recently concluded in the *Journal Register* case in Southern District of New York, a debtor may not utilize Section 363 to bypass the requirements of Section 1113 in relation to a labor contract's successor clause:

> The collective bargaining agreement continues to bind the debtor post-petition, and a debtor cannot reject a collective bargaining agreement except in accordance with Bankruptcy Code § 1113. Generally speaking, a rejection represents a decision not to perform a burdensome executory contract.  A debtor cannot bypass § 1113 and obtain a de facto rejection of its collective bargaining agreement simply by refusing to perform it.  Although the obligation to comply with the successor clause is only one duty among many under a collective bargaining agreement, a debtor's intentional breach of a material provision of the collective bargaining agreement is tantamount to a rejection, or alternatively, a unilateral alteration of its provisions in violation of Bankruptcy Code § 1113(f).  Thus, as a general proposition, a sale under Bankruptcy Code § 363 cannot circumvent the condition imposed under a successor clause absent compliance with § 1113.

*In re Journal Register Company*, 488 B.R. 835, 840 (Bankr. S.D.N.Y. 2013).

<u>E.</u>    Any Dispute Over Interpretation of the Successorship Clauses Must be Resolved Through Arbitration

52.    To the extent the Debtors differ on the interpretation of the successorship clauses, that difference must be resolved through the exclusive and binding arbitration provisions of the CBAs, which remain in full force in bankruptcy.  *Ionosphere Clubs, Inc.*, 922 F.2d at 993; *see also Continental Airlines,* 125 F.3d at 137-38*; In re Fulton Bellows & Components, Inc.,* 307

---

The *Lady H* decision is neither binding or persuasive.  The court initially held that, consistent with the successorship clause and Section 1113, a sale could proceed only if the union and the buyer reached an agreement or if the court granted Section 1113 relief.  193 B.R. at 237-38.  The court then refused to grant relief pursuant to Section 1113 because it found relief was not fair and equitable in light of certain executive compensation.  *Id*. at 242.  Thereafter, without explaining how it could ignore the mandate of Section 1113(f), the court reversed itself and held that the sale could go forward based on "relative equities to all parties-in-interest" and "the best combination of rights and remedies that can be tailored considering the issues presented and the limited choices that are available as a result of the Debtors' precarious financial position which has turned even worse during consideration of the Debtors' Motion," *Id*. at 236, 243.  The *Lady H* court, which issued its decision prior to the Third Circuit's decision in *Anchor Resolution* discussed above, as well as the *Journal Register* decision, simply ignored the fundamental requirements of section 1113.  Further, the *Lady H Coal* court granted the union an administrative expense claim, not for the rejection of the contract under section 1113, *compare In re Nw. Airlines Corp.*, 483 F.3d 160 (2d Cir. 2007), but for breach of contract, 193 B.R. at 243.

B.R. 896 (Bankr. E.D. Tenn. 2004); *In re Bunting Bearings,* 302 B.R. 210 (Bankr. N.D. Ohio 2003); *In re US Airways Group, Inc.*, 296 B.R. 734, 746-48 (Bankr. E.D. Va. 2003); *In re Bob's Supermarket's, Inc.*, 118 B.R. 783 (Bankr. D. Mont. 1990). As noted *supra,* the TNATINC offered to waive earlier stages of the grievance process and proceed expeditiously to arbitration prior to the instant hearing, and the Debtors refused.

  53. As noted *supra*, ¶¶ 31-33 and Exhibits 5-7, the TNATINC has filed grievances and has requested that the parties proceed expeditiously to arbitration over any dispute as to the meaning or application of the transfer of company title and interest/successorship clauses. The Debtors refused. The TNATINC remains committed to expeditiously proceeding to arbitration to resolve any issues.[17]

  54. Approval of this sale, in the face of Allied's contractual obligations and the sorry record of the auction, would be inconsistent with the requirements of the Bankruptcy Code. Here again, the Debtors' motion, instigated by BD/S, should be considered "dead on arrival."

---

[17] Section 12.6 of the APA purports to reserve to this court jurisdiction over all disputes arising out of or related to the APA "or any agreement contemplated hereby" :

> THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; *PROVIDED*, *HOWEVER*, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

 As noted, Debtors have not filed a proposed sale order. The TNATINC objects to this provision to the extent it seeks to have disputes under any collective bargaining agreement resolved other through the grievance and arbitration procedures established by such agreements. *See* text *supra*.

F.      This Court Should Include Appropriate Protective Language in Any Sale Order

55.     In addition to all the other infirmities, the Debtors failed to submit a proposed sale order with the sale motion or even thereafter in violation of Local Rule 6004-1 (b)(ii).

56.     Section 1.6 of the Asset Purchase Agreement, however, purports in broad language to insulate the Purchaser from any successor liability:

> Neither the Purchaser nor any Designated Purchaser shall be deemed, as a result of action taken in connection with the Purchase of the Purchased Assets, or the operation of the Purchased Assets and the Business from and after the Closing, to (a) be a successor, successor employer, or successor in interest (or similarly situated party) to any of the Sellers (other than with respect to the Assumed Liabilities), (b) have, de facto or otherwise, merged with any of Sellers, or (c) be a continuation or substantial continuation of Sellers or any business of Sellers.

