IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtor. | (Jointly Administered) |

**Hearing Date**: Sept. 10, 2013 at 12:00 p.m.(EDT)
**Objection Deadline**: Sept. 4, 2013 at 4:00 p.m. (EDT)
(extended by agreement with the Debtors for Committee and its individual members)

**Re: Docket Nos. 1175, 1320, 1616, 1640, 1654, 1712**

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE ENTRY OF AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE, AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Allied Systems Holdings, Inc. ("Allied"), Allied Systems, Ltd. (L.P.) ("Systems") and their U.S. and Canadian subsidiaries (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to certain relief requested in the *Motion of the Debtors for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving*

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

*Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and*

*Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining*

*Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase*

*Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course*

*of Business; (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims,*

*Encumbrances, and Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain*

*Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Sale

Motion") (D.I. 1175).[2]  In support of the Objection, the Committee respectfully represents as

follows:

## INTRODUCTION

1.      As this Court has observed, and the Committee agrees, a robust section

363 sale offers the best opportunity for the Debtors to preserve and maximize their value, ensure

that their customers, suppliers, employees and other stakeholders will continue to have a viable

entity to deal with going forward, and lead to the successful resolution of these chapter 11 cases.

However, the Committee unanimously believes that the winning bid (the "Requisite Lenders'

Winning Bid")[3] should not be approved because it is not the best option to preserve the going

concern value of the Debtors' businesses and to maximize the value of the estates.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion, the Bid Procedures Order or the Bid Procedures, as applicable.

[3]    BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD (together, "Black Diamond"), and Spectrum Investment Partners LP ("Spectrum" and together with Black Diamond, the "Petitioning Creditors") – in their capacity as Requisite Lenders under the Debtors' First Lien Credit Agreement (the "First Lien Credit Agreement") rather than as individual lenders (each, a "First Lien Lender" and collectively, the "First Lien Lenders") under the First Lien Credit Agreement – submitted their winning bid through an entity they created, New Allied Acquisition Co. LLC, which designated the following entities to purchase the Debtors' assets in the manner described in this Objection:  (1) New Axis Acquisition LLC (described herein as "New Axis"), (2) New Allied LeaseCo Acquisition LLC and New Allied (Canada) Acquisition Inc. (together, described herein as "LeaseCo"), (3) Axis/Allied LeaseCo Holdings LLC (described herein as "Axis/LeaseCo"), the holding company of New Axis and LeaseCo, (4) New Allied OpCo LLC and New Allied (Canada) OpCo Inc.

2.       Nominally, the Requisite Lenders' Winning Bid offers $105 million of consideration (though a combination of "credit bid" and cash).  In reality, however, the Requisite Lenders' Winning Bid is a complex, distressed M&A multi-purchaser transaction that is fraught with transaction risk (being borne by the Debtors' estates) and was the product of an auction process that can be described as being less than fair and open.  Moreover, the complicated structure involved in the Requisite Lenders' Winning Bid raises serious questions as to whether, absent clear evidence of the ability of the new operating company (which will contain a substantial portion of the Debtors' liabilities to employees and customer contracts) to provide adequate assurance of future performance, the Debtors are asking this Court to approve a transaction that conflates several "step-transactions" and effectively strips away the Debtors' "good" assets, thereby limiting the recourse of creditors for certain liabilities, such as union and customer obligations.

3.       The Committee – as a fiduciary for all unsecured creditors of the Debtors' estates, including, but not limited to, customers, suppliers, tort creditors and employees – has fought over the course of these chapter 11 cases for the best possible outcome for these constituents.  Upon entry of the bid procedures order (the "Bid Procedures Order") (D.I. 1320) approving bid procedures (the "Bid Procedures"), which were the product of extensive negotiations during the mediation process with Judge Drain, the Committee believed that framework had been set for preserving and maximizing the value of the Debtors' assets (the "Assets") through a competitive, fair and open process for the benefit of all creditors and stakeholders.

---

(together, described herein as "OpCo"), and (5) New Allied Management Services LLC (described herein as "MgmtCo").

4.      Despite the Bid Procedures and the Committee's beliefs, the manner in which the two-day auction (the "Auction") was conducted cannot be described as a competitive, fair and open process primarily because of the Debtors' willingness to waive and/or disregard the Bid Procedures in order to acquiesce to the "ghost" bidding of the Petitioning Creditors and ultimately determine that the last such "bid" was the highest and best.

5.      Specifically, notwithstanding that this Court entered an order determining that Black Diamond and Spectrum were "Requisite Lenders" under the First Lien Credit Agreement on August 8, 2013,[4] prior to the Auction (which commenced on August 14, 2013), Black Diamond and Spectrum only submitted a bid in their individual capacities.   At the Auction, however, the Petitioning Creditors bid (the "Requisite Lender Bids") in their collective capacity as Requisite Lenders, and proposed a transaction designed to isolate a substantial portion of the Debtors' liabilities (i.e., customer contracts and employees) from their valuable "hard" assets, i.e., rigs, real estate and assets relating to the Debtors' vehicle logistics services business ("Axis").  As is evidenced by the nearly two (2) weeks it took for the Debtors and the Petitioning Creditors to file the sale documentation (the "Sale Documentation") (D.I. 1654), the specifics of the Requisite Lender Bids were constantly changing and in flux, but, at bottom, were a variation on the same theme – credit bid the going concern business in a manner that will isolate the liabilities from the assets.

6.      Notwithstanding the clear requirements of the Bid Procedures that were designed to facilitate an open, transparent and fair bidding and auction process, the Debtors allowed the Petitioning Creditors to submit a brand new bid at the Auction without the benefit of

---

[4]   This Court entered an order on August 8, 2013 granting summary judgment in favor of the Petitioning Creditors, holding that the Petitioning Creditors (or the Petitioning Creditors collectively with AMMC, VIII, Limited ("AMMC")), are currently the Requisite Lenders under the First Lien Credit Agreement (Adv. Proc. No. 13-50530, D.I. 280).

- any documentation for the Requisite Lender bid, including the asset purchase agreement, intercompany arrangements, financing, and corporate structure (<u>see</u> Bid Procedures ¶ 12(iii)),

- a list identifying what executory contracts and unexpired leases each purchasing entity – whether it be OpCo, Axis/LeaseCo, or any other entity not determined at the time of the Auction – will assume and assign (<u>see</u> Bid Procedures ¶ 12(v)),

- any financial information showing the ability of the purchasers to consummate the sale and to provide adequate assurance of future performance (<u>see</u> Bid Procedures ¶¶ 12(vii), (viii), (x)), and

- disclosure of each of the entities owning or otherwise controlling OpCo and Axis/LeaseCo (<u>see</u> Bid Procedures ¶ 12(xi).

7.      Moreover, despite not having any documentation whatsoever evidencing (i) the terms of the sale, (ii) the corporate structure, (iii) the capital structure, (iv) the precise purchasing entities themselves, or (v) the financial wherewithal of the purchasers to consummate the sale and perform upon such a sale, the Debtors "evaluated" the Requisite Lenders' Winning Bid and determined it to be the highest and best offer.  Indeed, the Debtors determined that the Requisite Lenders' Winning Bid was the highest and best offer notwithstanding that the Petitioning Creditors removed from the Requisite Lenders' Winning Bid (i) their prior commitment to serve as a Backup Bid and (ii) the "hell or high water" specific performance/damages provision and replaced such provision with a liquidated damages provision that may be entirely inappropriate, as a large percentage of which would be the assignment of distributions on account of claims of First Lien Lenders other than the Petitioning Creditors.

