**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA
AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN
ALLIANCE FUND II, L.P., AND YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND II, L.P. TO SALE OF DEBTORS' ASSETS TO NEW ALLIED ACQUISITION
CO., LLC, AND THE SALE-RELATED DOCUMENTS**

## TABLE OF CONTENTS

                                                                        Page

I.     PRELIMINARY STATEMENT ......................................................................1

II.    OBJECTION .............................................................................................4

       A.    The NewCo Bid Violated, And The Sale Will Violate, The Sale
             Procedures And Rendered The Auction A Sham ....................................................4

       B.    The NewCo APA Is Materially Worse Than The Verbal Bid Accepted At
             The Auction .............................................................................................9

       C.    The NewCo Bid Violates Yucaipa's Rights Under The Bankruptcy Code...........10

       D.    The Right To Bid Under Section 363(k) Of The Bankruptcy Code Is Not
             Absolute..................................................................................................11

       E.    The NewCo APA Is Not A Good-Faith Bid Under Section 363(m) Of The
             Bankruptcy Code. .....................................................................................12

       F.    The NewCo Bid Violates The First Lien Credit Agreement. ................................14

III.   CONCLUSION ........................................................................................22

# TABLE OF AUTHORITIES

## CASES

Page(s)

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986) ...................................................................................13

*In re CGE Shattuck, LLC*,
    254 B.R. 5 (Bankr. D. N.H. 2000) ........................................................................10

*In re Channel One Communications, Inc.*,
    117 B.R. 493 (Bankr. E.D. Mo. 1990) ..................................................................10

*In re Continental Air Lines, Inc.*,
    780 F.2d 1223 (5th Cir. 1986) ..............................................................................19

*In re Delaware & Hudson Railway Co.*,
    124 B.R. 169 (D. Del. 1991) .................................................................................13

*In re Exaeris Inc.*,
    380 B.R. 741 (Bankr. D. Del. 2008) ...............................................................10, 13

*In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*,
    77 B.R. 15 (Bankr. E.D. Pa. 1987) .......................................................................10

*In re NJ Affordable Homes Corp.*,
    No. 05-06442, 2006 WL 2128624 (Bankr. D.N.J. 2006)......................................12

*In re Wilde Horse Enters., Inc.*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) .................................................................10

*Prudential Ins. Co. of America v. WestLB AG*,
    961 N.Y.S.2d 360, 2012 WL 4854713 (Oct. * 12, 2012) ...........................19, 20, 21

## STATUTES

11 U.S.C. § 1129..................................................................................................3, 11

11 U.S.C. § 363(e)....................................................................................................11

11 U.S.C. § 363(k).............................................................................................11, 12

11 U.S.C. § 363(m)...................................................................................................12

11 U.S.C. § 363(p)....................................................................................................15

01:14070146.1

**TREATISES**

Collier on Bankruptcy ¶ 363.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)...............19

Collier on Bankruptcy ¶ 363.09 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)...............11

Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "**Yucaipa**"), in their capacity as (a) holders of $134.8 million in principal amount of First Lien Debt (as defined below) and $20 million in principal amount of second lien debt, (b) majority stockholder of Allied Systems Holdings, Inc., and (c) as likely major future equity holder of Newco and/or Newco's designees under the Sale, by and through their undersigned counsel, hereby object to Debtors' Notice of Filing of Sale-Related Documents [D.I. 1654] and the exhibits attached thereto (collectively, the "**Sale Documents**"), filed by the above-captioned debtors and debtors in possession (the "**Debtors**") and the sale of assets pursuant thereto.  In opposition thereto, Yucaipa respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    The Debtors' proposed sale (the "**Sale**") of substantially all of the Debtors' assets purportedly to New Allied Acquisition Co., LLC, but in fact to a number of shell acquisition vehicles (collectively, "**NewCo**"), created by Black Diamond and Spectrum in their capacities as individual lenders, (a) constitutes an end run around the sale procedures approved by this Court, (b) is materially worse than the verbal offer accepted by the Debtors at the auction, (c) is based on NewCo's division of the Debtors' assets based on a scheme to provide the bulk of "real" value to Black Diamond and Spectrum and leave the remainder of the Debtors' creditors with liabilities, (d) is fraught with execution risk because the First Lien Credit Agreement[1] precludes NewCo's rights to credit bid, pledge the First Lien Debt to support the Sale and restrict

---

[1]    The "**First Lien Credit Agreement**" refers to that certain Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended and restated as of May 15, 2007 (as amended), and the lenders party thereto, the "**First Lien Lenders**."  The Obligations pursuant thereto and as defined therein are referred to herein as the "**First Lien Debt**."

distributions to Yucaipa, and (e) violates the distribution scheme mandated by the Bankruptcy Code.[2]

2.      Moreover, as set forth on Exhibit B to the Sale Documents, NewCo proposes to separate the purchased assets of the Debtors into two separately owned corporate structures: (1) New Allied Acquisition Co., LLC and its direct and indirect subsidiaries, which will hold all the operating liabilities (*e.g.*, contracts, employees, etc.), and (2) Axis/Allied LeaseCo Holdings LLC and its direct and indirect subsidiaries, including New Allied Management Services LLC, which will hold all the assets (including vehicle and real estate leases).  The creation of such a structure can only be explained by Black Diamond and Spectrum's desire to impermissibly prejudice Yucaipa's rights and separate the assets of the Debtors' businesses from their liabilities, so as to protect Black Diamond and Spectrum in the event of a subsequent liquidation of the assets, to the prejudice of the Debtors' other creditors, employees and stakeholders.

