**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: <br><br> ALLIED SYSTEMS HOLDINGS, INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> Case No. 12-11564 (CSS) <br><br> (Jointly Administered) <br><br> Docket Ref. Nos. 1175, 1320, 1736 & 1806 |

**YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P.'s (I) OBJECTION TO SALE OF DEBTORS' REAL PROPERTY ASSETS TO NEW ALLIED ACQUISITION CO., LLC, AND (II) LIMITED OBJECTION TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO JACK COOPER**

Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "**Yucaipa**"), in their capacity as (a) holders of $134.8 million in principal amount of First Lien Debt (as defined below) and $20 million in principal amount of second lien debt, (b) majority stockholder of Allied Systems Holdings, Inc., and (c) as likely major future equity holder of NewCo (as defined below) and/or NewCo's designees, by and through their undersigned counsel, hereby file this (i) objection to the Debtors' proposed sale of its *real property assets* (the "**Real Property Sale**" and such real property assets, the "**Real Property Assets**") to a shell acquisition vehicle ("**NewCo**") created by Black Diamond and Spectrum (collectively, "**Black Diamond/Spectrum**"), in their capacities as individual lenders, and (ii) limited objection to the sale of substantially all of the Debtors' assets (other than the Real Property Assets) to Jack Cooper Holdings Corp. ("**JCT**" and the "**JCT Sale**"), as noticed in the *Debtors' Amended Notice of Successful Bidders at Auction in Connection with the Sale of*

*Substantially All the Debtors' Assets* [D.I. 1806] (the "**Sale Notice**"). In opposition thereto, Yucaipa respectfully states as follows:

## I. FACTUAL SUMMARY[1]

1. Yucaipa objects to the Real Property Sale to NewCo on two grounds: (a) the Real Property Sale is unnecessarily rushed and will not maximize the value of the Real Property Assets for the Debtors' estates and their creditors; and (b) the Real Property Sale to NewCo violates the applicable provisions of the Bankruptcy Code and the First Lien Credit Agreement to the extent NewCo seeks, as part of the Real Property Sale, to unfairly discriminate against Yucaipa vis-à-vis all other First Lien Lenders.

2. The Real Property Sale seeks to dispose of the Real Property Assets – carved out of the JCT Sale – in exchange for NewCo's credit bid of $5 million of the First Lien Lenders' claims.[2] However, the sale process established by the Sale Procedures (and the conduct of the actual sale process) was focused on the sale of the Debtors' assets as a going concern. Now that the JCT Sale has been selected and highest and best, there is no reason for the Debtors – or the Court – to approve a bargain-basement credit bid for the Real Property Assets, when such assets are not wasting and have not been marketed for sale in a manner to maximize value.

3. Accordingly, the Court should not approve the Real Property Sale because, among other reasons:

- The Real Property Sale would not maximize value of the Real Property Assets for the Debtors' estates and their creditors because it proposes to sell <u>all</u> Real

---

[1] In the interest of brevity, this Limited Objection incorporates the facts and arguments discussed at length in the *Objection of Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. to Sale of Debtors' Assets to New Allied Acquisition Co., LLC, and the Sale-Related Documents* [D.I. 1736] (the "**Original Objection**"). Capitalized terms used and not otherwise defined herein have the meanings given to them in the Original Objection.

[2] As set forth in the Original Objection, Yucaipa disputes NewCo's authority to credit bid any portion of the First Lien Lenders' claims because, among other reasons, NewCo is not an agent of the First Lien Lenders.

Property Assets for a $5 million credit bid.  However, in early August, the Debtors received a fully documented written offer from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The Debtors did not pursue this offer or any other offer for the Real Property Assets.

