IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> ALLIED SYSTEMS HOLDINGS, INC. *et al.*,[1] <br><br> Debtors. | ) <br> ) Chapter 11 <br> ) Case No. 12-11564 (CSS) <br> ) (Jointly Administered) <br> ) <br> ) **Re: D.I. 1175, 1320, 1736, 1816** <br> ) <br> ) |

## RESPONSE OF THE PREPETITION FIRST LIEN AGENTS
## TO YUCAIPA'S OBJECTIONS TO THE DEBTORS' SALE MOTION

Black Diamond Commercial Finance, L.L.C. ("Black Diamond"), Spectrum Commercial Finance, LLC ("Spectrum") (together, the "Co-Administrative Agents") and Black Diamond as successor collateral agent (the "Collateral Agent") (the Co-Administrative Agents and Collateral Agent, collectively, the "First Lien Agents") on behalf of themselves and at the direction of the Requisite Lenders under the First Lien Credit Agreement,[2] by and through their undersigned counsel, hereby submit this response (the "Response") to the objection [D.I. 1816] (the "9/16 Obj.") filed by Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. ("Yucaipa") to the Debtors' Sale Motion, and respectfully state as follows:

---

[1] The Debtors in these cases, along with the federal tax identification number (business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta. LLC (45-5215545); Axis Canada Company (875688228); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services. Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057): QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

[2] Capitalized terms not defined herein shall have the meanings given to them in the "Asset Purchase Agreement" filed at D.I. 1827 (the "APA").

DOC ID - 20595404.6

## PRELIMINARY STATEMENT

1.     At the conclusion of an intense and highly contentious auction, the Debtors determined that the "highest and best" bids received for substantially all of their assets were the bids submitted by: (i) Jack Cooper Holdings Corp. (the "<u>JCT Bid</u>") and (ii) an acquisition vehicle ("<u>Purchaser</u>") formed by the First Lien Agents at the direction of the Requisite Lenders under the First Lien Credit Agreement (the "<u>Agent Bid</u>"). The JCT Bid and the Agent Bid were negotiated together as part of a global compromise and reflect a good faith effort on the part of the Debtors, the Creditors' Committee, JCT and the First Lien Agents to bring these highly contested cases to a consensual resolution.

2.     Yucaipa, as a dissenting First Lien Lender and litigation target, has filed objections seeking to disrupt the sale approval process in furtherance of a scorched-earth litigation strategy that has played out before this Court over the last sixteen months. As a threshold matter, Yucaipa is contractually prohibited from raising any objection to the JCT Bid or the Agent Bid as a First Lien Lender because the Third Amendment to the First Lien Credit Agreement expressly and unambiguously restricts Yucaipa's ability to participate in the Debtors' bankruptcy cases, or to contest the actions of First Lien Agents taken at the direction of the Requisite Lenders. For this reason alone, Yucaipa's objections should be stricken and overruled.

3.     In an effort to block the approval of the proposed sale agreements, Yucaipa raises six objections in its objection, which incorporates by references its brief filed on September 4, 2013 [D.I. 1736] (the "<u>9/4 Obj.</u>"). As explained below, all of the objections lack merit.

4.     <u>First</u>, Yucaipa challenges the Agent Bid because the "credit bid of $5 million" is a "bargain-basement" price and is not "fair and reasonable." (9/16 Obj. ¶¶ 2, 3.) Yucaipa misunderstands the terms of the Agent Bid and ignores the effect of the "Post-Closing Claim Contribution." The Agent Bid provides for an initial credit bid payment of $5 million **and**

provides for an **additional** credit bid equal to either (a) the net value realized upon the sale of any Purchased Assets in the first six months after the Closing Date (referred to as the "Disposition Value" and defined below), or (b) the appraised value of any Purchased Asset that is not sold during the first six months (referred to as the "Appraised Value" and defined below). Moreover, the Debtors will receive notice of any proposed disposition and the appraised value and will have an opportunity to object in this Court. Thus, the foregoing provisions fully and adequately ensure that the Debtors will receive fair credit (in the form of a reduction of First Lien Obligations) in respect of the Purchased Assets. Yucaipa's argument on this point completely misses the mark.

