**EXHIBIT A**
**TO**
**SALE ORDER**

Asset Purchase Agreement

**SRZ DRAFT 9/16/13**

# ASSET PURCHASE AGREEMENT

by and among

[_____],

as Purchaser,

and

## ALLIED SYSTEMS HOLDINGS, INC.

and

## THE SUBSIDIARIES OF ALLIED SYSTEMS HOLDINGS, INC. SET FORTH ON THE SIGNATURE PAGES HERETO,

as Sellers

DATED AS OF SEPTEMBER [●], 2013

DOC ID - 20595795.5

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of September [•], 2013 (the "Execution Date"), is entered into by and among Allied Systems Holdings, Inc., a Delaware corporation ("Allied"), the subsidiaries of Allied set forth on the signature pages hereto (collectively with Allied, "Sellers" and each, a "Seller") and [_____], a Delaware limited liability company (the "Purchaser"). Sellers and Purchaser are sometime individually referred to in this Agreement as a "Party" and collectively as the "Parties." Certain capitalized terms used herein are defined in Article X.

## RECITALS

WHEREAS, Sellers own or lease certain real property and own certain equipment, and Purchaser desires to purchase the Owned Real Property and Equipment, and to assume the lease for the Leased Real Property, pursuant to the terms of this Agreement;

WHEREAS, each Seller is (i) a debtor and debtor in possession in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") filed on May 17, 2012 in the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court"), as jointly administered under Case No. 12-11564 (CSS) (collectively, the "Chapter 11 Case"), and/or (ii) a debtor in those certain cases under Part IV of the *Companies' Creditors Arrangement Act* (the "CCAA") filed on June 12, 2012 in the Ontario Superior Court of Justice (the "Canadian Court", and together with the U.S. Bankruptcy Court, the "Bankruptcy Courts"), as administered under Court File No. 12-CV-9757-00CL (the "CCAA Case", and together with the Chapter 11 Case, the "Bankruptcy Cases");

WHEREAS, Sellers have received approval from the Bankruptcy Courts to conduct a sales process for all or substantially all of the Sellers' assets in accordance with the Bidding Procedures Order;

WHEREAS, in connection with the Bankruptcy Cases and subject to the terms and conditions contained herein and following the entry of the Sale Orders confirming the Purchaser as the winning bidder for the Purchased Assets and subject to the terms and conditions thereof, (i) Sellers shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from Sellers, the Purchased Assets free and clear of all Encumbrances and Liabilities (other than Permitted Encumbrances and Assumed Liabilities), and (ii) the Purchaser shall assume from Sellers the Assumed Liabilities all as more specifically provided herein and in the Sale Orders.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and Sellers hereby agree as follows:

# ARTICLE I.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1    Purchase and Sale of Assets.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Sections 36 and 49 of the CCAA and on the terms and subject to the conditions set forth in this Agreement and the Sale Orders, the Purchaser shall purchase, acquire and accept from each Seller, and each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, on the Closing Date, all of the Sellers' right, title and interest in, to and under the following (collectively, the "Purchased Assets"):

(a)    the Owned Real Property and any Personal Property related thereto;

(b)    the Leased Real Property and any Personal Property related thereto;

(c)    the Equipment;

(d)    all Documents used in or relating to or in respect of the Owned Real Property, Leased Real Property, Equipment, or Assumed Liabilities;

(e)    all Contracts related to the Owned Real Property, Leased Real Property, or Equipment with suppliers and vendors, and all rights pursuant thereto, entered into on or prior to the Closing Date by any Sellers (collectively, the "Assumed Vendor Contracts");

(f)    all deposits and prepaid expenses of Sellers related to the Owned Real Property, Leased Real Property, Equipment, or Assumed Liabilities, including but not limited to (i) security deposits, (ii) rebates, (iii) tenant reimbursements, (iv) pre-payments, and (v) unearned insurance premiums, in each case other than in connection with any Excluded Liabilities;

(g)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable Permits or under applicable Law, all Permits and all pending applications therefor in connection with the Purchased Assets (collectively, the "Transferable Permits");

(h)    to the extent the assignment or transfer thereof is not prohibited by applicable Law or the Sale Orders, all rights, claims, credits, causes of action or rights of set off with respect to third parties relating to the Owned Real Property, Leased Real Property, Equipment, or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities, guaranties and, solely to the extent against vendors, suppliers, or other contract counterparties of Sellers that are counterparties to the Assigned Contracts;

(i)    any counterclaims, setoffs or defenses that any Seller may have with respect to any Assumed Liabilities;

(j)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable insurance policies, applicable Law or the Sale Orders all of Sellers' insurance policies related to the Owned Real Property, Leased Real Property, Equipment, or the Assumed Liabilities and rights and benefits thereunder (including, without limitation, (A) all

rights pursuant to and proceeds from such insurance policies and (B) all claims, demands, proceedings and causes of action asserted by any Seller under such insurance policies relating directly to the Owned Real Property, Leased Real Property, Equipment, or any Assumed Liability);

(k)    copies of all Tax Returns or Tax Records of Sellers related to any Purchased Asset;

(l)    the Contracts set forth in Schedule 4 pursuant to which Sellers have subleased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of Sellers' interest in the Real Property (collectively, the "Real Property Subleases");

(m)    any Contract added to the definition of Purchased Assets in accordance with Section 1.5; and

(n)    the proceeds of any of the foregoing Purchased Assets to the extent sold, transferred or otherwise disposed of by Sellers (with the prior written consent of Purchaser) prior to the Closing.

1.2    [Intentionally Omitted]

1.3    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Orders, the Purchaser shall assume only the following Liabilities of Sellers (collectively, the "Assumed Liabilities"):

(a)    (i) all Cure Costs and (ii) any and all Liabilities of Sellers under each Assigned Contract arising on or after the Closing Date and related to such Assigned Contract;

(b)    any and all Liabilities for Transfer Taxes as provided in Section 11.1(a); and

(c)    any Liability added to the definition of Assumed Liabilities in accordance with Section 1.5.

1.4    Excluded Liabilities.  Except for the Assumed Liabilities, neither the Purchaser nor any Designated Purchaser shall assume, or become liable for the payment or performance of, any Liabilities of Sellers of any nature whatsoever (collectively, the "Excluded Liabilities"), which Excluded Liabilities shall remain Liabilities of Sellers and shall not be included in the Assumed Liabilities.

1.5    Updates to the Purchased Assets, the Assumed Liabilities and Excluded Liabilities; Cure Costs; Seller Disclosure Schedule Updates.

(a)    Notwithstanding anything in this Agreement to the contrary, upon written notice to Sellers, the Purchaser may (in its sole discretion) amend the definitions of the terms Purchased Assets, Assumed Liabilities and Excluded Liabilities to:

(i)     include in the definition of Purchased Assets any Contract of any Seller related to the Purchased Assets not previously included in the Purchased Assets, at any time on or prior to the Closing and require Sellers to give notice to the parties to any such Contract;

(ii)    exclude from the definition of Purchased Assets any Assigned Contract of any Seller related to the Purchased Assets previously included in the Purchased Assets at any time prior to the Closing;

(iii)   exclude from the definition of Purchased Assets any asset, property, interest or right (other than a Contract) of any Seller related to the Purchased Assets at any time prior to the Closing; and

(iv)    include in the definition of Assumed Liabilities and to exclude from the definition of Excluded Liabilities, any Liability of any Seller not previously included in the Assumed Liabilities, at any time prior to the Closing and require Sellers to give such notice to any third party as is required for the assumption of such Liability;

*provided* that no such change of the definition of the Purchased Assets, the definition of the Assumed Liabilities or the definition of the Excluded Liabilities shall increase or decrease the amount of the Purchase Price (except to the extent provided in Section 2.1(a) and Section 2.2).

The Parties acknowledge and agree that changes in the definitions of Purchased Assets, Assumed Liabilities and/or Excluded Liabilities that are permitted pursuant to this Section 1.5(a) may result in changes in the aggregate amount of Assumed Liabilities and Excluded Liabilities and any such changes in the amounts of such Liabilities shall be permitted at any time prior to the applicable deadlines set forth in Sections 1.5(a)(i)-(iv) for changing such definitions

(b)     If any change made by the Purchaser pursuant to Section 1.5(a) results in the Seller Disclosure Schedule being incorrect or incomplete, then within five (5) Business Days of such change Sellers shall be permitted to update, in writing to the Purchaser, such Seller Disclosure Schedule solely to the extent necessary to correct or complete such Seller Disclosure Schedule.

(c)     If any Contract is added to (or excluded from) the Purchased Assets as permitted by this Section 1.5, Sellers shall promptly take such steps as are reasonably necessary, subject to the Purchaser providing payment or adequate assurance of payment of any Cure Costs, including prompt delivery of notice to the non-debtor counterparty, to cause such Contracts to be assumed by Sellers, and assigned to the Purchaser, on the Closing Date (or excluded under the Sale Orders and this Agreement), other than any consents, approvals, waivers, authorizations or notices that can be overridden or canceled by the Sale Orders or other related order of the Bankruptcy Courts. Without limiting any of the Purchaser's rights pursuant to this Section 1.5, in the event that the Sale Orders do not approve the assignment or transfer of one or more of the Assigned Contracts, or if a non-debtor counterparty to such Assigned Contract objects to the proposed Cure Cost or to the assignment of such Assigned Contract, the Purchaser may, in its sole discretion, prior to the payment of such Cure Cost or the assumption and assignment of such Assigned Contract, exclude such Contract from the Assigned Contracts.

(d)     If, subsequent to the entry of the Sales Orders, the Purchaser exercises its rights under Section 12.8 to designate any other Person to be the assignee under any Assigned Contract, the Purchaser shall give prompt notice thereof to Sellers and shall provide such information as may be necessary regarding such designee to evidence such designee's ability to provide adequate assurance of future performance (as required by Section 365 of the Bankruptcy Code). Upon receipt of such notice from Purchaser, Sellers shall promptly take such steps as are reasonably necessary to provide notice to the counterparty to such Assigned Contract (with an opportunity for such counterparty to object).     The Purchaser and Sellers agree that, notwithstanding the occurrence of the Closing, the assignment of any such Assigned Contract shall not become effective until the earlier of (i) the passage of the notice period without the filing of any objection by the counterparty and (ii) the entry of an order at the applicable Bankruptcy Court overruling any such objection; provided that if the effective date of assignment of any Assigned Contract is after the Closing due to an exercise of the Purchaser's rights under Section 12.8, the Purchaser shall be liable for any and all liabilities and obligations of the Sellers arising under such Assigned Contract from and after the Closing through and including the effective date of assumption or rejection of such Assigned Contract (excluding any liabilities and obligations relating to rejection of such Assigned Contract), and shall further indemnify the Sellers for any losses or liabilities incurred by Sellers after the Closing as a result of the delay in effectuating the assignment of any such Assigned Contract (excluding, for the avoidance of doubt, any liabilities and obligations relating to rejection of such Assigned Contract).

