## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| | Re:  D.I. 2941 |

### OBJECTION OF YUCAIPA AMERICAN ALLIANCE FUND I, L.P. AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P TO THE MOTION TO (I) APPROVE DISCLOSURE STATEMENT, (II) APPROVE VOTING AND TABULATION PROCEDURES, AND (III) SET CONFIRMATION HEARING AND RELATED DEADLINES

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Michael R. Nestor (No. 3526)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman
Sabina Jacobs
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000

- and -

GIBSON, DUNN & CRUTCHER LLP
Matthew K. Kelsey
Mary Kate Hogan
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000

*Attorneys for Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ................................................................................. 3

    **A.**    The Debtors' Current Chapter 11 Cases .............................................3

    **B.**    Debtors' Prepetition Capital Structure ................................................4

    **C.**    DIP Financing Orders .......................................................................5

    **D.**    Sale of the Debtors' Operating Assets; Repayment of DIP Financing Using Sale Proceeds .......................................................................5

    **E.**    The Motion, the Disclosure Statement, and the Proposed Plan .............................6

    **F.**    Pending Litigations and the Plan's Attempt to Circumvent Such Pending Litigations ..........................................................................9

OBJECTION .................................................................................... 11

    **A.**    The Plan Described in the Disclosure Statement is Patently Unconfirmable ..............................................................................11

            **1.**    The Proposed Plan Is Not Proposed in Good Faith ...................................13

            **2.**    Unfair Discrimination .................................................................19

            **3.**    The Proposed Plan is Not in the Best Interests of Creditors......................21

            **4.**    The Proposed Plan Does Not Satisfy All Administrative And Priority Claims ...........................................................................23

            **5.**    The Proposed Plan Violates the Absolute Priority Rule............................24

            **6.**    The Proposed Plan Includes Improper Settlements Entered into by the First Lien Agents That Exceed the Powers Granted to the First Lien Agents Under the First Lien Credit Agreement .............................................................................26

            **7.**    The Proposed Plan Contains Other Violations of the FLCA and ICA ...............................................................................29

            **8.**    The Releases and Exculpations in the Proposed Plan Are Impermissibly Broad in Favor of Non-Debtors, Most Notably BD/S .....................................................................................31

    **B.**    The Disclosure Statement Does Not Contain Adequate Information...................34

RESERVATION OF RIGHTS ................................................................ 38

CONCLUSION .................................................................................. 39

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Gillman v. Continental Airlines (In re Continental Airlines)*,
203 F.3d 203 (3d Cir. 2000)..................................................................... 32

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) ......................................................... 18

*In re Adelphia Commc'ns Corp.*,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ...................................................... 15

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)............................................................ 11, 12, 13

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005 ..................................................................... 24

*In re Century Glove, Inc.*,
74 B.R. 958 (Bankr. D. Del. 1987) ......................................................... 25

*In re Copy Crafters Quickprint, Inc.*,
92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................................... 35

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) .............................................. 13, 14, 19

*In re Curtis Ctr. Ltd. P'ship*,
195 B.R. 631 (Bankr. E.D. Pa. 1996) ..................................................... 11

*In re Dune Deck Owners Corp.*,
175 B.R. 839 (Bankr. S.D.N.Y. 1995)..................................................... 15

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ......................................................... 32

*In re Felicity Assocs., Inc.*,
197 B.R. 12 (Bankr. D.R.I. 1996)............................................................ 11

*In re Fiesta Homes of Georgia, Inc.*,
125 B.R. 321 (Bankr. S.D. Ga. 1990) ..................................................... 19

*In re Foamex Int'l Inc.*,
No. 09-10560, ¶ P (Bankr. D. Del. May 27, 2009)................................. 27

*In re Greystone III Joint Venture*,
995 F.2d 1274 (5th Cir. 1991) .......................................................................................... 31

*In re GWLS Holdings, Inc.*,
2009 Bankr. LEXIS 378, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) ......................... 27

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004)............................................................................................... 17

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).............................................................................................. 31

*In re Lehigh Valley Prof'l Sports Clubs, Inc.*,
2001 WL 1188246 (Bankr. E.D. Pa. Sept. 7, 2001) ............................................................ 16

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)) .............................................................................. 32

*In re Metaldyne Corp.*,
409 B.R. 671 (Bankr. S.D.N.Y. 2009)................................................................................. 27

*In re Multiut Corp.*,
449 B.R. 323 (Bankr. N.D. Ill. 2011) ................................................................................. 22

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................................. 12

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................................................................ 11

*In re Smith*,
357 B.R. 60 (Bankr. M.D.N.C. 2006)................................................................................. 22

*In re Stone & Webster, Inc.*,
286 B.R. 532 (Bankr. D. Del. 2002) ................................................................................... 21

*In re Surfango, Inc.*,
2009 WL 5184221 (Bankr. D. N.J. Dec. 18, 2009) .............................................................. 17

*In re VIP Motor Lodge, Inc.*,
133 B.R. 41 (Bankr. D. Del. 1991) ..................................................................................... 25

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ............................................................................ 32, 34

*In re Western Asbestos Co.*,
313 B.R. 832 (Bankr. N.D. Cal. 2003) ............................................................................... 17

*In re WR Grace & Co.*,
729 F.3d 332 (3d Cir. 2013)............................................................................................... 13

iv

*In re Zaruba*,
    384 B.R. 254 (Bankr. D. Alaska 2008)..................................................................................22

*In re Zenith Elec. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .......................................................................................32

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154  (3d Cir. 1993)...............................................................................................31

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988).............................................................................................................25

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988).................................................................................................35

**Statutes**

11 U.S.C. § 1123(a)(4)...............................................................................................................19

11 U.S.C. § 1125(a)(1)...............................................................................................................35

11 U.S.C. § 1125(b) ...................................................................................................................34

11 U.S.C. § 1125(e) ...................................................................................................................33

11 U.S.C. § 1126(e) ...................................................................................................................15

11 U.S.C. § 1129(a)(1)...............................................................................................................19

11 U.S.C. § 1129(a)(3)...............................................................................................................13

11 U.S.C. § 1129(a)(7)...............................................................................................................21

11 U.S.C. § 1129(a)(9)...............................................................................................................23

11 U.S.C. § 1129(b)(2)(A)..........................................................................................................24

Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, "Yucaipa"), by and through their undersigned counsel, hereby file this objection (the "Objection") to the *Motion to (I) Approve Disclosure Statement, (II) Approve Voting and Tabulation Procedures, and (III) Set Confirmation Hearing and Related Deadlines* (D.I. 2941) (the "Motion") filed by the above-captioned debtors (the "Debtors"). In support of this Objection, Yucaipa respectfully represents as follows:[1]

### PRELIMINARY STATEMENT

9.     The Disclosure Statement[2] cannot be approved because the Proposed Plan it describes cannot be confirmed: the Proposed Plan contains flaws that violate many provisions of the Bankruptcy Code and improperly serves as a tool to enhance Black Diamond's, Spectrum's, and the Committee's respective litigation postures at the expense of Yucaipa. Indeed, as noted in Yucaipa's motion to suspend the Chapter 11 Cases (D.I. 2976), the Committee and BD/S have commenced numerous actions against Yucaipa, both in this Court and in other fora, at significant expense to all parties. The Proposed Plan is yet another in a seemingly endless list of attempts by BD/S to disenfranchise Yucaipa and curtail its rights. Not satisfied with asserting and adjudicating these claims in the various proceedings that they themselves have commenced, BD/S now seek to preclude Yucaipa from defending itself against these actions (and prosecuting its counterclaims) by filing the Proposed Plan. The Proposed Plan seeks to short-circuit these various judicial proceedings under the guise of a confirmation process for the Proposed Plan.

---

[1] Capitalized terms not defined in this Objection shall have the meaning ascribed to them in the Proposed Plan.

[2] Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them the first time they appear in the remainder of this Objection.

10.     Specifically, the Proposed Plan (a) treats Yucaipa in a separate and materially worse way than other similarly situated creditors, (b) improperly redistributes recoveries from Yucaipa to creditors with lesser priority, (c) erases Yucaipa's adequate protection claims, and (d) provides improper releases and discharges to the Debtors, Black Diamond and Spectrum. To effect confirmation of this scheme, the Plan Proponents seek to deny Yucaipa the right to vote on the Proposed Plan—without any motion to designate Yucaipa's votes—on the basis of unadjudicated disputes regarding Yucaipa's claims. Further, although Black Diamond's and Spectrum's conduct and good faith are directly at issue, they are nonetheless able to vote on the Proposed Plan.

11.     Remarkably, even if Yucaipa is ultimately successful on appeal of any confirmation order, the Proposed Plan provides that distributions to unsecured creditors and BD/S will not be subject to disgorgement, even if the litigations—commenced by the Plan Proponents themselves—do not go their way. Finally, the Proposed Plan purports to be a reorganization of the Debtors, even though the Debtors were liquidated over 18 months ago, in an effort to obtain a discharge and release that would otherwise be unavailing in a liquidating plan. These and other fatal flaws render the Proposed Plan patently unconfirmable.

