## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
| **ASHINC CORPORATION, *et al.*** [1] | ) | **Case No. 12-11564 (CSS)** |
|  | ) |  |
|  | ) | **Jointly Administered** |
| Debtors. | ) |  |

## DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS, THE COMMITTEE AND THE FIRST LIEN AGENTS

Mark D. Collins (No. 2981)
Marisa A. Terranova (No. 5396)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone No.: (302) 651-7700
Facsimile No.: (302) 651-7701
E-Mail: collins@rlf.com
E-Mail: terranova@rlf.com

Jeffrey W. Kelley (GA Bar No. 412296)
Matthew R. Brooks (GA Bar No. 378018)
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308-2216
Telephone No.: (404) 885-3000
Facsimile No.: (404) 885-3900
E-Mail: jeffrey.kelley@troutmansanders.com
E-Mail: matthew.brooks@troutmansanders.com

*Attorneys for the Debtors and Debtors in Possession*

- and -

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) (58-0360550); AAINC Corporation (f/k/a Allied Automotive Group, Inc.) (58-2201081); AFBLLC LLC (f/k/a Allied Freight Broker LLC) (59-2876864); ASCCO (Canada) Company (f/k/a Allied Systems (Canada) Company) (90-0169283); ASLTD L.P. (f/k/a Allied Systems, Ltd. (L.P.) (58-1710028); AXALLC LLC (f/k/a Axis Areta, LLC) (45-5215545); AXCCO Canada Company (f/k/a Axis Canada Company) (875688228); AXGINC Corporation (f/k/a Axis Group, Inc.) (58-2204628); Commercial Carriers, Inc. (38-0436930); CTSINC Corporation (f/k/a CT Services, Inc.) (38-2918187); CTLLC LLC (f/k/a Cordin Transport LLC) (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

DOC ID - 22951903.12

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
SULLIVAN HAZELTINE ALLINSON LLC
901 North Market Street, Suite 1300
Wilmington, Delaware 19801
Telephone No.: (302) 428-8191
Facsimile No.: (302) 428-8195
E-Mail: whazeltine@sha-llc.com
E-Mail: bsullivan@sha-llc.com

Michael G. Burke
Brian Lohan
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone No.: (212) 839-5200
Facsimile No.: (212) 839-5599
E-Mail: mgburke@sidley.com
E-Mail: blohan@Sidley.com

*Attorneys for the Committee*

- and -

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
LANDIS RATH & COBB LLP
919 North Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone No.: (302) 467-4400
Facsimile No.: (302) 467-4450
E-Mail: landis@lrclaw.com
E-Mail: mumford@lrclaw.com

Adam C. Harris
Robert J. Ward
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
Telephone No.: (212) 756-200
Facsimile No.: (212) 593-5955
E-Mail: Adam.Harris@srz.com
E-Mail: Robert.Ward@srz.com

*Attorneys for the First Lien Agents*

Dated:  June 17, 2015

THE DISCLOSURE STATEMENT WITH RESPECT TO THIS PLAN OF REORGANIZATION HAS NOT
BEEN APPROVED BY THE BANKRUPTCY COURT.  THE PLAN PROPONENTS HAVE SEPARATELY
NOTICED A HEARING TO CONSIDER THE ADEQUACY OF THE DISCLOSURE STATEMENT UNDER
BANKRUPTCY CODE SECTION 1125.  THE PLAN PROPONENTS RESERVE THE RIGHT TO MODIFY OR
SUPPLEMENT THIS PLAN OF REORGANIZATION AND THE ACCOMPANYING DISCLOSURE
STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.

## DISCLAIMER

This Disclosure Statement describes a plan of reorganization (the "**Plan**") for ASHINC Corporation and its affiliated-debtors (collectively, the "**Debtors**").  The Debtors, the Committee,[2] and the First Lien Agents will ask the Bankruptcy Court to confirm the Plan.  Confirmation is subject to certain material conditions, and there is no assurance that those conditions will be satisfied.[3]

If the Bankruptcy Court confirms the Plan, the Plan Proponents intend to have the Plan become effective as promptly as possible thereafter and to make an initial distribution to certain holders of Claims against the Debtors from Cash on Hand held by the Debtors, the Winddown Reserve and the First Lien Reserves.  The Plan Proponents intend to make some distribution to all holders of Allowed Claims, although not all distributions will be made in Cash.  Rather, certain distributions will be in the nature of beneficial interests in the Allied Litigation Trust (subsequent Cash distributions may be made on account of such beneficial interests).[4]

The Plan Proponents request that each holder of an Impaired Claim that is entitled to vote on the Plan vote in favor of the Plan.  The Plan Proponents recommend that voting creditors vote in favor of the Plan because the Plan Proponents believe that the Plan provides for the greatest possible recovery for all holders of Allowed Claims.

To have your vote counted, you must return an executed ballot (each a "**Ballot**") to the Claims Agent, Rust Consulting/Omni Bankruptcy on or before [●], 2015 (the "**Voting Deadline**").  You may mail your Ballot to one of the addresses set forth on the Ballot.

If your claim is in a Class that is entitled to vote on the Plan, enclosed with this disclosure statement (the "**Disclosure Statement**") is a Ballot together with instructions for completing it.  If you did not receive a Ballot and you are entitled to vote on the Plan, you may obtain a copy free of charge on the following website: http://omnimgt.com/alliedsystems, or by sending a letter to counsel to the Debtors at the address listed above.  To be counted, your Ballot must be duly completed, executed, and actually received no later than the Voting Deadline.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3]  Yucaipa, a purported holder of First Lien Lender Claims and other Claims, has filed an objection to the Disclosure Statement and asserted objections to confirmation of the Plan, and may assert additional objections.  You may obtain a copy of that objection free of charge on the following website:  http://omnimgt.com/alliedsystems, under Court Docket No. 2991.

[4]  As set forth in further detail below, the holders of Allowed Second Lien Lender Claims are entitled to receive certain beneficial interests in the Allied Litigation Trust, but such holders are required to turn over any amounts received in connection with such beneficial interests to the First Lien Agents for distribution to the First Lien Lenders pursuant to the terms of the Intercreditor Agreement until the First Lien Lenders have been indefeasibly paid in full in Cash.

DOC ID - 22951903.12

This Disclosure Statement summarizes events that occurred prior to the Debtors' filing for bankruptcy, material events during the Chapter 11 Cases, and the Plan itself. You should read this Disclosure Statement and the Plan in their entirety. The Plan Proponents believe that the information set forth in these documents is fair and accurate; however, the Plan and this Disclosure Statement (and the summaries that they provide) are qualified in their entirety by the matters to which they refer. Factual information contained in the Disclosure Statement is based on the Debtors' books and records, as well as public information related to the proceedings described in the Disclosure Statement. The Plan Proponents do not represent or warrant that the information contained in this Disclosure Statement, including the financial information, is without any inaccuracy or omission.

As you determine whether to vote to accept the Plan, you must rely on your own examination of the Debtors and the terms of the Plan, including the merits and risks involved. The contents of this Disclosure Statement do not constitute any legal, business, financial, or tax advice. You should consider consulting with your own legal, business, financial, and tax advisors with respect to the Plan and the Disclosure Statement.

Except as set forth in this Disclosure Statement, no person is authorized by the Debtors to give any information or to make any representation related to the Plan other than as contained in this Disclosure Statement. You should not rely on any such representation you may receive as having been authorized by the Debtors. The Disclosure Statement does not constitute an offer to buy or the solicitation of an offer to buy any securities, or an offer to sell or a solicitation of an offer to sell any securities.

The statements contained in this Disclosure Statement are made as of the date hereof (unless otherwise indicated) and should not under any circumstance create any implication that the information contained herein is correct at any time subsequent to the date hereof. Estimates of Claims set forth in this Disclosure Statement may vary from the amounts of Claims ultimately Allowed by the Bankruptcy Court.

The information contained in this Disclosure Statement is included for purposes of soliciting votes on the Plan only and should not be deemed as an admission or stipulation of any kind, absent the Plan Proponents' express, written consent.

## INTRODUCTION

The Plan Proponents provide this Disclosure Statement in connection with the Plan they have proposed.  The Plan Proponents are soliciting votes on the Plan.  A copy of the Plan is attached to this Disclosure Statement as <u>Exhibit DS-1</u>.

This Disclosure Statement summarizes certain information regarding the Debtors' operations prior the bankruptcy, their efforts to sell their assets, and significant events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes the Plan, the proposed distributions under the Plan, the effect of confirmation of the Plan (including the proposed business operations of the Reorganized Debtors after the Effective Date), the manner in which distributions will be made under the Plan, and summarizes the process to confirm the Plan, including voting on the Plan.  **While the Plan Proponents have attempted to provide a fair and accurate summary of the matters described in this Disclosure Statement, the summary of information contained in this Disclosure Statement is not considered an admission by any of the Plan Proponents in any legal proceeding.**

On [●], 2015, the Bankruptcy Court entered an order finding that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code.  "Adequate information" is "information of a kind, and in sufficient detail … that would enable … a hypothetical investor … to make an informed judgment about the plan."  The Bankruptcy Court has authorized the Plan Proponents to use this Disclosure Statement to solicit votes on the Plan.  **Even though the Bankruptcy Court has approved this Disclosure Statement and authorized the Plan Proponents to use this Disclosure Statement to solicit votes on the Plan, the Bankruptcy Court has not yet determined whether the Plan should be confirmed.  This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission nor has the Commission passed upon the accuracy or adequacy of the statements contained herein.**

The Bankruptcy Court has authorized <u>**only**</u> this Disclosure Statement to be used in connection with solicitation of votes on the Plan.  In voting to accept or reject the Plan, you should rely only on information contained in this Disclosure Statement (and accompanying exhibits) and your own examination of the Debtors and the terms of the Plan.  You should not rely on information from other sources.

**The Plan Proponents recommend that creditors entitled to vote on the Plan vote to accept the Plan.**

## SUMMARY OF VOTING PROCEDURES

If your claim is in a Class that is entitled to vote on the Plan, together with this Disclosure Statement and the accompanying exhibits, you are being provided with a Ballot to vote on the Plan.  After reviewing this Disclosure Statement and the accompanying exhibits, if you are entitled to vote on the Plan, you should vote to accept or reject the Plan using the enclosed Ballot.  **Only holders of Claims in Classes 2, 3, 4 and 5 may vote on the Plan.  Creditors in**

**Class 1 and holders of Class 7 Subsidiary Equity Interests are unimpaired and are deemed to accept the Plan.  Holders of Class 6 Parent Company Interests are not entitled to a distribution under the Plan, and accordingly, are deemed to reject the Plan.  If you are entitled to vote on the Plan, you must return your Ballot by overnight courier or regular mail.  Ballots submitted by facsimile or other electronic transmission will not be accepted and will be void.**

**The Voting Deadline to vote on the Plan is [●], 2015 at 4:00 p.m. Eastern time.  The Claims Agent must _receive_ your Ballot on or before the Voting Deadline for your vote on the Plan to be counted.**  If you have not received a Ballot, or if your Ballot is lost or mutilated, you may obtain a replacement Ballot free of charge on the following website: http://omnimgt.com/alliedsystems.   You may also contact the Claims Agent at the following address:

(i)   Via first-class mail, hand delivery or overnight mail –

ASHINC Corporation, *et al.* Claims Processing
c/o Rust Consulting/Omni Bankruptcy
5955 DeSoto Avenue, Suite 100
Woodland Hills, CA 91367

(ii)   Via Facsimile:

ASHINC Corporation, *et al.* Claims Processing
c/o Rust Consulting/Omni Bankruptcy
818-783-2737

(iii)   Via Email:

ASHINC Corporation, *et al.* Claims Processing
c/o Rust Consulting/Omni Bankruptcy
ashinc@omnimgt.com

(iv)   Via Telephone at 818-906-8300

Copies of the Plan, this Disclosure Statement, and other Plan related documents will also be available on the internet free of charge at the following website: http://omnimgt.com/alliedsystems.

## ARTICLE I
## OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by the full text of the Plan, which is attached as <u>Exhibit DS-1</u>.  For a more detailed description of the terms of the Plan, see Article IV, entitled "Description of the Plan."

A.        **Summary of Plan Structure.**

The Plan is a plan of reorganization whereby the Litigation Trust Assets (including the Lender Direct Claims and the Estate Claims), will vest in the Allied Litigation Trust, and the remainder of the Debtors' assets, including the proceeds from the Sale (defined below), will either revest in the Reorganized Debtors or be distributed to the Debtors' creditors.  The Reorganized Debtors will own certain parcels of real estate, the right to recover excess cash collateral pledged to secure obligations under certain (i) self-insured workers compensation programs, and (ii) bonds issued to governmental agencies and freight brokers to guaranty payment of the Debtors' transportation-related obligations, the equity of Haul Insurance Limited, and certain tax attributes relating to net operating losses.  The Reorganized Debtors intend to utilize these assets to continue certain business operations (including, without limitation, leasing the retained parcels of real estate and administering the workers compensation programs), and may develop new operations after the Effective Date.  The Allied Litigation Trust will jointly prosecute the Estate Claims and the Lender Direct Claims, with the proceeds (if any) flowing through the Litigation Proceeds Waterfall.  The Plan provides a release to the Plan Proponents and certain other parties and exculpates the Plan Proponents and other parties for actions taken during the course of the Chapter 11 Cases, and limits the liability of the Reorganized Debtors, the Committee, the First Lien Agents, the Litigation Oversight Committee, the Allied Litigation Trust and the Litigation Trustee and related parties for actions taken in carrying out the Plan following the Effective Date.

B.        **Summary of Estimated Distributions.**

All creditors will receive a distribution on account of their Claims under the Plan, although any distributions made to the Second Lien Lenders on account of their beneficial interests in the Allied Litigation Trust shall be turned over to the First Agents for distribution to the First Lien Lenders pursuant to the Intercreditor Agreement until the First Lien Lenders have been indefeasibly paid in full.

Holders of Allowed Unclassified Claims and Allowed Priority Claims shall be paid in full on the initial Distribution Date.  In connection therewith, Central States shall receive the treatment provided in the Central States Settlement, Northwest shall receive the treatment provided in the Northwest Settlement, and AIG shall receive the treatment provided in the AIG Settlement.

The holders of Allowed First Lien Lender Claims shall receive their Pro Rata share of: (i) the beneficial interests of the Allied Litigation Trust payable to holders of Allowed First Lien Lender Claims in accordance with the Litigation Proceeds Waterfall, and (ii) the First Lien Lender Cash Distribution, provided, however, that each First Lien Lender (other than Yucaipa) may elect, in lieu of receipt of its Pro Rata share of the First Lien Lender Cash Distribution, to receive its Pro Rata share of the New Common Stock.  Each of the First Lien Lenders comprising the First Lien Requisite Lender has elected to receive shares of New Common Stock in lieu of receiving its Pro Rata distribution of the First Lien Lender Cash Distribution.  In

addition, on the Effective Date, the First Lien Agents shall distribute to the holders of Allowed First Lien Lender Claims their Pro Rata share of the First Lien Reserves.

The holders of Allowed Second Lien Lender Claims shall receive their Pro Rata share of the beneficial interests of the Allied Litigation Trust payable to holders of Allowed Second Lien Claims (calculated on a Pro Rata basis with holders of Allowed General Unsecured Claims) in accordance with the Litigation Proceeds Waterfall, provided, however, that any distribution on account of such beneficial interests shall be turned over to the First Lien Agents for distribution to the First Lien Lenders to the extent required by Sections 4.1 and 4.2 of the Intercreditor Agreement until the First Lien Lenders have been indefeasibly paid in full in Cash.

