# <u>EXHIBIT DS-2</u>

# [MACAULAY DECLARATION]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ALLIED SYSTEMS HOLDINGS, INC.,** *et al.,*[1] | **Case No. 12-11564 (CSS)** |
| **Debtors.** | **(Joint Administration Pending)** |

## DECLARATION OF SCOTT D. MACAULAY IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Scott D. Macaulay, being duly sworn, deposes and says:

1.     I am Senior Vice President and Chief Financial Officer of Allied Systems Holdings, Inc.  In this capacity, I have substantial knowledge about the business of Allied Systems Holdings, Inc. and its direct and indirect subsidiaries (collectively "**Allied**").

2.     Allied Systems Holdings, Inc. and its direct and indirect U.S. and Canadian subsidiaries (collectively the "**Debtors**") have just become debtors in possession in Chapter 11 cases (collectively the "**Chapter 11 Case**") and are requesting relief by means of motions (the "**First Day Motions**") filed substantially contemporaneously with the orders of relief under Chapter 11.  The First Day Motions seek relief necessary to establish joint administration and to continue to operate as a going concern.  I submit this Declaration in support of the First Day Motions.

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

3.      Except as otherwise indicated, the statements in this Declaration are based upon my personal knowledge and upon Allied's business records, which are kept in the course of Allied's regularly conducted business activity and which were made at or near the time of the activity, in accordance with the regular practice of that business activity.

4.      Part I of this Declaration provides an overview of Allied's organization, business operations, financial condition, recent history, and the circumstances giving rise to the commencement of the Chapter 11 Case.[2]  Part II of this Declaration sets forth facts more particularly relevant to the various First Day Motions.

## I.

## OVERVIEW

A.    **Allied's Corporate Organization and Business.**

5.      Allied Systems Holdings, Inc., the ultimate parent of the other Debtors, is a privately held Delaware corporation headquartered in Atlanta, Georgia.  The Debtors were reorganized in Chapter 11 cases (collectively the "**Original Chapter 11 Case**") that were filed in the United States Bankruptcy Court for the Northern District of Georgia on July 31, 2005 and that resulted in a plan of reorganization (the "**Allied Plan of Reorganization**"), which was confirmed and became effective on May 29, 2007 (the "**Effective Date**").[3]  As a result of the reorganization, Allied's then unsecured creditors became the shareholders of Allied Systems

---

[2]      The financial data for all of the entities which comprise Allied are reported on a consolidated basis. Accordingly, throughout this Declaration, discussions of financial data and the related implications upon business operations are often presented with reference to "Allied."

[3]      Allied Systems Holdings, Inc. is the successor by merger with Allied Holdings, Inc., which was the ultimate Allied parent when the Original Chapter 11 Case was filed.  When the Allied Plan of Reorganization became effective, Allied Systems Holdings, Inc. was created as a subsidiary of Allied Holdings, Inc., which was merged into Allied Systems Holdings, Inc., the surviving corporation.  Thus, in connection with the Original Chapter 11 Case, the terms "Allied" and "Debtors" exclude Allied Systems Holdings, Inc. and include Allied Holdings, Inc.  Also, in connection with the Original Chapter 11 Case, the term "Debtors" includes certain indirect Allied subsidiaries that no longer exist.  Also, indirect Allied subsidiaries formed under the law of Mexico and Bermuda, as well as Haul Insurance Ltd., a captive insurance company formed under the law of the Cayman Islands, were not then and are not now Debtors.

- 2 -

Holding, Inc.  Two investment funds became the largest shareholders.  These two funds, Yucaipa American Alliance Fund I, LP and Yucaipa Alliance (Parallel Fund I, L.P. (collectively "**Yucaipa**"), affiliated with The Yucaipa Companies, LLC, together own about 63% of the outstanding shares of Allied Systems Holdings, Inc.  After the reorganization, when Yucaipa acquired debt owed by Allied and contributed it to capital, Yucaipa was issued non-voting preferred shares convertible into common shares.  If the preferred shares were so converted, Yucaipa would own about 70% of the outstanding common shares.

