# EXHIBIT DS-3

# [AMENDED COMPLAINT]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtor. | (Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLIED SYSTEMS HOLDINGS, INC. and its affiliated debtors, | |
| Plaintiff, | Adv. Proc. No. 13-50530 (CSS) |
| BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., AND SPECTRUM INVESTMENT PARTNERS, L.P., | |
| Intervenor(s), | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK J. GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AMENDED
COMPLAINT FOR (I) EQUITABLE SUBORDINATION, (II)
RECHARACTERIZATION, (III) BREACH OF CONTRACT, (IV) SPECIFIC
PERFORMANCE, (V) BREACHES OF FIDUCIARY DUTIES, (VI) AIDING AND
ABETTING BREACHES OF FIDUCIARY DUTIES,
(VII) AVOIDANCE AND RECOVERY OF AVOIDABLE TRANSFERS,
AND (VIII) DISALLOWANCE OF CERTAIN CLAIMS**

The Official Committee of Unsecured Creditors (the "Committee" or the "Plaintiff"),

appointed in the above-captioned chapter 11 cases of Allied Systems Holdings, Inc. ("Allied"),

Allied Systems, Ltd. (L.P.) ("Systems") and their U.S. and Canadian subsidiaries (collectively,

the "Debtors" or the "Company"), by and through its undersigned counsel, hereby files, on

behalf of the estates of the Debtors, this Amended Complaint for (I) Equitable Subordination, (II)

Recharacterization, (III) Breach of Contract, (IV) Specific Performance, (V) Breaches of

Fiduciary Duties, (VI) Aiding and Abetting Breaches of Fiduciary Duties, (VII) Avoidance and

Recovery of Avoidable Transfers, and (VIII) Disallowance of Certain Claims (the "Amended

Complaint") against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance

(Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance

(Parallel) Fund II, L.P. (collectively, "Yucaipa"), Mark J. Gendregske ("Gendregske"), Jos

Opdeweegh ("Opdeweegh"), James Frank ("Frank"), Derex Walker ("Walker"), Jeff Pelletier

("Pelletier"), Ira Tochner ("Tochner"), and Joseph Tomczak ("Tomczak," together with

Gendregske, Opdeweegh, Frank, Walker, Pelletier and Tochner, the "Allied Directors" and the

Allied Directors together with Yucaipa, the "Defendants").  The Committee expressly reserves

the right to amend or supplement the parties to, and claims for relief in, the Amended Complaint,

and to assert and file additional cross-claims and/or third-party complaints herein and in any

related adversary proceeding, including, without limitation, *Allied Systems Holdings, Inc. v.

American Money Management Corp. et al.*, Adv. Pro. No. 12-50947 (CSS) (Bankr. D. Del.) (the

"Delaware Action"), which cannot be articulated as a result of the fact that the Committee has

not yet been able to confirm or deny many of the allegations in the related adversary

proceedings, and/or due to the failure of the complainants to particularize their claims in the

related adversary proceedings, and/or due to the fact that the Committee does not have copies of

documents relating to certain of the allegations in the related adversary proceedings.  In support

of the requested relief, the Committee alleges, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This is a case about the efforts of the owner of the majority of equity in the

Debtors to take control over all facets of the Debtors' capital structure in order to protect its

equity investment over the legitimate rights and expectations of the Debtors' secured and

unsecured creditors.  Through various methods, after taking control of the Debtors following

their first bankruptcy proceeding, Yucaipa attempted to strip away the protections afforded to all

creditors of Allied, all in an effort to protect its equity investment from the legitimate exercise by

actual creditors of their rights.

2.      Following the first Allied bankruptcy, Yucaipa took control of approximately

67% of the outstanding equity of Allied and was given the ability to name outright three of the

five directors on Allied's Board of Directors (the "Board").  What is more, Yucaipa effectively

had the power to name all five directors on Allied's Board, as it was empowered, through its

express control of an outright majority of the Board, to select Allied's Chief Executive Officer

and the fourth Board member, as well as the fifth Board member, who, despite being selected by

the creditors' committee in the first Allied bankruptcy, had to be "reasonably acceptable" to

Yucaipa.  Thus, given its controlling influence and express appointment and veto powers, even

the two nominal "independent" directors were under the control of Yucaipa as the appointment

of both so-called "independent" directors was subject to Yucaipa's veto and whim.  Accordingly,

after Allied's emergence from the first bankruptcy, Yucaipa  effectively controlled not only a

super-majority of the outstanding equity, and expressly controlled a super-majority of the Board,

but it also effectively controlled 100% of the Board.

3.       Not long after Allied emerged from its first bankruptcy in May 2007, its business

prospects began to falter.  The global economic downturn began to come into view in late 2007

and early 2008, and was particularly felt in the automotive market, the primary market that

Allied serviced as a long-haul car carrier.

4.       Accordingly, as early as 2008, Allied was nearing insolvency, if not already

insolvent.  Indeed, at that time Allied was increasingly failing to meet various debt covenants

and failing to make required debt payments.  What was needed to keep the business afloat and to

navigate the challenging economic times was an equity investment that could be used to service

the outstanding debt or a voluntary restructuring to keep Allied's business running until the

challenging economic conditions improved.  Indeed, Allied's existing creditors pleaded with its

owner, Yucaipa, to provide such an infusion of equity for the benefit of all of its stakeholders,

including its creditors, its employees and its equity owners.

5.       Yucaipa, however, refused to put equity into Allied, but instead crafted a scheme

whereby it would protect its existing equity investment, take control over the outstanding secured

debt of the Company and launch a plan to eliminate the existing debt in a manner that would

benefit Yucaipa and Yucaipa alone.  Additionally, Yucaipa thwarted any possibility of the

Company entering into a voluntary restructuring or strategic combination that might have the

effect of diluting or eliminating Yucaipa's existing equity.  While Yucaipa may not have been

required to infuse the Company with additional cash for a new equity investment, what it could

not do was to take steps to prevent the possibility of a voluntary restructuring or the exercise of rights by creditors in order to protect Yucaipa's existing equity investment. However, that is exactly what Yucaipa did, as it utilized its control over Allied to elevate Yucaipa to a status whereby it controlled not only the majority of the equity and effectively 100% of the Board, but also the outstanding secured debt of the company.

6.      First, Yucaipa began to push Allied's creditors to lift the restrictions upon Yucaipa's ability to own outstanding debt (the "<u>First Lien Debt</u>") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended (the "<u>First Lien Credit Agreement</u>"). Initially, the lenders under the First Lien Credit Agreement (collectively, any and all such lenders who at any time held First Lien Debt are the "<u>First Lien Lenders</u>") agreed to permit Yucaipa to take a position in the First Lien Debt, but only if Yucaipa purchased that debt in a manner that prevented Yucaipa from taking control over the exercise of remedies by creditors and only in a manner that required Yucaipa to "put its money where its mouth is," by contributing half of any purchase of First Lien Debt as capital into the company. Yucaipa controlled this process from the outset. Indeed, Yucaipa ███████████████████████████████████████████████████████████ ███████████████████████████ while Allied sat idly by and let its controlling stockholder negotiate the terms of its outstanding First Lien Debt.

7.      Nevertheless, and notwithstanding its control over and input into the amendment of the First Lien Credit Agreement, Yucaipa refused to purchase any First Lien Debt unless it could have complete control over the credit facility, as it had already accomplished in the Second Lien Facility (as defined below). Indeed, under the Third Amendment to the First Lien Credit Agreement (the "<u>Third Amendment</u>"), Yucaipa could not protect its equity investment by

5

purchasing First Lien Debt because any such debt would have been non-voting, and, even if such debt was permitted to vote, the amendment ensured that Yucaipa could not acquire a sufficient amount of First Lien Debt to enable it to block the exercise of remedies for defaults under the First Lien Credit Agreement.

8.      Accordingly, instead of proceeding under the Third Amendment ▮▮▮▮▮▮▮▮▮▮, Yucaipa began to affirmatively seek total control over Allied's outstanding secured debt.  Thus, in the second step of its plan, Yucaipa launched a tender offer for the First Lien Debt in an effort to acquire a majority of the First Lien Debt and control over Allied's existing debt facilities.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, the existing First Lien Lenders knew full well that permitting the majority equity owner to take control over the outstanding secured debt could have disastrous consequences for the Company and its other stakeholders, as it would permit the equity owner to control any bankruptcy of the Company, all in violation of the spirit, if not the letter, of the absolute priority rule.

9.      Not surprisingly, Yucaipa's tender offer failed.  However, Yucaipa was not dissuaded by the reaction of the market and instead undertook a more surreptitious route to attempt to reach its goal of total and complete control.  In 2009, Yucaipa engaged in discussions with the then existing Requisite Lender under the First Lien Credit Agreement, ComVest Investment Partners III, L.P. ("ComVest"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████████████

████████████████████████████.

10.     Accordingly, ███████████████████████████████████████████

████████████████████████████████████████████████████████. This

time, Yucaipa eventually convinced ComVest to attempt to use its status as the Requisite Lender

to purport to amend the First Lien Credit Agreement through the purported Fourth Amendment

to the First Lien Credit Agreement (the "<u>Fourth Amendment</u>") to enable Yucaipa to purchase a

majority of the First Lien Debt and ascend to the status of the Requisite Lender, a position

wherein Yucaipa could prevent the exercise of remedies against the Company.

11.     Yucaipa was only able to pull off this scheme by promising ComVest something

that no legitimate or actual lender would do; ██████████████████.  Indeed, Yucaipa

treated its purchase of the ComVest debt like equity █████████████████████████

████████████████████████████████████████████████████████.  But this was

not all.  ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

12.     In the end, by ██████████████████████████████████████

Yucaipa was able to maneuver itself to the front of the line, protect its equity investment, and

essentially make an equity contribution to Allied without technically doing so.  Through its

manipulative scheme, Yucaipa gave itself the ability to prevent creditors from exercising rights

against the Company that could have benefitted the Debtors and their creditors but would have

adversely affected Yucaipa's equity interests.

13.     What is more, throughout this period, Yucaipa utilized Allied and its limited
funds to pay Yucaipa and Yucaipa's advisors to engage in the transactions that comprised
Yucaipa's scheme to protect Yucaipa's equity investment.  Allied was obligated to pay millions
of dollars to Yucaipa, under the guise of a consulting agreement, whereby Yucaipa purportedly
acted on behalf of Allied in negotiations with customers and employees of Allied.  Additionally,
Yucaipa caused Allied to pay millions of dollars in legal and other fees to advisors of Yucaipa in
connection with ██████████████████████████████, as well as in connection with
litigation that arose out of Yucaipa's scheme to eliminate any threat to its equity investment.
However, that is not all, as Yucaipa went so far as ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████.  All told,
Yucaipa's actions caused Allied to pay millions of dollars for services of agents and advisors
whose services solely benefitted Yucaipa.  All of these funds would otherwise have been
available to Allied's legitimate creditors.

