# EXHIBIT DS-5

# [LIQUIDATION ANALYSIS]

**Consolidated Hypothetical Liquidation Analysis for ASHINC. and Affiliated Debtors**

| Assets Available for Distribution | Notes | Amount of Claims | Estimated Chapter 7 Recovery | Estimated Chapter 11 Plan Recovery |
|---|---|---|---|---|
| Cash and Cash Equivalents | 1 | | $593,000.00 | $593,000.00 |
| Accounts Receivable, Net | 2 | | $639,500.00 | $1,139,500.00 |
| Other Receivables | 3 | | $1,460,283.15 | $3,677,000.00 |
| Fixed Assets, Net | 4 | | $486,750.00 | $774,625.00 |
| Equity in Non-Debtor Subsidiaries | 5 | | $1,320,000.00 | $2,640,000.00 |
| Estate Claims | 6 | | - | - |
| | | | | |
| **Estimated  Proceeds** | | | **$4,499,533.15** | **8,824,125.00** |
| | | | | |
| **Estimted Chapter 7 Expenses** | | | | |
| Chapter 7 Trustee Fees (3% of distributions) | 7 | | $252,960.00 | |
| Chapter 7 Trustee's Counsel and Other Professional Fees | 8 | | $450,000.00 | |
| Other Chapter 7 Administrative Expenses | 9 | | $50,000.00 | |
| | | | | |
| Total Estimated Chapter 7 Expenses | | | $752,960.00 | |
| | | | | |
| **Estimated Proceeds After Chapter 7 Expenses** | | | **$3,746,573.15** | **$8,824,125.00** |
| | | | | |
| **Distribution to Creditors** | | | | |
| | | | | |
| | | | | |
| Administrative & Priority Tax Claims | 10 | $4,432,000.00 | | |
| Recovery $ | | | $4,299,040.00 | $4,432,000.00 |
| Recovery % | | | 97.00% | 100.00% |
| | | | | |
| Priority Claims | 11 | $250,000.00 | | |
| Recovery $ | | | $242,500.00 | $250,000.00 |
| Recovery % | | | 97.00% | 100.00% |
| | | | | |
| First Lien Lender Claims | 12 | $244,021,526.00 | | |
| Recovery $ | | | -$4,432,466.85 | $392,125.00 |
| Recovery % | | | -1.82% | 0.16% |
| | | | | |
| Second Lien Lender Claims | 13 | $30,000,000.00 | | |
| Recovery $ | | | $0.00 | $0.00 |
| Recovery % | | | 0.00% | 0.00 |
| | | | | |
| AIG Claims | 14 | $4,382,495 | | |
| Recovery $ | | | $970,000.00 | $1,000,000.00 |
| Recovery % | | | 22.13% | 22.82% |
| | | | | |
| General Unsecured Claims | 15 | $1,742,807,202.00 | | |
| Recovery $ | | | $2,910,000.00 | $3,000,000.00 |
| Recovery % | | | 0.167% | 0.172% |
| | | | | |
| Parent Equity Interests | 16 | [] | | |
| Recovery $ | | | $0.00 | |
| Recovery % | | | 0.00% | |
| | | | | |
| Subsidiary Equity Interests | 17 | [] | | |
| Recovery $ | | | $0.00 | $0.00 |
| Recovery % | | | 0.00% | 0.00% |

## LIQUIDATION ANALYSIS FOR THE DEBTORS

### A.  Introduction and Reservation

Section 1129(a)(7) of the Bankruptcy Code, often referred to as the "Best Interests Test," requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  In order to determine whether this test has been satisfied, the Debtors must first determine the dollar amount that would be generated from the liquidation of the Debtors' assets in the context of Chapter 7 liquidation cases.  The gross amount of proceeds generated would then be reduced by the costs and expenses of administering the Chapter 7 estate (including the costs and expenses associated with the liquidation of the assets), leaving the amount available for distribution to creditors.  That amount would then be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

In connection with the Plan and Disclosure Statement, the Plan Proponents have prepared this hypothetical liquidation analysis ("Liquidation Analysis").  The Liquidation Analysis is for all of the Debtors on a consolidated basis and should be read in conjunction with the Plan and Disclosure Statement.  Estimating recoveries in any hypothetical liquidation under Chapter 7 is an uncertain process due to the number of unknown variables.  Accordingly, extensive use of estimates and assumptions has been made that, while considered reasonable by the Plan Proponents and their advisors, are inherently subject to a number of contingencies. The Plan Proponents make no representations or warranties regarding the accuracy of the estimates and assumptions used in the Liquidation Analysis or a Chapter 7 trustee's ability to achieve the forecasted results.  In the event the Debtors' Chapter 11 Cases are converted to cases under Chapter 7, actual recoveries and resulting distributions may vary substantially from the estimates and projections set forth in the Liquidation Analysis.