57.     However, this Court cannot preclude the National Labor Relations Board from making determinations post sale about the Buyer's obligations under labor law, including successorship or alter ego obligations. *See NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 955 (5th Cir. 1989) ("The question of whether a new entity, be it an employer or labor organization, is a successor, disguised continuance, or alter ego of another entity is a question of substantive labor law which could not have been decided, in this case, by the bankruptcy court."); *See also RCR Sportswear, Inc.*, 312 NLRB 513 (1993), *enforced*, 37 F.3d 1488 (3d Cir. 1994); *Century Printing Co.*, 242 NLRB 659 (1979); *enforced*, 661 F.2d 914 (3d Cir. 1981) (cases where the Board found a purchaser to be an alter ego where a bankruptcy court had authorized the purchaser's acquisition of another employer's business); *Erica, Inc. v. NLRB*, 200 Fed. App'x 344, 347 (5th Cir. Sept. 19, 2006) ("[i]f the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor," then the new employer must bargain with the union that represented the

predecessor's employees, and a bankruptcy court order cannot shield the new employer from its

bargaining obligations) (internal citations omitted).  *See also NLRB v. Horizons Hotel Corp.*, 49

F.3d 795, 803 (1st Cir. 1995); *Massey Energy Co.*, 358 N.L.R.B. 159, 2012 WL 4482797, *89

(NLRB Sept. 28, 2012) ("a bankruptcy sale order in no way insulates against the possibility that

a buyer will take actions subsequent to the sale that give rise to a successorship bargaining

obligation or require the buyer to maintain the existing terms and conditions of employment");

*In re Wrangell Seafoods, Inc.*, No. K09–00012–DMD, 2009 WL at 8478297, *2 (Bankr. D.

Alaska Mar. 9, 2009) (requiring the following language be added to a 363(f) sale order:

"Nothing in this Order is intended to, nor shall it be deemed to, preclude the National Labor

Relations Board or any court from finding that Trident Seafoods, Inc., or any other purchaser of

the Debtor's assets, is subject to a successor collective bargaining obligation under the National

Labor Relations Act."); *In re Adamar of N.J., Inc.*, No. 09-20711, 2009 Bankr. LEXIS 5191

(Bankr. D. N.J. Nov. 4, 2009) at *29-30 (qualifying sale order with the following: "nothing in

this Amended Sale Order is intended to, nor shall it be deemed to, preclude: (i) the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America from

arguing or requesting a finding from the National Labor Relations Board or any court, or (ii) the

National Labor Relations Board or any court from finding, as to each that Reorganized

Tropicana or Newco, as applicable, is subject to a collective bargaining obligation under the

National Labor Relations Act pursuant to *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92

S. Ct. 1571, 32 L. Ed. 2d 61 (1972) and its progeny; and provided, further, that the [unions']

rights to object to such a finding or any request for relief therefor are expressly reserved and

preserved"); *Morgan Olson, LLC v. Frederio (In re Grumman Olson Indus.)*, 445 B.R. 243, 250

(Bankr. S.D.N.Y. 2011) (Judge Bernstein) ("The Sale Order did not give Morgan a free pass on

future conduct, and the suggestion that it could is doubtful"), *aff'd,* 467 B.R. 694 (S.D.N.Y.

2012).

58.     Thus, the TNATINC  would request that any sale order include the

following language:

> Nothing in this Sale Order or the Asset Purchase Agreement shall
> be held to limit any independent obligation of the Buyer that
> potentially could arise after the closing pursuant to the National
> Labor Relations Act, 29 U.S.C. §145 *et seq.*

G.     The Alleged Teamsters Cure Payment

59.     While the current APA only provides an option for the assumption of the

TNATINC contract, the List of Assumed and Assigned Agreements  filed on July 15 listed $0.00

as the cure amount by Allied System Holdings, Inc. for "Union /Labor Collective Bargaining

Agreements" with the International Brotherhood of Teamsters  ("IBT") (page 30) and $0.00 for

certain Teamster locals (page 55).  (D.I. No. 1431).  TNATINC objects to these cure amounts

because: (a) the contracting party to the NMATA is the TNATINC, not the IBT, (b) the CBA is

with several Allied entities, including the NMATA with  Allied Automobile Group, Inc.

("AAG") and Transport Support, Inc. ("TSI") and the WPA with Allied Systems Holdings. Inc.

and Allied Auto Group, Inc., (c) there are constantly changing amounts due under the relevant

collective bargaining agreements as employees under the CBA accrue new amounts and use

some of the accruals, and so the only appropriate cure amount would be the assumption of all

amounts due in the ordinary course under the collective bargaining agreements, together with all

pending grievances, which are currently unliquidated.

## CONCLUSION

For the foregoing reasons, the Court should deny the Sale Motion and deny the request for the relevant cure amounts.

Dated: September 4, 2013

Respectfully submitted,

COOCH AND TAYLOR, P.A.

/s/ *Susan E. Kaufman*
Susan E. Kaufman (No. 3381)
1000 West Street, 10th Floor
The Brandywine Building
Wilmington, DE  19899
(302) 984-3893 / (302) 984-3939 Fax
Skaufman@coochtaylor.com

Richard M. Seltzer, Esq.
Thomas N. Ciantra, Esq.
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, NY  10036
(212) 563-4100 / (646) 473-8230 Fax
rseltzer@cwsny.com
tciantra@cwsny.com

*Counsel for the Teamsters National*
*Automobile Transporters Industry*
*Negotiating Committee ("TNATINC")*