8.      Process and substance aside, the Requisite Lenders' Winning Bid presents significant execution (and litigation) risk that is not present in the last bid ("<u>Jack Cooper's $100 Million Bid</u>") by Jack Cooper Holdings Corp. ("<u>Jack Cooper</u>").  For example:

- **<u>Failure to Provide Sufficient Proof of Adequate Assurance of Future Performance</u>**.
  Despite the requirements of the Bid Procedures, the Petitioning Creditors failed to

demonstrate that they will be able to provide adequate assurance of future performance. There is no evidence that either OpCo or LeaseCo will in fact be sustainable businesses going forward, risking the interests of the Debtors' customers, suppliers, employees, and other stakeholders that depend on the continued vitality of the Debtors post-sale. In fact, the proposed structure requires greater scrutiny on this issue because of the very goal which the structure seeks to achieve – isolation of liabilities (i.e., the customer contracts and employees) from the "hard" assets. This deliberate division raises the distinct possibility that LeaseCo could effectuate a liquidation (or utilize them for its own benefit) if OpCo does not or cannot perform, leaving the stakeholders of OpCo with little recourse.[5]

- **<u>Execution Risk Related to Union Issues</u>**.  Somewhat related to adequate assurance of future performance (as well as other issues), unions representing a significant percentage of the Debtors' employees in the U.S. and Canada have indicated that the uncertainty inherent in the bid with respect to the treatment of the Debtors' employees, and the scheme to limit their liabilities to employees solely within the stripped-down OpCo is unacceptable, and are challenging the bid on these (and other) bases.[6]  Indeed, this raises the genuine threat of a strike both in the U.S. and Canada, which poses an execution risk in order for the Requisite Lenders' Winning Bid to close (and even a risk the sale may not be approved in Canada) and also an enterprise value/business interruption risk.

- **<u>Execution Risk Related to Treatment of Yucaipa and Other First Lien Lenders</u>**.  The Requisite Lenders' Winning Bid treats Yucaipa American Alliance Fund I, L.P. (collectively, and together with each applicable affiliate of Yucaipa American Alliance Fund I, L.P., "Yucaipa") differently than other First Lien Lenders.  For example, the First Lien Lenders will receive their pro rata share of voting membership interests in New Allied (which will own OpCo), and have the option of participating in the second lien debt offering for New Axis and LeaseCo that would yield them voting membership interests in Axis/LeaseCo – except Yucaipa, which could at best obtain only non-voting membership interests, even if Yucaipa is ultimately determined to be a valid First Lien Lender.  Additionally, despite having the right to credit bid First Lien Debt, the Petitioning Creditors may not have the right to assign to the Debtors distributions that would otherwise go to all First Lien Lenders for purposes of the Good Faith Deposit and the liquidated damages provision.  This treatment may mean that the sale is an impermissible *sub rosa* plan, because the "payment" of First Lien Debt is being made for the purchase of Assets to be shared amongst the First Lien Lenders, and thus the bid provides disparate treatment amongst First Lien Lenders by unfairly discriminating

---

[5]  Given that the Petitioning Creditors propose that the yet undetermined management would be housed in the separate MgmtCo and would provide such services to each of the purchasers, this scenario raises an interesting question concerning where management's fiduciary duty would lie with respect to the new operating company and the other purchasers.

[6]  The Teamsters National Automobile Transporters Industry Negotiating Committee ("<u>TNATINC</u>"), affiliated with the International Brotherhood of Teamsters ("<u>IBT</u>") and the local unions of the IBT, and the National Automobile, Aerospace, Transportation and General Workers CAW-Canada of Canada (CAW-Canada) and certain of its Locals (collectively "<u>CAW-Canada</u>") have filed (or will shortly file) objections to the approval of the sale (D.I. 1723).

against Yucaipa in contravention of sections 1123(a)(4) and 1129 of the Bankruptcy Code.[7]

9.        Weighing the uncertainty endemic in the Requisite Lenders' Winning Bid of $105 million cash/credit bid against Jack Cooper's simpler and more straightforward $100 million all-cash bid, the Debtors had no good business reason to choose the Requisite Lenders' bid.  The real cost of litigating against numerous stakeholders and the delay that litigation would impose on the consummation of the sale in order to affirm a bid laden with feasibility and other problems in exchange for $5 million credit bid of First Lien Debt falls well short of the Debtors' sound business judgment – particularly when another bidder is ready and willing to submit a bid seemingly without these concerns.  Accordingly, the Court should deny approval of the sale to the Petitioning Creditors on the terms set forth in the Sale Documentation.

10.        While the Committee believes that Jack Cooper's $100 Million Bid is, in fact, higher and better than the Petitioning Creditors' Winning Bid, it also believes that the "moving target" auction and "ghost" bidding did not encourage "apples to apples" bidding and ultimately discouraged Jack Cooper from submitting further bids at the Auction that could have further enhanced the value of the Debtors' estates and benefitted all of the Debtors' stakeholders.  Objection of Jack Cooper to Sale of the Debtors' Assets to New Allied Acquisition Co. LLC ¶¶ 20-21 ("Jack Cooper Objection") (D.I. 1724).  Indeed, despite the deficiencies with the Auction, Jack Cooper remains willing to submit further bids.  See Jack Cooper Objection ¶¶ 4, 37, 43, 46.

11.        The Committee does not believe that the Debtors can meet their burden for this Court to approve the Petitioning Creditors Winning Bid, however, the Committee does still believe the best chance for the Debtors to maximize their going concern value is through a

---

[7]    The sale may further constitute an inappropriate attempt to avoid creditor protections under the chapter 11 plan process because it would likely fail to satisfy the feasibility requirement under section 1129(a)(11).  See 11 U.S.C. § 1129(a)(11) ("Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan. . .").

section 363 sale and respectfully requests that the Auction be reopened, on terms substantially similar to those in the Bid Procedures. Moreover, now that the Petitioning Creditors have submitted supporting documentation for their bid, the Debtors and other Qualified Bidders – with this Court's guidance – should be able to better evaluate all the benefits and risks associated with the transaction which will enable a more fair and open auction process.

## BACKGROUND

I.    **The Sale Process Leading to the Auction & the Opening Bids**

12.    On May 17, 2013, the Debtors filed the Sale Motion in conjunction with a motion (the "Replacement DIP Motion") seeking the approval of replacement financing (the "Replacement DIP") (D.I. 1174). In its original incarnation, the Sale Motion and Replacement DIP Motion envisioned that New Allied Acquisition Co. LLC (the "New Allied"), an acquisition entity formed and owned by affiliates of the Petitioning Creditors, would be the stalking horse purchaser of substantially all of the Debtors' assets. Following admonishment from the Court at the May 31, 2013 hearing for ceding control over the outcome of the Debtors' cases to the Petitioning Creditors, the parties negotiated terms for Bid Procedures and the Replacement DIP, both of which this Court approved on June 21, 2013 over the objections of Yucaipa (D.I. 1320, 1324).

13.    Upon information and belief, after the entry of the Bid Procedures Order, the Debtors and their professionals actively negotiated, solicited and entertained offers for the sale of the Assets consistent with the Bid Procedures, and provided information to potential bidders sufficient for such bidders to formulate bids for the Assets. On or before August 8, 2013 (the "Bid Deadline"), two (2) parties submitted bids for substantially all of the Assets, Jack Cooper and the New Allied. Jack Cooper's original bid ("Jack Cooper's Opening Bid") consisted of $95 million in cash for substantially all of the Assets, excluding, among other

things, proceeds from or related to the pending adversary proceeding (Adv. Pro. No. 13-50530) (the "Adversary Proceeds"), collective bargaining agreements (and associated liabilities), liabilities for unpaid contributions and withdrawal liability. Jack Cooper's Opening Bid included a liquidated damages provision of up to $10 million. The financing commitment did not appear to survive if Jack Cooper's Opening Bid was determined to be the Backup Bid.