3.      The Court should not approve the Sale because, among other reasons:

- The Sale violates the terms of the Court-ordered Sale Procedures (as defined below), which were expressly drafted and imposed by Black Diamond and Spectrum over the vigorous objection of Yucaipa – including provisions that by Court order cannot be modified (specifically the requirements that (i) non-cash bids be accompanied by valuations and (ii) a majority of the non-participating lenders consent to an offer including non-cash consideration).

- The Debtors seek approval of the Sale even though it does not comport with the material terms of the bid that the Debtors selected at the Auction (as defined below) as the "highest and/or best" offer.  Most notably, the Sale would leave NewCo overleveraged with more than $80 million in secured debt, as compared to the rights offering that NewCo represented at the Auction would be source of NewCo's cash portion of its bid.  This post-Auction secured financing is reflected only in term sheets, with covenants and other events of default left to further documentation – and substantially increasing the likelihood of a default under loans controlled by Black Diamond and Spectrum.

---

[2]      The "**Bankruptcy Code**" refers to title 11, United States Code, 11 U.S.C. § 101, *et seq.*

01:14070146.1

- The Sale is premised on a credit bid that delegates to NewCo rights to credit bid the First Lien Debt – but the First Lien Credit Agreement does not permit such delegation.

- The NewCo asset purchase agreement (the "**NewCo APA**") violates the plain terms of the First Lien Credit Agreement by, among other things, (a) pledging debt and distributions of First Lien Lenders as a deposit forfeitable by the actions of NewCo, a non-First Lien Lender and non-agent of any First Lien Lender, (b) purportedly requiring all First Lien Lenders to pledge their distributions to fund a liquidated damages provision triggered by NewCo's failure to perform, and (c) withholding distributions and providing unequal rights and proceeds to Yucaipa compared to other First Lien Lenders.

- The Sale Documents violate the Bankruptcy Code by unfairly discriminating against Yucaipa (and to a lesser extent certain other First Lien Lenders) through the unequal distribution of proceeds and voting rights in the NewCo structure – therefore trampling Yucaipa's rights under 11 U.S.C. § 1129. Specifically, as discussed further below:

  o Yucaipa will receive non-voting equity, whereas other First Lien Lenders will receive voting equity, irrevocably depriving Yucaipa of management over the various entities created as part of the NewCo Bid, despite Yucaipa's entitlement to a majority of the equity of NewCo.  Granting Yucaipa non-voting equity prejudges the dispute between Yucaipa and Black Diamond/Spectrum and permanently prejudices Yucaipa's rights.

  o Yucaipa's share of equity of NewCo will be withheld until all disputes concerning Yucaipa's First Lien Debt are resolved; no other First Lien Lender is subject to such restrictions.

  o Yucaipa's ability to participate in the Axis/Allied LeaseCo Holdings LLC second lien debt facility – and to receive a corresponding portion of the equity in such entity (which would be *non-voting* equity), may be repurchased and Yucaipa's equity interests stripped in full if a single dollar of Yucaipa's First Lien Debt is subordinated or found to be held invalidly.

  o Black Diamond and Spectrum prejudice all other First Lien Lenders by reserving 10% of the equity in Axis/Allied LeaseCo Holdings for themselves, and paying themselves a commitment fee.

  o The foregoing structural issues not only violate the First Lien Credit Agreement – they afford Black Diamond and Spectrum disparate treatment from similarly situated creditors – which is an improper use of section 363 of the Bankruptcy Code.

- For the reasons set forth above and herein, NewCo did not bid in good faith because NewCo was unfairly advantaged compared to other bidders and designed a sale structure designed to penalize only Yucaipa.

4.      Approval of the Auction results rested with a special committee of the Debtors' boards of directors comprised of the Debtors' CEO and Brian Cullen, an independent member of the board.  Although the Auction abrogated the Sale Procedures and the NewCo Bid is replete with infirmities, the Debtors declared NewCo as highest and/or best bidder at the close of the Auction (over the detailed objections of the Committee, Yucaipa and Jack Cooper) without convening a meeting of the Special Committee.  That meeting and approval apparently occurred more than a week after the close of the Auction, and after no back-up bidder remained in place.

5.      The Parties have agreed that the closing date is not required until December 31, 2013, so there exists no need to rush approval of a flawed sale agreement.   Accordingly, the Sale should not be approved.

## II.      OBJECTION

### A.      The NewCo Bid Violated, And The Sale Will Violate, The Sale Procedures And Rendered The Auction A Sham

6.      On June 21, 2013, the Court entered an order establishing the bid and sale procedures that would govern the subsequent auction for substantially all of the Debtors' assets (the "**Auction**").  (*See Order (A) Approving Bid Procedures, (B) Approving Cure Procedures, (C) Establishing Date for Auction and Approving Related Procedures, (D) Scheduling Sale Hearing and Related Deadlines, (E) Approving Form and Manner of Notices, and (F) Granting Related Relief* [D.I. 1320] (the "**Sale Procedures Order**" and the bid and sale procedures approved pursuant thereto, the "**Sale Procedures**").)  In so doing, the Court overruled Yucaipa's objections to the relief requested by the Debtors, the Committee, and the Petitioning Creditors,

and provided in both the Replacement DIP Order and the Sale Procedures Order. (*See* D.I. 1210 and 1286.)