- The Real Property Sale is not the result of any efforts to market and maximize the value of the Real Property Assets because the Debtors' Sale Procedures[3] contemplated and were specifically designed to facilitate the sale to the highest bidder for the Debtors' assets as a going concern, not piecemeal asset by asset.  (*See Sale Procedures* ¶ 6 ("The Debtors seek to sell the Assets as a going concern, provided that a sale so constituted would yield the highest or otherwise best offer for the Assets.").)

- Neither the Debtors nor Black Diamond/Spectrum conducted any valuations to support a finding that the Real Property Assets would be sold for a fair and reasonable price.  Nor did the Debtors facilitate an open auction and bidding process for the Real Property Assets to ensure that the purchase price would reflect the market price of the Real Property Assets.[4]

- The Real Property Assets are not wasting assets and do <u>not</u> need to be sold immediately to maximize value or to prevent loss in value.  Nor will separately marketing these assets result in a delay or continuation of the chapter 11 cases because the JCT Sale is not required to close until December 31, 2013.  Thus, there is no reason for the Debtors to rush to sell the Real Property Assets to Black Diamond/Spectrum without adequate marketing.

4.      Moreover, although the documents establishing the Newco and the terms of the Real Property Sale have not yet been filed, they should not be approved if they are comparable to past bids for the Debtors' assets by Black Diamond and Spectrum.  As discussed in the Original Objection, the terms of the Real Property Sale would violate (a) the plain terms of the First Lien

---

[3] The "**Sale Procedures**" refer to the bid and sale procedures that were approved by the *Order (A) Approving Bid Procedures, (B) Approving Cure Procedures, (C) Establishing Date for Auction and Approving Related Procedures, (D) Scheduling Sale Hearing and Related Deadlines, (E) Approving Form and Manner of Notices, and (F) Granting Related Relief* [D.I. 1320] (the "**Sale Procedures Order**") and attached thereto as Exhibit A.

[4] Counsel for Black Diamond/Spectrum have orally represented that if the ultimate aggregate sale price is higher than $5 million, the estate will receive additional debt forgiveness.  However, the sale of estate property should be conducted by estate fiduciaries in a manner (a) designed to maximize cash proceeds for other lenders and (b) with no goal of advantaging Black Diamond/Spectrum at the expense of other lenders.  As we have seen in the process leading up to the JCT Sale, the Black Diamond/Spectrum credit bid would have resulted in a lower overall price - and substantially less cash to lenders - than the results now before the court in the JCT sale.

Credit Agreement by, among other things, withholding distributions from and providing unequal rights and proceeds to Yucaipa compared to other First Lien Lenders, and (b) the Bankruptcy Code by, among other things, unfairly discriminating against Yucaipa through the unequal and delayed distribution of sale proceeds.

5. Accordingly, Yucaipa respectfully requests that the Real Property Sale <u>not</u> be approved until the Real Property Assets have been fully and fairly marketed in a commercially reasonable manner so as to maximize value for creditors.

6. Yucaipa also submits this limited objection to the JCT Sale, solely in so far as the JCT Sale documents purport to authorize the Debtors to distribute the sale proceeds in contravention of the First Lien Credit Agreement or in a manner calculated to prejudice Yucaipa. Section 3.3 of the revised Asset Purchase Agreement for the JCT Sale states that the purchaser will pay the consideration <u>as directed by the Debtors</u>. The Debtors should not have the power to direct payment directly to Black Diamond/Spectrum or the purported First Lien Agent – as each has indicated an intend to discriminate against Yucaipa in violation of the First Lien Credit Agreement. Instead, any proceeds of the JCT Sale should be paid into the Debtors' estates with the liens of the First Lien Lenders attaching to the proceeds of sale (pending confirmation of a liquidating plan affording Yucaipa the protections of section 1129 of the Bankruptcy Code or further order of this Court).

## II. <u>OBJECTION TO REAL PROPERTY SALE</u>

### A. <u>The Debtors Cannot Meet Their Burden of Demonstrating That The Real Property Sale Is Warranted Because The Assets Have Not Been Marketed To Maximize Value For Creditors</u>

7. Approval for the sale of a debtor's assets outside the debtor's ordinary course of business "requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer

has acted in good faith." *In re Exaeris*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  The Debtors cannot meet this burden.