5. Second, Yucaipa seeks to block approval of the Agent Bid (a credit bid) because Purchaser (an acquisition vehicle formed by the First Lien Agents) is "not an agent" of the First Lien Agents. (9/16 Obj. ¶ 2, n.2.) Yucaipa's argument is frivolous. The agency relationship is expressly set forth in the Direction and Designation Agreement [D.I. 1753, 1827], pursuant to which, among other things, (i) the Requisite Lenders directed the First Lien Agent to credit bid for the Purchased Assets and (ii) the First Lien Agent designated Purchaser to credit bid on their behalf and proceed with the Agent Bid.

6. Third, Yucaipa maintains that its consent is required to effectuate a credit bid because the Agent Bid implicates the First Lien Credit Agreement's "amendment provisions," which require 100% Lender authority before certain provisions can be modified or amended. (*See* 9/4 Obj. ¶ 24). This argument, as explained below, has been uniformly rejected by courts, including courts in this District and the Second Circuit Court of Appeals.

7. Fourth, Yucaipa further argues that the Agent Bid violates the First Lien Credit Agreement's ratable sharing provisions by treating Yucaipa differently from other First Lien

Lenders in two respects: (i) the distribution of Purchaser equity to Yucaipa will be non-voting and (ii) the distribution of Purchaser equity on account of its disputed First Lien Debt will be reserved pending the final determination as to the validity/subordination of such debt. (*See* 9/16 Obj. ¶¶ 16-19). The Agent Bid does, in fact, treat Yucaipa differently than other First Lien Lenders, but only because Yucaipa (unlike other First Lien Lenders) holds disputed First Lien Debt that is not entitled to vote under the terms of the First Lien Credit Agreement. The structure of the Agent Bid and contemplated ownership structure merely preserves the status quo with respect to Yucaipa's existing non-voting status and creates a reserve to hold Yucaipa's pro rata share of the equity in Purchaser to deal with the fact that Yucaipa's debt is disputed and subject to pending litigation.

8. Fifth, Yucaipa argues that "cause" exists to deny the First Lien Agent's right to credit bid under section 363(k) of the Bankruptcy Code because the bid is "a guise to restructure intercreditor relationships outside of the plan process" and violates the terms of the Bid Procedures. (*See* 9/4 Obj. ¶ 12-14). There is no evidence that "cause" exists to limit the First Lien Agents' right to credit bid.

9. Sixth, Yucaipa states that Purchaser is not entitled to a "good faith" finding under section 363(m). (*See* 9/4 Obj. ¶ 17; 9/16 Obj. ¶ 20). Yucaipa does not (and cannot) allege that the proposed sale or auction involved any fraud or collusion between Purchaser, the First Lien Agents, the Requisite Lenders (on the one hand) and any other party, including the Debtors and other bidders. At all times the First Lien Agents and Purchaser (as agent of the First Lien Agents) conducted all negotiations at arm's length and in good faith. The evidence will show that Purchaser is entitled to a good faith finding warranting the protections under 363(m) of the Bankruptcy Code.

10. <u>Seventh</u>, Yucaipa opposes approval of the JCT Bid unless the sale proceeds are left in the estate pending confirmation of a liquidating plan (and not distributed to the First Lien Agents). (*See* 9/16 Obj. ¶ 22). The First Lien Agents' consent to the release of the liens securing the First Lien Obligations was expressly conditioned upon payment of the JCT sale proceeds to the First Lien Agents at closing pursuant to the terms of a sale order acceptable to the First Lien Agents (net of the DIP Loan and a wind-down reserve in an amount to be determined).