1.6     No Successors.  Neither the Purchaser nor any Designated Purchaser shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, or the operation of the Purchased Assets from and after the Closing, to (a) be a successor, successor employer, or successor in interest (or other similarly situated party) to any of the Sellers (other than with respect to the Assumed Liabilities), (b) have, *de facto* or otherwise, merged with or into any of Sellers or (c) be a continuation or substantial continuation of Sellers or any business of Sellers.

## ARTICLE II.

## CONSIDERATION

2.1     Consideration.

(a)     The aggregate consideration (collectively, the "Purchase Price") to be paid for the purchase of the Purchased Assets shall be in the form of the contribution, release or waiver (as Purchaser may direct in its sole discretion) of amounts otherwise due and owing to the First Lien Lenders the under the First Lien Credit Documents by Sellers and any guarantors (and their respective successor and assigns) equal to the sum of the Initial Claim Contribution Amount (such contribution, release or waiver, the "Initial Claim Contribution") and the Post-Closing Claim Contribution Amount (such contribution, release or waiver, the "Post-Closing Claim Contribution").

(b)    In addition to the foregoing consideration, as consideration for the grant, sale, assignment, transfer and delivery of the Purchased Assets, the Purchaser shall assume and discharge the Assumed Liabilities.

2.2    Payment of Post-Closing Claim Contribution Amount.  The Post-Closing Claim Contribution (or applicable portion thereof) shall be paid by Purchaser upon (a) each Disposition Event with respect to any Purchased Asset that is the subject of such Disposition Event, and (b) on the first Business Day after the six (6) month anniversary of the Closing Date with respect to any Purchased Asset remaining in the possession or control of Purchaser as of such date.  The Post-Closing Claim Contribution in respect of each Disposition Event shall be  the Disposition Value of such Purchased Asset.  The Post-Closing Claim Contribution for any Purchased Asset not sold, transferred or otherwise disposed of prior to the six (6) month anniversary of the Closing Date shall be the Appraised Value.  Purchaser shall provide Sellers with prompt written notice upon the execution of any agreement for the sale, transfer or other disposition of any Purchased Asset, which notice shall include a copy of such agreement and any material ancillary agreements and provide reasonable detail of the terms of the sale, transfer or other disposition, including (without limitation) (w) the name of the purchaser (and whether such purchaser is an Affiliate of Purchaser), any Designated Purchaser, any First Lien Agent or any First Lien Lender), (x) the Purchased Asset(s) included in the proposed sale, transfer or other disposition, (y) the purchase price (including any non-cash consideration), and (z) the means by which offers for the Purchased Asset(s) were solicited.  With respect to Purchased Assets that are not sold, transferred or otherwise disposed of by Purchaser prior to the six (6) month anniversary of the Closing Date, Purchaser shall deliver to Sellers promptly after the expiration of such period the Appraised Value, a copy of the underlying appraisal(s) and any supporting documentation.  Any dispute regarding the Disposition Value or Appraised Value (including whether such Disposition Value or Appraised Value approximates the fair market Value) of any Purchased Asset shall be resolved in the manner provided in Section 12.6 hereof.

## ARTICLE III.

### CLOSING AND TERMINATION.

3.1    Closing.  Subject to the satisfaction of the conditions set forth in Sections 9.1 and 9.2 hereof or the waiver thereof by the Party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the New York office of Schulte Roth & Zabel LLP (or at such other place as the Parties may designate in writing), subject to Section 3.4, on the date that is two (2) Business Days following the date on which all of the conditions set forth in Section 9.1 and Section 9.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived by the Party entitled to waive the applicable condition, unless another time or date, or both, are agreed to in writing by the Parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the Parties in writing, upon the filing of the Information Officer's Certificate, the Closing shall be deemed effective and all right, title and interest of each of Sellers in the Purchased Assets to be acquired by the Purchaser hereunder shall be considered to have passed to the Purchaser and the assumption of all of the Assumed

Liabilities shall be considered to have occurred as of 12:01 a.m. Eastern Time on the Closing Date. Notwithstanding the foregoing, Purchaser shall have the right, in its sole discretion, to acquire the Purchased Assets in one or more Closings, provided that all such Closings shall have occurred by the Outside Date (subject to the extension thereof pursuant to Section 3.4(b)).

3.2    Closing Deliveries by Sellers.    At the Closing, Sellers shall deliver to the Purchaser:

(a)    a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as Exhibit A;

(b)    a duly executed assignment and assumption agreement with respect to the Assigned Contracts and Assumed Liabilities, substantially in the form attached hereto as Exhibit B;

(c)    true and correct copies of the Sale Orders, certified by the clerks of the applicable Bankruptcy Courts;

(d)    a true and correct copy of the Information Officer's Certificate; provided that all events to be certified therein by the Information Officer have occurred; provided further Sellers shall cause the Information Officer's Certificate to be filed with the Canadian Court immediately thereafter;

(e)    a duly executed non foreign person affidavit of each Seller (other than any Seller organized in a non-U.S. jurisdiction) (or, in the case of a Seller that is a disregarded entity for U.S. federal income tax purposes, the Person treated as the "transferor" with respect to such Seller within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii)) dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(f)    the officer's certificates required to be delivered pursuant to Sections 9.2(e) and 9.2(f);

(g)    certificates of title and title transfer documents to all Equipment;

(h)    special warranty or limited warranty deeds (as customary in the applicable jurisdiction), in recordable form, with respect to each parcel of Owned Real Property included within the Purchased Assets, which deeds shall be expressly made subject to the Permitted Encumbrances and shall otherwise be in the form required or customarily utilized in the applicable jurisdiction, and certifications of Sellers and other documents to be executed and delivered on behalf of Sellers that are normal and customary or required in the closing of real estate transactions in the applicable jurisdiction; provided, however, for purposes of this Section 3.2(h) and Section 9.2(f) below, the term "Permitted Encumbrances" shall include any matter of title or survey, including zoning requirements but excluding monetary Encumbrances, with respect to which Purchaser fails to object in writing to Sellers within thirty (30) days after entry by the U.S. Bankruptcy Court of the U.S. Sale Order;

(i)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon such delivery;

(j)     such other documents or instruments that Purchaser reasonably requests at or prior to Closing to effect (or evidence of record) the transactions contemplated hereby;

(k)     duly executed lien releases, each in recordable form, evidencing the release of all monetary liens and other Encumbrances and Liabilities on the Purchased Assets (other than permitted Encumbrances and Assumed Liabilities) as of the Closing Date, in form and substance reasonably satisfactory to the Purchaser; and

(l)     the Sellers' Documents included in the Purchased Assets.

3.3     Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver to (or at the direction of) Sellers:

(a)     the Initial Contribution Amount;

(b)     a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B;

(c)     the officer's certificates required to be delivered pursuant to Sections 9.1(d) and 9.1(e);

(d)     satisfactory evidence of the payment of the Cure Costs (or establishment of appropriate reserves therefor); and

(e)     the Purchaser's Documents.

3.4     Termination of Agreement.  This Agreement may be terminated as follows:

(a)     by the mutual written consent of Allied and the Purchaser at any time prior to the Closing;

(b)     by either the Purchaser or Allied, if the Closing shall not have been consummated on or prior to the close of business on December 31, 2013 (the "Outside Date"); *provided, however,* that the Purchaser and Allied shall have the right to extend the Outside Date with respect to any Purchased Asset (or all Purchased Assets) upon such Parties' mutual written agreement on or prior to the Outside Date; *provided, further,* that the right to terminate this Agreement under this Section 3.4(b) shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)     by either the Purchaser or Allied, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions

contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)      [intentionally omitted]

(e)      by the Purchaser, if any Chapter 11 Case is converted to a case or cases under Chapter 7 of the Bankruptcy Code and the Chapter 7 trustee in the bankruptcy case notifies the Purchaser in writing that the Chapter 7 trustee does not intend to pursue the transactions contemplated hereunder;

(f)      [intentionally omitted]

(g)      by the Purchaser, if (A) the U.S. Sale Order shall not have been issued by the U.S. Bankruptcy Court by the close of business on September [●], 2013 and the Canadian Sale Order shall not have been issued by the Canadian Court by the close of business on the day that is ten (10) days after the issuance of the U.S. Sale Order by the U.S. Bankruptcy Court (subject to court availability) or (B) following its entry, and its recognition by the Canadian Court, the Sale Orders (1) shall fail to be in full force and effect or shall have been stayed or reversed and the Sales Orders are not reinstated or such stay has not been lifted prior to the Outside Date, or (2) shall have been modified or amended in any respect without the prior written consent of the Purchaser and Allied; *provided* that the right to terminate this Agreement under this Section 3.4(g) shall not be available to the Purchaser if the Purchaser's failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Sale Orders to meet these requirements on or before such date. For the avoidance of doubt, the failure to satisfy any condition to Closing set forth in Section 9.2 of this Agreement shall not be deemed a failure of Purchaser to fulfill any obligation of Purchaser hereunder;

(h)      [intentionally omitted]

(i)      [intentionally omitted];

(j)      by Allied, if the Purchaser has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 9.1(c) and/or Section 9.1(d) hereof, as the case may be, would not then be satisfied at the time of such breach; *provided, however*, that if such breach is curable by the Purchaser within thirty (30) days through the exercise of its commercially reasonable efforts, then for so long as the Purchaser continues to exercise such commercially reasonable efforts Sellers may not terminate this Agreement under this Section 3.4(i) unless such breach is not cured within thirty (30) days from written notice to the Purchaser of such breach; *provided, further*, that Sellers are not then in material breach of the terms of this Agreement, and *provided, further*, that no cure period shall be required for a breach which by its nature cannot be cured;

(k)      by the Purchaser, if Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 9.2(d) and/or Section 9.2(e) hereof, as the case may be, would not then be satisfied at the time of such breach; *provided, however*, that if such breach is curable by Sellers within thirty (30) days through the exercise of their respective commercially reasonable efforts, then for so long as Sellers continue to exercise such commercially reasonable efforts the

Purchaser may not terminate this Agreement under this Section 3.4(j) unless such breach is not cured within thirty (30) days from written notice to Sellers of such breach; *provided, further*, that the Purchaser is not then in material breach of the terms of this Agreement, and *provided, further*, that no cure period shall be required for a breach which by its nature cannot be cured;

(l)      by the Purchaser, if between the Execution Date and the Closing Date, there occurs a Material Adverse Effect; or

(m)      by Allied, if all of the conditions set forth in Section 9.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and the Purchaser fails to deliver the Initial Claim Contribution at the Closing.