12.     Yucaipa also objects to the approval of the Disclosure Statement because it fails to provide "adequate information" as contemplated by section 1125 of the Bankruptcy Code. The Disclosure Statement omits important information upon which creditors would normally rely in making an informed decision to vote to accept or reject a chapter 11 plan. These omissions include no (a) quantification of the amount of distributions being made to creditors, (b) quantification of the amount of outstanding claims against the Debtors, (c) liquidation analysis, (d) analysis of the reasonableness of the settlements that are among the cornerstones of

the Proposed Plan, (e) disclosure of the consideration supporting the exculpation and releases to be received by parties who are not estate fiduciaries, (f) disclosure regarding the feasibility of a $2 million cap on administrative claims, (g) disclosure of the basic economics of a proposed loan to the litigation trust, and (h) disclosure concerning BD/S's bad faith action in commencing involuntary cases against these Debtors, among other material omissions.

13.     For all of these reasons, and the reasons set forth below, the Motion should be denied, the Disclosure Statement should not be approved, and the Plan Proponents should not be allowed to solicit votes to accept or reject the Proposed Plan.

## **BACKGROUND**

### A.     **The Debtors' Current Chapter 11 Cases**

14.     On May 17, 2012 (the "Petition Date"), Black Diamond CLO 2005-1 Ltd. ("BD CLO"), BDCM Opportunity Fund II, L.P. ("BDCM" and together with BD CLO, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" and together with Black Diamond, "BD/S") filed an involuntary bankruptcy petition (the "Involuntary Petition") against Allied Systems Holdings, Inc. ("Allied"). On June 10, 2012, Allied consented to the entry of an order for relief, and certain of Allied's subsidiaries (collectively, with Allied, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases").

15.     On June 11, 2011, the Court entered an order authorizing the joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). On June 20, 2012, the Office of the United States Trustee for the District of Delaware appointed the Official Unsecured Creditors' Committee of Allied (the "Committee").

16.    The Involuntary Petition constitutes the product of an illegal claims trade under Bankruptcy Rule 1003 that was designed to induce Spectrum to participate as a petitioning creditor. As set forth in that certain complaint filed in the United States District Court for the District of Delaware, styled as *Yucaipa Am. Alliance Fund I, L.P., et al. v. Ehrlich, et. al*, No. 15-373-SLR (the "RICO Action"), Black Diamond and Spectrum conspired to put the Debtors into an involuntary bankruptcy case in order to specifically harm and subordinate Yucaipa's claims. The Proposed Plan represents another step in that scheme—and implicates the good faith of Black Diamond and Spectrum as Plan Proponents.

**B.    Debtors' Prepetition Capital Structure**

17.    As of the Petition Date, the Debtors owe a total of approximately $244,047,529.60 in debt (the "First Lien Debt") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended and restated as of May 15, 2007 (the "FLCA" and such lenders thereunder, the "First Lien Lenders"). A true and correct copy of the FLCA is annexed hereto as Exhibit A.

18.    Of these amounts, Yucaipa holds $134,835,689 in principal amount of the First Lien Debt, Black Diamond allegedly holds $35,955,502.69 of the First Lien Debt (which includes a disputed transfer from another First Lien Lender), and Spectrum allegedly holds $20,531,461.63 of the First Lien Debt.

19.    As of the Petition Date, the Debtors also owe a total of $30,000,000 (the "Second Lien Debt") under the Second Lien Credit Agreement (the "SLCA" and such lenders thereunder, the "Second Lien Lenders"). Yucaipa holds $20 million in principal amount of the Second Lien Debt.[3] Spectrum holds $5 million in principal amount of the Second Lien Debt.

---

[3] This amount is net of the $20 million capital contribution that Yucaipa voluntarily made after it acquired $40 million of the Second Lien Debt.

### C.    DIP Financing Orders

20.    On July 12, 2012, the Court entered an order (the "Initial DIP Order") (D.I. 230) authorizing the Debtors to obtain postpetition secured financing from Yucaipa, pursuant to which the Debtors obtained a $22 million loan maturing on June 11, 2013. As the maturity date approached, the Debtors sought and obtained replacement DIP financing from BD/S in an amount not to exceed $33,500,000 (the "DIP Loan"), which the Court approved on June 21, 2013 (the "Replacement DIP Order" and together with the Initial DIP Order, the "DIP Orders") (D.I. 1324).

21.    The DIP Orders entitle Yucaipa, as a prepetition secured party, to adequate protection of its interests in the prepetition collateral, including cash collateral, to the extent of the aggregate diminution in value of such collateral, including any diminution resulting from or attributable to any carve-outs, the imposition of the automatic stay, any sale, or any other decline in value of the collateral (e.g., repayment of priming postpetition loans). *See* Initial DIP Order ¶ 9; Replacement DIP Order ¶ 9. At a minimum, Yucaipa is entitled to recovery as adequate protection the pro rata amount of the DIP Loan, which reduced the recoveries to First Lien Lenders out of proceeds of the JCT Sale (defined below).

### D.    Sale of the Debtors' Operating Assets; Repayment of DIP Financing Using Sale Proceeds

22.    On September 17, 2013, the Court entered an order (the "JCT Sale Order") (D.I. 1837) approving the sale of substantially all assets of the Debtors to Jack Cooper Transport ("JCT") for cash in the amount of $135 million (the "JCT Sale"). Pursuant to the JCT Sale Order, the proceeds from the JCT Sale first were applied to repay the DIP Loan in full. *See* JCT Sale Order ¶ 13.

E.       **The Motion, the Disclosure Statement, and the Proposed Plan**

23.      On May 4, 2015, approximately 18 months after entry of the JCT Sale Order, the Debtors, the Committee, and BD/S (collectively, the "Plan Proponents") filed the Motion seeking approval of the disclosure statement (the "Disclosure Statement") and authority to solicit votes on their proposed chapter 11 plan (the "Proposed Plan").

24.      The Proposed Plan provides for immediate distributions to BD/S and unsecured creditors in the form of cash and distribution rights with respect to the proceeds of a litigation trust. Proposed Plan § 3.3(a), (d). The litigation trust will contain the Committee Action and the Current BD/S Action (each defined herein). *Id*. § 5.11(a). Yucaipa will get a distribution, if any, of cash upon the favorable resolution of the Committee Action and the Current BD/S Action. *Id.* § 3.3(a). In addition, the Proposed Plan contains several settlements with individual unsecured creditors and the Committee reached on behalf of all of the First Lien Lenders, including Yucaipa, by BD/S, in their capacity as alleged First Lien Agents. Proposed Plan § 5.15; Disclosure Statement Art. III(I)-(K).

25.      Importantly, the Proposed Plan reallocates $3 million in cash that constitutes collateral of the First Lien Lenders and Second Lien Lenders and gifts it to certain unsecured creditors to induce the Committee to support the Proposed Plan.

26.      In aid of this distribution scheme, the Proposed Plan contains the following problematic provisions:

   a. The Proposed Plan is really a liquidating plan, not a reorganization plan and, as such, the "reorganized" Debtors thereunder are not entitled to a discharge and there is no basis for the releases.

   b. The Proposed Plan presumes the success of BD/S and the Committee in the Pending Litigations prior to their adjudication in separate forums and proceedings, and presumes the loss by Yucaipa on all of its claims against BD/S. *See* Proposed Plan § 3.3(a) (distributions on account of Disputed First Lien

6

Obligations will be held in escrow); Proposed Plan § 7.1(a) (holders of Allowed Claims will receive distributions on each Distribution Date); Motion ¶ 20(c) (denying Yucaipa the right to vote on account of the Disputed First Lien Obligations); Disclosure Statement Art. IV(H)(5) (all distributions are final; no disgorgement).

c.     The Proposed Plan provides for the waiver by both the First Lien Lenders and the Second Lien Lenders of their unsecured deficiency claim. *See* Proposed Plan §§ 3.3(a), (b). This exceeds the scope of the First Lien Agents under the FLCA and violates the Intercreditor Agreement (the "ICA"). A true and correct copy of the ICA is annexed hereto as Exhibit B.

d.     The Proposed Plan is not in the best interests of creditors because Yucaipa would receive greater recoveries in a hypothetical chapter 7 liquidation.

e.     As a condition to confirmation, distribution on account of priority and administrative claims may not exceed $2 million. The Disclosure Statement, however, identifies over $8 million in administrative and priority claims asserted against the estates. Moreover, Yucaipa holds a superpriority adequate protection claim of at least $16.5 million that is nowhere described in the Disclosure Statement.[4]

f.     The Proposed Plan provides for a ratable distribution of $3 million of the proceeds of the JCT Sale, which is the First and Second Lien Lenders' collateral, to general unsecured creditors even though the First and Second Lien Debt are not being paid in full.

g.     The Proposed Plan proposes to bind all First Lien Lenders and Second Lien Lenders to four settlements (with AIG, Northwest, Central States, and general unsecured creditors), each of which relies on the reallocation to unsecured creditors of the proceeds of the JCT Sale, which are the First and Second Lien Lenders' collateral. *See* Proposed Plan §§ 3.1(a), 3.3(c), 5.15. The FLCA does not give BD/S, in their capacity as First Lien Agents or Requisite Lenders (as that term is used in the FLCA), the power to reallocate that collateral or bind Yucaipa to these settlements.