The holders of Allowed General Unsecured Claims shall receive their Pro Rata share of: (i) the GUC Cash Distribution and (ii) the beneficial interests of the Allied Litigation Trust payable to holders of Allowed General Unsecured Claims (calculated on a Pro Rata basis with holders of Allowed Second Lien Lender Claims) in accordance with the Litigation Proceeds Waterfall.

The holders of Parent Company Interests will not receive any distribution on account of such interests, although the holders of Subsidiary Equity Interests shall retain such interests, subject to any corporate reorganization that may be undertaken by the Debtors or the Reorganized Debtors prior to, on or after the Effective Date.

Holders of Administrative Claims, Priority Tax Claims and Priority Claims will each receive payment of 100% of the amount of their Allowed Claims (as the same may have been or is hereafter determined by the Bankruptcy Court or agreement with the Debtors or Plan Administrator, as applicable). The recoveries for all other holders of Allowed Claims (other than the AIG Claims, which will be satisfied in accordance with the AIG Settlement) will be substantially dependent on the outcome of the prosecution of the Estate Claims and Lender Direct Claims, and cannot be estimated at this time.

## ARTICLE II
## BACKGROUND LEADING TO CHAPTER 11 FILING

### A.    Incorporation of the Macaulay Declaration

When the Debtors (other than Allied Holdings and Allied Systems) filed these Chapter 11 Cases, and Allied Holdings and Allied Systems consented to the entry of an order for relief on June 10, 2012, Scott D. Macaulay, a Senior Vice President and the Chief Financial Officer of Allied Holdings, filed a declaration (the "**Macaulay Declaration**") setting forth the Debtors' background and the events leading up to the Chapter 11 Cases. A copy of the Macaulay Declaration is attached as Exhibit DS-2 to this Disclosure Statement. The following section contains an abbreviated summary of certain events discussed in greater detail in the Macaulay Declaration. Creditors are encouraged to read the Macaulay Declaration in its entirety.

**B.    Summary Background**

**1.    The Debtors' Businesses**

The Debtors' main line of business was carried out by Allied Automotive and its direct and indirect subsidiaries (collectively, the **Allied Automotive Group**").[5]  This major line of business, known in the industry as "car-haul," was the transport of light vehicles, such as automobiles, sport-utility vehicles and light trucks, from manufacturing plants, ports, auctions, and railway distribution points to automobile dealerships in the United States and Canada.  The trips were generally what are known in the industry as "short hauls," with each averaging less than two hundred miles.  The Debtors' major customers were automobile manufacturers.

Allied Automotive Group, primarily through its operating subsidiary, Allied Systems, transported light vehicles by means of tractor trailers (the "**Rigs**") specially designed for transporting light vehicles.  As of the end of 2011, the Debtors owned about 2400 Rigs, which operated out of approximately 44 terminals, most of which were leased, located in the United States and Canada.  Allied Systems' drivers were unionized.

The Debtors' much smaller line of business was carried out by Axis and its direct and indirect subsidiaries (collectively, the "**Axis Group**").[6]  This line of business included arranging for and managing vehicle tracking, vehicle accessorizing, and dealer preparation services for the automotive industry in the United States and Canada, and providing yard management services in Mexico.  The Axis Group operated 39 terminals located in the United States, Canada and Mexico.

**2.    The Georgia Bankruptcy Case**

The Debtors were reorganized in Chapter 11 cases (collectively, the "**Georgia Bankruptcy Cases**") that were filed in the United States Bankruptcy Court for the Northern District of Georgia on July 31, 2005 and that resulted in the 2007 Plan of Reorganization, which was confirmed and became effective on May 29, 2007.  As a result of the 2007 Plan of Reorganization, two investment funds became the largest shareholders of Allied Holdings. These two funds, Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, the "**Yucaipa**"), which are affiliated with the Yucaipa Companies, LLC, together owned approximately 63% of the outstanding shares of Allied Holdings.    After confirmation of the 2007 Plan of Reorganization, Yucaipa acquired approximately $40 million in principal amount of the obligations outstanding under the Second Lien Credit Facility (defined below) and contributed approximately $20 million of such amount to capital, in exchange for which Yucaipa was issued non-voting preferred shares convertible into common shares.  If the preferred shares were so converted, Yucaipa would have owned approximately 70% of the outstanding common shares in Allied Holdings.

---

[5]   The Allied Automotive Group included the following Debtors: Allied Automotive, Allied Systems, Allied Canada, QAT, RMX, Transport Support, F.J., GACS, Commercial Carriers and Allied Freight.
[6]   The Axis Group included the following Debtors: Axis, CT Services, Cordin, Terminal Services, Axis Canada, Axis Areta, Logistic Technology and Logistic Systems.

### 3.    The Credit Facilities

The exit financing established on the effective date of the 2007 Plan of Reorganization was still outstanding on May 17, 2012, the date involuntary petitions under Chapter 11 of the Bankruptcy Code were filed against Allied Holdings and Allied Systems, and a substantial portion of those facilities remain outstanding as of the filing of this Disclosure Statement. Indeed, that exit financing is the First Lien Credit Facility and the Second Lien Credit Facility (defined below) which provided financing of up to $315 million to the Debtors upon emergence pursuant to the 2007 Plan of Reorganization.  The larger facility (the "**First Lien Credit Facility**") is evidenced by the First Lien Credit Agreement and provided for up to $265 million in financing.  The First Lien Credit Facility was provided by the First Lien Lenders, one of which, CIT Group/Business Credit Inc. ("**CIT**"), initially served as administrative and collateral agent of the First Lien Credit Facility.[7]  The First Lien Credit Facility was comprised of three facilities: (1) a facility for revolving loans and swing line loans up to the amount of $35 million (the "**Revolving Loan Facility**"); (2) a facility for the issuance of letters of credit for the account of the Debtors in the amount of up to $50 million (the "**Letter of Credit Facility**"); and (3) a term loan facility in the amount of $180 million (the "**First Lien Term Loan Facility**").  CIT was the sole lender under the Revolving Loan Facility and was not a Lender under either the Letter of Credit Facility or the First Lien Term Loan Facility.

The other credit facility (the "**Second Lien Credit Facility**") is evidenced by the Second Lien Credit Agreement and provided for a $50 million term loan to the Debtors.  Goldman Sachs Credit Partners L.P. was the original administrative agent and collateral agent under the Second Lien Credit Facility and was later replaced in these capacities by Bank of New York Mellon.

The First Lien Credit Facility was secured by a first-priority security interest in substantially all of the Debtors' assets, including accounts, general intangibles, money, inventory, equipment (including Rigs), real estate and the stock of certain subsidiaries (the "**Collateral**").  The Second Lien Credit Facility was secured by a second-priority security interest in the Collateral.  The Debtors and the collateral agents for the two credit facilities entered into the Intercreditor Agreement to set forth, among other things, the relative rights and priorities as between the two facilities with respect to their liens on the Collateral.

### 4.    Pre-Petition Litigation Relating to the First Lien Credit Facility

Soon after its emergence from the Georgia Bankruptcy Cases pursuant to the 2007 Plan of Reorganization, the Debtors business again began to falter leading to the occurrence of defaults and events of default under the First Lien Credit Agreement and the Second Lien Credit Agreement.  The Petitioning Creditors (defined below), allege that, as a result of the occurrence of these defaults and events of default, Yucaipa became concerned that the lenders under those facilities would declare the debt to be due and payable and commence the exercise of rights and remedies, which would in turn cause Yucaipa to lose its equity investment.  The Petitioning Creditors allege that, in an effort to forestall this possibility, Yucaipa commenced a series of

---

[7] CIT subsequently resigned as administrative agent and collateral agent and was replaced by the First Lien Agents.

DOC ID - 22951903.12

actions designed to facilitate its acquisition of a majority of the outstanding obligations under both the First Lien Facility and the Second Lien Facility, and to become the "Requisite Lender" under each. Both the First Lien Credit Agreement and the Second Lien Credit Agreement provided for the "Requisite Lender" under such facility to have certain powers and the right to direct the administrative agent and the collateral agent with respect to certain actions, including the right to direct or not direct the exercise of rights and remedies upon the occurrence of an event of default. The Petitioning Creditors allege that, with this power, Yucaipa could stop the lenders from taking actions to threaten Yucaipa's investment.

As initially drafted, however, both the First Lien Credit Agreement and the Second Lien Credit Agreement contained explicit restrictions prohibiting Yucaipa from becoming as "Lender" under such facilities by excluding Yucaipa from the definition of an "Eligible Assignee." Thus, in order to move forward with its efforts to become the Requisite Lender Yucaipa needed the loan facilities to be amended to permit its acquisition of the debt.

On April 17, 2008, amendments were executed to both the First Lien Credit Agreement and the Second Lien Credit Agreement that permitted Yucaipa to acquire debt under those facilities. The amendment to the Second Lien Credit Agreement did not impose any limitations on Yucaipa's ability to acquire debt under that facility, other than requiring that half of any debt acquired be contributed to capital. As discussed above, Yucaipa subsequently acquired $40 million in principal amount of obligations under the Second Lien Facility and contributed $20 million to capital.

The amendment under the First Lien Credit Agreement (the **"Third Amendment"**), unlike the amendment for the Second Lien Credit Agreement, imposed significant restrictions on Yucaipa's ability to both acquire debt and to vote that debt once acquired, thus precluding Yucaipa from becoming the Requisite Lender under the First Lien Credit Facility. Yucaipa also waived its right to take any action as a First Lien Lender in any insolvency or liquidation proceeding, and voluntarily assigned its right to vote in any insolvency or liquidation proceeding to the administrative agent under the First Lien Credit Agreement (now the First Lien Agents). Yucaipa did not acquire any obligations under the First Lien Facility at that time.

In early 2009, Yucaipa launched a tender offer to purchase not less than 51% of the principal amount of the obligations outstanding under the First Lien Facility. As a condition to accepting the tender, however, the selling lender was required to execute a further amendment to the First Lien Credit Facility that, had it become effective, would have eliminated all of the restrictions on Yucaipa's ability to acquire and vote debt under the First Lien Facility imposed by the Third Amendment. The tender offer failed.

By April 2009, ComVest Investment Partners III, L.P. ("**ComVest**") had acquired a majority of the outstanding obligations under First Lien Credit Facility and had thereby become the First Lien Requisite Lender. Yucaipa engaged in negotiations with ComVest directly to acquire ComVest's position in the First Lien Facility, and to become the Requisite Lender. Those negotiations continued throughout the Spring of 2009 and into the Summer, culminating in an agreement between ComVest and Yucaipa whereby Yucaipa would acquire ComVest's

debt position in the First Lien Facility and become the Requisite Lender.   In order to consummate this transaction without being subject to the restrictions on its ability to acquire and vote debt imposed by the Third Amendment, Yucaipa sought a further amendment to the First Lien Credit Facility eliminating those restrictions.

Thus, on August 21, 2009, ComVest and the Debtors purported to enter into an amendment (the "**Purported Fourth Amendment**") to the First Lien Credit Agreement to allow Yucaipa to be an eligible assignee under the First Lien Credit Facility, with no restriction on either the amount of debt it could acquire or its right to vote.   No lender other than ComVest executed (or was asked to execute) the Purported Fourth Amendment.   Upon execution of the Purported Fourth Amendment, Yucaipa purchased from ComVest the majority in principal amount of outstanding obligations under the First Lien Facility.   However, CIT, as the administrative agent, declined to recognize the validity of the Purported Fourth Amendment and consequently declined to recognize Yucaipa as the purported First Lien Requisite Lender.

In November 2009, Allied Holdings and Yucaipa sued CIT in Georgia State Court to establish (1) that Yucaipa had become the First Lien Requisite Lender in August 2009 and (2) that CIT was damaging Yucaipa and the Debtors by failing to take action lawfully demanded by Yucaipa as purported First Lien Requisite Lender.   CIT denied the allegations in the complaint and filed counterclaims against both Yucaipa and the Debtors alleging, among other things, that the Purported Fourth Amendment was invalid.   Allied Holdings, Yucaipa and CIT settled the litigation pursuant to a settlement agreement dated as of December 5, 2011 (the "**Settlement Agreement**"), with the parties filing mutual dismissals with prejudice on December 7, 2011. The terms of the Settlement Agreement included, among others, mutual limited releases, and the recognition by CIT (in its individual capacity and not on behalf of any other lender) of the validity of the Purported Fourth Amendment and of Yucaipa as the purported First Lien Requisite Lender

On January 18, 2012, three lenders under the First Lien Credit Facility filed suit against Yucaipa in the Supreme Court of the State of New York, Index No. 650150/2012.   These lenders were Black Diamond CLO 2005-1 Ltd., its affiliate BDCM Opportunity Fund II, LP (collectively, "**Black Diamond**"), and Spectrum Investment Partners, L.P. ("**Spectrum**").   In this suit (the "**NYS Action**"), the plaintiffs sought a judicial declaration that the Purported Fourth Amendment was null and void and that Yucaipa was not the First Lien Requisite Lender.   The NYS Action was pending as of the Petition Date and is described in further detail below.

### 5.      Events Leading to the Chapter 11 Cases

In 2011, in connection with attempts to implement rate increases with its car-haul customers, the Debtors ceased providing car-haul services to several customers.   This lead to a decrease in the Debtors' revenue from 2010 to 2011.   The Debtors sought to implement rate increases because the rate levels in effect were not sustainable and did not cover operating costs. One major reason for the unsustainable rate levels that caused the Debtors to cease providing car-haul services to several substantial customers (and the Debtors' financial distress) was the drastic decline of production by original equipment manufacturers of light vehicles resulting

from the recession that began in December 2007 and was ongoing as of the Petition Date.  This decline led to fierce competition among trucking companies and railroads for contracts to transport these vehicles and a related reduction in the rate of compensation offered to the Debtors and their competitors.  While the rate of compensation to the Debtors for transporting light vehicles declined, the Debtors' expenses in many areas, including the rate of compensation for the Debtors' unionized employees, increased.

On May 17, 2012, the three plaintiffs in the NYS Action (the "**Petitioning Creditors**") filed involuntary bankruptcy petitions seeking relief under Chapter 11 against Allied Holdings and Allied Systems in the U.S. Bankruptcy Court for the District of Delaware.  As of the commencement of the involuntary bankruptcy cases, the outstanding principal amount due under the First Lien Credit Facility totaled approximately $244 million**,** including about $35 million due under the Revolving Loan Facility.  Also, as of the commencement of the involuntary cases, the outstanding principal amount due under the Second Lien Term Facility was approximately $30 million.

In light of the involuntary bankruptcy cases and its financial condition, the Debtors determined that it would be in the best interests of their Estates to proceed under Chapter 11.  Accordingly, Allied Holdings and Allied System consented to relief under Chapter 11, and caused seventeen direct and indirect subsidiaries of Allied Holdings to join them by filing voluntary Chapter 11 petitions.

## ARTICLE III
## EVENTS DURING THE CHAPTER 11 CASE

This section of the Disclosure Statement summarizes material events that have occurred in the Chapter 11 Cases prior to the date of filing of this Disclosure Statement.  This is not an inclusive list of all matters that have occurred.  Creditors and Interest holders are encouraged to review the docket in the Chapter 11 Cases for a complete list of all matters that have been put before the Bankruptcy Court.  A copy of the docket may be accessed online at the following website: http://omnimgt.com/alliedholdings.