6.      Allied Systems Holdings, Inc. has three direct subsidiaries.  Two of them, Allied Automotive Group, Inc. and Axis Group, Inc., are Debtors.  The third, Haul Insurance Limited, which is a captive insurance company incorporated under the laws of the Cayman Islands, is not a Debtor.

7.      Allied's major line of business is carried out by Allied Automotive Group, Inc. and its direct and indirect subsidiaries (collectively the "**Allied Automotive Group**").[4]  This major line of business, known in the industry as "car-haul," is the transport of light vehicles, such as automobiles, sport-utility vehicles and light trucks, from manufacturing plants, ports, auctions, and railway distribution points to automobile dealerships in the United States and Canada.  The trips are generally what are known in the industry as "short hauls," with each averaging less than two hundred miles.  Allied's major customers are automobile manufacturers.

8.      Allied Automotive Group, primarily through its operating subsidiary, Allied Systems Ltd. (L.P.) ("**ASL**") transports light vehicles by means of tractor trailers (the "**Rigs**") specially designed for transporting light vehicles.  As of the end of 2011, Allied owned about

---

[4]      The following Debtors are part of the Automotive Group:  Allied Automotive Group, Inc., Allied Systems, Ltd. (L.P.), Allied Systems (Canada) Company, QAT, Inc., RMX LLC, Transport Support LLC, F.J. Boutell Driveaway LLC, GACS Incorporated, Commercial Carriers, Inc., and Allied Freight Broker LLC.

- 3 -

2400 Rigs, which operated out of about 44 terminals, most of which were leased, located in the United States and Canada.

9.  ASL's drivers are unionized.  These employees (the "**Teamster Employees**") are members of local unions affiliated with the International Brotherhood of Teamsters (the "**Teamsters**"), which negotiates on behalf of the local unions and their members.  Allied employs about 1,835 people of whom about 1,062 are Teamster Employees.

10.  Allied's much smaller line of business is carried out by Axis Group, Inc. and its direct and indirect subsidiaries (collectively the "**Axis Group**").[5]  This line of business includes arranging for and managing vehicle distribution services, automobile inspections, auction and yard management services, vehicle tracking, vehicle accessorizing, and dealer preparation services for the automotive industry in the United States and Canada, and providing yard management services in Mexico.  The Axis Group operates from 39 terminals located in the United States, Canada, and Mexico

11.  In 2010, Allied had revenue of about $543 million.  In 2011, Allied had substantially less revenue (about $343 million) because, in the first quarter of 2011, Allied ceased providing car-haul services to several customers.  In March 2011, Allied approached substantially all of its car-haul customers for rate increases, because the rate levels then in effect were not sustainable and did not cover current operating costs.  New long-term contracts and rate increases were achieved with Ford and several smaller customers in the United States and with Ford, Mazda, Hyundai, Kia, Honda, Nissan and Mitsubishi in Canada.  However, General

---

[5]    The following Debtors are part of the Axis Group:  Axis Group, Inc., CT Services, Inc., Cordin Transport LLC, Terminal Services LLC, Axis Canada Company. Axis Areta, LLC, Logistic Technology, LLC, Logistic Systems, LLC.  Certain other foreign direct and indirect subsidiaries of Axis Group, Inc. are not Debtors.

Motors, Chrysler, Toyota, and Honda in the United States refused to accept the rate increases and, consequently, Allied discontinued providing car-haul services to these companies.

**B.      Decline in OEM Production**

12.     A major reason for the unsustainable rate levels that caused Allied to cease providing car-haul services to several substantial customers and that caused the Debtors to return to this Court is the drastic decline of production ("**OEM Production**") by original equipment manufacturers of light vehicles since the Allied Plan of Reorganization became effective in May 2007.  This decline is a result of the recession which began in December 2007 and which is ongoing.  The recession has hit the domestic automobile market particularly hard, with General Motors Corporation and Chrysler LLC commencing bankruptcy cases in 2009 and shutting down most production until their assets could be sold.