14.     Once it had claimed to have taken control of the First Lien Debt, Yucaipa
exercised its purported power as the Requisite Lender in ways that caused harm to all creditors of
the Debtors.  For instance, when the agent for the First Lien Lenders objected to the Fourth
Amendment and Yucaipa's acquisition of ComVest's interests, Yucaipa caused Allied to bring
suit against the agent ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████.

8

15.     Yucaipa's efforts were also aided and enabled by the members of Allied's Board, who failed to fulfill their fiduciary obligations to the stakeholders and creditors of Allied.  The Allied Directors were, or should have been, on notice of the possibility, if not certainty, that Yucaipa's interests, as Allied's primary equity holder, could conflict with the interests of Allied's legitimate creditors.  Indeed, even prior to Allied's emergence from the first bankruptcy the possibility that a conflict between the interests of Yucaipa and Allied was apparent, as many of the prior board of directors noted that Yucaipa's actions could be unlawful.

16.     Allied's Board, however, failed to take anything approaching reasonable steps to avoid the obvious conflicts of interests that arose from Yucaipa's control over the Debtors.  For instance, while Allied nominally established a "Special Committee" (the "Special Committee") of purportedly independent board members to evaluate transactions involving Yucaipa, even if those board members could be deemed to be "independent," the Special Committee process was entirely flawed and deficient.  Indeed, the Special Committee – which never retained any independent counsel or advisors until long into these bankruptcy cases – approved most, if not all, of the Yucaipa transactions, and did so without any independent evaluation.  Instead, the Special Committee approved most, if not all, of these transactions only after the full Board, including the Yucaipa Board members, had already deliberated and received advice from the same advisors who represented the entire Board and whose retention was subject to the whims of Yucaipa and its Board members.

17.     All told, Yucaipa's actions have cost the Debtors' estates and their stakeholders tens, if not hundreds, of millions of dollars that would otherwise be available for distribution to Allied's legitimate and actual creditors.  Moreover, in addition to the payment of millions of dollars in benefits to Yucaipa, the Debtors and their creditors have been deprived of tens of

millions of dollars in capital contributions that Yucaipa was required to have made as a result of
its acquisition of ComVest's First Lien Debt, which Yucaipa instead has purported to have
transformed into First Lien Debt.

18.   Accordingly, Plaintiff, derivatively on behalf of the Debtors' estates, brings this
action for: (i) equitable subordination of Yucaipa's purported debt holdings to all other claims
asserted against the Debtors pursuant to section 510(c) of the Bankruptcy Code; (ii)
recharacterization as equity of Yucaipa's purported debt holdings pursuant to section 105(a) of
the Bankruptcy Code; (iii) breach of the Third Amendment by Yucaipa; (iv) specific
performance of the Third Amendment against Yucaipa; (v) breach of fiduciary duties against
Yucaipa; (vi) breach of fiduciary duties against the Allied Directors; (vii) aiding and abetting
breach of fiduciary duty against Yucaipa and the Allied Directors; (viii) the avoidance and
recovery of fraudulent transfers and obligations against Yucaipa pursuant to sections 548(a) and
550 of the Bankruptcy Code, (ix) the avoidance and recovery of fraudulent transfers,
conveyances and obligations against Yucaipa pursuant to sections 544(b) and 550 of the
Bankruptcy Code (x) the avoidance and recovery of preferential transfers against Yucaipa
pursuant to sections 547 and 550 of the Bankruptcy Code; and (xi) disallowance of certain
claims of Yucaipa pursuant to section 502(d) of the Bankruptcy Code.

19.   BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and
Spectrum Investment Partners, L.P. ("Intervenors") intervened in this proceeding, on behalf of
themselves and not on behalf of the Debtors' estates, pursuant to the directions given by the
Court at the February 27, 2013 hearing. Additionally, the Intervenors assert a claim for equitable
subordination of Yucaipa's purported debt holdings to all other claims asserted against the

Debtors arising under the First Lien Credit Agreement and Second Lien Credit Agreement

pursuant to section 510(c) of the Bankruptcy Code for harm caused to the holders of such claims.

## JURISDICTION AND VENUE

20.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.

21.    This Court has original jurisdiction under 28 U.S.C. § 1334(b), in that this is a

civil proceeding relating to the underlying case arising under title 11 of the United States Code.

22.    This adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

23.    This Court has personal jurisdiction over Defendants pursuant to Rule 7004 of the

Federal Rules of Bankruptcy Procedure.

24.    Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409(a).

## STANDING

25.    The Committee has sought and received consent from the Debtors to have

standing to bring this action against the Defendants on behalf of the Debtors' estates, [D.I. 907],

and were granted such standing by the Court at the February 27, 2013 hearing.

## THE PARTIES

26.    The Committee, as Plaintiff in this adversary proceeding on behalf of the Debtors'

estates, was appointed on June 20, 2012, pursuant to Section 1102 of the Bankruptcy Code.[2]

Pursuant to Section 1103 of the Bankruptcy Code, the Committee has investigated and continues

to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

---

[2] The Committee consists of Pension Benefit Guaranty Corporation; Central States, Southeast and Southwest
Pension Fund; Teamsters National Automobile Transporters Industry Negotiating Committee; and General Motors
LLC.

27.     Intervenor BDCM Opportunity Fund II, LP is a Delaware limited partnership, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT 06830.

28.     Intervenor Black Diamond CLO 2005-1 Ltd. is a Cayman Islands limited liability company, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich CT 06830.

29.     Intervenor Spectrum Investment Partners, L.P. is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY 10001.

30.     Upon information and belief, Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. are Delaware limited partnerships headquartered at 9130 West Sunset Boulevard, Los Angeles, California 90069.

31.     Upon information and belief, Mark J. Gendregske is a citizen of the state of Georgia and the chief executive officer and a director of Allied.

32.     Upon information and belief, Jos Opdeweegh is a citizen of the state of Illinois, had previously served as an operating partner and advisor at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and was a director of Allied.

33.     Upon information and belief, James Frank is a citizen of the state of New York, is employed by The Yucaipa Companies, LLC, an affiliate of Yucaipa, and a director of Allied.

34.     Upon information and belief, Derex Walker is a citizen of the state of California, a partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and a director of Allied.

35.     Upon information and belief, Jeff Pelletier is a citizen of the state of California, is an operating partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and is a director of Allied.

36.     Upon information and belief, Ira Tochner is a citizen of the state of California, is a partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and is a director of Allied.

37.     Upon information and belief, Joseph Tomczak is a citizen of the state of Illinois and was an operating partner at The Yucaipa Companies, LLC, an affiliate of Yucaipa, and was a director of Allied.

## FACTUAL ALLEGATIONS

38.     Allied is a leading provider of distribution and transportation services to the automotive industry in North America, primarily focused on the delivery of new automobiles from manufacturing facilities to dealerships.

(a)     **Allied's 2007 Bankruptcy, Yucaipa's Acquisition of the Majority of the Equity in Allied, and Board Members' Early Concerns About Yucaipa**

39.     Unfortunately, it is now clear that at least some of the seeds for the Debtors' current financial difficulties were sewn at the time of its last exit from bankruptcy in May 2007, which saw Yucaipa ascend to the role of Allied's majority and controlling shareholder with the power to appoint three of its five directors and the ability to control Allied's senior management.

40.     Allied filed its first petition for relief under the Bankruptcy Code on July 31, 2005 in the United States Bankruptcy Court for the Northern District of Georgia (the "2005 Bankruptcy").  In or about May 2006, Yucaipa purchased a majority stake of the then existing Senior Unsecured Notes of Allied at a substantial discount to their par value.

41.     After Yucaipa's acquisition of its interests in Allied, and during the 2005 Bankruptcy process, members of Allied's then board of directors were already focused on Yucaipa's tactics and voiced concerns about Yucaipa damaging Allied and its prospects.  Among other things, members of the board raised significant concerns about the propriety of Yucaipa's actions taken purportedly on behalf of Allied and concerns about the amount of control that

13

Yucaipa was exerting over Allied's business.  For instance, at a February 9, 2007 special meeting of the board, a board member raised his concern that there was "tort[i]ous interference" with the Company's business or contracts by Yucaipa.

42.     During a February 20, 2007 special board meeting, another board member "indicated that he believed that Yucaipa is in the driver's seat and he and [another board member] agreed that once the Company[] signs the addendum, we would not be able to oppose what Yucaipa says or wants to do."  At that time, the board discussed creating "value" for "everyone, not just Yucaipa, even in the circumstance if equity is out of the money" and the desire that the "process . . . allow the Company some control over this issue."

43.     Additionally, as early as February 12, 2007, the board discussed whether Yucaipa had breached a confidentiality agreement that it had with Allied.  The board even discussed whether Allied should bring a tortious interference claim against Yucaipa—so serious were these concerns, the board asked Allied's regular outside counsel to explore potential claims against Yucaipa.

44.     By mid-March 2007, it was apparent to the board that, "in practical terms, Yucaipa may really be running and controlling the process."

45.     Indeed, one member of the board described the situation in stark terms at a March 16, 2007 special board meeting, stating, "he believes that the Board has failed in its efforts in regard to the involvement of Yucaipa in the process."  He was concerned "that the Board has exposure because the Company let Yucaipa do this to the Company," when it "should have required Yucaipa to sign some sort of agreement precluding it from" doing so, but "the Company never did" require such an agreement.

46. When Allied emerged from bankruptcy in May 2007, Yucaipa was in total control of Allied. As part of the exit plan, Yucaipa was permitted to name three of the five members of the Board, giving it a permanent majority and complete control of the board of directors. Not surprisingly, none of the prior directors who had voiced concerns about Yucaipa's actions were retained as members of the Board of the reorganized Allied.

47. Moreover, the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. And Affiliated Debtors Proposed By The Debtors, Yucaipa, And The Teamsters National Automobile Transportation Industry Negotiating Committee (the "2007 Reorganization Plan"), approved by the United States Bankruptcy Court for the Northern District of Georgia on May 18, 2007 and effective as of May 29, 2007, demonstrates that the "independent" directors were hardly independent at all. Indeed, one of the two so-called "independent" directors was the Chief Executive Officer of the Company, "who shall be selected by Yucaipa and shall be reasonably acceptable to TNATINC [i.e., the Teamsters] and the Creditors' Committee," in addition to the "three other members selected by Yucaipa." (Allied Form 8-K, dated May 24, 2007, at Ex. 2.1 § 7.2.)