The Plan embodies various settlements between and among the Debtors, the Committee, the First Lien Agents and various creditors asserting Administrative Expense Claims.  These settlements resolve various disputes regarding (among others) (a) the legal entitlement of the First Lien Agents to "adequate protection" and the amount of the diminution claim (if any) the First Lien Agents have or may have under the 2012 Final DIP Order and the Replacement DIP Order, and (b) the obligation of the First Lien Agents to fund the Wind Down Budget pursuant to the terms of the JCT Sale Order.  These disputes would not be rendered moot by a conversion of the Debtors' Chapter 11 Cases to cases under Chapter 7.  As a result, this Liquidation Analysis assumes that the First Lien Agents would enter into settlements with the Chapter 7 trustee (in lieu of the Debtors and the Committee) having substantially similar terms and resulting in payments to holders of Administrative Expense Claims, Priority Claims and General Unsecured

Claims.  In addition, this Liquidation Analysis assumes that the First Lien Agents and the Chapter 7 trustee would enter into the AIG Settlement, the Central States Settlement and the Northwest Settlement.

As is evident from the Liquidation Analysis, the Plan Proponents believe that the Plan provides a superior recovery for the Holders of Claims, and the Plan meets the requirements of the Best Interests Test. Because the majority of the Debtors' assets have already been liquidated, the value of such assets and the Cash available for distribution has already been determined (subject to the continued use of Cash Collateral to fund the wind down of the Debtors' estates). Thus, the principal difference between the recoveries to be received by holders of Allowed Claims in the Chapter 11 Cases versus a Chapter 7 relates to (a) the incremental costs associated with a conversion of the Chapter 11 Cases and the administration of the Chapter 7 Cases, and (b) lower anticipated values for assets yet to be sold or recovered.  Conversion of the Chapter 11 Cases to Chapter 7 cases would require the appointment of a Chapter 7 trustee, and in turn, such Chapter 7 trustee would likely retain new professionals.  The "learning curve" that the trustee and new professionals would face comes at a significant cost to the Estates and with a significant delay compared to the Plan (and prosecution of the Estate Claims).  Further, a Chapter 7 trustee would be entitled to fees of up to 3% of the total amount distributed to creditors, degrading further creditor recoveries.

As a result, the Plan Proponents believe that holders of Claims in all Impaired Classes will recover less if the Debtors' cases were converted to Chapter 7 cases.  Accordingly, the Plan Proponents believe the Plan satisfies the "Best Interests Test" requirements of Bankruptcy Code Section 1129.

## B.  General Assumptions

The Liquidation Analysis reflects estimates of the proceeds that might be realized through the liquidation of the Debtors in accordance with Chapter 7 of the Bankruptcy Code.  A general summary of the assumptions used in preparing this Liquidation Analysis follows.

This Liquidation Analysis is based on the estimated and unaudited book values of the Debtors' assets as of May 31, 2015, unless otherwise indicated.  The book values used to prepare the Liquidation Analysis have not been subject to review, compilation, or audit by an independent accounting firm.

The Liquidation Analysis has been prepared assuming the Debtors' Chapter 11 Cases convert to proceedings under Chapter 7 on July 24, 2015.  Thereafter, a Chapter 7 trustee would be appointed or elected to liquidate all of the Debtors' remaining assets.    The liquidation is assumed to occur over a 12 month period (the "Liquidation Period").  There can be no assurance that the liquidation would be completed in this time frame nor is there any assurance that the

recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interests of the parties-in-interest. Depending on actual circumstances, the liquidation period could be significantly longer, in which event, wind-down costs would increase and recoveries would likely decrease.

### C. Notes to Liquidation Analysis

1. <u>Cash and Cash Equivalents</u> – The Liquidation Analysis assumes no further cash would be generated during the Chapter 7 cases. It is assumed that the cash balance of the Debtors' bank and operating accounts as of May 31, 2015, will be fully recoverable, less outstanding checks and projected account fees and/or charges.