14.    The Petitioning Creditors' initial bid (the "Petitioning Creditors' Opening Bid") consisted of cash consideration of at most $50 million to be offered by New Allied for substantially all of the Assets, including all of the Debtors' cash and cash equivalents (other than the cash funding the wind-down) and seemingly including the Adversary Proceeds, but excluding collective bargaining agreements (and associated liabilities), liabilities for unpaid contributions and withdrawal liabilities. The Petitioning Creditors' Opening Bid was not a credit bid. Unlike Jack Cooper's Opening Bid, the Petitioning Creditors' Opening Bid required New Allied have agreed, executed and ratified new collective bargaining agreements with each applicable union as a condition precedent to closing and the obligations of New Allied. Both Jack Cooper and the Petitioning Creditors provided Good Faith Deposits in cash equal to 10% of the aggregate value of their respective bids as required under the Bid Procedures.

15.    In accordance with the Bid Procedures, following consultation with the Committee and Yucaipa (collectively, the "Consultation Parties"), the Debtors determined, on or before August 12, 2013, that Jack Cooper's Opening Bid (waiving the Backup Bid requirement) and the Petitioning Creditors' Opening Bid were Qualified Bids and announced that the Auction would commence on August 14, 2013 (D.I. 1584). The Debtors also announced that two (2) other bids, each for a portion of the Assets, were not Qualified Bids, including a $10 million bid by Vascor, Ltd. ("Vascor") for the Debtors' Assets relating to their vehicle logistics services

business ("Axis"), and a bid by General Motors Holdings LLC and several of its affiliates (collectively, "GM") in their individual capacities for certain of the Debtors' rights in accounts receivable (D.I. 1602).

## II.    The Auction

16.    The Auction commenced on August 14, 2013 and concluded on August 15, 2013. At the beginning of the Auction, the Debtors announced that Jack Cooper's Opening Bid was the first highest and best bid. Over the course of the Auction, the Petitioning Creditors – in their capacity as Requisite Lenders – made several Requisite Lender Bids, each of which were combined cash/credit bids,[8] appeared to contemplate that New Axis and LeaseCo would be one or two companies (together Axis/LeaseCo), and was focused on preserving the separation of OpCo from Axis/LeaseCo in an apparent effort to isolate the liabilities of OpCo from the value contained in Axis/LeaseCo. Every Requisite Lender Bid submitted at the Auction was a variation on this theme, and substantially different in form from the Petitioning Creditors' Opening Bid.[9]

17.    Generally speaking, the Petitioning Creditors sought, and continue to seek, to isolate a substantial portion of the employees (including all of those employees covered by collective bargaining agreements) and customer contracts in the new operating companies (i.e., OpCo), from the assets of Axis, which ultimately would be acquired by new entities (i.e, New

---

[8]    The purchase price of the Requisite Lender Bids consisted at all times of (i) cash consideration (not less than $40.5 million) equal to the amount necessary to pay off the Petitioning Creditors' Replacement DIP and to fund the wind-down budget, plus additional cash consideration of up to $10 million to be paid to First Lien Agents in partial satisfaction of the outstanding obligations under the First Lien Facility, and (ii) a credit bid of an amount sufficient to fill the differential between the cash component and whatever the overall purchase price of the applicable Requisite Lenders' Bid.

[9]    The final structure is described in the next section on the Requisite Lenders' Winning Bid. The iterative bids submitted by the Petitioning Creditors are set forth in the Auction transcripts. See 8/14 Auction Transcript at 12-16, 40-42; Transcript of Auction Proceedings, August 15, 2013, at 2-3, 25, 43-44 ("8/15 Auction Transcript") (D.I. 1616).

Axis), and the owned and leased terminal real estate (the "Terminals") and the trucks, rigs, tractors, trailers and other vehicles and related systems and operations (collectively, the "Rigs"), which would be acquired by new leasing companies (i.e., LeaseCo). See Transcript of Auction Proceedings, August 14, 2013, at 15, 58-59, 60 ("8/14 Auction Transcript") (D.I. 1616). This was made especially clear by the Petitioning Creditors' repeated assertions in the Auction that only OpCo would enter into the new collective bargaining agreements. See, e.g., 8/14 Auction Transcript at 41-42, 58-59; 8/15 Auction Transcript at 43-50.

18.    Throughout the Auction, the Petitioning Creditors did not provide (i) the executed terms of the sale under any of the Requisite Lender Bids, (ii) a complete picture of the corporate or capital structure of the purchasers, (iii) any independent projections concerning the ability of OpCo, New Axis and LeaseCo to perform under the contracts to be assumed and assigned, (iv) the specific contracts and leases that would be assumed and assigned to each particular purchaser, or (v) any idea about the post-closing intercompany arrangements regarding how and on what terms LeaseCo would provide to OpCo the Terminals and Rigs that are necessary for OpCo to operate its car-hauling business. See 8/14 Auction Transcript at 39, 47-49, 50-53, 80; Transcript of Auction Proceedings, August 15, 2013, at 6-8, 52-53, 58-59, 63-65, 70-73, 75-77 ("8/15 Auction Transcript") (D.I. 1616).

## III.    The Requisite Lenders' Winning Bid

19.    The Auction concluded after the Debtors announced that the final bid submitted by the Petitioning Creditors was the highest and best. Following the Auction, the Debtors and the Petitioning Creditors soon recognized the extent of the task ahead of them in order to document the concepts set forth in the Requisite Lenders' Winning Bid, and thus the Debtors requested more time to flesh out all of the details missing from the Requisite Lenders' Winning Bid – details that should have been provided in advance of the Auction. As a result, on

August 27, 2013, the Debtors filed the Sale Documentation, which contained the details of the Requisite Lenders' Winning Bid, including (i) a revised asset purchase agreement (the "APA"), (ii) the post-closing corporate structure, (iii) an executed direction and designation agreement purporting to enable New Allied to act on behalf of the agents under the First Lien Credit Agreement, (iv) an executed notice of designated purchasers (the "Designated Purchasers Notice") describing the assets, contracts and liabilities that entity in the new corporate structure would be acquiring or assuming and affirming the designated purchasers to be bound under the APA, (v) a series of new commitment letters, and (vi) service and lease agreements between the various entities.

      20.    ***Corporate Structure and Designated Purchasers (Exhibits B through D of the Sale Documentation).***  The corporate structure has been modified from the two or three entity structure described at the Auction, with New Allied designating numerous entities as designated purchasers:

- New Axis appears to be the designated purchaser of the Axis assets.

- Two entities – LeaseCo – appear to be the designated purchasers of the "hard" assets of the Debtors, i.e., rigs and real estate essential to the operation of OpCo.  One entity will acquire the applicable Canadian assets, while the other will acquire the applicable U.S. (and any other) assets.

- Two entities – OpCo – appear to be the designated purchasers of the substantial portion of the Debtors' customer contracts, employees and current assets.  One entity will acquire the applicable Canadian assets, while the other will acquire the applicable U.S. (and any other) assets.

- MgmtCo appears to be the designated purchaser of the assets of Allied (i.e., the holding company).

      21.    The First Lien Lenders will own New Allied (which will own OpCo) based on their pro rata share of the First Lien Debt, and will be entitled to participate in an offering of a new second lien facility for New Axis and LeaseCo in order to acquire 90% of

membership interests in Axis/LeaseCo (the Petitioning Creditors will acquire 10% of the membership interests as a fee for backstopping the offering). Any membership interests in OpCo that a "Restricted Sponsor Affiliate" – which under the First Lien Credit Agreement means Yucaipa – would otherwise be entitled to will be held in reserve pending the resolution of disputes concerning the treatment of Yucaipa's First Lien Debt, but will, in any event, be non-voting membership interests. Similarly, any membership interests in Axis/LeaseCo that Yucaipa acquires (even if Yucaipa is ultimately determined to be a valid holder of First Lien Debt) will be deemed "Class B non-voting membership interests."