7.    The Sales Procedures specified detailed requirements for the rules of the Auction, determination of Qualified Bids, and deadlines for bidders' submissions of financial information and non-cash consideration, among other requirements. Although these Sales Procedures were drafted and endorsed by Black Diamond and Spectrum, as set forth below, the NewCo Bid violates virtually all of the Sales procedures – including those provisions that the Court ordered could not be modified or changed. For example:

a.    **No Written Documentation Of The NewCo Bid.** The Sale Procedures require that "a Qualified Bidder must deliver to the Debtors a written offer," including hard copies and electronic copies. (Sale Procedures ¶¶ 12, 12(xvi).) At no point in time during the Auction did NewCo submit a written offer reflecting the terms of Sale.

Instead, NewCo did not submit the Sale Documents until two weeks after the close of the Auction, and many of these "operative documents" are incomplete. For example, material contracts, including intercompany agreements crucial to the operation of the businesses and for lenders to evaluate the value of what they are receiving under the Sale and for contract parties to evaluate NewCo's assurance of future performance under assumed contracts and leases, remain in only term sheet form with important provisions left to be determined and documented:

i.    <u>Shared Services Agreement</u> – the term sheet attached as Exhibit E to the Sale Documents states that it covers only "general terms and guiding principles." (*See* Sale Documents, Ex. E, § 2 (Subject Matter).) Although the term sheet states that "specific service level requirements for individual services are described on Annex I," Annex 1 is blank under the headings "Term" and "Service Level." In addition, the term sheet contains no specifics about the cost of the applicable services.

ii.   <u>Unitary Lease</u> – the term sheet attached as Exhibit F to the Sale Documents states in the first paragraph that it is a "preliminary summary of terms and conditions" and "does not describe or define all of the terms and conditions of the proposed Lease." (*See* Sale Documents, Ex. F, ¶ 1.)

      iii.    <u>Unitary Master Vehicle Lease Agreement</u> – the term sheet attached
as Exhibit G to the Sale Documents states that this term sheet
covers only "general terms and guiding principles." (*See* Sale
Documents, Ex. G, § 2 (Subject Matter).)

**b.**    **No Statement That Bid Is An Irrevocable Offer Through Closing.** The
Sale Procedures require that each bid state that it is irrevocable through the
closing. (Sale Procedures ¶ 12(xii).) Here, no such statement
accompanied the NewCo Bid. In fact, after first submitting a bid at the
Auction that was binding and irrevocable through a closing, Black
Diamond and Spectrum modified their bid to expressly state that the
NewCo bid would not be a back-up bidder. (*See* August 15 Transcript[3] at
44:10-12 ("[W]e are going to withdraw our obligation to be a backup
bidder if you chose to go with JCT. . ..").)

**c.**    **Nondisclosure Of Material Terms Of NewCo Bid.** The Sale Procedures
require documented bids so that all material terms of each bid are fully
disclosed. (Sale Procedures ¶ 12.) Here, NewCo refused to provide such
disclosure. For example, although the NewCo Bid required the division of
the Debtors' assets among three companies, NewCo refused to identify
which assets would go into which company or the material terms of the
critical intercompany leasing and use arrangements necessary for the
various companies to function. (*See* August 15 Transcript at 58:20-23 (No
independent financial statements for the NewCo designees "[b]ecause they
haven't been created yet. And I haven't decided exactly what assets are
going to be in each of them as we sit here right now"); *id.* at 63:18-64:11.)

**d.**    **No Good Faith Deposit.** The Sale Procedures require that a "qualified
bidder" submit a good faith deposit equal to 10% of the bid. (Sale
Procedures ¶ 12(ii).) NewCo did not put up a valid deposit and instead
pledged distributions belonging to third party lenders who were not part of
NewCo and on whose behalf NewCo has no authority to act under the
First Lien Credit Agreement. As described further below, the Debtors'
inability to rely on this invalid pledge of distributions creates substantial
execution risk with respect to the Sale.

**e.**    **No Duly Executed And Enforceable Purchase Agreement With
Exhibits And Schedules To Accompany Bid.** The Sale Procedures
require that a bid be accompanied by a clean, duly executed APA along
with all necessary exhibits and schedules. (Sale Procedures ¶ 12(iii).) The
NewCo bid was presented orally, and no executed APA, exhibits or
schedules were presented at or before the Auction. (*See* August 15
Transcript at 7:2 – 8:22 (NewCo could not provide contracts, term sheets,

---

[3]    The "**August 15 Transcript**" refers to the August 15, 2013 transcript of the Auction, attached as Exhibit B
to the *Debtors' Notice of Filing of Transcript of Auction Held from August 14, 2013 through August 15,
2013* [D.I. 1616].

01:14070146.1

or descriptions at the Auction); August 14 Transcript[4] at 21:10-15; 37:5-20 (not even a term sheet); 49:7-18; 52:10-23 (no description of any covenants regarding sales of assets or competition); *id.* at 28:10-11 ("There's a lot of stuff that's going to have get written out.").)

f.      **No List Of Executory Contracts And Unexpired Leases To Be Assumed And Assigned.**  The Sale Procedures require that a bid indicate which executory contracts and/or unexpired leases would be assumed and assigned.  (Sale Procedures ¶ 12(v).)  NewCo did not submit a list of such contracts and/or leases.  (*See* August 14 Transcript at 28:11-24 (according to Black Diamond and Spectrum's counsel, NewCo had not identified which contracts would be assigned to which new entity, noting at the Auction:  "[We n]eed to go through list of contracts and whack them all up.  So we haven't done that yet.").)

g.      **Evidence Of Financial Capability To Consummate The Sale.**  The Sale Procedures require that a bid contain a representation that the bidder is financially capable of consummating the sale.  (Sale Procedures ¶ 12(vii).)  Here, NewCo failed to submit any evidence that the purchaser is financially capable of consummating the transaction contemplated by the agreement, that NewCo can credit bid the debt of other First Lien Lenders, that NewCo can pledge the claims and distributions of other First Lien Lenders in connection with the Deposit, or that NewCo had written evidence of a firm, irrevocable commitment for the financing as required under the bid procedures.