8.  A debtor must show that there is "a sound business purpose" for the proposed sale.  In fact, the Second Circuit has held that "a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application . . . . 'The need for expedition [of a bankruptcy proceeding] is not a justification for abandoning proper standards.'" *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968)).  *See also In re Blue Coal Corp.*, 59 B.R. 157, 160 (Bankr. M.D. Pa. 1986) ("It is well established that in a sale in bankruptcy, the Court is the real seller and the Trustee is its agent to obtain a higher possible price.").

9.  Following decisions in the Second and Sixth Circuits, the Delaware bankruptcy court has articulated the following non-exhaustive list of factors in considering whether such a purpose exists:

> the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; <u>the amount of proceeds to be obtained from the sale versus appraised values of the property</u>; and <u>whether the asset is decreasing or increasing in value</u>.

*In re Delaware*, 124 B.R. at 176 (citing *In re Lionel*, 722 F.2d at 1068-69) (emphasis added).

10. Of the factors listed above, the most important factor is "whether the asset is increasing or decreasing in value." *In re Lionel*, 722 F.2d at 1071.  In *In re Lionel*, the court denied the proposed sale of certain common stock on the grounds that (1) the sale was premature because the asset proposed to be sold "is not a wasting asset and there is no emergency," (2)

there was "no justifiable cause present since [the asset], if anything, is improving," and (3) the price was inadequate. *Id.*

11. The Third Circuit has held that the Bankruptcy Code requires a debtor-in-possession, acting in the shoes of the bankruptcy trustee, to "investigate all sources of income for the estate and 'collect and reduce to money the property of the estate.'" *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996). *See also In re Blue Coal*, 59 B.R. at 162 ("[I]t is a well-established principle of Bankruptcy law that the objective of bankruptcy sale and leases, and <u>the trustee's duty with respect to such sales or leases, is to obtain the highest price or greatest overall benefit possible for the estate</u>.") (emphasis added).

12. Accordingly, the debtor "has the duty to maximize the value of the estate, and in so doing is 'bound to be vigilant and attentive in advancing [the estate's] interests.'" *Myers*, 91 F.3d at 394 (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 353 (1985) and *In re Baird*, 112 F. 960, 960 (D.C. Cir. 1902)). "[I]t is the trustee's duty to both the debtor and the creditor to realize from the estate <u>all that is possible for distribution among the creditors</u>." *Id.* (citing 4 Collier on Bankruptcy ¶ 704.01 (15th ed. 1993)) (emphasis added). *See also In re Integrated Res., Inc.,* 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd* 147 B.R. 650 (S.D.N.Y. 1992) ("When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold.").

13. Moreover, the debtor has the burden of demonstrating that the proposed sale price is adequate. *In re Delaware*, 124 B.R. at 176. The U.S. Supreme Court explained that "the best way to determine value is exposure to a market." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 457 (1999). The Third Circuit has similarly stated that "an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt." *See*

*In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143, 149 (3d Cir. 1986).  <u>However, an auction must be open and calculated to maximize bidding in order to be a deemed "a final arbiter" of the value of a debtor's assets</u>.  *Id*.  In *In re Abbotts*, however, the court concluded that no auction had taken place because the debtors and the bidder had "colluded with respect to the timing . . . in an attempt to chill the bidding for the assets involved [so] it would follow that no 'auction' took place in the bankruptcy court; thus, the 'bidding' could not . . . serve as the final arbiter of the 'value' of [the debtor's] assets."  *Id.*

14. Here, the sale process was only designed to sell substantially all of the Debtors' assets as a going concern.  The Debtors disqualified bids for individual real property assets, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬.  The Debtors, as estate fiduciaries, should be charged with running a sale and auction process that will result in the highest and best offer for the Real Property Assets.  No urgency exists to deviate from a fair and open process that could result in greater cash proceeds for the benefit of these estates.  Accordingly, the sale of the Real Property Assets should not be approved until those assets are subject to a commercially reasonable sale process designed to maximize value.