11. For these reasons, the Court should overrule Yucaipa's objections.

## Summary of Agent Bid

12. Set forth below is a summary of the material terms of the Agent Bid, a copy of which is filed at D.I. 1827.[3]

| Purchaser | The Purchaser is a duly authorized agent of the First Lien Agents, acting at the direction of the Requisite Lenders under the First Lien Credit Agreement. |
|---|---|
| Purchased Assets | 6 parcels of fee-owned real estate, a leased property related to the South Brooklyn Marine Terminal, and 50 so-called "low boy" trailers. |
| Purchase Price | The aggregate consideration (collectively, the "<u>Purchase Price</u>") shall be in the form of the contribution, release or waiver (as Purchaser may direct in its sole discretion) of Sellers and any guarantors (and their respective successor and assigns) equal to the sum of the Initial Claim Contribution Amount and the Post-Closing Claim Contribution Amount.<br><br>"<u>Initial Claim Contribution</u>" means obligations held by the First Lien Lenders under the First Lien Credit Agreement and First Lien Credit Documents equal to FIVE MILLION DOLLARS ($5,000,000).<br><br>"<u>Post-Closing Claim Contribution</u>" means an amount equal to the sum of (i) the aggregate Disposition Value realized in a Disposition Event; <u>plus</u> (ii) the aggregate Appraised Value for any Purchased Asset that is not the subject of a Disposition Event; <u>less</u> (iii) the Initial Claim Contribution. |

---

[3] The foregoing is merely intended to be a summary of the salient terms of the agreement and, in the event of any inconsistency, the APA controls.

| | For avoidance of doubt, the Post-Closing Claim Contribution shall be net of the Initial Claim Contribution.[4] |
|---|---|
| Ownership | The equity interests of Purchaser will be issued to the holders of the First Lien Debt, pro rata. Any holder of First Lien Debt whose claims are in dispute will have their equity interests reserved by the First Lien Agents pending resolution of such dispute. Any holder of First Lien Debt that is a "Restricted Sponsor Affiliate" (*i.e.*, Yucaipa) will receive non-voting equity interests (provided that such interests will otherwise be identical in right to all other equity interests, and will convert to voting interests upon transfer to any person that is not a Restricted Sponsor Affiliate). |

## RESPONSE

### I.   Yucaipa Lacks Standing

13.   As a threshold matter, Yucaipa is contractually prohibited from raising any sale objections as a First Lien Lender because the Third Amendment to the First Lien Credit Agreement expressly and unambiguously restricts Yucaipa's ability to participate in this Debtors' bankruptcy cases, or to contest the actions of First Lien Agents taken at the direction of the Requisite Lenders. The First Lien Agents filed a motion to strike the entirety of Yucaipa's objection (Hillman Decl. Ex. A),[5] which is incorporated herein by reference, and for the reasons

---

[4]   "Disposition Value" means the value, as determined by the Purchaser, of the consideration received in connection with a Disposition Event less all reasonable out of pocket costs and expenses actually incurred by the Purchaser to hold, use, operate, preserve, maintain or dispose of the Purchased Assets that are the subject of the Disposition Event (net of any associated revenues), provided, Purchaser shall make available to Sellers supporting documentation with respect to such costs and expenses.

"Disposition Event" means the sale or other disposition of the any Purchased Asset during the first six months after the Closing Date.

"Appraised Value" means the fair saleable value of the applicable Purchased Assets, as of the date that is no later than six (6) months after the Closing Date, which shall be determined by a recognized independent appraiser(s) or broker(s) (to be selected by the Purchaser in good faith) in the region(s) where the applicable Purchased Assets are located, which net value shall be net of all out of pocket costs and expenses actually incurred by Purchaser to hold, use, operate, preserve, maintain, dispose or appraise such Purchased Assets from the Closing Date to the date of such appraisal and such reasonable costs and expenses that Purchaser in good faith reasonably anticipates will be incurred in order to realize the appraised value (net of any associated revenues), provided, Purchaser shall make available to Sellers supporting documentation with respect to such costs and expenses. With respect to the Equipment, the basis for the Appraised Value shall be (i) the Accuval appraisal obtained by Sellers and dated April 11, 2012 for any Equipment owned by Sellers as of the date of such appraisal and (ii) the purchase price of any Equipment acquired by Sellers after the date of such appraisal.