3.5      Procedure Upon Termination.  In the event of a termination of this Agreement pursuant to Section 3.4, (a) if such termination is by the Purchaser or Sellers, or both, written notice thereof shall be given promptly by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) except as contemplated by Section 3.6, this Agreement shall thereupon terminate and become void and of no further force and effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the Parties hereto.  If this Agreement is terminated as provided herein, each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

3.6      Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or Sellers; *provided, however*, that Section 3.4, Section 3.5, this Section 3.6, and Article XII, shall survive any such termination and shall be enforceable hereunder.  In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any willful breach of this Agreement by such Party.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Sellers hereby, jointly and severally, make the representations and warranties in this Article IV to the Purchaser as of the Execution Date and as of the Closing (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or supplemented by Sections in the Seller Disclosure Schedule delivered pursuant to this Agreement (regardless of whether there is an express reference to the Seller Disclosure Schedule in the representations and warranties contained in this Article IV; provided that information furnished in any particular section of the Seller Disclosure Schedule shall not be deemed to be included in any other sections of the Seller Disclosure Schedule unless such information is specifically listed or cross-referenced in such other sections of the Seller Disclosure Schedule), as the same may be amended or modified in accordance with Section 1.5 hereof.  Each such Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article IV.

4.1    Corporate Organization and Qualification.    Allied is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware. Each Allied Entity has all requisite corporate, limited liability company or other organizational, as applicable, power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.

4.2    [Intentionally Omitted]

4.3    Authority Relative to This Agreement.    Except for such authorization as is required by the Bankruptcy Courts, and subject to and assuming entry of the Sale Orders, each Seller has all requisite corporate, limited liability company or other organizational, as applicable, power, and authority to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Sellers in connection with the consummation of the transactions contemplated by this Agreement (the "Sellers' Documents"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby. Subject to and assuming entry of the Sale Orders, the execution and delivery of this Agreement and the Sellers' Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite corporate, limited liability company or other organizational, as applicable, action on the part of Sellers. This Agreement has been, and at or prior to the Closing, each of the Sellers' Documents will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto, and the entry of the Sale Orders) this Agreement constitutes, and each of the Sellers' Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with its respective terms except as enforceability may be limited by bankruptcy, insolvency, reorganization and moratorium Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies (collectively, "Bankruptcy Exceptions").

4.4    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Section 4.4(a) of the Seller Disclosure Schedule, except for such consents, approvals, waivers, authorizations or notices that can be overridden or canceled by the Sale Orders or other related order of the Bankruptcy Courts and subject to and assuming entry of the Sale Orders, none of the execution and delivery by Sellers of this Agreement or any Sellers' Document, the consummation of the transactions contemplated hereby or thereby, or compliance by Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or constitute a breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) Allied's certificate of incorporation, Allied's bylaws, or the certificate of incorporation or bylaws (or other comparable organizational documents) of any of the other Allied Entities; (ii) any order of any Governmental Body applicable to any of the Purchased Assets as of the Execution Date; or (iii) any applicable Law, other than in the case of clauses (ii) and (iii), such conflicts, violations, defaults, terminations or cancellations that would not have, individually or in the aggregate, a Material Adverse Effect..

(b)    Except as set forth on Section 4.4(b) of the Seller Disclosure Schedule, no order, Permit or declaration or filing with, or notification to, any Governmental Body is required on the part of the Allied Entities in connection with the execution and delivery of this Agreement or the Sellers' Documents, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Allied Entities of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Orders, and (ii) such other orders, Permits, declarations, filings and notifications, the failure of which to obtain or make would not have, individually or in the aggregate, a Material Adverse Effect.

4.5    [Intentionally Omitted].

4.6    Litigation.  Except in connection with the Bankruptcy Cases and except as set forth in Section 4.6 of the Seller Disclosure Schedule, there is no material litigation, action, claim, suit, proceeding, or, to the Knowledge of Sellers, investigation (collectively, "Actions"), pending, or, to the Knowledge of Sellers, threatened against any Allied Entity relating to the Purchased Assets.

4.7    [Intentionally Omitted].

4.8    [Intentionally Omitted].

4.9    Regulatory Matters; Permits.

(a)    All of the material Permits that are necessary for the ownership of the Purchased Assets are held by the Allied Entities and are in full force and effect, except as a result of the Bankruptcy Cases (collectively, the "Material Permits").

(b)    Each Allied Entity is in material compliance with its obligations under each of the Material Permits, except as a result of the Bankruptcy Cases.

(c)    Each Material Permit is valid and in full force and effect and there is no proceeding, notice of violation, order of forfeiture or complaint or investigation against any Allied Entity relating to any of the Material Permits pending or, to the Knowledge of the Seller, threatened, before any Governmental Body, in each case except as a result of the Bankruptcy Cases and except as would not have, individually or in the aggregate, a Material Adverse Effect.

4.10    Brokers and Finders.  Except as set forth in Section 4.10 of the Seller Disclosure Schedule, Sellers have not employed, and to the Knowledge of Sellers, no other Person has made any arrangement by or on behalf of Sellers with any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11    Title to Assets.  At Closing, the Allied Entities will have and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser good and marketable title or a valid leasehold interest in and to each of the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and Liabilities (other than Assumed

12

Liabilities).  At Closing, the Allied Entities will have and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser valid leasehold interests in the Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances) and Liabilities (other than Assumed Liabilities).

4.12    Real Property.

(a)    Section 4.12(a) of the Seller Disclosure Schedule sets forth the street address of each Owned Real Property.  As of the Closing the Allied Entities will have good and marketable, indefeasible, fee simple title to the Owned Real Property subject only to Permitted Encumbrances.  Sellers have made available to the Purchaser true, correct and complete copies of the recorded deeds and other instruments by which the Allied Entities acquired the Owned Real Property.

(b)    Subject to Permitted Encumbrances, the lease and subleases with respect to the Leased Real Property are in full force and effect and grant the Allied Entities the right to use and occupy the Leased Real Property in accordance with the terms thereof.  Sellers have made available to the Purchaser a true, correct and complete copy of the lease governing the Leased Real Property.  With respect to the lease governing the Leased Real Property, no Allied Entity owes any brokerage commissions or finder's fees with respect to such lease which is not paid or accrued in full.

(c)    Except as set forth on Section 4.12(c) of the Seller Disclosure Schedule, the Allied Entities have not (i) leased, subleased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of the Allied Entities' interest in the Real Property, that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date; (ii) no renewal or extension options have been granted to any tenants (or subtenants) on the Real Property; except as set forth in the governing lease, sublease or other document (true correct and complete copies of which have been made available to Purchaser); (iii) no tenant has an option to purchase any Owned Real Property; (iv) no tenant is entitled to rental concessions or abatements for any period subsequent to the Closing Date except as set forth in the governing lease, sublease or other document; (v) no action or proceeding instituted against an Allied Entity by any tenant of the Real Property is presently pending in any court; and (vi) there are no security deposits, except as set forth in the governing lease, sublease or other document.

(d)    Utilities and other services necessary for the operation of the premises leased pursuant to each Real Property Lease are available at such premises.

(e)    Except for the Assumed Liabilities and Permitted Encumbrances, as of the Closing no Real Property that is included in the Purchased Assets will be subject to (i) any Liabilities or Encumbrances, or (ii) any decree, order or action of a Governmental Body (or, to the Knowledge of Sellers, threatened decree or order of a Governmental Body) that would prevent the operation of such Real Property for the purposes for which it is currently being utilized.

4.13    Compliance with Law. Each Allied Entity is in compliance in all respects with all applicable Laws with respect to the Purchased Assets, including, without limitation, the Americans with Disabilities Act and all state and local ordinances relating to the Owned Real Property and the Leased Real Property. No Allied Entity has received any written notice of any alleged violation of any Law applicable to it or them related to the Purchased Assets. No Allied Entity is in default in any respect of any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement.

4.14    Tax Returns; Taxes. Except as set forth in Section 4.14 of the Seller Disclosure Schedule:

(a)    All Taxes due and payable by the Allied Entities in respect of the Purchased Assets (whether or not shown on any Tax Return) have been paid in full or are accrued as Liabilities for Taxes on the books and records of the Allied Entities. The accruals and reserves with respect to Taxes (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) are adequate to cover all Taxes of the Allied Entities with respect to the Purchased Assets accruing or payable with respect to Tax Periods (or portions thereof) ending before the Execution Date.

(b)    No claims have been asserted in writing, no Taxes have been assessed and no proposals or deficiencies for any amount of Taxes of the Allied Entities are being asserted or, to the Knowledge of Sellers, are being proposed or threatened, and no audit or investigation of any Tax Return of the Allied Entities is currently underway, pending or, to the Knowledge of Sellers, threatened, in each case with respect to any of the Purchased Assets.

(c)    There are no Encumbrances for Taxes with respect to the Purchased Assets, nor is there any such Encumbrance that, to the Knowledge of Sellers, is pending or threatened other than Permitted Encumbrances.

(d)    None of the Allied Entities has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes with respect to the Purchased Assets. No Allied Entity has made an election, nor is any Allied Entity required, to treat any Purchased Asset as owned by another Person or as tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code or under any comparable provision of state or local Tax law.

(e)    None of the Allied Entities has engaged in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b).

(f)    No Canadian Seller has been, and is not now a financial institution for the purposes of the Excise Tax Act (Canada). Each Canadian Seller is a registrant for the purposes of the *Excise Tax Act* (Canada) and its registrant number is set forth on Section 4.14 of the Seller Disclosure Schedule.