---

[4] The Disclosure Statement does not establish the amount of adequate protections claims waived under the Plan. However, the proceeds of the JCT Sale were used to pay down the DIP Loan. Yucaipa owns 55% of First Lien Debt and, therefore, could have a claim (on a pro rata basis) approximating $16.5 million simply from the imposition of the priming DIP upon collateral securing the First Lien Lenders' collateral. There could be other diminution of value claims to render Yucaipa's adequate protection claim even higher. Yucaipa reserves all rights to adjust the amount of its adequate protection claim.

h.     The Proposed Plan binds Yucaipa to a waiver of its adequate protection claims, despite the fact that the FLCA and the DIP Orders do not give BD/S, in their capacity as First Lien Agents, the power to do so.

i.     The settlements in the Proposed Plan have the effect of violating certain of Yucaipa's "sacred rights" under the FLCA, including the waiver and reduction of scheduled loan repayments. BD/S, in their capacity as First Lien Agents or Requisite Lenders, do not have the power to do this.

j.     The Proposed Plan violates other provisions of the FLCA regarding deferral of the repayment date, reduction of the amount owed to Yucaipa, and a release of substantially all of the collateral owed to Yucaipa.

k.     The Proposed Plan violates the ICA by requiring the Second Lien Lenders to turn over distributions received under the Proposed Plan until the First Lien Lenders are paid in full. However, the contemplated distributions to holders of the Second Lien Debt (i) are not collateral securing obligations under the FLCA and SLCA and (ii) are not the result of enforcement actions against the Debtors. As a result, the ICA does not require the turnover of these proceeds. *See* ICA § 4.1.

l.     The Proposed Plan includes broad release and exculpation provisions for the benefit of, among others, BD/S, which are non-Debtors and non-estate fiduciaries. *See* Proposed Plan §§ 10.6, 10.8.

m.     The Proposed Plan transfers the Committee Action and the Current BD/S Action into a litigation trust, which will be controlled by an oversight committee dominated by BD/S (e.g., BD/S get to appoint the trustee and the majority of the oversight board). *See* Proposed Plan §§ 5.10-5.12.  In other words, BD/S – bad faith actors – become estate fiduciaries under the Plan prosecuting the Committee Action.

27.     In addition to these provisions in the Proposed Plan, the Disclosure Statement provides that all distributions made under the Plan are final, and no one may seek disgorgement of any distributions made under the Plan. *See* Disclosure Statement Art. IV(H)(5). In the Motion, the Plan Proponents seek to prevent Yucaipa from voting its claims. Motion ¶ 20(c) ("[T]he Debtors will not count for voting purposes any Ballot cast for a claim … on

8

account of which a proof of claim was filed that is subject of a pending objection (including any

Disputed First Lien Obligations [referring only to Yucaipa's claims.]"). There is no similar

restriction with respect to the claims held by BD/S, even though they are subject to objections

and litigations. No Plan Proponent separately has sought to designate the vote of Yucaipa.

F.    **Pending Litigations and the Plan's Attempt to Circumvent Such Pending Litigations**

28.    As this Court is all too aware, the Plan Proponents and Yucaipa are

embroiled in multiple litigations (the "Pending Litigations") that are described in more detail in

the *Motion to (A) Suspend the Debtors' Chapter 11 Cases Pending Resolution of Various*

*Litigations Pursuant to 11 U.S.C. §§ 105(a) and 305(a) or (B) Alternatively, Stay Plan*

*Confirmation Proceedings Pending Resolution of Various Litigations Pursuant to 28 U.S.C.*

*§ 1334(C)* (the "Stay Motion") (D.I. 2976).

29.    The Pending Litigations will determine the rights of Yucaipa, BD/S, and

unsecured creditors to receive distributions from the Debtors' estates. While described in more

detail in the Stay Motion, a short summary of each Pending Litigation is provided below.

a.    *Declaratory Action (Adv. No. 12-50947).* The Debtors commenced an action, with counterclaims and cross-claims by Yucaipa, regarding the identity of the "Requisite Lenders" under the FLCA, the enforceability of the Third and Fourth Amendments to the FLCA, and the validity of Yucaipa's First Lien Debt claims. Yucaipa timely appealed the Court's grant of summary judgment and ruling that BD/S are the Requisite Lenders, and the appeal is currently pending in the District Court before Judge Robinson.

b.    *Committee Action (Adv. No. 13-50530).* The Committee commenced an action against Yucaipa and certain of Allied's directors, with BD/S as intervenors, seeking several forms of relief against Yucaipa, including (i) equitable subordination of Yucaipa's claims, (ii) recharacterization of Yucaipa's debt as equity, (iii) avoidance of alleged fraudulent transfers and preferences, and (iv) disallowance of Yucaipa's claim. Yucaipa and the director defendants have asserted various affirmative defenses to the Committee's and BD/S's claims, including (i) validity of the

Fourth Amendment to the FLCA, (ii) estoppel, (iii) waiver, (iv) unclean hands and *in pari delicto*, (v) unjust enrichment, (vi) consent, (vii) statute of limitations, and (viii) laches.

c. *Current BD/S Action (Adv. No. 14-50971).* BD/S filed a complaint against Yucaipa and certain Allied directors, asserting, among other things, claims for (i) equitable subordination, (ii) breach of contract, (iii) breach of implied duty of good faith and fair dealing, and (iv) tortious interference with contract. Yucaipa filed its answer and asserted counterclaims against BD/S for equitable subordination.

d. *RICO Action (No. 15-373).* Yucaipa commenced an action in the District Court against BD/S and their principals and agents under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d), asserting conspiracy, bankruptcy fraud, and wire and mail fraud arising out of, among other things, BD/S' illegal claims trading and scheme to file the Involuntary Petitions.

30. Given the substantial overlap of issues to be resolved in the Pending Litigations and the Proposed Plan, Yucaipa has requested—via the Stay Motion currently pending before this Court—that the Court suspend the Chapter 11 Cases, or alternatively, stay all plan confirmation-related proceedings, in each case pending the resolution of the Pending Litigations.

31. In addition, there is another pending action, filed by Yucaipa in the Court of Chancery of the State of Delaware, styled as *Yucaipa American Alliance Fund I, LP, et al. v. SBDRE LLC, et al.*, C.A. 9151-VCP (the "SBDRE Action"), which seeks to determine the lawful governance and control of SBDRE LLC, the entity BD/S formed to execute a credit bid on behalf of the First Lien Lenders to acquire certain real estate assets of the Debtors. The SBDRE Action asserts that BD/S (a) have breached the FLCA, (b) are improperly asserting control over SBDRE, and (c) are improperly engaging in self-dealing transactions. Specifically, the SBDRE Action alleges that BD/S, in the guise of acting as First Lien Agents and Requisite Lenders, tried to alter the economics of the acquisition of the Debtors' real estate assets so that First Lien

10

Lenders other than BD/S would receive substantially worse economics than BD/S, all in violation of the FLCA. The Chancery Court dismissed part of Yucaipa's complaint, and stayed the remainder of the case.

## OBJECTION

A.    **The Plan Described in the Disclosure Statement is Patently Unconfirmable**

32.    If a plan is not confirmable, the related disclosure statement should not be approved. *See*, *e.g.*, *In re Am. Capital Equip., LLC,* 688 F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.") (internal quotation marks omitted); *In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the [motion] to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("[A] disclosure statement should be disapproved where the plan it describes is patently unconfirmable."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'").

33.    A plan is patently unconfirmable where "(1) confirmation 'defects cannot be overcome by creditor voting results,' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *In re Am. Capital Equip.*, 688 F.3d at 154-55 (citations omitted). To preserve estate resources, courts will not approve a disclosure statement describing a patently unconfirmable

plan. *See id.* at 154 ("[A] court should not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan *may* not be confirmable because it does not comply with confirmation requirements.") (citations omitted) (emphasis added). Indeed, "undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (citations omitted) (internal quotation marks and citations omitted).

34.    Here, the Plan Proponents are trying to prosecute confirmation of the Proposed Plan by denying one of the largest creditors—Yucaipa—the ability to vote to accept or reject the Proposed Plan even before soliciting votes. *See* Motion ¶ 20(c). The proposed disenfranchisement of Yucaipa brings to the forefront all of the confirmation issues raised by the Proposed Plan because they will not be able to be cured by a fair vote of the Debtors' creditors.

35.    To exacerbate matters, the Plan Proponents seek to make indefeasible distributions to BD/S and to other unsecured creditors prior to the resolution of the Declaratory Action, the Committee Action, and the Current BD/S Action—all of which were filed and have been prosecuted by the very parties who are sponsoring the Proposed Plan. *See* Proposed Plan § 7.1(a); Disclosure Statement Art. IV(H)(5). Not content to allow these Actions to run their course, the Proposed Plan presupposes that the Plan Proponents will be successful in the Declaratory Action, the Committee Action, and the Current BD/S Action. Having commenced the aforementioned actions (which were not unwillingly foisted upon them by Yucaipa or any party), which have been pending for years, the Committee, Black Diamond and Spectrum seek to shortcut Yucaipa's significant rights and claims in a summary fashion without providing Yucaipa

the right to defend such claims and prosecute its own claims against Black Diamond and

Spectrum.