A.    **First Day Motions**

On June 10, 2012, the Debtors filed several motions and other pleadings (the "**First Day Motions**") to ensure an orderly transition into Chapter 11, including (1) a motion to pay certain pre-petition workforce obligations and other benefits to the Debtors' employees; (2) a motion relating to the continued use of the Debtors' existing cash management system, bank accounts and business forms; (3) a motion to retain and employ the Claims Agent; (4) a motion to establish procedures for determining adequate assurance for the provision of utility services; (5) a motion to pay prepetition claims of certain critical vendors; (6) a motion to continue the Debtors' insurance programs; (7) a motion to pay customs duties, claims of common carriers and warehousemen; (8) a motion to pay prepetition sales, use and other taxes; and (9) a motion to obtain post-petition debtor-in-possession financing from the Yucaipa DIP Lenders (defined

below).  The First Day Motions were granted with certain agreed limited modifications to accommodate the comments of the United States Trustee.

## B.    The DIP Financing Motions

In order for the Debtors to maintain their operations during the Chapter 11 Cases, it was necessary for the Debtors to obtain post-petition financing.  As a result of negotiations with Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. (the "**Yucaipa DIP Lenders**"), the Debtors entered into a debtor-in-possession facility with the Yucaipa DIP Lenders (the "**2012 DIP Facility**").  The 2012 DIP Facility was approved by the Bankruptcy Court on an interim basis on June 12, 2012 pursuant to an interim order [Docket No. 114] and on a final basis on July 12, 2012 pursuant to the 2012 Final DIP Order.  Pursuant to its terms, the 2012 DIP Facility included a credit facility of up to $20 million.  The proceeds of the 2012 DIP Facility were used for working capital and general corporate purposes subject to the terms and conditions of the 2012 Final DIP Order and to the extent set forth in the Debtors' one-year budget attached to the 2012 Final DIP Order.

On May 17, 2013, the Debtors filed a motion to replace the 2012 DIP Facility with a new line of credit from affiliates of the Petitioning Creditors (the "**Replacement DIP Facility**").  The Replacement DIP Facility was a debtor-in-possession delayed draw term loan facility that provided for postpetition secured loans in an aggregate principal amount not to exceed $33,500,000.  The Replacement DIP Facility was approved by the Bankruptcy Court on a final basis on June 21, 2013 pursuant to the Replacement DIP Order.  The Replacement DIP Facility provided the Debtors with $11.5 million of incremental financing and allowed the Debtors to avoid potential defaults and events of default under the 2012 DIP Facility.  The proceeds of the Replacement DIP Facility were also used to refinance in full the 2012 DIP Facility, to pay certain fees and expenses related to the 2012 DIP Facility and for the Debtors' working capital needs and general corporate purposes, as outlined in the Debtors' 13-week cash projections attached to the Replacement DIP Order.  The amounts outstanding under the Replacement DIP Facility were paid in full from the proceeds of the Sale.

## C.    Retention of Professionals

Shortly after filing for bankruptcy, the Debtors filed applications to retain the following professionals: Troutman Sanders LLP as bankruptcy co-counsel; Richards, Layton & Finger, P.A. as bankruptcy co-counsel; the Claims Agent as administrative advisor; Gowling Lafleur Henderson LLP as Canadian counsel; Rothschild Inc. as financial advisor and investment banker; and PricewaterhouseCoopers LLP to provide tax compliance services.

Following the formation of the Committee on June 20, 2012 [Docket No. 144], the Committee filed applications to retain Sidley Austin LLP, as co-counsel to the Committee; Sullivan Hazeltine Allinson LLC, as co-counsel to the Committee; Conway Mackenzie, Inc., as financial advisors to the Committee; and Stikeman Elliott LLP as Canadian counsel.

The Bankruptcy Court granted each of these applications.

-14-

D.      **The NYS Action**

Following the commencement of the Chapter 11 Cases, the NYS Action continued to proceed in the Supreme Court of the State of New York.  On March 29, 2013, Justice Charles E. Ramos docketed an opinion and order holding that the Purported Fourth Amendment was invalid and void *ab initio* because that amendment required unanimous First Lien Lender consent, and no First Lien Lender (other than ComVest) had consented to (or was asked to consent to) the terms of the Purported Fourth Amendment.  Justice Ramos' opinion also concluded that Yucaipa was not the First Lien Requisite Lender.  Justice Ramos' decision was subsequently affirmed by the Appellate Division and Yucaipa's request for further review by the New York State Court of Appeals was denied.

E.      **Filing of the Schedules and Statement of Financial Affairs and Proof of Claims and Bar Date**

On July 25, 2012, the Debtors filed detailed schedules and statements of financial affairs with the Bankruptcy Court.  On May 28, 2013, the Debtors filed a proposed form of order establishing the deadline by which parties holding claims against the Debtors must file such claims [Docket No. 1202].   Pursuant to the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7), (f), (l) and 3003(c)(3), and Local Rule 2002-1(e) Establishing the Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 1208] (the "**Bar Date Order**"), entered on May 29, 2013, the Bankruptcy Court established August 2, 2013 at 12:00 a.m. (midnight) (prevailing Eastern Time) as the bar date for filing Proofs of Claim against the Debtors and a governmental bar date of November 30, 2013 at 12:00 a.m. (midnight) (prevailing Eastern Time) (collectively, the "**Bar Date**").  On June 3, 2013, the Debtors served, among other things, the *Notice of Deadlines for the Filing of Proofs of Claim* on all known creditors of the Debtors.

The chart below reflects, as of May 1, 2015, Claims that were scheduled as not disputed, contingent or unliquidated, together with timely filed Proofs of Claim, in each case (1) excluding Claims that have been paid or satisfied post-petition, (2) excluding duplicate Claims, including where the same Claim has been filed against multiple Debtors, and (3) reducing amounts for Claims that have been stipulated to after the filing of a Proof of Claim:

| Class | Description | Estimated Number of Claims | Estimated Amount of Claims | Treatment Under Plan | Estimated Recovery as % of Available Assets |
|---|---|---|---|---|---|
| Unclassified | Administrative Claims and Priority Tax Claims | 75 | $4,432,000 | With respect to each Allowed Administrative Claim, except as otherwise provided for in Section 10.1 of the Plan, on the Effective Date, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which such holder and the Debtors or the Plan Administrator, as applicable, shall have agreed upon in writing; provided, however, that Allowed Administrative Claims (other than Professional Fee Claims and Claims asserted under Section 503(b)(3) or (b)(4)) with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  For the avoidance of doubt, (i) Central States shall receive the treatment provided in the Central States Settlement, and (ii) Northwest shall receive the treatment provided in the Northwest Settlement.<br><br>Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtors or by the Plan Administrator, either (i) on the Effective Date, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in a manner consistent with Bankruptcy Code Section 1129(a)(9)(C), or (iii) such different treatment as to which such holder and the Debtors or the Plan Administrator, as applicable, shall have agreed upon in writing. | 100% |
| 1 | Priority Non-Tax Claims | 16 | $250,000 | On the applicable Distribution Date, each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) Cash equal to the unpaid portion of such Allowed Priority Claim or (ii) such different treatment as to which such holder and the Debtors or the Plan Administrator, as applicable, shall have agreed upon in writing. | 100% |

| Class | Description | Estimated Number of Claims | Estimated Amount of Claims | Treatment Under Plan | Estimated Recovery as % of Available Assets |
|---|---|---|---|---|---|
| 2 | First Lien Lender Claims | | $244,021,526.00 | On the applicable Distribution Date, each holder of an Allowed First Lien Lender Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed First Lien Lender Claim its Pro Rata share of: (i) the beneficial interests in the Allied Litigation Trust payable to holders of Allied First Lien Lender Claims in accordance with the Litigation Proceeds Waterfall, and (ii) the First Lien Lender Cash Distribution, provided, however, that each First Lien Lender may elect, in lieu of receipt of its Pro Rata share of the First Lien Lender Cash Distribution, to receive its Pro Rata share of the New Common Stock.  Each of the First Lien Lenders comprising the First Lien Requisite Lender has elected to receive shares of New Common Stock in lieu of receiving its Pro Rata distribution of the First Lien Lender Cash Distribution.  In addition, on the Effective Date, the First Lien Agents shall distribute to the holders of Allowed First Lien Lender Claims the First Lien Reserves.  For the avoidance of doubt, pursuant to the limitations set forth in the First Lien Credit Agreement, in no event shall Yucaipa be entitled to make the election contemplated in the proviso to clause (ii) of this Section 3.3(a) of the Plan.<br>Notwithstanding anything to the contrary set forth herein, any distributions that would otherwise be made on account of the Disputed First Lien Obligations by the Debtors or the First Lien Agents shall be made to the Disputed First Lien Obligations Escrow to be held, and ultimately distributed, in accordance with the terms thereof and the JCT Sale Order.  For the avoidance of doubt, the holders of First Lien Lender Claims shall be deemed to waive the right to participate in the GUC Cash Distribution on account of any unsecured portion of a First Lien Lender Claim. | 0.16% |

| Class | Description | Estimated Number of Claims | Estimated Amount of Claims | Treatment Under Plan | Estimated Recovery as % of Available Assets |
|---|---|---|---|---|---|
| 3 | Second Lien Lender Claims | | $30,000,000.00 | Each holder of an Allowed Second Lien Lender Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Second Lien Lender Claim its Pro Rata share of the beneficial interests of the Allied Litigation Trust payable to holders of Allowed Second Lien Lender Claims (calculated on a Pro Rata basis with holders of Allowed General Unsecured Claims) in accordance with the Litigation Proceeds Waterfall, provided, however, that any future distribution on account of such beneficial interests shall be turned over to the First Lien Agents for distribution to the First Lien Lenders to the extent required by Sections 4.1 and 4.2 of the Intercreditor Agreement until the First Lien Lenders have been indefeasibly paid in full in Cash.<br>For the avoidance of doubt, the holders of Second Lien Lender Claims shall be deemed to waive the right to participate in the GUC Cash Distribution on account of any unsecured portion of a Second Lien Lender Claim. | 0.00% |
| 4 | AIG Claims | | $4,382,495.00 | On the Effective Date, pursuant to the AIG Settlement (and subject to the satisfaction of the conditions to effectiveness) the AIG Entities shall receive in full satisfaction, settlement, release, and discharge of and in exchange for all Allowed AIG Claims, (i) the AIG Cash Collateral, and (ii) Cash in the amount of $1,000,000.00.  If the conditions to effectiveness of the AIG Settlement are not satisfied (or waived by AIG) the AIG Settlement will not become effective and the AIG Claims will be treated as Disputed. | 22.82% |
| 5 | General Unsecured Claims | 1,934 | $1,742,807,202.34 | On the applicable Distribution Dates, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, a Pro Rata share of (a) the GUC Cash Distribution and (b) the beneficial interests of the Allied Litigation Trust payable to holders of Allowed General Unsecured Claims (calculated on a Pro Rata basis with holders of Allowed Second Lien Lender Claims) in accordance with the Litigation Proceeds Waterfall. | 0.17% |

| Class | Description | Estimated Number of Claims | Estimated Amount of Claims | Treatment Under Plan | Estimated Recovery as % of Available Assets |
|---|---|---|---|---|---|
| 6 | Parent Equity Interests | - | $0.00 | Holders of Parent Equity Interests shall not receive or retain any distribution under the Plan on account of such Interests, and the Common Stock shall be cancelled as set forth in Section 5.4 of the Plan. | 0.00% |
| 7 | Subsidiary Equity Interests | - | $0.00 | Holders of Subsidiary Equity Interests shall retain such Subsidiary Equity Interests, subject to any corporate reorganization that may be undertaken by the Debtors or the Reorganized Debtors prior to, on or after the Effective Date. | 0.00% |

The Debtors are currently in the process of reviewing Proofs of Claim and assessing which Claims are valid and which claim objections to prosecute. The Debtors expect to file claim objections. Consequently, the Debtors anticipate that the figures set forth above, which reflect the face amount of claims filed or scheduled (and not otherwise satisfied prior to the filing of the Plan), will be reduced following the claims reconciliation process. As set forth in further detail below, to the extent that the Debtors dispute an amount listed in a Proof of Claim, any distribution that could be made on account of such amount will be reserved in a Disputed Claims Reserve until such time as the Claim is Allowed or disallowed. If such Claim is disallowed, the amounts in the Disputed Claims Reserve will be distributed by the Plan Administrator in accordance with the terms of the Plan.

**F.      The Sale**

On May 17, 2013, the Debtors entered into a stalking horse asset purchase agreement (the "**Stalking Horse Agreement**") with New Allied Acquisition Co. LLC ("**New Allied Acquisition Co.**"), an acquisition entity formed by Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, in their capacities as First Lien Agents, contemplating the sale of substantially all of the Debtors' assets. Also on May 17, 2013, the Debtors filed the *Motion of the Debtors for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtors Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests; (III) Authorizing the Assumption, Sale, and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 1175] (the "**Sale Motion**"), seeking approval of bid procedures and the Stalking Horse Agreement.

On June 21, 2013, the Bankruptcy Court entered a bidding procedures order [Docket No. 1320], which (1) established bidding and auction procedures (the "**Bidding Procedures**") related to the Sale; (2) scheduled a hearing (the "**Sale Hearing**"); (3) approved the form and manner of

notice of an auction (the "**Auction**"); and (4) established procedures to determine cure amounts and deadlines for objections for certain contract and leases to be assumed and assigned by the Debtors.

From August 14, 2013 through August 15, 2013, the Debtors conducted the Auction, and at the conclusion of the Auction, the Debtors determined that New Allied Acquisition Co.'s final bid, worth approximately $105 million, was the highest and best bid submitted at the Auction. On August 16, 2013, the Debtors filed the *Notice of Successful Bidder at Auction of Sale of Substantially All of Debtors' Assets* [Docket No. 1609].

Numerous parties filed objections to the sale of the Debtors' assets to New Allied Acquisition Co. [Docket Nos. 1602, 1628, 1720, 1723, 1724, 1730, 1731, 1735, 1736, 1754 & 1761]. On September 6, 2013, Jack Cooper, one of the bidders at the Auction, made a revised bid for the Debtors' assets of $135 million. On that same day, the Committee filed the *Motion of the Official Committee of Unsecured Creditors to Reopen the Auction Relating to the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests* [Docket No. 1769] (the "**Motion to Reopen**"), seeking to reopen the Auction to allow Jack Cooper to formally submit its revised bid for the Debtors' assets. On September 8, 2013, the Debtors joined in the Motion to Reopen [Docket No. 1772]. On September 9, 2013, the Bankruptcy Court conducted a telephonic hearing on the Motion to Reopen and approved same. Accordingly, the Debtors reopened the Auction on September 11, 2013, and the reopened Auction concluded on September 12, 2013. On September 12, 2013, the Debtors filed the *Amended Notice of Successful Bidders at Auction in Connection with the Sale of Substantially All the Debtors' Assets* [Docket No. 1806], announcing that the successful bidder for substantially all of the Debtors' assets other than certain owned real and personal property (the "**Excluded Assets**") was Jack Cooper, and that the successful bidder for the Excluded Assets was an acquisition entity to be formed by the First Lien Agents (the "**SBDRE Purchaser**").