13.     As a result of the drastic decline in OEM Production since 2007, there was an industry-wide oversupply of capacity to transport light vehicles. The fierce competition among trucking companies (both union and non-union) and railroads for contracts to transport these vehicles led Allied's customers to reduce substantially the rate of compensation offered to Allied and its competitors.  Thus, lower OEM production combined with lower rates of compensation caused Allied to suffer large losses in the years since its reorganization in 2007.

14.     The aggregate industry OEM production of light vehicles in North America in 2007 was approximately 15 million units.  OEM Production declined drastically in 2008 and 2009 with a slight improvement in 2010, when production reached 11.9 million units.  Reflecting that decline in production, Allied transported 6.9 million light vehicles in 2007 and had revenue of $823 million, while in 2010, Allied transported 4.5 million light vehicles and had revenue of $543 million.

- 5 -

15.     While the rate of compensation to Allied for transporting light vehicles has been declining, Allied's expenses in many areas have increased.   For example, the rate of compensation of its Teamster Employees increased by over 15% in June 2010 and increased again in June 2011.   Also, as the Rigs age, they require more maintenance and capital improvements.

## C.     Allied's First Reorganization.

16.     In connection with the Original Chapter 11 Case, the Debtors commenced ancillary proceedings (the "**CCAA Proceeding**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") under the Companies' Creditors Arrangement Act ("**CCAA**").   In the CCAA Proceeding, the Canadian Court issued orders which, among other things, recognized the Original Chapter 11 Case as a foreign proceeding under the CCAA, stayed creditors from instituting proceedings or taking remedies in Canada against the Debtors or their property, approved the Debtors' financing, and gave full effect to the Allied Plan of Reorganization.

17.     In the Original Chapter 11 Case, Allied's goals were (1) to increase revenue by increasing customer pricing, (2) to deleverage by conversion of debt into equity, and (3) to reduce labor costs through reductions in compensation and changes in work rules with respect to the Teamsters Employees and through shared sacrifice from non-union employees.

18.     These goals were largely achieved, with significant aid from Yucaipa.   During the original Chapter 11 Case, Yucaipa, among other things, (1) acquired about two-thirds of a series of unsecured notes that Allied had issued in the principal amount of $150 million; (2) was the catalyst for obtaining an agreement with the Teamsters for concessions ("Labor Modifications") reducing wages of Allied's Teamster Employees by 15% for a three-year period; (3) financed the

- 6 -

acquisition of Rigs for Allied's use; (4) supported a plan to convert general unsecured debt into equity; and (5) aided Allied in securing the exit financing (the "**Exit Financing**") essential to its reorganization.

19.     Yucaipa and the Teamsters joined the Debtors as proponents of the Allied Plan of Reorganization. As of the Effective Date of the Allied Plan of Reorganization, Allied Holdings, Inc. created Allied Systems Holdings, Inc. as a subsidiary and merged into it. As provided in the Allied Plan of Reorganization, the outstanding stock of Allied Holdings, Inc. was canceled and Allied Systems Holdings, Inc. issued new common stock to Allied's general unsecured creditors, with Yucaipa becoming the owner of about 63% of it. Also as of the Effective Date, Allied's Exit Financing and the Labor Modifications became effective. Allied Systems Holdings, Inc. became a private company and terminated its reporting obligations with the Securities and Exchange Commission.

**D.     Labor Costs**

20.     At the end of May 2010, the Labor Modifications agreed to as part of the Allied Plan of Reorganization expired. The Teamsters insisted on an immediate snap-back of wage rates to what they were under the then current multi-employer collective bargaining agreement, known as the National Master Automobile Transporter Agreement (the "**NMATA**"), which was for a three-year term beginning June 1, 2008 and expiring May 31, 2011. As a result, as of the beginning of June  2010, Allied no longer had the benefit of the wage concessions agreed to in connection with the Allied Plan of Reorganization, and wage rates rose over 15% for Allied's Teamster Employees.