48. The other "independent" director had served as the financial advisor to the creditors' committee in the 2005 Allied Bankruptcy. While this member was not employed by Yucaipa or Allied, the 2007 Reorganization Plan makes clear that even though this individual was to be "chosen by the Creditors' Committee," he or she "shall be reasonably acceptable to Yucaipa." (Id.) Thus, following Allied's emergence from bankruptcy in May 2007, Yucaipa effectively controlled all five Board members: it directly appointed 3 directors, its selection of the CEO and fourth Board member was subject only to being "reasonably acceptable" to certain

15

other creditors, and the fifth Board member, while chosen by the creditors' committee, was to be "reasonably acceptable to Yucaipa."

49.     In addition to its ability to control Allied's Board, through the 2007 Reorganization Plan, Yucaipa held 67% of the equity of Allied, which has increased to an approximate 70% equity stake.

50.     Through the 2005 Bankruptcy, Yucaipa acquired approximately two-thirds of a series of unsecured notes that Allied had issued in the principal amount of $150 million; it facilitated the $15.1 million financing of certain rigs represented by certain notes that were converted to equity; it supported the conversion of general unsecured debt into equity under the 2007 Reorganization Plan, of which Yucaipa held 67%; and it aided Allied in securing exit financing.  Accordingly, through its below-par purchase of Allied's then existing Unsecured Notes, Yucaipa was able to cancel the existing equity and take complete control over Allied thereafter.  Not only did Yucaipa own the majority of the newly issued equity in Allied, but it controlled at least two-thirds of the Board and, in reality, controlled one hundred percent of the Board.

(b)     **The Secured Debt Structure After Allied's Exit from its First Bankruptcy**

51.     Allied exited bankruptcy with $315 million of exit financing comprised of a $265 million senior secured first priority credit facility (the "First Lien Facility"), and a $50 million second lien facility (the "Second Lien Facility").

52.     The First Lien Facility was comprised of $180 million of term loans; a $35 million revolving credit facility from The CIT Group/Business Credit, Inc. ("CIT"); and a $50 million letter of credit facility.

53.     The First Lien Facility is governed by the First Lien Credit Agreement, entered into by and among Allied Holdings, Inc. ("Holdings") and Allied Systems Ltd (LP) ("Systems"),

as Borrowers, and certain subsidiaries of Holdings, as Guarantors, various lenders, Goldman

Sachs Credit Partners L.P. ("Goldman Sachs"), as Lead Arranger and Syndication Agent, and

CIT, as Administrative Agent and Collateral Agent.

54.     The Second Lien Facility was comprised of $50 million of loans.

55.     The Second Lien Facility is governed by that certain Second Lien Secured Super-

Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the

"Second Lien Credit Agreement"), entered into by and among Holdings and  Systems as

Borrowers and certain subsidiaries of Holdings as Guarantors, various lenders, and Goldman

Sachs, as Lead Arranger, Syndication Agent, Administrative Agent and Collateral Agent.

56.     Allied has been in default under both the First Lien Credit Agreement and Second

Lien Credit Agreement since August 2008.  Specifically, and only by way of example among

many other Events of Default, Allied has failed to pay required principal and interest

payments—at times at Yucaipa's express insistence—even when Allied had the cash on hand to

make the payments.

**C.      The First Lien Credit Agreement and Second Lien Credit Agreement Were Expressly Drafted and Always Intended to Prevent Yucaipa, as the Majority Equity Holder, from Gaining Control Over the Outstanding Debt**

57.     Given the size of Yucaipa's equity holdings, its control of Allied's Board and,

indeed, its control over all of Allied, it was always intended that Yucaipa would be precluded

from taking control over the First Lien Debt and the outstanding debt under Second Lien Facility

(the "Second Lien Debt").  This intention was hardly surprising and, indeed, standard in such

secured debt offerings.  Secured creditors had the right to know that the majority equity holder

would not attempt to prevent creditors from enforcing rights that could harm the interests of

secured creditors.  Similarly, unsecured creditors and other stakeholders wanted to ensure that

Yucaipa, as the majority equity holder, would not be able to control the outstanding secured debt of the company in a manner that would favor equity holdings over legitimate debt holders.

58.     The First Lien Credit Agreement set forth a mechanism designed to ensure that a majority of the holders of the First Lien Debt would be able to control most of the actions taken by the lending group.  In particular, the First Lien Credit Agreement provides that "Requisite Lenders"—defined as holders of debt under the First Lien Facility representing more than 50% of the sum of the aggregate "Term Loan Exposure" of all lenders, the aggregate letter of credit exposure, and the aggregate revolving credit exposure (First Lien Credit Agreement § 1.1)— have the power to make certain key decisions affecting all First Lien Lenders.

59.     Among other things, the Requisite Lenders under the First Lien Facility have the authority to declare or not declare "Events of Default" under the First Lien Credit Agreement. (Id. §§ 8.1, 9.8.)

60.     The First Lien Credit Agreement expressly prevented Yucaipa from becoming eligible to become a Requisite Lender under the First Lien Credit Agreement because, as Allied's majority shareholder and "Sponsor," it was not a lender under the First Lien Facility and could not become such a lender.  (Id. §§ 1.1, 10.6.)

61.     The First Lien Credit Agreement was amended or, in the case of the "Fourth Amendment," purportedly amended, on four occasions.  The Third Amendment[3] and purported Fourth Amendment,[4] are relevant to this proceeding.

---

[3] The Third Amendment refers to that certain Amendment No. 3 To Credit Agreement and Consent, dated as of April 17, 2008, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007.

[4] The Fourth Amendment refers to that certain Amendment No. 4 To Credit Agreement, dated as of August 21, 2009, to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dates as of May 15, 2007.

62. The Second Lien Credit Agreement was amended on three occasions. The "Second Lien Third Amendment" is relevant to this proceeding.

63. Notwithstanding the clear prohibition in the respective First Lien Credit Agreement and Second Lien Credit Agreement that prohibited Yucaipa from acquiring the secured debt of Allied, Yucaipa refused to acknowledge or abide by those terms. ███████████

████████████████████████████████████████████

████████████████████████████████████ Yucaipa would subsequently ██████████████████ that it could take control over the secured debt facilities of Allied.

(d) **Yucaipa Causes the Second Lien Credit Agreement to be Amended and Acquires the Outstanding Second Lien Facility**

64. On May 6, 2008, as part of Yucaipa's scheme to take control over the entirety of Allied's financial structure, Yucaipa, acquired the face amount of $40 million in term loans under the Second Lien Facility and exchanged $20 million of it for 21,396 shares of preferred stock that is convertible into common stock. The $40 million face value acquired by Yucaipa represented approximately 80% of the outstanding amount of the term loans under the Second Lien Facility. Yucaipa acquired its holdings of the Second Lien Facility at a substantial discount to its par value.

65. In connection with Yucaipa's acquisition of the Second Lien Debt, the Second Lien Credit Agreement was amended to allow Yucaipa to become an Eligible Assignee with no restrictions on its right to vote or control the Second Lien Facility. Accordingly, Yucaipa became the Requisite Lender under the Second Lien Facility. Yucaipa, not Allied, controlled the negotiation of the amendment to the Second Lien Facility that enabled Yucaipa to take control over the Second Lien Facility.

19

      (e)    **Yucaipa Causes the Third Amendment to the First Lien Facility to be Executed by Allied to Permit Yucaipa to Purchase a Limited Amount of First Lien Debt**

66.    Not long after Allied emerged from the first bankruptcy, notwithstanding the terms of the First Lien Credit Agreement but consistent with Yucaipa's belief ███████████ ████████████████, Yucaipa began to push to acquire First Lien Debt. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████

67.    ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████  By contrast, Allied took a back seat and went along for the ride while Yucaipa ████████████████████████████████.

68.    ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

69.    Under the Third Amendment, a "Restricted Sponsor Affiliate" was defined as the "Sponsor and its Affiliates," and, under the First Lien Credit Agreement, the Sponsor is Yucaipa. (First Lien Credit Agreement § 1.1.)  Accordingly, in light of the Restricted Sponsor Affiliate definition and under the terms of the Third Amendment, Yucaipa could acquire certain First Lien Debt.  However, Yucaipa was precluded from becoming a Requisite Lender under the Third

Amendment, and, to the extent Yucaipa decided to acquire any First Lien Debt, it would be

subject to the following restrictions, among others:

- Yucaipa could not acquire more than 25% of the aggregate principal amount of the Term Loan Exposure held by all Lenders (Third Amendment § 2.7(c));

- Yucaipa could not acquire more than $50 million of the principal amount of Term Loans (id. § 2.7(c));

- Yucaipa could not exercise any voting rights that it would otherwise have as a Lender, including the right to consent to any amendment to the Credit Agreement or the right to vote its debt in any Allied bankruptcy (id. §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)); and

- Within ten days of its acquisition of any Term Loans, Yucaipa was required to make a capital contribution to Allied of at least 50% of the aggregate principal amount of those Term Loans (id. § 2.7(e)).

70.     Notwithstanding its restrictions, the fact that the Third Amendment permitted

Yucaipa, as a Sponsor, to acquire any of Allied's First Lien Debt was a unique achievement for

Yucaipa. █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████

71.     ████████████████████████████████████████████████████

██████████████████ Yucaipa was not interested in acquiring any debt subject to the

restrictions ████████████ in the Third Amendment.  Indeed, in these bankruptcy proceedings,

Yucaipa has averred that it "never intended to purchase any debt claims that would make it

bound by the Third Amendment's provisions."  (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I.

65 at ¶25(a).)  Yucaipa has made plain to this Court that it "never would have acquired any first

lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential

ownership rights existed." (Id. at ¶ 50.)  Accordingly, unsatisfied by the terms of the Third

Amendment that it solicited and ▆▆▆▆▆, Yucaipa continued with its scheme to take total

control over the financial structure of Allied in order to protect its equity investment, to the

detriment of all of Allied's other creditors.

(f)     **Yucaipa's Control Over Allied's Purported Special Committee's Review of Potential Yucaipa Transactions**

72.     During the spring of 2008, in connection with the Third Amendment that Yucaipa

apparently never actually wanted, Yucaipa continued to pursue ways to take total control over

the financial affairs of Allied.  Throughout this period, the Allied Board simply went along for

the ride.  Indeed, notwithstanding the appointment of a so-called "Special Committee" of

allegedly independent directors, who were supposed to evaluate any transaction involving

Yucaipa, including the Third Amendment, to ensure that it was beneficial to Allied and its

stakeholders, the Board, and ultimately the Special Committee, largely sat idly by ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

73.     On March 31, 2008 the Special Committee was formed.  The Committee

consisted of the two purportedly "independent" directors not formally appointed by Yucaipa,

Brian Cullen ("Cullen") and Defendant Gendregske, with Cullen appointed as its Chairman.