2. <u>Accounts Receivable, Net</u> – Accounts Receivable consist primarily of past-due rent from sublessees and trade accounts payables, each of which is subject to pending litigation. The Debtors' largest account receivable is owed by Plaza Automall, Ltd under a defaulted sublease. The Debtors have filed suit against Plaza Automall, Ltd. to collect the past due rent, asserting damages in the amount of $1,664,740.02. The litigation is pending in the United States District Court for the Southern District of New York under Case No. 1:14-cv-04648, and the parties are currently engaged in discovery.

3. <u>Other Receivables</u> – Other Receivables consist primarily of cash collateral and letters of credit in excess of liabilities for the Debtors' self-insured workers compensation plans. Currently, cash collateral in the amount of $1,810,000 and $3,780,525 is held by the Georgia Self-Insurers Guaranty Trust Fund and the State of Kentucky, respectively, to secure ASLTD's self-insured retention payment obligations under the respective policies. Based on prior loss portfolio transfer valuations, a net recovery under both the Georgia and Kentucky policies is estimated at 15% (Chapter 7) and 45% (Plan) of the current cash collateral value (net of anticipated expenses associated with maintaining the plans). The Debtors believe it will take several years for these programs to be wound down and it is unlikely that any significant value will be realized in the Liquidation Period. Additionally, Great American Insurance Corporation currently holds cash collateral totaling $1,100,000 to secure bonds issued to governmental agencies and freight brokers to guaranty payment of transportation-related obligations of the Debtors, such as tolls and customs charges. Great American Insurance Corporation has agreed to release approximately $379,704.40 of cash collateral, but will continue to hold $720,295.60 pending discharge of outstanding bonds in the penal sum of $626,344.00 and payment of related attorneys' fees. Finally, the Debtors anticipate receiving approximately $242,000

being held by SunTrust Bank under an escrow agreement set to expire on March 15, 2016, that is not subject to any pending claims.

4. <u>Fixed Assets, Net</u> - Net Fixed Assets consists of real property and related improvements, equipment, office furniture and fixtures, and leasehold improvements.  The Debtors own three parcels of improved real estate located in Memphis, Tennessee; Columbia, South Carolina; and Soldotna, Alaska.  The liquidation recovery for these parcels is based on information currently available to the Debtors' management, including without limitation, purchase offers for the Tennessee and South Carolina parcels dated December 10, 2014, and November 7, 2014, respectively.  Based on time elapsed since the purchase offers, the potential need to enlist real estate brokers to market the property should the previous purchase offers not materialize, and the general real estate market of the respective locations, liquidation discounts ranging from 40% to 50% were applied to the purchase offers (net of anticipated expenses associated with the sale of these properties). The Alaska property is currently subject to a potential adverse possession claim from an adjacent property owner and, as a result, any sale of the property would require litigation to resolve the Debtors' ownership rights.  Accordingly, the Debtors have not associated any liquidation or Plan value to the Alaska parcel.

5. <u>Equity in Non-Debtor Subsidiaries</u> – Haul Insurance Limited, a Cayman-domiciled captive insurance company, is a wholly-owned subsidiary of ASHINC Corporation.  Haul ceased writing new business in 2010, and has three insurance programs remaining:  (i) the Reliance workers' compensation program, which covers the periods from 3/1/1991 to 4/1/1995 and from 1/1/1996 to 1/1/2000, with deductibles of $500,000 from 1991 through 1996, and then $650,000 from 1997 onward; (ii) the Royal & Sun Alliance ("RSA") Canadian auto liability program covering from 1/1/1996 to 1/1/2002; and (iii) the AIG Canada Canadian auto liability program covering a $500,000 deductible from 1/1/2002 to 1/1/2010.  Reliance, which itself is in liquidation, is holding $6,682,673 to secure actuarially estimated liabilities of $5,335,105. The Debtors anticipate that it would take approximately 4-5 years to run-out the remaining claims. There are no open claims in the RSA program and RSA is holding no collateral.  All that remains under the program are claims payments in the amount of C$457,482 advanced by RSA for which it is seeking reimbursement; the Debtors have a settlement in principle to resolve the payable in return for a one-time payment of $275,000.  AIG Canada is holding $1,928,206 in collateral to secure actuarially estimated liabilities of $172,442.  In addition, AIG is entitled to reimbursement for claims payments in excess of $735,000 made on Haul's behalf.  In addition, the Debtors' ability to realize any value on account of its equity interest in Haul is subject to the approval of the Cayman Island Monetary Authority, whose approval is required before Haul can distribute any funds to or for the

benefit of its parent company.    There can be no assurance when, or if, such approval might be obtained.  The estimated recovery for Haul under the Chapter 7 and Chapter 11 scenarios is based upon information currently available to the Debtors, and the assumption that the value realized for Haul in a Chapter 7 would be significantly reduced by the constraint of the Liquidation Period.