22.     ***Capital Structure (Exhibits H through J of the Sale Documentation).*** OpCo will have access to a $6.5 million, 11.0% first lien revolving credit facility (the "OpCo Credit Facility") provided by affiliates of the Petitioning Creditors, and New Axis and LeaseCo will be co-obligors under a $20 million, 11.0% first lien revolving credit facility (the "Axis/LeaseCo First Lien Facility") provided by affiliates of the Petitioning Creditors and a $60 million, 12.5% second lien term loan facility (the "Axis/LeaseCo Second Lien Facility") backstopped by affiliates of the Petitioning Creditors. The Petitioning Creditors will offer to each First Lien Lender an "all or nothing" option to participate in the Axis/LeaseCo Second Lien Facility, i.e. – a First Lien Lender must subscribe for all of its pro rata share of the principal amount of the Axis/LeaseCo Second Lien Facility. If Yucaipa participates in this offering and is subsequently found to not hold "valid" First Lien Debt, New Axis and LeaseCo will have the right to buy out any debt held by Yucaipa under the Axis/LeaseCo Second Lien Facility at an amount equal to the original principal amount (less any previous payments made on account thereof) plus a discounted 3.50% interest rate (the "Buyout Amount"), and if this right is exercised and effectuated, any membership interests Yucaipa acquired as a result of subscribing

to the Axis/LeaseCo Second Lien Facility (the "Yucaipa Axis/LeaseCo Interests") will be extinguished. Moreover, if New Axis and LeaseCo do not exercise this right, the other lenders under the Axis/LeaseCo Second Lien Facility will have the right to purchase such Yucaipa debt under the Axis/LeaseCo Second Lien Facility *and* the Yucaipa Axis/LeaseCo Interests at the Buyout Amount. The Petitioning Creditors will earn approximately $1.3 million in fees for three credit facilities (not including loan servicing fees), plus their share of the $1.95 million commitment fee for the Axis/LeaseCo Second Lien Facility (which, at a minimum, is likely to be at least $500,000 given the Petitioning Creditors' pro rata share of the First Lien Debt).

23.      ***Intercompany Agreements (Exhibits E through G of the Sale Documentation).***  Allied Management will provide many of the administrative services for the other companies under a Shared Services Agreement. LeaseCo will lease the real property to OpCo for $1.725 million a year on a 48 month term, plus additional amounts for utilities, taxes and operating expenses. LeaseCo will lease the Rigs to OpCo for $6.3 million a year on a 48 month term, with OpCo maintaining the Rigs.

## OBJECTION

24.      It is a fundamental policy of bankruptcy law that a debtor in possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of *all* creditors," not just a select few. In re R.H. Macy & Co., 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 527 (1984)) (emphasis added). Indeed, one of the core purposes of a chapter 11 reorganization is to preserve the value of the debtor's estate as a going concern for the benefit of all creditors and stakeholders. See In re Integrated Telecom Express, Inc., 384 F.3d 108 119 (3d Cir. 2004) (stating that "[t]he Supreme Court has identified two of the basic purposes of Chapter 11 as (1) 'preserving going concern'

14

and (2) 'maximizing property available to satisfy creditors.'"); In re General Motors Corp., 407

B.R. 463, 493 (Bankr. S.D.N.Y. 2009) (stating that the court's interests were "focused on

preserving and maximizing value, allowing suppliers to survive, and helping keep their jobs").

These considerations necessarily inform a sale under section 363 of the Bankruptcy Code in the

Debtors' chapter 11 cases, and thus the debtor in possession has a fiduciary duty to maximize the

going concern value of the assets being sold for the benefit of the estate and *all* its creditors.

See, e.g., In re Reliant Energy Channelview LP, 594 F.3d 200, 210 (3d Cir. 2010) ("debtors-in-

possession have a fiduciary duty to maximize the value of the estate."); In re Mushroom Transp.

Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004) (stating that "in Chapter 11 cases where no trustee is

appointed, 11 U.S.C. § 1107(a) provides that the debtor-in-possession, i.e., the debtor's

management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with

those powers, of course, comes the trustee's fiduciary duty to maximize the value of the

bankruptcy estate. The debtor-in-possession's fiduciary duty to maximize includes the duty to

protect and conserve property in its possession for the benefit of creditors."); In re Food Barn

Stores, Inc., 107 F.3d 558,564-65 (8th Cir. 1997) (stating that in evaluating a bankruptcy sale,

"the court must also remain mindful of the ubiquitous desire of the unsecured creditors, and a

primary objective of the Code, to enhance the value of the estate at hand.").

       25.    A sale of substantially all of a debtor's assets pursuant to section 363 of

the Bankruptcy Code outside of a plan of reorganization "requires a bankruptcy court's careful

review." In re Exaeris Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008); see also In re Dewey

Ranch Hockey, LLC, 414 B.R. 577, 592 (Bankr. D. Ariz. 2009) (holding that "[b]ecause there is

a real danger that a section 363 sale might deprive parties of substantial rights inherent in the

plan confirmation process, sales of substantial portions of a debtor's assets under Section 363 must be scrutinized closely by the court.").

26.   To obtain approval of a sale of its assets outside of a plan, a debtor bears the burden of demonstrating that: "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith." Id. at 744.   Moreover, it is well-settled in the Third Circuit and other circuits that a section 363 asset sale may not be used to circumvent the creditor protection provisions of the Bankruptcy Code.   See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 (3d Cir. 1986); In re Westpoint Stevens, Inc., 330 B.R. 30, 52 (S.D.N.Y. 2005); In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998); In re Nicole Energy Services, Inc., 385 B.R. 201 (Bankr. S.D. Ohio 2008); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (illustrating numerous factors considered by courts).

27.   Based on the facts of this case, the Debtors cannot satisfy their burden to sell substantially all of their Assets pursuant to the Requisite Lenders' Winning Bid because (a) the Debtors did not facilitate a fair and open Auction by improperly accommodating and selecting the Requisite Lenders' Winning Bid despite the absence of sufficient concrete metrics to evaluate it against Jack Cooper's bids, and (b) the Requisite Lenders' Winning Bid is not the highest and best offer available to the Debtors, given the excessive execution risk and the absence of an appropriate remedy for the Debtors if it fails to close.

28.   Because of the current circumstances of these chapter 11 cases, the Committee believes that a firm, high probability sale that maximizes the Debtors' *going concern* value promptly, without substantial prejudice to unsecured creditors and the Debtors' contractual

counterparties, and minimizes the expenses of the estates going forward. For all of the reasons outlined above and described in depth below, the Requisite Lenders' Winning Bid is not such a sale – the value offered by the Requisite Lenders' Winning Bid is largely illusory as its numerous infirmities and contingencies put into serious question its validity and ability to ever close. When set against Jack Cooper's $100 Million Bid, which was far simpler and robust, the Committee believes that the Debtors, perhaps caught in a blind pursuit for merely a higher purchaser price, did not exercise their sound business judgment in naming the Requisite Lenders' Winning Bid as the highest and best offer.[10]

29.       Accordingly, there is no sound business purpose for the approval of the Requisite Lenders' Winning Bid, particularly given Jack Cooper's desire to bid on the Assets in a fairly administered Auction. See Jack Cooper Objection ¶¶ 4, 37, 43, 46. Thus, the Committee requests that the Auction be reopened to permit further bidding, on terms substantially similar to those provided for in the Bid Procedures, with the appropriate instructions from this Court, so that the Debtors will truly have the best opportunity to preserve and maximize the going concern value of their Assets.