h.      **No Financial Statements To Support Bid.**  The Sale Procedures require that the bid be accompanied by the bidder's financial statements.  (Sale Procedures ¶ 12(viii).)  At the Auction, the Debtors' financial advisor reported that "I don't have access to any new set of projections yet from the Purchaser" and didn't know the anticipated EBITDA for each NewCo.  (*See* August 15 Transcript at 64:4-11.)  NewCo did not provide any such financial information during the Auction and only did so weeks later, late in the day on Labor Day.

i.      **No Adequate Assurance Of Future Performance Under Assumed Contracts.**  The Sale Procedures require that the bid include evidence that the bidder will be able to perform all assumed and assigned contracts and leases.  (Sale Procedures ¶ 12(x).)  NewCo failed to provide any projections for any of the newly formed companies that would become obligated under those contracts and leases.  (*See* August 14 Transcript at 51:17-23.)

---

[4]      The "**August 14 Transcript**" refers to the August 14, 2013 transcript of the Auction, attached as Exhibit A to the *Debtors' Notice of Filing of Transcript of Auction Held from August 14, 2013 through August 15, 2013* [D.I. 1616].

j.  **No Evidence Of Authorization From NewCo's Board.** The Sale Procedures require that the bidder include evidence of corporate authorization for the bid. (Sale Procedures ¶ 12(xv).) Here, no such evidence was presented at the Auction by NewCo – which kept the identity of its board of directors a secret during the auction. (*See* August 15 Transcript at 78:2-6 ("There's no evidence of authorization and approval from the bidder's board of directors. In fact, we don't even know who the board of directors are or who the equity holders are.").)

k.  **Non-Cash Consideration Was Not Supported By Valuations.** The Sale Procedures require that a bidder submit a valuation to support non-cash consideration as part of a bid made by an entity other than the Agent under the First Lien Credit Agreement. (Sale Procedures ¶ 12(xvii).) Here, no such evidence was provided.

l.  **No Majority Consent Of First Lien Lenders To NewCo Bid.** The Sale Procedures require that bids made by a First Lien Lender (or its affiliate) that include non-cash consideration must be approved by the majority of non-bidding First Lien Lenders. (Sale Procedures ¶ 12(xviii).) Black Diamond and Spectrum insisted on this provision in the Sale Procedures to block a non-cash bid by Yucaipa. However, NewCo's offer – which is made by an affiliate of First Lien Lenders – expressly violated this provision by including non-cash consideration in the form of a credit bid without first obtaining the consent of a majority of non-bidding First Lien Lenders. (*See* August 15 Transcript at 78:16 – 79:4 ("[N]o written offer that includes non-cash consideration that is made by an entity in which a First Lien Lender or any affiliate or related parties are participants, whether directly or indirectly, that written offer shall not constitute a qualified bid unless the debtors obtain the written consent of the holders of a majority of the prepetition First Lien Debt held by the other First Lien Lenders that are not participating in that bid. [The Petitioning Creditors] have not obtained that consent. And Yucaipa does not grant that consent.").)

m.  **Impermissible Modifications To Certain Sale Procedures.** The Sale Procedures prohibit the Debtors from modifying certain provisions governing qualified bids and credit bidding – specifically the requirements that (i) non-cash bids be accompanied by valuations and (ii) a majority of the non-participating lenders consent to an offer including non-cash consideration. (Sale Procedures ¶ 20(ii) (referencing Sale Procedures ¶¶ 12(xvii), (xviii).) Further, paragraph 20(ii) of the Sale Procedures requires that the provisions of paragraphs 12(xvii), 12(xviii), and 13 shall not be modified. Yet the Debtors modified them without obtaining an order of this Court.

n.  **Modifications Of NewCo Bid Were Less Favorable To The Debtors.** The Sale Procedures prohibit modifications to a bid that are less favorable

to the Debtors. (Sale Procedures ¶ 20(viii).) Here, the ultimate NewCo Bid was less favorable to the Debtors than the first bids offered by NewCo. For example, the first bid made by NewCo at the Auction on August 14 included the following favorable provisions:

    i.      NewCo agreed to be a back-up bidder as required by the Sale Procedures (August 14 Transcript at 12:1-13); and

    ii.     In order to ensure performance, NewCo agreed to insert a so called "hell or high" water specific performance provision (August 14 Transcript at 13:9-17).

Although both of these provisions were essential to ensure that a closing would occur, NewCo removed them both in a subsequent bid during the Auction. (*See* August 15 Transcript at 44:10-12 ("[W]e are going to withdraw our obligation to be a backup bidder if you chose to go with JCT . . ..."); *id.* at 44:6-8 ("[W]e're going to eliminate the specific performance provision"); *id.* at 51:21-22 ("There would be no specific performance provision.").)

    o.    **No Provision That The NewCo Bid May Be Selected As The Backup Bidder.** As noted above, the Debtors permitted NewCo to withdraw its commitment to function as the Back-Up Bidder.