15. Further, Newco would not commit to distribute the equity of Newco of proceeds of any sale of the Real Property Assets on a ratable basis to all First Lien Lenders or even to describe the ownership structure of and funding sources for Newco.  Newco indicated that it will market the assets for sale outside of the Court's purview following closing of the sale, but provided no mechanism to ensure (short of additional litigation) that Newco is seeking the highest and best price.  Thus, the Newco purchase is shrouded in secrecy, violates the terms of

the First Lien Credit Agreement and is designed to subject Yucaipa unfairly to the whim of Black Diamond and Spectrum – and therefore should not be approved.

        **B.**        **The NewCo Bid Violates Yucaipa's Rights Under The Bankruptcy Code and First Lien Credit Agreement**

16.    As set forth in detail in the Original Objection, the Delaware Bankruptcy Court has held that "[a debtor's] sale of all or substantially all of its assets, outside of a plan of reorganization . . . requires a bankruptcy court's careful review." *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). *See also In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ("[I]n the absence of the protection and finality offered by a disclosure statement and plan, such a transaction pursuant to Section 363(b) requires specific authorization by the Court. The sale must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.") (citing *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D. N.H. 2000); ("The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter."); *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

17.    The First Lien Credit Agreement requires that any distributions of proceeds to First Lien Lenders be allocated ratably among all such lenders. In addition, the Bankruptcy Code does not authorize this Court to impose through a section 363 sale different treatment on Yucaipa than other lenders on account of their claims (*i.e.*, outside of a chapter 11 plan). *See Contrarian Funds v. Westpoint Stevens, Inc. (In re West- Point Stevens, Inc.)*, 333 B.R. 30, 52 (S.D.N.Y. 2005), *rev'd on other grounds sub nom. Contrarian Funds v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231 (2d Cir. 2010) (stating that a sale order directing distribution of proceeds to creditors overstepped section 363).

18. Further, the provisions of the First Lien Credit Agreement mandate that the First Lien Lenders are treated equally with respect of their rights thereunder, including distributions of proceeds. *See Prudential Ins. Co. of America v. WestLB AG*, 961 N.Y.S.2d 360, 2012 WL 4854713, *5 (Oct. 12, 2012) (unreported disposition) (holding that a credit agreement's ratable sharing provision disallowed "the differential treatment of lenders vis-à-vis their rights in the collateral without their consent" and prohibited a subset of the lenders from reserving additional economic and voting rights to themselves). The Bankruptcy Code does not authorize this Court to grant Yucaipa different treatment on account of its debt claims than the other lenders receive on substantially similar claims through a sale under section 363 of the Bankruptcy Code (*i.e.*, outside of a chapter 11 plan), yet that is precisely what has been proposed by NewCo. *See Westpoint Stevens*, 333 B.R. at 52 ("Indeed, it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures" and finding that the sale order was not proper because, among other things, it "authorized and directed . . . . the direct distribution to creditors of the consideration paid . . . ."); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986) ("[A] debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization"); Collier on Bankruptcy ¶ 363.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Attempts to determine plan issues in connection with the sale are improper and should result in a denial of the relief requested").

19. In addition to the reasons for denying the Real Property Sale set forth above, to the extent NewCo endeavors to direct Yucaipa's treatment with respect to sale proceeds, or provide Yucaipa disparate treatment from other First Lien Lenders, the NewCo structure violates the First Lien Credit Agreement and exceeds the relief that may be properly afforded by the

Court as part of a sale under section 363 of the Bankruptcy Code.  In the event that this Court decides to approve the Real Property Sale, it should mandate that all distributions on a pro rata basis be made to all existing First Lien Lenders at the same time.