[5]   The Declaration of David Hillman is being filed concurrently in support of this Response.

set forth therein request that the Court enforce the terms of the Third Amendment and strike the Yucaipa objection.

14.  The indisputable contractual prohibitions on Yucaipa aside, Yucaipa's objections raise a litany of purely intercreditor creditor issues under the First Lien Credit Agreement that have no bearing on the Debtors' estates or whether the sale should be approved. Those issues, even if Yucaipa was contractually permitted to raise them (which it is not) can be addressed at a later date and in an appropriate forum. *See, e.g., In re Metaldyne Corp*, 409 B.R. 671, 675 n. 7 (Bankr. S.D.N.Y. 2009) (noting that a dissenting lender's concerns about recoveries and its agent's compliance with credit and security agreements is fundamentally a dispute with the agent, other lenders, and the purchasers, and so the court need not reach those issues). This Court addressed a similar intra-lender sale dispute in *PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. 2009) (CSS) and noted that:

> ***There are, potentially, arguments that the ABL lenders have against their agent in connection with whether it was appropriate to exercise the credit bid … but the bottom line on all of that is, to be somewhat flip, that's not my problem, that's not the debtor's problem, that's an intercreditor issue.*** Having said that, one could posit that there's a serious question as to whether the ABL lenders even have standing to be heard. Their agent has credit bid the entirety of their debt, any issues they have with the agent this Court does not have jurisdiction over and in any event would abstain if it did. The process was complied with; nonetheless, I am going to hear them on these issues.[6]

Tr. of 4/14/10 Hrg. at 49-5-19 (emphasis added), *PTC Alliance Corp.*, No. 09-13395; D.I. 613.

## II.  Purchase Price is Sufficient

15.  Yucaipa argues that the Agent Bid should not be approved because the $5 million credit bid is a "bargain-basement" purchase price. (*See* 9/16 Obj. ¶ 2). The $5 million credit bid is only the **initial** consideration. The Purchaser has also agreed to pay the Post-Closing Claim

---

[6] This Court ultimately approved the sale.

Contribution Amount equal to (i) Disposition Value (if any) plus the (ii) aggregate Appraisal Value as set forth more fully in section 2.2 of the APA. Moreover, the Purchaser has agreed to provide the Debtors with notice of the appraisal and advance notice of any sale including (i) the identity of the purchaser and whether there is an any affiliation with the First Lien Agent or any First Lien Lenders; (ii) the Purchased Asset(s) included in the proposed sale, transfer or other disposition; (iii) the purchase price (including any non-cash consideration); and (iv) the means by which offers for the Purchased Asset(s) were solicited. *See* APA § 2.2. The Bankruptcy Court will retain jurisdiction to resolve any dispute concerning the Post-Closing Claim Contribution Amount. The foregoing provisions ensure that the Purchase Price will always equal the fair value of the Purchased Assets.

### III.   The Agent Bid Does Not Violate the First Lien Credit Agreement

A.   *Purchaser is an Agent of First Lien Agents*

16.   There is no dispute, and it is law of the case, that Black Diamond and Spectrum are the Requisite Lenders under the First Lien Credit Agreement.[7] There is no dispute that Black Diamond and Spectrum are the First Lien Agents.[8] The Requisite Lenders are vested with broad authority to make key decisions affecting the rights of *all* First Lien Lenders, including the authority to direct the First Lien Agent to exercise—or refrain from exercising—certain rights and remedies on behalf of all First Lien Lenders, such as declaring Events of Default, demanding immediate payment of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations. *See* First Lien Credit Agreement §§ 8.1, 9.8 (Hillman Decl. Ex. E). The First Lien Credit Agreement expressly provides that the Requisite Lenders also have

---

[7]   *See Order Granting Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders Under the First Lien Credit Agreement* at 3 ("the Petitioning Creditors are and shall be deemed the Requisite Lenders under the First Lien Credit Agreement") [Adv. Proc. No. 13-50530, D.I. 280].