(g)    The Canadian Sellers will have paid and satisfied all Canadian federal and provincial sales Taxes, goods and services Taxes, harmonized sales Taxes and other similar Taxes applicable to the Purchased Assets sold by the Canadian Sellers (other than on the transfer

thereof to the Purchaser) with respect to all periods prior to the Closing to the extent such Taxes are due and remittable on or before the Closing under applicable Law. [STILL REQUIRED?]

(h)     None of the Purchased Assets constitutes "taxable Canadian property" for the purposes of the *Income Tax Act* (Canada) to an Allied Entity that is not a Canadian Seller.

(i)     Each Canadian Seller is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada).

4.15   [Intentionally Omitted].

4.16   [Intentionally Omitted].

4.17   [Intentionally Omitted]

4.18   Insurance Policies.   All insurance policies owned or held by any Allied Entity related to or otherwise applicable to the Purchased Assets (the "Insurance Policies") (or substitute policies with substantially similar terms and underwritten by insurance carriers with substantially similar or higher ratings) are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid (or will be paid prior to the Closing), and no written notice of cancellation or termination has been received by any Allied Entity with respect to any Insurance Policy. Except as set forth in Section 4.18 of the Seller Disclosure Schedule, there are no pending, or to the Knowledge of Sellers, threatened claims under any Insurance Policy.

4.19   Environmental Matters.   Except as set forth in Section 4.19 of the Seller Disclosure Schedule, to the Knowledge of Sellers (a) there is no investigation, suit, claim, action or judicial or administrative proceeding relating to or arising under Environmental Laws that is pending or, to the Knowledge of Sellers, threatened against any Owned Real Property, the Leased Real Property or any of the other Purchased Assets, (b) none of the Owned Real Property or Leased Real Property has been listed on the federal National Priorities List under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) or any other similar state list of known or suspected contaminated sites, (c) no Hazardous Materials have been treated, stored or Released by any Allied Entity or, to the Knowledge of the Sellers by any other Person at, on or under the Owned Real Property or Leased Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws or would otherwise cause any Allied Entity or any future owner or operator of any Owned Real Property or Leased Real Property to incur material liability under Environmental Laws, and (d) no Allied Entity has received any notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved obligations, liabilities or requirements relating to or arising under Environmental Laws.

4.20   [Intentionally Omitted].

4.21   [Intentionally Omitted].

4.22   [Intentionally Omitted].

4.23    [Intentionally Omitted].

4.24    [Intentionally Omitted].

4.25    [Intentionally Omitted].

4.26    [Intentionally Omitted].

4.27    [Intentionally Omitted].

4.28    No Other Representations or Warranties.  No Seller nor any other Person has made or is making any express or implied representation or warranty with respect to the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective Representatives.  Except for the representations and warranties contained in this Article IV (as modified by the Seller Disclosure Schedule), Sellers expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose). Notwithstanding anything contained in this Agreement to the contrary, Sellers acknowledge and agree that the Purchaser is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Purchaser in Article V (as modified by the Purchaser Disclosure Schedule).  Sellers further represent that neither the Purchaser nor any of its Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Purchaser or any of its Affiliates or the transactions contemplated by this Agreement not expressly set forth in this Agreement.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article V to Sellers as of the Execution Date and the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or supplemented by Sections in the Purchaser Disclosure Schedule attached hereto:

5.1    Organization and Qualification.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation. The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite limited liability company power and authority to own its properties and to carry on its business as it is now being conducted except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.2     Authority Relative to This Agreement.  The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Purchaser in connection with the consummation of the transactions contemplated hereby and thereby, which are set forth on Section 5.2 of the Purchaser Disclosure Schedule attached hereto (the "Purchaser's Documents"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Purchaser of this Agreement and each applicable Purchaser's Document have been duly authorized by all necessary limited liability company action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each applicable Purchaser's Document will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each the Purchaser's Document when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3     Consents and Approvals; No Violation.

(a)     Except as set forth on Section 5.3(a) of the Purchaser Disclosure Schedule, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser's Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) the governing documents of the Purchaser, (ii) any Contract (including but not limited to any Contracts related to financing) or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound, (iii) any order of any Governmental Body applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound, or (iv) any applicable Law, other than in the case of clauses (ii), (iii), and (iv), except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)     No consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Body or other Person nor any other Regulatory Approval is required on the part of the Purchaser in connection with the execution and delivery of this Agreement and the Purchaser's Documents, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Purchaser of any other action contemplated hereby or thereby, or for the Purchaser to operate the Purchased Assets, except for such other orders, Permits, declarations, filings and notifications, the failure of which to obtain or make would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.4     Brokers and Finders.  The Purchaser has not employed, and to the knowledge of the Purchaser, no other Person has made any arrangement by or on behalf of the Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the

transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.5    Adequate Assurances Regarding Assigned Contracts. As of the Closing, the Purchaser will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code and Section 11.3 of the CCAA with respect to the Assigned Contracts.

5.6    Litigation. Except as set forth on Section 5.6 of the Purchaser Disclosure Schedule, there is no Action pending against the Purchaser or any of its Affiliates that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.7    [Intentionally Omitted].

5.8    Credit Bid Rights. The First Lien Agents have assigned to the Purchaser the right to "credit bid" under the First Lien Credit Agreement and the First Lien Credit Documents and authorized the Purchaser to pay the Purchase Price.

No Other Representations or Warranties; Investigation. Notwithstanding anything contained in this Agreement to the contrary, the Purchaser acknowledges and agrees that no Seller is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article IV (as modified by the Seller Disclosure Schedule), and the Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and Assumed Liabilities are being transferred on an "as is" and "where is" basis. The Purchaser further represents that no Seller or any of its Affiliates or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers or any of their Affiliates, and the transactions contemplated by this Agreement not expressly set forth in this Agreement. The Purchaser acknowledges that it has conducted to its satisfaction its own independent review and analysis of the Purchased Assets and the Assumed Liabilities, and of the value of such Purchased Assets and the Purchaser acknowledges that Sellers have provided the Purchaser with access to the personnel, properties, premises and records of the Business for this purpose. The Purchaser has conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Courts in connection with the Bankruptcy Cases. In entering into this Agreement and in making the determination to proceed with the transactions contemplated by this Agreement, the Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by Sellers in Article IV (as modified by the Seller Disclosure Schedule).

## ARTICLE VI.

## [INTENTIONALLY OMITTED]

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

7.1    Bankruptcy Court Approval; Determination of Cure Costs.

(a)    Sellers shall use commercially reasonable efforts to promptly obtain entry of the Sale Orders at the earliest possible dates after the conclusion of the Auction. Within two (2) Business Days of the issuance of the U.S. Sale Order, Allied, as foreign representative in the CCAA Case, shall file a motion seeking an order from the Canadian Court recognizing the U.S. Sale Order and vesting the Purchased Assets of the Canadian Sellers in the Purchaser (the "Canadian Recognition Order"), which motion shall be scheduled to be heard by the Canadian Court within five (5) Business Days of the entry of the U.S. Sale Order (subject to such Court's availability).

(b)    In the event an appeal is taken or a stay pending appeal is requested, with respect to the Sale Orders, (i) Sellers shall promptly notify the Purchaser of such appeal or stay request and shall promptly provide to the Purchaser a copy of the related notice of appeal or order of stay and (ii) the parties shall promptly defend such appeal with reasonable diligence. Sellers shall also provide the Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

## ARTICLE VIII.

## COVENANTS AND AGREEMENTS

8.1    Maintenance of the Purchased Assets.  During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 or the Closing, except (1) for any limitations on operations imposed by, or actions required by, the Bankruptcy Courts or the Bankruptcy Code, (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or as set forth on Section 8.1 of the Seller Disclosure Schedule, or (4) with the prior written consent of the Purchaser, each Seller shall (and shall cause each Allied Entity controlled by such Seller to):

(a)    operate and maintain the Purchased Assets in the Ordinary Course of Business;

(b)    use its commercially reasonable efforts to (x) preserve the goodwill of and relationships with Governmental Bodies, vendors, lessors, contractors, agents, and others having business dealings in each case concerning the Purchased Assets or Assumed Liabilities; and (y) comply with all applicable Laws concerning the Purchased Assets and Assumed Liabilities and, to the extent consistent therewith, preserve the Purchased Assets (tangible and intangible).

8.2    Access to Information.

(a)    Each Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, the Purchaser shall be entitled, through its Representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records and properties related to the Purchased Assets as the Purchaser's Representatives may reasonably request. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Each Seller shall use commercially reasonable efforts to cause its Representatives and each Allied Entity controlled by such Seller to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and the Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with such Sellers and their respective Representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business.

(b)    From and after the Closing Date, Sellers shall give the Purchaser and the Purchaser's Representatives reasonable access during normal business hours to the properties, assets, Documents, and books and records of the Allied Entities pertaining to the Purchased Assets. In connection with the foregoing, each Seller shall use commercially reasonable efforts to cause its Representatives and each Allied Entity controlled by such Seller to make available to the Purchaser such financial, technical, operating and other information pertaining to the Purchased Assets, as the Purchaser's Representatives shall from time to time reasonably request and to discuss such information with such Representatives. It is understood and agreed that nothing in this Section 8.2(b) shall be deemed as an obligation on the part of Sellers to maintain any properties, assets, Documents, and books and records of the Allied Entities pertaining to the Purchased Assets after the Closing.

(c)    No information received pursuant to an investigation made under this Section 8.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of Sellers set forth in this Agreement or any certificate or other instrument delivered to the Purchaser in connection with the transactions contemplated hereby, (ii) amend or otherwise supplement the information set forth in the Seller Disclosure Schedule, (iii) limit or restrict the remedies available to the parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iv) limit or restrict the ability of either party to invoke or rely on the conditions to the obligations of the parties to consummate the transactions contemplated by this Agreement set forth in Article IX.

8.3    Assignability of Certain Contracts, Etc. The Sellers shall use commercially reasonable efforts to obtain, as part of the Canadian Sale Order or otherwise, an order of the Canadian Court authorizing the assignment of the Assigned Contracts to which the Canadian Sellers are parties. To the extent that the assignment to the Purchaser of any Assigned Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Orders or other related order of the Bankruptcy Courts, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Assigned Contract or any right or interest therein

unless and until such consent is obtained; *provided, however,* that the Parties hereto will use their commercially reasonable efforts, before the Closing, to obtain all consents of such third parties that cannot be effectively overridden or canceled by the Sale Orders or other related order of the Bankruptcy Courts; *provided, further,* that if any such consents are not obtained prior to the Closing Date, Sellers and the Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser (such arrangement to be at the sole cost and expense of the Purchaser) with the benefits and obligations of any such Assigned Contract.