36.     In addition to these threshold issues—which by themselves are sufficient

to demonstrate that the Proposed Plan was proposed in bad faith—the Proposed Plan also

contains many other significant defects fatal to its ability to be confirmed. Specifically, the

Proposed Plan (a) unfairly discriminates against secured claims held by Yucaipa, (c) is not in the

best interests of creditors, (d) does not pay administrative priority claims in full, (e) violates the

absolute priority rule, (f) attempts to bind Yucaipa to unreasonable settlements through the *ultra*

*vires* actions of the purported First Lien Agents, (g) violates the FLCA and the ICA, and

(h) contains impermissibly broad releases and exculpations.

### *1.     The Proposed Plan Is Not Proposed in Good Faith*

37.     The Bankruptcy Code requires a plan of reorganization to be "proposed in

good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *see also In re WR*

*Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) ("Under § 1129(a)(3), courts may only confirm

reorganization plans proposed in good faith."). In assessing whether a plan has been proposed in

good faith, "[t]he important point of inquiry is the plan itself and whether such a plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *WR Grace*,

729 F.3d at 346 (quoting *In re Am. Capital Equip.*, 688 F.3d 145, 156 (3d Cir. 2012)) (internal

quotation marks omitted).

38.     Courts in this District have held that "[t]he good faith standard requires

that the plan be proposed with honesty, good intentions and a basis for expecting that a

reorganization can be effected with results consistent with the objectives and purposes of the

Bankruptcy Code." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)

(citations omitted) (internal quotation marks omitted). In evaluating the totality of circumstances

surrounding a plan, a court has "'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan." *Id.* (citations omitted).

39.     The Proposed Plan fails before the foregoing authorities because it constitutes an attempt to skew the results and distributions against Yucaipa and presumes a negative outcome for Yucaipa in the Pending Litigations. As noted above, only Yucaipa is stripped of voting rights, only Yucaipa cannot get distributions under the Plan, and Yucaipa bears the major brunt of the reallocation of proceeds designed to buy Committee support for the Proposed Plan. In addition, BD/S drafted the Proposed Plan and related litigation trust to further enrich themselves at Yucaipa's expense.[5] Under the Proposed Plan, both BD/S and unsecured creditors would receive immediate distributions of the JCT Sale proceeds, while Yucaipa would have to wait until the conclusion of the Pending Litigations. *See* Proposed Plan §§ 3.3(a), 7.1(a), 7.1(e); Disclosure Statement Art. IV(H)(1). Further, distributions of JCT Sale proceeds made to BD/S and unsecured creditors would not be subject to disgorgement, even though the entitlements of BD/S and unsecured creditors to such distributions are currently the subject of litigation in the Pending Litigations. *See* Disclosure Statement Art. IV(H)(5). Accordingly, the Proposed Plan amounts to an attempt to short-circuit the Committee Action and the Current BD/S Action, even though they were commenced by the Plan Proponents themselves.

---

[5] Other aspects of the Proposed Plan support the contention that BD/S dominated the formulation of the Proposed Plan. For instance, the Proposed Plan creates a litigation trust in which is transferred, among other things, the Committee Action. But BD/S would get to appoint the litigation trustee and two-thirds of the trust's oversight board, with no mechanism for changing the litigation trustee. *See* Proposed Plan §§ 5.10(a), 5.12(a). Similarly, the litigation waterfall disproportionately favors proposed lenders to the litigation trust who, by definition, will be largely (if not entirely) BD/S. *Id.* §§ 5.1(c), 5.14. BD/S will also receive a rich backstop fee for committing to fund the loan. *Id.* § 5.1(c). In essence, the chapter 11 plan proposed by BD/S appoints BD/S—a bad faith actor—to act as estate fiduciaries to manage estate assets.

40.     The Plan Proponents also seek to prevent Yucaipa from voting its claims during the solicitation process. *See* Motion ¶ 20(c) ("[T]he Debtors will not count for voting purposes any Ballot cast for a claim … on account of … any Disputed First Lien Obligations [referring only to Yucaipa's claims.]"). The Motion indicates that the rationale for denying Yucaipa the right to vote is the dispute surrounding Yucaipa's claims. But BD/S's entitlements to distribution are also disputed, yet BD/S's right to vote is preserved. Given the other numerous flaws in the Proposed Plan (each of which prejudices Yucaipa at the expense of other constituencies), disenfranchising Yucaipa represents the principal component of the Plan Proponents' confirmation strategy.

41.     Attempting to prevent Yucaipa from voting prior to solicitation constitutes an end-run around the prerequisites in Section 1126(e) for the designation of Yucaipa's vote. The Plan Proponents could not meet the burdens of Section 1126(e). Pursuant to section 1126(e) of the Bankruptcy Code, a court may "designate" the vote of any creditor whose vote is not cast in "good faith." 11 U.S.C. § 1126(e). While "good faith" and "bad faith" are not defined in the Bankruptcy Code, hallmarks of bad faith in the context of voting for a plan usually involve (a) the use of obstructive tactics to extort personal advantage in the form of improper gain or (b) the pursuit of an ulterior motive. *See*, *e.g.*, *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995) (A creditor acts in bad faith for the purposes of 1126(e) when it "attempts to extract or extort a personal advantage not available to other creditors in its class."); *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006) (noting that "badges of the requisite bad faith include creditor votes designed to (1) assume control of the debtor; (2) put the debtor out of business or otherwise gain a competitive advantage; (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party which

depends on the debtor's failure to reorganize.") (internal quotation marks omitted); *see also In re Lehigh Valley Prof'l Sports Clubs, Inc.*, 2001 WL 1188246, at *6 (Bankr. E.D. Pa. Sept. 7, 2001) ("The fact that [the creditor] voted against a plan because its centerpiece was a suit against it without more is not a basis to find bad faith. A creditor is expected to act in its own self interest.").

42.     Applying these precedents to these cases, the Plan Proponents cannot designate Yucaipa's vote to reject the Proposed Plan. The Proposed Plan singles out Yucaipa for discriminatory and less favorable treatment than provided to similarly situated creditors, and Yucaipa's vote to reject the Proposed Plan, while admittedly self-interested, would not rise to bad faith. Yucaipa's vote to reject the Proposed Plan could also not be construed as an attempt to interfere with the Debtors' business, given that the Debtors no longer operate and have liquidated their assets. Nor does Yucaipa hold any ulterior motive for a vote to reject the Proposed Plan other than the protection of Yucaipa's rights as a creditor. The Plan Proponents' attempt to short-circuit vote designation proceedings under 1126(e)—and the substantial evidentiary burdens on the Plan Proponents required thereby—further demonstrates the lack of good faith surrounding the Proposed Plan.

43.     Finally, the Proposed Plan is styled as a "plan of reorganization," rather than a liquidating chapter 11 plan. As this Court is aware, the Debtors have liquidated all of their operating assets in the JCT Sale, and plan to distribute their remaining assets (i.e., the estate litigations) to the litigation trust. As a result, the Debtors have no business around which to reorganize. Instead, the Proposed Plan is being styled as a plan of reorganization *solely* because BD/S, as future owners of the "reorganized" Debtors, are seeking to obtain the benefit of a discharge and inappropriately broad releases (discussed below). Courts have rejected attempts,

such as here, that seek to effect the "reorganization" of a non-operating debtor for the purpose of obtaining a discharge and release. *See*, *e.g.*, *In re Western Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003) (holding a corporate debtor's post-emergence enterprise (i.e., to assign or pursue insurance policy rights and then wind up its affairs) was not sufficient to constitute a reorganization that would entitle the debtor to a discharge).

44. Bankruptcy courts in this Circuit have found that comparable plans were not proposed in good faith and, therefore, were not confirmable. The facts in *In re Surfango, Inc.*, an unpublished opinion, are remarkably similar to those here. *See* 2009 WL 5184221 (Bankr. D. N.J. Dec. 18, 2009). In *Surfango*, the court stated that one of the relevant inquiries into whether a plan has been proposed in good faith is "whether the plan is proposed to obtain a tactical litigation advantage."[6] *Id.* at *8 (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119-20 (3d Cir. 2004)). A year before the bankruptcy petition was filed, the plan proponents filed suit in Michigan state court against one of the shareholders, Mike Rui. *Id.* at *5. The court stated that the plan proponents "admittedly filed this plan to get rid of the Rui brothers as shareholders, something they had not accomplished in the Michigan state court litigation in more than a year." *Id.* at *8. The court held the plan was not proposed in good faith because the "plan serves only as a litigation tactic for one faction of the feuding shareholders to cast off the others" and its "primary purpose is to award victory to one side of the shareholder dispute, side-stepping the state court." *Id.*at *9.

---

[6] The Third Circuit has held in other situations that using the bankruptcy process to attempt to obtain a tactical litigation advantage is improper and in bad faith. *In re SGL Carbon Corp.*, 200 F.3d 154, 165-69 (3d Cir. 1999) (dismissing a chapter 11 petition for cause under 11 U.S.C. § 1112(b) as filed in bad faith, explaining that filing a petition to obtain a tactical litigation advantage is not a legitimate reorganizational purpose); *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 125, 128 (3d Cir. 2004) (dismissing a chapter 11 petition because it was not filed for a valid bankruptcy purpose but to gain a litigation advantage).