On September 17, 2013, the Bankruptcy Court approved the JCT Sale and entered the JCT Sale Order. On September 30, 2013, the Bankruptcy Court approved the SBDRE Sale and entered the SBDRE Sale Order. The JCT Sale closed on December 27, 2013. On March 20, 2014, the SBDRE Purchaser assigned its rights to acquire certain of the Excluded Assets to ATC Transportation LLC and the SBDRE Sale with respect to those Excluded Assets was consummated. The SBDRE Sale with respect to other Excluded Assets was consummated on June 12, 2014. In addition to satisfying certain cure claims, including prepetition Claims of counter-parties to contracts that were assumed and assigned to Jack Cooper in connection with the Sale (such satisfaction being part of the overall consideration for the Sale), the Debtors satisfied certain other obligations from the proceeds of the Sale pursuant to authority granted under the JCT Sale Order, including obligations arising under the Replacement DIP Facility. Accordingly, on or shortly after the closing date of the JCT Sale, certain of the Claims against the Debtors were satisfied.

**G.      The Retiree Benefit Plans and the Retiree Committee**

On December 9, 2013, the Debtors filed the *Debtors' Motion to Approve Termination of Retiree Medical Benefits* [Docket No. 2064] (the "**Retiree Motion**"), seeking to terminate the medical benefits provided to certain of the Debtors' retirees (the "**Medical Benefits Retirees**"), pursuant to Allied Holdings' contractual right to terminate the Retirement Benefit Plan.[8]  One of the Medical Benefit Retirees filed two objections to the Retiree Motion [Docket Nos. 2088 & 2119].  In response to these objections, the Bankruptcy Court ordered the U.S. Trustee to form the Retiree Committee to serve as the "authorized representative" of the Medical Benefits Retirees under Section 1114(b) of the Bankruptcy Code.  On January 8, 2014, the U.S. Trustee formed the Retiree Committee.  Since that time, the Debtors have adjourned the Retiree Motion and have continued to provide medical benefits to the Medical Benefits Retirees, as described below.

At the time the Debtors filed the Retiree Motion and through the close of the JCT Sale, the Medical Benefits Retirees were covered under an employee group medical plan for non-union employees.  Once the JCT Sale closed, the Debtors' insurer determined not to renew the group policy.  Therefore, Allied Holdings undertook to provide premium supplements to the Medical Benefits Retirees.  Allied Holdings has paid approximately $13,000 a month for these premium supplements, which cover (1) the cost of the premium for a prescription drug supplement for those Medical Benefits Retirees that are also covered by Medicare and (2) the benefits premium for the four Medical Benefits Retirees not covered by Medicare (and their dependents).

In addition the Retirement Benefit Plans include a program which provides for a death benefit of $5,000 to each of about one hundred fifty-five retirees.  Further, another retiree asserts a right to a death benefit of $50,000.

In connection with confirmation of the Plan, the Debtors shall seek entry of either (1) a form of the Confirmation Order that deems the Retiree Benefit Plans terminated and cancelled in accordance with their terms or as otherwise permitted by law on the Effective Date or (2) upon the Debtors' satisfaction of the requirements of Section 1114 of the Bankruptcy Code, the 1114 Order terminating the Retiree Obligations under the Retiree Benefit Plans.  Entry of a form of Confirmation Order that provides for such termination on the Effective Date or the 1114 Order is a condition to the occurrence of the Effective Date.

**H.      The Requisite Lender Litigation; Committee Adversary Proceeding and Lender Direct Complaint**

On October 18, 2012, the Debtors initiated an adversary proceeding (Case No. 12-11564) (the "**Allied Adversary Proceeding**") against the First Lien Lenders seeking (1) to enjoin the NYS Action, and (2) a declaration that the Third and Fourth Amendments to the First Lien

---

[8]    Allied Holdings possesses a contractual right "to amend, withdraw, suspend, or terminate" the Retiree Benefit Plan "in its sole discretion."  *See* Retiree Benefit Plan, § 6.  A copy of the Retiree Benefit Plan was filed an exhibit to the Retiree Motion.

Credit Agreement were valid and enforceable in accordance with their terms and also seeking a declaration as to the identity of the First Lien Requisite Lender. The Bankruptcy Court refused to enjoin the NYS Action, which was then set for oral argument on the motion of Black Diamond and Spectrum for summary judgment. Justice Ramos' oral decision at the conclusion of the hearing in November 2012, and subsequently confirmed by his written decision in March 2013, effectively rendered moot substantially all of the relief requested in the Allied Adversary Proceeding.

Notwithstanding Justice Ramos' ruling in the NYS Action, on January 5, 2013, Yucaipa filed cross-claims in the Allied Adversary Proceeding seeking, *inter alia*, a declaration that the Third Amendment was invalid (the "**Yucaipa Cross-Claims**"). At a hearing on February 27, 2013, the Bankruptcy Court dismissed the Yucaipa Cross-Claims, finding, among other things, that the Third Amendment was valid and enforceable and that the covenant not to sue in the Third Amendment barred the Yucaipa Cross-Claims.

On February 1, 2013, the Committee commenced an adversary proceeding (Case No. 13-50530) (the "**Committee Adversary Proceeding**"), asserting claims against Yucaipa for, *inter alia*, equitable subordination, and breach of fiduciary duty claims against certain of the Debtors current and former officers and directors. That same day, the Committee filed a motion for standing to prosecute claims on behalf of the Debtors' estates [Docket No. 858]. In that standing motion, the Committee noted that it had undertaken "a comprehensive investigation of potential claims belonging to the Debtors' estates." Id. ¶ 6.

On February 27, 2013, the Bankruptcy Court granted the Committee standing to pursue various claims against Yucaipa and the Debtors' officers and directors and allowed the First Lien Agents to "intervene/participate in the litigation." As a result, on March 14, 2013, the Committee, as plaintiff, and the First Lien Agents, as intervenors, filed the Amended Complaint against Yucaipa and numerous officers and directors of Allied. A copy of the Amended Complaint is attached hereto as Exhibit DS-3. The Amended Complaint in the Committee Adversary Proceeding asserts various claims, including breach of fiduciary duty claims, an equitable subordination claim against Yucaipa on behalf of the Estates, brought by the Committee, and an equitable subordination claim against Yucaipa on behalf of the First Lien Lenders (other than Yucaipa) brought by the First Lien Agents as intervenors. The claims and causes of action being prosecuted in the Committee Adversary Proceeding are the "Estate Claims" that will be transferred to the Allied Litigation Trust upon the Effective Date of the Plan, with the proceeds thereof distributed to the Holders of Allowed Claims pursuant to the Litigation Proceeds Waterfall.

On April 8, 2013 defendant Mark Gendregske filed motions seeking (a) a determination that the breach of fiduciary duty claims were non-core proceedings and a demand for a jury trial, and (b) withdrawal of the reference by the District Court. Neither Yucaipa nor the other defendants joined in that motion or sought similar relief. Black Diamond, Spectrum and the UCC filed oppositions to the Gendregske motions. On January 28, 2015, the Bankruptcy Court issued an Opinion concluding that the breach of fiduciary duty claims against Gendregske are

non-core and that he is entitled to a jury trial.  On April 9, 2015, the District Court granted Gendregske's motion to withdraw the reference.

On July 10, 2014, Yucaipa filed a motion in the Bankruptcy Court seeking to amend its answer to the Amended Complaint and assert counterclaims for equitable subordination against Black Diamond and Spectrum.  The basis for Yucaipa's equitable subordination claim is that Black Diamond and Spectrum engaged in a concerted scheme, carried out over a period lasting more than three years, to induce Yucaipa to purchase First Lien Obligations so that, in connection with a later bankruptcy of Allied, they could seek to have Yucaipa's debt equitably subordinated in a way that would materially increase the recoveries for Black Diamond and Spectrum.  According to Yucaipa, this scheme included (a) improper inducement of Yucaipa (an insider) to purchase First Lien Obligations and become the Requisite Lender, only to thereafter challenge Yucaipa's status and block recognition by CIT (the then First Lien Agent), (b) litigation with Yucaipa over the validity of the Purported Fourth Amendment to the Credit Agreement, (c) sham negotiations with Jack Cooper regarding the potential sale of First Lien Obligations to Jack Cooper, (d) improper trading of First Lien Obligations between Black Diamond and Spectrum coupled with fraudulent representations to the Bankruptcy Court in connection with the May, 2102 involuntary chapter 11 petitions, and (e) baseless assertions of claims for equitable subordination against Yucaipa.  Black Diamond and Spectrum opposed the motion to amend and the Bankruptcy Court has not yet ruled on the request.

On July 9, 2013, the First Lien Agents filed a motion for summary judgment in the Allied Adversary Proceeding and the Committee Adversary Proceeding for a determination that they are the First Lien Requisite Lender.  At a hearing on July 30, 2013, the Bankruptcy Court granted that motion, ruling that Black Diamond and Spectrum are the First Lien Requisite Lender [Adv. Pro. 13-50530 D.I. 297].

On November 19, 2014, Black Diamond and Spectrum, together with Black Diamond Commercial Finance, LLC and Spectrum Commercial Finance, LLC, commenced an adversary proceeding in the Bankruptcy Court against Yucaipa, numerous officers and directors of Allied, and Ronald Burkle.[9]  The Lender Direct Complaint[10] asserts, *inter alia*, a claim for equitable subordination against Yucaipa based, in part, on allegations that Yucaipa improperly used its status as purported First Lien Requisite Lender prior to the commencement of the Chapter 11 Cases to, among other things, derail negotiations with Jack Cooper -- regarding a transaction that Yucaipa alleges would have resulted in all lenders under the First Lien Facility receiving payment in full -- by insisting upon a disproportionate share of the consideration Jack Cooper was willing to pay.  The claims and causes of action asserted in this adversary proceeding are referred to as the "Lender Direct Claims" and will be prosecuted together with the Estate Claims, with the proceeds thereof distributed to the Holders of Allowed Claims pursuant to the Litigation Proceeds Waterfall.  On February 19, 2015, Yucaipa and the other defendants (other than Burkle) filed answers to the complaint denying the material allegations, asserting affirmative

---

[9]   BDCM Opportunity Fund II, LP, et al. v. Yucaipa Am. Alliance Fund I, L.P., et al., Adv. Proc. No. 14-50971 (CSS) (Bankr. D. Del.).

[10]   A copy of the Lender Direct Complaint is attached hereto as Exhibit DS-4.

defenses, and asserting counterclaims against Black Diamond and Spectrum for equitable subordination (on the same bases as the equitable subordination claim described above). In addition, Burkle filed a motion to dismiss the claims against him.

Black Diamond and Spectrum filed a motion to dismiss Yucaipa's counterclaim for equitable subordination and Yucaipa has opposed that motion. Black Diamond and Spectrum also filed an opposition to Burkle's motion to dismiss and Burkle has filed a reply in support. The Bankruptcy Court has not yet ruled on either Black Diamond and Spectrum's motion to dismiss the equitable subordination counterclaim or on Burkle's motion to dismiss.

On February 10, 2015, in reliance on the Bankruptcy Court's January 28th Opinion in respect of the Gendregske motion for determination of core versus non-core status, Yucaipa and the other defendants filed (a) a motion for determination of core versus non-core status of the claims asserted by Black Diamond and Spectrum, and (b) a motion seeking withdrawal of the reference. Black Diamond and Spectrum have opposed both motions and Yucaipa and the other defendants have filed replies. The Bankruptcy Court entered an agreed order on Yucaipa and the other defendants' motion for determination of core versus non-core status. The District Court has not yet ruled on the motion to withdraw the reference.

## I.      The Northwest Settlement and the Central States Settlement

On March 3, 2014, Northwest filed the Northwest Request, asserting an administrative expense claim and/or Priority Claim in the amount of $93,960.27. According to the Northwest Request, prior to the commencement of the Chapter 11 Cases and through the close of the Sale, the Debtors employed members of a bargaining unit represented by Teamsters Locals 542 and 848. The Debtors were also party to collective bargaining agreements with Locals 542 and 848 and agreed to be bound by the Western Conference of Teamsters Pension Trust Fund Agreement and Declaration of Trust (the "**Pension Trust Fund Agreement**"). Northwest alleges in the Northwest Request that the Debtors agreed under the Pension Trust Fund Agreement that if they were to withdraw from a pension plan established in connection with the Pension Trust Fund Agreement (the "**Pension Plan**"), they would be generally liable to the Western Conference of Teamsters Pension Trust (the "**Trust Fund**") for a share of the unfunded vested benefits of the Pension Plan, as determined under the Employer Withdrawal Liability Rules and Procedures adopted and amended from time to time by the trustees of the Trust Fund. Northwest further alleges that in 2011, the Debtors had a partial withdrawal from the Pension Plan, and that the consummation of the Sale triggered a complete withdrawal liability. Northwest, as the authorized administrative agent and assignee of the Trust Fund, has calculated the Debtors' total withdrawal liability as $5,223,598.88, $93,970.27 of which could be attributed to the time after the Petition Date.

Following the filing of the Northwest Request, the Plan Proponents engaged in discussions with Northwest regarding the Northwest Request. Following these discussions, the Plan Proponents and Northwest reached the Northwest Settlement, agreeing to reduce and allow the Administrative Claim or Priority Claim in the Northwest Request in the Northwest Request

in the amount of $40,000.00.  The Northwest Settlement has no effect on the General Unsecured Claims of Northwest for withdrawal liability.

Central States also asserts Claims against the Estates for withdrawal liability relating to a pension plan.  In its filed Proofs of Claims, Central States alleges that the Debtors may not have correctly reported contribution amounts, and accordingly, the amounts asserted in its Proofs of Claims may grossly understate the Debtors' withdrawal liability.  Central States further indicates in the Proofs of Claims that at least a portion its Claims are Administrative Expense Claims and/or Priority Claims.  Following discussions, the Plan Proponents and Central States have agreed, pursuant to the Central States Settlement, to reduce and allow the portion of the Central States Claim alleged to constitute an Administrative or Priority Claim in the amount of $270,000.00.  The Central States Settlement has no effect on the General Unsecured Claims of Central States for (among other things) withdrawal liability.

## J.  The AIG Settlement

On January 16, 2014, the AIG Entities filed the AIG Motion, seeking, *inter alia*, an Allowed Administrative Expense Claim in the amount of the 2012 Premium Adjustment (defined below), any premium that becomes due for the 2013/2014 Policy Period (as defined in the AIG Motion), and any other premiums that become due as a result of further adjustments.

AIG provided primary casualty coverage to the Debtors pursuant to two programs, the U.S. Insurance Program and the Canada Insurance Program (collectively, the "**Chartis Insurance Programs**").  In connection with the Chartis Insurance Programs, the AIG Entities hold cash collateral (in the amount of approximately $6,381,880 as reflected in AIG's Summary of Closeout Quotes dated August 15, 2015 and as adjusted thereafter).

On January 9, 2013, the Debtors filed the *Debtors' Motion for an Order (I) Authorizing the Debtors to Assume the Chartis Insurance Programs, (II) Approving the Debtors' Entry into Postpetition Insurance Agreements Pursuant to the Chartis Insurance Programs, and (III) Granting Related Relief* [Docket No. 765] (the "**AIG Assumption Motion**").  On January 24, 2013, the Bankruptcy Court entered an order approving the AIG Assumption Motion [Docket No. 810] (the "**AIG Assumption Order**"), authorizing Chartis (as defined in the AIG Assumption Order and which are certain of the AIG Entities) to have administrative expense claims and obviating the need for Chartis to file Proofs of Claims with respect to such administrative expense claims.

Following entry of the AIG Assumption Order, AIG renewed certain of the U.S. Insurance Programs and Canada Insurance Programs to January 1, 2014.  In the AIG Motion, AIG alleges that the Debtors failed to pay a November 2013 invoice in the amount of $1,141,100.00 (the "**2012 Premium Adjustment**").  The AIG Motion further asserts that AIG was attempting to audit the Debtors' books and records to determine whether any premium obligations were due for the policy period covering January 1, 2013 to January 1, 2014 (the "**2013 Policy Period**") and that it would invoice the Debtors for amounts related to the

2013/2014 Policy Period.    Later, the AIG entities determined that the Debtors owe approximately $93,624 for premium obligations for the 2013/2014 Policy Period.