21.     The employers who are parties to the NMATA are members of a multi-employer collective bargaining association, known as the National Automobile Transporters Labor

- 7 -

Division ("**NATLD**"), which is authorized by its employer members to bargain collectively with the Teamsters. When the NMATA for the period June 1, 2008 through May 31, 2011 expired, NATLD agreed to new NMATA for a 51 month term from June 1, 2011 through August 31, 2015 with increases in compensation for all covered employees, including Allied's Teamster Employees. This agreement was entered over Allied's objection but was nevertheless binding on Allied.

**E.      Allied's Major Credit Facilities**

22.      The Exit Financing established on the Effective Date of the Allied Plan of Reorganization is still extant as of the commencement of the Chapter 11 Case. This Exit Financing is comprised of two credit facilities which together provide financing of up to $315 million. The largest facility is the credit facility (the "**First Lien Credit Facility**"), which provides for up to $265 million in financing on terms originally set forth in the *Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement*, dated as of March 30, 2007, amended and restated as of May 15, 2007 (the "**First Lien Credit Agreement**"). The other credit facility (the "**Second Lien Credit Facility**") provides for up to $50 million in loans on terms originally set forth in a *Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement*, dated as of May 15, 2007 (the "**Second Lien Credit Agreement**").

23.      The First Lien Credit Facility is secured by a first-priority security interest in substantially all of the Debtors' assets, including accounts, general intangibles, money, inventory, equipment (including Rigs), real estate and the stock of certain subsidiaries (the "**Collateral**") as granted by an *Amended and Restated Pledge and Security Agreement (First Lien)* dated as of May 15, 2007. The Second Lien Credit Facility is secured by a second-priority

- 8 -

security interest in the Collateral, as granted by an *Amended and Restated Pledge and Security Agreement (Second Lien)* dated as of May 15, 2007. Allied and the collateral agents for the two credit facilities entered an *Intercreditor Agreement* dated as of May 15, 2007 to set forth, among other things, the relative rights and priorities as between these two credit facilities.

24.     The First Lien Credit Facility is provided by a group of financial institutions (the "**Lenders**"), one of which, CIT Group/Business Credit Inc. ("**CIT**"), has served, but is no longer serving, as administrative and collateral agent of this facility. The First Lien Credit Facility is comprised of the following three facilities: (i) a facility (the "**Revolving Loan Facility**") for revolving loans and swing line loans (collectively the "**Revolving Loans**") up to the amount of $35 million, (ii) a facility (the "**Letter of Credit Facility**") for the issuance by a bank ("**Issuing Bank**") of letters of credit ("**Letters of Credit**") for the account of Allied in the amount of up to $50 million; and (iii) a Term Loan Facility for loans ("**First Lien Term Loans**") up to the amount of $180 million.

25.     CIT is the sole Lender under the Revolving Loan Facility Agreement and is not a Lender under the other two facilities. The other Lenders ("**First Lien Term Loan Lenders**") have made the First Lien Term Loans and deposited up to $50 million to support the Letter of Credit Facility. CIT asserts that the *Amended and Restated Pledge and Security Agreement (First Lien)* dated as of May 15, 2007 provides for the Revolving Loans to the paid before the Term Loans or the obligations due the First Lien Term Lenders under the Letter of Credit Facility.

26.     The Second Lien Credit Facility, which provides for loans ("**Second Lien Term Loans**") of up to $50 million, is provided by certain lenders ("**Second Lien Lenders**"). Goldman Sachs Credit Partners L.P. ("**Goldman Sachs**") was the original administrative agent

- 9 -

and collateral agent of this facility and was later replaced in these capacities by Bank of New York Mellon.

27.    Both the First Lien Credit Facility and the Second Lien Credit Facility provide that lenders ("**Requisite Lenders**") under each facility with more than 50% of the exposure under the respective facility have certain powers and the right to direct the administrative agent and the collateral agent with respect to certain actions, including whether to waive or exercise remedies if an event of default ("**Event of Default**") should occur under the respective facility.