Other individuals, including Allied's in-house and outside counsel, regularly attended Special

Committee meetings.

74.     The purpose of the Special Committee was purportedly to negotiate on behalf of

Allied in connection with any transaction in which Yucaipa would be involved.  This necessarily

would have included the Third Amendment, which for the first time permitted Yucaipa to

acquire First Lien Debt.  However, neither Allied nor its Special Committee took any control

████████████████████████████████████████████████████

████████████████████████ .

75.     In addition, the Special Committee never took any steps to ensure that it was

represented by or advised by independent professionals who could have taken steps to ensure

that the interests of Allied, as opposed to those of Yucaipa, were being represented at the

bargaining table over the Third Amendment or any subsequent transaction involving Yucaipa.

At no time did the Special Committee retain independent counsel or independent financial

advisors to assist its considerations of proposed transactions and whether to make certain

recommendations to the Board.[5]  Indeed, throughout its entire existence until well into these

chapter 11 cases, the Special Committee has relied solely on the legal and other advisors for the

Debtors.

76.     At an April 1, 2008 Special Committee meeting, a transaction was discussed

whereby Yucaipa would purchase Allied's Second Lien Debt, potentially at a discount, and then

would turn around and forgive that debt as a contribution to Allied in exchange for equity.  Two

weeks later, the Special Committee discussed Yucaipa's willingness to acquire and then to

convert up to $25 million of Second Lien Debt into equity, subject to a material adverse change

clause.

77.     Three days later, on April 17, 2008, the Special Committee was advised that

Defendant Walker, on behalf of Yucaipa, had stated that Yucaipa was only willing to convert

$20 million of Second Lien Debt into equity, despite the fact that Allied's negotiators had

advised that they would be more comfortable at the previously discussed $25 million conversion

amount.  Nevertheless, at the conclusion of the Special Committee's April 17, 2008 meeting, the

---

[5] Only after months had passed in these current bankruptcy cases did the Special Committee ever retain independent
counsel.

Special Committee unanimously agreed to return a term sheet to Yucaipa containing the $20 million commitment that Yucaipa preferred.

78.     Yucaipa would ultimately be unwilling, however, ████████████████████ ████████████████████████████████████████████████████████. Notwithstanding the enactment of the Third Amendment that ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████

    (g)     **Yucaipa Continues to Seek Approval to Acquire a Majority of the First Lien Debt to Protect its Equity Investment**

79.     Throughout 2008, Yucaipa was ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

80.     ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

81.     ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

82.     During the same time that Yucaipa was cementing its control, Allied was suffering financially and was informed of the heightened duties that it owed to its creditors as a result.  On December 10, 2008, Cullen advised the Board that it should "consider the possibility that the Company was in the zone of insolvency and may have altered responsibilities as a consequence."

83.     Nevertheless, while discussions concerning Yucaipa's potential acquisition of First Lien Debt continued, the Board and the Special Committee failed to take even rudimentary steps to ensure that any transaction would be fair to Allied and its stakeholders.  For instance, on January 24, 2009, the Special Committee determined that it would not seek a fairness opinion concerning a contemplated transaction where Yucaipa would only acquire a minority amount of the First Lien Debt.  Ultimately, Allied failed to ever obtain a fairness opinion concerning any acquisition of First Lien Debt by Yucaipa, including when Yucaipa ultimately purported to acquire the majority of outstanding First Lien Debt.

84.     Notably, while the Special Committee and the Board failed to take steps to protect the interests of Allied and its stakeholders, the true motives of Yucaipa were obvious to, and known by, Allied's directors.  For instance at a February 3, 2009 Special Committee meeting, Cullen stated in no uncertain terms that "he believed that Yucaipa was putting more money into the Company in an effort to retain and protect its ownership position."  The Special Committee shared Cullen's views, as the minutes from that same meeting reflect that the "Special Committee noted that Yucaipa's additional infusion of cash in the Company suggested that it would remain willing to augment the Company's cash position to protect its investment."  Still, the Allied Directors failed to take appropriate steps to ensure that the interests of the Company and its creditors, as opposed to the interests of Yucaipa, were protected.

25

Case 13-50530-CSS Doc 76 Filed 03/14/13 Page 26 of 61

85. Throughout this time, Yucaipa continued to [redacted]

86. [redacted]

87. [redacted]

88. [redacted], on February 4, 2009, Yucaipa launched a tender offer to the existing holders of the First Lien Debt that, if successful, would have permitted Yucaipa "to be Lenders under [First Lien] Credit

Agreement without any capital contributions to [Allied] and without any limit on the amount of

Loans and LC Deposits that can be purchased."  As part of the tender offer, Yucaipa offered to

purchase the outstanding debt at substantial discounts to par, namely term loans and letter of

credit deposits for approximately 15 cents on the dollar and revolving credit commitments for

approximately 13 cents on the dollar.  Simultaneously, Yucaipa caused Allied to seek to secure

lender consent to an amendment to the First Lien Credit Agreement that, if successful, would

have permitted Yucaipa to become the Requisite Lender under the First Lien Facility.

89.     However, the existing lenders to the First Lien Facility would not tender or

consent to Yucaipa's desire to take control over the First Lien Facility.  Accordingly, the

proposed tender offer and amendment strategy failed.

(h)     **Yucaipa Initiates Its Backup Plan to Take Total Control Over Allied
        Utilizing ComVest to Enable Yucaipa to Become the Requisite Lender Over
        the First Lien Facility**

90.     Having failed in its efforts to convince the First Lien Facility lenders to permit

Yucaipa to take total control over the First Lien Facility, Yucaipa initiated its backup plan to take

complete control over Allied.  Accordingly, Yucaipa turned its sights on another entity,

ComVest, to give Yucaipa the total control it so desired.

91.     At a March 6, 2009 Allied Board meeting, Defendant Walker informed the Board

about a contemplated transaction between Yucaipa and ComVest to acquire ComVest's Allied

debt holdings.  At that meeting, Defendant Walker advised the Board that

> Yucaipa and Com-Vest reached an agreement under which Com-
> Vest would retain its debt holdings, but would allow Yucaipa full
> voting control over those holdings, as well as any future Allied
> debt acquired by Com-Vest.  Com-Vest further agreed not to
> undertake any other activities in the carhaul sector.  Com-Vest and
> Yucaipa reached an agreement as to how the two companies would
> share any recovery in the event of a liquidation by Allied.  Under
> that agreement, any payments to Com-Vest/Yucaipa would be
> provided first to Com-Vest for the first $70 million, then to

27

> Yucaipa up to an amount equal to the amount invested by Yucaipa
> in purchasing first lien debt, with any remaining funds shared
> between the companies pro-rata. Yucaipa planned to launch a
> tender offer for remaining first lien debt at twenty-three cents on
> the dollar. Finally, under the agreement, Allied was to provide
> Com-Vest a warrant for 25% of the outstanding shares in Allied. . .
> . Mr. Walker pointed out that in exchange for the 25% of the
> Company's equity, the Company would receive an amendment that
> would cure all defaults and set covenants at a level selected by the
> Company as achievable. It would also put requisite lender
> approval in the hands of Yucaipa, more closely aligning the
> interests of the Company and those of the requisite lenders.

92.     After Defendant Walker's presentation, the Board "went on to discuss the
ramifications of the proposed transaction, including the impact of the proposed transaction on
minority shareholders, and other lenders." As part of that discussion, Defendant Walker stated
that ComVest's intention, absent an agreement on the proposed transaction, would be to "push
the Company into bankruptcy and force a 363 sale in which it would likely credit bid its loans in
order to obtain an order to purchase the Company."

93.     At this Board meeting, Cullen inquired as to whether a Special Committee
meeting was needed and whether the Board should obtain a fairness opinion. The Board
"directed the Special Committee to meet and return to the full Board with a recommendation on
whether to authorize the Company to enter into the proposed transaction." The Board meeting
was simply suspended momentarily to permit the Special Committee to meet. As usual, the
Special Committee received no independent advice regarding the proposed transaction. Shortly
thereafter the Board reconvened, and the Special Committee advised that it had unanimously
decided to recommend that the Board approve of the proposed transaction and what would
ultimately lead to the Fourth Amendment.

94.     Yucaipa's intent throughout this period was clear. Having failed in earlier
attempts to convince the holders of the First Lien Debt to voluntarily consent to permit Yucaipa

to become the Requisite Lender, Yucaipa would utilize Allied in whatever fashion it desired in order to effectuate Yucaipa's efforts to protect its equity investment.

95.     Yucaipa's intentions throughout this period were known to the Allied Directors. All involved understood that Yucaipa, having already succeeded in its efforts to take control over the Second Lien Facility, was seeking approval to obtain First Lien Debt in an effort to support its equity investment in Allied.  Nevertheless, the Allied Directors took no measures to stop Yucaipa, or even to ensure that any takeover by Yucaipa of the First Lien Facility would not be inimical to the interests of Allied or its creditors.

(i)     **Yucaipa Causes Allied and the Allied Directors to Fail to Negotiate with the First Lien Lenders Concerning a Consensual Restructuring of the First Lien Facility**

96.     Notwithstanding Defendant Walker's representation to the Allied Board in March 2009, Yucaipa and ComVest did not have any agreement at that time.  To the contrary, ComVest was interested in pursuing a restructuring of the outstanding debt of Allied in a manner that would have involved a potential consensual reorganization of Allied's debt structure.

97.     In the spring and summer of 2009, ComVest repeatedly approached Allied in an effort to engage in discussions concerning a potential conversion of the outstanding First Lien Debt into equity of a reorganized Allied.  The precise parameters of this potential consensual restructuring were not set in stone, but could have taken a number of different forms, including potentially a strategic combination with other parties in the long-haul auto industry or other potential structures.

98.     The benefits of a potential voluntary restructuring of the outstanding debt of the Company should have been clear to the Allied Directors at the time.  Indeed, by the spring of 2009, Allied had been in continuous default of its obligations under the First Lien Facility for almost a year.  A voluntary restructuring of the First Lien Debt in a manner that involved the

conversion of the outstanding debt into equity of a reorganized Allied would have significantly benefitted Allied and its creditors, as it could have potentially de-levered Allied's balance sheet. Accordingly, given the obvious benefits to the Company and its stakeholders, it was incumbent upon the Allied Directors to at least pursue discussions with ComVest, as the Requisite Lender, concerning a potential voluntary restructuring.

99.     The one party that would not have benefitted, however, from such a voluntary restructuring or strategic combination would have been Yucaipa, as the controlling existing equity holder of Allied.  In particular, to the extent that the Company entered into such a restructuring or combination, it is likely, if not certain, that Yucaipa would have seen the value of its existing equity holdings eliminated or, at a minimum, substantially diminished and would potentially see its super-majority control over Allied be eliminated or at least reduced.