6.   <u>Estate Claims</u> – Estate Claims consist of any and all claims of the Debtors' Estates asserted in the Amended Complaint and any additional claims of the Debtors' Estates arising out of or related to the facts and circumstances described therein.  Under the Plan the Estate Claims will be jointly prosecuted along with the Lender Direct Claims by the Litigation Trustee, in consultation with the Litigation Oversight Committee.  Funding for the prosecution of the Estate Claims and the Lender Direct Claims shall be provided through the Litigation Funding Loans issued by the Litigation Lenders.  Any proceeds resulting from the prosecution of the Estate Claims will be distributed pursuant to the Litigation Proceeds Waterfall, as more fully described on pages 21-22 of the Plan.  The Plan Proponents believe that in a Chapter 7 liquidation, to resolve issues related to the First Lien Agents' adequate protection claims and the wind-down budget required under the JCT Sale Order, the Litigation Lenders would enter into a similar arrangement with the Chapter 7 trustee to fund prosecution of the Estate Claims with a similar Litigation Proceeds Waterfall as provided in the Plan.  Thus, expected recoveries and distributions on Estate Claims under either the Plan or Chapter 7 is assumed to be the same, except that additional expenses for the Chapter 7 trustee fees would be incurred in Chapter 7. Because the value of the Estate Claims is difficult to quantify, and because the expected recoveries and distributions are assumed to be the same under either the Plan or Chapter 7, the Liquidation Analysis does not analyze the specific amounts that will be recovered and distributed in each case.

7.   <u>Chapter 7 Trustee Fees</u> – These include fees payable to a Chapter 7 trustee pursuant to Section 326 of the Bankruptcy Code. The Liquidation Analysis assumes trustee fees equal to 3% of the total value of the Cash and/or assets distributed.  The fee is deducted from the estimated distributions in Chapter 7 to each class of claims shown on the Liquidation Analysis.

8.   <u>Chapter 7 Trustee's Counsel and Professional Fees</u> – During the liquidation period, it will be necessary for the Chapter 7 trustee to employ the services of various professionals to carry out the liquidation of estate assets, including but not limited to counsel to the Chapter 7 trustee, accountants, financial advisors, and real estate brokers. The trustee, and any professionals retained by the trustee, would undoubtedly require time to become familiar with the Debtors' assets and any attendant issues, thereby resulting in a "learning

curve" and associated costs to the Debtors' Estates.    Compensation for these professionals is estimated to be approximately $450,000.

9.  <u>Other Chapter 7 Administrative Expenses</u> – These include various wind-down and overhead expenses likely to be incurred during the Liquidation Period.    Significant liquidation activities would include, but are not limited to:  (i) the sale of the Debtors' real property and improvements located in Alaska, South Carolina, and Tennessee, (ii) collection of accounts receivable; (iii) administration and wind-down of the Debtors' various insurance programs; and (iv) closing of books and records and filing final tax returns.  The wind-down costs include estimated wages for an employee of the Debtors and general overhead costs.

10.  <u>Administrative & Priority Tax Claims</u> – These include, without limitation, fees and expenses incurred by the Debtors' retained professionals prior to conversion of the Debtors' Chapter 11 Cases, obligations owing to various taxing authorities or other claimants and entitled to priority under Bankruptcy Code Section 507 or 503, as well as amounts payable under the Northwest Settlement and Central States Settlement.  The Debtors have assumed that, in accordance with the settlements reached by the Debtors, the Committee and the First Lien Agents relating to, among other things, the obligation of the First Lien Agents to fund the Wind Down Budget under the JCT Sale Order, the payments to these creditors would be the same in a Chapter 7 liquidation as are being proposed under the Plan (other than the 3% fee for the Chapter 7 trustee).