I.      **The Requisite Lenders' Winning Bid Is Not the Highest and Best Offer and Was Selected in Contravention of the Bid Procedures and Not Within the Sound Business Judgment of the Debtors**

30.       If a competitive, market-tested auction generated a winning bid, courts ordinarily assume that such a bid approximates market value. See, e.g., Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship, 526 U.S. 434, 457 (1999). However, as in this case, the fact

---

[10]    The Debtors may have also been influenced by the Petitioning Creditors' rights to credit bid the First Lien Facility; but the right to credit bid is *not* absolute. See 11 U.S.C. § 363(k) (stating that a credit bid may limited by the court "for cause"); 11 U.S.C. § 363(e) (requiring that any request for a sale under section 363, "the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."); see also In re NJ Affordable Homes Corp., 2006 WL 2128624, *16 (Bankr. D.N.J. 2006) ("[T]he language of § 363(k) does not prohibit a bankruptcy court from placing conditions upon a secured creditor's ability to credit bid.").

that an auction simply occurred is not determinative of the fairness of the sale process. <u>See</u> <u>Abbott Dairies</u>, 78 F.2d at 149. Here, the Debtors have failed to demonstrate that the Requisite Lenders' Winning Bid was the product of an adequate competitive bidding process due to numerous defects in the Auction process and the clear evidence that it simply is not the highest and best bid.

> **A.    The Conduct of the Auction Violated the Bid Procedures in a Manner that Prevented the Facilitation of a Open and Fair Auction And Obstructed the Maximization of the Going Concern Value of the Assets**

31.    The Auction was not conducted in a manner consistent with the goal of maximizing the going concern value of the Debtors' estates. Instead, the Debtors modified the Bid Procedures on multiple occasions to accommodate the Requisite Lender Bids at the Auction without any of the documentation necessary to properly evaluate these bids, thus perverting the purpose and rationale for such Bid Procedures.[11] "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate" <u>In re Edwards</u>, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); <u>see also</u> <u>In re Mama's Original Foods, Inc.</u>, 234 B.R. 500, 505 (Bankr. C.D. Cal. 1999) (a fair bidding process is required so that each potential bidder is given an adequate opportunity to bid).

32.    These principles are especially important in these cases where the Court found that the original Petitioning Creditors-sponsored Bid Procedures were "dead on arrival" because of efforts by the Petitioning Creditors to wield an inordinate amount of control over the Debtors. <u>See</u> Hr'g Transcript, May 31, 2013 at 21-22. As a result, the Committee, the

---

[11]    In an interesting contrast, when asked by Jack Cooper to provide a basis for valuing the Petitioning Creditors' $95.5 million bid over Jack Cooper's Opening Bid of $95 million, the Debtors refused to respond (<u>see</u> 8/14 Auction Transcript at 65-66), while when asked by the Petitioning Creditors to explain why the Petitioning Creditors' $100.5 million bid was not higher and better than Jack Cooper's $100 Million Bid, the Debtors stated that it was primarily because of the union issues associated with the Petitioning Creditors' bid. <u>See</u> 8/15 Auction Transcript at 29-30, 37.

Petitioning Creditors and others negotiated and revised the Bid Procedures in a manner that would facilitate an open and fair process that would encourage third parties to participate in the sale process.

33.    While the Committee does not take issue with routine modifications to the Bid Procedures that may be made by the Debtors to adapt to changing circumstances, the wholesale disregard of the Bid Procedures at the Auction was contrary to the facilitation of an open and fair auction and the maximization of going concern value for the estate.  Indeed, the Bid Procedures state that

> the Debtors, in consultation with the Consultation Parties, may adopt and modify rules for the Auction at the Auction that, in the Debtors' reasonable business judgment and in consultation with the Consultation Parties, *will better promote the goals of the Auction* and that are not inconsistent with any provisions of the Bid Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court . . . .  All such rules will provide that:  (i) the Auction procedures must be *fairly and evenly administered, and not intended to cause any participating Qualified Bidder to be disadvantaged in any material way with respect to the process as compared to any other participating Qualified Bidder*; and (ii) the Consultation Parties and all participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other participating Qualified Bidders and that *all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction.*

Bid Procedures ¶ 20(ii) (emphasis added).

34.    Prior to the Auction, the Petitioning Creditors, in their individual capacities only, submitted a straightforward cash bid that the Debtors found minimally satisfied the requirements of a Qualified Bid under the Bid Procedures.  At the Auction however, the Petitioning Creditors submitted combined cash/credit bids in their capacity as Requisite Lender, that included non-cash consideration and the multi-purchaser ownership structure described above that theretofore had not been seen or reviewed by any other party in these chapter 11 cases.

35.    The Petitioning Creditors were permitted to continue to make these Requisite Lender Bids at the Auction despite the absence of virtually any information available for the Debtors, the Consultation Parties and other Qualified Bidders to properly assess and evaluate the value and viability of such bids in the context of a fair and open auction. Despite the fact that the Bid Procedures were designed specifically to ensure that such a scenario would not occur, the Debtors ignored or waived numerous such requirements under the Bid Procedures, including, without limitation, the Petitioning Creditors' failure to:[12]

- disclose all material terms of the Requisite Lender Bids (<u>see</u> Bid Procedures ¶ 20(ii)),

- deliver full written documentation of the material documents to the Debtors (<u>see</u> Bid Procedures ¶ 12(xvi)),

- provide duly executed and enforceable asset purchase agreement together with all necessary exhibits, schedules and ancillary documents, including the terms of the intercompany arrangements that must be in place between LeaseCo and OpCo in order for OpCo to operate its car-hauling business (<u>see</u> Bid Procedures ¶ 12(iii)),

- provide, for each purchasing entity, a list of executory contracts and unexpired leases to be assumed and assigned (<u>see</u> Bid Procedures ¶ 12(v)),

- provide any independent financial projections or other information demonstrating the ability of OpCo, New Axis and/or LeaseCo to consummate the sale and to provide adequate assurance of future performance, including specific financing for such entities, that such purchasers can perform as going concerns (<u>see</u> Bid Procedures ¶ 12(vii). (viii), (x)), and

- disclosure as to the identity of each new entity formed for purpose of acquiring some or all of the Assets and the parties that will bear liability for any breach by such entity (<u>see</u> Bid Procedures ¶ 12(xi)).

36.    None of these modifications were a proper exercise of the Debtors' reasonable business judgment, nor did they aid in promoting the goals of the Auction. Instead,

---

[12]   The Auction transcripts at numerous points reveal these, and other, deficiencies with the Requisite Lender Bids. <u>See</u>, <u>e.g.</u>, 8/14 Auction Transcript at 39, 47-49, 50-53, 68-69, 74, 80; 8/15 Auction Transcript at 6-8, 52-53, 58-59, 63-64, 70-81. Moreover, as other parties noted at the Auction, it is doubtful that the Debtors even had the authority to modify the Qualified Bid requirements for any bid by the Prepetition First Lien Agents (or affiliates thereof) with a credit bid component. <u>See</u> 8/14 Transcript at 74-75 (noting that paragraph 13 of the Bid Procedures requires such credit bids by the Prepetition First Lien Agents comply with paragraph 12(i)-(xvi) and that paragraph 20(ii) of the Bid Procedures prohibits the modification of paragraph 13).

they enabled the Petitioning Creditors to propose variations of their new multi-purchaser bid without the parties being able to competently evaluate all facets of the bid, thereby infusing the bidding process with incurable uncertainty and materially disadvantaging the ability of other parties to digest the actual value of the bid, all material terms of which were not even disclosed at that time.[13]  The Debtors, perhaps blinded by the Petitioning Creditors' offer of incrementally "higher" purchase prices and the extent of the Petitioning Creditors' credit bid rights, ultimately deemed, with approval of the special committee of the Debtors' board of directors, the Requisite Lenders' Winning Bid (5% higher than the purchase price of Jack Cooper's last bid at the Auction) to be the highest and best offer for substantially all of the Assets.  See 8/14 Auction Transcript at 68-69, 74; 8/15 Auction Transcript at 5, 63, 67.