**B.**    **The NewCo APA Is Materially Worse Than The Verbal Bid Accepted At The Auction**

8.    The Sale should not be approved because the terms of the written NewCo APA are materially different and worse from the verbal bid that the Debtors accepted as the highest and best offer at the end of the Auction. For example, the bid that the Debtors accepted at the Auction contained modest leverage because NewCo represented that the funding for the cash portion of the bid would come from a rights offering, backstopped by Black Diamond and Spectrum. (*See* August 14 Transcript at 44:10-11; 60:19-23 (cash component funded by selling equity of the entity that will hold Axis entity – "Black Diamond and Spectrum will backstop that rights offering") (emphasis added).) The NewCo APA, on the other hand, unilaterally converted the funding source from a rights offering into $80 million in first and second lien loans not previously described at the Auction – and without any disclosure to date with respect to the

details of covenants and other events of default. This new financing leaves NewCo with substantially greater leverage than disclosed at the Auction, thereby materially increasing the risk of default under loans controlled by Black Diamond and Spectrum.

    **C.**    **The NewCo Bid Violates Yucaipa's Rights Under The Bankruptcy Code**

    9.    The Delaware Bankruptcy Court has held that "[a debtor's] sale of all or substantially all of its assets, outside of a plan of reorganization . . . requires a bankruptcy court's careful review." *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). *See also In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ("[I]n the absence of the protection and finality offered by a disclosure statement and plan, such a transaction pursuant to Section 363(b) requires specific authorization by the Court. The sale must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.") (citing *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D. N.H. 2000); ("The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter."); *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

    10.    The First Lien Credit Agreement requires that any distributions of proceeds to First Lien Lenders be allocated ratably among all such lenders. (*See* discussion *infra*, at § F.) In addition, the Bankruptcy Code does not authorize this Court to impose through a section 363 sale different treatment on Yucaipa than other lenders on account of their claims (*i.e.*, outside of a chapter 11 plan). *See Contrarian Funds v. Westpoint Stevens, Inc. (In re West- Point Stevens, Inc.)*, 333 B.R. 30, 52 (S.D.N.Y. 2005), *rev'd on other grounds sub nom. Contrarian Funds v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231 (2d Cir. 2010) (stating that a sale order directing distribution of proceeds to creditors overstepped section 363).

11.     Here, the proposed Sale constitutes an impermissible modification and violation of Yucaipa's rights because the NewCo APA and the Sale Documents purport to adjudicate Yucaipa's claims against the Debtors in advance of the Debtors' plan confirmation process, and in derogation of Yucaipa's rights relative to those of the other First Lien Lenders.  (*See* discussion *infra*, at § F.)

### D.     The Right To Bid Under Section 363(k) Of The Bankruptcy Code Is Not Absolute

12.     Credit bidding is the process by which a creditor with a valid security interest in the assets being sold pursuant to section 363 of the Bankruptcy Code "may bid [for such assets] at the sale and, if [the creditor] is successful, may offset its claim against the purchase price of the [assets]." *See* Collier on Bankruptcy ¶ 363.09 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Secured creditors are not, however, permitted to confirm plans of reorganization, or otherwise restructure intercreditor relationships, through the guise of "credit bidding" outside of a plan.  The NewCo APA involves a going-concern transfer of the entire company, a complex "newco" with a capital structure devised by its sponsors without oversight or review by this (or any) Court, all to the severe prejudice of at least one major secured creditor.  As discussed below in greater detail, under the express terms of section 363(e), the right of a creditor to credit bid under section 363(k) is subject and subordinate to the requirement that adequate protection be provided to non-bidding secured creditors in connection with any such bid.  *See* 11 U.S.C. § 363(e).  Here, the NewCo Bid restructures – by eliminating – a substantial portion of the secured claim of Yucaipa and the other First Lien Lenders, without providing adequate protection under section 363(e) or attempting to meet the confirmation requirements of section 1129 of the Bankruptcy Code.  As a result, the Sale cannot be approved.

13.     In addition, section 363(k) of the Bankruptcy Code provides that "[a]t a sale under [section 363(b)] of property that is subject to a lien that secures an allowed claim, *unless the court for cause orders otherwise* the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k) (emphasis added).  Section 363(k) expressly contemplates that the Court may for "cause" shown prevent or impose conditions upon a creditor's right to credit bid under section 363(k).  *See In re NJ Affordable Homes Corp.*, No. 05-06442, 2006 WL 2128624, *16 (Bankr. D.N.J. 2006) ("[T]he language of § 363(k) does not prohibit a bankruptcy court from placing conditions upon a secured creditor's ability to credit bid.").

14.     Cause exists here to decline to recognize the credit bid component of the NewCo APA, because it has been used as a guise to restructure intercreditor relationships outside the plan process.  Further, as set forth below the credit bid violated the plain terms of the Bid Procedures when it was coupled with a non-Agent cash bid.  In addition, as also described below, the Sale violates the First Lien Credit Agreement – which prevents NewCo from satisfying its representation that NewCo has full authority to consummate the Sale (*see* NewCo APA, §§ 5.2 and 5.3(a)) while simultaneously preventing NewCo from pledging First Lien Debt to support either NewCo's good faith deposit or liquidated damages.  This Court should not permit the section 363 sale process to be used for these improper purposes.

**E.      The NewCo APA Is Not A Good-Faith Bid Under Section 363(m) Of The Bankruptcy Code**

15.     Yucaipa also objects to the sale order to the extent that it would grant the purchaser a finding of good faith under section 363(m).  The NewCo APA was fashioned for the purpose of squeezing-out dissident lenders and to create an unfair advantage for Black Diamond

and Spectrum compared to other potential bidders.  The entire purpose was inappropriate under section 363, and one that does not reflect good faith.

16.     Specifically, the sale of assets which is not in the debtor's ordinary course of business "requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith." *In re Exaeris*, 380 B.R. at 744 (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  The court in *In re Exaeris* noted that "the element of 'good faith' is of particular importance, as the Third Circuit made clear in *In re Abbotts Dairies of Pa., Inc.*" *Id.* (citations omitted).