> C. **The NewCo APA Is Not A Good-Faith Bid Under Section 363(m) Of The Bankruptcy Code**

20.    Also as further set forth in the Original Objection, and as the Delaware bankruptcy court explained in *In re Exaeris*, "the element of 'good faith' is of particular importance, as the Third Circuit made clear in *In re Abbotts Dairies of Pa., Inc.*" *In re Exaeris*, 380 B.R. at 744 (citations omitted).  "A purchaser's good faith 'is shown by the integrity of his conduct during the course of the sale proceedings.'" *In re Chrysler LLC*, 405 B.R. 84, 106 (Bankr. S.D.N.Y. 2009).  In *In re Abbotts Dairies*, the Third Circuit explained that "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or <u>an attempt to take grossly unfair advantage of other bidders</u>." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (emphasis added).  The court explained that "[t]he purpose of requiring such a finding in each situation, however, is quite similar: it prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11." *Id.* at 150 n. 5.  The Third Circuit also emphasized that "section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and, as such, it mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan and make a finding that it 'has been proposed in good faith and not by any means forbidden by law.'" *Id*. at 150.  Yucaipa submits that to the extent the NewCo structure attempts to afford Yucaipa disparate treatment from other First Lien Lenders, such treatment

demonstrates that NewCo is not a good faith purchaser or entitled to the protections of section 363(m).

### III.   LIMITED OBJECTION TO JCT SALE

21.   Yucaipa generally supports the JCT Sale. However, Yucaipa submits this limited objection to the JCT Sale to the extent the JCT Sale documents purport to authorize distributions of the sale proceeds in contravention of the First Lien Credit Agreement or in a manner calculated to prejudice Yucaipa. As noted above, section 363 sales cannot be used as an end-run around the protections afforded to creditors in a plan process. While broad, section 363 does not authorize a court to approve the distribution of disparate assets to creditors; rather, section 363 enables the estate to sell assets, with creditors rights attaching to the proceeds of the sale.

22.   Section 3.3 of the revised Asset Purchase Agreement for the JCT Sale states that the purchaser will pay the consideration to the sellers <u>or as the sellers direct</u>. Yucaipa objects to such sale to the extent the Debtors direct the sale proceeds (directly to or through Black Diamond, Spectrum, the agent under the First Lien Credit Agreement or any other party) in a manner that results in distributions to the First Lien Lenders that violate the ratable sharing provisions of the First Lien Credit Agreement. Black Diamond/Spectrum have repeatedly structured bids and voiced their intention under the JCT Sale to direct sale proceeds to themselves (as purported agent or their respective lender capacities) in violation of the First Lien Credit Agreement and the Bankruptcy Code and to the material negative prejudice to Yucaipa. Allowing Black Diamond/Spectrum to insert themselves directly or indirectly into the flow of JCT Sale consideration will result in prejudice to Yucaipa and further litigation. Accordingly, as noted above, any proceeds of the JCT Sale should be paid to the Debtors (pending confirmation of a liquidating plan affording Yucaipa the protections of section 1129 of the Bankruptcy Code or further order of the Court).

## IV. CONCLUSION

For the foregoing reasons, Yucaipa respectfully requests this Court to (a) deny the Debtors' request to sell the Real Property Assets to NewCo until such time as the Real Property Assets have been marketed in a commercially reasonable manner designed to maximize value for creditors, (b) order the Debtors to direct the proceeds from the JCT Sale into their estates pending confirmation of a plan or further order of the Court, and (c) grant such other relief as may be appropriate under the circumstances.

Dated: September 16, 2013
Wilmington, Delaware

Respectfully submitted,

By: */s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 576-3321

and

Robert A. Klyman (*Admitted Pro Hac Vice*)
Russell F. Sauer, Jr. (*Admitted Pro Hac Vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

*Counsel to Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P.*