[8]   *See* Appointment Agreement dated December 3, 2012 (Hillman Decl. Ex. C).

authority to direct the First Lien Agent, "for the purpose of bidding" at a "public or private sale or other disposition" to "use and apply any of the Obligations as a credit on account of the purchase price." *See id.* § 9.8(b)(ii)).

17.   Yucaipa acknowledges (as it must) that the First Lien Agents can exercise their rights and powers under the First Lien Credit Agreement through "agents." (*See* 9/4 Obj. ¶ 22 (quoting § 9.2)). Yucaipa maintains that the Purchaser "is not an agent" of the First Lien Agents. (9/4 Obj. ¶ 23; 9/16 Obj. ¶ 2, n.2). It is, however, beyond dispute that the Purchaser is, in fact, an agent of the First Lien Agent as evidenced by the "Direction and Designation Agreement" ("Direction and Designation Agreement"), filed September 16, 2013 [D.I. 1827] (Hillman Decl. Ex. B). Pursuant to that agreement, the First Lien Agents, as directed by the Requisite Lenders,

> designate[d] the Purchaser *as their designee and agent* and vest[ed] the Purchaser with all rights, powers and authorities to exercise on behalf of the [First Lien Agents] *(as their designee and agent)* the [First Lien Agents] rights to credit bid up to the full amount of the Obligations to the fullest extent permitted under the DIP Orders, the Bid Procedures Order, the First Lien Credit Agreement, the Pledge and Security Agreement, Section 363(k) of the Bankruptcy Code and applicable non-bankruptcy law. *See* Direction and Designation Agreement ¶ B (emphasis added).

It is customary for financial acquirers (such as the Requisite Lenders and First Lien Agents) to use an acquisition vehicle when purchasing assets.[9] For liability reasons, no lender would acquire material assets without facilitating the credit bid sale through a newly formed entity. Yucaipa's argument on this point contradicts the plain language of the First Lien Credit Agreement and ordinary commercial practice.

18.   The First Lien Credit Agreement is unambiguous. Under New York law,[10] a contract must be interpreted and enforced according to the plain meaning of its unambiguous

---

[9]   For example, the agents under the relevant credit documents in *PTC Alliance, GWLS, Foamex,* and *Metaldyne* (discussed below) all used an acquisition vehicle to facilitate their credit bids.

[10]  The First Lien Credit Agreement is governed by New York law. *See* Hillman Decl. Ex. E, § 10.14.

terms. As the Delaware Bankruptcy Court has recognized: "In New York, it is well-settled that a 'written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *In re GWLS Holdings, Inc.*, 2009 WL 453110, *4 (Bankr. D. Del. Feb. 23, 2009) (quoting *RMM Records & Video Corp. v. Universal Music & Video Distrib., Corp.*, 372 B.R. 619, 622 (Bankr. S.D.N.Y. 2007) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002)).