8.4    Rejected Contracts.    No Seller shall reject any Assigned Contract in any bankruptcy proceeding following the Execution Date without the prior written consent of the Purchaser.

8.5    Further Agreements.    Each of Sellers shall promptly deliver to the Purchaser or the applicable Designated Purchaser any mail or other communication received by them after the Closing Date and relating to the Purchased Assets or the Assumed Liabilities. The Purchaser or the applicable Designated Purchaser shall promptly deliver to Sellers any mail or other communication received by it after the Closing Date and relating to assets other than the Purchased Assets or the Excluded Liabilities. From and after the Closing Date, Sellers shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to the Purchaser or the applicable Designated Purchaser, and the Purchaser or the applicable Designated Purchaser shall refer all inquiries with respect to the assets other than the Purchased Assets and the Excluded Liabilities to Sellers.

8.6    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, Sellers and the Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement as soon as practicable, and shall coordinate and cooperate with each other in exchanging information, keeping the other Party reasonably informed with respect to the status of the matters contemplated by this Section 8.6 and supplying such reasonable assistance as may be reasonably requested by the other Party in connection with the matters contemplated by this Section 8.6. Without limiting the foregoing, following the Execution Date and until the date on which this Agreement is terminated in accordance with Section 3.4, the Parties shall use their commercially reasonable efforts to take the following actions but solely to the extent that such actions relate to the transactions contemplated by this Agreement:

(i)    obtain any required consents, approvals (including Regulatory Approvals), waivers, Permits, authorizations, registrations, qualifications or other permissions or actions by, and give all necessary notices to, and make all filings with, and applications and submissions to, any Governmental Body or third party and provide all such information concerning such Party as may be necessary or reasonably requested in connection with the foregoing (other than any consents, approvals, waivers, authorizations or notices that can be overridden or canceled by the Sale Orders or other related order of the Bankruptcy Courts);

(ii)    avoid the entry of, or have vacated or terminated, any injunction, decree, order, or judgment that would restrain, prevent, or delay the consummation of the transactions contemplated hereby;

(iii)    take any and all reasonably necessary steps to avoid or eliminate every impediment under any applicable Law that is asserted by any Governmental Body with respect to the transactions contemplated hereby so as to enable the consummation of such transactions to occur as expeditiously as possible; and

(iv)    at or following the Closing, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and for the Purchaser and its successors and assigns, to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby and thereby.

Subject to the terms and conditions of this Agreement, the Parties shall not take any action or refrain from taking any action the effect of which would be to delay or impede the ability of Sellers and the Purchaser to consummate the transactions contemplated by this Agreement, unless in such Party's reasonable judgment, taking such action or refraining from taking such action is consistent with achieving the ultimate objective of consummating the transactions contemplated hereby or is required by applicable Law.

(b)    Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4: (i) Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Sellers or the Purchaser (as the case may be), from any Governmental Body with respect to the transactions contemplated by this Agreement; and (ii) Sellers shall, to the extent permitted by applicable Law, (A) provide to the Purchaser substantially final drafts of all of Sellers' pleadings, orders and notices to be filed in the Bankruptcy Cases in connection with this Agreement at least two (2) Business Days before the filing to the extent reasonably practicable and, if not reasonable practicable, as soon as possible, and consider in good faith Purchaser's reasonable comments related to such pleadings, orders and notices, and (B) Sellers shall cooperate and coordinate with the Purchaser's reasonable requests concerning court hearings, pleadings, orders and notices.

(c)    The obligations of the Purchaser and Sellers pursuant to this Section 8.6 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Courts or the Bankruptcy Code or the CCAA (including in connection with the Chapter 11 Case), and each of Sellers' obligations as a debtor in possession to comply with any order of the Bankruptcy Courts (including the Bidding Procedures Order and the Sale Orders).

8.7    Preservation of Records.    Sellers and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Purchased Assets

and Assumed Liabilities for a period of five (5) years from the Closing Date, in the case of the Purchaser, and until the closing of the Bankruptcy Cases or the liquidation and winding up of Sellers' estates, in the case of Sellers, and shall make such records available to the other Party as may be reasonably required by such other Party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of Sellers or the Purchaser or any of their respective Affiliates or in order to enable Sellers or the Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers or the Purchaser wishes to destroy such records at the end of such applicable period, such Party shall first give sixty (60) days' prior written notice to the other Party and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of Sellers' estates shall permit.

8.8     Publicity. The Allied Entities or the Purchaser may issue a press release or public announcement concerning this Agreement or the transactions contemplated hereby only with the prior written approval of the other Parties hereto, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the disclosing Party, such disclosure is otherwise required by applicable Law or by the Bankruptcy Courts with respect to filings to be made with the Bankruptcy Courts in connection with this Agreement. Without limiting the generality of the foregoing sentence, the Party intending to make such release shall use its commercially reasonable efforts, consistent with such applicable Law or Bankruptcy Courts requirement, to consult with the other Parties with respect to the text thereof.

8.9     [Intentionally Omitted].

8.10    Notification of Certain Matters. Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the Sale Orders by the Bankruptcy Courts. To the extent permitted by applicable Law, Sellers shall give prompt notice to the Purchaser of (i) any written notice from any Governmental Body of any alleged violation of Law applicable to any Allied Entity, and (ii) the commencement of any investigation, inquiry or review by any Governmental Body with respect to the Business or that any such investigation, inquiry or review, to the Knowledge of Sellers, is contemplated.

8.11    Environmental Matters, Access and Cooperation. Each Seller agrees that, from and after the Execution Date, the Purchaser and its Representatives shall be entitled to have, upon reasonable advance notice, such reasonable access to and to make such reasonable investigation and examination of the environmental condition of the Real Property that is included in the Purchased Assets, including phase I and phase II reports, at the Purchaser's sole expense, as the Purchaser or its Representatives may reasonably request. Each Seller shall use commercially reasonable efforts to cause its Representatives and each Allied Entity controlled by such Seller to cooperate with the Purchaser and the Purchaser's Representatives in connection

with such investigations and examinations, and the Purchaser shall, use its commercially reasonable efforts to cause its Representatives to, reasonably cooperate with such Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business; *provided* that any invasive or subsurface investigations of any Real Property shall be conducted in such locations and in such manners as are approved in advance by Sellers (which approval shall not be unreasonably withheld, conditioned, or delayed); and *provided, further*, that promptly following the Purchaser's investigation or examination of any Real Property, the Purchaser shall, at its sole expense, restore such Real Property to the condition in which it existed immediately prior to such investigation or examination. The Purchaser further agrees that it and its Representatives shall treat and maintain all information generated as a result of any phase I or phase II investigation of any Real Property as confidential business information and that such information shall not be shared with any Person or Governmental Body except as required by applicable Law and unless the Purchaser has given written notice, at least five (5) Business Days in advance, to Allied prior to providing any such information to any third-party.

8.12    [Intentionally Omitted].

8.13    [Intentionally Omitted]

8.14    Canadian Sale Order.   Sellers and Purchaser shall use their commercially reasonable efforts to include in the Canadian Sale Order (i) a provision specifically authorizing the assignment of the Assigned Contracts to which the Canadian Sellers are parties to the Purchaser in accordance with the U.S. Sale Order, (ii) customary provisions approving the sale of the Purchased Assets that are situated in Canada or that are owned by the Canadian Sellers (the "Canadian Purchased Assets") and vesting the Canadian Purchased Assets in the Purchaser, free and clear of Encumbrances (other than Permitted Encumbrances), and (iii) a provision recognizing and giving effect to the U.S. Sale Order pursuant to s.49 of the CCAA.

8.15    [intentionally omitted].

8.16    [Intentionally Omitted].

8.17    [Intentionally Omitted].

8.18    [Intentionally Omitted].

## ARTICLE IX.

## CONDITIONS TO CLOSING

9.1    Conditions Precedent to the Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction

restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the U.S. Bankruptcy Court shall have entered the U.S. Sale Order and the Canadian Court shall have entered the Canadian Sale Order;

(c)     the representations and warranties of the Purchaser set forth in Article V hereof shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date), and Sellers shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(d)     the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(e)     the Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 3.3;

(f)     the Purchaser shall have delivered the Initial Claim Contribution in accordance with Section 2.1; and

(g)     the Purchaser shall have delivered to Sellers appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated hereby, including, without limitation:  (i) certified copies of resolutions duly adopted by the Purchaser's Board of Directors or similar governing body approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by the Purchaser of this Agreement; and (ii) a certificate as to the incumbency of officers of the Purchaser executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

9.2     Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any statute, rule, regulation, or order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the U.S. Bankruptcy Court shall have entered the U.S. Sale Order and the Canadian Court shall have entered the Canadian Sale Order;

(c)    Sellers shall have delivered to the Purchaser (i) certified copies of the Sale Orders, and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Sellers;

(d)    (i) the Sellers' Fundamental Representations shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct in all material respects as of such date), and (ii) each of the representations and warranties of Sellers set forth in Article IV (other than the Sellers Fundamental Representations) shall be true and correct in all respects (disregarding for these purposes any exception in such representation and warranties relating to "materiality," Material Adverse Effect or similar materiality qualifications) as of the Execution Date and the Closing Date as if made at and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, then as of such earlier date), except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and the Purchaser shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the foregoing effect;

(e)    Sellers shall have performed and complied in all material respects with all obligations, covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the foregoing effect;

(f)    Sellers shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 3.2; and

(g)    between the Execution Date and the Closing Date, there shall not have occurred a Material Adverse Effect.

9.3    Frustration of Closing Conditions.  Neither Sellers nor the Purchaser may rely on the failure of any condition set forth in Section 9.1 or Section 9.2, as the case may be, if such failure was caused directly by such Party's failure to comply with any provision of this Agreement.

9.4    Information Officer's Certificate.  Provided all the events to be certified therein have occurred, Sellers shall cause the Information Officer to deliver on Closing the Information Officer's Certificate substantially in the form attached to the Canadian Sale Order.  Forthwith upon delivery, Sellers shall cause the Information Officer to file the Information Officer's Certificate with the Canadian Court.

## ARTICLE X.

## ADDITIONAL DEFINITIONS

10.1    Certain Definitions.  As used herein:

"Actions" has the meaning set forth in Section 4.6.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allied" has the meaning set forth in the Preamble.