45.     Here, like in *Surfango*, the Plan Proponents have filed the Proposed Plan as a litigation tactic to circumvent the determination of Yucaipa's and BD/S's rights to receive distributions that are the subject of active litigation in other forums. The Proposed Plan is an attempt to award victory to litigants in the Pending Litigations. Based on *Surfango*, this fact is sufficient for the Court to find that the Proposed Plan has not been proposed in good faith.

46.     The facts in *In re ACandS, Inc.* also support a finding that the Plan Proponents filed the Proposed Plan in bad faith, rendering the Proposed Plan unconfirmable. *See* 311 B.R. 36 (Bankr. D. Del. 2004). In *ACandS*, the court held that the debtor's plan could not satisfy the good-faith requirement under section 1129(a)(3) because it found that "the plan was largely drafted by and for the benefit of" a creditor (namely, a prepetition asbestos plaintiffs' committee). *Id. at* 43. The court noted that this committee had dominated the debtors, especially in crafting the plan. *Id.* Coupled with the fact that the plan favored the committee's plaintiff constituency over other similarly situated creditors, the court relied on these facts to conclude that the plan was not proposed in good faith. *Id.* ("It is [ ] impossible to conclude that this plan is imbued with fundamental fairness" based on the discriminatory classification of the claims.).

47.     The Proposed Plan also falls squarely within the holding of *ACandS*. Here, BD/S, as Plan Proponents, are a driving force behind the Proposed Plan, which provides for more favorable treatment of BD/S than of Yucaipa, despite the fact that the parties assert similar claims that involve similar disputes, including equitable subordination challenges for alleged bad acts. The favoritism toward BD/S reflected in the Proposed Plan reflects their level of involvement in the process of crafting the Proposed Plan. And, like in *ACandS*, BD/S's control over the Proposed Plan, which yielded lopsided treatment of BD/S at the expense of Yucaipa, demonstrates the bad faith inherent in the Proposed Plan.

48.     Other courts have also found that conflicts of interest will cause a plan to fail the good faith requirement under section 1129(a)(3) of the Bankruptcy Code. For instance, in *In re Coram Healthcare Corp.*, the court found that the debtor's CEO and president had "a continuous conflict of interest" because he was receiving $1 million a year from one of the debtor's largest creditors while serving in his capacity as an officer of the debtor, and this conflict of interest "precludes the Debtors from proposing a plan in good faith under 1129(a)(3)." 271 B.R. 228, 235, 240 (Bankr. D. Del. 2001). Likewise, the court in *In re Fiesta Homes of Georgia, Inc.* found that the close relationships among the Debtors' officers and insiders precluded the court from finding that the plan could achieve a fair result. *See* 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) (finding that because the main assets that would provide a recovery to unsecured creditors were the potential recoveries from preference actions against insiders who were relatives of the officers, the officers may not aggressively pursue those actions).

49.     Here, BD/S has a conflict of interest as an architect of the Proposed Plan in that it is in major litigation with one of the largest creditors of the Debtors' estates. That posture, coupled with disparate treatment of BD/S, on the one hand, and Yucaipa, on the other hand, illustrates the risks inherent with allowing a creditor with a debilitating conflict to propose a chapter 11 plan. These risks are evidenced by the fact that the Proposed Plan attempts to side-step the Pending Litigations, blatantly discriminates against Yucaipa, and impermissibly favors BD/S. Accordingly, the Proposed Plan is unconfirmable because it cannot satisfy section 1129(a)(3) of the Bankruptcy Code.

### 2.     *Unfair Discrimination*

50.     Under section 1129(a)(1) of the Bankruptcy Code, the court shall only confirm a plan if it "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). This requires, among other things, that the Proposed Plan comply with section

19

1123(a)(4) of the Bankruptcy Code, which states that a plan shall "provide the same treatment

for each claim or interest of a particular class, unless the holder of a particular claim or interest

agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

    51.  The Proposed Plan violates section 1123(a)(4) by providing different and

worse treatment to Yucaipa than to other holders of the First Lien Debt in Class 2. As discussed,

the Proposed Plan provides for immediate distribution to BD/S of the JCT Sale proceeds, *see*

Proposed Plan §§ 3.3(a), 7.1, even though BD/S's entitlement to such distribution is very much

in doubt, but provides that Yucaipa—a member of Class 2—does not receive such prompt

distributions. In addition, the Disclosure Statement provides that all distributions under the

Proposed Plan are not subject to disgorgement, which means that BD/S could potentially receive

a windfall by being allowed to keep distributions it is not entitled to (and that would otherwise

go to Yucaipa). Disclosure Statement Art. IV(H)(5). Additionally, all members of Class 2 except

Yucaipa can elect to receive common stock in the Reorganized Debtors and only BD/S – and not

Yucaipa – can earn a backstop fee associated with the Litigation Trust. *See, e.g.*, Proposed Plan

§§ 3.3(a), 5.1(c).

    52.  The Proposed Plan discriminates against Yucaipa in other ways, too. For

instance, the Proposed Plan makes no provisions for Yucaipa's potential unsecured claims

arising under section 502(h) of the Bankruptcy Code, which would arise depending on the

outcome of certain of the Pending Litigations. It is unfair to deny Yucaipa its ratable share of the

$3 million GUC Cash Distribution with respect to this potential claim, while all other unsecured

creditors in Class 5 will receive a share of the $3 million GUC Cash Distribution.

    53.  Similarly, under the Proposed Plan, there is jeopardy to Yucaipa that other

similarly-situated creditors do not face resulting from (a) the immediate distribution of value to

creditors under the Proposed Plan except Yucaipa and (b) the indefeasible nature of these distributions once made. For instance, if Yucaipa is successful in the Pending Litigations, it would be entitled to a greater distribution under the Proposed Plan as a holder of First Lien Debt than the proceeds of the JCT Sale that are currently being held in escrow. In other words, Yucaipa would be entitled to all of the proceeds of the JCT Sale (up to the allowed amount of the First and Second Lien Debt), because BD/S's claims would be subordinated. But as currently drafted, Yucaipa could never realize this additional value. By contrast, BD/S never face this jeopardy, as a successful litigation result for BD/S and the Committee would result in additional distributions from the escrowed JCT Sale proceeds that would have gone to Yucaipa.

54.     Yucaipa will not consent to less favorable treatment under the Proposed Plan and, therefore, this disparate treatment violates section 1123(a)(4) of the Bankruptcy Code.

### 3.     The Proposed Plan is Not in the Best Interests of Creditors

55.     The Proposed Plan must meet the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code. To satisfy the test, a debtor must show that each creditor in a class who has not accepted the plan "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7). "The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan. A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes." *In re Stone & Webster, Inc.,* 286 B.R. 532, 544-45 (Bankr. D. Del. 2002).

56.     The Disclosure Statement does not include a liquidation analysis. Rather, the Disclosure Statement includes a spare and conclusory description of what a hypothetical chapter 7 case might look like. Disclosure Statement Art. VI(C). Significantly, the Disclosure Statement contains no analysis, calculations, or comparisons—not even a description of the underlying assumptions—that would govern the hypothetical chapter 7 liquidation. This alone is sufficient for the Court to deny approval of the Disclosure Statement. *See, e.g., In re Multiut Corp.*, 449 B.R. 323, 344 (Bankr. N.D. Ill. 2011) ("Failure to attach a liquidation analysis violates § 1129(a)(7)."); *In re Zaruba*, 384 B.R. 254, 262 (Bankr. D. Alaska 2008) (denying approval of disclosure statement because the "debtors have failed to present an appropriate liquidation analysis."); *In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions."). Courts have held that conclusory statements and assertions unsupported by "actual evidence or analysis" that actually demonstrate what creditors would receive in a hypothetical chapter 7 liquidation fail to meet the burden of satisfying the best interests of creditors test. *See Multiut Corp.*, 449 B.R. at 346 (finding a liquidation analysis fails to satisfy the best interests of creditors test because "the Debtor fails to provide an accurate and reliable valuation of its assets … [o]ther than the conclusory testimony from [the Debtor's owner] and assertions in the Disclosure Statement, there is no actual evidence or analysis to indicate what creditors would receive in a Chapter 7 case versus a Chapter 11 case").

57.     A true liquidation analysis would demonstrate that Yucaipa would receive more in a chapter 7 liquidation than under the Proposed Plan. The Plan Proponents fail to meet this burden: for example, in a chapter 7 liquidation, Yucaipa's adequate protection claims arising

under the DIP Orders could not be waived by BD/S and, therefore, would be paid first from

unencumbered assets. In addition, Yucaipa, if successful in the Pending Litigations, would

recover the proceeds of the JCT Sale that are slated to be distributed to BD/S under the Proposed

Plan. Additionally, in a hypothetical chapter 7 case, repayment of litigation loans and the

backstop fee would not be necessary and, therefore, repayments would not come before creditor

distributions. Also, in a hypothetical chapter 7 liquidation, Yucaipa would benefit by receiving

its ratable share of JCT Sale proceeds that would otherwise be allocated under the Proposed Plan

to general unsecured creditors.