In reaction to the Sale, AIG filed the AIG Motion to ensure that the Debtors comply with the Assumption Order, including providing for the payment of $1,234,724.00, the 2012 Premium Adjustment and the premium obligation for the 2013/2014 Policy Period.    As described in further detail below, the Plan proposes that on the Effective Date, the AIG Entities receive, in full satisfaction, settlement, release, and discharge of and in exchange for all Allowed AIG Claims, the AIG Cash Collateral plus a cash payment of $1,000,000.

In addition to (i) the agreement of the Debtors and AIG on a form of settlement agreement to be filed as part of the Plan Supplement and (ii) the occurrence of the Effective Date, the effectiveness of the AIG Settlement shall be conditioned upon satisfaction of the following conditions, which may be waived by AIG: (a) the Debtors shall have settled or transferred to the State of Florida all remaining workers' compensation claims, or shall otherwise have withdrawn from the self-insured workers' compensation program in the State of Florida, and (b) the Debtors shall have settled or transferred to the State of Georgia all remaining workers' compensation claims, or shall otherwise have withdrawn from the self-insured workers' compensation program in the State of Georgia.  If these conditions are not satisfied (or waived by AIG) the AIG Settlement will not become effective and the AIG Claims will be treated as Disputed.

**K.**    **Settlement Among the Debtors, the Committee and the First Lien Agents (on behalf of the First Lien Lenders)**

Pursuant to each of the 2012 Final DIP Order and the Replacement DIP Order, the First Lien Agents (for the benefit of the First Lien Lenders) were granted certain "adequate protection" in the form of adequate protection liens and superpriority adequate protection claims to protect them against any diminution in their interests in the Collateral resulting from, *inter alia*, the Debtors' incurrence of debtor in possession financing and use of cash collateral pursuant to the 2012 DIP Order and the Replacement DIP Order.  In addition, pursuant to the JCT Sale Order, the First Lien Agents agreed to fund the Wind Down Budget (as defined therein).

The Committee challenged the amount of the First Lien Agents' adequate protection claims arguing that the priming of the First Lien Facility by the 2012 DIP Facility and the Replacement DIP Facility did not result in a diminution in the value of the Collateral.  Rather, the Committee asserted that those loan facilities allowed the Debtors to preserve and maintain the value of the Collateral, enabling it to be sold to Jack Cooper and SBDRE.  To avoid potentially extensive and protracted litigation over the extent of such diminution, the Debtors, the Committee and the First Lien Agents have agreed that the Plan (including the funds to be made available by the First Lien Agents to fund the distributions contemplated by the Plan) shall constitute a settlement of any and all disputes between or among the Debtors, the Committee and the First Lien Agents (on behalf of the First Lien Lenders), including any such disputes relating

to the First Lien Agents' entitlement to adequate protection and the obligation of the First Lien Agents to fund the Wind Down Budget.

## ARTICLE IV
## DESCRIPTION OF THE PLAN

### A.    Overview

The Plan is a plan of reorganization that provides for a means for the efficient pursuit of the Estate Claims and the Lender Direct Claims, and the maximization of the value of the Debtors' remaining assets through certain continuing business operations.

Jack Cooper and the SBDRE Purchaser acquired substantially all of the Debtors' assets pursuant to the Sale. Accordingly, following the close of the Sale, other than the proceeds of the Sale in which the Debtors hold an interest, the assets that remain in the Debtors' estates include the (i) Estate Claims, (ii) Cash on Hand, (iii) certain interests in recoveries for Taxes, including net operating losses, (iv) three parcels of real property (formerly truck terminals located in Memphis, Tennessee, Soldotna, Alaska, and Columbia, South Carolina) **(the "Retained Property")**, (v) shares of Haul Insurance Limited, the Debtors' captive insurance subsidiary, (vi) the right to recover excess cash collateral pledged to secure obligations under certain self-insured workers' compensation programs and other insurance programs, and (vii) rights related to the foregoing.

After the Effective Date, the Reorganized Debtors will continue a number of business operations, including those related to Haul Insurance Limited,[11] managing the Retained Property (e.g., identifying potential tenants and entering into leases for the Retained Property), and administering certain self-insured workers' compensation programs in Florida, Georgia, and Kentucky.[12] The Reorganized Debtors may also seek to acquire income-producing assets in order to utilize the benefits of retained net operating losses.

The Estate Claims (which together with the Lender Direct Claims comprise the Litigation Trust Assets) shall vest automatically in the Allied Litigation Trust, and the Litigation Claims shall be jointly prosecuted in the Bankruptcy Court (or such other court of competent jurisdiction) in a single action to the maximum extent permitted by law, or otherwise in actions coordinated for the purposes of trial and discovery. The Litigation Oversight Committee and the Litigation Trustee will determine the means by which the Litigation Claims will be prosecuted in order to maximize efficiency and minimize cost. Funding for the prosecution of the Litigation Claims shall be provided through the Litigation Funding Loans issued by the Litigation Lenders.

---

[11] Haul Insurance Limited historically has provided reinsurance on several programs that are ongoing, and will take several years to conclude. The Reorganized Debtors will continue their relationships with certain third-party administrators to oversee the reinsurance programs, including making periodic payments of fees and claims as required.

[12] The Reorganized Debtors will also continue their relationships with certain third-party administrators engaged by the Debtors to oversee the workers compensation programs, including making periodic payments of fees and claims as required.

Each First Lien Lender (other than Yucaipa) is entitled to participate in the Litigation Funding Loans up to its pro rata share of the First Lien Obligations (calculated without giving effect to any First Lien Obligations held or allegedly held by Yucaipa).  The Backstop Parties will backstop the commitments for the full amount of the Litigation Funding Loans.

As described in further detail below, the beneficial interests in the Allied Litigation Trust will be distributed to holders of Claims as a portion of the distributions that will be made under the Plan.  Proceeds of the Litigation Claims will be distributed pursuant to the Litigation Proceeds Waterfall as follows: (1) *first*, to the Backstop Parties in satisfaction of the Backstop Fee to the extent not otherwise paid from draws under the Litigation Funding Loans; (2) *second*, to repay all Litigation Funding Loans then outstanding; (3) *third*, to the Litigation Lenders in the amount of $4.5 million; (4) *fourth*, a distribution of up to the next $3 million, to be allocated on a dollar for dollar basis (i) 50% on a Pro Rata basis to the holders of Allowed First Lien Lender Claims and (ii) 50% on a Pro Rata basis to the holders of Allowed General Unsecured Claims and Allowed Second Lien Lender Claims; and (5) thereafter, any remaining balance shall be split on a dollar for dollar basis as follows (i) 20% on a Pro Rata basis to the holders of Allowed First Lien Lender Claims; (ii) 5% on a Pro Rata basis to the holders of Allowed General Unsecured Claims and Allowed Second Lien Lender Claims; and (iii) 75% to the Litigation Funding Lenders; provided, however, that any distributions made pursuant to subsection (d) of Section 5.14 of the Plan shall be credited against any distributions that would otherwise be made under clause (e) of Section 5.14 of the Plan.  The Litigation Claims seek damages from the defendants (among other relief) in excess of $100 million.  Notwithstanding the foregoing, because the Litigation Claims are at an early stage, the Plan Proponents cannot provide any information on the likelihood of success.

The rest of the Debtors' assets (the Reorganized Debtors' Assets) will revest in the Reorganized Debtors, and the Reorganized Debtors will continue to operate as they have following the close of the Sale.  On the Effective Date, the Plan Administrator shall have all rights and powers to implement provisions of the Plan pertaining to the Plan Administrator, including, without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan; (2) make distributions as contemplated in the Plan, (3) establish and administer any necessary reserves for Disputed Claims that may be required; and (4) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such Disputed Claims.  The Litigation Trustee shall serve as the initial Plan Administrator.

As set forth above, the Plan provides the Plan Administrator with the authority to resolve Disputed Claims.  As Disputed Claims are resolved (either consensually or by Final Order), the amounts related to such Disputed Claims in the Disputed Claim Reserves will be released for distribution to the Debtors' creditors pursuant to the Plan.  For the avoidance of doubt, the Plan Administrator shall not have any obligation to object to or dispute (or expend funds to dispute) any Claims where, in the Plan Administrator's sole judgment, the cost of such objection or dispute is not warranted in light of the potential incremental benefit to the remaining creditors.

## B.    Administrative Claims and Priority Tax Claims

Administrative Claims are specified in section 503 of the Bankruptcy Code and generally include those expenses related to the administration of the Bankruptcy Case.  Priority Tax Claims are those set forth in sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Under the Bankruptcy Code, these Claims may not be "classified" and must be paid in full and in Cash to confirm the Plan.

Under the Plan, all Requests for Payment and Claims for Professional Fees must be filed no later than forty-five (45) days after the Effective Date of the Plan or otherwise be barred for all purposes by operation of the Plan.  Further, contemporaneous with filing the Plan and the Disclosure Statement, the Debtors filed a motion to establish the date by which holders of Administrative Claims (other than governmental entities to the extent provided in Section 503(b)(1)(D) of the Bankruptcy Code) must assert such Claims against the Debtors.  If approved, this bar date will be in advance of the Confirmation Hearing, and the Debtors will provide notice of this bar date in the notice of the Confirmation Hearing.

On the Effective Date, each holder of an Allowed Administrative Claim or an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim or Allowed Priority Tax Claim, either (1) Cash equal to the due and unpaid portion of such Allowed Administrative Claim or Allowed Priority Tax Claim or (2) such different treatment as to which such holder and the Debtors or the Plan Administrator, as applicable, shall have agreed upon in writing.  Alternatively, holders of Allowed Priority Tax Claims could receive treatment in a manner consistent with Bankruptcy Code Section 1129(a)(9)(C).  For the avoidance of doubt, (i) Central States shall receive treatment provided in the Central States Settlement, and (ii) Northwest shall receive the treatment provided in the Northwest Settlement.

## C.    Classification and Treatment of Claims and Interests

Section 1123(a)(1) of the Bankruptcy Code requires that the Debtors designate Classes of Claims and Interests, other than Administrative Expense Claims and Priority Tax Claims, under the Plan consistent with Section 1122 of the Bankruptcy Code.  The classification set forth in the Plan is applicable for purposes of voting, distribution and confirmation of the Plan.

Set forth below are the Classes of Claims and Interests under the Plan, as well as whether or not such Classes are "impaired" within the meaning of the Bankruptcy Code.  Only impaired Classes may vote on the Plan. The Unimpaired Class is deemed to accept the Plan, and the Impaired Class that will not receive a distribution is deemed to reject the Plan.

1.      **Classification and Treatment of Classified Claims and Interests**

a.      **Unimpaired Class of Claims – Not Entitled to Vote and Deemed to Accept**

*Class 1 – Priority Claims.*  Priority Claims are Claims entitled to priority in payment under section 507 of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.  Each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) Cash equal to the unpaid portion of such Allowed Priority Claim or (ii) such different treatment as to which such holder and the Debtors or the Plan Administrator, as applicable, shall have agreed upon in writing.  Class 1 Claims are not impaired under the Plan and are deemed to accept the Plan.

The Plan Administrator will pay Allowed Priority Claims in full on or as soon as practicable after the later of (1) the Effective Date, or (2) the date on which such Claim becomes an Allowed Claim; or at such other time and in such other manner as may be agreed upon in writing between the holder of such Claim and the Plan Administrator.  For the avoidance of doubt, the Plan Administrator shall commence distributions under the Plan to holders of Allowed Priority Claims no later than 60 days after the Effective Date of the Plan.

b.      **Impaired Classes of Claims – Entitled to Vote**

*Class 2 – First Lien Lender Claims.*  First Lien Lender Claims are the Secured Claims held by each First Lien Lender.  Each holder of an Allowed First Lien Lender Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed First Lien Lender Claim its Pro Rata share of: (i) the beneficial interests of the Allied Litigation Trust payable to holders of Allowed First Lien Lender Claims in accordance with the Litigation Proceeds Waterfall, (ii) the First Lien Lender Cash Distribution, provided, however, that each First Lien Lender may elect, in lieu of receipt of its Pro Rata share of the First Lien Lender Cash Distribution, to receive its Pro Rata share of the New Common Stock, and (iii) the First Lien Reserves.  The First Lien Lender Cash Distribution, $2.6 million, will be funded by the Reorganized Debtors, and payments from First Lien Reserves will be made by the First Lien Agents.  Class 2 Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.  For the avoidance of doubt, pursuant to the Third Amendment to the First Lien Credit Agreement, the First Lien Agents hold an irrevocable power of attorney and proxy to vote any First Lien Lender Claims held or allegedly held by Yucaipa.  The First Lien Agents intend to exercise that power of attorney and proxy to vote such First Lien Lender Claims to accept the Plan.

The Plan Administrator will commence distributions of the First Lien Lender Cash Distribution and the First Lien Agents will make distributions from the First Lien Reserves as soon as practicable after the later of (1) the Effective Date, or (2) the date on which the applicable First Lien Lender Claim becomes an Allowed Claim; or at such other time and in such other manner as may be agreed upon in writing between the holder of such First Lien Lender

Claim and the Plan Administrator. For the avoidance of doubt, the Plan Administrator shall commence distributions under the Plan to holders of Allowed First Lien Lender Claims no later than 60 days after the Effective Date of the Plan. Any distribution to Yucaipa (including any distribution to Yucaipa in its capacity as an alleged holder of a Claim in Class 2) shall continue to be held in the Disputed Obligations Escrow (as defined in the JCT Sale Order) and shall be released only in accordance with paragraph 13 of the JCT Sale Order and the Escrow Agreement (as defined in the JCT Sale Order). Further, any payments on account of the distributions of beneficial interests in the Allied Litigation Trust to the holders of Claims in Class 2, payable in accordance with the Litigation Proceeds Waterfall, will be made when proceeds from the Litigation Claims are available.

As noted above, in lieu of its Pro Rata share of the First Lien Lender Cash Distribution, each holder of an Allowed First Lien Lender Claim (other than Yucaipa, who is precluded from making any such election by virtue of the Third Amendment) may elect to receive shares of the New Common Stock by so indicating such election on its Ballot. Those Holders making this election will receive the shares of New Common Stock when the New Governing Documents become effective. Any Holder of First Lien Obligations that either (1) fails to affirmatively make such election on its Ballot, or (2) fails to timely return a Ballot voting to accept the Plan, will be deemed to have elected to receive its Pro Rata Share of the First Lien Lender Cash Distribution. Each of the First Lien Lenders comprising the First Lien Requisite Lender has elected to receive shares of the New Common Stock in lieu of receiving its share of the First Lien Lender Cash Distribution.