**F.    Administration of the Credit Facility.**

28.    On May 6, 2008, Yucaipa acquired the face amount of $40 million of the Second Lien Term Loan and exchanged $20 million of it for 21,396 shares of preferred stock ("**Series A Preferred Stock**"), convertible into common stock at a conversion price, whereby each preferred share is valued at $934.74.  In connection with Yucaipa's acquisition of the Second Lien Term Loan, the Second Lien Credit Facility was amended to allow Yucaipa to be an assignee (an "**Eligible Assignee**") with no restrictions on its right to vote.  Yucaipa thereby became the Requisite Lender under the Second Lien Credit Facility.

29.    In August 2008, heavily impacted by the sharp downturn that year in OEM Production, Allied notified CIT, as Administrative Agent of the First Lien Credit Facility, that, as of June 30, 2008, Allied was in default under that facility in that Allied was not in compliance with certain of its financial covenants in the First Lien Credit Agreement.  On September 3, 2008, CIT, as Administrative Agent, sent Allied notice of default and of reservation of rights. Effective September 24, 2008, Allied and CIT entered a Forbearance Agreement, which, as amended, expired on November 15, 2008.  On November 24, 2008, CIT sent Allied another notice of default and reservation of rights.  However, CIT received no instruction from the

- 10 -

Requisite Lenders to terminate the Credit Facility or to declare the indebtedness thereunder to be due.

30.    By April 2009, ComVest Investment Partners III, L.P. ("**ComVest**") had acquired a majority of the outstanding Lender exposure under First Lien Credit Facility and had thereby become the Requisite Lender.  On August 21, 2009, ComVest and Allied entered an amendment ("**Fourth Amendment**") to the First Lien Credit Agreement to allow Yucaipa to be an Eligible Assignee, with no restriction on its right to vote.  In connection with this amendment, Yucaipa purchased from ComVest the majority in face value of the First Lien Exposure.  However, CIT declined to recognize the validity of the Fourth Amendment and consequently declined to recognize Yucaipa's status as the Requisite Lender under the First Lien Credit Facility.

31.    In November 2009, Allied Systems Holdings, Inc and Yucaipa sued CIT to establish (1) that Yucaipa became the Requisite Lender in August 2009 and (2) that CIT was damaging Yucaipa and Allied by failing to take action lawfully demanded by Yucaipa as Requisite Lender.

32.    In 2009, after General Motors Corporation and Chrysler LLC commenced their bankruptcy cases and shut down most production, in order to preserve Allied's liquidity position, Allied did not make quarterly interest payments due under the First Lien Credit Facility for the third and fourth quarters.  Since then, Allied has not made payments due under the First Lien Credit Facility and the Second Lien Credit Facility.

33.    Allied Systems Holdings, Inc., Yucaipa and CIT settled the litigation among them with regard to the First Lien Credit Facility pursuant to a Settlement Agreement dated as of December 5, 2011, with the parties filing Mutual Dismissals with Prejudice on December 7, 2011.  The terms of the Settlement Agreement include, among others, mutual limited releases,

- 11 -

the recognition of the validity of the Fourth Amendment and of Yucaipa as the Requisite Lender, provisions for the resignation and replacement of CIT as administrative and collateral agent, the recognition, by Allied and Yucaipa, of the payment priority of CIT's revolver over the term loans included in the First Lien Credit Facility, and the reduction of the letter of credit facility.

34.    On January 18, 2012, three lenders under the First Lien Credit Facility filed suit against Yucaipa in the Supreme Court of the State of New York, Index No. 650150/2012.  These lenders were Black Diamond CLO 2005-1 Ltd., its affiliate BDCM Opportunity Fund II, LP, and Spectrum Investment Partners, L.P.  In this suit (the "**Black Diamond/Yucaipa Action**"), the plaintiffs seek a judicial declaration that the Fourth Amendment is null and void and that Yucaipa is not the Requisite Lender under the First Lien Credit Facility.  The grounds for the Black Diamond/Yucaipa Action are similar to those asserted by CIT in the prior action between CIT, Yucaipa and Allied Systems Holdings, Inc.  The Black Diamond/Yucaipa Action is still pending.