100.     Unfortunately, the Allied Directors failed to even attempt to engage or direct the officers of Allied to engage in discussions or negotiations with ComVest concerning a potential voluntary restructuring of Allied's outstanding First Lien Debt.  Although the precise reasons for the failure of the Allied Board to fulfill its fiduciary obligations is not known to date, given Yucaipa's control over the Board and its decision making, it is hardly surprising that Allied failed to even attempt to engage in discussions concerning a potential transaction that could have greatly enhanced the value of the Company where it would not advance Yucaipa's self-serving interests.

101.     Accordingly, ComVest, having been rebuffed in its efforts to effectuate a voluntary out-of-court restructuring of Allied's debt structure, went back to the drawing board and began serious negotiations with Yucaipa.

(j)     **Yucaipa Causes Allied to Fail to Pay Under the First Lien Facility In Order
to Benefit Yucaipa in its Negotiations with ComVest**

102.     Not content to simply pursue its backup plan to take control over Allied's entire

financial structure, Yucaipa also took measures to put pressure on the existing First Lien Lenders

through its control over Allied's equity and its Board.  What is more, Yucaipa utilized Allied's

existing funds as a cudgel to assist Yucaipa in connection with negotiations with ComVest, all to

the detriment of the existing creditors of Allied.

103.     For example, at an August 3, 2009 Board meeting called for the purpose of

discussing Allied's "liquidity, especially with respect to the approximately $4.8 million interest

payment due to the first lien lenders the next day," the Board was advised that Defendant Walker

"had suggested that the Company might be well-advised not to make the payment."

104.     At that meeting, Defendant Walker "updated the Board on the status of

negotiations with ComVest, stating that ComVest and Yucaipa were back in discussions," that

Yucaipa believed a deal could be reached, but "warned, however, that it was critical that the

Company have adequate liquidity to provide a sufficient runway for negotiations, and that a free

fall into bankruptcy could be highly disruptive to the Company and to the ongoing negotiations."

Defendant Walker further "advised that based upon his conversations with ComVest, he did not

believe that failure to make the payment would lead to precipitous action by the lenders or

anyone else", because, according to Defendant Walker, "ComVest, as the Requisite Lenders,

would not seek to exercise any rights and would not allow others to do so given the current state

of negotiations between ComVest and Yucaipa."

105.     At this same meeting, Scott Macaulay, Allied's chief financial officer, advised the

Board that Allied had $16.5 million of cash on hand, of which $12.3 million was immediately

available.  Of that $12.3 million, $2 million was needed for insurance premium payments,

31

leaving, as a practical matter, $10.3 million in immediately available cash on hand.  Mr. Macaulay advised that making the interest payment of $4.8 million to the First Lien Facility lenders would leave Allied with $5.5 million of immediately available cash on hand. Accordingly, Allied had sufficient funds available to make its payment and to stay current on its payment obligations under the First Lien Facility.

106.    Nevertheless, notwithstanding the fact that Allied had sufficient liquidity to pay debt service under the First Lien Facility, in order to facilitate Yucaipa's interests in negotiations with ComVest, Defendant Walker's motion that Allied forego the quarterly interest payment that it owed the First Lien Facility lenders on August 4, 2009 carried unanimously.  Based upon the information disclosed to the Committee to date, it does not appear that the Special Committee ever met to consider or evaluate Defendant Walker's motion, notwithstanding that it was clearly in Yucaipa's interests (but not the Debtor's) for Allied not to make the payments owing under the First Lien Facility.

107.    Of course, these were hardly the only defaults by Allied under the First Lien Credit Agreement.  Indeed, since August 2008, Allied had been in continuous default under the First Lien Credit Agreement, as it failed to meet financial covenants set forth in the First Lien Credit Agreement.  Additionally, Allied later disclosed that as of August 30, 2008, it had failed to fulfill its requirement under the First Lien Credit Agreement to disclose Yucaipa's acquisition of Second Lien Debt in June and July 2008.  The failure to disclose Yucaipa's purchase of that debt also constituted an Event of Default under the First Lien Credit Agreement.  Yucaipa directed or caused Allied to fail to disclose the acquisition of debt by Yucaipa in June and July 2008.

### (k) Yucaipa Completes Its Backup Plan to Take Total Control Over Allied's Financial Structure, as it [redacted] Causes Allied to Execute The Purported Fourth Amendment

108. While it was causing Allied to further default on its obligations to its creditors, Yucaipa continued negotiations with ComVest to complete its backup plan to cement its total control over Allied. During this time, Yucaipa [redacted]

109. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

110. [redacted]

[redacted]



[redacted]

111. [redacted] Yucaipa had struck a deal with ComVest whereby those parties agreed to amend the terms of the First Lien Agreement to provide precisely the opposite of what was always intended, namely that Yucaipa would now be permitted to control the entirety of Allied's debt structure. [redacted]

112. [redacted] The transaction was ultimately approved by Allied's Board on August 19, 2009, at the recommendation of the purportedly independent Special Committee. Despite the approval, neither Allied's Special Committee, nor the full Board, played any significant role in the negotiations of the terms of the

Fourth Amendment.  Instead, the Allied Directors simply went along for the ride as Yucaipa

completed its backup plan to cement control over Allied.

113. 

114.    The purported Fourth Amendment purported to eliminate all of the Third

Amendment's restrictions on Yucaipa's ability to obtain First Lien Debt.  The Fourth

Amendment purports to amend the First Lien Agreement's definitions of "Eligible Assignee"

and "Term Loan Exposure" such that Yucaipa's ability to acquire certain First Lien Debt is no

longer capped.  (Fourth Amendment § 2.1(b).)  It further purports to eliminate the voting

restrictions for debt obtained by Yucaipa, purports to remove the $50 million cap, and purports

to eliminate the capital contribution requirement.  (Id. § 2.4(a).)

115. 

 Yucaipa now purports to hold "$114,712,088.66 of

Term Loans and $30,400,458.40 of LC Commitments (i.e. deposits to support letter of credit),

totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First

Lien Credit Agreement," according to Yucaipa's Cross-Claims.  (Adv. Pro. No. 12-50947

35

(Bankr. D. Del.), D.I. 65 at ¶17.) ████████████████████████████

██████████████

116.     ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

117.     Following the execution of the Fourth Amendment, ███████████████

███████████████████████████████████████████████ Yucaipa contended that it was the

Requisite Lender under the Credit Agreement.

(l)     **Having Executed its Backup Plan Through the Fourth Amendment, Yucaipa Plans to Eliminate the Threat to Its Equity Position**

118.     Having succeeded in its backup plan to take control over the entire secured debt

structure of Allied, Yucaipa next turned to planning a reorganization of Allied that would further

cement and protect its equity holdings in the Company.

119.     ██████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

120.    During this time, Yucaipa pursued discussions with other parties and entities that

had an interest in the First Lien Facility concerning the potential of a reorganization of Allied

whereby the existing debt of Allied would be converted to equity or wiped out.  Neither Yucaipa

nor the Allied Directors considered during this time whether such a reorganization strategy

would be consistent with the fiduciary obligations owed by Yucaipa and the Allied Directors to

Allied as a whole and its stakeholders, including its creditors.

121.    Additionally, following the execution of the Fourth Amendment, ███████

███████████████████████  Yucaipa took additional steps to protect Yucaipa's equity position at the

expense of Allied's legitimate creditors.  As noted above, beginning in August 2009, Allied, at

Yucaipa's direction, began to refuse to make regularly scheduled payments of principal and

interest under the First Lien Facility.  Additionally, Yucaipa also caused Allied to fail to

reimburse collateral accounts that secured the First Lien Facility's letter of credit facility, to

attempt to terminate certain control agreements, and to retain excess cash all in violation of the

terms of the First Lien Credit Agreement.  These steps frustrated the rights of secured and

unsecured creditors to attempt to remedy defaults committed by Allied, all during a period in

which Allied was insolvent and in default of its obligations to creditors.

(m)    **Litigation Surrounding the Purported Fourth Amendment**

122.    Although Yucaipa has claimed to be the Requisite Lender under the Credit

Agreement in light of the purported Fourth Amendment, its claim to that position has been hotly

contested around the country and has been an issue in at least three separate proceedings (the

third of which includes multiple adversary proceedings in the Delaware Action).[6]

<div align="center">(i)     <b>The Georgia Litigation</b></div>

123.    Approximately one month after the execution of the Fourth Amendment and

affiliated agreements, the majority of the other First Lien lenders objected to Yucaipa's

acquisition and instructed CIT, which acted as the Administrative Agent and Collateral Agent

under the First Lien Credit Agreement, to object to Yucaipa's claim to be the Requisite Lender

and to challenge the validity of the Fourth Amendment.

124.    Following CIT's objection to the Fourth Amendment, Yucaipa and Allied, at

Yucaipa's direction, brought suit against CIT in the Superior Court of Fulton County, Georgia

(the "Georgia Action"),[7] seeking, among other things, a declaratory judgment that the Fourth

Amendment was valid and that Yucaipa was the Requisite Lender. In response, CIT filed

counterclaims seeking, among other things, a declaration that the Fourth Amendment was invalid

and stating claims for breach of fiduciary duty against the Allied Board and aiding and abetting

breach of fiduciary duty against Yucaipa.

125.    Shortly after filing a motion for partial summary judgment in its favor, CIT

entered into a settlement agreement with Allied and Yucaipa. The Settlement Agreement made

clear that the settlement was made solely by CIT in its individual capacity and did not release

any claims that may have existed on behalf of "any other person."

---

[6]The Intervenors commenced on January 25, 2013 an adversary proceeding before this Court related to the same issues. *BDCM Opportunity Fund II, LP, et al. v. Yucaipa American Alliance Fund, I, LP et al.*, Adv. Pro. No. 13-50499 (CSS) (Bankr. D. Del.).

[7] In addition to the Georgia Litigation, the purported Fourth Amendment spawned a separate lawsuit against ComVest in Florida state court. In that case, Michael T. Riggs and affiliated entities sued ComVest, claiming that by entering into the transaction with Yucaipa that ComVest had breached various letters of intent and other agreements that contemplated a transaction involving Allied. That lawsuit has apparently been stayed pending these bankruptcy cases.

(ii) **The New York Action**

126.    On January 17, 2012, just weeks after the settlement of Yucaipa and Allied's

lawsuit against CIT, the Intervenors commenced an action against Yucaipa in the Supreme Court

of the State of New York (the "<u>New York Action</u>") seeking a declaration from the court that "(i)

the purported Fourth Amendment is null and void, ineffective, and not binding," and (ii) that

"Yucaipa is not Requisite Lenders under the Credit Agreement."