11.  <u>Priority Claims</u> – These include Allowed Claims entitled to priority under Bankruptcy Code Section 507(a), other than Administrative and Priority Tax Claims, and include without limitation accrued and unpaid wages and benefits owing to any current or former employees of the Debtors. The Debtors have assumed that, in accordance with the settlements reached by the Debtors, the Committee and the First Lien Agents relating to, among other things, the obligation of the First Lien Agents to fund the Wind Down Budget under the JCT Sale Order, the payments to these creditors would be the same in a Chapter 7 liquidation as are being proposed under the Plan (other than the 3% fee for the Chapter 7 trustee).

12.  <u>First Lien Lender Claims</u> – The Liquidation Analysis assumes that the First Lien Lenders receive the proceeds from the sale of the Debtors' remaining parcels of real property in Alaska, South Carolina and Tennessee, as well as any excess collateral recovered under the Debtors' self-insured workers' compensation plans.  The Liquidation Analysis does not include any proceeds from any prior sale of the Debtors' assets that were distributed to the First Lien Agents.

13. <u>Second Lien Lender Claims</u> – The Liquidation Analysis assumes no recovery for any holder of Second Lien Lender Claims by virtue of the enforcement by the First Lien Agents of the Intercreditor Agreement.

14. <u>AIG Claims</u> – As a condition to AIG's renewal of certain U.S. and Canadian insurance policies effective January 1, 2013, the Debtors were required to assume the U.S. Insurance Program and the Canadian Insurance Program (as defined in the Plan).  As a result of that assumption, AIG alleges that it holds an administrative claim for, among other things:  (i) any amounts needed to satisfy the Debtors deductible obligations under its U.S. auto liability policies ($1 million/claim from 2006-2011, and $250,000/claim for 2012 & 2013) and Canadian auto and garage liability policies ($250,000), against which AIG is holding $6,381,880; (ii) reimbursement for any claims payments advanced by AIG in connection with the Debtors' self-insured workers' compensation programs in Missouri, Ohio, Florida, and Georgia; and (iii) premium adjustments of $1,141,000 for the policy period January 1, 2012 through December 31, 2012, and $93,624 for policy period January 1, 2013 through December 28, 2013.  AIG's estimate of the total value of these claims is $10,764,325, leaving an administrative claim of $4,382,495 after the collateral is applied.  AIG has agreed to settle its administrative claim for $1,000,000 under the Plan, as reflected in the estimated distribution on the claim.  The Liquidation Analysis assumes that this claim will be paid in Chapter 7 pursuant to the AIG Settlement.

15. <u>General Unsecured Claims</u> – These include claims scheduled by or filed against the Debtors.  No attempt has been made to estimate potential additional general unsecured claims that may arise as a result of the cessation of the Debtors' operations, including, without limitation, the rejection of any remaining executory contracts and/or real property leases or the failure of the Debtors to perform under any other agreements.  Under the Plan, holders of Allowed General Unsecured Claims would receive a Pro Rata share of (a) the GUC Cash Distribution and (b) the beneficial interests of the Allied Litigation Trust, resulting in funds totaling at least $3,000,000 that would be distributable to such claimants.  The GUC Cash Distribution, the Litigation Funding Loans, and the beneficial interests in the Allied Litigation Trust given to General Unsecured Creditors are part of a global settlement, reflected in the terms of the Plan, between the First Lien Agents, the Committee, and the Debtors related to disputes surrounding the First Lien Agents' adequate protection claims and the Wind Down Budget.  The Plan Proponents believe these issues would remain in a Chapter 7 and that a similar settlement would be executed with a Chapter 7 trustee to resolve such issues.  Accordingly, the Liquidation Analysis assumes that General Unsecured Creditors would receive the GUC Cash Distribution in

Chapter 7, less the 3% Chapter 7 trustee fees.  As stated in note 6, distributions on beneficial interests in the Allied Litigation Trust would also be the same in both a Chapter 7 and under the Plan, except that distributions would be reduced in a Chapter 7 on account of Chapter 7 trustee fees.

16. <u>Parent Equity Interests</u> – Will neither receive nor retain any property under the Plan (other than the Subsidiary Equity Interests) or in a Chapter 7 liquidation.

17. <u>Subsidiary Equity Interests</u> – Will neither receive nor retain any property under the Plan or in a Chapter 7 liquidation.