37.    Further troubling the Committee was the step backwards that the Debtors took in accepting the Requisite Lenders' Winning Bid as a Qualified Bid and the highest and best offer.  As noted by several Auction participants, the Requisite Lenders' Winning Bid was on the whole *worse* than their prior bid of $100.5 million as a result of the Petitioning Creditors' refusal to be the Backup Bidder and replacement of the "hell or high water" specific performance/damages provision with a $20 million liquidated damages provision.  See 8/15 Auction Transcript at 69, 80.  The Backup Bid requirement is important enough that it is customarily required in order for bids to be qualified under bid procedures, including these Bid Procedures, and thus the effective waiver of that requirement diminished the value of the Requisite Lenders' Winning Bid.  Moreover, cutting down the full specific performance/damages provision to a $20 million damages provision on its face, and coupled with the open question of whether the Petitioning Creditors can assign, as liquidated damages for their

---

[13]    Presumably, all material terms of the Requisite Lenders' Winning Bid were disclosed in the Debtors' filing of the Sale Documentation last week (D.I. 1654).

21

own breach, distributions on account of claims of all First Lien Lenders, further reduced the value of the Requisite Lenders' Winning Bid.[14] See 8/14 Auction Transcript at 12-13, 27, 47; 8/15 Auction Transcript at 43-44, 63.

      38.    Thus, upon evaluation of the Requisite Lenders' Winning Bid, the Debtors failed to demonstrate how that bid was any better than their $100.5 million bid, which was deemed by the Debtors to be inferior to Jack Cooper's $100 Million Bid on the basis of the $100.5 million bid's execution risks.   Accordingly, the Debtors' ultimate finding that the Requisite Lenders' Winning Bid is both a Qualified Bid and the highest and best offer is doubly problematic as it

    (i) violates paragraph 20(viii) of the Bid Procedures, which prohibits Qualified Bidders from submitting modifications to their bids that, "on an aggregate basis and viewed in whole," are less favorable to the Debtors "as determined by the Debtors, and in consultation with the Consultation Parties," and

    (ii) violates paragraph 20(ix) because it cannot be the highest and best offer when it is clearly inferior to the Requisite Lenders' prior $100.5 million bid that the Debtors found was *not* higher and better than Jack Cooper's $100 Million Bid.

It is evident that the Debtors cannot modify these two provisions of the Bid Procedures without disadvantaging any other Qualified Bidder, disrupting the fair and even administration of the Auction and prejudicing the ability of the Debtors to maximize the value of their Assets.

      39.    The Petitioning Creditors have been involved from the very beginning of these chapter 11 cases (in fact, instigating them), and likely had contemplated some form of the multi-purchaser structure proposed at the Auction for some time now.  Yet instead of preparing a bid predicated on that structure by the Bid Deadline (or bringing appropriate documentation to the Auction) so that all parties in interest could evaluate and value such a bid, they submitted a

---

[14]  The Requisite Lenders' Winning Bid also stated that the new operating company would enter into new collective bargaining agreements that are identical to the ones currently in place. However, as set forth at the Auction, the bid continues to have the same union issues that sunk the Petitioning Creditors' earlier $100.5 million bid. See 8/15 Auction Transcript at 83-84.

marginal "decoy" bid in their individual capacities, and lobbed in their multi-purchaser "Requisite Lender" bid with no documentation or substance whatsoever other than what was represented at the Auction – truly a "ghost" bid in contravention of the Bid Procedures. For its part, Jack Cooper appears to have fully prepared its bid in accordance with the Bid Procedures. Accordingly, the Committee struggles to see how the Debtors could have exercised its sound business judgment to nominate the last Requisite Lenders' Bid as the highest and best without critical information described above. As such, the Requisite Lenders' Winning Bid cannot be approved.

**B.     The Requisite Lenders' Winning Bid Is Not Higher And Better Than Jack Cooper's $100 Million Bid**

40.     Procedural issues aside, the Requisite Lenders' Winning Bid is not a higher and better offer than Jack Cooper's $100 Million Bid. While the Requisite Lenders' Winning Bid provides $5 million (as a credit bid) more than Jack Cooper's all-cash bid, the transaction risk and delay associated with it could end up costing the Debtors' estates substantially more in "real" dollars than the incremental $5 million credit bid consideration.

41.     Indeed, courts have held that "lower" bids can be the highest and *best* bid if the execution risk is lower than a bid with a higher purchase price. See In re Bakalis, 220 B.R. at 525 (holding that the bid that was $700,000, or 6%, lower than a competing bid was the "highest and best" because it was only contingent upon regulatory approval while the competing bid was conditioned on numerous contingency and walk-away clauses); In re Dewey Ranch Hockey, LLC, 414 B.R. 577, 592 (Bankr. D. Ariz. 2009) (finding that bid submitted by professional hockey league at auction sale of one of its member teams in Chapter 11 case was better than a competing bid despite offering substantially lower purchase price, because it paid secured debt in full, made a significant payment to unsecured creditors, had significant support

from some of the other creditors and had materially fewer execution risks); In re Broadmoor Place Investments, L.P., 994 F.2d 744, 745 (10th Cir. 1993) (approving a cash bid over a bid offering approximately 4% more in cash because the "lower" bid "provided fewer contingencies and facilitated a more immediate closing.").

42.    Here, the Committee observes that (1) the Petitioning Creditors have failed to demonstrate adequate assurance of future performance for at least OpCo and LeaseCo, (2) the Petitioning Creditors' Winning Bid suffers from potential defects with respect to its treatment of collective bargaining agreements and will be vigorously challenged by the unions representing a significant portion of the Debtors' employees, and (3) the Petitioning Creditors' Winning Bid will result in more time-consuming and expensive litigation (at the expense of a successful resolution to these chapter 11 cases), because it treats Yucaipa worse than other First Lien Lenders under the post-closing corporate and capital structure (and may be an impermissible *sub rosa* plan), and may inappropriately prejudice the rights of other First Lien Lenders with respect to its assignment of distributions to which all First Lien Lenders would otherwise be entitled. In light of these risks, described in detail below, the Committee can come to only one conclusion: that taking into account all material factors, as required under the Bid Procedures and the Bankruptcy Code, the Requisite Lenders' Winning Bid is inferior to Jack Cooper's $100 Million Bid.[15]

### a.  Adequate Assurance of Future Performance

43.    The Petitioning Creditors and the Debtors have not demonstrated in its adequate assurance package that there is adequate assurance of future performance under the

---

[15]    The Bid Procedures provide that the "Debtors seek to sell the Assets as a going concern, provided that a sale so constituted would yield the highest or otherwise best offer for the Assets" (Bid Procedures ¶ 6) and several factors to be used as guideposts in valuing bids at the Auction, "including, without limitation, the aggregate amount of cash consideration, the Assumed Liabilities, and the executory contracts to be assumed and assigned (including collective bargaining agreements)." Bid Procedures ¶ 20(ix).