17.     In *In re Abbotts Dairies*, the Third Circuit explained that "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (emphasis added).  The court explained that "[t]he purpose of requiring such a finding in each situation, however, is quite similar: it prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11." *Id.* at 150 n. 5.  The Third Circuit also emphasized that "section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and, as such, it mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan and make a finding that it 'has been proposed in good faith and not by any means forbidden by law.'" *Id.* at 150.

18.    Here, the NewCo Bid cannot be deemed made in good faith given the misconduct that enabled NewCo to "take grossly unfair advantage of other bidders." First, Black Diamond and Spectrum mandated bid procedures that specifically set the rules of the Auction and precluded a First Lien Lender or its affiliate to submit a bid that included any non-cash consideration with the consent of a majority of the other First Lien Lenders. While Yucaipa vigorously opposed this and other provisions as barring any bid by Yucaipa, this Court approved the Sale Procedures. At the Auction, and after the deadline for Yucaipa or other bidders to have submitted any non-cash bid, Black Diamond and Spectrum submitted a bid by their affiliate NewCo that purported to include non-cash consideration – the credit bid of claims under the First Lien Credit Agreement – and offer up the right to participate in a loan/equity purchase to all First Lien Lenders but allocate different and worse rights to Yucaipa, which represented a use of their position as requisite lender to specifically discriminate against Yucaipa. The NewCo Bid also included a non-cash deposit and liquidated damages provision – the bulk of which will be borne by First Lien Lenders pursuant to an invalid pledge of distributions to them by NewCo. Thus, Black Diamond and Spectrum obtained a court order barring the very consideration package that constitutes the NewCo Bid, and then used the barred consideration to disadvantage other bidders.

19.    Under the foregoing facts, demonstrating a lack of good faith by the purchaser, the Debtors, Black Diamond, and Spectrum have not met – and cannot meet – their burden of demonstrating that a finding of good faith is warranted under section 363(m) of the Bankruptcy Code.

**F.    The NewCo Bid Violates The First Lien Credit Agreement**

20.    As demonstrated above, the approval of the NewCo Bid, over Yucaipa's objection, would violate the Bankruptcy Code. The Debtors cannot now save a sale to this bidder

on the theory that the relevant contracts give them, or the Agent, the right to force these arrangements on an unwilling lender.

21.     To prevail on a contract-based theory, the Debtors would have to show: (a) that the bidder was authorized, over the objection of Yucaipa, to submit the credit bid on its behalf; and (b) that the bidder was authorized to foreclose Black Diamond from sharing ratably in the purchased assets except by the consent of Black Diamond. Under section 363(p) of the Bankruptcy Code, the Debtors would have the burden of proof as to each showing. Neither can be made here.

22.     The First Lien Credit Agreement limits the power of the Agent and who can exercise that power:

> Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.

(First Lien Credit Agreement at § 9.2.) Further, the Agent is only authorized to "apply any of the [First Lien Debt] Obligations as a credit on account of the purchase price." (*Id.* at § 9.8(b).)

23.     Notably, nothing in the First Lien Credit Agreement authorizes NewCo to undertake a credit bid or to pledge the First Lien Debt as liquidated damages (*e.g.*, as anything other than a "credit on account of the purchase price"). Moreover, NewCo is a creation of Black Diamond and Spectrum in their individual capacities. NewCo is not an agent or employee of the Agent under the First Lien Credit Agreement, and therefore lacks authority to credit bid the First Lien Debt in the first instance.

24.     In addition, the NewCo APA uses an invalid credit bid under the Frist Lien Credit Agreement attempts to modify the rights of Lenders under the First Lien Credit Agreement in ways that are impermissible without the consent of each affected First Lien Lender (including

Yucaipa). For example, the NewCo APA would have the following effects, which all require

Yucaipa's consent:

- "waive, reduce or postpone any scheduled repayment" – prohibited under Section 10.5(b)(ii) of the First Lien Credit Agreement.

- "reduce the principal amount" under the First Lien Credit Agreement – prohibited under Section 10.5(b)(vii) of the First Lien Credit Agreement.

- Release all or substantially all of the collateral – prohibited under Section 10.5(b)(x) of the First Lien Credit Agreement.

- Alter the ratable treatment of any obligations under the First Lien Credit Agreement – prohibited under Section 10.5(c)(vi) of the First Lien Credit Agreement (and which cannot be modified under Section 10.5(b)(viii) of the First Lien Credit Agreement).

25. Further, as with nearly all syndicated loans, the First Lien Credit Agreement and

First Lien Security Agreement require the ratable sharing of any payments (whether voluntary,

involuntary, through the exercise of any right of set-off or, among other things, the enforcement

of any right under the Credit Documents) – *i.e.*, the very document pursuant to which Black

Diamond and Spectrum presumably purport to credit bid the loans of all First Lien Lenders) and

all collateral proceeds. (*See* First Lien Credit Agreement, §§ 2.17, 10.5(b)(ix) and 10.5(c)(vi);

First Lien Security Agreement, § 7.2.) In other words, the First Lien Credit Agreement requires

that all First Lien Lenders be treated equally and receive the exact treatment in connection with

any distributions. The requirement of ratable treatment of any obligations cannot be modified

without the affected Lender's consent. (*See* First Lien Credit Agreement, §§ 10.5(c)(vi) and

10.5(b)(viii).)