### B. *Credit Bidding Does Not Implicate the Credit Agreement's Amendment Provision*

19.     Yucaipa maintains that its consent is required to effectuate a credit bid by its agent because the bid implicates the Credit Agreement's "amendments" provision, which requires 100% lender authorization before certain provisions of the Loan Agreement may be modified or amended. (9/4 Obj. ¶ 24). This argument has been uniformly rejected by courts analyzing credit documents similar to the ones in this case. Those courts have held that a credit bid sale does not require an amendment of any loan documents and does not limit the agent's power to act in a 363 sale. *See In re Chrysler LLC,* 576 F.3d 108, 119-20 (2d Cir. 2009); *GWLS Holdings*, 2009 WL 453110, at *5; *Metaldyne*, 409 B.R. at 678. Analyzing similar provisions to a security agreement, the Second Circuit rejected a dissenting lender's argument that a credit bid required the lenders' authorization, holding that:

> [t]he § 363(b) Sale did not entail amendment of any loan document. To the contrary, the § 363(b) sale was effected by implementing the clear terms of the loan agreements-specifically, the terms by which (1) the lenders assigned an agent to act on their behalf, (2) the agent was empowered, upon request from the majority lenders, to direct the trustee to act, and (3) the trustee was empowered, at the direction of the agent, to sell the collateral in the event of a bankruptcy. Because the Sale required no amendment to the loan documents, Chrysler was not required to seek, let alone receive, the Pensioners' written consent.

*In re Chrysler LLC*, 576 F.3d at 120.

20. Similarly, in *GWLS*, a dissenting lender argued (like Yucaipa does here) that the credit bid required the unanimous consent of all lenders because it would result in the "waiver and release of the First Lien Lenders' claims to the collateral securing their claims...." *GWLS Holdings*, 2009 WL 453110, at *5. Judge Walsh soundly rejected this argument, holding that the amendment section of the credit agreement only prohibited waivers and modifications of the loan documents, and not credit bidding. *See id., see also Metaldyne*, 409 B.R. at 678-79 (evaluating similar credit agreement provisions and holding that "[w]hile the loan documents restrict the right of the Agent to unilaterally alter or waive any provisions in the agreements without the various constituent lenders' consent, nothing in the agreements prohibits the Agent from exercising rights that are consistent with § 363(k) of the Bankruptcy Code."). Moreover, Yucaipa's objection relies on Section 10.5(b)(vii) of the First Lien Credit Agreement, which provides that the principal amount of the loans cannot be reduced without the consent of all lenders. However, Section 9.8(b) of the First Lien Credit Agreement, which grants the Collateral Agent the right to credit bid, begins with the language "[a]nything contained in any of the Credit Documents (including the Intercreditor Agreement) to the contrary notwithstanding...." As a matter of contract interpretation, this language must be read to say that the right to credit bid prevails over the approval rights contained in Section 10.5(b)(vii). *See, e.g., Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 91 (2d Cir. 2002) (holding such language "overrides any inconsistent language" elsewhere in contract). Thus, the amendment provisions cited by Yucaipa are not implicated by the credit bid.

C. *Ratable Treatment Provision is Not Implicated*

21. Yucaipa further argues that the Agent Bid violates its rights under the Bankruptcy Code and the First Lien Credit Agreement's ratable sharing provisions by treating Yucaipa differently from other First Lien Lenders in two respects: (i) the distribution of equity in

Purchaser to Yucaipa (each of which is either directly or effectively on account of its existing non-voting First Lien Debt) will be non-voting and (ii) the distribution of Purchaser equity on account of its disputed First Lien Debt will be reserved pending the final determination as to the validity/subordination of such debt. Not only is Yucaipa unable to point to any provision of the Bankruptcy Code under which its rights are allegedly being impaired, its argument entirely ignores the unequivocal terms of the First Lien Credit Agreement which mandate the fundamentally different treatment of Yucaipa's First Lien Debt.