"Allied Borrowers" means Allied and Allied Systems Ltd. (L.P.), a Georgia corporation.

"Allied Entities" means Sellers.

"Appraised Value" means the fair saleable value of the applicable Purchased Assets, as of the date that is no later than six (6) months after the Closing Date, which shall be determined by a recognized independent appraiser(s) or broker(s) (to be selected by the Purchaser in good faith) in the region(s) where the applicable Purchased Assets are located, which net value shall be net of all out of pocket costs and expenses actually incurred by Purchaser to hold, use, operate, preserve, maintain, dispose or appraise such Purchased Assets from the Closing Date to the date of such appraisal and such reasonable costs and expenses that Purchaser in good faith reasonably anticipates will be incurred in order to realize the appraised value (net of any associated revenues), provided, Purchaser shall make available to Sellers supporting documentation with respect to such costs and expenses. With respect to the Equipment, the basis for the Appraised Value shall be (i) the Accuval appraisal obtained by Sellers and dated April 11, 2012 for any Equipment owned by Sellers as of the date of such appraisal and (ii) the purchase price of any Equipment acquired by Sellers after the date of such appraisal.

"Assigned Contracts" means the lease for the Leased Real Property, the Assigned Vendor Contracts, the Real Property Subleases and any other contracts added to the definition of Purchased Assets pursuant to Section 1.5 hereof.

"Assumed Liabilities" has the meaning set forth in Section 1.3.

"Assumed Vendor Contracts" has the meaning set forth in Section 1.1(e).

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq.

"Bankruptcy Courts" has the meaning set forth in the Recitals.

"Bankruptcy Exceptions" has the meaning set forth in Section 4.3.

"Bidding Procedures" means the procedures appended to the Bidding Procedures Order.

"Bidding Procedures Order" means the Order (A) Approving Bid Procedures, (B) Approving Cure Procedures, (C) Establishing Date for Auction and Approving Related Procedures, (D) Scheduling Sale Hearing and Related Deadlines, (E) Approving Form and Manner of Notices, and (F) Granting Related Relief, entered by the U.S. Bankruptcy Court on June 21, 2013 [Docket No. 1320].

"Buildings" means all buildings and other improvements situated on the Owned Land and the Leased Real Property.

"Business" means the business of providing vehicle transportation, distribution, logistics, inspections, yard management, tracking, accessorizing, dealer preparation and other support services to the automotive industry.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

"Canadian Court" has the meaning set forth in the Recitals.

"Canadian Purchased Assets" has the meaning set forth in Section 8.13.

"Canadian Sale Order" has the meaning set forth in the definition of Sale Orders in this Section 10.1.

"Canadian Seller" means Allied Systems (Canada) Company and Axis Canada Company.

"CCAA" has the meaning set forth in the Recitals.

"CCAA Case" has the meaning set forth in the Recitals.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is legally binding upon a Person or its property.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assigned Contracts, in each case as of the Closing Date and to the extent required by Section 365 of the Bankruptcy Code or Section 11.3 of the CCAA and any order of the Bankruptcy Courts.

"Disposition Event" means the sale or other disposition of any Purchased Asset during the first six months after the Closing Date.

"Disposition Value" means the value, as determined by the Purchaser, of the consideration received in connection with a Disposition Event less all reasonable out of pocket costs and expenses actually incurred by the Purchaser to hold, use, operate, preserve, maintain or dispose of the Purchased Assets that are the subject of the Disposition Event (net of any associates revenues), provided, Purchaser shall make available to Sellers supporting documentation with respect to such costs and expenses.

"Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Encumbrance" means any lien, encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, deemed trust, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, or any other interest (as used in any applicable section of the Bankruptcy Code or the CCAA, including section 363(f)) (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security devise, and (iii) any claim based on any theory that the Purchaser is a successor or continuation of Sellers or the Business), in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or liquidated, material or non-material, known or unknown.

"Environmental Laws" means all Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. §1251 *et seq.*), Resource Conservation and Recovery Act (42 U.S.C. §6901 *et seq.*), Safe Drinking Water Act (42 U.S.C. §3000(f) *et seq.*), Toxic Substances Control Act (15 U.S.C. §2601 *et seq.*), Clean Air Act (42 U.S.C. §7401 *et seq.*), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 *et seq.*) and other similar U.S. or Canadian federal, state, provincial and local statutes.

"Equipment" means the fifty (50) lowboys to be designated by Purchaser no later than thirty (30) days after the entry of the U.S. Sale Order from the Sellers' existing inventory of lowboys not then in active use by Sellers (which lowboys, upon designation, shall be set forth on Schedule 3).

"Excluded Liabilities" has the meaning set forth in Section 1.4.

Case 12-11564-CSS    Doc 1827-1    Filed 09/16/13    Page 32 of 57

"Execution Date" has the meaning set forth in the Recitals.

"First Lien Agents" means Black Diamond Commercial Finance, LLC and Spectrum Commercial Finance, L.L.C., as co-Administrative Agents under the First Lien Credit Agreement.

"First Lien Credit Agreement" means that certain Amended and Restated First Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among, *inter alia*, the Allied Borrowers certain subsidiaries of Allied Borrowers as guarantors, the lenders party thereto from time to time, and CIT, as administrative and collateral agent (as amended, modified, supplemented or restated from time to time).

"First Lien Credit Documents" means the Credit Documents as defined in the First Lien Credit Agreement.

"First Lien Lenders" means the lenders party to the First Lien Credit Agreement from time to time.

"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state, provincial or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes therefore, asbestos and asbestos containing materials, and any and all materials defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law, including hazardous substances under Health Canada's Workplace Materials Information System (WHMIS) and any equivalent legislation of other applicable jurisdictions.

"Income Taxes" shall mean all Taxes based upon, measured by, or calculated with respect to gross or net income or gross or net receipts or profits.

"Information Officer" means Duff & Phelps Canada Restructuring Inc., in its capacity as information officer.

"Information Officer's Certificate" means a certificate of the Information Officer certifying the closing of the transactions among the Canadian Sellers and the Purchaser contemplated pursuant to this Agreement and substantially in the form attached to the Canadian Sale Order.

"Initial Claim Contribution Amount" means an amount of obligations held by the First Lien Lenders under the First Lien Credit Agreement and First Lien Credit Documents equal to FIVE MILLION DOLLARS ($5,000,000).

"Insurance Policies" has the meaning set forth in Section 4.17.

"Knowledge" An individual shall be deemed to have "Knowledge" of a particular fact or other matter if such individual is, or with reasonable diligence within the scope of reasonable fulfillment of such individual's duties, would be, aware of such fact or other matter. Sellers shall be deemed to have "Knowledge" of a particular fact or other matter if any of the following individuals has Knowledge of such fact or other matter: Mark Gendregske, John Jansen, Robert Ferrell, John Blount, Devora Mitchell, Scott Macaulay, Julie Sieja or Bob Hutchison.

"Laws" means all federal, state, provincial, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies, or court of competent jurisdiction, or other requirement or rule of law.

"Leased Real Property" means all of the real property leased, subleased, licensed, used or occupied by any Sellers (other than the Owned Real Property) set forth in Schedule 2, together with all of Sellers' right, title and interest in any Buildings, and any structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"Liability" means, as to any Person, any claim (as defined in Section 101(5) of the Bankruptcy Code or Section 2(1) of the CCAA), debt, adverse claim, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

"Material Adverse Effect" means any event, circumstance, change, occurrence or state of facts that has had, or could reasonably be expected to have, a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, except, in each case, for any such effect resulting from any of the following:  (A) changes after the Execution Date in any applicable Law, (B) the announcement or pendency of this Agreement or the transactions contemplated hereby, including, without limitation, effects on relationships, contractual or otherwise, with customers, suppliers, vendors or employees, (C) any action by the Purchaser or any of its Affiliates or the omission of an action that was required to be taken by the Purchaser or any of its Affiliates pursuant to this Agreement or the transactions contemplated hereby, or (D) any action taken or omitted by any Seller or any of its Affiliates that was required to be so taken or omitted, respectively, by any Seller or any of its Affiliates pursuant to this Agreement or at the request or with the prior written consent of the Purchaser.

"Material Permits" has the meaning set forth in Section 4.9(a).

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

"Outside Date" has the meaning set forth in Section 3.4(b).

"Owned Land" means all those certain plots, pieces and parcels of land described in Schedule 1 hereto.

"Owned Real Property" means the Owned Land, together with (i) all Buildings, structures, fixtures and improvements erected thereon, (ii) all easements, licenses, rights of way, reservations, privileges, hereditaments, appurtenances, and other estates and rights of Seller pertaining to the Owned Land, the Buildings, structures, fixtures and improvements erected thereon, (iii) all oil, gas and mineral rights of Sellers, if any, in and to the Owned Land, and (iv) all right, title and interest of Seller, if any, in and to all strips and gores, all alleys adjoining the Owned Land, and the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Owned Land to the center line thereof, and all right, title and interest of Sellers, if any, in and to any award made or to be made in lieu thereof and in and to any unpaid award for any taking by condemnation or any damages to the Owned Land or the Buildings by reason of a change of grade of any street, road or avenue.

"Party" and "Parties" has the meaning set forth in the Preamble.

"Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any Sellers and used, or held for use, applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

"Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect in any material respect the ownership of the Purchased Assets, and, in the case of the Owned Real Property or the Leased Real Property, which do not, individually or in the aggregate, adversely affect in a material respect the use or occupancy of such Real Property or materially detract from the value of such Real Property, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business, (v) the Encumbrances set forth in Section 10.1(iii) of the Seller Disclosure Schedule, and (vi) such other Encumbrances or title exceptions as the Purchaser may approve in writing in its sole discretion.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"Personal Property" means all right, title and interest of Sellers in and to all fixtures, machinery, equipment, supplies and other articles of personal property attached or appurtenant to the Owned Land, the Leased Real Property or the Buildings.

"Petition Date" means the date on which Sellers commenced the Chapter 11 Case and the CCAA Case.

"Post-Closing Claim Contribution Amount" means an amount equal to the sum of (i) the aggregate Disposition Value for a Disposition Event; plus (ii) the aggregate Appraised Value for any Purchased Asset that is not the subject of a Disposition Event; less (iii) the Initial Claim Contribution. For avoidance of doubt, the Post-Closing Claim Contribution shall be net of the Initial Claim Contribution.

"Purchase Price" has the meaning set forth in Section 2.1(a).