58.     Based on this, the Proposed Plan does not meet the best interests of

creditors test because Yucaipa would receive a larger distribution in a chapter 7 liquidation than

under the Proposed Plan. Therefore, the Proposed Plan is unconfirmable.

### 4.     *The Proposed Plan Does Not Satisfy All Administrative And Priority Claims*

59.     The Bankruptcy Code requires that administrative and priority claims be

paid in full in cash on the effective date of the plan (unless those claimants consent to different

treatment). 11 U.S.C. § 1129(a)(9). Here, the Proposed Plan fails to provide for the payment of

administrative and priority claims in full on the effective date in violation of section 1129(a)(9).

60.     The Proposed Plan provides that the Debtors will only distribute $2

million in the aggregate on account of allowed administrative claims and priority claims.

Proposed Plan § 8.2(g). The Disclosure Statement states that there are $1,240,534.99 in

administrative expense claims and $6,919,385.19 in priority claims asserted against the Debtors

(Disclosure Statement Art. III(E)), which combined exceed the $2 million cap. The disclosed

administrative expense claims do not include Yucaipa's superpriority adequate protection claims

arising under the DIP Orders, which Yucaipa believes to be no less than $16.5 million, and

which Yucaipa does not (and will not) agree to waive.[7] As a result, the actual amount of

administrative expense claims will be well in excess of the contemplated $2 million cap.

Accordingly, the allotted $2 million reserved to pay administrative and priority claims under the

Proposed Plan falls well short of what is necessary to satisfy these claims in full in cash on the

effective date. Therefore, the Proposed Plan is unconfirmable.

### 5.    *The Proposed Plan Violates the Absolute Priority Rule*

61.    The Third Circuit has explained that while "[t]he absolute priority rule is a

judicial invention that predated the Bankruptcy Code," it has been "codified as part of the 'fair

and equitable' requirement of 11 U.S.C. § 1129(b)." *In re Armstrong World Indus., Inc.*, 432

F.3d 507, 512 (3d Cir. 2005). With respect to secured claims, a plan is fair and equitable if the

plan provides:

> (i) (I)  that the holders of such claims retain the liens securing such
> claims, whether the property subject to such liens is retained by the
> debtor or transferred to another entity, to the extent of the allowed
> amount of such claims; and (II)  that each holder of a claim of such
> class receive on account of such claim deferred cash payments
> totaling at least the allowed amount of such claim, of a value, as of
> the effective date of the plan, of at least the value of such holder's
> interest in the estate's interest in such property;
>
> (ii)  for the sale, subject to section 363(k) of this title [11 U.S.C.
> § 363(k)], of any property that is subject to the liens securing such
> claims, free and clear of such liens, with such liens to attach to the
> proceeds of such sale, and the treatment of such liens on proceeds
> under clause (i) or (iii) of this subparagraph; or
>
> (iii)    for the realization by such holders of the indubitable
> equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). Courts in this District have held that chapter 11 plans must satisfy the

requirements of section 1129(b)(2)(A). *See, e.g., In re VIP Motor Lodge, Inc.,* 133 B.R. 41, 45

---

[7] As described below, BD/S also has no ability to waive these superpriority adequate protection claims on Yucaipa's
behalf.

(Bankr. D. Del. 1991) ("[T]he court must deny confirmation because the cramdown does not treat the Bank's secured claim equitably or fairly under § 1129(b)(2)(A)."); *In re Century Glove, Inc.*, 74 B.R. 958, 961 (Bankr. D. Del. 1987). The Supreme Court has held that "[u]nder current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections … if it fails to comply with the absolute priority rule." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).

62.     Here, the Proposed Plan violates the absolute priority rule by providing for distributions on account of unsecured claims from the proceeds of the First Lien Lenders' and Second Lien Lenders' collateral even though the First Lien Lender claims and the Second Lien Lender claims are not satisfied in full.[8] The proceeds of the JCT Sale, which are indisputably collateral of the First and Second Lien Lenders, are insufficient to pay the holders of the First and Second Lien Claims in full. Nevertheless, the Proposed Plan provides a $3 million distribution to holders of allowed general unsecured claims from the Lenders' collateral. Proposed Plan § 3.3(d). Furthermore, three unsecured claimants—Central States, Northwest, and AIG—will receive distributions from that collateral on account of their unsecured claims despite the fact that the holders of First Lien and Second Lien Claims are not paid in full. *Id.* § 5.15. Additionally, unsecured creditors will be receiving value ahead of repayment of Yucaipa's superpriority adequate protection claims, which are proposed to be improperly and illegally waived by the Proposed Plan. And finally, the distribution waterfall from the litigation trust ignores (a) the potential success of Yucaipa's counterclaims against BD/S, and the implications that might have on distributions, and (b) that the deficiency claims of the First Lien Lenders and

---

[8] Given the highly discriminatory and prejudicial treatment of Yucaipa, it will not vote to accept the Proposed Plan. Yucaipa's no vote would mean that both the holders of First Lien Lender claims and Second Lien Lender claims rejected the Proposed Plan. This would trigger 1129(b) of the Bankruptcy Code, thereby requiring the Plan Proponents to satisfy 1129(b) to confirm the Proposed Plan.

the Second Lien Lenders should share ratably from the Committee Action. *Id.* § 5.14. For all of

these reasons, the Proposed Plan violates the absolute priority rule and, therefore, is

unconfirmable.

> **6.      *The Proposed Plan Includes Improper Settlements Entered into by the First Lien Agents That Exceed the Powers Granted to the First Lien Agents Under the First Lien Credit Agreement***

63.      The Proposed Plan is also predicated on a number of settlements entered

into by the First Lien Agents that violate the terms of the First Lien Credit Agreement.  For

example, one such settlement involves the provision of the $3 million GUC Cash Distribution to

unsecured creditors and a waiver of the First Lien Lenders' adequate protection claims under the

DIP Orders in exchange for not funding the Wind Down Budget. *See* Proposed Plan § 5.15;

Disclosure Statement Art. III(K). The other settlements involve granting several unsecured

creditors – AIG, Northwest, and Central States – priority claims (that will get paid in full and in

cash under the Proposed Plan) to settle disputes involving these claims. Disclosure Statement

Art. III(I)-(J). According to the Disclosure Statement, these settlements were reached by the First

Lien Agents on behalf of the First Lien Lenders. Disclosure Statement Art. III(I), (K). In other

words, BD/S, acting in their (disputed) capacity as First Lien Agents, are attempting to bind

Yucaipa to these settlements. The Proposed Plan requires that the Second Lien Lenders waive

their unsecured deficiency claims with respect to distributions made to unsecured creditors.

Proposed Plan 3.3(b).

64.      The express terms of the FLCA, however, forbid BD/S from doing so,

either in their capacity as First Lien Agents or in their capacities as "Requisite Lenders." Credit

agreements are enforceable by creditors against one another in a bankruptcy case. This principle

is aptly illustrated in a line of recent cases involving the right of first lien agents to credit bid for

assets on behalf of the first lien lenders over the objection of minority lenders. *In re GWLS*

*Holdings, Inc.*, 2009 Bankr. LEXIS 378, *11-14, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) (holding that the first lien agents could credit bid on behalf of the first lien lenders according to the plain meaning of the credit agreement and the collateral agreement which governed the powers and authority delegated to the first lien agents); *In re Metaldyne Corp.*, 409 B.R. 671, 677-79 (Bankr. S.D.N.Y. 2009) (holding that the first lien agents could credit bid on behalf of the first lien lenders pursuant to the authority delegated to them in the loan documents); *In re Foamex Int'l Inc.*, No. 09-10560, ¶ P (Bankr. D. Del. May 27, 2009) (order approving sale of assets) ("The Credit Bid was accepted by the Debtors at the Auction, complied with the provisions of section 363(k) of the Bankruptcy Code, and was a valid exercise of the Agent's rights, responsibilities and obligations under the First Lien Term Credit Agreement.").

65.     Here, under the FLCA, the rights and powers of the First Lien Agents are limited and narrowly tailored to those that are "specifically delegated or granted to such [First Lien Agents] by the terms [of the FLCA], together with such powers, rights and remedies as are reasonably incidental thereto." *See* FLCA § 9.2. The FLCA does not give the First Lien Agents authority to bind the other First Lien Lenders to any settlement. For instance, nothing in the FLCA gives BD/S, as First Lien Agents, the ability to settle claims of Yucaipa arising under the DIP Orders. (Nothing in the DIP Orders give BD/S this right, either.) And while BD/S may be willing to waive its superpriority adequate protection claims, they have no authority to waive them on behalf of Yucaipa. Similarly, under the FLCA, the Requisite Lenders are not delegated the power to settle claims on behalf of the First Lien Lenders either. As discussed below, the "sacred rights" provisions prevent certain amendments or waivers without the consent of the affected lender. These "sacred rights" prohibit the Requisite Lenders, or any other party, from binding Yucaipa to these settlements without its consent.