*Class 3 – Second Lien Lender Claims.* The Second Lien Lender Claims are Claims held by each Second Lien Lender. Each holder of an Allowed Second Lien Lender Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Second Lien Lender Claim its Pro Rata share of the beneficial interests of the Allied Litigation Trust payable to holders of Allowed Second Lien Lender Claims (calculated on a Pro Rata basis with holders of Allowed General Unsecured Claims) in accordance with the Litigation Proceeds Waterfall, provided, however, that any distribution on account of such beneficial interests shall be turned over to the First Lien Agents for distribution to the First Lien Lenders to the extent required by Sections 4.1 and 4.2 of the Intercreditor Agreement until the First Lien Lenders have been indefeasibly paid in full in Cash. For the avoidance of doubt, the holders of Second Lien Lender Claims shall be deemed to waive the right to participate in the GUC Cash Distribution on account of any unsecured portion of a Second Lien Lender Claim. The Debtors believe that the outstanding principal amount of Second Lien Lender Claims is approximately $30 million. Class 3 Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

*Class 4 – AIG Claims.* The AIG Claims include the Secured Claims asserted by the AIG Entities pursuant to the AIG Motion and the Administrative Expense Claim asserted by the AIG Entities in the amount of $1,281,710.00. On the Effective Date, pursuant to the AIG Settlement (and subject to the satisfaction of the conditions to effectiveness) the AIG Entities shall receive in full satisfaction, settlement, release, and discharge of and in exchange for all Allowed AIG Claims, the AIG Settlement. If the condition to effectiveness of the AIG Settlement are not

satisfied (or waived by AIG) the AIG Settlement will not become effective and the AIG Claims will be treated as Disputed.  Class 4 Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

*Class 5 – General Unsecured Claims.*  General Unsecured Claims are Claims that arose prior to the Petition Date that are not supported by collateral and not entitled to legal priority under the Bankruptcy Code.  Each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, a Pro Rata share of (i) the GUC Cash Distribution and (b) the beneficial interests of the Allied Litigation Trust payable to holders of Allowed General Unsecured Claims (calculated on a Pro Rata basis with holders of Allowed Second Lien Lender Claims) in accordance with the Litigation Proceeds Waterfall.  The GUC Cash Distribution will be $3 million and will be funded from Cash on Hand and/or from the Winddown Reserve.  Class 5 Claims are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

The Plan Administrator will commence distributions of the portion of the GUC Cash Distribution funded with Cash on Hand and/or from the Winddown Reserve to holders of General Unsecured Claims as soon as practicable after the later of (1) the Effective Date, or (2) the date on which the applicable General Unsecured Claim becomes an Allowed Claim; or at such other time and in such other manner as may be agreed upon in writing between the holder of such General Unsecured Claim and the Plan Administrator.  For the avoidance of doubt, the Plan Administrator shall commence distributions under the Plan to holders of Allowed General Unsecured Claims no later than 60 days after the Effective Date of the Plan.  Further, any payments on account of the distributions of beneficial interests in the Allied Litigation Trust to the holders of Claims in Class 4, payable in accordance with the Litigation Proceeds Waterfall, will be made when proceeds from the Litigation Claims are available.

### c.    Impaired Class of Interests – Not Entitled to Vote and Deemed to Reject

*Class 6 – Parent Equity Interests.*  The Parent Equity Interests are the legal, equitable, contractual, or other rights of any Person with respect to the Common Stock.  Holders of Parent Equity Interests shall not receive or retain any distribution under the Plan on account of such Interests, and the Common Stock shall be cancelled as set forth in Section 5.4 of the Plan.  Class 6 Interests are Impaired and will not receive a distribution under the Plan.  Accordingly, Class 6 is deemed to reject the Plan.

### d.    Unimpaired Class of Interests – Not Entitled to Vote and Deemed to Accept

*Class 7 – Subsidiary Equity Interests.*  The Subsidiary Equity Interests are the equity interests in each of the Debtors other than Allied Holdings.  Holders of Subsidiary Equity Interests shall retain such Interests, subject to any corporate reorganization that may be undertaken by the Debtors or the Reorganized Debtors prior to, on or after the Effective Date.

Class 7 Interests are Unimpaired and will not be affected by the Plan.  Accordingly, Class 7 is deemed to accept the Plan.

### 2.    Claims and Interests May Be in More Than One Class

A Claim or Interest is part of a particular Class only to the extent that the Claim or Interest qualifies within the definition of that Class and such Claim or Interest is part of a different Class to the extent that the remainder of the Claim or Interest qualifies within the description of a different Class.  A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent the Claim or Interest is an Allowed Claim or an Allowed Interest and the Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

### 3.    Impairment, Classification, and Related Disputes

A holder of a Claim or Interest may dispute the classification of a Claim or Interest or the treatment of a Class (including whether a Class is Impaired or Unimpaired), by objecting to the Plan or otherwise filing an appropriate motion to challenge the classification, characterization or treatment of the Claim, the Interest, or the Class.  The deadline to file any such motion or objection is the deadline set by the Bankruptcy Court to object to confirmation of the Plan.  If the Bankruptcy Court does not grant the motion or otherwise confirms the Plan without conditioning confirmation upon any grounds raised in such a motion or objection, the treatment, characterization, and classification set forth in the Plan will be binding upon all holders of Claims and Interests.

## D.    Acceptance or Rejection of the Plan

### 1.    Classes of Claims Entitled to Vote

Creditors and Interest holders in Classes 1 and 7 are Unimpaired and are deemed to accept the Plan.  Creditors in Classes 2, 3, 4, and 5 are Impaired and may vote on the Plan.  Holders of Interests in Class 6 are impaired and will not receive a distribution under the Plan.  Therefore, holders of Interests in Class 6 are deemed to reject the Plan.

### 2.    Acceptance by a Class of Claims

In accordance with Bankruptcy Code Section 1126(c), and except as provided in Bankruptcy Code Section 1126(e), the Impaired Classes of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 3.    Cramdown

Class 6 is deemed to reject the Plan.  In addition, one or more of the Impaired Classes of Claims could vote to reject the Plan.  At the Confirmation Hearing, the Debtors will request that

the Bankruptcy Court confirm the Plan notwithstanding such rejection under the cramdown provisions of the Bankruptcy Code, because the Plan is fair and equitable and does not discriminate unfairly with respect to any Class that rejects the Plan.

## E.    Effects of Confirmation

### 1.    Revesting of Reorganized Debtor Assets

On the Effective Date, the Reorganized Debtor Assets shall revest in the Reorganized Debtors.  The value of the Reorganized Debtor Assets is set forth in the Liquidation Analysis attached as Exhibit DS-5 hereto.[13]  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or Bankruptcy Court approval.  Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, and all Liens with respect thereto.  Holders of First Lien Obligations that are considering making the election to receive New Common Stock in lieu of their Pro Rata Share of the First Lien Lender Cash Consideration should be aware that from and after the Effective Date, the Reorganized Debtors will require new capital to, among other things, make the payment required to fund the First Lien Lender Cash Distribution and to pay ongoing costs and expenses.  The Reorganized Debtors may raise such capital through the incurrence of debt or the issuance of additional New Common Stock, which could affect the value of the New Common Stock that would be received by any First Lien Lender making such election.

### 2.    Vesting of Litigation Trust Assets in the Allied Litigation Trust

On the Effective Date, the Estate Claims shall vest automatically in the Allied Litigation Trust for joint prosecution with the Lender Direct Claims.  The proceeds of the Litigation Claims will be distributed to the Beneficiaries pursuant to the Litigation Proceeds Waterfall.

### 3.    Preservation and Retention of Defenses of the Debtor and Rights to Object to Claims and Interests

Confirmation of this Plan will have no impact upon, and will not render *res judicata*: (i) the Debtors', the Reorganized Debtors', the Allied Litigation Trust's, the Litigation Trustee's or the Plan Administrator's rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment; or (iii) any party's right to object to any Claim against the Debtors, subject to any limitation expressly set forth in the Plan.  Similarly, nothing herein shall prejudice or be deemed to prejudice creditors' rights of setoff or recoupment.

---

[13]    No value has been attributed to the Reorganized Debtors' tax attributes because there can be no assurance that the Reorganized Debtors will generate sufficient income to utilize such tax attributes, or that such attributes will be available for use under applicable law.

4.        **Authority to Effectuate the Plan**

Except as expressly set forth in the Plan, on the Effective Date, all matters provided for under the Plan will be authorized and approved without further approval or order of the Bankruptcy Court.

5.        **No Waiver of Legal Privileges**

Confirmation of the Plan will not waive the attorney/client, work product, or other legal privileges of the Debtors.  Further, as set forth in the Plan, (i) the Litigation Trust Assets include the attorney-client privilege related or incidental to the assets identified in definition of the Litigation Trust Assets and (ii) the Reorganized Debtor Assets include the attorney-client privilege related or incidental to the assets identified in the definition of the Reorganized Debtor Assets.  Accordingly, the Plan explicitly preserves the attorney-client privilege, and the Litigation Trustee and the Reorganized Debtors are each authorized to assert the attorney-client privilege related to their respective assets.

F.    **Means of Implementation of the Plan**

1.        **Continued Corporate Existence**

The Reorganized Debtors shall continue to exist as of and after the Effective Date as private legal entities, in accordance with the applicable laws of the State of Delaware, the State of Georgia, the State of Florida, the State of Michigan and the applicable jurisdictions in Canada and pursuant to the New Debtor Governing Documents.  Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may engage in any corporate restructuring prior to, on or after  the Effective Date, which may include the merger, liquidation or dissolution of one or more of the Debtors or the Reorganized Debtors.

2.        **Entity Governance Documentation**

The organizational documents of the Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Bankruptcy Code Section 1123(a)(6), a provision prohibiting the issuance of non-voting equity securities (but only to the extent required by Bankruptcy Code Section 1123(a)(6)).  The amended organizational documents of the Debtors shall constitute the New Debtor Governing Documents.  The New Debtor Governing Documents shall be in substantially the forms of such documents included in the Plan Supplement and shall be in full force and effect as of the Effective Date.

3.        **The Allied Litigation Trust**

a.        **The Litigation Oversight Committee**

The Allied Litigation Trust shall be governed by the Litigation Oversight Committee. The Litigation Oversight Committee shall be comprised of three members: two members

selected by the First Lien Requisite Lender and one member selected by the Committee. Each member of the Litigation Oversight Committee shall be reasonably satisfactory to each of the Backstop Parties. The identity of the members of the Litigation Oversight Committee shall be disclosed prior to the Confirmation Hearing as part of the Plan Supplement in accordance with Section 1129(a)(5) of the Bankruptcy Code. The Litigation Oversight Committee shall be authorized to retain and employ Professionals to assist it with and advise it with respect to its duties under the Plan. All fees and expenses of such Professionals shall be satisfied by the Allied Litigation Trust. The duties and powers of the Litigation Oversight Committee shall terminate upon the final resolution of the Litigation Claims and the final distribution of all proceeds in accordance with the terms of the Litigation Trust Agreement.

### b.      Appointment of the Litigation Trustee

The Litigation Trustee shall be selected by the Litigation Oversight Committee. Pursuant to the Litigation Trust Agreement, the selection of the Litigation Trustee will be determined by a majority vote of the Litigation Oversight Committee and will require the written approval of the two members of the Litigation Oversight Committee selected by the First Lien Requisite Lender. The identity of the Litigation Trustee shall be disclosed prior to the Confirmation Hearing as part of the Plan Supplement in accordance with Section 1129(a)(5) of the Bankruptcy Code.

### c.      Rights, Powers, and Duties of the Allied Litigation Trust and the Litigation Trustee

The Allied Litigation Trust shall be established for the purpose of prosecuting the Litigation Claims. The Litigation Trustee shall be a representative of the Debtors' Estates and shall have the power to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Litigation Trust Agreement; (2) administer the Litigation Trust Assets, including prosecuting, settling, abandoning or compromising any actions that are or relate to the Litigation Trust Assets; (3) employ and compensate professionals and other agents consistent with Section 5.10(b) of the Plan, provided, however, that any such compensation shall be made only out of the proceeds of the Litigation Funding Loans, to the extent not inconsistent with the status of the Allied Litigation Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes; and (4) control attorney/client privilege relating to or arising from the Litigation Trust Assets. The following actions, however, will require prior written approval from the two members of the Litigation Oversight Committee selected by the First Lien Requisite Lender: (1) selection of the Litigation Trustee; (2) any determination to draw funds under the commitments for the Litigation Funding Loans issued by the Litigation Lenders; (3) the incurrence by the Allied Litigation Trust of additional indebtedness to fund the prosecution of the Litigation Claims in excess of the Litigation Funding Loans; (4) retention of counsel and other professionals to assist in prosecution of the Litigation Claims; (5) settlement of all or any portion of the Litigation Claims; and (6) any arrangement for compensation of the Litigation Trustee.

### d.      Compensation of the Litigation Trustee

The Litigation Trustee will be compensated by the Allied Litigation Trust.

### e.      Limitations on Liability

The Litigation Trustee (and each of the members of the Litigation Oversight Committee and each of the Professionals retained by the Litigation Trustee and the Litigation Oversight Committee) shall not incur liability to any Person by reason of discharge of its duties as set forth in the Plan, except in the event of gross negligence or willful misconduct.

### f.      Retention of Professionals

The Allied Litigation Trust (with the approval of the two member of the Litigation Oversight Committee appointed by the First Lien Requisite Lenders) may retain attorneys, accountants, or other professionals to assist in the prosecution of the Litigation Claims.  The Litigation Trust may compensate such Professionals without prior order of the Bankruptcy Court.

### 4.      Committee

Upon the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) obligations arising under confidentiality agreements which shall remain in full force and effect according to their terms; (b) applications for Professional Fee Claims filed by or on behalf of the Committee; (c) any motions or other actions seeking enforcement or implementation of the provisions of this Plan, the Confirmation Order or the Litigation Trust Agreement, and (d) providing assistance (if requested by the Litigation Trustee) in connection with the Litigation Claims or in defending any claim brought against the Committee by any party in the Litigation Claims.  Professionals retained by the Committee shall be entitled to reasonable compensation for services rendered in connection with the matters identified in clauses (b), (c) and (d) after the Effective Date, subject to a budget to be agreed between the Committee and the members of the Litigation Oversight Committee appointed by First Lien Requisite Lender.

### 5.      Retiree Committee

Upon the Effective Date, the Retiree Committee shall dissolve automatically, whereupon its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code.

**G.      Objection to and Resolution of Claims Against and Interests in the Debtors**

**1.      Consolidation for Distribution Purposes Only**

Solely for the purposes of determining the Allowed amount of Claims to be used in calculating distributions to be made pursuant to the Plan, any Holder asserting the same Claim against more than one Debtor (based on a guarantee, joint and several liability under contract or applicable law, or any other basis) shall be deemed to have only one Claim and shall only receive distributions under the Plan on account of such Claim.

**2.      Authority to Object to and Resolve Objections to Claims and Interests**

As set forth above, the Plan Administrator may prosecute, settle, or decline to pursue objections to any Claims against or Interests in the Debtors in accordance with the terms of the Plan, whether objections to the Claims or Interests were filed prior to or after the Effective Date. The Plan Administrator shall have no obligation to raise or prosecute any objections to Claims or Interests.

**3.      Deadline for Objection to Claims and Interests**

The last day for filing objections to Claims in the Bankruptcy Court shall be the latest of (1) sixty (60) days after the Effective Date, (2) sixty (60) days after the applicable Proof of Claim or Request for Payment is filed (except as otherwise provided in Section 10.1 of the Plan), and (3) such other later date as is established by order of the Bankruptcy Court upon motion of the Plan Administrator.  The Plan Administrator may, in its discretion, move to extend the Claim Objection Deadline at any time prior to the expiration of the Claim Objection Deadline.

**4.      No Bankruptcy Court Approval Required for Resolution of Disputed Claims**

The Plan does not require the Plan Administrator to obtain Bankruptcy Court approval for the resolution of any Disputed Claim.  To the extent, however, the Plan Administrator is unable to resolve a Disputed Claim, the Plan Administrator will request the Bankruptcy Court to make a determination resolving such Disputed Claim.