35.    While the Black Diamond/Yucaipa Action was being litigated, Allied was exploring the possibility of a sale of its business.

36.    On May 17, 2012, the three plaintiffs in the Black Diamond/Yucaipa Action filed involuntary bankruptcy petitions seeking relief under Chapter 11 against Allied Systems Holdings, Inc. and its Allied Systems Ltd. (L.P.) in the U.S. Bankruptcy Court for the District of Delaware.

37.    As of the commencement of the involuntary bankruptcy cases, the outstanding principal amount due under the First Lien Credit Agreement totaled about $244 million, including about $35 million due under the Revolving Loan Facility.  The First Lien Credit Agreement provides for varying interest rates for its facilities, in addition to a default rate of 2%

- 12 -

over the otherwise applicable rates. Also, as of the commencement of the involuntary cases, the outstanding principal amount due under the Second Lien Term Facility was $30 million.

38.     In light of the involuntary bankruptcy cases and its financial, condition, Allied determined that it would be in the best interests of their estates to proceed under Chapter 11. Therefore, Allied Systems Holdings, Inc, and Allied System Ltd. (L.P.) consented to relief under Chapter 11, and caused seventeen direct and indirect subsidiaries of Allied Systems Holdings, Inc. to join them by filing voluntary Chapter 11 petitions.

## II.

## FIRST DAY MOTIONS

39.     In furtherance of the objective of successfully administering this Chapter 11 Case and maximizing value for all creditors, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering orders granting such First Day Motions.

40.     I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto) listed on **Exhibit A** and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

41.     Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the maximization of the Debtors' value.

- 13 -

42.   Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

### CONCLUSION

43.   I declare under penalty of perjury that I have reviewed the information contained herein and that the information contained herein is true and correct to the best of my information and belief.

Executed on June 10, 2012.

SCOTT D. MACAULAY
Senior Vice President and Chief Financial
Officer, Allied Holdings Systems, Inc..

- 14 -

RLF1 6086970v. 1

# EXHIBIT A

## List of First Day Motions

## List of First Day Motions

1.  Emergency Motion of the Debtors for Bridge Order (I) Authorizing the Use of Cash Collateral, (II) Approving the Continued Use of the Debtors' Cash Management System, (III) Authorizing Debtors to Pay Prepetition Employee Wages and Expenses, and (IV) Granting Related Relief

2.  Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases

3.  Application for Order Appointing Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c) and Section 105(a) of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date

4.  Motion to Authorize Allied Systems Holdings, Inc. to Act as Foreign Representative of the Debtors

5.  Motion for Order (A) Deeming Utilities Adequately Assured of Payment, (B) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, and (C) Establishing Procedures for Resolving Requests for Additional Assurance

6.  Motion for Order Authorizing Debtors to Continue Their Insurance Programs

7.  Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Granting Certain Related Relief

8.  Motion of the Debtors for Order Pursuant to U.S.C. §§ 105(a) and 363(b) Authorizing Payment of Prepetition Customs Duties and Claims of Common Carriers and Warehousemen and Authorizing the Debtors to Honor Certain Prepetition Cargo Claims and Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims

9.  Motion of the Debtors for Orders Authorizing the Debtors to Pay Prepetition Sales, Use, and Other Taxes and Related Obligations

10. Motion for Authority to (A) Maintain Existing Cash Management System and Bank Accounts, (B) Continue Use of Existing Checks and Business Forms, (C) Obtain Limited Waiver of § 345(b) and (D) Continue to Make Intercompany Advances with § 364(c)(1) Administrative Priority

11. Motion of Debtors for Interim and Final Orders Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits and Related Expenses, and Other Compensation to Employees and Independent Contractors

12.   Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr. L.R. 4001-2: (I) Authorizing Debtors to (A) Obtain Postpetition Secured DIP Financing and (B) Use Cash Collateral; (II) Granting Superpriority Liens and Providing for Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Lenders; (IV) Modifying Automatic Stay; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)