127.    Yucaipa's motion to dismiss the New York Action was denied at a May 30, 2012

hearing without a written opinion, and the transcript of that hearing was "So Ordered" on August

2, 2012.

128.    The Intervenors moved for summary judgment on August 27, 2012.  At oral

argument on that motion on November 19, 2012, the court indicated it would grant the motion

for summary judgment and indicated it would subsequently issue a written order, as Yucaipa has

acknowledged (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 at ¶88).

(n)    **Yucaipa Has Failed to Perform Under the Third Amendment**

129.    By virtue of the ruling in the New York Action, the Fourth Amendment has now

been found to be invalid such that reliance on the Fourth Amendment now is misplaced.

Accordingly, the Third Amendment is again the operative amendment to the First Lien Credit

Agreement and its terms, including the contribution provisions and limitations upon Yucaipa's

debt holdings, are binding and controlling.

130.    However, notwithstanding the ruling in the New York Action, Yucaipa has

refused to perform in accordance with the terms of the First Lien Credit Agreement, as amended

by the Third Amendment.  Indeed, even if the forthcoming written ruling in the New York

Action withstands any appeal that Yucaipa claims it will bring, Yucaipa expressly contends in

this proceeding that it would refuse to perform the obligations contained in the First Lien Credit

Agreement, as amended by the Third Amendment. (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 ¶¶ 109, 118-122, 130). Yucaipa's cross claims against the Interventors, setting forth its refusal to perform under the Third Amendment, were dismissed with prejudice by this Court on February 27, 2013.

(o)     **The Filing of These Bankruptcy Cases and Yucaipa's Attempt to Fulfill its Plan to Protect its Equity Investment**

131.     On May 18, 2012, the Intervenors filed these involuntary bankruptcy proceedings, alleging that Yucaipa had caused Allied to be mismanaged and had caused Allied to be in default under the First Lien Credit Agreement. Subsequently, Allied consented to the bankruptcy cases and filed a voluntary petition under chapter 11 of the Bankruptcy Code.

132.     Since that time, Yucaipa has sought to complete its long-standing plans for Allied. In particular, Yucaipa has repeatedly stated that it was preparing to bid to takeover Allied. Yucaipa would essentially retain its control over Allied's equity through any bid and eliminate existing debt of Allied, both secured and unsecured.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa**

133.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 132 as if fully set forth herein.

134.     The equities in this case demand that the amounts allegedly owed to Yucaipa on account of the First and Second Lien Facilities should be subordinated to all other claims except those of equity interest holders under 11 U.S.C. § 510(c).

135.     Yucaipa, as the owner of a super-majority of the outstanding equity in the Debtors and having been able to appoint at least three of the five directors on Allied's board of directors, was at all times, and still is, an insider of the Debtors.

136.     Yucaipa and its agents, including the members of Allied's Board appointed by Yucaipa, breached their fiduciary duties of good faith, honest governance, loyalty and care to Allied and its creditors by, among other wrongs, looting and engaging in self-dealing transactions for Yucaipa's own benefit and to the detriment of the Debtors and their creditors.

137.     Yucaipa's inequitable conduct injured Allied and its creditors by, among other things, causing the Company to fail to repay amounts outstanding under its various debt facilities and to expend millions of dollars in fees and other amounts that served no one's interest but those of Yucaipa.  In addition, Yucaipa acted inequitably toward Allied by improperly exercising its control over Allied and causing Allied to pay for and consent to a series of transactions effectuating Yucaipa's purported acquisition of a majority of the outstanding secured debt of Allied, all with the express intention of causing Allied to sell its assets to Yucaipa through the guise of a bid that would eliminate legitimate debt of Allied while protecting the equity interests of Yucaipa at the expense of the Debtors and their creditors.

138.     Plaintiff believes that equitable subordination of Yucaipa's purported debt holdings to all other claims except those of equity interest holders is consistent with the provisions of the Bankruptcy Code.  Yucaipa should not be permitted to profit from an illicit scheme that it willingly, and intentionally, imposed upon Allied and its creditors, in violation of its fiduciary duties of good faith and loyalty.

139.     For the reasons set forth above, Yucaipa's claims, in total, against the Debtors should be subordinated to all other claims asserted against the Debtors pursuant to section 510(c)

of the Bankruptcy Code because Yucaipa's inequitable conduct resulted in injury to the Debtors'

creditors as a whole and conferred an unfair advantage on Yucaipa, and such subordination

would be consistent with the provisions of the Bankruptcy Code.

### Second Claim for Relief

### Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa for Harm to All First Lien and Second Lien Lenders

140.    Intervenors repeat and reallege each and every allegation in paragraphs 1 through

139 as if set forth fully herein.

141.    At all times relevant hereto, Yucaipa was an insider of the Debtor.

142.    As more fully described above, Yucaipa has engaged in unfair and inequitable

conduct towards First Lien and Second Lien Lenders in that Yucaipa has manipulated the

Debtors as an insider and in its capacity as alleged Requisite Lender and has engaged in

overreaching with respect to the Debtors and their creditors by, among other things:

  (a)    Yucaipa caused the Debtors to favor Yucaipa at the expense of other non-insider creditors.

  (b)    Yucaipa improperly acted as Requisite Lender by failing to permit First Lien Lenders to exercise legitimate rights and remedies.

  (c)    Yucaipa caused the Debtors to abdicate their duty to maximize value, in favor of protecting Yucaipa's ownership position.

  (d)    Yucaipa pressured Debtors' management repeatedly to defer to Yucaipa for the sole benefit of Yucaipa.

143.    Yucaipa's inequitable conduct has resulted in injury to First Lien and Second Lien

Lenders by conferring unfair advantages upon Yucaipa in at least the following ways:

  (a)    Yucaipa caused the Debtors to adopt a business strategy to benefit Yucaipa at the expense of Plaintiffs.

  (b)    Yucaipa prevented the Debtors from developing restructuring proposals that maximize value for Intervenors.

(c)     Yucaipa forced the Debtors to place the interests of Yucaipa above the Debtors' own interests and those of the Intervenors, including but not limited to orchestrating amendments to the Credit Agreement solely for the benefit of Yucaipa.

144.    As a result of Yucaipa's conduct, First Lien and Second Lien Lenders have been materially harmed.

145.    Granting the relief sought herein against Yucaipa is consistent with the Bankruptcy Code and is appropriate based on the indisputable facts of this case.

146.    Pursuant to 11 U.S.C. §510(c), all distributions to Yucaipa on account of  its status as First Lien Lender and Second Lien Lender should be subordinated to the claims of all First Lien and Second Lien Lenders.

### Third Claim for Relief

**Recharacterization Pursuant to 11 U.S.C. § 105(a) of Yucaipa's Purported Debt Holdings Under the First and Second Lien Facilities against Yucaipa**

147.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 146 as if fully set forth herein.

148.    The substance and character of Yucaipa's purported debt holdings under the First Lien Facility and Second Lien Facility is one of an equity contribution.

149.    Considering the totality of the circumstances surrounding Yucaipa's scheme to take control of Allied's outstanding debt, including, but not limited to, its acquisition of Second Lien Debt, the Third Amendment to the First Lien Credit Agreement, the Fourth Amendment to the First Lien Credit Agreement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Yucaipa's claims against the Debtors should be recharacterized as equity interests based on, but not limited to, the following factors:

a)      Since at least the spring of 2008, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

43

b) Yucaipa's goal of obtaining First and Second Lien Debt was a transparent effort to control both sides of the lending equation—it has controlled the borrower through its majority equity holdings and accompanying power to appoint a majority of the Board, and it has sought to control the First Lien and Second Lien Debt by attempting to become the Requisite Lender under both facilities;

c) Yucaipa has never sought to obtain First or Second Lien Debt as debt, as it never intended to enforce the right of a debt holder to receive regularly scheduled payments of principal and interest on the debt;

d) Indeed, given the restrictions that would have attended any First Lien Debt that it would have acquired under the Third Amendment, in Yucaipa's Cross-Claims in these proceedings and in the New York Action, it has admitted that it did not acquire any First Lien Debt under the Third Amendment, "never would have," and "never intended to purchase any debt claims that would make it bound by the Third Amendment's provisions" (Adv. Pro. No. 12-50947 (Bankr. D. Del.), D.I. 65 at p. 15), an admission that it was only interested in acquiring First Lien Debt to the extent that it could achieve Requisite Lender status in furtherance of its equity interests;

e) Yucaipa's acquisition of First and Second Lien Debt was in the nature of an equity contribution because it was only acquired in furtherance of Yucaipa's equity interest in Allied ███████████████████████████████████████████████ .

150.    For the reasons set forth above, Yucaipa's claims against the Debtors under the First Lien Facility and Second Lien Facility should be recharacterized as equity pursuant to section 105(a) of the Bankruptcy Code.

**Fourth Claim for Relief**

**Specific Performance of Third Amendment
to the First Lien Credit Agreement against Yucaipa (Contribution Provision)**

151.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 150 as if fully set forth herein.

152.    As a purported holder of First Lien Debt, Yucaipa is bound by the terms of the First Lien Credit Agreement, as amended.

153.    The court in the New York Action has declared that the Fourth Amendment is

invalid.  Accordingly, because the Fourth Amendment has been found to be null and void, the

Third Amendment is enforceable and its terms govern the holdings of any holders of First Lien

Debt, including Yucaipa.

154.    Pursuant to the terms of the Third Amendment, Yucaipa is obligated to make a

capital contribution of fifty (50) percent of the face value of certain First Lien Debt holdings that

it acquired within ten days of the acquisition of such debt.  Specifically, under Section 10.6(j)(iii)

of the First Lien Credit Agreement,

> "(j) <u>Restricted Sponsor Affiliates</u>. …Each Lender that is a Restricted
> Sponsor Affiliate, upon succeeding to an interest in the Term Loans:
>> …
>
>> (iii) agrees further that no later than ten days after the date of such
> assignment or transfer of such Term Loans (or, if a Default or Event of Default
> occurs during such ten day period, then three Business Days after such Restricted Sponsor
> Affiliate has knowledge of the occurrence of such Default or Event of Default but in no
> event later than the last day of such ten day period), such Restricted Sponsor Affiliate
> shall make a capital contribution to Borrowers of no less than 50% of the aggregate
> principal amount of such Term Loans in accordance with Section 10.6(k);

155.    Yucaipa acquired a total of $145,112,547.06 in First Lien Debt, $114,712,088.66

in the form of Term Loans.

156.    Yucaipa has breached the First Lien Credit Agreement by failing to make the

capital contribution of not less than $57,356,044.33, required by the Third Amendment.

157.    Plaintiff has no adequate remedy at law for the harm that will continue to be

caused by Yucaipa's continued breach of the First Lien Credit Agreement, as amended by the

Third Amendment.