Petitioning Creditors' Winning Bid. Given that this sale proposes to sell the Assets as a going concern business and isolate the liabilities in OpCo, away from the valuable "hard" assets, adequate assurance of future performance required under section 365(f)(2) of the Bankruptcy Code in connection with a 363 sale is imperative as OpCo could be insolvent upon the consummation of the sale. To date, the only financial information provided by the Petitioning Creditors consists of the highly summarized chart contained in the filed adequate assurance package (D.I. 1712) and a Professionals' Eyes Only spreadsheet that is essentially the source for the figures contained in the summary chart. The disclosures are deficient and based, in part, on faulty assumptions. For example:

- The projected revenue both for OpCo and Axis/LeaseCo are extraordinarily aggressive, ██████████████████████████████████████████████████. However, the August 2013 forecast for North American light vehicle production (which closely correspond to car haul revenue) calls for year-over-year increases of only 2%, 4% and 3% for 2014, 2015 and 2016 respectively.[16] The Petitioning Creditors have not provided any commentary for its projected increase in revenue of any of these units, nor the discrepancy to the overall market forecasts.

- The Petitioning Creditors suggest a normalization of terms with the Debtors' existing customers which presumably would include a return to industry standard payment terms of approximately 45 days (vs. the current expedited payment terms of approximately 15 days). ██████████████████████████████████████. To finance this growth the Petitioning Creditors are proposing only $6.5 million revolving line of credit. Conversely, without a return to normal industry standard payment terms, OpCo's ability to attract new business, let alone retain its existing customers appears unlikely. Notwithstanding the apparent lack of working capital financing, OpCo's customers (sophisticated multinational automotive manufactures) are unlikely to place, or keep, business with OpCo under such an unusual and risky operating structure as proposed by the Petitioning Creditors.

---

[16] This data comes from IHS Automotive, a widely-used market publication in the automotive industry. See IHS Automotive Light Vehicle Production: Summary – North America, August 2013.

- The Petitioning Creditors' projected capital expenditure spending for LeaseCo of approximately $64 million for the three year period of 2014 through 2016

- Equally troubling is the fact that OpCo, New Axis and LeaseCo – new entities to be created for the purposes of acquiring the Assets – have no commitment or guaranty from each other, the Petitioning Creditors, or any other entity for the contractual obligations to be undertaken.

- The Petitioning Creditors have presented no evidence of any experience or ability to successfully run the Debtors' businesses, and indeed have not provided any business plan or management team that offer such a capability.

44.     In contrast to all of the foregoing, Jack Cooper is an established player in the trucking industry and based upon confidential information provided to the Committee's professionals as to its financial ability as a whole, can assure future performance of the executory contracts and unexpired leases to be assumed and assigned.

**b.  Execution Risk Related to Union Issues**

45.     Moreover, there is a significant probability that the Requisite Lenders' Winning Bid – as described at the Auction and documented in the sale documentation – would not be acceptable to TNATINC (which represents a significant percentage of the Debtors' U.S. employees), CAW-Canada and potentially other unions because of the structure proposed by the Petitioning Creditors to confine the liabilities of OpCo to OpCo, and Axis/LeaseCo to Axis/LeaseCo. As the unions could strike, breaching a precondition to the sale, the ability of the Debtors to close the sale is threatened, in addition to presenting substantial business interruption and enterprise value risk. As described at the Auction, TNATINC will not accept the Petitioning Creditors' scheme because of a violation of certain collective bargaining provisions – which was

26

not disputed by the Petitioning Creditors at the Auction. See, e.g., 8/15 Auction Transcript at 14-15, 83-84. Indeed, the Debtors themselves concluded that an earlier iteration of the Requisite Lender Bids had too much execution risk that threatened the Petitioning Creditors' "ability to close given certain 1113 issues." See 8/15 Auction Transcript at 29-30.

46.    Despite recognizing this issue, the Debtors failed to recognize that the Requisite Lenders' Winning Bid in no way mitigated this risk. The Requisite Lenders' Winning Bid only provides that an entity would enter into a new collective bargaining agreement identical to an existing collective bargaining agreement in place with the Debtors only to the extent that such entity is hiring an employee currently under such existing collective bargaining agreement. See APA §§ 6.1, 8.12; 8/15 Auction Transcript at 83-84. As the Petitioning Creditors have continued to refuse to have each of their designated purchasers enter into all of the existing collective bargaining agreements, and otherwise satisfy the requirements of each such collective bargaining agreement, there is substantial likelihood that the Requisite Lenders' Winning Bid cannot close in the U.S. or in Canada, and a serious risk that a significant portion of the Debtors' workforce could strike under each union's collective bargaining agreement and section 1113 rights, compromising the viability of the Debtors' businesses as a going concern. See, e.g., Objection and Reservation of Rights of TNATINC to the Sale Motion (D.I. 1207); CAW-Canada Objection (D.I. 1723). Unlike the Petitioning Creditors, Jack Cooper "has no union issues, no 1113 issues" (8/15 Auction Transcript at 37) because Jack Cooper is already "a signatory [to] the same collective bargaining agreement that Allied is . . . [and thus has] met the obligations of the collective bargaining agreement." 8/15 Auction Transcript at 14-15.[17]

---

[17]    The addition of section 9.2(k) to the APA, which enables the Petitioning Creditors to request the assumption and assignment of existing collective bargaining agreements, has no real impact on the foregoing, as it is entirely within the discretion of the Petitioning Creditors, and does not require that all of the purchasing entities would be assuming the applicable collective bargaining agreements.

### a. Execution Risk Related to Treatment of Yucaipa and Other First Lien Lenders

47.     There is substantial litigation risk associated with the Petitioning Creditors' proposed treatment of Yucaipa under the Requisite Lenders' Winning Bid.  While the Petitioning Creditors represented at the Auction that Yucaipa would be entitled to its share of the New Allied's membership interests and entitled to participate in the offering for Axis/LeaseCo membership interests, the Requisite Lenders' Winning Bid treats Yucaipa differently than all other First Lien Lenders, even if they are ultimately found to be valid First Lien Lenders.  For example, the bid

- treats all of Yucaipa's interests as non-voting membership interests, even if Yucaipa ultimately is found to hold valid First Lien Debt,

- creates harsh consequences if Yucaipa's First Lien Debt is to be subordinated (i.e., enabling New Axis and LeaseCo to buy out Yucaipa's Axis/LeaseCo Second Lien Facility holdings at the discounted Buyout Amount and cancel the Yucaipa Axis/LeaseCo Interests in Axis/LeaseCo, enabling the other First Lien Lenders to acquire Yucaipa's Axis/LeaseCo Second Lien Facility holdings and the Yucaipa Axis/LeaseCo Interests at the Buyout Amount), and

- establishes strict requirements on how First Lien Lenders can participate in the debt offering of the Axis/LeaseCo Second Lien Facility (i.e., requiring full subscription, which is clearly targeted to hinder the ability of Yucaipa, as a holder of over 50% of the First Lien Debt, to participate).

48.     It is uncertain whether 363 sales can treat creditors of a similar type in this fashion, particularly given that the Requisite Lenders' Winning Bid relies in large part on a credit bid of First Lien Debt.  Indeed, there may be a credible argument that this treatment renders the sale an impermissible *sub rosa* plan.  The "payment" of First Lien Debt being made for the purchase of Assets should be shared *pro rata* amongst the First Lien Lenders, but the bid's terms seem specifically geared towards punishing Yucaipa and impeding its ability to participate in the ownership of the new companies.  This raises the issue of whether such treatment unfairly discriminates against Yucaipa by distributing "worse" value to Yucaipa as opposed to other First

Lien Lenders on account of the credit bid of First Lien Debt, resulting in disparate treatment amongst First Lien Lenders in contravention of sections 1123(a)(4) and 1129 of the Bankruptcy Code and constituting an improper attempt at dictating terms of a chapter 11 plan without subjecting such terms to the usual section 1129 scrutiny under the Bankruptcy Code. See Collier on Bankruptcy ¶ 363.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Attempts to determine plan issues in connection with the sale are improper and should result in a denial of the relief requested").