26. The NewCo Bid violates the ratable sharing provisions of the First Lien Credit

Agreement and related documents by:

a.      **With respect to New Allied Acquisition Co. LLC, among other things:**

     i.    *Reserving Yucaipa's Equity.*  The Sale Documents propose to reserve Yucaipa's equity interests in New Allied Acquisition Co., LLC until final determination of the validity/subordination of Yucaipa's pre-closing debt claims.  (*See* Sale Documents, Ex. C (Direction and Designation Agreement), § C.1.b; *see also id.*, Ex. B (Summary of Post-Closing Corporation Structures), n. 7 ("The membership interests otherwise distributable to any Person that is a Restricted Sponsor Affiliate shall be held in reserve pending entry of a final order resolving all disputes relating to the status of such Person as a Lender, the amount of Obligations validly held by such Person, and/or whether the Obligations held by such person are subject to subordination (in whole or in part).").)  No other lender is subject to this reservation.

     ii.    *Depriving Yucaipa Alone Of Voting Rights.*  The Sale Documents seek to provide that all membership interests will be non-voting so long as they are held by Yucaipa (a "Restricted Sponsor Affiliate").  (*See id.*, Ex. B (Summary of Post-Closing Corporation Structures), n. 7 ("Under all circumstances any Restricted Sponsor Affiliate receiving a distribution of membership interests shall receive membership interests that will be non-voting for so long as such membership interests are held by the Restricted Sponsor Affiliate."); *see also id.*, Ex. C (Direction and Designation Agreement), § C.1.c. (such equity will be "[Class B] membership interests").)  No other lender is subject to these voting restrictions.

b.      **With respect to Axis/Allied LeaseCo Holdings LLC, among other things:**

     i.    *Reserving 10% Of The Membership Interests And Other Benefits Solely For Black Diamond And Spectrum – To The Detriment Of Other First Lien Lenders.*  Pursuant to the Sale Documents, only 90% of the membership interests in Axis/Allied LeaseCo Holdings LLC will be distributed to the lenders based on their participation in the facility described in Exhibit J.  The remaining 10% is reserved for Black Diamond and Spectrum.  (*See* Sale Documents, Ex. J, § 5 ("On the day of execution hereof, Axis/Allied LeaseCo Holdings LLC shall issue to the Commitment Parties [Black Diamond and Spectrum] membership interests evidencing ten percent (10%) of the authorized membership interests of Axis/Allied LeaseCo Holdings LLC in the form of Class A membership interests.").)  The term sheet annexed to the $60 million commitment letter as Exhibit J to the Sale Documents (the "**$60 Million Commitment Term Sheet**") also provides for a

3.25% commitment fee, and other benefits that are not available pro rata to the First Lien Lenders.

ii.    ***Providing That Yucaipa's Membership Interests May Be Stripped If <u>Any</u> Portion Of Yucaipa's First Lien Debt Holdings Are Subordinated Or Found To Be Invalidly Held, Or If Yucaipa Voluntarily Reduces Its Claims.*** The Sale Documents seek to provide that if Yucaipa is found to hold $1 of its debt claims impermissibly, or $1 of its claims is subordinated, or if Yucaipa voluntarily reduces its claims to amounts different than listed on the First Lien Credit Agreement Register, Yucaipa's entire debt and equity interests in Axis/Allied LeaseCo Holdings LLC could be stripped – not just the debt and equity interests corresponding to the portion found to be invalidly held or subordinated. (*See* $60 Million Commitment Term Sheet, at 15 (providing that if a party is a Restricted Sponsor Affiliate and a court determines that such party "was not a Lender, does not validly hold the amount of Obligations evidenced by the Register, or that such Restricted Sponsor Affiliates' Obligations should be subordinated in whole or in part, the Borrowers shall have the right (but not the obligation) to satisfy in full the Term Loans held by such Person under the Financing Facility the by [sic] payment of an amount equal to the original principal amount of such Term Loans (less any previous payments made on account thereof) plus interest at the rate of 3.5%," and "[i]f the Borrowers exercise such right, the Distributable Membership Interests issued to such Person shall be extinguished and of no further force or effect...") (emphasis added).) No other lender is subject to such treatment.

iii.    ***Depriving Yucaipa Of Voting Rights.*** The $60 Million Commitment Term Sheet provides that Yucaipa's membership interests in Axis/Allied LeaseCo Holdings LLC will be non-voting so long as such membership interests are held by Yucaipa. (*See* $60 Million Commitment Term Sheet, at 9 ("Each Lender that is a Restricted Sponsor Affiliate (as defined in the Existing First Lien Credit Agreement) shall receive Class B non-voting membership interests (which membership interests shall automatically convert to Class A membership interests upon transfer to any Person who is not a Restricted Sponsor Affiliate.").) No other lender is subject to these voting restrictions.

27.    There is no legal basis for the structure NewCo proposes – and this Court is asked to approve – which is designed to prejudice Yucaipa's rights, attempts to pre-judge the outcome of the dispute between Yucaipa and the Petitioning Creditors with respect to Yucaipa's debt

holdings, and violates the ratable sharing requirements of the First Lien Credit Agreement and the First Lien Security Agreement.[5]  (*See* First Lien Credit Agreement, §§ 2.17, 10.5(b)(ix), and 10.5(c)(vi); First Lien Security Agreement, § 7.2.)