      (i)    *Non-Voting Equity*

22.    The Agent Bid does, in fact, treat Yucaipa differently than other First Lien Lenders. It does so, however, to preserve the status quo that exists under the First Lien Credit Agreement today. Any equity in Purchaser that is distributed to Yucaipa will be non-voting because Yucaipa (unlike every other First Lien Lender) has no right to vote its debt under the terms of the First Lien Credit Agreement. *See* Third Amendment § 2.7(a) (Hillman Decl. Ex. D) (Yucaipa as "Restricted Sponsor Affiliate" shall "have no voting rights for all purposes under [the First Lien Credit Agreement] (whether before, during *or after* an Insolvency or Liquidation Proceeding) and the other Credit Documents with respect to their Term Loans.") (emphasis added). Thus, the voting structure is designed to maintain the status quo. Yucaipa's treatment under the Agent Bid with respect to its non-voting equity is consistent with, and in fact mandated by, the applicable unambiguous provisions of the First Lien Credit Agreement.

      (ii)    *Reserve of Purchaser Equity*

23.    The Agent Bid contemplates that Yucaipa's equity in Purchaser will be reserved with the intention of preserving the status quo pending the outcome of litigation pending against Yucaipa that seeks to equitably subordinate and/or disallow its First Lien Debt claim. Under

Judge Ramos' order in the New York State court proceeding, the Fourth Amendment is invalid, and, it is law of the case, that the Third Amendment is valid and binding on Yucaipa. Under the Third Amendment, Yucaipa is required to contribute to equity and/or divest a portion of its First Lien Debt. There is pending litigation seeking to specifically enforce those provisions of the Third Amendment and to equitably subordinate Yucaipa's First Lien Debt. *See* Amended Complaint, filed Mar. 14, 2013 [Adv. Proc. No. 13-50530]. If that litigation is successful, then Yucaipa will not have an allowed claim under the First Lien Credit Agreement on account of which it would be entitled to a distribution of Purchaser equity, and/or such equity would need to be distributed to the other First Lien Lenders (if equitable subordination is ordered). Thus, the bid structure contemplates reserving Yucaipa's equity in Purchaser pending the outcome of that litigation as a reasonable and necessary means of preserving the status quo.

       (iii)    *No Bankruptcy Code Violation*

24.    Unsurprisingly, Yucaipa cannot point to any specific provision of the Bankruptcy Code being violated. *See In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1228 (5th Cir. 1986) ("when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied."). Neither do any of the cases cited by Yucaipa support its position. For example, the *WestPoint Stevens* court's holding that "a sale order directing distribution of proceeds to creditors overstepped section 363" (as characterized by Yucaipa) was entirely based on the fact that the sale order in controversy ***impaired and altered contractual rights*** between first and second lien lenders. *See Contrarian Funds v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30, 52-53 (S.D.N.Y. 2005), *rev'd sub nom, Contrarian Funds v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d

231(2d Cir. 2010). Similarly, the *Prudential Ins. Co. v. WestLB AG* case involved inter-creditor issues and the court's holding that the ratable sharing provision was violated was based on the finding that the defendant could "point to no language ... which ... permit[ted] the differential treatment of lenders vis-à-vis their rights in the collateral without their consent." 916 N.Y.S.2d 360, 2012 WL 4854713, *5 (Sup. Ct. Oct. 12, 2012). Here, the terms of the Third Amendment, which are valid and binding upon Yucaipa, wholly justify and mandate the treatment Yucaipa complains about. Accordingly, Yucaipa's argument that "plan issues" are implicated is not true in the current context where only purely intra-creditor issues are present and no contractual rights are being modified.

## IV. No Cause Exists to Deny Right to Credit Bid

25. Yucaipa's argues that "cause" exists to deny the First Lien Agents' right to credit bid under section 363(k) because the bid is "a guise to restructure intercreditor relationships outside of the plan process" and violates the terms of the Bid Procedures. (*See* 9/4 Obj. ¶ 14). There is no evidence that "cause" exists to the First Lien Agents' right to credit bid.