"Purchased Assets" has the meaning set forth in Section 1.1.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Disclosure Schedule" means the disclosure letter prepared and delivered by the Purchaser for and to Sellers as of the date hereof, which sets forth the exceptions to the representations and warranties contained herein and certain other information called for by this Agreement.

"Purchaser's Documents" has the meaning set forth in Section 5.2.

"Real Property" means the Owned Real Property and the Leased Real Property.

"Release" means, with respect to any Hazardous Material, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

"Representatives" means a Person's officers, employees, counsel, accountants and other authorized representatives, agents and contractors.

"Sale Hearing" means the hearing or hearings held in the Bankruptcy Court and the Canadian Court (or such other court of competent jurisdiction) to approve the sale of the Purchased Assets to the Purchaser.

"Sale Motion" means *Motion of the Debtors for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of Debtors Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief Filed by Allied Systems Holdings, Inc.* [Docket No. 1175].

"Sale Orders" means the orders of the U.S. Bankruptcy Court (the "U.S. Sale Order") and the Canadian Court (the "Canadian Sale Order"), each in form and substance acceptable to Purchaser in its sole discretion.

"Seller" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" means the disclosure letter prepared and delivered by Sellers for and to the Purchaser as of the date hereof, which sets forth the exceptions to the representations and warranties contained herein and certain other information called for by this Agreement.

"Sellers' Documents" has the meaning set forth in Section 4.3.

"Sellers Fundamental Representations" means Section 4.1 (Corporate Organization and Qualification), Section 4.3 (Authority Relative to This Agreement), or the first sentence of Section 4.11 (Title to Assets).

"Tax" and "Taxes" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, and include any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes.

"Tax Period" means any period prescribed by any Governmental Body for which a Tax Return is required to be filed or a Tax is required to be paid.

"Tax Records" means any Tax Returns, workpapers or other Documents relating to Taxes.

"Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

"Transfer Taxes" has the meaning set forth in Section 11.1.

"U.S. Bankruptcy Court" has the meaning set forth in the Recitals.

"U.S. Sale Order" has the meaning set forth in the definition of Sale Orders in this Section 10.1.

"Wholly-Owned Subsidiaries" means any Person all of the equity interests in which are held as of the Closing either (a) directly or indirectly by the Purchaser, or (b) directly or indirectly by the Purchaser and/or the First Lien Lenders or their designees.

## ARTICLE XI.

## TAXES

11.1    Additional Tax Matters.

(a)    Any sales, use, excise, consumption, purchase, transfer, franchise, deed, fixed asset, stamp, documentary, or other similar Taxes ("Transfer Taxes") which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein shall be borne and timely paid by the Purchaser, provided, however, notwithstanding any other provision of this Agreement, the Purchaser shall not assume or have any obligation to pay any income, capital gains or other Taxes of Sellers (other than Transfer Taxes) arising as a result of the consummation of the transactions contemplated by this Agreement (and any such income, capital gains or other Taxes (other than Transfer Taxes) shall remain the sole obligation of Sellers). The Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the other Party), protect, and save Sellers from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes that the Purchaser is obligated to bear and pay pursuant to the preceding sentence of this Section 11.1(a).  The Purchaser shall prepare or caused to be prepared and timely file or cause to be timely filed all Tax Returns required to be filed in respect of the Transfer Taxes required to be borne and paid pursuant to this Section 11.1(a).

(b)    The Purchaser shall, within the later of (i) 90 days after the Closing Date, or (ii) 45 days prior to the date by which Allied's federal Income Tax Returns for the year in which the transactions contemplated hereunder are consummated must be filed, prepare and deliver to Allied a schedule allocating the Purchase Price (and any other items that are required for federal Income Tax to be treated as Purchase Price) among the Purchased Assets and detailing the entity that purchased the Purchased Assets and the applicable jurisdictions (such schedule, the "Allocation").  The Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding).  In the event that any part of the Allocation is disputed by any Governmental Body, the party receiving notice of such dispute shall use reasonable efforts to notify the other party, and the Purchaser and Sellers shall cooperate in good faith in responding to such challenge to preserve the effectiveness of such Allocation.  The Purchaser and Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.  Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 11.1(b) shall survive the Closing without limitation.

11.2    [Intentionally Omitted.]

## ARTICLE XII.

## MISCELLANEOUS

12.1     Payment of Expenses.  Sellers and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

12.2     Survival of Representations and Warranties; Survival of Confidentiality.  The Parties hereto agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date.  The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive in accordance with the terms of the particular covenant.

12.3     Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and Exhibits hereto), the Sellers' Documents, the Purchaser's Documents, the Seller Disclosure Schedule and the Purchaser Disclosure Schedule represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.    No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.   All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4     Counterparts.  For the convenience of the Parties hereto, this Agreement may be executed (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5     Governing Law.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; *PROVIDED, HOWEVER*, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    Notices.    Unless otherwise set forth herein, any notice, request, instruction or other document to be given hereunder by any Party to the other Parties shall be in writing and shall be deemed duly given (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission (with a confirming copy sent by overnight courier), and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to Sellers:

> Allied Systems Holdings, Inc.
> 2302 Parklake Drive
> Building 15
> Suite 600
> Atlanta, GA 30345
> Attention: General Counsel
> Email: john.blount@alliedholdings.com

> With a mandatory copy to (which copy shall not constitute notice):

> Troutman Sanders LLP
> 600 Peachtree Street, N.E., Suite 5200
> Atlanta, GA 30308
> Attention: Stephen E. Lewis and Jeffrey W. Kelley
> Email: stephen.lewis@troutmansanders.com;
> jeffrey.kelley@troutmansanders.com

If to the Purchaser:

[_____]
c/o Black Diamond Capital Management, L.L.C.
One Conway Park
100 Field Drive, Suite 170
Lake Forest, IL 60045
Attention: Les Meier
Email: lmeier@bdcm.com

and

[_____]
c/o Black Diamond Capital Management, L.L.C.
1 Sound Shore Dr.
Greenwich, CT 06830
Attention: Richard Ehrlich
Email: rehrlich@bdcm.com

and

[_____]
c/o Spectrum Group Management LLC
1250 Broadway
New York, NY 10001
Attention: Jeff Schaffer, Jeff Buller and Stephen Jacobs
Email: jschaffer@spectrumgp.com, jbuller@spectrumgp.com and
sjacobs@spectrumgp.com

With a mandatory copy to (which copy shall not constitute notice):

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention: Adam Harris
Email: adam.harris@srz.com

or to such other Persons or addresses as may be designated in writing by the party to receive such notice.

12.8    Binding Effect; Assignment.

(a)    This Agreement shall be binding upon the Purchaser and, subject to entry of the Sale Orders, Sellers, and inure to the benefit of the parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers or the Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the

required consents shall be void, except for designations by the Purchaser to a Designated Purchaser in accordance with Section 12.8(b).

(b)      In connection with the Closing, notwithstanding anything to the contrary contained in this Agreement, the Purchaser shall be entitled to designate, in accordance with the terms of this paragraph, one or more Wholly-Owned Subsidiaries or Affiliates to (i) purchase and acquire specified Purchased Assets (including specified Assigned Contracts) and pay the corresponding Purchase Price amount and Cure Costs, as applicable, and/or (ii) assume specified Assumed Liabilities (any such Wholly-Owned Subsidiary or Affiliate of the Purchaser that shall be properly designated in accordance with this clause, a "Designated Purchaser"). Upon any such designation of a Designated Purchaser, such Designated Purchaser shall be solely responsible with respect to the payment of the corresponding Cure Costs and the specified Assumed Liabilities, it being understood that Purchaser shall remain liable with such Designated Purchaser(s) for payment of such Designated Purchaser's portion of the Purchase Price. Any reference to the Purchaser made in this Agreement in respect of any purchase or assumption referred to in this paragraph and in any representation, warranty or covenant contained in this Agreement, as applicable, shall be deemed a reference to the appropriate Designated Purchaser, if any, with respect to the given obligation, representation, warranty or covenant. All obligations of the Purchaser and the Designated Purchasers shall be several and not joint and, notwithstanding anything to the contrary contained in this Agreement, neither the Purchaser nor any Designated Purchaser shall have any obligation for any Assumed Liabilities assumed by any other Designated Purchaser in accordance with this paragraph. The above designations shall be made by the Purchaser by way of a written notice to be delivered to the Sellers in no event later than the Business Day prior to Closing and include a signed counterpart to this Agreement in a form acceptable to the Sellers, agreeing to be bound by the terms of this Agreement as it relates to such Designated Purchaser and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder. In addition, the parties agree to modify any Closing deliverables in accordance with the foregoing assignment(s).

12.9      Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

12.10      Injunctive Relief. The Parties agree that, except as otherwise expressly provided in this Agreement, damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the other Parties hereto, and, accordingly, except as otherwise expressly provided in this Agreement, each Party shall be entitled to injunctive relief with respect to any breach by any other Party hereto, including without limitation, specific performance of such covenants, promises or agreements or an order enjoining such Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by such party. The rights set

forth in this <u>Section 12.10</u> shall be in addition to any other rights which the Parties may have at Law or in equity pursuant to this Agreement.

12.11  <u>Non-Recourse</u>.  Except as expressly contemplated by this Agreement with respect to the entities identified on the signature pages hereto, no past, present or future director, officer, employee, incorporator, member, partner or equity holder of Sellers or the Purchaser shall have any liability for any obligations or liabilities of Sellers or the Purchaser under this Agreement or the Sellers' Documents or the Purchaser's Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.12  <u>Allied as Representative of Sellers</u>.  By executing this Agreement, each Seller agrees that Allied shall serve as its representative and duly authorized agent for all purposes relating to this Agreement, including: (i) providing any consents or acknowledgements required under this Agreement; (ii) receiving and delivering any notices provided for under this Agreement; and (iii) taking any other actions required by Sellers under this Agreement.  Each Seller agrees that any action taken by Allied in accordance with clauses (i) through (iii) shall be valid, binding and enforceable against such Seller.

12.13  <u>Time of the Essence</u>.  Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

12.14  <u>Certain Interpretations</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of

such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to $ shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The Parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the Party drafting such agreement or document.