66.     Similarly, BD/S, as First Lien Agents, have no right to bind Yucaipa to waive its rights to receive a distribution on account of any unsecured portion of its Second Lien Claims, as such right is not expressly delegated to them under the FLCA or under the ICA. Section 3.1 of the ICA expressly reserves all rights and powers of the Second Lien Lenders to protect their rights relative to any unsecured claim that they might have.

67.     The proposed settlements also run afoul of several "sacred rights" under the FLCA, to which Yucaipa will not consent. For instance, the FLCA prohibits waiver, reduction, or postponement of any scheduled repayment of the loans absent the consent of the affected First Lien Lender. FLCA § 10.5(b)(ii). The funds necessary to pay the settlements are the First Lien and Second Lien Lenders' cash collateral and should be distributed to them before any distributions to junior creditors absent consent. Yucaipa does not consent to distribution of its collateral to junior creditors in this manner, and BD/S have no right under the FLCA to bind Yucaipa without its consent.

68.     The FLCA also prohibits the reduction of the principal amount of the loan to be repaid absent the consent of each affected First Lien Lender. FLCA § 10.5(b)(vii). The settlements under the Proposed Plan divert cash collateral to junior creditors that will result in a reduction of the amount of collateral proceeds Yucaipa is entitled to receive. This reduction in distributable value available to Yucaipa has the practical effect of reducing Yucaipa's claim as a holder of First Lien Debt, which is impermissible under the FLCA absent Yucaipa's consent (which it does not grant).

69.     For these reasons, the Proposed Plan cannot be confirmed as it includes improper settlements of Yucaipa's claims by BD/S that contravene the FLCA and the ICA.

### 7.      *The Proposed Plan Contains Other Violations of the FLCA and ICA*

70.      The Proposed Plan contains other impermissible violations of the FLCA and the ICA, rendering it unconfirmable. For instance, the FLCA prevents BD/S, acting either as First Lien Agents or Requisite Lenders, from deferring the date of repayment of a First Lien Lender absent the consent of the affected First Lien Lender. FLCA § 10.5(b)(ii). Under the Proposed Plan, however, BD/S is entitled to receive proceeds from the JCT Sale, which would not be disgorged regardless of the outcome of the Pending Litigations. Proposed Plan §§ 3.3(a), 7.1. Yucaipa, by contrast, must wait until the resolution of the Pending Litigation to receive a distribution on account of its claims. *Id.* This treatment under the Proposed Plan effects a delay of Yucaipa's repayment rights under the FLCA relative to all of the other First Lien Lenders, which is impermissible without Yucaipa's consent—and Yucaipa does not consent to this treatment.

71.      The FLCA also prohibits (i) the reduction of the principal amount of payment to a First Lien Lender and (ii) the release of substantially all of the collateral securing repayment of a First Lien Lender, in each case absent its consent. *See* FLCA § 10.5(b)(vii), (x). The Proposed Plan seeks, in effect, to do both of these things to Yucaipa without its consent. The principal amount of payment owed to Yucaipa runs the unique risk under the Proposed Plan of being substantially reduced, because Yucaipa could lose an opportunity to recover more if it is successful in the Pending Litigations. This is because distributions under the Proposed Plan are indefeasible when made to BD/S. Under the Proposed Plan, therefore, Yucaipa could not recover from BD/S any distributions under the Proposed Plan if Yucaipa obtains an order subordinating BD/S' recovery to that of Yucaipa. Thus, if Yucaipa is successful in the Pending Litigations, the Proposed Plan reduces the amount of collateral available to pay Yucaipa's claim, thereby reducing its allowed secured claim. In other words, the Proposed Plan would reduce the principal

29

amount of payment owed to it under the FLCA. Similarly, if collateral proceeds are distributed to BD/S and rulings in the subsequent rulings vitiate their entitlements to distribution, the Proposed Plan will have, in effect, released a substantial portion of the First Lien Lenders' collateral by making distributions to BD/S to which they were not entitled. The Proposed Plan cannot do either of these things without disrupting Yucaipa's protections under the FLCA.

72.     Furthermore, Section 4.1 of the ICA requires the Second Lien Lenders to turn over proceeds only of collateral received in connection with the enforcement of remedies under the ICA by the First Lien Agents or any First Lien Lender. The proceeds the Second Lien Lenders receive under the Plan arise from the litigation claims in the trust. But these litigation claims do not constitute collateral securing the repayment of the FLCA or the SLCA and therefore are not subject to any turnover provisions in the ICA. Furthermore, the Proposed Plan is not an exercise of remedies. Additionally, as mentioned above, Section 3.1 of the ICA reserves all rights of the Second Lien Lenders in their capacity as an unsecured creditor. Accordingly, the Proposed Plan inappropriately forces the Second Lien Lenders to waive their unsecured deficiency claims, as well as rights to distributions that are being received by other unsecured creditors in Class 5, who are receiving distributions on account of their unsecured claims. Accordingly, the Proposed Plan impermissibly violates the ICA.

73.     Finally, because the Second Lien Lenders are not required to turn over proceeds received under the Proposed Plan by the ICA, the Second Lien Lenders' claims should be classified in Class 5 with other unsecured claims and share all distributions ratably with other unsecured creditors in Class 5. The failure to classify the Second Lien Debt with other general unsecured claims results in an improper classification amounting to gerrymandering the Proposed Plan to ensure that Class 5 delivers a vote in favor of the Plan.

74.    In the Third Circuit, similar claims may be placed in separate classes, but the classification must be reasonable. *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987). Specifically, the reasonableness requirement is designed to prevent vote gerrymandering. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158  (3d Cir. 1993) ("Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.") (citations omitted); *see also In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

75.    As described above, because the ICA does not require turnover of distributions received by the Second Lien Lenders under the Proposed Plan, there is no basis for classifying them separately from other unsecured creditors. The Proposed Plan acknowledges that holders of Second Lien Debt are unsecured creditors by providing them with identical distribution rights from the litigation trust that other unsecured creditors in Class 5 receive. The only logical explanation the separate classification is to (a) ensure that these creditors receive separate and discriminatory treatment and (b) influence the vote of Class 5, which could result in general unsecured creditors voting against the Proposed Plan. This is an inappropriate attempt to gerrymander votes, and an improper reason for separately classifying the claims.  Accordingly, the Second Lien Lender claims of Class 3 should instead be classified in Class 5 and receive Class 5 treatment.

**8.    *The Releases and Exculpations in the Proposed Plan Are Impermissibly Broad in Favor of Non-Debtors, Most Notably BD/S***

a.    <u>Releases</u>

76.     Except for asbestos claims procedures under section 524(g), the

Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims

against non-debtors. That said, many courts in this Circuit have recognized that releases of non-

debtors are appropriate under the right circumstances. *See, e.g., In re Exide Techs.,* 303 B.R. 48,

72, 74 (Bankr. D. Del. 2003); *In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).

Nevertheless, "[w]hile the Third Circuit has not barred third party releases, it has recognized that

they are the exception, not the rule." *In re Wash. Mut., Inc.,* 442 B.R. 314, 351 (Bankr. D. Del.

2011) (citing *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 212 (3d

Cir. 2000)). Those circumstances do not exist here.

77.     The courts in this District have applied the following five non-exclusive

factors to determine the propriety of non-debtor, third-party releases:

> (1) an identity of interest between the debtor and non-debtor such
> that a suit against the non-debtor will deplete the estate's
> resources;
>
> (2) a substantial contribution to the plan by the non-debtor;
>
> (3) the necessity of the release to the reorganization;
>
> (4) the overwhelming acceptance of the plan and release by
> creditors and interest holders; and
>
> (5) the payment of all or substantially all of the claims of the
> creditors and interest holders under the plan.

*In re Wash. Mut.*, 442 B.R. at 346 (citing *Zenith,* 241 B.R. at 110 (adopting the five-factor test

articulated in *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994))).

78.     Here, the Proposed Plan contains impermissibly broad releases in favor of

BD/S without justification or explanation of the extraordinary circumstances that warrant such

releases. Under the Proposed Plan, the Debtors, the Reorganized Debtors, the Plan

Administrator, the Committee, the First Lien Agents, any person seeking to exercise the rights of

the Debtors' Estates (among others), release BD/S (among others) from all claims, rights, causes

of action and liabilities in connection with or related to the Debtors, the Chapter 11 Cases, or the

Proposed Plan. *See* Proposed Plan §§ 10.6(a), (b). The Proposed Plan provides for an injunction

against prosecuting claims against BD/S for claims released. *See* Proposed Plan § 10.9(a), (b).

79.    Applying the five nonexclusive factors that assess the propriety of third-

party releases reveals that there is no basis whatsoever for extending the broad releases and

injunctions to BD/S. First, there is no identity of interest between the Debtors and BD/S; BD/S

are nothing more than secured lenders of the Debtors. Second, there is no indication that BD/S

have made any contribution to the Proposed Plan, let alone a substantial contribution. To the

contrary, BD/S is proposing to backstop a loan to fund this litigation trust and they are being paid

handsomely for it. Proposed Plan § 5.1(c). Third, these releases are not necessary for the Debtors

to reorganize; the Debtors have sold all of their assets and retain no business to reorganize.