**5.      Estimation of Claims**

The Plan authorizes the Plan Administrator to request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code.  The Bankruptcy Court may estimate Claims to: (1) establish the Allowed amount of the Claim for purposes of distribution; or (2) to establish the maximum amount of any such Claim, without prejudice to the Plan Administrator later objecting to the Claim.

## H.     Distributions

### 1.     No Distributions on Account of Disputed Claims

No distribution shall be made on account of any Disputed Claim until and unless such Disputed Claim becomes an Allowed Claim.

### 2.     Setoff

The Plan Administrator may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Reorganized Debtors or the Litigation Trustee may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Allied Litigation Trust of any such claim that the Debtors, the Reorganized Debtors or the Allied Litigation Trust may have against such holder.

### 3.     The Disputed Claims Reserve

Prior to making any distribution to holders of Claims, the Plan Administrator shall establish a Disputed Claims Reserve for Disputed Claims for each Class, which shall be administered by the Plan Administrator.  The Plan Administrator shall reserve in Cash or other property, for distribution on account of each Disputed Claim, the amount that would be distributed to the holder of such Disputed Claim if such claim were Allowed in the full asserted amount (or such lesser amount as may be estimated or otherwise ordered by the Bankruptcy Court in accordance with Section 7.5 of the Plan or otherwise) with respect to each Disputed Claim.

### 4.     Maintenance of the Disputed Claims Reserve and other Cash of the Debtors and the Estates

Except as otherwise provided in the Plan, the Plan Administrator may hold Cash of the Estates in one or more accounts that the Plan Administrator determines to be in the best interests of the Estates.  Any reference to the establishment or maintenance of any reserves contained in the Plan, including the Disputed Claims Reserves, will not require the Plan Administrator to establish separate deposit or similar accounts for such reserves.  The establishment of reserves under the Plan may be accomplished by accounting, general ledger, paper, or other book entry, as the Plan Administrator may determine.

### 5.     Finality of Distributions

All distributions made under the Plan shall be final, and none of the Estates, the Litigation Trustee, nor any representative of the Debtors' Estates may seek disgorgement of any distributions made under the Plan.

6.        **Manner of Payment; Delivery of Distributions**

Except as otherwise set forth in the Plan, the Plan Administrator will make all Cash distributions under the Plan in Cash made by check drawn on a domestic bank or by wire transfer or ACH from a domestic bank.

7.        **Undeliverable Distributions**

If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Plan Administrator is notified by the Claims Agent or such holder of such holder's then current address, at which time all missed distributions shall be made, subject to Section 7.2(d) of the Plan, to such holder without interest.  If any distribution is made by check and such check is not returned but remains uncashed for three (3) months after the date of such check, the Plan Administrator may cancel and void such check, and the distribution with respect thereto shall be deemed undeliverable.  If, pursuant to Section 7.8 of the Plan, any holder is requested to provide an applicable Internal Revenue Service form or to otherwise satisfy any tax withholding requirements with respect to a distribution and such holder fails to do so within three (3) months of the date of such request, such holder's distribution shall be deemed undeliverable.

8.        **Fractional Amounts**

The Plan Administrator may elect not to make distributions of Cash in fractions of dollars.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the Plan Administrator may round the amount of such distribution to the nearest dollar (up or down).

9.        **De Minimis Distributions**

The Plan Administrator may elect not to make a distribution of less than $25.00 to any holder of an Allowed Claim unless the distribution is a final distribution.  If, at any time, the Plan Administrator determines that the remaining Cash and other assets are not sufficient to make distributions to holders of Allowed Claims in an amount that would warrant the Plan Administrator incurring the cost of making such a distribution, the Plan Administrator may dispose of such remaining Cash and other assets in a manner the Plan Administrator deems appropriate.

10.        **Withholding and Reporting Requirements**

In connection with the Plan and all distributions thereunder, the Plan Administrator shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a distribution, the holder of an Allowed Claim complete the

appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder.  Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the applicable Plan Administrator to allow it to comply with its tax withholding and reporting requirements.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Plan Administrator, as the case may be, until such time as the Plan Administrator is satisfied with the holder's arrangements for any withholding tax obligations.

## I.    Injunctions and Limitations of Liability

### 1.    Injunction

**Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged pursuant to Section 10.7 of the Plan or Bankruptcy Code Sections 524 and 1141 or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, the Committee, the Allied Litigation Trust, the Litigation Oversight Committee, the Plan Administrator, the Litigation Trustee, the First Lien Agents, their respective directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, and their respective subsidiaries or their property, on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights:    (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtors, the Allied Litigation Trust or the Litigation Trustee; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

**As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors, the Committee, the Reorganized Debtors, the First Lien Agents, the Allied Litigation Trust, the Litigation Oversight Committee, the Plan Administrator or the Litigation Trustee any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and**

**liabilities against the Debtors and termination of all Common Stock, pursuant to Bankruptcy Code Sections 524 and 1141, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.**

2. **No Liability for Solicitation or Participation**

Pursuant to section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

3. **Exculpation and Limitation of Liability**

**To the fullest extent permitted by applicable law and approved in the Confirmation Order, neither the Debtors, nor the Litigation Oversight Committee, nor any Released Party shall have any liability for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that constitute or are the result of fraud, criminal conduct, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.**

**Notwithstanding any other provision of the Plan other than Section 10.2 of the Plan, to the fullest extent permitted by applicable law and approved in the Confirmation Order, no holder of a Claim or an Interest, no other party in interest, and none of their respective present or former directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, shall have any right of action against the Debtors, the Litigation Oversight Committee or any Released Party for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that constitute or are the result of fraud, criminal conduct, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.**

4. **Releases**

a. **Releases by the Debtor**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, the Plan Administrator, the

Allied Litigation Trust, the Litigation Trustee and any Person (including the Committee and the First Lien Agents) seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to Bankruptcy Code Section 1123(b)(3), shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, willful misconduct, criminal conduct and/or gross negligence), whether direct or derivative, in connection with or related to the Debtors, the Chapter 11 Cases, or the Plan (other than the rights of the Debtors, the Committee, the Reorganized Debtors, the Allied Litigation Trust, the Litigation Trustee and the First Lien Agents to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date against (i) any of the directors and officers of the Debtors serving during the pendency of the Chapter 11 Cases, other than those directors and officers named as defendants in either the Amended Complaint or the Lender Direct Complaint or any other director or officer that is party to a tolling agreement with the Committee, (ii) any Professionals of the Debtors, (iii) the First Lien Agents, in their capacity as such, (iv) the First Lien Lenders (other than Yucaipa) in their capacity as such, (v) any Professional of the First Lien Agents, (vi) the Second Lien Lenders (other than Yucaipa) in their capacity as such, (vii) any Professional for the Second Lien Lenders (other than Yucaipa), (viii) the members of the Committee, but only in their capacity as such, (ix) any Professional of the Committee, in their capacity as such; and (x) with respect to the Persons identified in clauses (ii) through (ix), their respective directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns (collectively, the "Released Parties"); provided, however, that nothing in Section 10.6(a) of the Plan shall be deemed to prohibit the Debtors, the Reorganized Debtors, the Allied Litigation Trust, the Litigation Trustee, the Plan Administrator or the First Lien Agents from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any Person identified as a defendant in any of the Litigation Claims.

### b.    Releases by Holders of Claims and Interests

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim or Interest that affirmatively votes in favor of the Plan and does not otherwise elect on its Ballot to withhold the release contemplated by Section 10.6(b) of the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever (other than for fraud, willful misconduct, criminal conduct and/or gross negligence) against the Released Parties in connection with or related to the Debtors, the Chapter 11 Cases, or the Plan (other than the rights under the Plan and the contracts,

instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; provided, however, that nothing herein shall be deemed a waiver or release of a Claim holder's right to receive a distribution pursuant to the terms of the Plan or any obligation under the Plan or Confirmation Order.  For the avoidance of doubt, this Release by holders of Claims and Interests is not and shall not be deemed a waiver of the Debtors' rights or claims against the holders of Claims and Interests, including to the Debtors' rights to assert setoffs, recoupments or counterclaims, or to object or assert defenses to any such Claim, and all such rights, causes of action and claims are expressly reserved, except as otherwise provided in the Plan or other Final Order.  For the avoidance of doubt, nothing contained in Section 10.6(b) of the Plan shall be deemed to prohibit the First Lien Lenders from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any Person identified as a defendant in any of the Litigation Claims.

**J.      Certain Provisions Relating to Central States, Southeast and Southwest Area Pension Fund**

Notwithstanding anything to the contrary contained in the Plan (including, but without limitation, Sections 10.6, 10.7, 10.8 and 10.9 of the Plan), neither Yucaipa nor any Affiliate, officer, director, member or shareholder thereof shall be released from any claim or liability (including, without limitation, any liability or Claim for withdrawal liability under 29 U.S.C. §§ 1383 and 1385) now or hereafter owing to Central States, Southeast and Southwest Area Pension Fund ("**Central States Pension Fund**"), a multi-employer plan as that term is defined by 29 U.S.C. § 1301(a)(3), as a result of any Debtor's participation in Central States Pension Fund. For the avoidance of doubt, subject to the Central States Settlement, nothing in this paragraph shall restrict Central States Pension Fund's right to receive distributions on its Claims pursuant to the terms of the Plan.

Notwithstanding anything to the contrary contained in the Plan, no provision of the Plan shall be construed as discharging, releasing or relieving any party (other than the Reorganized Debtors and their subsidiaries), in any capacity, from any liability imposed under any law or regulatory provision with respect to any pension plans covered by Title IV or ERISA or the Pension Benefit Guaranty Corporation (the "**PBGC**").  Neither the PBGC nor any pension plans covered by Title IV or ERISA will be enjoined or precluded from enforcing any such liability as a result of any provision of the Plan or the Confirmation Order.

**1.      Release of Liens**

Except as otherwise provided in the Plan or the Confirmation Order, all Liens, security interests, deeds of trust, or mortgages against property of the Debtors or the Estates shall be deemed to be released, terminated, and nullified on the Effective Date.

## 2. Cancellation of Instruments

Unless otherwise provided for in the Plan, on the Effective Date, all Old Securities, including all promissory notes, instruments, indentures, agreements, or other documents evidencing, giving rise to, or governing any Claim against or Parent Equity Interest in the Debtors shall represent only the right, if any, to participate in the distributions contemplated by the Plan.

## 3. Authorization and Issuance of the New Common Stock

On the Effective Date, Reorganized Allied Holdings shall issue shares of New Common Stock to the New Common Stockholders. The rights of the New Common Stockholders shall be as provided for in the New Debtor Governing Documents.

## K. Other Plan Matters

### 1. Executory Contracts and Unexpired Leases

#### a. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except for the executory contracts and unexpired leases listed in the Plan Supplement, if any, and except to the extent that a Debtor either previously has assumed, assumed and assigned or rejected an executory contract or unexpired lease by an order of the Bankruptcy Court, including, but not limited to, the JCT Sale Order or the SBDRE Sale Order, or has filed a motion to assume or assume and assign an executory contract or unexpired lease prior to the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Assumed Contracts listed in the Plan Supplement will be assumed effective on the Effective Date of the Plan. Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection or assumption, as appropriate, of such contracts rejected or assumed pursuant to the Plan. The Debtors shall provide written notice to each counterparty to an executory contract or unexpired lease as to whether such contract or lease constitutes an Assumed Contract or has been rejected (together with a statement of the date by which any Proof of Claim must be filed).

#### b. Claims for Rejection Damages

Proofs of Claim for damages allegedly arising from the rejection of any contract pursuant to the Plan must be filed with the Bankruptcy Court and served on the Plan Administrator not later than thirty (30) days after the Effective Date. All Proofs of Claim for such damages not timely filed and properly served as prescribed herein shall be forever barred and the holder of such a Claim shall not be entitled to participate in any distribution under the Plan.

### c.    Objections to Proofs of Claim Based On Rejection Damages

Objections to any Proof of Claim based on the rejection of an Executory Contract pursuant to the Plan may be made as otherwise set forth in the Plan.

### 2.    Conditions Precedent to Confirmation

The following are conditions precedent to Confirmation of the Plan: (1) an order pursuant to Bankruptcy Code Section 1125 shall have been entered finding that the Disclosure Statement contains adequate information; (2) the proposed Confirmation Order, in form and substance satisfactory to the Debtors, the First Lien Requisite Lenders and the Committee, shall have been submitted to the Bankruptcy Court; (3) the Bankruptcy Court shall have approved the Northwest Settlement, the Central States Settlement, the AIG Settlement and the settlement among the First Lien Agents (in behalf of the First Lien Lenders), the Debtors and the Committee as contemplated by Section 5.15 of the Plan, and (4) the Bankruptcy Court shall have determined that the Plan satisfies the requirements for confirmation under the Bankruptcy Code.

### 3.    Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date of the Plan: (1) the Confirmation Order shall have been entered; (2) the Confirmation Order shall, among other things: (i) provide that the Debtors, the Reorganized Debtors, the Committee, the Plan Administrator, the Litigation Trustee, the Litigation Oversight Committee and the Allied Litigation Trust are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the transactions contemplated by and the contracts, instruments, releases, indentures, and other agreements or documents created under or in connection with the Plan; and (ii) authorize the issuance of the New Common Stock; (3) the Confirmation Order shall not then be stayed, vacated, or reversed; (4) all other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed, or will be effected or executed contemporaneously with implementation of the Plan (including, without limitation, the New Debtor Governing Documents), each of which shall be in form and substance acceptable to the First Lien Requisite Lender; (5) the Cash necessary to fund the First Lien Lender Cash Distribution and the GUC Cash Distribution shall have been provided to the Plan Administrator; (6) the fees and expenses required to be paid on the Effective Date pursuant to Section 10.2 of the Plan shall have been paid in full in Cash; (7) the aggregate amount of all Allowed Administrative Claims and Priority Tax Claims shall not exceed $4.5 million (such cap to be reduced for all administrative expenses and other wind-down costs paid by the Debtors, in the ordinary course, on or after the date of this Disclosure Statement and prior to the Effective Date) and the aggregate amount of all Allowed Priority Claims shall not exceed $275,000; (8) BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P. shall each have executed and delivered the Reorganized Allied Holdings Shareholders' Agreement; (9) either the Confirmation Order shall provide that the Retiree Benefit Plans are terminated by their terms on the Effective Date or the 1114 Order shall have been entered; and (10) the Effective Date shall have occurred by no later than September 30, 2015.

4.      **Operations of the Debtors Between the Confirmation Date and the Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all Final Orders.

5.      **Retention of Jurisdiction**

From and after the Effective Date, and notwithstanding the entry of the Confirmation Order, to the extent it has jurisdiction, the Bankruptcy Court shall retain exclusive jurisdiction of the Chapter 11 Cases and all matters arising under, arising out of, or related to the Chapter 11Cases, the Plan, and the Confirmation Order to the fullest extent permitted by law, including, among other things, jurisdiction to:

(1) allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim (whether a Filed Claim or Unfiled Claim) or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including, without limitation, the resolution of any Request for Payment  and the resolution of any objections to the allowance or priority of Claims;

(2) hear and determine all applications for Professional Fees; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors, the Plan Administrator or the Allied Litigation Trust (to the extent different from those of the Plan Administrator) shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(3) hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtors were a party or with respect to which the Debtors may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(4) effectuate performance of and payments under the provisions of the Plan;

(5) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Litigation Claims, the Chapter 11 Cases, including, without limitation, any matters arising out of the asset purchase agreements evidencing the Sale, the JCT Sale Order, and the SBDRE Sale Order;

(6) enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(7) hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with the Plan, provided, however, that any dispute arising under or in connection with the New Debtor Governing Documents shall be adjudicated in accordance with the provisions of the applicable document;

(8) consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(9) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(10) enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(11) hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

(12) enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or provided for under the Plan;

(13) except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(14) hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code Sections 346, 505, and 1146;

(15) hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(16) hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(17) enter a final decree closing the Chapter 11 Cases.