158.    Accordingly, Plaintiff is entitled to a decree of specific performance by Yucaipa

of its obligations under the First Lien Credit Agreement, as amended by the Third Amendment,

to, among other things, make the required capital contribution of not less than $57,356,044.33.

45

## Fifth Claim for Relief

### Breach of Third Amendment
### to the First Lien Credit Agreement against Yucaipa  (Contribution Provision)

159.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 158 as if fully set forth herein.

160.    As a purported holder of First Lien Debt, Yucaipa is bound by the terms of the First Lien Credit Agreement, as amended.

161.    The court in the New York Action has declared that the Fourth Amendment is invalid.  Accordingly, because the Fourth Amendment has been found to be null and void, the Third Amendment is enforceable and its terms govern the holdings of any holders of First Lien Debt, including Yucaipa.

162.    Pursuant to the terms of the Third Amendment, Yucaipa is obligated to make a capital contribution of fifty (50) percent of the face value of certain First Lien Debt holdings that it acquired within ten days of the acquisition of such debt.  Specifically, under Section 10.6(j)(iii) of the First Lien Credit Agreement,

> "(j) <u>Restricted Sponsor Affiliates</u>. …Each Lender that is a Restricted Sponsor Affiliate, upon succeeding to an interest in the Term Loans:
> …
>
> (iii) agrees further that no later than ten days after the date of such assignment or transfer of such Term Loans (or, if a Default or Event of Default occurs during such ten day period, then three Business Days after such Restricted Sponsor Affiliate has knowledge of the occurrence of such Default or Event of Default but in no event later than the last day of such ten day period), such Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k);

163.    Yucaipa acquired a total of $145,112,547.06 in First Lien Debt, $114,712,088.66 in the form of Term Loans.

164.     Yucaipa has breached the First Lien Credit Agreement by failing to make the capital contribution of not less than $57,356,044.33, required by the Third Amendment.

165.     Yucaipa's breach of the First Lien Credit Agreement, as amended by the Third Amendment has caused, and will continue to cause, substantial monetary damages to the Debtors and their creditors, in an amount to be determined at trial, but reasonably believed to be an amount not less than $57,356,044.33, plus interest.

### Sixth Claim for Relief

**Specific Performance of Third Amendment to the First Lien Credit Agreement against Yucaipa (Divestiture of Debt)**

166.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 165 as if fully set forth herein.

167.     Even after giving effect to the terms of the First Lien Credit Agreement, as amended by the Third Amendment, requiring Yucaipa to pay the requisite capital contribution of not less than $57,356,044.33, Yucaipa is still in material breach of the terms of the First Lien Credit Agreement, as amended by the Third Amendment.

168.     Yucaipa has breached the First Lien Credit Agreement by exceeding the maximum permissible limits under the First Lien Credit Agreement on the acquisition of Term Loan Exposure under Section 10.6(c) after giving effect to the mandatory capital contribution in Section 10.6(j)(iii).  Specifically, Section 10.6(c)(ii) provides, in relevant part:

> "provided further, that (x) no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would

exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

169.    Section 10.6(j)(iii) further provides that the "Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans . . . ."

170.    Under the terms of the Third Amendment, then, at most, Yucaipa would be permitted to hold no more than $25 million of the principal amount of Term Loans under the First Lien Credit Agreement.

171.    Yucaipa purports to hold $114,712,088.66 in Term Loans under First Lien Credit Agreement, which, even after reducing such amount by an award of monetary damages or conversion of such holdings into a capital contribution by $57,356,044.33, is still $32,356,044.33 greater than permitted under the First Lien Credit Agreement, as amended by the Third Amendment.

172.    Plaintiff has no adequate remedy at law for the harm that will continue to be caused by Yucaipa's continued breach of the First Lien Credit Agreement, as amended by the Third Amendment, even after Yucaipa is required to make the requisite capital contribution.

173.    Accordingly, Plaintiff is entitled to a decree of specific performance by Yucaipa of its obligations under the First Lien Credit Agreement, as amended by the Third Amendment, to, among other things, divest itself of not less than $32,356,044.33 of Term Loans under the First Lien Credit Agreement.

## Seventh Claim for Relief

### Breach of Fiduciary Duty against Yucaipa

174.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 173 as if fully set forth herein.

175.    As the controlling shareholder of Allied, Yucaipa owed Allied and, as of early 2008, its creditors, fiduciary duties of good faith, honest governance, loyalty and care.

176.    In addition to its ability to influence Allied by yielding no less than 67% of the voting power of equity, Yucaipa exercised further improper influence over Allied by entering into a consulting agreement with Allied as of May 29, 2007.  Through this "Monitoring and Management Services Agreement" ("MMSA"), Allied was induced to and did repose confidence in Yucaipa and its alleged superior knowledge and capabilities in negotiating with Allied's customers and its employees.  However, Yucaipa engaged in a self-serving campaign that extracted unnecessary and unreasonable fees from Allied and acted to ensure that Yucaipa and its interests would be served before the interests of Allied and its creditors.

177.    In violation of its fiduciary duties, Yucaipa engaged in inequitable conduct with regard to Allied and its creditors by entering into the transactions described above, whereby Yucaipa purported to seize control over the First and Second Lien Facilities with the intention of protecting its equity investment in the Debtors, while knowing that Allied was, at best, undercapitalized and insolvent.  Yucaipa further engaged in inequitable conduct through its control of the board of directors of Allied, by causing the directors to fail to even consider potential transactions that could have benefitted Allied if such transactions held even the potential of harming Yucaipa's equity interests.  Yucaipa abused its position of trust and control over the Debtors by structuring transactions that were nominally in the name of the Debtors but

were, in reality, actually structured in a manner to ensure and protect Yucaipa's existing equity investments in Allied.

178.     The Debtors and their creditors have suffered damages in an amount to be proved at trial as a result of Yucaipa's breaches of its fiduciary duties.

### Eighth Claim for Relief

### Breach of Fiduciary Duty against the Allied Directors

179.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 178 as if fully set forth herein.

180.     As members of the Board, the Allied Directors owed Allied and, as of at least early 2008, when Allied became insolvent, owed its creditors fiduciary duties of loyalty and care.

181.     The Allied Directors breached their fiduciary duty of loyalty to Allied by consciously and intentionally disregarding the responsibilities they bore to deal with Allied's debt structure in a manner that did not unduly benefit Yucaipa as Allied's primary equity holder. In abdicating their responsibilities they violated their fiduciary duties to act loyally to the corporation and in good faith.

182.     Specifically, the Allied Directors consciously and intentionally turned away from their responsibilities to Allied when they failed to ensure that Allied, and not Yucaipa, ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ In derogation of those duties, however, the Allied Directors consciously permitted Yucaipa to control the drafting of the Third Amendment and the Fourth Amendment to the First Lien Debt Facilities in a manner that attempted to ensure that Yucaipa could control the outstanding

secured debt of the company in a manner that would protect Yucaipa's interests, without regard to the interests of Allied and its creditors.

183.    Additionally, the Allied Directors consciously and intentionally failed to consider potential transactions that could have potentially greatly benefitted Allied if such transaction held even the potential of harming Yucaipa's equity interests in the Company.  In derogation of their duties to benefit the Company, not Yucaipa, the Allied Directors failed to even engage in negotiations with lenders concerning potential restructuring alternatives that could have benefitted the Company and its balance sheet, if such transactions were not likely beneficial to Yucaipa.

184.    The Allied Directors also consciously and intentionally disregarded their obligations to the corporation by repeatedly failing to make legitimate or conscientious efforts to ensure that any transactions involving the Company and Yucaipa, including the acquisition of outstanding secured debt, were in the Company's interests, not only Yucaipa's interests.  While the board of directors appointed a purported "Special Committee" of independent directors to evaluate any transaction involving Yucaipa, the committee was neither special nor independent and utterly failed in its purpose.  Indeed, the "Special Committee" never hired independent advisors, and repeatedly failed to engage in deliberations separate and apart from deliberations with the Yucaipa directors, but instead would merely meet and deliberate after presentations by and deliberations with the conflicted Yucaipa directors and the ordinary advisors to the Company, whose retention was subject to the whims of Yucaipa and its control over Allied.

185.    Additionally, the Allied Directors violated their duties of loyalty and care to the corporation by permitting and approving the payment of millions of dollars in purported fees paid to or on behalf of Yucaipa.  The Allied Directors failed to ensure that Allied received any

benefit from the millions of dollars that were scheduled to be paid to or on behalf of Yucaipa were necessary and appropriate

186.    The Allied Directors further violated their duties of care through their gross negligence of their obligation to seek information about Yucaipa's intentions once and if it acquired a majority stake in the outstanding secured debt of the Company.  This failure to act, and the approvals of the amendments to the secured debt facilities that enabled Yucaipa to seize complete control over every aspect of the Debtors' capital structure, were breaches of the Allied Directors fiduciary duties of loyalty and care.

187.    The Debtors have suffered damages in an amount to be proved at trial as a result of the Allied Directors' breach of fiduciary duties.

<p style="text-align:center;">**Ninth Claim for Relief**</p>

<p style="text-align:center;">**Aiding and Abetting Breach of Fiduciary Duty against the Allied Directors and Yucaipa**</p>

188.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 187 as if fully set forth herein.

189.    If and to the extent that any Defendant is found not to have owed a fiduciary duty to the Debtors at the time of the transactions complained of herein, each Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duty of one or more of the other Defendants who are found to have direct responsibility for the breaches of such duties.

190.    Each of the Defendants knowingly participated in or acquiesced to, benefitted from and aided and abetted the breach of fiduciary duty engaged in by the other Defendants.

191.    The Allied Directors knowingly participated in Yucaipa's breach of fiduciary duty by encouraging and approving the transactions described above which have injured the Debtors and its creditors.

192.    Yucaipa knew that the Allied Directors breached their fiduciary duties to Allied by entering into the transactions described above.  Yucaipa knowingly participated in the Allied Directors' breach by controlling and dictating the terms of the transactions that were nominally entered into by the Debtors but were at all times performed for and perpetrated by Yucaipa.

193.    As a result of the insider transactions, which the Allied Directors and Yucaipa aided and abetted, the creditors of Allied have been damaged in an amount to be proved at trial in this action.  At a minimum, the damages suffered by the Company, and thereby its creditors, include fees and interest paid to and on behalf of Yucaipa in connection with, among other things, the Third Amendment, the Fourth Amendment █████████████████ and the Georgia Litigation, through which Yucaipa received, or received the benefit of having Allied pay for, millions of dollars in fees paid by Allied.

### **Tenth Claim for Relief**

**Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 548(a) and 550**

194.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 193 as if fully set forth herein.