49.    Further, while this Court held that the Petitioning Creditors are the Requisite Lenders under the First Lien Credit Agreement, it is unclear the extent to which they can give up the rights of other First Lien Lenders for a material breach by the Petitioning Creditors of their own winning bid, and to forgive distributions to all First Lien Lenders as part of their Good Faith Deposit. As such, the status of the Petitioning Creditors' Good Faith Deposit, and ability of the Debtors to obtain liquidated damages against the Petitioning Creditors under the APA and associated documents are in serious question. At the Auction, Yucaipa forcefully challenged the validity of the Requisite Lenders' Winning Bid based upon the authority of the Petitioning Creditors to act on behalf of all First Lien Lenders and upon other grounds, including the treatment. The litigation risk associated with Yucaipa's anticipated challenge to the sale on each of these grounds further jeopardizes the underlying validity of the Requisite Lenders' Winning Bid, as well as its ability to close promptly. On the other hand, Jack Cooper's $100 Million Bid suffers from no such issues.

50.    While the Committee acknowledges that execution risk exists with any deal, the Requisite Lenders' Winning Bid poses a disproportionate amount of risk in relation to the incremental benefit of the additional $5 million credit bid to the estate. The foregoing issues

pose an unreasonable execution risk substantially borne by the Debtors and their creditors, including contractual counterparties and employees, as they will likely leave the Debtors without a buyer through the end of this year and without liquidity to continue much longer as a going concern beyond that point. The Requisite Lenders' Winning Bid, like their defeated stalking horse bid, is replete with contingencies and uncertainty, is not the highest and best offer, and thus should not be approved.

## II.    The Auction Should Be Reopened Subject to the Court-Approved Bid Procedures

51.    While the Requisite Lenders' Winning Bid should not be approved, the Committee is fundamentally concerned about generating the best value for the Debtors and their stakeholders through a viable and executable going concern 363 sale. The Committee submits that the appropriate solution is to reopen the Auction so that Qualified Bidders can participate, as well as to have the Debtors and the Consultation Parties reconsider the other bids for individual segments of the Assets that were not qualified in advance of the Auction in the event a value maximizing transaction could be formulated based upon a combination of bids.

52.    Courts have held that reopening an auction is appropriate before the entry of the sale order in circumstances where competing bidders have remained interested and willing to present higher and better offers, especially when there were defects in the auction process. See In re Financial News Network, Inc., 980 F.2d 165, 170 (2d Cir. 1992) ("It is plain therefore that unusual situations may justify the exercise of the judge's discretion to refuse confirmation of the highest auction bid. To hold otherwise would seriously compromise the necessarily broad discretion of the bankruptcy court."); Food Barn, 107 F.3d at 566-67 (holding that bankruptcy court acted within its discretion when it accepted other bids after announcing its intention to approve sale of debtor's lease to original bidder, as the original bidder knew that the sale would not be final prior to court approval); Corporate Assets, Inc. v. Paloian, 368 F.3d 761, 768-73 (7th

Cir. 2004) (holding that bankruptcy court properly permitted second auction and confirmed sale based on results of second auction, where first auction was materially flawed, where the second auction resulted in significantly more value for estate).

53.    Here, the Committee believes that the best opportunity to enhance value and produce a quick and executable sale would be to reopen the Auction under the Bid Procedures because (i) the Auction failed to facilitate a fair, even and transparent environment to maximize value, and accordingly discouraged Jack Cooper from continuing to participate, (ii) the bid submitted in the Sale Documentation at long last sets forth in much more depth the structure and details of the bid such that all parties are now better equipped to evaluate the benefits and risks of that bid, (iii) the bid submitted in the Sale Documentation differs in several material ways from the Requisite Lenders' Winning Bid as announced at the Auction, and thus parties should have an opportunity to, at the very least, be afforded another round of bidding, and (iv) Jack Cooper has indicated its continued interest in bidding on the Assets if the Auction is conducted fairly and evenly.   See Jack Cooper Objection ¶¶ 4, 37, 43, 46.   Therefore, the Committee respectfully requests that this Court issue the appropriate instructions concerning the deficiencies with the Requisite Lenders' Winning Bid and reopen the Auction subject to substantially the same terms as set forth in the Bid Procedures and any other modifications this Court deems appropriate in light of the circumstances.

### RESERVATION OF RIGHTS

54.    The Committee and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, to raise additional objections to the Sale Motion

and related documents prior to, or during, the hearing scheduled on the Sale Motion, and to negotiate and document alternative sale transactions.

**CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) sustain this Objection, (ii) deny the approval of the sale of substantially all of the Debtors' assets to the Petitioning Creditors on the terms set forth in the Notice of Filing of Sale-Related Documents (D.I. 1654), (iii) reopen the Auction subject to substantially the same terms as set forth in the Bid Procedures, and (iv) grant such other further relief as is just and proper.

Dated: Wilmington, Delaware
September 4, 2013

SULLIVAN · HAZELTINE · ALLINSON LLC

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
901 N. Market St., Suite 1300
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile:  (302) 428-8195

– and –

**SIDLEY AUSTIN LLP**
Michael G. Burke
Nicholas K. Lagemann
Dennis Kao
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599

*Counsel for the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I, William A. Hazeltine, do hereby certify I am not less than 18 years of age and that on this 4th day of September 2013, I caused unredacted copies of the foregoing document, unless otherwise indicated, to be served upon the parties listed below in the manner indicated.

**Via Electronic and First Class U.S. Mail**

Jeffrey W. Kelley, Esq.
Ezra Cohen, Esq.
Michael E. Johnson, Esq.
Troutman Sanders LLP
600 Peachtree Street, NE Suite 5200
Atlanta, GA 30308-2216
Email: jeffrey.kelley@troutmansanders.com
        ezra.cohen@troutmansanders.com
        michael.johnson@troutmansanders.com

**Via Electronic and First Class U.S. Mail**

Robert A. Klyman, Esq.
Glen B. Collyer, Esq.
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Email: robert.klyman@lw.com
        glen.collyer@lw.com

**Via Electronic and First Class U.S. Mail**

Adam C. Harris, Esq.
Robert J. Ward, Esq.
Lawrence V. Gelber, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Email: adam.harris@srz.com
        robert.ward@srz.com
        lawrence.gelber@srz.com

**Via Electronic Mail and Hand Delivery**

Mark D. Collins, Esq.
Robert J. Stearn, Jr., Esq.
Christopher M. Samis, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 King Street
Wilmington, DE 19801
Email: collins@rlf.com
        stearn@rlf.com
        samis@rlf.com

**Via Electronic Mail and Hand Delivery**

Michael R. Nestor, Esq.
John T. Dorsey, Esq.
Donald J. Bowman, Jr., Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Email: mnestor@ycst.com
        jdorsey@ycst.com
        dbowman@ycst.com

**Via Electronic Mail and Hand Delivery**

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Jeffrey Drobish, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
Email: landis@lrclaw.com
        mumford@lrclaw.com
        drobish@lrclaw.com

1

**Via Electronic Mail and Hand Delivery**

William E. Chipman, Jr., Esq. *(redacted copy only)*
Cousins Chipman & Brown, LLP
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Email: chipman@ccpllp.com

**Via Electronic Mail and Hand Delivery**

David L. Buchbinder, Esq. *(redacted copy only)*
Office of the United States Trustee
844 N. King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Email: David.L.Buchbinder@usdoj.gov

**Via Electronic and First Class U.S. Mail**

Jesse H. Austin, Esq. *(redacted copy only)*
Paul K. Ferdinands, Esq.
King & Spaulding LLP
1180 Peachtreet Street
Atlanta, GA 30309
Email: jaustin@kslaw.com

September 4, 2013
Date

*/s/ William A. Hazeltine*
William A. Hazeltine