28.     The provisions of the First Lien Credit Agreement mandate that the First Lien Lenders are treated equally with respect of their rights thereunder, including distributions of proceeds.  *See Prudential Ins. Co. of America v. WestLB AG*, 961 N.Y.S.2d 360, 2012 WL 4854713, *5 (Oct. 12, 2012) (unreported disposition) (holding that a credit agreement's ratable sharing provision disallowed "the differential treatment of lenders vis-à-vis their rights in the collateral without their consent" and prohibited a subset of the lenders from reserving additional economic and voting rights to themselves).  The Bankruptcy Code does not authorize this Court to grant Yucaipa different treatment on account of its debt claims than the other lenders receive on substantially similar claims through a sale under section 363 of the Bankruptcy Code (*i.e.*, outside of a chapter 11 plan), yet that is precisely what is proposed by NewCo.  *See Westpoint Stevens*, 333 B.R. at 52 ("Indeed, it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures" and finding that the sale order was not proper because, among other things, it "authorized and directed . . . . the direct distribution to creditors of the consideration paid . . . ."); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986) ("[A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization"); Collier on Bankruptcy ¶ 363.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Attempts to determine plan issues in connection with the sale are improper and should result in a denial of the relief requested").  It is no answer to say that Yucaipa may sue NewCo in state court for

---

[5]     The "**First Lien Security Agreement**" refers to the Pledge and Security Agreement, as defined in the First Lien Credit Agreement.

violations of the Credit Agreement, because the structure this Court is asked to approve is designed to unfairly and permanently impair Yucaipa's rights.

29.    As a result, the First Lien Credit Agreement prohibits NewCo from (i) withholding distribution of Yucaipa's pro rata share of the equity interests in Axis/Allied LeaseCo Holdings LLC until Yucaipa's rights are finally determined simply because the Petitioning Creditors have challenged Yucaipa's debt holdings; (ii) providing Yucaipa with only non-voting equity when all other lenders will receive voting-equity; or (iii) providing that any new debt or equity holdings in Axis/Allied LeaseCo Holdings LLC can be stripped if any portion (*e.g.*, $1) of Yucaipa's holdings under the First Lien Credit Agreement are subordinated, found to be invalidly held or voluntarily reduced by Yucaipa. *See Prudential*, 961 N.Y.S.2d 360, 2012 WL 4854713, at *7 (finding that an operating agreement stemming from a section 363 sale, which created three distinct classes of owners with disparate voting rights and attempted to dilute two of the classes pro rata interests, violated the original credit agreement's ratable sharing provision). The same is the case for the 3.25% commitment fee included in the $60 Million Commitment Term Sheet, and any other benefits that the Petitioning Creditors endeavor to reserve to themselves. *See id.* at *5 ("WestLB can point to no language in the Credit Agreement or Financing Documents which grants it authority to reduce a lender's interests, or permit the differential treatment of lenders vis-à-vis their rights in the collateral without their consent. Accordingly, there is no legal justification for its contention that the exit lenders deserve more than other lenders in the proceeds from the Valero transaction.")

30.    In *Prudential*, the court was asked to determine "whether the Credit Agreement and Financing Documents permit WestLB, as both collateral and administrative agent, to effectuate a series of transactions following the borrower's bankruptcy filing involving the sale

of the collateral and the reordering of the original lenders' ratable interests therein, including the marked diminishment of certain lenders' interests without their consent. The Credit Agreement and Financing Documents unequivocally mandate the pro rata distribution of ownership of the plants and payments received from the sale of the plants, and lenders' rights may not be so fundamentally modified with respect to the collateral without their consent." In *Prudential*, the court found the defendant lenders liable for conversion as a matter of law for their grab for additional benefits not shared ratably by the other lenders. *Id.* at *4-6, 6-8.

31.     While the Petitioning Creditors have made certain claims with respect to Yucaipa's holdings under the First Lien Credit Agreement, at this time, without pre-judging those disputes, Yucaipa should receive approximately 54% of the equity in both entities (putting aside Black Diamond and Spectrum's impermissible attempt to grab an additional 10% of the equity of Axis/Allied LeaseCo Holdings LLC). Such an ownership percentage should entitle Yucaipa to control over both entities, or at the very least meaningful input in the management of those entities. The structure proposed by Black Diamond and Spectrum is an impermissible attempt to end-run around these facts and forever prejudice Yucaipa's rights in the NewCo structure, regardless of the outcome of subsequent litigation. In addition to trying to circumvent the pro rata sharing provisions of the First Lien Credit Agreement, such provisions are blatant attempts to enable Black Diamond and Spectrum permanently lock in the governance structure for Axis/Allied LeaseCo Holdings and New Allied Acquisition Co., LLC, regardless of the outcome of the litigation over Yucaipa's debt holdings.

32.     The sale should not be approved because it is designed to prejudice Yucaipa alone. However, in the event this Court decides to approve the sale, it should mandate that (i) all equity be distributed immediately on a pro rata basis to existing First Lien Lenders, (ii) that

either (a) all equity be voting, or (b) all voting and non-voting equity be distributed pro rata among the lenders, and (iii) appropriate governance documents be executed so as to protect the governance rights of Yucaipa and the other lenders.

## III.   CONCLUSION

For the foregoing reasons, Yucaipa respectfully requests this Court to (a) deny the Motion, (b) refuse to approve the NewCo Sale, and (c) grant such other relief as may be appropriate under the circumstances.

Dated:  September 4, 2013
       Wilmington, Delaware

Respectfully submitted,

By: */s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 576-3321

and

Robert A. Klyman (*Admitted Pro Hac Vice*)
Russell F. Sauer, Jr. (*Admitted Pro Hac Vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

*Counsel to Yucaipa American Alliance Fund I,*
*L.P., Yucaipa American Alliance (Parallel)*
*Fund I, L.P., Yucaipa American Alliance Fund*
*II, L.P., and Yucaipa American Alliance*
*(Parallel) Fund II, L.P.*

01:14070146.1

22