26. It is well-established that "the secured party [has the] right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k).... " H.R. Rep. No. 95-595, at 549, reprinted in 1978 U.S.C.C.A.N. 5963, 6474 (quoted in *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 460 n. 15 (3d Cir. 2006)); *see also Metaldyne*, 409 B.R. at 679 (holding agent properly credit bid 100% of term debt to purchase substantially all of the debtors' assets in auction and released lien with respect to remaining collateral). This "right of a lienholder ... to [credit] bid at a sale" is "an important protection for a secured party whose collateral is being liquidated in a bankruptcy sale" and has "significant value." Collier on Bankruptcy ¶¶ 363.06; 363.09 (Alan N. Resnick & Henry J. Sommers eds., 16th ed). A court may circumscribe a secured creditor's right to credit bid "for cause." Section 363 gives courts

the discretion to decide what constitutes "cause" and the flexibility to fashion an appropriate remedy by conditioning credit bidding on a case-by-case basis. *See In re NJ Affordable Homes Corp.*, 2006 WL 2128624, *16 (Bankr. D.N.J. June 29, 2006).

27. Tellingly, Yucaipa cites no cases (and has advised that it will present no witnesses) to support its request that the Court decline to recognize the credit bid. Rather, Yucaipa simply argues that "cause" exists because (in its view) the credit bid will "restructure intercreditor relationships outside the plan process." (9/4 Obj. ¶ 14). That argument is absurd and, carried to its extreme, would be a basis to deny every credit bid by an agent in an multi-lender credit agreement.

## V. Purchaser and The First Lien Agents are Entitled to Good Faith Purchaser Status Under Section 363(m)

28. Yucaipa states that the Purchaser is not entitled to a "good faith" finding under section 363(m). (*See* 9/4 Obj. ¶ 17, 9/16 Obj. ¶ 20). In the Third Circuit "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir.1978)); *see also In re Gucci*, 126 F.3d 380, 392-93 (2d Cir. 1997) (finding "good faith" by purchaser and no "gross unfair advantage", even though (i) purchaser's trademark litigation allegedly violated automatic stay prior to sale, (ii) alleged collusion between purchaser and trustee, and (iii) attempts to control assets beyond the scope of estate); *In re Cable One CATV*, 169 B.R. 488, 493-94 (Bankr. D.N.H. 1994) (finding no "gross unfair advantage" despite fact that purchaser allegedly had access to confidential information concerning the value of asset, had secret deals and there was collusion to support sale to purchaser).

29.     Yucaipa does not (and cannot) allege that the proposed sale or auction involved any fraud or collusion between Purchaser, the First Lien Agents, the Requisite Lenders (on the one hand) and any other party, including the Debtors and other bidders.  At all times the First Lien Agents and Purchaser (as agent of the First Lien Agents) conducted all negotiations at arm's length and in good faith, and did not take and were not granted any "grossly unfair advantage" in the auction or sale process.  Rather, as a result of difficult and often heated negotiations, the First Lien Agents made significant and repeated concessions at the request of the Debtors and the Committee in order to position the estates to seek approval of the JCT Bid and the Agent Bid as part of a global compromise to resolve these contentious cases.  The evidence will show that Purchaser is entitled to a good faith finding warranting the protections under 363(m) of the Bankruptcy Code.

### VI.     Distribution of Proceeds in the Sale Proceeds From JCT Bid

30.     Finally, Yucaipa objects to the sale of assets to JCT to the extent the sale proceeds are distributed to the First Lien Agents outside of a plan of liquidation.  (9/16 Obj. ¶ 22).  The First Lien Agents will not release consent to a sale "free and clear" of liens securing the First Lien Obligations unless the JCT sale proceeds (net of the DIP Loan and a wind-down reserve in an amount to be determined) are paid to the First Lien Lenders at Closing pursuant to the terms of a sale order that is acceptable to the First Lien Agents.

## CONCLUSION

WHEREFORE, the First Lien Agents respectfully requests that the Court overrule Yucaipa's objections, approve the Agent Bid, and grant such other relief as it deems just and proper.

Dated: September 16, 2013
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-and-

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
David M. Hillman
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955