(c)    The Purchaser acknowledges and agrees hereby that Sellers shall not be required to comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

[_____]

By: _____
       Name:  Stephen H. Deckoff
       Title:  Manager


By: _____
       Name:  Jeffrey A Schaffer
       Title:  Manager

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS:**

**ALLIED SYSTEMS HOLDINGS, INC.**

By: _____

     Name:

     Title:

**ALLIED SYSTEMS, LTD. (L.P.)**

By: Allied Automotive Group, Inc.,

     its Managing General Partner

By: _____

     Name:

     Title:

**ALLIED AUTOMOTIVE GROUP, INC.**
**ALLIED FREIGHT BROKER LLC**
**AXIS GROUP, INC.**
**COMMERCIAL CARRIERS, INC.**
**CORDIN TRANSPORT LLC**
**CT SERVICES, INC.**
**F.J. BOUTELL DRIVEAWAY LLC**
**GACS INCORPORATED**
**QAT, INC.**
**RMX LLC**
**TERMINAL SERVICES LLC**
**TRANSPORT SUPPORT LLC**

By: _____

     Name:

     Title:

**ALLIED SYSTEMS (CANADA) COMPANY**
**AXIS CANADA COMPANY**

By: _____
      Name:
      Title:


**AXIS ARETA, LLC**
**LOGISTIC SYSTEMS, LLC**
**LOGISTIC TECHNOLOGY, LLC**

By:  AX International Limited,
     its Sole Member and Manager

By: _____
      Name:
      Title:

## EXHIBIT A

## FORM OF BILL OF SALE

**THIS BILL OF SALE** dated as of _____, 2013 by Allied Systems Holdings, Inc., a Delaware corporation ("Allied"), and the subsidiaries of Allied set forth on the signature pages hereto (collectively with Allied, the "Sellers" and each, a "Seller"), in favor of [_____], a Delaware corporation (the "Purchaser").

**WHEREAS**, the parties hereto have entered into an Asset Purchase Agreement dated as of September [ ], 2013 (the "Purchase Agreement") providing for, among other things, the purchase by, and transfer to, the Purchaser of certain assets of Sellers, and the parties now desire to carry out such purchase and transfer by Sellers' execution and delivery to the Purchaser of this instrument evidencing the vesting in the Purchaser of all of the assets and rights of Sellers hereinafter described. Capitalized terms used but not defined herein have the meanings given them in the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the premises and of other valuable consideration to Sellers in hand paid by the Purchaser, at or before the execution and delivery hereof, the receipt and sufficiency of which by Sellers are hereby acknowledged, subject to the terms and conditions set forth in the Purchase Agreement, Sellers hereby convey, grant, bargain, sell, transfer, set over, assign, remise, release, deliver and confirm unto the Purchaser, its successors and assigns forever, effective as of 12:01 a.m. EDT on the date hereof (the "Effective Time"), all of Sellers' right, title and interest in and to the Purchased Assets.

Sellers hereby covenant that, from time to time after the delivery of this instrument, at the Purchaser's request and without further consideration, Sellers will do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged and delivered, all and every such further acts, deeds, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required to more effectively convey, transfer to and vest in the Purchaser, and to put the Purchaser in possession of, any of the Purchased Assets.

The Purchaser acknowledges that Sellers make no representation or warranty with respect to the Purchased Assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any person, firm or corporation other than the Purchaser and its successors and assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or condition hereof, and all of the terms, covenants and conditions, promises and agreements in this instrument contained shall be for the sole and exclusive benefit of the Purchaser and its successors and assigns.

This instrument is executed by, and shall be binding upon, each Seller and its successors and assigns for the uses and purposes above set forth and referred to, effective as of the Effective Time.

This instrument shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of New York, without regard to its conflict of law principle provisions.

This instrument is executed and delivered under and pursuant to the Purchase Agreement. Notwithstanding any other provision of this Agreement, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive or otherwise affect any of the provisions of the Purchase Agreement, including, without limitation, the representations, warranties, covenants and agreements of any of the parties thereto. To the extent this Bill of Sale is inconsistent with any terms or conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

This instrument may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

**IN WITNESS WHEREOF,** Sellers have executed this Bill of Sale or caused this Bill of Sale to be executed on their behalf by a duly authorized officer of each Seller as of _____, 2013.

**SELLERS:**

ALLIED SYSTEMS HOLDINGS, INC.

By: _____
       Name:
       Title:

ALLIED SYSTEMS, LTD. (L.P.)

By:  Allied Automotive Group, Inc.,
     its Managing General Partner

By: _____
       Name:
       Title:

ALLIED AUTOMOTIVE GROUP, INC.
ALLIED FREIGHT BROKER LLC
AXIS GROUP, INC.
COMMERCIAL CARRIERS, INC.
CORDIN TRANSPORT LLC
CT SERVICES, INC.
F.J. BOUTELL DRIVEAWAY LLC
GACS INCORPORATED
QAT, INC.
RMX LLC
TERMINAL SERVICES LLC
TRANSPORT SUPPORT LLC

By: _____
       Name:
       Title:

ALLIED SYSTEMS (CANADA) COMPANY
AXIS CANADA COMPANY

By: _____
     Name:
     Title:


AXIS ARETA, LLC
LOGISTIC SYSTEMS, LLC
LOGISTIC TECHNOLOGY, LLC

By:  AX International Limited,
     its Sole Member and Manager

By: _____
     Name:
     Title:

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is entered into as of _____, 2013 by and among Allied Systems Holdings, Inc., a Delaware corporation ("Allied"), and the subsidiaries of Allied set forth on the signature pages hereto (collectively with Allied, the "Assignors") and [_____], a Delaware corporation (the "Assignee").

**W I T N E S S E T H:**

WHEREAS, Assignors and Assignee entered into that certain Asset Purchase Agreement dated as of September [__], 2013 (the "Purchase Agreement" capitalized terms used but not otherwise defined herein have the meanings given them in the Purchase Agreement); and

WHEREAS, pursuant to the Purchase Agreement, Assignors have agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume certain obligations of Assignors, as set forth herein and therein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto mutually covenant and agree as follows:

1.    Effective as of 12:01 a.m. EDT on the date hereof (the "Effective Time"), subject to the terms of the Purchase Agreement, Assignors hereby sell, transfer and assign (collectively, the "Assignment") to Assignee, and Assignee hereby assumes and agrees to pay, perform and discharge, as and when due, the Assigned Contracts and all obligations constituting the Assumed Liabilities, as defined in and in accordance with Section 1.3 of the Purchase Agreement.

2.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

3.    This Agreement shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of New York, without regard to its conflict of law principle provisions.

4.    This Agreement is executed and delivered under and pursuant to the Purchase Agreement.    Notwithstanding any other provision of this Agreement, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive or otherwise affect any of the provisions of the Purchase Agreement, including, without limitation, the representations, warranties, covenants and agreements of any of the parties thereto.    To the extent this Agreement is inconsistent with any terms or conditions in the Purchase Agreement, the Purchase Agreement shall control.

5.    This Agreement may be executed in counterpart signature pages, all of which when so executed and attached hereto shall constitute one and the same original.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the date first set forth above.

**ASSIGNORS:**

**ALLIED SYSTEMS HOLDINGS, INC.**

By: _____
      Name:
      Title:


**ALLIED SYSTEMS, LTD. (L.P.)**

By:  Allied Automotive Group, Inc.,
      its Managing General Partner

By: _____
      Name:
      Title:


**ALLIED AUTOMOTIVE GROUP, INC.**
**ALLIED FREIGHT BROKER LLC**
**AXIS GROUP, INC.**
**COMMERCIAL CARRIERS, INC.**
**CORDIN TRANSPORT LLC**
**CT SERVICES, INC.**
**F.J. BOUTELL DRIVEAWAY LLC**
**GACS INCORPORATED**
**QAT, INC.**
**RMX LLC**
**TERMINAL SERVICES LLC**
**TRANSPORT SUPPORT LLC**

By: _____
      Name:
      Title:

DOC ID - 20595795.5

ALLIED SYSTEMS (CANADA) COMPANY
AXIS CANADA COMPANY

By: _____
     Name:
     Title:


AXIS ARETA, LLC
LOGISTIC SYSTEMS, LLC
LOGISTIC TECHNOLOGY, LLC

By:  AX International Limited,
     its Sole Member and Manager


By: _____
     Name:
     Title:

ASSIGNEE:

[_____]


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

## SCHEDULE 1

## OWNED REAL PROPERTY

| Location Street | City | State/Province | Country |
|---|---|---|---|
| 1500 Winder Highway | Dacula | GA | USA |
| 19550 Smokey Road | Marysville | OH | USA |
| 355 Old Highway 67 | Midlothian | TX | USA |
| 6301 Wyoming Avenue (including excess land) | Dearborn | MI | USA |
| 6151 Colonel Talbot Road | London | Ontario | Canada |
| 1790 Provincial Road (including excess land) | Windsor | Ontario | Canada |

## SCHEDULE 2

## LEASED REAL PROPERTY

| Lessee | Lessor | Location Street | City | State |
|--------|--------|-----------------|------|-------|
| Axis Group, Inc. | The City of New York Department of Small Business Services (acting through NYC EDC) | South Brooklyn Marine Terminal | New York | New York |

DOC ID - 20595795.5

**SCHEDULE 3**

**EQUIPMENT**

***TO COME***

**SCHEDULE 4**

**REAL PROPERTY SUBLEASES**

1.    OWNED REAL PROPERTY

1790 Provincial Road, RR Terminal #1, Windsor, Ontario  N9A 6J3

Pursuant to the Property Lease Agreement between Allied Systems (Canada) Company and Pattison Outdoor Advertising, a division of Jim Pattison Industries Ltd., dated April 14, 2000, Allied Systems (Canada) Company has granted a billboard lease for a portion of this property.

2.    LEASED REAL PROPERTY

South Brooklyn Marine Terminal Lease (Brooklyn, New York)

Amended and Restated Sublease Agreement between Axis Group, Inc. and Plaza Automall, Ltd. dated November 14, 2012

License Agreement between the City of New York Department of Citywide Administrative Services and Axis Group, Inc. dated June 17, 2013

Short-Term License Agreement between Axis Group, Inc. and Merkos L'inyonei Chinuch dated June 19, 2013

Sublease Agreement between Axis Group, Inc. and Phoenix Marine dated July 22, 2013[1]

Various owner-operators have been granted the right to park and store their tractor-trailers on a portion of the Brooklyn property.  These arrangements have not yet been formalized in writing.

---

[1] This agreement has been executed by the parties thereto and will be effective upon approval of the landlord.

DOC ID - 20595795.5