Fourth, the Proposed Plan will not be accepted by an overwhelming majority of the Debtors'

creditors, given that Yucaipa holds the majority of First Lien Debt and Second Lien Debt and

intends to vote against the Proposed Plan. Finally, the Proposed Plan does not propose to pay all

or substantially all of the claims of the Debtors' creditors and interest holders; there are

insufficient assets to satisfy all secured claims and there's nothing in the Disclosure Statement to

suggest that creditors are being paid in full. Therefore, the Plan Proponents have not

demonstrated a single reason for this Court to allow third-party releases in favor of BD/S.

80.    Further, the RICO Action describes in detail how BD/S fraudulently

commenced the Chapter 11 Cases, including the impermissible sale and acquisition of claims

against the Debtors for the purpose of filing the Involuntary Petition. Given the serious nature of

the allegations contained in the RICO Action, and the potential impact the result thereof may

33

have for other constituencies to obtain recoveries against BD/S for their illegal conduct, a broad release of BD/S by any stakeholder in the Debtors is inappropriate. In addition, an estate release prior to resolution of the RICO Action—by either the Debtors or the Committee—seems, at best, premature, given the nature of the allegations of the criminal activity engaged in by BD/S.

b.    Exculpations

81.    Section 1125(e) of the Bankruptcy Code governs the scope of exculpation clauses and states that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title … is not liable, on account of such solicitation . . . for violation of any applicable law, rule or regulation governing solicitation of acceptance of rejection of a plan." 11 U.S.C. § 1125(e). "The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers." *Wash. Mut., Inc.*, 442 B.R. at 350-51. The court in *Washington Mutual* held that an exculpation provision that extended to parties that are non-estate fiduciaries and their agents is too broad. *Id.* at 350.

82.    Here, the exculpation provisions in the Proposed Plan also improperly extend to BD/S, which are not estate fiduciaries. As explicitly stated in *Washington Mutual*, exculpation must be limited to fiduciaries alone, and BD/S are not fiduciaries. In fact, as noted above, BD/S are defendants in the RICO Action in which their conduct and motives in relation to these Chapter 11 Cases are directly at issue. It would be particularly inappropriate to exculpate parties that are not only not bound by a fiduciary duty to the estates, but whose conduct is actively being litigated as not in compliance with the applicable provisions of title 11.

**B.    The Disclosure Statement Does Not Contain Adequate Information**

83.    The Disclosure Statement should not be approved because it fails to provide "adequate information" as required by section 1125(b) of the Bankruptcy Code. Section

1125(b) of the Bankruptcy Code prohibits the solicitation of votes to accept or reject a plan from creditors or equity holders "unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved . . . by the court as containing adequate information."

11 U.S.C. § 1125(b). The Bankruptcy Code defines "adequate information" as

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1). "Adequate information" under section 1125 of the Bankruptcy Code is "determined by the facts and circumstances of each case." *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) ("What constitutes adequate information is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties.").

84.     Here, the Disclosure Statement falls well short of containing adequate information about the Proposed Plan by failing to provide adequate information about rather basic elements of the Proposed Plan. Indeed, the Disclosure Statement fails to provide very basic disclosure to assist creditors in determining whether to vote to accept or reject the Proposed Plan. These neglected disclosures include:

> a.   The total value of the Debtors' assets and total distributable value, so that creditors can understand concretely what they can expect to receive under the Proposed Plan.

b.  The estimated amount of claims in each class established by the Proposed Plan asserted against the Debtors.

c.  An inventory and value of assets remaining with the Reorganized Debtors, so that creditors can understand the value of the equity interests in the Reorganized Debtors that are being offered to the First Lien Lenders (other than Yucaipa).

d.  The business rationale for reorganizing the Debtors under the Proposed Plan, and the proposed line of business the Reorganized Debtors will engage in upon emergence from the Chapter 11 Cases.

e.  The estimated value of the estate claims in the Committee Action and BD/S's claims in the Current BD/S Action, each of which is being transferred to the litigation trust established under the Proposed Plan, so that creditors can determine the value of the distribution rights being distributed to them.

f.  An actual liquidation analysis for each individual Debtor, including concrete distributions that creditors might expect to receive in a hypothetical chapter 7 case and all assumptions underlying the analysis, so that creditors can determine whether the Proposed Plan satisfies the best interests of creditors test. Now, the Disclosure Statement only offers the conclusory assertion that "the Estates would have fewer funds to be distributed in a hypothetical Chapter 7 liquidation than it would if this Plan is confirmed and, therefore, holders of Claims in all Impaired Classes will recover less than in the hypothetical Chapter 7 cases" (Disclosure Statement Art. V(C));

g.  An analysis of the reasonableness of the proposed settlements with AIG, Northwest, and Central States, including an analysis of litigation risks (including, without limitation, estimated litigation costs and the probability of success) of prosecuting those disputes, rather than settling them, so that creditors can determine whether each of the settlements with AIG, Northwest, and Central States is reasonable;

h.  The material terms of the loan to be made to the litigation trust (e.g., interest rate, maturity, etc.) which would help creditors determine how successful the litigations have to be in order to receive a recovery on account of the trust interests;

i.  The identity of the members of the litigation trust oversight board and the litigation trustee, which is especially important for creditors because it is proposed that BD/S will appoint the majority of the board and the litigation trustee (Proposed Plan § 5.12(a)), who will be in charge of prosecuting the Committee Action, which is an estate cause of action, as well as the Current BD/S Action;

j.  Why the Plan Proponents believe that substantive consolidation for distribution purposes only is appropriate in the Chapter 11 Cases and how

36

such deemed consolidation complies with the Third Circuit's ruling in the *Owens Corning* bankruptcy;

k.  The consideration supporting the proposed releases, exculpations, and injunctions that the Proposed Plan contemplates providing to entities that are not estate fiduciaries, such as BD/S;

l.  The Plan Proponents' ability to satisfy the cramdown requirements of section 1129(b) if impaired classes of creditors vote to reject the Proposed Plan, rather than conclusory assertions that the Proposed Plan would satisfy 1129(b);

m.  The value of adequate protection claims arising under the DIP Orders in favor of the First Lien Lenders and Second Lien Lenders on account of diminution in value of their claims;

n.  An analysis of the reasonableness of the proposed settlement with the Committee, which results in, among other things, the waiving of adequate protection claims under the DIP Orders and the provision of $3 million of the Lenders' collateral for distribution to unsecured creditors and the Second Lien Lenders' waiver of unsecured deficiency claims, so that creditors can determine whether to vote in favor of this proposed settlement;

o.  The amount of the Wind Down Budget, the funding of which is a key part to the consideration received by the Committee in connection with the settlement contained in the Proposed Plan (Proposed Plan § 5.15; Disclosure Statement Art. III(K));

p.  The source of the right of the First Lien Agents to waive claims on behalf of all of the First Lien Lenders (Proposed Plan § 5.15; Disclosure Statement Art. III(K));

q.  The reason why the Plan Proponents decided to let BD/S vote for the Proposed Plan, but deny Yucaipa the right to vote on the Proposed Plan;

r.  A description of all of the Pending Litigations, including the allegations contained in the RICO Action, which implicate the propriety of the Involuntary Petition itself, because of BD/S illegal claims trading relating to its scheme to file the Involuntary Petitions;

s.  The value of the claims against BD/S that the Committee and the Debtors are proposing to release, including, without limitation, any claims the estates may have as a result of the illegal conduct alleged in the RICO Action;

t.  The proposed treatment of Yucaipa's potential 502(h) claim, including, without limitation, the size of the reserve established for Yucaipa's potential 502(h) claim and the amount of the GUC Cash Distribution to be reserved on account of this claim;

u.  The consideration received by the estates from BD/S in exchange for releases from the estates; and

v.  The reason why, given the pendency of the RICO Action and the counterclaims asserted in the Current BD/S Action, distributions made under the Proposed Plan are not subject to disgorgement, even though BD/S's rights to receive those distributions are very much in doubt.

85.     Absent these additional disclosures, the Disclosure Statement will not contain adequate information sufficient for a creditor to make an informed decision to vote to accept or reject the Proposed Plan. Therefore, the Disclosure Statement as currently drafted should not be approved.

## RESERVATION OF RIGHTS

86.     Yucaipa reserves its rights to supplement this objection (including if any of the Plan Proponents submit any new or revised documents or pleadings) and to object to the Proposed Plan on any grounds whatsoever, regardless of whether those grounds are addressed herein.

## CONCLUSION

WHEREFORE, Yucaipa respectfully requests entry of an order denying the Debtors'

Motion, denying the approval of the Disclosure Statement, and granting such other and further

relief as is just and appropriate.

Dated: Wilmington, Delaware
       June 9, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
rnnestor@ycst.com

- and -

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman
Sabina Jacobs
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
rklyman@gibsondunn.com

- and -

GIBSON, DUNN & CRUTCHER LLP
Matthew K. Kelsey
Mary Kate Hogan
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
mkelsey@gibsondunn.com

*Attorneys for Yucaipa American Alliance Fund I, L.P. and*
*Yucaipa American Alliance (Parallel) Fund I, L.P.*