## 6.    Post-Effective Date Reporting and Payment of Certain Fees

The Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable.  All such fees payable after the Effective Date shall be paid by the Plan

Administrator as and when due, until such time as the Chapter 11 Cases are closed, dismissed or converted.

### 7. Modification of the Plan

The Plan Proponents may alter, amend, or modify the Plan under Bankruptcy Code Section 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Bankruptcy Code Section 1101(2), the Plan Proponents may under Bankruptcy Code Section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

### 8. Revocation or Withdrawal of the Plan

The Plan Proponents may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Plan Proponents or any other Person or to prejudice in any manner the rights of the Plan Proponents or any Person in any further proceedings involving the Plan Proponents.

### L. Miscellaneous Provisions

### 1. Exemption from Transfer Taxes

All transfers of assets made pursuant to the terms of the Plan shall be exempt from all stamp, transfer, and similar taxes within the meaning of Section 1146(c) of the Bankruptcy Code, to the fullest extent permitted by law.

### 2. No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors with respect to any matter set forth in the Plan including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

### 3. Controlling Documents

If there is an inconsistency or ambiguity between any term or provision contained in this Disclosure Statement and the Plan, the terms and provisions of the Plan shall control. To the extent there is an inconsistency or ambiguity between any term or provision contained in the Plan and the Confirmation Order, the terms and provisions of the Confirmation Order shall control.

4.    **Governing Law**

Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal laws are applicable, the laws of the State of Delaware shall govern the construction, implementation, and enforcement of the Plan and all rights and obligations arising under the Plan, without giving effect to the principles of conflicts of law.

5.    **Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heir, executor, administrator, representative, successor, or assign of such Person.

6.    **Severability**

Should the Bankruptcy Court determine, on or prior to the Confirmation Date, that any provision of the Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Interest, the Bankruptcy Court may alter and modify such provision to make it valid and enforceable to the maximum extent practicable consistent with the original purpose of such provision.  Notwithstanding any such determination, interpretation, or alteration, the remainder of the terms and provisions of the Plan shall remain in full force and effect.

7.    **Integration**

The Plan Supplement is incorporated in and is a part of the Plan as if set forth in full therein.

8.    **Binding Effect**

The Plan is binding on and inures to the benefit of (and detriment to, as the case may be) the Debtors and all holders of Claims or Interests (whether or not they have accepted this Plan) and their respective personal representatives, successors, and assigns.

9.    **Withholding and Reporting**

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, the Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding and reporting requirements.  Notwithstanding anything in the Plan to the contrary, in calculating and making the payments under this Plan, the Plan Administrator may deduct from such payments any necessary withholding amount.

10.     **Other Documents and Actions**

Subject to the provisions of the Plan, the Plan Administrator, the Litigation Trustee or the Reorganized Debtors, as applicable, may execute, deliver, file, or record such documents, contracts, instruments, releases and other agreements, and take such other action as is reasonable, necessary, or appropriate to effectuate the transactions provided for in the Plan, without any further action by or approval of the Bankruptcy Court.

11.     **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under Section 1101 and 1127(b) of the Bankruptcy Code.

12.     **Aid and Recognition**

The Debtors, the Reorganized Debtors, the Plan Administrator or Litigation Trustee, as the case may be, shall, as needed to effect the terms hereof, request the aid and recognition of any court or judicial, regulatory or administrative body in any province or territory of Canada or any other nation or state.

## ARTICLE V
## FINANCIAL INFORMATION

The Debtors have filed the Schedules and monthly operating reports with the Bankruptcy Court.  This financial information may be examined in the Bankruptcy Court Clerk's Office and is also available on the following website:  http://www.omnimgt.com/alliedsystems.

## ARTICLE VI
## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

A.     **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

B.     **Confirmation Standards**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Bankruptcy Code Section 1129(a) have been satisfied with respect to the Plan. The Plan Proponents believe that:  (1) the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Debtors have complied or will have complied with

all of the requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the applicable confirmation requirements of Bankruptcy Code Section 1129(a) set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors and the other Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means proscribed by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed or will have disclosed prior to the Confirmation Hearing (i) the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director or officer of the Reorganized Debtors or as the Litigation Trustee or the lead individual working for or on behalf of the Litigation Trustee, (ii) any affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and (iii) the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

- With respect to each Impaired Class of Claims, each holder of an Impaired Claim either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

- As set forth above, because Class 6 is deemed to reject the Plan (and other Classes of Impaired Claims could vote to reject the Plan), the Debtors will request that the Bankruptcy Court confirm the Plan notwithstanding such rejection under the cramdown provisions of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims,

Allowed Priority Tax Claims and Allowed Priority Claims will be paid in full on the Distribution Date.

- At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

- All fees payable under Section 1930 of Title 28 have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## C.    Best Interests Test/Liquidation Analysis

As described above, Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Because the majority of the Debtors' assets have already been liquidated to Cash, the value of any distributions if the Debtors' Chapter 11 Cases were converted to a case under Chapter 7 of the Bankruptcy Code would be less than the value of distributions under the Plan. This is because conversion of the Chapter 11 Cases to Chapter 7 cases would require the appointment of a Chapter 7 trustee, and in turn, such Chapter 7 trustee's likely retention of new professionals. The "learning curve" that the trustee and new professionals would be faced with comes at a significant cost to the Estates and with a significant delay compared to the time of distributions under the Plan (and prosecution of the Estate Claims). Worse still, a Chapter 7 trustee would be entitled to significant fees relating to the distributions of the already monetized assets made to creditors. Accordingly, a portion of the Cash currently available for distribution to holders of Claims would instead be paid to the Chapter 7 trustee. Attached hereto as Exhibit DS-5 is a liquidation analysis supporting the Plan Proponents' belief that creditors would receive less value if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

As a result, the Plan Proponents believe that the Estates would have fewer funds to be distributed in a hypothetical Chapter 7 liquidation than it would if this Plan is confirmed, and therefore holders of Claims in all Impaired Classes will recover less than in the hypothetical Chapter 7 cases. In addition, if the Chapter 11 Cases were converted to cases under the Chapter 7 of the Bankruptcy Code, the only constituents that likely would receive any recovery would be the holders of Allowed First Lien Lender Claims as the assets belonging to the Estates (which, for the most part already have been liquidated) are insufficient to satisfy the Claims of the First Lien Lenders. Therefore, without the structure of the Plan, all of the creditors with Claims of lower priority than the First Lien Lender Claims would likely receive little, if any, recovery on account of their Claims. Accordingly, the Debtors believe that the "best interests" test of Bankruptcy Code Section 1129 is satisfied.

## D.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial

reorganization. For the purposes of whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. The Debtors believe that the Plan Administrator will be able to make all payments required under the Plan and that the Litigation Trustee will be able to adequately prosecute the Estate Claims. Moreover, the Reorganized Debtors have the same ability to operate their limited businesses after Confirmation as they did before. Therefore, Confirmation is not likely to be followed by liquidation or the need for further reorganization.

**E.     Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class. The Plan Proponents believe this Plan meets the test.

**1.     No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair". The Plan does not discriminates unfairly against any Impaired Class of Claims or Interests. Indeed, each holder of a Claim will receive equal treatment to the other holders of similarly situated Claims. Further, no holder of a Parent Company Interest will receive a distribution, and accordingly, each holder of a Parent Company Interest will receive equal treatment. In addition, while the holders of Subsidiary Equity Interests will retain their Interests under the Plan, and such treatment is different than the treatment that the holders of Parent Company Interests will receive, this disparate treatment is not unfair discrimination in violation of the provisions of the Bankruptcy Code relating to confirmation. The treatment of the Subsidiary Equity Interests only contemplates maintaining the Debtors' corporate structure, as each holder of a Subsidiary Equity Interest is a Debtor. Accordingly, the disparate treatment of Classes 6 and 7 is not unfair discrimination.

**2.     Fair and Equitable Test**

This test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class. As to the dissenting class, the test sets different standards depending on the type of claims against or interests in the debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

• Secured Creditors: Each holder of a secured claim either (1) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the Chapter 11 plan, of at least the allowed amount of such claim, (2) has the right to credit bid the amount of its claim if its property is sold

and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (3) receives the "indubitable equivalent" of its allowed secured claim.

• Unsecured Creditors: Either (1) each holder of an impaired unsecured claim receives or retains under the Chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Chapter 11 plan.

• Equity Interests: Either (1) each holder of an interest will receive or retain under the Chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference (if any) to which such holder is entitled, the fixed redemption price (if any) to which such holder is entitled, or the value of the interest or (2) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement because all of the foregoing requirements have been met, there is no Class of equal priority receiving more favorable treatment, and no holder of a lower class recovers anything until higher classes are paid in full other than that the holders of Subsidiary Equity Interests will retain such Interests while the holders of Parent Company Interests will not.  As set forth above, this variation in treatment does not violate the "fair and equitable" requirement because the treatment of Interests in Class 7 only serves as a means of maintaining the Debtors' corporate structure following the Effective Date.

## ARTICLE VII
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that confirmation of the Plan represents the best mechanism for expediting a prompt distribution of the Debtors' assets to holders of Claims and Interests. The alternatives to confirmation of the Plan include (a) development of an alternative plan, (b) dismissal of the Bankruptcy Case, or (c) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  The Plan Proponents believe that each of these alternatives is inferior to confirmation of the Plan.

The Plan substantially, though not entirely, implements the rights that creditors and holders of Interests would otherwise have under a non-bankruptcy distribution of the Debtors' assets.  The Plan Proponents do not believe that there are any other reasonable alternative and better plan structures because there are very few estate assets that have not been liquidated, and the largest unliquidated asset of the Debtors' Estates is the Estate Claims for which the Plan provides the best mechanism for liquidation.  Another alternative plan would simply introduce delay and added expense for little, or no, benefit.  Therefore, the Plan Proponents believe that pursuing an alternative plan is not appropriate.

Dismissal of the Chapter 11 Cases is also an inferior alternative.  Dismissal would, among other things, (a) eliminate the efficacy of the Bar Date Order thereby creating

-55-

considerable risks and added costs; (b) cause the automatic stay to terminate; (c) eliminate a forum for contesting Claims; and (d) eliminate the most efficient means for the Debtors to liquidate the Estate Claims.  Therefore, dismissal of the Chapter 11 Cases provides no benefit and is not an appropriate alterative to the Plan.

Conversion of these cases to cases under Chapter 7 also is an inferior alternative. Conversion of these cases to cases under Chapter 7 would result in the appointment of a Chapter 7 trustee and, likely, the retention of new professionals.  The Chapter 7 trustee also would be entitled to a percentage fee for distributions.  The costs alone of replacing the Debtors' current fiduciary and professionals would be disproportionate and unnecessary.  Furthermore, the flexibility of the plan process, as described in this Disclosure Statement, makes confirmation of the Plan more efficient and effective than conversion of these cases to Chapter 7.

If the Effective Date of the Plan is delayed, or the Plan is not confirmed, the Debtors will continue to incur Professional Fees that will consume Cash that would otherwise be available to satisfy Allowed Claims.  Such a delay would also delay distributions of Allowed Claims, because distributions will not be made until the Effective Date of the Plan.

There are numerous permutations and/or alternatives to the proposed Plan, ranging from technical differences to differences in certain provisions that could be deemed material.  It is the Plan Proponents' estimation that the most likely alternative that would provide a meaningfully different structure would be a conversion to Chapter 7.  Such an alternative would consume additional Cash in the form of the Chapter 7 trustee's statutory fees as well as the other factors set forth in Section VI.C of this Disclosure Statement, and likely delay distribution of Allowed Claims when compared to the proposed Plan.

## ARTICLE VIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Interests.  The Plan Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to holders of Claims and Interests as a result of the confirmation of the Plan.  All holders of Claims and Interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan.  **This Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any Creditor, Interest holder, or other party in interest.**

## ARTICLE IX
## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation of the Plan is in the best interests of all holders of Claims and urge all holders of Claims in Classes 2, 3, 4, and 5 to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Claims Agent at the address set forth above so that they will actually be received on or before 4:00 p.m., prevailing Eastern Time, [●], 2015.

Dated: June 17, 2015

**ASHINC Corp.**
(for itself and on behalf of each Debtor)

By:   _/s/ John F. Blount_____
    Name:  John F. Blount
    Title:  President and CEO/Wind-Down Officer

**Official Committee of Unsecured Creditors**

By:   _/s/ Michael G. Burke_____
    Name: Michael G. Burke
    Title:  Counsel to the Official Committee of
           Unsecured Creditors

**First Lien Agents**
By:   _/s/ Adam C. Harris_____
    Name: Adam C. Harris
    Title: Counsel to the First Lien Agents

| | |
|---|---|
| Mark D. Collins (No. 2981) | Jeffrey W. Kelley (GA Bar No. 412296) |
| Marisa A. Terranova (No. 5396) | Matthew R. Brooks (GA Bar No. 378018) |
| RICHARDS, LAYTON & FINGER, P.A. | TROUTMAN SANDERS LLP |
| One Rodney Square | Bank of America Plaza |
| 920 North King Street | 600 Peachtree Street, Suite 5200 |
| Wilmington, Delaware 19801 | Atlanta, Georgia 30308-2216 |
| Telephone No.: (302) 651-7700 | Telephone No.: (404) 885-3000 |
| Facsimile No.: (302) 651-7701 | Facsimile No.: (404) 885-3900 |
| E-Mail: collins@rlf.com | E-Mail: jeffrey.kelley@troutmansanders.com |
| E-Mail: terranova@rlf.com | E-Mail: matthew.brooks@troutmansanders.com |

*Attorneys for the Debtors and Debtors in Possession*

- and -

| | |
|---|---|
| William D. Sullivan (No. 2820) | Michael G. Burke |
| William A. Hazeltine (No. 3294) | Brian Lohan |
| SULLIVAN HAZELTINE ALLINSON LLC | SIDLEY AUSTIN LLP |
| 901 North Market Street, Suite 1300 | 787 Seventh Avenue |
| Wilmington, Delaware 19801 | New York, NY 10019 |
| Telephone No.: (302) 428-8191 | Telephone No.: (212) 839-5200 |
| Facsimile No.: (302) 428-8195 | Facsimile No.: (212) 839-5599 |
| E-Mail: whazeltine@sha-llc.com | E-Mail: mgburke@sidley.com |
| E-Mail: bsullivan@sha-llc.com | E-Mail: blohan@Sidley.com |

*Attorneys for the Committee*

- and -

| | |
|---|---|
| Adam G. Landis (No. 3407) | Adam C. Harris |
| Kerri K. Mumford (No. 4186) | Robert J. Ward |
| LANDIS RATH & COBB LLP | SCHULTE ROTH & ZABEL LLP |
| 919 North Market Street, Suite 1800 | 919 Third Avenue |
| Wilmington, Delaware 19801 | New York, NY 10022 |
| Telephone No.: (302) 467-4400 | Telephone No.: (212) 756-200 |
| Facsimile No.: (302) 467-4450 | Facsimile No.: (212) 593-5955 |
| E-Mail: landis@lrclaw.com | E-Mail: Adam.Harris@srz.com |
| E-Mail: mumford@lrclaw.com | E-Mail: Robert.Ward@srz.com |

*Attorneys for the First Lien Agents*