195.    Upon information and belief, for Yucaipa's benefit, the Debtor Allied Systems Holdings, Inc. or one of its Debtor affiliates transferred legal fees to Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") totaling not less than $2,458,549.76 (the "Kasowitz Transfers").

196.    The Kasowitz Transfers are as follows:

a)      December 23, 2009:  $19,155.09.

b)      March 8, 2010:  $100,379.58.

c)      April 13, 2010:  $38,128.38.

d)      April 16, 2010:  $13,359.04.

53

    e)      May 13, 2010:  $98,894.79.

    f)      July 26, 2010:  $101,538.66.

    g)      September 15, 2010:  $191,526.39.

    h)      September 20, 2010:  $304,033.11.

    i)      October 6, 2010:  $209,165.47.

    j)      November 2, 2010:  $360,447.42.

    k)      December 16, 2010:  $111,808.98.

    l)      December 21, 2010:  $4,897.50.

    m)      March 7, 2011:  $237,893.64.

    n)      June 30, 2011:  $100,000.00.

    o)      September 7, 2011:  $117,321.71.

    p)      October 12, 2011:  $200,000.00.

    q)      November 23, 2011:  $100,000.00.

    r)      December 9, 2011:  $75,000.00.

    s)      December 15, 2011:  $75,000.00.

197.    Upon information and belief, for Yucaipa's benefit, the Debtor Allied Systems Holdings, Inc. or one of its Debtor affiliates transferred legal fees to Latham & Watkins LLP ("Latham") totaling not less than $1,911,949.17 (the "Latham Transfers," together with the Kasowitz Transfers, the "Law Firm Transfers").

198.    The Latham Transfers are as follows:

    a)      November 19, 2007:  $13,701.44.

    b)      December 11, 2007:  $26,064.71.

    c)      December 13, 2007:  $196,295.99.

    d)       January 2, 2008:  $8,408.82.

    e)       May 2, 2008:  $18,642.50.

    f)       October 15, 2008:  $36,461.28.

    g)       December 31, 2008:  $1,280,000.00.

    h)       December 23, 2009:  $15,276.86.

    i)       December 31, 2009:  $26,961.67.

    j)       February 4, 2010:  $4,495.50.

    k)       September 23, 2010:  $33,220.53.

    l)       October 6, 2010:  $46,285.93.

    m)     December 9, 2010:  $1,235.00.

    n)      December 31, 2010:  $39,106.45.

    o)       March 11, 2011:  $26,536.16.

    p)       December 27, 2011:  $139,256.33.

199.    Additionally, since May 29, 2007, the Debtors were required to transfer an annual management services fee of $1,500,000.00 per year to Yucaipa pursuant to the MMSA, whether or not Yucaipa provided such services (the "<u>Yucaipa Transfers</u>").

200.    

collectively with the Law Firm Transfers and any Yucaipa Transfers, the "<u>Fraudulent Transfers</u>") whereby, in connection with the Fourth Amendment and the

, Yucaipa obtained ComVest's First Lien Debt holdings.

201.    The Debtors were controlled and dominated by Yucaipa on the date of each of the Fraudulent Transfers.

202.    The Debtors were controlled and dominated by Yucaipa when ███████████
███████████.

203.    Each of the Fraudulent Transfers constituted a transfer of an interest in property
of the Debtors that were made to, or for the benefit of, Yucaipa.

204.    The Debtors incurred one or more obligations that gave rise to each of the
Fraudulent Transfers, and those obligations shall be defined as the "Fraudulent Obligations."

205.    The Debtors made each of the Fraudulent Transfers and incurred the Fraudulent
Obligations with actual intent to hinder, delay, or defraud any entity to which the Debtors were
or became, on or after the date that each such Fraudulent Transfer and Fraudulent Obligation was
made, indebted.

206.    The Debtors received less than a reasonably equivalent value in exchange for each
of the Fraudulent Transfers and Fraudulent Obligations.  Moreover, each of the Fraudulent
Transfers and Fraudulent Obligations was made or incurred by the Debtors without a fair
consideration.

207.    At the time each of the Fraudulent Transfers was made and each of the Fraudulent
Obligations was incurred, the Debtors (i) were insolvent, or became insolvent as a result of each
such transfer or obligation; (ii) were engaged in business or a transaction, or were about to
engage in business or a transaction, for which the property remaining with them was an
unreasonably small amount of capital or was unreasonably small in relation to the business or
transaction; and (iii) intended to incur, or believed that it would incur, debts that would be
beyond its ability to pay as such debts matured or became due.

208.    None of the recipients of the Fraudulent Transfers or the Fraudulent Obligations
took such transfers or obligations for value and in good faith.

209.    Yucaipa was either the initial transferee of the Fraudulent Transfers, the entity for whose benefit the Fraudulent Transfers were made or an immediate or mediate transferee of the initial transferee of the Fraudulent Transfers.

210.    The Fraudulent Transfers and Fraudulent Obligations made on or within two (2) years of the "Petition Date" (May 17, 2012 for Allied and Systems and June 10, 2012 for the other Debtors) constitute transfers or obligations avoidable by Plaintiff pursuant to section 548(a) of the Bankruptcy Code and such transfers are recoverable from Yucaipa pursuant to section 550 of the Bankruptcy Code.  For the foregoing reasons, Yucaipa is liable to the Debtors for the return of these Fraudulent Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtors' estates.  Each Yucaipa Defendant is jointly and severally liable for the entire amount of each Fraudulent Transfer.

### Eleventh Claim for Relief

**Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers and Conveyances against Yucaipa Pursuant to 11 U.S.C. §§ 544(b) and 550**

211.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 210 as if fully set forth herein.

212.    At all relevant times, there has been at least one creditor – including but not limited to the members of the Committee – holding an unsecured claim against the Debtors that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

213.    Each of the Fraudulent Transfers and Fraudulent Obligations identified above was made to a creditor whose claim arose before the transfer or obligation was made, and was made to an insider for an antecedent debt.

57

214.    At the time each of the Fraudulent Transfers was made, the Debtors were insolvent and the insider receiving the Fraudulent Transfer had reasonable cause to believe that the Debtors were insolvent.

215.    The Fraudulent Transfers identified above constitute transfers and conveyances avoidable by Plaintiff pursuant to section 544(b) of the Bankruptcy Code and applicable state law[8] and such transfers are recoverable from Yucaipa pursuant to section 550 of the Bankruptcy Code.  The Fraudulent Obligations constitute obligations avoidable by Plaintiff pursuant to section 544(b) of the Bankruptcy Code and applicable state law as set forth above.  Yucaipa is liable to the Debtors for the return of these Fraudulent Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers and conveyances, plus interest from the transfer dates, and costs and fees to the extent available for the benefit of the Debtors' estates.  Each Yucaipa Defendant is jointly and severally liable for the entire amount of each Fraudulent Transfer.

## Twelfth Claim for Relief

### Preferential Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 547 and 550

216.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 215 as if fully set forth herein.

217.    As described above, Yucaipa was at all relevant times, including at the times of the Fraudulent Transfers, and still is, an insider of the Debtors.

218.    The Fraudulent Transfers that were made within one (1) year of the Petition Date (collectively, the "Preferential Transfers") were made (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt owed by the Debtors before such Preferential Transfers were

---

[8] Applicable state law may include, without limitation, Cal. Civ. Code § 3439.01 *et seq.*, Del. Code § 1301 *et seq.*, Fla. Stat. § 726.101 *et seq.*, and Ga. Code Ann. § 18-2-70 *et seq.*, and, if the Court should determine that this action is governed by the laws of other states, the applicable laws of such other states.

made, (iii) made while the Debtors were insolvent or presumed insolvent as a matter of law, and (iv) enabled such creditor would receive if (a) the case were a case under chapter 7 of the Bankruptcy Code, (b) the Preferential Transfers had not been made; and (c) such creditor received payment of such debt to the extent provided by the Bankruptcy Code.

219.    The Preferential Transfers are transfers avoidable by Plaintiff pursuant to section 547 of the Bankruptcy Code, and recoverable from Yucaipa pursuant to section 550 of the Bankruptcy Code.

220.    For the foregoing reasons, Yucaipa is liable to the Debtors for the return of the Preferential Transfers, or their value, in an amount to be determined at trial, but not less than the sum of those transfers.

<p style="text-align:center"><strong>Thirteenth Claim for Relief</strong></p>

<p style="text-align:center"><strong>Disallowance of Claim against Yucaipa</strong></p>

221.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 220 as if fully set forth herein.

222.    For Yucaipa's benefit, the Debtors transferred millions of dollars, all of which is either recoverable or avoidable pursuant to the Bankruptcy Code.

223.    By reason of the foregoing, pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow an amount, to be proven at trial, of Yucaipa's claims.

<p style="text-align:center"><strong>PRAYER FOR RELIEF</strong></p>

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order

a)      subordinating Yucaipa's claim, in total, against the Debtors to all other claims, or subordinating Yucaipa's claim, in total, against the Debtors to such other claims as the Court may deem appropriate;

b)      recharacterizing Yucaipa's claim against the Debtors under the First Lien Facility and Second Lien Facility as equity;

c)      decreeing that Yucaipa specifically perform its obligations under the First Lien Facility, as amended by the Third Amendment;

d)      entering judgment in favor of Plaintiff and Debtors for money damages due to Yucaipa's breach of the First Lien Facility not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

e)      entering judgment in favor of Plaintiff and Debtors for damages due to Yucaipa's breach of fiduciary duties in an amount not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

f)      entering judgment in favor of Plaintiff and Debtors for damages due to the Allied Directors' breach of fiduciary duties in an amount not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

g)      entering judgment in favor of Plaintiff and Debtors for damages due to Defendants' aiding and abetting breach of fiduciary duty in an amount not less than $57,356,044.33, but in an amount to be proven at trial, plus pre-judgment interest;

h)      entering judgment for Plaintiff to recover the value of the preferential and fraudulent transfers that Yucaipa caused the Debtors to make, in an amount to be proven at trial, plus pre-judgment interest;

i)      disallowing an amount to be proven at trial of Yucaipa's claim pursuant to section 502(d) of the Bankruptcy Code;

j)      awarding Plaintiff all reasonable attorneys' fees, costs and disbursements in this action; and

k)      granting such other or further relief as is just, proper and equitable.

Dated: Wilmington, Delaware
       March 14, 2013

**SULLIVAN HAZELTINE ALLINSON LLC**

_____

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
901 N. Market St., Suite 1300
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile:  (302) 428-8195

– and –

**SIDLEY AUSTIN LLP**
Michael G. Burke
Nicholas K. Lagemann
Cameron Moxley
Dennis Kao
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599

*Counsel for the Official Committee of Unsecured Creditors*